DANIELLE M. HOLT
(Nevada Bar No. 13152)
DE CASTROVERDE LAW GROUP
1149 S Maryland Pkwy
Las Vegas, NV 89104
Ph (702) 222-9999
Fax (702) 383-8741
danielle@decastroverdelaw.com

JESSICA L. BLOME
(Cal. Bar No. 314898, pro hac vice application forthcoming)
ALEXANDRA J. MONSON
(Cal. Bar No. 324794, pro hac vice application forthcoming)
GREENFIRE LAW, PC
P.O. Box 8055
Berkeley, CA 94707
(510) 900-9502
jblome@greenfirelaw.com
amonson@greenfirelaw.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| CANA FOUNDATION, a non-profit corporation, LAURA LEIGH, individually, and WILD HORSE EDUCATION, a non-profit corporation, | CASE NO. |
| Plaintiffs, | **PLAINTIFFS' COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| v. | |
| UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and JON RABY, Nevada State Director of the Bureau of Land Management, | |
| Defendants. | |

1.      Plaintiffs respectfully bring this case to challenge a decision by the United States Department of Interior, Bureau of Land Management (BLM) to remove wild, free-roaming horses and burros from Herd Management Areas in violation of the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. § 1331, et seq., which, as implemented through federal regulations, requires that such plans be carried out pursuant to a Herd Management Area Plan, or "HMAP." *See* 43 C.F.R. § 4710.4. The BLM has not yet adopted an HMAP for the area in question. Nonetheless, beginning on August 1, 2022, BLM plans to gather and remove hundreds of horses and burros by helicopter in the Blue Wing Complex of Herd Management Areas, located in Nevada, with the stated goal of removing approximately 1,000 animals from the land. The BLM developed its plan to remove these wild horses and burros in violation of the Wild Free-Roaming Horses and Burros Act, which, through its regulations, requires that such plans be carried out pursuant to an HMAP. 43 C.F.R. § 4710.4. An HMAP does not yet exist for the Blue Wing Complex or any of its Herd Management Areas. The BLM's gather plan was finalized in 2017 and BLM's decision to conduct a 2022 gather of wild horses and burros pursuant to that plan also violates the mandate that BLM immediately remove excess animals based on current information. 16 U.S.C. § 1333(b)(2). Plaintiffs file this Complaint for Injunctive and Declaratory Relief (Complaint) to prevent the BLM from implementing further herd management activities until Defendants have complied with the Wild Free-Roaming Horses and Burros Act, National Environmental Policy Act (NEPA), and Administrative Procedure Act (APA).

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action pursuant to 5 U.S.C. § 706, 28 U.S.C § 1331, and 28 U.S.C. § 1361.

3.      Venue is proper in this district court pursuant to 28. U.S.C. § 1391. The BLM has sufficient contacts to subject it to personal jurisdiction in this district.

## THE PARTIES

4.      Plaintiff CANA FOUNDATION is a non-profit corporation that works with science-backed information to create rewilding initiatives for wild horses and environments.

CANA Foundation's principal place of business is at 6150 Northern Boulevard, East Norwich, N.Y., 11732. CANA Foundation's rewilding initiatives foster community empowerment, land conservation, and the sustainable management and preservation of America's wild horse populations. CANA Foundation rescues, re-wilds, and re-homes wild horses in order to improve their quality of life and ensure that they can live with dignity in protected habitats. CANA Foundation actively monitors for any Herd Management Area Plans that are available for public comment in the United States and routinely submits comments throughout the public commenting process. The Blue Wing Complex is one of the wild horse herds that CANA Foundation monitors and advocates for. The further gathering and removal of wild horses and burros in the Blue Wing Complex due to the challenged actions will adversely affect the substantial recreational, aesthetic, scientific, and conservational interests of CANA Foundation and its staff, volunteers, members, and supporters.

5.      Defendants' failure to comply with the requirements of the Wild Free-Roaming Horses and Burros Act injured the CANA Foundation because Defendants' failure to prepare the required HMAP thwarted their organizational mission to advance rewilding as an alternative management strategy for wild horses and burros. Because the BLM failed to prepare an HMAP (and refused to entertain comments it considered outside the scope of its NEPA review that would have been appropriate in the context of an HMAP review), the CANA Foundation has been and continues to be injured by Defendants' violations of the law.

6.      Plaintiff WILD HORSE EDUCATION is a national non-profit corporation dedicated to research, journalism, and public education concerning the activities and operations of federal and state management of the free-roaming wild horse and burro populations. Wild Horse Education's principal place of business is 216 Lemmon Drive, # 316, Reno, N.V., 89506. Wild Horse Education has more than 150,000 members and educates and informs the public about wild horses and burros through articles, photographs, videos, and sharing data and other information. Wild Horse Education also frequently submits comments on Herd Management Area Plans, Environmental Assessments, and other wild horse management documents and hearings made

available for public comment. Advocating for the wild horses and burros in the Blue Wing Complex is a past, present, and future important issue for Wild Horse Education. Wild Horse Education attended Bureau of Land Management's public tour of the Blue Wing Complex in March 2016 and actively participated in the public commenting process of the Environmental Assessment for the Blue Wing Complex Gather Plan, which was finalized on October 23, 2017. Wild Horse Education has actively participated in the review of wild horse and burro management and gather plans, and their members and supporters regularly attend and observe wild horse and burro roundups, removals, and holding pens. The further gathering and removal of wild horses and burros in the Blue Wing Complex due to the challenged actions will adversely affect the substantial recreational, aesthetic, and conservational interests of Wild Horse Education and its staff, volunteers, members, and supporters.

