DANIELLE M. HOLT
(Nevada Bar No. 13152)
DE CASTROVERDE LAW GROUP
1149 S Maryland Pkwy
Las Vegas, NV 89104
Ph (702) 222-9999
Fax (702) 383-8741
danielle@decastroverdelaw.com

JESSICA L. BLOME
(Cal. Bar No. 314898, pro hac vice application pending)
ALEXANDRA J. MONSON
(Cal. Bar No. 324794, pro hac vice application pending)
GREENFIRE LAW, PC
P.O. Box 8055
Berkeley, CA 94707
(510) 900-9502
jblome@greenfirelaw.com
amonson@greenfirelaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| CANA FOUNDATION, a non-profit corporation, LAURA LEIGH, individually, and WILD HORSE EDUCATION, a non-profit corporation,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and JON RABY, Nevada State Director of the Bureau of Land Management,<br><br>Defendants. | CASE NO. 2:22-cv-01200<br><br>**DECLARATION OF LAURA LEIGH**<br><br>Complaint Filed: July 26, 2022<br>Hearing: |

I, Laura Leigh, declare as follows:

1. I have been attending wild horse roundups for over 13 years.

2. From 2009-2019 I had attended more days of operation than any member of the public or single government employee.

3. Based on my extensive experience with BLM and wild horse and burro roundups, it is my understanding that when BLM constructs temporary holding facilities on private land, the BLM contracts with the property owner.

4. Most gather operations contract with private parties for temporary holding facilities, but we, the public, are still granted daily tours to view the gathered wild horses and burros. This access is vital to our ability to assess the conditions and identities of the animals gathered.

5. It is also my experience that wild horses and burros are less startled by a few individuals with cameras at any distance (near or far), then by large BLM trucks and trailers, as well as the children and dogs I have seen onsite at trap and holding. BLM and contractor employees are often documented using cell phones and cameras to record the ents while crouched trap wings and during release.

6. In the past, BLM has even allowed certain media representatives to sit at trap and even place a camera in the trap; Melissa Farlow for National Geographic is one such photographer.

7. I formed the organization "Wild Horse Education" to advocate for the welfare and well-being of wild horses and burros from on-range management planning through capture and adoption and sale.

8. The organization was built in the initial years working to gain access to document roundups and to gain the first humane handling policy since the 1971 Act was signed.

9. I successfully litigated on both issues.

10. In 2011 I filed a First Amendment claim that resulted in a Ninth Circuit court

opinion that affirmed the right of access, affirmed repetitive conduct, but remanded to the district court to further debate the specific issues at hand.

11. We appealed the second district court opinion and were ordered into mediation by the Ninth Circuit.

12. The Internal Memorandum of 2013 is part of the settlement I helped craft during mediation.

13. The intention was to utilize a "fire" type protocol that allowed press/media into areas that were considered dangerous, but with narrowly tailored limitations in extreme events.

14. Initially access became better; the agency even agreed to open closed facilities if used as intake from the range.

15. In 2016, we began to have issues. BLM responding to requests for access as if the settlement only covered one year.

16. I repeatedly had to remind the agency that the First Amendment has no expiration date; even writing multiple, public, articles on the subject.

17. The agency has accelerated removals of wild horses and burros to historically high levels. I am unable to attend all roundups myself as the responsibilities of running an internationally recognized organization increase.

18. I am training observers to join our "CAWP team," a team trained in policy and assessment.

19. Laurie Ford underwent online training and in-person training. She had previous observation experience, extensive burro knowledge and requested Blue Wing as an assignment.

20. Roundups in the district that manages Blue Wing include several areas where access issues to document capture, handling at temporary and the decision to ship to off-limits corrals is commonplace.

21. It is our standard operating procedure to request access to temporary holding,

request an alternative observation spot if available, and, if denied, to document the denial and pass on to the team leader.

22. In this instance, I am the team leader.

23. Laurie, as with all observers or CAWP team members, immediately checks in with me and sends me video files and daily log sheets that I review.

24. I have been to most trap locations in 5 states at least once, in the state of NV even more often, and am extremely familiar with capture methods.

25. Each night we do a briefing. I review footage with the team member, that the member feels is the most important. Then I review every second of every video file after excusing the member to ready for the next day's work.

26. I could see the issues at trap, know the Porter Springs location well, and know that this trap could be used to capture the majority of the targeted burros.

27. The access issues were serious and needed timely resolution.

28. I contacted Garret immediately to see if the issues involving access could be resolved; there is no access to clearly document the operation at any time of the day.

29. I received a standard reply; no changes would be made and an assertion that they comply with all policy and law.

30. I have tried to address this issue many times, at many operations in the State of Nevada to no avail.

31. It is our primary purpose attending operations to report to the public and engage processes to improve the humane handling policy.

32. This goal has been central to our organization since inception.

33. When we have no access to clearly document a single aspect of capture or handling we are prohibited from our professional obligations.

34. In addition, the cost of attending a week of roundup operations runs from $2K-3K each week. A day at a roundup begins with rising at 3:30 and often not completing your workday until late into the evening.

I affirm that the foregoing is true to the best of my knowledge. If called to testify, I would do so competently and based on my personal knowledge of these events.

DATED this 3rd day of August, 2022.

_____
Laura Leigh