7.     Plaintiff LAURA LEIGH is the Founder and President of Plaintiff WILD HORSE EDUCATION. In addition, Ms. Leigh works with multiple non-profit organizations engaged in public land issues and provides in-field documentation and commentary on public land issues such as wild horse and burro gathers and removals. Ms. Leigh is also a free-lance photojournalist, whose work has appeared internationally in media broadcast outlets, such as CNN, BBC/ITV, ABC, Common Dreams, and CounterPunch. Ms. Leigh has visited, observed, and photographed the wild horses and burros at the Blue Wing Complex at least once a year since 2009. Ms. Leigh experiences great enjoyment from watching and monitoring individual horses and burros in the Blue Wing Complex. Of particular interest, Ms. Leigh commonly seeks out and photographs paint burros at the Blue Wing Complex as this is one of the only areas where there are wild paint burros. Ms. Leigh has also attended several wild horse and burro roundups throughout the United States, and frequently reviews photographs and videos from any roundups she is not able to attend in person. When Ms. Leigh recognizes individual horses and burros that she has previously observed as wild, free-roaming horses and burros, she experiences great sadness, but feels it is her responsibility to the animals to observe their treatment and capture and share it with others to educate them on the plight of wild horses and burros. The further gathering and removal of wild horses and burros in

the Blue Wing Complex due to the challenged actions will adversely affect the substantial recreational, aesthetic, and conservational interests of Ms. Leigh.

8.     CANA Foundation and Wild Horse Education (collectively, the Nonprofit Plaintiffs) and their members, supporters, and staff have a long-standing interest in wild, free-roaming horses and burros and routinely advocate for wild horses and burros in Nevada. If they had been given the opportunity, Nonprofit Plaintiffs would have submitted comments to the Bureau of Land Management regarding a Herd Management Area Plan for the Blue Wing Complex.

9.     Wild Horse Education's members, supporters, and staff visit the Blue Wing Complex for photography, observing wildlife, and other recreational and professional pursuits. Nonprofit Plaintiffs' members, supporters, and staff gain aesthetic enjoyment from observing, attempting to observe, hearing, seeing evidence of, and studying wild horses and burros. The opportunity to possibly view wild horses and burros, or signs of them, in these areas is of significant interest and value to Nonprofit Plaintiffs' members, supporters, and staff, and increases their use and enjoyment of Nevada's public lands. Nonprofit Plaintiffs' members, supporters, and staff have engaged in these activities in the past and have specific plans to do so again in the future.

10.     Nonprofit Plaintiffs' members and supporters are adversely impacted by the gathering and removal of wild horses and burros from the Blue Wing Complex. Nonprofit Plaintiffs' members also have an interest in the health and humane treatment of animals, and work to rehabilitate sick and injured wildlife, including horses and burros. Nonprofit Plaintiffs' members, staff, volunteers, and supporters have engaged in these activities in the past and intend to do so again soon.

11.     Nonprofit Plaintiffs, as well as their members, supporters, and staff, are dedicated to ensuring the long-term survival of the wild, free-roaming horses and burros throughout the contiguous United States, and specifically in Nevada, and to ensuring that Defendants comply with all applicable state and federal laws related to the survival and humane treatment of wild horses and burros in Nevada. In furtherance of these interests, Nonprofit Plaintiffs' members, supporters,

and staff have worked, and continue to work, to protect and advocate for wild horses and burros in Nevada and throughout the contiguous United States.

12.     The interests of Nonprofit Plaintiffs' members, supporters, and staff have been, and will continue to be, injured by Defendants' improper and inhumane gather and removal of wild horses and burros in the Blue Wing Complex. The interests of Nonprofit Plaintiffs' members, supporters, and staff have been, and will continue to be, injured by Defendants' failure to comply with their obligations under the Wild Free-Roaming Horses and Burros Act (Wild Horse Act), National Environmental Policy (NEPA), and Administrative Procedure Act (APA) in gathering and removing wild, free-roaming horses and burros in gruesome and inhumane ways in the Blue Wing Complex without a Herd Management Area Plan.

13.     The injunctive relief requested provides the only remedy that can redress the injuries of Nonprofit Plaintiffs, including of their members, supporters, volunteers, and staff. The relief requested by Plaintiffs, if granted, would require Defendants to comply with the requirements of the Wild Horse Act, NEPA, and APA before further gathering and removing wild, free-roaming horses and burros from the Blue Wing Complex. The relief requested by Plaintiffs, if granted, would reduce the number of wild, free-roaming horses and burros needlessly injured, killed, or removed by Defendants.

14.     Defendant JON RABY is Nevada State Director of the BLM, and is charged by federal statute with managing, administering, and protecting the wild horses and burros in the State of Nevada, including the Blue Wing Complex, pursuant to the Wild Horse Act.

15.     Defendant DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGE-MENT is charged by federal statute to manage administer and protect the wild horses and burros in the State of Nevada, including the Blue Wing Complex, pursuant to the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. §§ 1331-1340.

## GENERAL ALLEGATIONS OF FACTS

**A.  Wild Free-Roaming Horses and Burros Act**

16.     Finding that "wild free-roaming horses and burros are living symbols of the historic

and pioneer spirit of the West," and that "they contribute to the diversity of life forms within the Nation and enrich the lives of the American people," Congress enacted the Wild Free-Roaming Horses and Burros Act (Wild Horse Act) to ensure that "wild-free roaming horses and burros shall be protected from capture, branding, harassment, [and] death," and will "be considered in the area where presently found, as an integral part of the natural system of the public lands." 16 U.S.C. § 1331.

17.     "Wild free-roaming horses and burros" are defined under the Wild Horse Act as "all unbranded and unclaimed horses and burros on public lands of the United States," which include lands "administered by the Secretary of the Interior through the Bureau of Land Management or by the Secretary of Agriculture through the Forest Service." *Id*. §§ 1332(b), (e); *see also* 36 C.F.R. § 222.60(b)(13).

18.     The Wild Horse Act directs the Secretary of the Interior to "manage wild free-roaming horses and burros as components of the public lands ... in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1331. To further ensure this objective, the statute provides that "[a]ll management activities shall be at the minimal feasible level." 16 U.S.C. § 1333(a).

19.     The Wild Horse Act also gives the Secretary the ability to remove "excess" wild free-roaming horses and burros from the public range. "[E]xcess animals" are defined in the statute as wild free-roaming horses and burros "which must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area."  16 U.S.C. § 1332(f).

20.     The Secretary must first make a determination that 1) an overpopulation of animals exists and 2) that action is necessary to remove excess animals, before immediately removing the excess animals. 16 U.S.C. § 1333(b)(2). The Secretary must determine both of those requirements on the basis of the current inventory of lands, information contained in any land use planning documents, information contained in court ordered environmental impact statements, and any additional information currently available to him/her. *Id*.

21.    A wild horse gather plan violates the immediate removal mandate of the Wild Horse Act when it permits the removal of excess animals up to ten years from its promulgation. *Friends of Animals v. Culver*, No. 19-3506 (D.D.C. Jun. 28, 2022).

22.    Excess horses must be "humanely captured and removed" per the Wild Horse Act's mandates. 16 U.S.C § 1333(b)(2)(B).

23.    "[H]umane treatment" is defined as "handling compatible with animal husbandry practices accepted in the veterinary community, without causing unnecessary stress or suffering to a wild horse or burro." 43 C.F.R. § 4700.0-5(e). "Inhumane treatment" is defined as "any intentional or negligent action or failure to act that causes stress, injury, or undue suffering to a wild horse or burro and is not compatible with animal husbandry practices accepted in the veterinary community." 43 C.F.R. § 4700.0-5(f).

24.    The Secretary delegated responsibility to administer the Wild Horse Act to the BLM. 43 C.F.R. § 4700.0-3.

25.    The BLM's regulations require that the Secretary establish Herd Management Areas for the maintenance of wild horse and burro herds. 43 C.F.R. § 4710.3-1. In delineating each herd management area, the BLM must consider the appropriate management level for the herd, the habitat requirements of the animals, the relationships with other uses of the public and adjacent private lands, and the constraints contained in § 4710.4, which limits management of wild horses and burros to "the minimum level necessary to attain the objective identified in approved land use plans and herd management area plans." 43 C.F.R. § 4710.4.

26.    Once a Herd Management Area is established, the BLM "*shall* prepare a herd management area plan, which may cover one or more herd management areas." 43 C.F.R. § 4710.4 (emphasis added).

27.    The Herd Management Area Plans assist the BLM in meeting the regulatory policy requirements to manage wild horses and burros "in balance with other uses and the productive capacity of their habitat" and to ensure that wild horses and burros are "considered comparably with other resource values[.]" 43 C.F.R. §§ 4700.0-6(a)-(b).

28.     A Herd Management Area Plan is the only wild horse and burro management document that is expressly identified and required by the Wild Horse Act regulations.

29.     The BLM implements its regulations through a policy document referred to as the "Wild Horses and Burros Management Handbook H-4700-1," (BLM Handbook).

30.     The BLM Handbook is not an agency rule; it was not subject to notice and comment rulemaking and does not have the force and effect of law, like the Wild Horse Act and BLM Regulations. The BLM Handbook is a policy document that presents guidance to BLM staff for implementing BLM's statutory and regulatory obligations in a uniform matter.

31.     Nevertheless, the BLM Handbook mirrors the BLM Regulations and requires that all wild horse herd management activities be carried out "at the minimum feasible level of management necessary to attain the objectives identified in approved land use plans (LUPs) *and* Herd Management Area Plans (HMAPs)." BLM Handbook, Chap. 1, p. 6 (emphasis added).

32.     Nothing in the BLM Handbook gives BLM authority to ignore its statutory and regulatory mandate to conduct herd management activities in a way that maintains the minimum feasible level required pursuant to a LUP *and* HMAP. *See* 43 C.F.R. § 4710.4 ("Management shall be at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans.")

33.     The BLM Handbook goes on to clarify that HMAPs, rather than LUPs, must be used to identify and document habitat and population management and monitoring objectives for specific complexes of HMAs. *Id.* at Chap. 2, p. 10. In fact, the BLM Handbook dictates that HMAPs must tier to and be in conformance with applicable LUPs. *Id.*

34.     To achieve statutory goals, HMAPs must also include a plan for monitoring and evaluating management actions and decisions and require the collection of data/information necessary to evaluate the effectiveness of those decisions. *Id.* at Chap. 6.2, p. 43. The BLM Handbook further emphasizes that "[a]s required in 43 C.F.R. § 4710.4, management shall be at the minimum level necessary to attain the objectives identified in approved LUPs and HMAPs." *Id.*

35.     Importantly, in evaluating and selecting the wild horse management plan authorized by an HMAP, the BLM must consider a range of alternatives, including taking no action. *Id.* at p. 38.  The BLM Handbook provides the example of "consider[ing] differing gather seasons or methods, various tools to slow population growth, or various habitat tools, projects, or techniques" as possible considerations for an alternatives analysis. *Id.* The alternative management strategies identified in an HMAP are intended to be broader and more long-term than just single and one-time management tools, projects, or methods.

36.     HMAPs may be prepared for a single HMA or a complex of adjacent HMAs where animal interchange occurs and must "identify and set objectives for [wild horse and burro] herds and their habitat." *Id.* at Chap. 6, p. 11, 36.

37.     Habitat management and monitoring consists of analyzing the forage, water, cover, and space available for wild horses. *Id.* at Chap. 3, p. 12-13.

38.     Examples of habitat management projects include seeding, emergency fire rehabilitation, constructing and maintaining fencing, rewilding, and water developments. *Id.* at p. 13-15. Examples of population control methods include gathers and removals, fertility control, and adjusting male/female sex ratios. *Id.* at p. 23-17.

39.     The BLM makes clear that the public participation process for an HMAP involves public review and comment to allow for public scoping of the key issues identified and the range of alternatives to be considered in the HMAP. *Id.* at p. 37.

40.     Figure 6.1 of the BLM Handbook demonstrates the separate and important decision-making process undertaken by agency officials when developing required HMAPs,



Figure 6.1
Overview of the HMAP Analysis and Decision Process

including public participation. *See* BLM Handbook, Figure 6.1, p. 36.

41.    During HMAP development, herd-specific and habitat-specific information and concerns may be raised during public participation. For example, the public could submit information and data regarding the foaling season of the particular herd or local weather conditions that effect the range and horse movement during certain months. BLM would then be required to consider and address these site-specific concerns in the HMAP and any management actions that result from the HMAP would be in conformance with these considerations. This leads to more tailored and humane management actions.

42.    In the few HMAPs that BLM has developed, the HMAP affirms that BLM uses the HMAP to attain the mandate in the Wild Horse Act to establish a "thriving ecological balance" between and among wild horses, burros, and their habitat.

43.    The BLM has identified no other mechanism to attain the goals specific to the Wild Horse Act, including ensuring the humane treatment and, if necessary, capture of wild horses.

**B.  National Environmental Policy Act**

44.    A second statute, NEPA, 42 U.S.C. § 4321 et seq., governs decisions by the BLM to gather horses. NEPA requires federal agencies to take a "hard look" at the environmental

consequences before carrying out federal actions. *Marsh v. Or. Nat. Res. Council,* 490 U.S. 360, 373-74 (1989).

45.     NEPA serves the dual purpose of, first, informing agency decisionmakers of the significant environmental effects of proposed major federal actions and, second, ensuring that relevant information is made available to the public so that it "may also play a role in both the decision-making process and the implementation of that decision." *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

46.     To meet these goals, NEPA requires a comprehensive Environmental Impact Statement (EIS) for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.3.

47.     To determine whether a proposed action will have significant effects, an agency may prepare an Environmental Assessment (EA). 40 C.F.R. § 1501.54. An EA is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS].'" *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004) (quoting 40 C.F.R. § 1508.9(a)).

48.     Unlike the Wild Horse Act, NEPA does not impose any substantive obligations upon an agency but requires that an agency take a "hard look" at the environmental consequences of its decision-making. *Robertson*, 490 U.S. at 350.

49.     If in its EA the agency finds that the proposed action will not significantly affect the human environment, it may issue a finding of no significant impact (FONSI) in lieu of an EIS. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005) (citing 40 C.F.R. § 1508.9(a)(1)); *see also* 40 C.F.R. § 1501.6(e).

50.     A FONSI "briefly present[s] the reasons why an action … will not have a significant effect on the human environment and for which an [EIS] therefore will not be prepared." 40 C.F.R. § 1508.1(1).

51.     When preparing an EA, agencies are only required to conduct brief discussions of reasonably feasible alternatives that are reasonably related to the purpose of the project. *See*

*Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004). Agencies need not "consider alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area." *Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1180 (9th Cir. 1990) (citing *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982)).

52.     Critically, an agency's "obligation to consider alternatives under an EA is a lesser one than under an EIS," and so long as "'reasonable alternatives' have been considered," there is no "minimum number of alternatives that an agency must consider." *Native Ecosystems Council*, 428 F.3d at 1246 (finding sufficient the consideration of two alternatives including the no-action alternative).

53.     According to the BLM Handbook, if the BLM decides to implement the objectives of an HMAP by removing excess wild horses, it must prepare an environmental assessment to comply with NEPA for that specific gather plan. BLM Handbook, at p. 27-28; *see id.* at Chap. 7, p. 48 (the environmental analysis for gather plans should tier to HMAPs). (A gather plan that has gone through the NEPA process will be referred to as a "Gather-EA" throughout this Complaint.)

54.     BLM has determined that under NEPA, Gather-EAs are not required to solicit public scoping comments and are limited in scope to analyzing the proposed action's effect on the human environment.

55.     Because the broad management of wild horses under an HMAP is also a federal action that may significantly affect the human environment, the BLM may prepare an HMAP-EA that analyzes herd management and the environmental impacts associated with a range of alternative herd management strategies for the herd and its habitat. *Id.* at Chap. 6, p. 38. (A finalized HMAP that has gone through the NEPA process will be referred to as an "HMAP-EA" throughout this Complaint.)

56.     Though the NEPA process may be used to analyze the HMAP's potential impacts to the human environment, the NEPA process is one discreet part of the HMAP preparation process which, when completed, is intended to analyze the broad and long-term potential impacts to the wild horse herds and their habitats. *See id.* at Chap. 6, pp. 36-44 (Herd Management Area

Planning).

57.     To further illustrate the distinction between an HMAP/HMAP-EA and a Gather-EA, the BLM Handbook indicates that the separate decision to gather and remove horses has a different appeal process than the appeals process for the HMAP generally. *Id.* at Chap. 7, p. 45.

58.     Additionally, a Gather-EA is not the proper analysis for the long-term management of wild horses and burros. *Friends of Animals v. Culver*, No. 19-3506 (D.D.C. Jun. 28, 2022) (holding that "BLM's ten-year [phased gather-EA] exceeds its discretion, per statutory command").

59.     Therefore, a Gather-EA simply cannot substitute an HMAP or an HMAP-EA.

**C.  The Winnemucca District Resource Management Plan**

60.     The Blue Wing Complex consists of 2,283,300 acres of land. The Blue Wing Complex is made up of five Herd Management Areas (HMAs), four Herd Areas (HAs), and other non-HMA areas. The HMAs are: Kamma Mountains, Seven Troughs Range, Lava Beds, Blue Wing Mountains, and Shawave. The HAs are: Antelope Range, Selenite Range, Trinity Range, and Truckee Range.

61.     The Blue Wing Complex is located in the Winnemucca District of Nevada and is therefore subject to the land use planning and management directives in the 2015 Winnemucca District Resource Management Plan (DOI-BLM-NV-W000-2004-0001-RMP-EIS).

62.     Appendix K of the Winnemucca District Resource Management Plan consists of Wild Horse and Burro Standards and Guidelines that were approved on August 30, 2007. The Standards and Guidelines state the following Implementation directives which require the development of HMAPs:

> Following adoption of the Standards and Guidelines for Wild Horses and Burros, subsequent planning decisions and management actions must be consistent with the Standards and Guidelines. Standards and Guidelines for Wild Horses and Burros as outlined above will be implemented through a multi-step process involving:
>
> 1.     Development of herd management area plans and establishment of long-term objectives for managing wild horses and burros and their habitat, initiation of the necessary management

actions, monitoring to assess progress toward achievement of plan objectives; periodic adjustments of population levels to maintain AMLs; and periodic evaluation of management actions to assure they are being implemented and effective in achieving plan objectives.

2.      Herd management area plans (HMAPs) will be the vehicle for determining the management and objectives for the herds and their habitat. Assessments of wild horse and burro herds and individual animals will occur through periodic censuses of the animals as well as notation of the condition, age, and sex of animals that have been captured. . ..

Department of the Interior Bureau of Land Management Winnemucca District, *Record of Decision and Resource Management Plan for the Winnemucca District Planning Area* (May 22, 2015), Appendix K.

63.      The Winnemucca District Resource Management Plan also requires that BLM evaluate and adjust Appropriate Management Levels (AMLs) as applicable based on the multi-tiered process outlined in BLM Handbook 4700-1. *Id.* at Action WHB 5.6, p. 2-32.

64.      Further, the Winnemucca District Resource Management Plan states that "[i]f monitoring data indicate that adverse impacts on resources are occurring as a result of livestock, wild horses, or burros, appropriate management actions (e.g., adjust AUMs or AMLs, fence, season of use) will be made to the specific class of use (i.e., livestock, wild horses, burros) causing the impacts. In absence of specie specific monitoring data, adjustments in available forage will be proportional to applicable livestock active AUMs and WHB AMLs." *Id.* at Action WHB 5.7, p. 2-32.

**D.  The Blue Wing Complex Gather EA**

65.      The BLM never prepared an HMAP for the Blue Wing Complex or any of its HMAs or HAs.[1]

66.      Instead, on October 23, 2017, the BLM published the Blue Wing Complex Gather

---

[1] Even if any HMAPs have been prepared in the past, they were not considered or cited in the 2017 Blue Wing Complex Gather Plan Final Environmental Assessment at issue.

Plan Final Environmental Assessment, DOI-BLM-NV-W010-2015-0034-EA, and its associated Finding of No Significant Impact (FONSI) and Decision Record. This assessment will be referred to as the Gather EA throughout this Complaint.

67.     The Gather EA cites Appropriate Management Levels (AMLs) that were purportedly established through Final Multiple Use Decisions (FMUDs). *See* Gather EA, Section 1.1, p. 3-5. The most recent FMUD cited is from a 1999 Appeal Order. Gather EA, Table 2, p. 4.

68.     The Gather EA also admits that most recent monitoring data is from December 2014 animal count estimates. Gather EA, Table 1, p. 3, n.2 ("Fall 2017 estimates are based directly on the December 2014 estimates (Lubow 2015), with three years of projected population growth").

69.     The Gather EA specifically notes that "[f]uture decisions regarding long-term management within the Blue Wing Complex would continue to be accomplished through a Herd Management Area Plan…" Gather EA, Section 1.3, p. 5.

70.     Far narrower in scope than an HMAP, the Gather EA analyzed the proposed gather as a population control tool and did not analyze this tool as an activity to be utilized in conjunction with various other habitat and herd management tools.

71.     The Gather EA did not identify or analyze the herd-specific foaling season, nor the habitat-specific ground conditions during different seasons, both of which would have been a required component of an HMAP.

72.     The Gather EA purports to allow BLM to implement a "wide range of management actions…designed to…meet low AML and maintain AML ranges within approximately 20 years." Gather EA, Section 2.4, p. 19. Alternative B, the preferred alternative and the one chosen in the Decision Record, admittedly "allows for the most flexibility." Gather EA, Section 2.0, p. 9.

73.     The Gather EA did not identify or analyze the significant impacts to the environment caused by removing over 88% of the horses and burros that make up the Blue Wing Complex. *See* Gather EA, Table 1, p. 3 (Fall 2017 Estimate of 3,340 horses and burros, compared to the AML low of 388 horses and burros).

74.     The Gather EA did not consider impacts to *horses* as opposed to *the human*

*environment* because it was prepared under NEPA, which reflects government environmental policy, whereas the Wild Horse Act reflects government policy for the humane treatment and management of wild horses and burros.

75.     Proving this point, every time Plaintiff Laura Leigh, on behalf of Plaintiff Wild Horse Education, commented on the preliminary Gather EA regarding subject matter that would have been considered during the development of an HMAP, the BLM responded by advising that the comment was outside the scope of the Gather EA, which addressed environmental impacts only.

76.     For example, though BLM has authority under the Wild Horse Act to close public lands to livestock grazing if necessary to protect wild horses (43 C.F.R. § 4710.5), when Ms. Leigh and other commenters commented on the preliminary Gather EA regarding the impact of livestock grazing on wild horse habitat, the BLM responded that it was "outside the scope of this EA" and "[a]djustments to livestock grazing cannot be made through a WH&B gather EA." Gather EA, Appendix J, p. 22.

77.     Without a proper HMAP, BLM failed to consider recent data—*see* Public Employees for Environmental Responsibility (PEER), *BLM Rangeland Health Status (2020) – The Significance of Livestock Grazing on Public Lands* (available at https://mangomap.com/peer/maps/126421/blm-rangeland-health-status-2020-the-significance-of-livestock-grazing-on-public-lands)—indicating that livestock grazing, rather than wild horses, is a significant reason why a majority of BLM land does not meet its own land health standards.

78.     In response to public comments, BLM also deemed evidence requiring the evaluation and adjustment of AMLs to be outside the scope of the Gather EA. Gather EA, Appendix J, p. 5-7.

79.     BLM also deemed range improvements, such as moving fencing and developing water sources, to be outside the scope of the Gather EA, though both greatly impact the management of the Blue Wing Complex wild horses and burros and would be considered in an HMAP. Gather EA, Appendix J, p. 18.

80.     Though BLM briefly discussed genetic diversity in the Gather EA, it refused to solicit and consider the public's local knowledge of rare genetic lineages present in the Blue Wing Complex such as paint burros which are not common in other HMAs in the United States.

81.     The Gather EA also failed to appropriately consider that wild horses are a native species and the resulting harmful environmental impacts of removing native species.

82.     To comply with the Wild Horse Act's humane handling directive, BLM incorporated its own Comprehensive Animal Welfare Policy (CAWP). Gather Plan, Section 2.2, p. 10.

83.     However, the BLM refused to consider any gather-specific public comment on the CAWP or CAWP implementation.

84.     The CAWP itself is a published instruction memorandum and was never subject to notice and opportunity for public comment. BLM, 2015, Instruction Memorandum 2015-151.

**E.  Blue Wing Complex Gathers**

85.     Under the 2017 Gather EA, BLM has already gathered and removed 1,653 horses and 623 burros from the Blue Wing Complex.

86.     BLM plans to initiate a gather of 200 horses and 800 burros on August 1, 2022. *See* BLM, *FY2022 Tentative Wild Horse and Burro Gather and Fertility Control Schedule* (July 13, 2022), available at https://www.blm.gov/sites/blm.gov/files/docs/2022-07/National%202022%20Tentative%20Gather%20and%20FC%20Schedule_7.13.2022.pdf.

87.     The gather is scheduled to last until August 30, 2022. *See id.*

88.     The only rationale for the August 2022 gather is that the number of wild horses and burros in the Blue Wing Complex exceeds the AMLs set in a 1999 Appeal Order. *See id.*; *see also* Gather EA, Table 2, p. 4.

89.     The August 2022 gather is purportedly authorized by the 2017 Gather EA.

90.     No additional planning or analysis documents are expected to be released prior to the August 2022 gather.

**F.  Exhaustion of Administrative Remedies**

91.    Plaintiff Laura Leigh, in her individual capacity and on behalf of Plaintiff Wild Horse Education, actively participated in the public commenting process of the Blue Wing Complex Gather EA, which was finalized on October 23, 2017.

92.    Plaintiffs CANA Foundation and Wild Horse Education also sent a letter to Defendant Jon Raby on July 18, 2022 demanding that Defendants cancel all future gathers under the 2017 Gather EA until Defendants develop an HMAP and a new or supplemental gather EA.

**FIRST CAUSE OF ACTION**

**Writ of Mandamus, 28 U.S.C. § 1361**

93.    Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

94.    Defendants have a mandatory duty to prepare a Herd Management Area Plan for each Herd Management Area prior to conducting any herd management activities, including the gather and removal of excess horses, under 43 C.F.R. § 4710.4, which provides, "Management shall be at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans." 43 C.F.R. § 4710.4, *see also* 16 U.S.C § 1333.

95.    Defendants violated 16 U.S.C. § 1333 and 43 C.F.R. § 4710.4 when they authorized the gather and removal of wild horses and burros from the Blue Wing Complex without first developing a Herd Management Area Plan.

96.    To the extent Defendants have interpreted the BLM Handbook to conflict with Defendants' mandatory duty to comply with 43 C.F.R. § 4710.4 to carry out management of wild horse herds at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans, BLM has exceeded its authority and jurisdiction to comply with statutory and regulatory mandates.

97.    Defendants only have authority to immediately remove excess animals from the range when current information indicates that there is an overpopulation and action is necessary to remove excess animals. 16 U.S.C. § 1333(b)(2).

98.     Defendants rely on a 2017 Gather Plan Final Environmental Assessment as justification for an August 2022 gather of wild horses and burros from the Blue Wing Complex in violation of 16 U.S.C. § 1333.

99.     Defendants' failure to adopt a Herd Management Area Plan and a new or supplemental Environmental Assessment for the Blue Wing Complex has injured Plaintiffs in the manner described in this Complaint.

100.    The Mandamus and Venue Act, 28 U.S.C. § 1361, vests district courts with original jurisdiction over any action in the nature of mandamus to compel a federal officer or agency to perform a duty owed to plaintiffs.

101.    Plaintiffs seek a writ of prohibition preventing Defendants from gathering wild horses and burros under the Blue Wing Complex Gather Plan Final Environmental Assessment, DOI-BLM-NV-W010-2015-0034-EA, until Defendants have fully complied with the Wild Free-Roaming Horses and Burros Act and developed a Herd Management Area Plan and a new or supplemental Environmental Assessment for the Blue Wing Complex.

## SECOND CAUSE OF ACTION
### Administrative Procedure Act, 5 U.S.C. § 706(1)

102.    Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

103.    Defendants have a mandatory duty to prepare a Herd Management Area Plan for each Herd Management Area prior to conducting any herd management activities, including the gather and removal of excess horses, under 43 C.F.R. § 4710.4, which provides, "Management shall be at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans." *See* 43 C.F.R. § 4710.4 (implementing 16 U.S.C § 1333).

104.    Defendants violated 16 U.S.C. § 1333 and 40 CFR § 4710.4 when they authorized the gather and removal of wild horses and burros from the Blue Wing Complex without first developing a Herd Management Area Plan.

105.    Defendants only have authority to immediately remove excess animals from the

range when current information indicates that there is an overpopulation and action is necessary to remove excess animals. 16 U.S.C. § 1333(b)(2).

106.     Defendants rely on a 2017 Gather Plan Final Environmental Assessment as justification for an August 2022 gather of wild horses and burros from the Blue Wing Complex in violation of 16 U.S.C. § 1333.

107.     Defendants have unlawfully withheld or unreasonably delayed their mandatory duty to prepare an HMAP for the Blue Wing Complex or for the individual Herd Management Areas that make up the Complex and their mandatory duty to *immediately* remove animals on the basis of *current* information.

108.     Defendants' failure to adopt a Herd Management Area Plan and failure to complete a new or supplemental Environmental Assessment for the Blue Wing Complex has injured Plaintiffs in the manner described in this Complaint.

109.     The Administrative Procedure Act gives this court authority to compel agency action unlawfully withheld or unreasonably delayed. 5 U.S.C. § 706(1).

### THIRD CAUSE OF ACTION
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A)

110.     Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

111.     Defendants have a mandatory duty to prepare a Herd Management Area Plan for each Herd Management Area prior to conducting any herd management activities, including the gather and removal of excess horses, under 43 C.F.R. § 4710.4, which provides, "Management shall be at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans." *See* 43 C.F.R. § 4710.4, 16 U.S.C § 1333.

112.     Defendants violated 16 U.S.C. § 1333 and 43 C.F.R. § 4710.4 when they authorized the gather and removal of wild horses and burros from the Blue Wing Complex without first developing a Herd Management Area Plan.

113.     To the extent Defendants have interpreted the BLM Handbook to conflict with

Defendants' mandatory duty to comply with 43 C.F.R. § 4710.4 to carry out management of wild horse herds at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans, Defendants have acted arbitrarily and capriciously and contrary to the law and abused their discretion.

114.   Defendants only have authority to immediately remove excess animals from the range when current information indicates that there is an overpopulation and action is necessary to remove excess animals. 16 U.S.C. § 1333(b)(2).

115.   Defendants rely on a 2017 Gather Plan Final Environmental Assessment as justification for an August 2022 gather of wild horses and burros from the Blue Wing Complex in violation of 16 U.S.C. § 1333.

116.   Defendants' decision to proceed with the gather and removal of 1,000 wild horses and burros from the Blue Wing Complex was arbitrary and capricious, an abuse of discretion, and contrary to the law.

117.   Defendants' failure to adopt a Herd Management Area Plan and failure to complete a new or supplemental Environmental Assessment for the Blue Wing Complex has injured Plaintiffs in the manner described in this Complaint.

118.   The Administrative Procedure Act gives this court authority to hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

### FOURTH CAUSE OF ACTION
### Administrative Procedure Act, 5 U.S.C. § 706(2)(C)

119.   Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

120.   Defendants exceeded their statutory jurisdiction and authority as well as their own regulatory limitations when they removed 1,000 wild horses and burros from the Blue Wing Complex without ensuring its management was at the minimum level necessary to attain the objectives identified in a herd management area plan. *See* 43 C.F.R. § 4710.4.

121.    To the extent Defendants have interpreted the BLM Handbook to conflict with Defendants' mandatory duty to comply with 43 C.F.R. § 4710.4 to carry out management of wild horse herds at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans, Defendants have acted in excess of statutory jurisdiction, authority, or limitations.

122.    Defendants' failure to adopt a Herd Management Area Plan and failure to complete a new or supplemental Environmental Assessment for the Blue Wing Complex has injured Plaintiffs in the manner described in this Complaint.

123.    The court may also set aside agency actions "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

### FIFTH CAUSE OF ACTION

**National Environmental Policy Act and Administrative Procedure Act, 5 U.S.C. § 706(2)**

124.    Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

125.    The BLM violated NEPA when it failed to analyze the significant environmental impacts of removing wild horses from the Blue Wing Complex as alleged herein, including by failing to analyze (1) alternative methods of habitat management, such as rewilding and retiring livestock grazing allotments and licenses; (2) population control, including managing to preserve rare genetic lines of wild horse breeds; and (3) significant environmental impacts of removing the vast majority of the wild horses and burros on the range.

126.    In addition, the BLM violated NEPA by abusing its discretion to permit a 20-year Environmental Assessment for multiple gathers. *See Friends of Animals v. Culver*, No. 19-3506 (D.D.C. Jun. 28, 2022) (holding "BLM's ten-year deadline [in a wild horse gather EA] exceeds its discretion, per statutory command").

127.    Defendants' decision to proceed with the gather and removal of 1,000 wild horses and burros from the Blue Wing Complex without analyzing significant environmental impacts was arbitrary and capricious, an abuse of discretion, and contrary to the law.

128.   Defendants' actions have injured plaintiffs in the manner described in this Complaint.

129.   The BLM's decision to adopt the Blue Wing Gather Environmental Assessment was arbitrary and capricious, and not in accordance with law in violation of the APA, 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court:

A. Issue a writ of prohibition preventing Defendants from gathering wild horses until Defendants have fully complied with the Wild Free-Roaming Horses and Burros Act, National Environmental Policy Act, and Administrative Procedure Act;

B. Issue an order and injunction compelling Defendants to immediately stop implementation of the Blue Wing Complex Environmental Assessment until Defendants have fully complied with the Wild Free-Roaming Horses and Burros Act, National Environmental Policy Act, and Administrative Procedure Act;

C. Vacate and set aside the Blue Wing Complex Gather Environmental Assessment;

D. Maintain jurisdiction over this action until Defendants are in compliance with the Wild Free-Roaming Horses and Burros Act, the Administrative Procedure Act, the National Environmental Policy Act, and every order of this Court;

E. Award Plaintiffs attorney fees and costs pursuant to and 28 U.S.C. § 2412; and

F. Grant such additional and further relief to which plaintiffs may be entitled.

1    DATED: July 26, 2022,                    Respectfully Submitted,

2                                             */s/ Alexandra J. Monson*
                                              Jessica L. Blome
3                                             (Cal. Bar No. 314898, pro hac vice forthcoming)
                                              Alexandra J. Monson
4                                             (Cal. Bar No. 324794, pro hac vice forthcoming)
                                              GREENFIRE LAW, PC
5                                             P.O. Box 8055
                                              Berkeley, CA 94707
6                                             (510) 900-9502
                                              jblome@greenfirelaw.com
7                                             amonson@greenfirelaw.com

8
                                              Danielle M. Holt
9                                             (Nevada Bar No. 13152)
                                              DE CASTROVERDE LAW GROUP
10                                            1149 S Maryland Pkwy
                                              Las Vegas, NV 89104
11                                                  Ph (702) 222-9999
                                                    Fax (702) 383-8741
12                                            danielle@decastroverdelaw.com

13                                            *Attorneys for Plaintiffs*

14

15

16

17

18

19

20

21

22

23

24

25

26