DANIELLE M. HOLT
(Nevada Bar No. 13152)
DE CASTROVERDE LAW GROUP
1149 S Maryland Pkwy
Las Vegas, NV 89104
Ph (702) 222-9999
Fax (702) 383-8741
danielle@decastroverdelaw.com

JESSICA L. BLOME
(Cal. Bar No. 314898, admitted pro hac vice)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| CANA FOUNDATION, a non-profit corporation, LAURA LEIGH, individually, and WILD HORSE EDUCATION, a nonprofit corporation, <br><br> *Plaintiffs,* <br><br> v. <br><br> UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and JON RABY, Nevada State Director of the Bureau of Land Management, <br><br> *Defendants.* | CASE NO. 2:22-cv-01200-CDS-BNW <br><br> **PLAINTIFFS' NOTICE OF MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> First Amended Complaint Filed: September 2, 2022 |

To all parties and their attorneys of record:

PLEASE TAKE NOTICE that Plaintiffs CANA Foundation, Laura Leigh, and Wild Horse Education, by and through their counsel, Danielle M. Holt, Esq., and Jessica L. Blome, Esq. hereby move this court for summary judgment on their First, Second, Third, Fourth, Fifth and Sixth causes of action as raised in their First Amended Complaint against Defendants United States Department of Interior, Bureau of Land Management, and Jon Raby, Nevada State Director of the Bureau of Land Management.

Pursuant to the Court's September 29, 2023, scheduling order (ECF 48), Rule 56 of the Federal Rules of Civil Procedure, and Local Rule 56-1, Plaintiffs' motion is supported by the accompanying Memorandum of Points and Authorities; the Declarations of Laura Leigh, Manda Kalimian, and Laurie Ford; Plaintiffs' Motion for Judicial Notice with corresponding Notice, Memorandum of Points and Authorities, Declaration of Jessica Blome with exhibits, Declaration of Laurie Ford (filed concurrently); Plaintiff's First Amended Complaint (ECF 24); the certified Amended Administrative Record; and any written and oral argument and authorities that are presented at or before the hearing on this motion.

DATED: December 15, 2023                    Respectfully Submitted,

/s/ Danielle M. Holt
Danielle M. Holt
(Nevada Bar No. 13152)
DE CASTROVERDE LAW GROUP
1149 S Maryland Pkwy
Las Vegas, NV 89104
(702) 222-9999
danielle@decastroverdelaw.com

/s/ Jessica L. Blome
Jessica L. Blome
(Cal. Bar No. 314898, admitted pro hac vice)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com

1

2

# TABLE OF CONTENTS

I.  Introduction ......................................................................................................... 8

II.  Statement of Facts .............................................................................................. 9

    A.  The Wild and Free-Roaming Horses and Burros Act ............................. 11

    B.  The National Environmental Policy Act ................................................. 14

III.  Standard of Review ........................................................................................... 16

IV.  Standing ............................................................................................................ 17

    A.  Zone of Interest ...................................................................................... 17

    B.  Article III ................................................................................................ 18

        1.  Plaintiffs have suffered injury in fact. ........................................... 18

        2.  Plaintiffs' injuries are fairly traceable to BLM's conduct, and
            this Court can redress those injuries. ............................................. 21

        3.  Plaintiffs have exhausted their administrative remedies. ................ 21

V.  ARGUMENT ..................................................................................................... 22

    A.  The WHBA and its implementing regulations establish mandatory duties with which
        BLM must comply. ................................................................................. 22

        1.  BLM must prepare Land Use Plans and HMAPs prior to engaging in
            management activities, such as the removal of horses and burros. .... 23

        2.  WHBA establishes a mandatory duty to remove excess animals
            immediately ................................................................................... 28

    B.  BLM has failed to comply with its mandatory duties as established through the
        WHBA and its implementing regulations. .............................................. 28

        1.  BLM did not create an HMAP prior to engaging in gather operations. ............... 28

        2.  BLM has failed to act on its excess determination immediately. ....................... 33

    C.  BLM failed to comply with NEPA. ....................................................... 36

        1.  BLM did not take a "hard look" at the impact of gathers in the Blue Wing
            Complex. ....................................................................................... 37

        2.  BLM failed to consider new evidence and circumstances. ................. 38

    D.  BLM violated Plaintiffs' First Amendment rights. ................................. 40

VI.  Conclusion ........................................................................................................ 43

**Table of Authorities**

**Cases**

*350 Montana v. Haaland*, 50 F.4th 1254 (9th Cir. 2022) .................................................. 36, 37

*Am. Horse Prot. Asso. v. Frizzell*, 403 F. Supp. 1206 (D. Nev. 1975) ............................. 19

*Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127 (D.D.C. 2020) ................................ 19

*American Horse Protection Asso. v. Watt*, 694 F.2d 1310, 1315-19 (D.C. Cir. 1982)..................... 34

*Andujar v. Weinberger*, 69 F.R.D. 690 (S.D.N.Y. 1976) ................................................. 22

*Animal Prot. of N.M. v. United States,* No. 98-538 JP/LFG,
    2000 U.S. Dist. LEXIS 24419 (D.N.M. Jan. 10, 2000) ................................................. 38

*Auer v. Robbins*, 519 U.S. 452 (1997) .................................................................. 23

*Bd. of Cnty. Comm'rs of Rocky Mt. Wild v. United States BLM*,
    584 F. Supp. 3d 949 (D. Colo. 2022)................................................................... 18

*Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166 (9th Cir. 2002)................................... 29

*Biodiversity Legal Found. v. Norton*, 285 F. Supp. 2d 1 (D.D.C. 2003). ............................... 30

*Bruce v. First Fed. Sav. & Loan Asso.*, 837 F.2d 712 (5th Cir. 1988) ................................. 24

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) .................................. 32

*Castillo v. Ridge*, 445 F.3d 1057 (8th Cir. 2006)................................................... 29, 33

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
    868 F.3d 104 (2d Cir. 2017) ....................................................................... 19, 20

*Cetacean Cmty. v. Bush*, 386 F.3d 1169 (9th Cir. 2004) ............................................... 19

*Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156 (2012) ..................................... 23, 26, 28

*Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946 (9th Cir. 2013) ....................... 27

*Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388 (1987) .................................................... 17

*Cmty. Voice v. United States EPA*, 878 F.3d 779 (9th Cir. 2017) ...................................... 30

*Davidson v. United States Dep't of State*, 113 F. Supp. 3d 183 (D.D.C. 2015)......................... 17

*E.W. Bliss Co. v. United States*, 77 F.3d 445 (Fed. Cir. 1996) ....................................... 32, 36

*Ecosystem Inv., Partners v. Crosby Dredging, L.L.C.*, 729 F. App'x 287 (5th Cir. 2018) ............... 18

*Envtl. Defense Fund, Inc. v. U.S. Army Corps of Engrs.*, 492 F.2d 1123 (5th Cir. 1974)............... 37

Plaintiffs' Notice of Motion for Summary Judgment and Memorandum of Points and Authorities in Support Thereof

*ErieNet, Inc. v. Velocity Net, Inc.*, 156 F.3d 513 (3d Cir. 1998) ....................................... 24

*Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118 (2d Cir. 2020) ............................. 17

*Firebaugh Canal Co. v. United States*, 203 F.3d 568 (9th Cir. 2000) ................................. 24

*Friends of Animals v. Culver*, 610 F. Supp. 3d 157 (D.D.C. 2022) ............................. 28, 35

*Friends of the Earth v. Sanderson Farms, Inc.*, 992 F.3d 939 (9th Cir. 2021) ................................. 20

*Giddings v. Chandler*, 979 F.2d 1104 (5th Cir. 1992) ....................................... 17

*Glenwood Springs Citizens' All. v. United States DOI*, 639 F. Supp. 3d 1168 (D. Colo. 2022) ....... 30

*Gonzalez v. United States Dep't of Homeland Sec.,* 500 F. Supp. 3d 1115 (E.D. Cal. 2020) .......... 33

*Greene v. Costle*, 577 F. Supp. 1225 (W.D. Tenn. 1983) ....................................... 22

*Hamazaspyan v. Holder*, 590 F.3d 744 (9th Cir. 2009) ....................................... 22

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ....................................... 20

*Hernandez-Avalos v. INS*, 50 F.3d 842 (10th Cir. 1995) ....................................... 17

*Idaho Conserv. League v. Mumma*, 956 F.2d 1508 (9th Cir. 1992) ................................. 37

*In re A Cmty. Voice*, 878 F.3d 779 (9th Cir. 2017) ....................................... 31

*In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413 (D.C. Cir. 2004) ........................................ 31

*In re Bluewater Network*, 234 F.3d 1305 (D.C. Cir. 2000) ....................................... 31

*In re Int'l Chem. Workers Union*, 958 F.2d 1144 (D.C. Cir. 1992) ....................................... 31

*In re Pesticide Action Network*, 798 F.3d 809 (9th Cir. 2015) ....................................... 31

*Independence Mining Co. v. Babbitt*, 105 F.3d 502 (9th Cir. 1997) ....................................... 30

*Kingman Reef Atoll Invs., L.L.C. v. DOI*, 195 F. Supp. 2d 1178 (D. Haw. 2002) ........................... 19

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) ....................................... 23, 26

*Knuckles v. Weinberger*, 511 F.2d 1221, 1222 (9th Cir. 1975) ....................................... 22

*Koopmann v. U.S. Dep't of Transp.*, 335 F. Supp. 3d 556 (S.D.N.Y. 2018) ....................................... 16

*Leigh v. Raby*, No. 3:22-cv-00034-MMD-CLB,
   2022 U.S. Dist. LEXIS 15747 (D. Nev. Jan. 28, 2022) ....................................... 41

*Leigh v. Salazar*, 677 F.3d 892 (9th Cir. 2012) ....................................... 19, 40, 41

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ....................................... 18, 19

4

1    *Marsh v. Oregon Natural Resources* Council, 490 U.S. 360 (1990)............................................. 36, 37

2    *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012) ......... 17

3    *McGarry v. Sec'n of the Treasury*, 853 F.2d 981 (D.C. Cir. 1988)...................................................... 19

4    *McMahon v. Califano*, 476 F. Supp. 978 (D. Mass. 1979)................................................................. 22

5    *Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000) ............................................................................. 37

6    *Mitchael v. Colvin*, 809 F.3d 1050 (8th Cir. 2016)........................................................................... 24

7    *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)..................... 32, 36

8    *Muckleshoot Indian Tribe v. U.S. ForestServ.*, 177 F.3d 800 (9th Cir. 1999).................................. 37

9    *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067 (9th Cir. 2011) ....................... 38

10   *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286 (2d Cir. 2011) ............................ 19

11   *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7 (2d Cir. 1997) ........................................................... 38

12   *Nat'l Wildlife Fedn v. Nat'l Marine Fisheries Serv.*, 184 F. Supp. 3d 861 (D. Or. 2016) .......... 38, 39

13   *National Parks & Conservation Ass'n. v. Babbitt*, 241 F.3d 722 (9th Cir. 2001) ............................ 37

14   *New York v. U.S.Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475 (S.D.N.Y. 2019)................ 17

15   *New York v. United States HHS*, 414 F. Supp. 3d 475 (S.D.N.Y. 2019)........................................... 22

16   *Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011) ................................................................................... 20

17   *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986) ............................................................. 40

18   *R.J. Reynolds Tobacco Co. v. Cnty. of L.A.*, 29 F.4th 542 (9th Cir. 2022) ....................................... 27

19   *Rice v. Vill. of Johnstown*, 30 F.4th 584 (6th Cir. 2022) .................................................................. 19

20   *Schulke v. United States*, 544 F.2d 453 (10th Cir. 1976).............................................................. 29, 33

21   *Sec'y of Labor v. Seward Ship's Drydock, Inc.*, 937 F.3d 1301 (9th Cir. 2019) ............................... 23

22   *Service v. Dulles*, 354 U.S. 363, 370 (1957)................................................................................... 27

23   *Sierra Club v. Peterson*, 717 F.2d 1409 (D.C. Cir. 1983) ................................................................ 36

24   *Sierra Club v. United States DOT*, 753 F.2d 120 (D.C. Cir. 1985)................................................... 36

25   *Singh v. Still*, 470 F. Supp. 2d 1064 (N.D. Cal. 2007).................................................................. 29, 33

26   *Telecommunications Research & Action v. FCC (TRAC)*, 750 F.2d 70 (D.C. Cir. 1984) ......... 29, 30

*Train v. Colorado Pub. Int. Research Group*, 426 U.S. 1 (1976)..................................................... 23

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001) ............................................................................... 27

*U.S. v. American Trucking*, 310 U.S. 534 (1940) ............................................................... 22, 23

*United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) ................................. 26, 27

*United States v. Henry*, 1 F.4th 1315, 1333 (11th Cir. 2021) ............................................... 22

*United States v. Nixon*, 418 U.S. 683 (1974) ......................................................................... 27

*W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267 (D. Utah 2017). ...... 30, 33, 34, 35

*W. Watersheds Project v. Kraayenbrink*, 620 F.3d 1187 (9th Cir. 2010)........................................ 37

*Warth v. Seldin*, 422 U.S. 490 (1975) ................................................................................... 19

*Williams v. Hanover Hous. Auth.*, 871 F. Supp. 527 (D. Mass. 1994) ....................................... 26, 28

*Woodstock v. City of Portland*, No. 3:20-cv-1035-SI, 2020 U.S. Dist. LEXIS 116612 (D. Or. July 2, 2020) .................................................................................................................................. 42

*Workman v. Mitchell*, 502 F.2d 1201 (9th Cir. 1974) ........................................................... 22

**Statutes**

16 U.S.C § 1333(b)(1) ............................................................................................................ 36

16 U.S.C. § 1331(a) ...................................................................................................... 16, 21, 25

16 U.S.C. § 1333(a) ........................................................................................................... 10, 21

16 U.S.C. § 1333(b). ...................................................................................................... 10, 21, 24

16 U.S.C. § 1333(b)(2 ............................................................................................................ 26

42 U.S.C. § 4332(2)(C) ........................................................................................................... 34

42 U.S.C. §4332(E) .......................................................................................................... 34, 35

5 U.S.C. § 706(1) ............................................................................................................. 27, 33

5 U.S.C. § 706(2)(A) ....................................................................................................... 30, 34

5 U.S.C. § 706(2))(C) ...................................................................................................... 30, 34

5 U.S.C. §706 ....................................................................................................................... 14

Plaintiffs' Notice of Motion for Summary Judgment and Memorandum of Points and Authorities in Support Thereof

1

**Regulations**

2

40 C.F.R. § 1502.9 .......................................................................................... 35, 36, 38

3

40 C.F.R. § 1502.9(d) .......................................................................................... 36

4

43 C.F.R. § 1501.0-5 .......................................................................................... 10

5

43 C.F.R. § 46.120(c) .......................................................................................... 35

6

43 C.F.R. § 4700 .......................................................................................... 21, 23

7

43 C.F.R. § 4700.0-1 .......................................................................................... 10

8

43 C.F.R. § 4700.0-2 .......................................................................................... 10

9

43 C.F.R. § 4700.0-3 .......................................................................................... 10

10

43 C.F.R. § 4710.1 .......................................................................................... 10

11

43 C.F.R. § 4710.3-1 .......................................................................................... 10

12

43 C.F.R. § 4710.5(a) .......................................................................................... 12

13

43 C.F.R. § 4730.5 .......................................................................................... 23

14

43 C.F.R. § 4730.6 .......................................................................................... 23

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs' Notice of Motion for Summary Judgment and Memorandum of Points and Authorities in Support Thereof

## I.       INTRODUCTION

Since 2017, BLM has improperly relied upon a flawed environmental assessment to gather and remove thousands of horses and burros in Nevada's Blue Wing Complex. The agency has intentionally denied Plaintiffs unobstructed access to BLM's operations, impeding Plaintiffs ability to protect the interests of these horses and burros and report on the agency's activities. Ignoring its mandatory duties under the Wild Free-Roaming Horses and Burros Act (WHBA), the requirements of the National Environmental Policy Act (NEPA), and the First Amendment of the U.S Constitution, BLM has acted in a manner that has caused horses and burros to die from fractured legs, broken necks, stress-induced hyperlipidemia, and hemorrhaging associated with castration.

This harm is ongoing. BLM recently reported that it plans to do another gather at the Blue Wing Complex from July 8, 2024, to August 18, 2024. During this gather, BLM plans on removing an additional 1,373 horses and 356 burros, pursuant to a potentially invalid NEPA review that is currently the subject of judicial review in this litigation. *See* Leigh Decl. at ¶45.

Plaintiffs' First Amended Complaint challenges Defendants' actions in relation to gather operations for wild horses and burros in the Blue Wing Complex of wild horse and burro management areas. It contains six causes of action brought under the Mandamus and Venue Act (predicated on violation of the Wild Free-Roaming Horses and Burros Act (WHBA)), the Administrative Procedure Act (APA) (predicated on violation of the WHBA and National Environmental Policy Act (NEPA), and the First Amendment of the U.S. Constitution. *See* ECF 24. Summary judgment is appropriate to each cause of action because:

1.       In violation of the WHBA and its implementing regulations, BLM has a mandatory duty to conform gather operations to land use plans and Herd Management Area Plans (HMAPs), but BLM has failed to follow the standards contained within applicable land use plans and has failed to create any HMAPs for herd areas within the Blue Wing Complex;

2.       After determining that excess horses need to be removed from the Blue Wing Complex, BLM is required to remove these horses "immediately," but in violation of the WHBA, BLM instead is removing animals in a phased approach that contemplates removals over a 20-year period of time;

3.       BLM violated NEPA because it failed to take a "hard look" at potential impacts

associated with removing wild horses and burros from the Blue Wing Complex;

4.     BLM violated NEPA because it has failed to issue a new environmental analysis or supplement its earlier environmental analysis in the face of new data and scientific information;

5.     BLM has violated Plaintiffs' First Amendment right to access the gather operations and associated holding corrals in the Blue Wing Complex.

## II.   STATEMENT OF FACTS

The Blue Wing Complex consists of over 2,200,000 total acres. *See* AR03278. It contains five HMAs that include the Kamma Mountains HMA, Seven Troughs Range HMA, Lava Beds HMA, Blue Wing Mountains HMA, and Shawave HMA.[1] *See id.* BLM began roundup horses at the Blue Wing Complex in 2019. That year, agency staff gathered and permanently removed 188 wild burros from the landscape. *See* AR03838. "In August 2020, 1,653 wild horses and 220 wild burros were gathered from the Shawave HMA. 46 wild horses were released back into the HMA and given fertility control. In December 2020, 218 wild burros were removed from the Selenite Range HA along Hwy 447." *Id.* During the 2020 gathers, Plaintiff WHE was granted access to the temporary holding corrals located on private property in the Blue Wing Complex to view and document the wild horses gathered from the range. *See* Leigh Decl. at ¶38.

On July 26, 2022, BLM announced the upcoming gather of 200 horses and 800 burros from the Blue Wing Complex to begin on August 1. *See* AR03888-0389. The gather and shipment operations took place every day beginning August 1 until August 12. *See* AR03908-03913. During this time, BLM reported that 1,022 animals were gathered, 1,008 animals were shipped to off-range holding corrals, and 14 animals died. *See id.* Of the 1,022 animals gathered, 804 were wild burros and 218 were wild horses. *See id.* Of the 1,008 animals shipped, 794 were wild burros and 214 were wild horses. *See id.* Of the 14 animal deaths, 10 were wild burros and 4 were wild horses. *Id.* At least one paint burro was euthanized. *See id.* All of the shipped wild burros went to the Axtell Off Range Corrals in Axtell, Utah and all of the shipped wild horses went to the Palomino Valley Off-Range Corrals in Reno, Nevada. *See* AR03888.

---

[1] The complex also contains four herd areas (HAs), including the Selinite Range HA. "HAs are not managed for [wild horse and burro] populations however, animals that migrate from HMAs are occasionally removed from these areas [by BLM]." AR03278.

Plaintiff WHE sent a representative who is also a burro specialist, Laurie Ford, to the Blue Wing Complex to observe and document BLM's gather, holding, and shipment operations. *See* Leigh Decl. at ¶33; Ford Decl. at ¶6. These operations were particularly important and crucial to WHE's mission and purpose because the Blue Wing Complex is one of the very few HMAs that has a population of wild burros in Nevada. *See* Leigh Decl. at ¶34.

When Ms. Ford arrived on the morning of August 1, she was escorted by BLM to a public observation site that was approximately 1.3 to 1.8 miles away from the trap site. *See* Ford Decl. at ¶7. The trap site is where low-flying helicopters and wranglers drive the wild animals towards and the animals are sent through chutes, into pens, loaded onto trucks, and brought to temporary holding corrals. *See id.* BLM's observation protocol for the Blue Wing Complex states that viewing locations are to be approximately 500 feet from any operating helicopters. *See* AR03467.

From the observation site, Ms. Ford could hardly observe nor document the gather operations at the trap site because of the distance and obstruction from BLM trucks and stock trailers. *See id.* at ¶8. Even using a 500 mm camera lens and a 3000 mm video camera, Ms. Ford could not view BLM's actions nor assess the condition of the animals being gathered and loaded onto trucks. *See id.* at ¶¶9-11 (with Exhs. 1-2).

On August 1, Ms. Ford was denied access to the temporary holding corrals where the gathered burros were being held. *See id.* at ¶¶12-13. She was told that the public would not be allowed access to any temporary holding corrals for the whole of the gather; nor would they have access to observe processing or be able to assess the conditions of burros at the Axtell Off Range Holding Corrals. *See id.* Historically, the public has been allowed daily tours of and/or access to temporary holding corrals to assess the condition of the animals and to document any individual markings or tags on the animals. *See id.*

On August 2, Ms. Ford again attended the daily gather operations. *See id.* at ¶15. She was once again escorted to the public observation site that was 1.3 to 1.8 miles from the trap site. *See id.* During the day, Ms. Ford could just barely see a burro being roped by a wrangler on horseback near the trap site. *See id.* The burro appeared to struggle for over an hour, falling onto his side and perhaps flipping over at one point. *See id.* Ms. Ford was denied access to view the burro close enough to identify him or his tag so that she could track him through BLM's adoption and sales

program or permanent placement in a long-term holding facility. *See id.*

Ms. Ford remained at the Blue Wing Complex and attended the gather from August 3 through August 7. *See id.* at ¶16. On August 4, the trap site was moved, and the public observation site was likewise moved to approximately 0.7 miles from the new trap site. *See id.* at ¶17. The distance and obstructions continued to prevent Ms. Ford from being able to observe details regarding individual animals and their conditions. *See id.* After the target number of burros had been gathered, Ms. Ford left the Blue Wing Complex and traveled to Utah to observe the Bible Spring Complex HMA gather operations. *See id.* at ¶18. Ms. Ford hoped that she would be able to get close to the Axtell Off Range Corrals at that time. *See id.* Though privately owned, Axtell Off Range Corrals have been under contract with BLM since 2015. *See* Leigh Decl. at ¶38. While under contract, the Axtell Off Range Corrals have historically been open to the public on select visitation days. *See id.*

The public has been allowed to view the wild *horses* being held at Axtell Off Range Corrals on select visitation days, but BLM informed Ms. Ford that no such access to view the wild *burros* being held there will ever be granted. *See* Ford Decl. at ¶18. BLM has indicated that this is because its contract with the Axtell Off Range Corrals inexplicably only allows for select public viewing days of wild horses, and not of wild burros. *See id.* Based upon the number of burros dying at these Corrals, WHE believes access is being denied to keep the public from viewing BLM's improper handling of burros. *See* Ford Decl. at ¶¶19-23 (with Exhs. 3-6).

After being denied meaningful access to observe gathers and access to view burros at the Axtell Off Range Corrals, WHE contacted Garret Swisher with BLM to see if the issues involving access could be resolved. They received the standard reply that no changes would be made, with Garret asserting that they were complying with all policy and law. *See* Leigh Decl. at ¶39. On August 7, 2022, Laura Leigh again reached out to BLM to request access to burros at the Axtell Off Range Corrals, but BLM never responded. Ms. Leigh notified BLM that assess was a time-sensitive matter as WHE needed to assess the conditions of the burros after their capture. *See id.* at ¶41.

A. **The Wild and Free-Roaming Horses and Burros Act**

Finding that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West," and that "they contribute to the diversity of life forms within the Nation

and enrich the lives of the American people," Congress enacted the WHA to ensure that "wild-free roaming horses and burros shall be protected from capture, branding, harassment, [and] death," and will "be considered in the area where presently found, as an integral part of the natural system of the public lands." 16 U.S.C. §1331. The WHA provides the statutory authority by which the Secretary of the Interior "protect[s] and manage[s]" wild horses and burros on public lands, with the restriction that '[a]ll management activities shall be at the minimal feasible level. Id. at §1333(a). In managing wild horses and burros, the Act also provides the statutory authority by which the Secretary can remove "excess" wild horses from public lands. Id. at §1333(b).

The Secretary delegated responsibility for administering the WHA to BLM. *See* 43 C.F.R. §4700.0-3. BLM has adopted regulations, the purpose of which "is to implement the laws relating to the protection, management, and control of wild horses and burros under the administration of the Bureau of Land Management." *Id.* at §4700.0-1. Their stated objective is the "management of wild horses and burros as an integral part of the natural system of the public lands under the principle of multiple use; protection of wild horses and burros from unauthorized capture, branding, harassment or death; and humane care and treatment of wild horses and burros[,]" which shall be done pursuant to the establishment of herd management areas (HMAs) and herd management area plans (HMAPs). *See id.* at §§4700.0-2, 4710.3-1,4710.4. Management also must be undertaken in conformance with land use plans (LUPs), commonly called resource management plans (RMPs). *See id.* at §§1501.0-5, 4710.1, 4710.4

BLM recognizes that land use plans (LUPs) "are the basis for every on-the-ground management decision that BLM makes. *See* AR00058. LUPs establish goals and objectives; i.e. desired outcomes; identify the management actions needed to achieve the desired outcomes; and identify allowable uses of the public lands." *See id*. In addition, "LUPs normally contain general habitat and population management goals and objectives." *See* AR00060.

One type of LUP is a resource management plan (RMP). The Blue Wing Complex is located in the Winnemucca District of Nevada and is therefore subject to the land use planning and management directives in the 2015 Winnemucca District RMP (DOI-BLM-NV-W000-2004-0001-

RMP-EIS).[2] *See* AR03277, 03280, 03322, 03551; *see also* 43 C.F.R. §4710.4. Appendix K of the Winnemucca District RMP contains Wild Horse and Burro Standards and Guidelines, which were first adopted in 2007. *See* AR02223-02231. The Standards and Guidelines are to be implemented through a multi-step process that includes development of herd management area plans (HMAPs)[3] and recognizes the ability of BLM to change Appropriate Management Levels (AMLs)[4] when the Standards and Guidelines are not being met. *See id.* More specifically, the process includes:

> 1. Development of herd management area plans and establishment of long-term objectives for managing wild horses and burros and their habitat, initiation of the necessary management actions, monitoring to assess progress toward achievement of plan objectives; periodic adjustments of population levels to maintain AMLs; and periodic evaluation of management actions to assure they are being implemented and effective in achieving plan objectives.
>
> 2. Herd management area plans (HMAPs) will be the vehicle for determining the management and objectives for the herds and their habitat. Assessments of wild horse and burro herds and individual animals will occur through periodic censuses of the animals as well as notation of the condition, age, and sex of animals that have been captured. ...
>
> 3. When evaluation of resource monitoring data indicates that failure to meet Standards is being caused by excess wild horses and burros, short term adjustments in population levels, changes in AML's, or other appropriate management actions should be taken.

AR02231.

In the RMP, BLM also addresses its role in making livestock decisions:

> The BLM manages livestock grazing according to the Rangeland Management and Grazing Administration regulations, 4100. Included in the regulations are requirements to manage

---

[2] The Winnemucca District's administrative boundaries encompass approximately 11.3 million acres of land. BLM manages about 8.4 million acres of public lands within this boundary. *See* AR01750.

[3] In its Wild Horses and Burros Management Handbook, BLM notes: "Habitat or population management and monitoring objectives regarding the management of a specific HMA or complex of HMAs are normally identified in a Herd Management Area Plan (HMAP) rather than a LUP. . . .[HMAPs] "are prepared under 43 C.F.R § 4710.3-1. HMAPs establish short- and long-term management and monitoring objectives for a specific [wild horse and burro] herd and its habitat. HMAPs also identify the actions to be taken to accomplish herd and habitat management objectives." AR00061-00062. In its 2020 report to Congress, BLM acknowledged "HMAP development is a key component in the decision-making process for BLM's wild horse and burro management activities on the ground." AR03622.

[4] AML refers to a "number that is the high point of an established population range to maintain a thriving ecological balance, based on available forage, water, and other resource needs or conflicts (related to management of wild horses and burros)." AR01895. The RMP identifies the AML for HMAs within the Blue Wing Complex as 553 for horses and 90 for burros. *See* AR03280.

public lands by assessing resource conditions and evaluating rangeland health standards. Through this process, based on monitoring and professional observations, plans are developed to include strategies or management actions to meet objectives and land health standards. Based on plan evaluations, the BLM may issue decisions that include changes in grazing management or adjustment in AUMs. . . .

Based on current regulatory requirements, policy, and current land use plan decisions, the [Winnemucca District] will continue to adjust livestock AUMs by allotment on a case-by-case basis . . .

AR02739.[5] Further, "[i]f monitoring data indicate that adverse impacts on resources are occurring as a result of livestock, wild horses, or burros, appropriate management actions (e.g., adjust AUMs or AMLs, fence, season of use) will be made to the specific class of use (i.e., livestock, wild horses, burros) causing the impacts. In absence of specie specific monitoring data, adjustments in available forage will be proportional to applicable livestock active AUMs and WHB AMLs." AR01829.

The RMP also states that BLM is to monitor the RMP to ensure its objectives are met. *See* AR01793. "BLM may modify or adjust management without amending or revising the plan as long as assumptions and impacts disclosed in the analysis remain valid and broad-scale goals and objectives are not changed." *Id.*

### B.     The National Environmental Policy Act

On October 23, 2017, BLM published the phased 20-year Blue Wing Complex Gather Plan Final Environmental Assessment, DOI-BLM-NV-W010-2015-0034-EA, and its associated Finding of No Significant Impact (FONSI) and Decision Record in an attempt to comply with the National Environmental Policy Act, or NEPA. This assessment and its adoption will be referred to as the "Gather EA" throughout this Motion. *See* AR03268-03557. No HMAPs have been created for any of the HMAs in the Blue Wing Complex; no HMAPs were consulted for the Gather-EA. *See id.* In looking at project alternatives, the Gather-EA addresses AMLs for the Complex, stating that the

---

[5] BLM also is authorized to close public lands to livestock grazing. In its Wild Horses and Burros Management Handbook, BLM notes: "If necessary to provide habitat for [wild horses and burros], to implement herd management actions, or to protect [wild horses and burros] from disease, harassment or injury, the authorized officer may close areas of the public lands to grazing use by all or a particular kind of livestock (43 C.F.R. § 4710.5(a))." AR00060.

AML range is 333-553 for horses and 55-90 for burros.[6] *See* AR03279. The purpose of the alternatives "is to reduce the wild horse and burro population in order to achieve low AML." AR03281. To determine the number of horses and burros in excess of AMLs, the analysis relies on monitoring data from December 2014 animal count estimates.[7] *See* AR03279.

The Gather-EA notes that it is not intended to establish or adjust AMLs or livestock use, clarifying that "[f]uture decisions regarding long-term management within the Blue Wing Complex would continue to be accomplished through a Herd Management Area Plan" (despite no HMAPs having been created). AR03281. Numerous members of the public asked BLM to consider these issues, but BLM dismissed such comments by stating they were outside the scope of the Gather-EA.[8] *See* AR03529-03531, 03546-03547. BLM also deemed range improvements, such as moving fencing and developing water sources, to be outside the scope of the Gather EA, though both greatly impact the management of the Blue Wing Complex wild horses and burros and would be considered in an HMAP. *See* AR03542. BLM adopted Alternative B, which calls for multiple gathers and removals over 20 years, accompanied by fertility control tools. *See* AR03549. Approximately 30% of the low AML would be managed as non-breeding. *See* AR03295. Population growth control treatments are to include treating mares with a fertility control vaccine (PZP/GonaCon). *See*

---

[6] These ranges "were established through Final Multiple Use Decisions (FMUD) based on monitoring data." *Id.* The most recent FUMD cited is from a 1999 Appeal Order. *See* AR03280. However, AMLs are supposed to be "based on many factors such as forage and water availability, animal movement patterns, productivity and limitations of the range, trend, climate and actual use." AR03530.

[7] Fall 2017 estimates were based "directly on the December 2014 estimates (Lubow 2015), with three years of projected population growth (December 2014 to December 2015, to December 2016, and to Fall 2017). Projected annual population growth rates are 20% for horses (based on nationally used values for projection) and 11% for burros (based on assumed growth rates that have been applied locally in the Winnemucca District)." AR03279.

[8] *See e.g.,* AR03529 (BLM that evaluation and adjustment of AMLs was "outside the scope of this analysis"); AR03530 (BLM that "[c]hanges to the ALM are appropriate only if multiple use allocations are being adjusted through the land-use planning process, or if monitoring data demonstrates that the AML is either set too high or too low within the existing multiple use allocations and after BLM conducts the appropriate environmental analyses and provides opportunities for public input through a public decision-making process. BLM is mandated to manage [wild horses and burros] at the established AMLs and remove animals in excess of the established AML range"); AR03529-03530 (BLM stating that "[u]ntil such time as the RMP is amended," BLM is required" to adhere to existing livestock allocations); AR03546 (BLM stating "[a]djustments to livestock grazing cannot be made through a gather EA")

AR03295, 03550.

The Gather-EA envisions removing over 88% of the horses and burros estimated to live in the Blue Wing Complex.[9] *See* AR03279. The impact of such a significant reduction was not addressed by BLM. *See* AR03268-03557. BLM also did not address why a 20 year plan was being adopted other than to say "[g]radually removing [wild horses and burros] would help alleviate holding capacity limitations within short and long-term holding facilities." AR03296. And, the Gather-EA "is designed to be flexible in management actions due [to] national priorities, available holding space and budget constraints." AR03536.

In addressing the impact of gather operations on wild horses and burros, the Gather-EA does not differentiate between the two species. *See* AR03356-03359. While acknowledging that gather operations can be stressful to the animals, BLM notes that gather related mortality generally averages .5%, with another .6% attributable to animals being euthanized due to pre-existing conditions. *See* AR03356. Since 2017, when the Gather-EA was adopted, mortality for burros associated with Blue Wing Complex gathers actually has been much higher – ranging from 5% to 17.5%! *See* Exhs. 3-5 to Ford Decl.; Exhs. 3-5 to Motion for Judicial Notice (MJN).  New scientific information demonstrates that gather operations impact burros differently than horses. *See* Ford Decl. at ¶¶24-30. Despite this data and new information, BLM has not completed a new or supplemental Environmental Assessment for the Blue Wing Complex.

## III.   STANDARD OF REVIEW

The moving party on motion for summary judgment typically has the burden of demonstrating that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. Proc. 56(a). When addressing a summary judgment motion in a case that involves the Mandamus and Venue Act or APA, the court acts more like an appellate tribunal than a trial court because the scope of its review generally is limited to reviewing the administrative record, deciding relevant questions of law, interpreting statutory and regulatory provisions, and determining the meaning or applicability of agency action. *See* 5 U.S.C. §706; *Koopmann v. U.S. Dep't of Transp.*, 335 F. Supp. 3d 556 (S.D.N.Y. 2018); *New York v. U.S.Dep't*

---

[9] This percentage is based on the Fall 2017 estimate of 3,340 horses and burros, compared to the AML low of 388 horses and burros. *See* AR03279.

*of Health & Hum. Servs.*, 414 F. Supp. 3d 475, 516 (S.D.N.Y. 2019); *Davidson v. United States Dep't of State*, 113 F. Supp. 3d 183 (D.D.C. 2015).

**IV.     STANDING**

Plaintiffs have filed, concurrent with this Motion, the declarations of Laura Leigh, individually and on behalf of Wild Horse Education; Laurie Ford on behalf of Wild Horse Education; and Manda Kalimian on Behalf of the CANA Foundation to establish standing in this matter.

**A.     Zone of Interest**

Under both the Mandamus and Venue Act and the APA, the first step in establishing standing requires a demonstration that the plaintiff falls within the "zone of interest" protected by the at-issue law, which may include statutes or regulations. *See Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020); *Hernandez-Avalos v. INS*, 50 F.3d 842, 846-847 (10th Cir. 1995); *Giddings v. Chandler*, 979 F.2d 1104, 1108-1110 (5th Cir. 1992). The "zone of interest" test "is not meant to be especially demanding." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399-400 (1987). The Supreme Court has emphasized that a plaintiff's claim need only "arguably" fall within the zone of interest, which "indicate[s] that the benefit of any doubt goes to the plaintiff." *Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d at 128 (2d Cir. 2020) (citing to *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224-225 (2012).)

Plaintiffs' First, Second, Third, Fourth, and Fifth Causes of Action consist of Mandamus and Venue Act or APA claims based upon violation of the WHBA and NEPA. The WHBA provides the statutory authority by which BLM manages wild horses and burros on public lands. 16 U.S.C. §1331 et seq. The congressional findings and declaration of policy for the WHBA states:

> Congress finds and declares that wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene. It is the policy of Congress that wild free-roaming horses and burros shall be protected from capture, branding, harassment, or

death; and to accomplish this they are to be considered in the area where presently found, as an integral part of the natural system of the public lands.

16 U.S.C. §1331. This Congressional finding requires that management activities affecting wild horses be conducted at the minimal feasible level. *See id.* at §1333(a).

Plaintiffs consist of people with an interest in ensuring that wild free-roaming horses and burros are treated as an integral part of public lands and that management activities are conducted at the minimal level feasible. *See e.g.*, Leigh Decl. at ¶¶3-7, 12; Ford Decl. at ¶¶3; Manda Kalimian Decl. at ¶¶4, 18. As such, they arguably are within the zone of interests to be protected and have a clear right to pursue the relief requested.

In enacting NEPA:

Congress's purpose in enacting NEPA was to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; . . . promote efforts which will prevent or eliminate damage to the environment and biosphere . . . ; [and] enrich the understanding of the ecological systems and natural resources important to the Nation." Naturally, NEPA's zone of interests covers environmental injuries and not purely economic ones. . . . Environmental injuries include, but are not necessarily limited to, detrimental effects upon a plaintiff's "recreational use and aesthetic enjoyment."

*Ecosystem Inv., Partners v. Crosby Dredging, L.L.C.*, 729 F. App'x 287, 294-95 (5th Cir. 2018) (internal citations omitted). Conservacional interests also are recognized under NEPA. *See Bd. of Cnty. Comm'rs of Rocky Mt. Wild v. United States BLM*, 584 F. Supp. 3d 949, 963 (D. Colo. 2022).

Plaintiffs consist of an individual and organizations averring environmental, aesthetic, and conservational injuries that fall within NEPA's zone of interests. See e.g., Leigh Decl. at ¶¶3-8, 11-15, 42; Manda Kalimian Decl. at ¶¶4-6, 10-13, 15-18. Thus, they have a clear right to pursue the relief requested.

## B.    Article III

To demonstrate Article III standing to sue, plaintiffs must show (1) they suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) the injury is fairly traceable to defendants' challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

### 1.    Plaintiffs have suffered injury in fact.

Standing can apply to an individual, or where an organization is the plaintiff, there are two types of standing: organizational and associational (or representative). *See N.Y. Civil Liberties*

1   *Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2011); *Warth v. Seldin*, 422 U.S. 490, 511

2   (1975). Organizational standing exists where an organization sues in its own right to seek judicial

3   relief from injury to itself. *See id.* Alternatively, an organization can assert associational standing to

4   "sue on behalf of its members . . . ." *N.Y. Civil Liberties Union*, 684 F.3d at 294. Further, "[i]t is

5   well settled that where multiple parties seek the same relief, 'the presence of one party with

6   standing is sufficient to satisfy Article III's case-or-controversy requirement.'" *Centro de la*

7   *Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017)

8   (citations omitted).

9         The injury in fact requirement of standing can be established when a plaintiff is deprived of

10  a procedural right that is connected to the protection of an established interest (such as those

11  established to be within the "zone of interest" of applicable law). *See Rice v. Vill. of Johnstown*, 30

12  F.4th 584, 591 (6th Cir. 2022); *Kingman Reef Atoll Invs., L.L.C. v. DOI*, 195 F. Supp. 2d 1178,

13  1187 (D. Haw. 2002); *Am. Horse Prot. Asso. v. Frizzell*, 403 F. Supp. 1206, 1213 (D. Nev. 1975).

14  For example, "[i]nterpreting NEPA broadly, [courts] have recognized standing for individuals and

15  groups of individuals who sue to require preparation of an EIS, when they contend that a challenged

16  federal action will adversely affect the environment." *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1179

17  (9th Cir. 2004). Additionally, standing exists where plaintiffs challenges an agency action that

18  deprived them of their opportunity to comment. *See McGarry v. Sec'y of the Treasury*, 853 F.2d

19  981, 984 (D.C. Cir. 1988) (in such cases, plaintiffs need only state that "had the opportunity been

made available, it would have commented upon" the agency action).

20        For cases involving the WHBA and NEPA, "[i]t is clear that the person who observes . . . a

21  particular animal threatened by a federal decision is facing perceptible harm, since the very subject

22  of his interest will no longer exist." *Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127,

23  144 (D.D.C. 2020) (quoting *Lujan*, 504 U.S. at 566). *See also Am. Horse Prot.Asso.*, 403 F. Supp. at

24  1214 (finding an injury in fact where aesthetic or environmental interests have been impacted).

25  Under the First Amendment, the Ninth Circuit has held that a right of access exists for wild horse

26  and burro gathers conducted by BLM. *See Leigh v. Salazar*, 677 F.3d 892, 897-900 (9th Cir. 2012).

27  Where this right has been violated, a cognizable injury in fact exists. *See Lujan*, 504 U.S. at 560.

28        For organizations, standing exists where the challenged violation results in an impairment of

19

1  the organization's ability to fulfill its mission or has resulted in a diversion of resources from other

2  activities of the organizations. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982);

3  *Friends of the Earth v. Sanderson Farms, Inc.*, 992 F.3d 939, 942 (9th Cir. 2021); *Centro de la*

4  *Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104 (2d Cir. 2017); *Nnebe v.*

5  *Daus*, 644 F.3d 147, 156 (2d Cir. 2011).

6         a)      **WHE and Laura Leigh have suffered injury in fact.**

7         Plaintiff Laura Leigh, individually, and on behalf of WHE, has suffered injury because of

8  Defendants' failure to create an HMAP and failure to adequately conduct an environmental review

9  under NEPA. Ms.Leigh has visited the wild horses and burros at the Blue Wing Complex and

10  intends to continue to visit, observe, enjoy, and photograph the wild horses and burros of the Blue

11  Wing Complex in the future. *See* Leigh Decl. at ¶¶13-14. Ms. Leigh and members of WHE have

12  formed strong bonds with wild horses and burros in the Blue Wing Complex. *See id.* at ¶11. But,

13  BLM's action (or inaction) threatens their ability to recreate and enjoy these horses. *See id.* at ¶43.

14  Further, by failing to create an HMAP prior to gathering horses in the Complex, Ms. Leigh's right

15  to comment has been impaired. *See id.* at ¶¶16-22. By failing to adhere to the procedural

16  requirements of the WHBA and NEPA, Ms. Leigh suffered injury to her aesthetic and procedural

17  interests—interests that are recognized under the WHBA and NEPA as challenged by the

18  Mandamus and Venue Act and APA. *See id.* at ¶43.

19         WHE is a national nonprofit corporation whose mission is to protect and preserve wild

20  horses and burros on range, during and after capture. *See id.* at ¶¶4-5. It aims to remove the

21  curtain that veils governmental activities against wild horses from the public eye in order to

22  advance wild horse advocacy and support. It also aims to facilitate public awareness and

23  participation in wild horse issues. *See id.* Advocating for the wild horses and burros in the Blue

24  Wing Complex is a past, present, and future important issue for Laura Leigh, for WHE, and for

25  WHE's members. *See id.* at ¶43.

26         WHE has established injury in fact for associational standing. The WHE also has

27  organizational standing because the Blue Wing Complex Gather Plan and its implementation have

28  caused the organization to divert an inordinate amount of resources in staff time and attention to the

   Blue Wing Complex. *See id.* at ¶44.

b)      **The CANA Foundation has suffered injury in fact.**

"CANA is a non-profit corporation whose mission is conserve and restore the North American landscape by creating sustainable environmental ecosystems through restoring and preserving biodiversity and native species (also known as "rewilding"); in particular, CANA's focus is on the reintroduction and continuing survival of wild horses as a keystone species within their ecosystems. CANA believes that reintroducing and sustaining wild horses in their historic habitats can improve the overall health and vitality of North American grasslands. CANA's initiatives to achieve this mission foster community empowerment, land conservation, and the sustainable management and preservation of America's wild horse populations." Kalimian Decl. at ¶4. This mission includes monitoring and advocating for wild horses in the Blue Wing Complex. *See id.* at ¶5. CANA suffered organizational injury to their right to publicly comment on management strategies for wild horses in the Blue Wing Complex by Defendants' failure to create an HMAP. *See id.* at ¶¶7-10. Had an HMAP had been created, CANA would have submitted comments during the scoping period, with comments addressing rewilding as an alternative management strategy for wild horses and burros. *See id.* at ¶9. Not only did this result in CANA's right to comment being injured, but as a result, CANA's primary organization mission was thwarted. *See id.* at ¶¶11-18. Accordingly, Plaintiffs have established injury in fact for CANA's organizational standing.

2.      **Plaintiffs' injuries are fairly traceable to BLM's conduct, and this Court can redress those injuries.**

Every injury addressed above is predicated upon Defendants' failure to follow the WHBA and its implementing regulations as regards the creation of HMAPs and directive to conduct gathers at the minimum feasible level and/or upon Defendants' failure to conduct an appropriate environmental review. The relief being sought would result in the prohibition of any future gathers (and corresponding future injuries) until Defendants complied with the WHBA, NEPA, and APA. By doing so, injury to Plaintiffs' individual, associational, and organizational interests would be rectified.

3.      **Plaintiffs have exhausted their administrative remedies.**

Plaintiff Laura Leigh, in her individual capacity and on behalf of WHE, actively participated

21

in the public commenting process of the Blue Wing Complex Gather EA. *See e.g.,* AR03527-03529, 03532-03533, 03544-03546. Plaintiffs CANA Foundation and Wild Horse Education also sent a letter to Defendant Jon Raby on July 18, 2022, demanding that Defendants cancel all future gathers under the 2017 Gather EA until Defendants develop an HMAP and a new or supplemental gather EA pursuant to recent case law. *See* AR03874-03887.

## V.    ARGUMENT

### A.    The WHBA and its implementing regulations establish mandatory duties with which BLM must comply.

Plaintiffs' First, Second, Third, Fourth and Fifth Causes of Action all contain allegations regarding BLM's violation of mandatory duties that have been established by the WHBA and its implementing regulations. In determining whether agency action is in violation of a mandatory duty, courts must often interpret the meaning of statutory or regulatory provisions to determine if an agency's actions contradict a legal mandate. *See Knuckles v. Weinberger*, 511 F.2d 1221 (9th Cir. 1975); *Workman v. Mitchell*, 502 F.2d 1201, 1205 (9th Cir. 1974); *New York v. United States HHS*, 414 F. Supp. 3d 475, 517-18 (S.D.N.Y. 2019); *Greene v. Costle*, 577 F. Supp. 1225, 1228 (W.D. Tenn. 1983); *McMahon v. Califano*, 476 F. Supp. 978, 982 (D. Mass. 1979); *Andujar v. Weinberger*, 69 F.R.D. 690, 693-94 (S.D.N.Y. 1976). "In statutory construction the function of the court is to give effect to legislative intent 'and there is no invariable rule for the discovery of that intent.'" *Greene*, 577 F. Supp. at 1228 (quoting *U.S. v. American Trucking*, 310 U.S. 534, 542 (1940)). Regulations have the same effect as statutes, since the agency has a duty to comply with regulations it has established. *See Workman*, 502 F.2d at 1205; *McMahon*, 476 F. Supp. at 982; *Andujar*, 69 F.R.D. at 693-94.

Initially, courts should look to the wording of the law. *See id.* A well-settled principle of statutory construction is that each word of a statute must be accorded meaning. *See Hamazaspyan v. Holder*, 590 F.3d 744, 749 (9th Cir. 2009). Statutory titles and headings also can be viewed to establish meaning. *See United States v. Henry*, 1 F.4th 1315, 1333 (11th Cir. 2021). Where statutory language appears clear and ambiguous, courts normally look no further, but "[w]hen aid to construction of the meaning of the words . . . is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.'" *Train v.*

1   *Colorado Pub. Int. Research Group*, 426 U.S. 1, 10 (1976) (quoting *United States v. American*

2   *Trucking Assns.*, 310 U.S. 534 (1940)).

3       Supreme Court doctrine, established in *Auer v. Robbins*, provides that courts also may

4   examine an agency's interpretation of its own regulations where genuine ambiguity exists. *See Auer*

5   *v. Robbins*, 519 U.S. 452 (1997); *see also Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019);

6   *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012). In such circumstances,

7   deference should be given to reasonable agency interpretation, although deference does not apply

8   where such interpretation is plainly erroneous or inconsistent with the regulation. *See Kisor*, 139 S.

9   Ct. at 2415; *Christopher*, 132 S. Ct. at 2166; *Auer v. Robbins*, 519 U.S. 452, 461 (1997). Nor does

10  such deference mean that the court shouldn't first rely on the ordinary tools of construction, such as

11  looking at the "text, structure, purpose, and regulatory history" of a regulation. *Sec'y of Labor v.*

12  *Seward Ship's Drydock, Inc.*, 937 F.3d 1301, 1310 (9th Cir. 2019); *see also Kisor*, 139 S. Ct. at

13  2415-2416.

14      In this case, BLM has mandatory duties to conform gather operations to land use plans and

15  HMAPs. Further, after determining that excess horses need to be removed from the Blue Wing

16  Complex, BLM is required to remove these horses immediately.

17      **1.    BLM must prepare Land Use Plans and HMAPs prior to engaging in
            management activities, such as the removal of horses and burros.**

18      Congress enacted the WHBA to ensure that "wild-free roaming horses and burros shall be

19  protected from capture, branding, harassment, [and] death," and will "be considered in the area

20  where presently found, as an integral part of the natural system of the public lands." 16 U.S.C.

21  §1331. The WHBA provides the statutory authority by which the Secretary of the Interior

22  "protect[s] and manage[s]" wild horses and burros on public lands. 16 U.S.C. §1333(a). "All

23  management activities shall be at the minimal feasible level." *Id.* This includes management

24  activities related to the removal of excess animals. *See id.* at §1333(b).

25      The Secretary has delegated its responsibilities to BLM, which in response has adopted

26  implementing regulations. *See* 43 C.F.R. §4700 *et seq.* Subpart 4710 of these regulations, entitled

27  "Management Considerations," addresses HMAs and HMAPs as follows:

28

§4710.3-1   Herd management areas.
Herd management areas shall be established for the maintenance of wild horse and burro herds. In delineating each herd management area, the authorized officer shall consider the appropriate management level for the herd, the habitat requirements of the animals, the relationships with other uses of the public and adjacent private lands, and the constraints contained in §4710.4. The authorized officer shall prepare a herd management area plan, which may cover one or more herd management areas.

§4710.4   Constraints on management.
Management of wild horses and burros shall be undertaken with the objective of limiting the animals' distribution to herd areas. Management shall be at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans.

Section 4710.3-1's use of the word "shall" creates a mandatory duty for BLM to create HMAs "for the maintenance of wild horse and burro herds" and a mandatory duty to create HMAPs for these HMAs. *See Firebaugh Canal Co. v. United States*, 203 F.3d 568, 573-74 (9th Cir. 2000) ("[t]he term 'shall' is usually regarded as making a provision mandatory, and the rules of statutory construction presume that the term is used in its ordinary sense unless there is clear evidence to the contrary"); *cf. Mitchael v. Colvin*, 809 F.3d 1050, 1054 (8th Cir. 2016) (finding that the term "may" does not establish a "clear and non-discretionary duty.") Further, the Section clearly links the creation of HMAs with consideration of Section 4710.4.

The wording of Section 4710.4 establishes, <u>as a constraint on management</u>, that both LUPs and HMAPs are a prerequisite for taking management actions since management "shall" be undertaken based upon the objectives in LUPs "and" HMAPs. *See Bruce v. First Fed. Sav. & Loan Asso.*, 837 F.2d 712, 714-15 (5th Cir. 1988) (finding that the use of the word "and" is "to be accepted for its conjunctive connotation rather than as a word interchangeable with 'or'"); *see also ErieNet, Inc. v. Velocity Net, Inc.*, 156 F.3d 513, 516 (3d Cir. 1998) (holding that effect must be given to all of a law's provisions, "so that no part will be inoperative or superfluous, void, or insignificant.")

### a)   Regulatory History

The clear and plain language of BLM's regulations creates a mandatory duty for BLM to create LUPs and HMAPs before engaging in management activities; therefore, there is no need to look further for purposes of statutory construction.  But, to the extent the Court seeks to look deeper into the intent of the regulations, the regulatory history further establishes BLM's duty is

24

ministerial.

The current BLM regulations were adopted in 1986, as amended in 1991. *See* Notes for 43 C.F.R. Subtit. B, Ch. II, Subch. D, Group 4700; 51 Fed. Reg. 7410, Mar. 3. 1986; 56 Fed. Reg. 786, January 9, 1991; 43 C.F.R. §4700 *et seq.* (1985); and 49 Fed. Reg. 49252, Dec. 18, 1984, attached as Exh.s 7-11 to MJN. Prior to 1986, the regulations did not provide that HMAs "shall be established for the maintenance of wild horse and burro herds," did not contain any language regarding consideration of LUPs or HMAPs, and did not connect any land use or management plans with HMAs.[10] *See* 43 C.F.R. §4700 et seq. (1983), attached as Exh. 10 to MJN.

In 1984, BLM proposed changes to its regulations, introducing the requirements for HMAs, HMAPs and LUPs, which were published for comment. *See* 49 Fed. Reg. 49252 at proposed §§4710.3-1, 4710.4, attached as Exh. 11 to RJN. This proposed rulemaking revises the provisions on wild free-roaming horses and burros in Part 4700 to reduce the regulatory burden on the public, to clarify the management procedures of the Bureau of Land Management as they affect the public, to remove unnecessary self-regulating provisions, and to arrange the regulations by subject. *Id.* at Summary on p. 49252. Specific to management considerations: "The proposed rulemaking, amends existing Subpart 4730 as new Subpart 4710 to link the management of wild free-roaming horses and burros with the Bureau's planning system; to identify precisely the lands that will be considered for wild horse and burro management; to require that herd management area plans be prepared for all herd management areas; to allow the authorized officer to protect wild horses and burros and their habitat by closing certain lands to all or particular kinds of livestock grazing or by removing unauthorized livestock . . ." *Id.* (emphasis added). In so doing, the requirement to consult both LUPs and HMAPs was created under a section entitled "Constraints on management," – a title that was

---

[10] The pre-1986 regulations provided that BLM "may designate and maintain specifically designated ranges principally for the protection and preservation of wild free-roaming horses and burros." Exhibit 10 at §4730.5. Herd management areas are mentioned once, without context. *Id.* The regulations stated that BLM "shall, in connection with the designation of a specific range, develop a proposed wild free-roaming horse or burro management plan designed to protect, manage, and control wild free-roaming horses and burros on the area on a continuing basis." *Id.* at §4730.6. These plans are not tied to ensuring that maintenance activities are "undertaken with the objective of limiting the animals' distribution to herd areas" nor at ensuring that management "shall be at the minimum level necessary." *Id.* at §4700 et seq.

non-existent in the earlier regulations. *See* 43 C.F.R. §4710.4; *cf.* Exh. 10.  Thus, the regulatory

history further establishes that land use plans and HMAPs were purposely included in the

regulations as a mandatory duty for all herd management areas and for the purpose of management

activities affecting wild horses.

### b)        BLM's Interpretation

BLM's implementing regulations clearly establish that LUPs and HMAPs must be created

for the management of HMAs, thus, no Auer deference should be granted to any BLM

interpretation that is in contradiction. As the U.S. Supreme Court has elucidated:

> First and foremost, a court should not afford Auer deference unless the regulation is
> genuinely ambiguous. If uncertainty does not exist, there is no plausible reason for
> deference. The regulation then just means what it means—and the court must give it effect,
> as the court would any law. . . . Deference in that circumstance would "permit the agency,
> under the guise of interpreting a regulation, to create de facto a new regulation." Auer does
> not, and indeed could not, go that far. See Kisor, 139 S. Ct. at 2415 (internal citations
> omitted).

Plaintiffs nonetheless anticipate BLM arguing that (1) the WHBA gives it discretion to rely

on documents other than LUPs and HMAPs and (2) any duty to create an LUP or HMAP is

unenforceable because the regulations do not create a deadline by which these management

documents must be created.[11] Both arguments must necessarily fail.

First, Defendants may argue that Section 1333(b) of the WHBA gives it discretionary

authority regarding plans to remove excess wild horses and burros in so far as it states the Secretary

of the Interior may consider inventory, land use planning documents, and "such additional

information as becomes available." 16 U.S.C. §1333(b). The problem with this interpretation and

argument is that it ignores the effect of BLM's regulations. In *United States ex rel. Accardi v.*

*Shaughnessy*, the Attorney General adopted regulations that limited certain of his discretionary

powers relating to immigration. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260,

265-268 (1954). The Court held the Attorney General was unable to exercise the full discretion that

was his prior to the regulation's enactment; should he wish to restore his full discretionary

---

[11] BLM may suggest that the interpretations of the WHBA contained within its Wild Horses and
Burros Management Handbook are evidence that its duty is discretionary. This handbook is not
binding law and cannot alter BLM's mandatory duties. *See Christopher*, 567 U.S. at 155; *Williams
v. Hanover Hous. Auth.*, 871 F. Supp. 527, 531 (D. Mass. 1994).

authority, he would need to amend the regulations. *See id; see also United States v. Nixon*, 418 U.S. 683, 695-96 (1974) (finding that where the Attorney General delegated some of his powers to a Special Prosecutor via regulations, the Attorney General could not reassert these powers without amendment of the regulations). Similarly, in *Service v. Dulles*, Congress awarded the Department of State broad discretion in making determinations to terminate Department employees. *See Service v. Dulles*, 354 U.S. 363 (1957). The Department thereafter adopted regulations that established standards and procedural requirements governing such termination, which regulations the Secretary of State did not follow. *See id.* at 387-388. The Court ruled that "[w]hile it is of course true that under the [statute] the Secretary was not obligated to impose upon himself these more rigorous substantive and procedural standards, neither was he prohibited from doing so . . . and having done so he could not, so long as the Regulations remained unchanged, proceed without regard to them." *Id.* at 388.

BLM made the decision to implement its authority under the WHBA by adopting regulations that mandate management based upon *both* LUPs *and* HMAPs. This decision purposely established "constraints on management." Now, if BLM regrets that decision, it must go through the process of changing Section 4710.4 to allow consideration of Gather EAs in the absence of LUPs and HMAPs.

Next, while the Section 4710.3-1 mandate to create an HMAP has no identifiable deadline, Section 4710.4 establishes the deadline by tying management to "the objectives identified in approved land use plans and herd management area plans." 43 C.F.R. 4710.4. To find otherwise would make the regulatory mandate to create HMAPs for all HMAs a nullity. *See R.J. Reynolds Tobacco Co. v. Cnty. of L.A.*, 29 F.4th 542, 559 (9th Cir. 2022) (declining statutory interpretation that renders sections superfluous); *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 965 (9th Cir. 2013) ( "[i]n interpreting statutes, we observe the 'cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant'", quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)). Further, to find that there is no deadline to create LUPs and HMAPs undermines the regulations' stated purpose of having it considered for the purpose of managing wild horses "at the minimum level necessary." *Id. See also* 16 U.S.C. §1331(a) (the goal

of the WHBA is to ensure the protection and management of wild horses so as to ensure that "[a]ll management activities" are "at the minimal feasible level" ).

### 2. The WHBA establishes a mandatory duty to remove excess animals immediately.

The WHBA provides that where BLM determines excess horses or burros need to be removed from public lands, it "shall immediately remove" these animals. 16 U.S.C. § 1333(b)(2).[12] "'Shall' imposes a mandatory duty; BLM must immediately remove the excess, no matter how difficult the task." *Friends of Animals v. Culver*, 610 F. Supp. 3d 157, 170 (D.D.C. 2022).

### B. BLM has failed to comply with its mandatory duties as established through the WHBA and its implementing regulations.

### 1. BLM did not create an HMAP prior to engaging in gather operations.

Summary judgment for Plaintiffs' First, Second, Third, and Fourth Causes of Action is proper because BLM violated 16 U.S.C. § 1333 and 43 C.F.R. § 4710.4 by authorizing gather operations without first developing an HMAP. Here, no HMAP was created for the Blue Wing Complex or any of its HMAs. Further, the Gather-EA did not properly conform to the Winnemucca District RMP's directive to create HMAPs. In the Blue Wing Complex Gather EA, BLM states the gather operations are "in conformance with" the Winnemucca District RMP. AR03322. That RMP, however, states that BLM must develop HMAPs, and these HMAPs "will be the vehicle for determining the management and objectives for the herds and their habitat." AR02231. By not creating any HMAPs, BLM not only violates the WHBA and its implementing regulations, but it also engages in gather operations that do not conform to the Winnemucca District RMP.[13]

### a) First Cause of Action

The First Cause of Action is brought under the Mandamus and Venue Act, which provides that "[d]istrict courts shall have original jurisdiction of any action in the nature of mandamus to

---

[12] BLM may suggest that the interpretations of the WHBA contained within its Wild Horses and Burros Management Handbook are evidence that "immediately" only means "as soon as possible." AR00074. This handbook is not binding law and cannot alter BLM's mandatory duties. *See Christopher*, 567 U.S. at 155; *Williams*, 871 F. Supp. at 531 (D. Mass. 1994).

[13] The Gather EA also specifically notes that "[f]uture decisions regarding long-term management within the Blue Wing Complex would **continue to be** accomplished through a Herd Management Area Plan…" AR03281 (emphasis added). Since no HMAPs exist, this statement is nonsensical.

28

compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. §1361. Mandamus relief is appropriate where a plaintiff establishes a defendant violated a clear, nondiscretionary duty to perform an act. *See Castillo v. Ridge*, 445 F.3d 1057, 1060 (8th Cir. 2006); *Schulke v. United States*, 544 F.2d 453, 455 (10th Cir. 1976); *Singh v. Still*, 470 F. Supp. 2d 1064, 1072 (N.D. Cal. 2007).

Because BLM has failed to create any HMAPs associated with the Blue Wing Complex, mandamus relief is proper. Without the relief requested, BLM can continue to remove wild horses and burros without the constraint of ensuring gather operations are done "at the minimum level necessary." *See* 43 C.F.R. § 4710.4. Indeed, BLM is continuing to remove wild horses and burros, recently reporting that the agency plans to do another gather at the Blue Wing Complex from July 8, 2024 to August 18, 2024. During this gather, BLM plans on removing an additional 1,373 horses and 356 burros. *See* Leigh Decl. at ¶45. For this reason, Plaintiffs respectfully request that the Court grant its request for summary judgment as to their First Cause of Action and order Defendants to halt any future gathers until such time as they develop an HMAP for the Blue Wing Complex.

### b)   Second Cause of Action

The Second Cause of Action is brought under Section 706(1) of the APA, alleging that Defendants have "unlawfully withheld or unreasonably delayed" their mandatory duty to prepare an HMAP for the Blue Wing Complex. *See* 5 U.S.C. § 706(1). The 9th Circuit distinguishes between action that is "unreasonably delayed" and action that is "unlawfully withheld," with the former applying to agency inaction in the face of a discretionary deadline, and the latter applying to actions where a mandatory deadline exists. *See Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 n.11 (9th Cir. 2002).

For cases involving action "unreasonably delayed," courts balance the "TRAC" factors elucidated in *Telecommunications Research & Action v. FCC (TRAC)*, 750 F.2d 70, 80 (D.C. Cir. 1984). Where a deadline exists, courts do not consider the TRAC factors. *See Biodiversity*, 309 F.3d at 1176 and n.11. The TRAC factors focus on (1) whether the delay in action is reasonable, (2) what interests are at stake, and (3) what the effect of expediting delayed action would be on agency

activities of a higher or competing priority. *TRAC*, 750 F.2d at 80.[14] In viewing these factors, courts need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed." *Id.*

Looking at whether delay is reasonable is the most important focus of a TRAC factor analysis. *See Cmty. Voice v. United States EPA*, 878 F.3d 779, 786 (9th Cir. 2017). This analysis may take into account whether Congress has provided some indication of the speed with which it expects the agency to proceed. *See TRAC*, 750 F.2d at 80. Generally, however, courts have found "reasonable" to be synonymous with "expeditious." *Indep. Min. Co. v. Babbitt*, 885 F. Supp. 1356, 1365 (D. Nev. 1995). And, reasonable time for agency action normally is considered in terms of months and not years. *See Cmty. Voice*, 878 F.3d at 787.

The TRAC factors note that courts must "take into account the nature and extent of the interests prejudiced by delay." *TRAC*, 750 F.2d at 80. More delay may be tolerated when the interests are purely economic; less delay may be tolerated when human health is at stake. *Id.* Where environmental and public health interests are impacted, this may be sufficient to compel agency action. *Glenwood Springs Citizens' All. v. United States DOI*, 639 F. Supp. 3d 1168, 1183 (D. Colo. 2022).

In looking at the effect of compelling agency action, courts sometimes consider an agency's justifications for delay. *W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1292 (D. Utah 2017). Yet in so doing, "neither a lack of sufficient funds nor administrative complexity, in and of themselves, justify extensive delay." *Biodiversity Legal Found. v. Norton*, 285 F. Supp. 2d 1, 16 (D.D.C. 2003). Here, Section 4710.4 provides the deadline for BLM's duty to create an HMAP – before management of wild horses is undertaken. *See* 43 C.F.R. §4710.4.  This is a concrete

---

[14] There are six *TRAC* factors: "(1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed." *TRAC*, 750 F.2d at 80.

1    timeframe; BLM has no discretion to create the HMAP after management of wild horses is

2    undertaken. Therefore, the Court is mandated by the APA to compel BLM's action, and Plaintiffs

3    respectfully request that the Court grant its request for summary judgment as to their Second Cause

4    of Action and order Defendants to halt any future gathers until such time as they develop an HMAP

5    for the Blue Wing Complex.

6          However, even if the court were to find that the application of the TRAC factors is

7    warranted, the requested relief should still be granted. Sections 4710.3-1 and 4710.4 were adopted

8    in 1986 – 37 years ago. *See* Exhs. 7-8 to MJN. And, the Winnemucca District RMP, which provides

9    that HMAPs will be used for management of horses and burros, was promulgated over 8 years ago.

10   *See* AR02231. Despite this, BLM has failed to create any HMAPs for HMAs in the Blue Wing

11   Complex. Surely this constitutes unreasonable delay under the TRAC factors. *See e.g., In re A*

12   *Cmty. Voice*, 878 F.3d 779, 783–84 (9th Cir. 2017) (eight-year delay unreasonable); *In re Pesticide*

13   *Action Network*, 798 F.3d 809, 815 (9th Cir. 2015) (after eight years and without a "concrete

14   timeline" for action, agency had "stretched the 'rule of reason' beyond its limits"); *In re Am. Rivers*

15   *& Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004) (agency's "six-year-plus delay is

16   nothing less than egregious"); *In re Bluewater Network*, 234 F.3d 1305, 1316 (D.C. Cir. 2000)

17   (nine-year delay unreasonable); *In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1150 (D.C. Cir.

      1992) (six-year delay unreasonable).

18         As regards the interests at stake, the WHBA's main interest is to protect wild horses, with a

19   recognition that such interest is "an integral part of the natural system of the public lands." 16

20   U.S.C. §1331. Further, Congress stated that this interest is important to "enriching the lives of the

21   American people." *Id.* Specific to the removal of excess horses, Congress declared that gather

22   operations are necessary "to restore a thriving natural ecological balance to the range, and protect

23   the range from the deterioration associated with overpopulation." *Id.* at §1333(b)(2). By not creating

24   an HMAP for the Blue Wing Complex, BLM's actions do not consider the full range of

25   management options available to protect wild horses, and delay goes against the interests

26   specifically elucidated by Congress.

27         Finally, Plaintiffs are unaware of any negative effect associated with compelling BLM to

28   create an HMAP. Plaintiffs are unaware of any justification for delaying HMAP creation for so

                                              31

many years. Taken together, contemplation of the TRAC factors leads to the conclusion that no reasonable justification exists for BLM's delay in creating an HMAP, and this delay goes against Congress' stated intent for legislating the WHBA. Thus, even if the court considers BLM's inaction as being "unreasonably delayed" versus "unlawfully withheld," Plaintiffs' request should be granted.  Without APA relief, BLM could withhold creating HMAPs indefinitely.

### c)      Third Cause of Action

The Third Cause of Action is brought under Section 706(2)(A), alleging that Defendants failure to create an HMAP is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A). The arbitrary and capricious standard is met where the there is no "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). Such examination takes into consideration whether the government's action is consistent with applicable statutes or regulations, as well as its own internal criteria. *See E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996); 5 U.S.C. §706(2)(A). Where an agency has "entirely failed to consider an important aspect of the problem" that is at issue, courts have held action to violate the APA. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

As addressed above, Defendants had a mandatory duty to compile an HMAP prior to any gather plan, with the objectives contained within the HMAP to be used to ensure "[m]anagement shall be at the minimum level necessary." 43 C.F.R. § 4710.4. BLM has no discretion in this regard, and its choice to proceed with the removal of wild horses and burros in the Blue Wing Complex without creating an HMAP is plain error contrary to law.

### d)      Fourth Cause of Action

Plaintiffs' Fourth Cause of Action is based upon the APA's provision for a court to set aside actions "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(C). A cause of action based upon this APA provision examines whether defendants' actions contravene the meaning of a statute or regulation. As established above, the WHBA provides the statutory authority by which the Secretary of the Interior, as delegated to BLM, protects and manages wild horse and burros, including the removal of horses and burros from public lands. 16 U.S.C. §1333.

This authority is limited by the provision that "[a]ll management activities shall be at the minimal feasible level." *Id.* BLM adopted regulations to implement the WHBA, and for the purposes of ensuring that management activities adhered to Section's 1333 limit on its authority, these regulations provide that "[m]anagement shall be at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans." 43 C.F.R. 4710.4. Defendants refusal to create an HMAP, as mandated by the WHBA and its implementing regulation and as directed by the Winnemucca RMP, clearly violates Section 706(2)(C) of the APA.

### 2.     BLM has failed to act on its excess determination immediately.

Summary judgment of Plaintiffs' First, Second, Third and Fourth Causes of Action is proper because BLM violated 16 U.S.C. § 1333(b)(2) by failing to remove excess horses and burros immediately. Here, BLM adopted a phased project for gathering and removing excess horses in the Blue Wing Complex over a twenty-year period of time.

### a)     First Cause of Action

The First Cause of Action is brought under the Mandamus and Venue Act, which provides plaintiffs relief where a defendant violates a mandatory duty. *See Castillo*, 445 F.3d at 1060; *Schulke*, 544 F.2d at 455; *Singh*, 470 F. Supp. 2d at 1072. As addressed above, the WHBA requires that once BLM decides excess animals need to be remove from public lands, it must remove these animals immediately. *See* 16 U.S.C. § 1333(b)(2). Without the relief request, BLM can continue to ignore its mandatory duty and wait for up to 20 years before removing excess horses and burros.

### b)     Second Cause of Action

Plaintiffs' Second Cause of Action focuses on agency action that has been unlawfully withheld or unreasonabley delayed. "[T]he APA commands courts to 'compel agency action unlawfully withheld or unreasonably delayed' when the agency is under a mandatory legal duty to act." *Gonzalez v. United States Dep't of Homeland Sec.,* 500 F. Supp. 3d 1115, 1131 (E.D. Cal. 2020).  The WHBA's immediacy requirement for removal of excess animals does not identify a specific deadline, and thus, Section 706(1)'s analysis properly focuses on action unlawfully delayed. *See W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1285 (D. Utah 2017)). In 1982, the D.C. Circuit Court of Appeals explored the Congressional intent in adopting Section 1333's immediacy requirement. *See American Horse Protection Asso. v. Watt*, 694 F.2d

1310, 1315-19 (D.C. Cir. 1982). The WHBA was adopted in 1971 to protect wild horses and burros from threats to their survival. *See id.* at 1316. At that time, there was no immediacy language as regards the removal of excess horses. *See id.* at 1317. However, in 1978, Congress amended the WHBA. *See id.* at 1316. "[T]he 1978 amendments made it clear that Congress expected prompt administrative action to deal with wild horse overpopulations that had developed in the period 1971-78. . . . Most importantly, the new section 1333(b)(2) specifies that excess horses 'shall' be removed 'immediately.'" *Id.* at 1317. In this context, "immediately" is synonymous with "expeditiously." *Id.* at 1316.

In 2017, the Utah District Court invalidated a "phased-in approach" whereby BLM planned to remove wild horses from public lands over a six to ten-year period of time. *W. Rangeland Conservation Ass'n*, 265 F. Supp. 3d at 1287. In that case, Plaintiffs argued that "immediately" means "without delay." *Id.* at 1283. BLM argued that "the lack of specific statutory deadlines indicates that 'pace and timing of removals are discretionary.'" *Id.* The Court agreed with Plaintiff, noting that "Congress' use of [the term 'immediately'] to govern necessary removal actions . . . evokes significant urgency and shuns delay." *Id.* In so finding, the Court recognized that some delay might be reasonable, but the timing of removals is not entirely within BLM's discretion. *See id.* at 1284.

> The term "immediately" must mean something—its presence in the statute necessarily places some temporal limits on any discretion BLM has to plan and execute removal actions . . . the statute indicates that "immediate[]" removal action is required "so as to restore a thriving natural ecological balance to the range[] and [to] protect the range from the deterioration associated with overpopulation." . . . Any unnecessary delay or lack of urgency in reducing the population to within AML would contravene these purposes by allowing excess wild horses to persist, propagate, and consume an imbalance of already scarce resources. With the viability of the range and the wild horses themselves in immediate peril as a result of overpopulation, BLM cannot postpone action to remove excess wild horses once it determines that such action is necessary.

*See id.* at 1284-85 (internal citations omitted). Thus, BLM "may only delay necessary removal actions insofar as delay is necessary to plan and execute the actions safely and effectively." The Court also explained that "certain broad administrative constraints . . ., including competing removal needs across multiple states, severe budget limitations, and shortage of space for removed animals, cannot erase the urgency that Section [1333] clearly demands." *Id.* at 1285 n.14. Specifically, the Court concluded that the agency's plan to remove excess animals over a six-to-ten

year period of time could not be justified as necessary by virtue of limited resources. *See id.* at 1286 ("the fundamental nature of BLM's statutory duty cannot be altered by the agency's budgetary constraints).

Fundamentally, a plan to remove excess animals in phases over a matter of years is an approach that is "gradual" and not "immediate." *Id.* BLM's reliance on such an approach is in violation of Section 1333's immediacy requirement and constitutes action unlawfully delayed under 5 U.S.C. § 706(1). *See id.* at 1287. In 2022, a 10-year gather plan adopted by BLM was similarly held to be in violation of Section 1333's immediacy requirement. *See Friends of Animals v. Culver*, 610 F. Supp. 3d 157, 171 (D.D.C. 2022).[15] BLM argued that the term "immediately remove" had to "account for the practical realities of the removal process." *Id.* at 169. "Doing so, BLM propose[d], would lead the Court to conclude that waiting ten years to remove excess horses is 'immediately' removing excess horses." *Id.* The Court did not accept this argument:

> There is no indication in the statute that "immediately" does not require BLM to remove excess horses or burros "without delay," and, on the Court's review, there is no statutory definition otherwise altering the plain meaning of "immediately." . . . Even if there were some ambiguity to the term--there is not--BLM points to no legislative history that would suggest "immediately" means anything other than what it says. Although a statutory deadline may be impracticable, or even impossible, an agency's failure to comply with a statutory deadline is necessarily unlawful.

*Id.*

Here, the Gather EA for the Blue Wing Complex is even more egregious than the plans addressed in *W. Rangeland Conservation Ass'n* and *Friends of Animals* as it seeks to allow removals over a twenty-year period of time. This clearly is not reasonable delay, and it goes against Congress' intent in adopting Section 1333. Further, BLM has no justification for delaying removal as it has admitted the delay is based solely on budget constraints and available holding space. *See* AR03296, 03536. Accordingly, summary judgment is appropriate.

### c)    Third Cause of Action

The Third Cause of Action is brought under Section 706(2)(A), alleging that Defendants failure to create remove excess animals immediately is "arbitrary, capricious, an abuse of discretion,

---

[15] Plaintiff's claim in this case was based upon violation of 5 U.S.C. § 706(2)(A) and (C), but it still addressed the statutory meaning of "immediately" as used in Section 1333 of the WHBA. *See Friends of Animals*, 610 F. Supp. 3d at 169-171.

or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A). As noted above, there is no valid justification for BLM wanting to remove horses over a 20 year period of time rather than "immediately." Nothing in the Gather EA shows a rational connection between the facts found and the plan that was adopted, as required by law. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. The Gather EA is not consistent with Section 1333 of the WHBA. *See E.W. Bliss Co.*, 77 F.3d at 449. As such, summary judgment is appropriate.

**d)      Fourth Cause of Action**

Plaintiffs' Fourth Cause of Action is based upon the APA's provision for a court to set aside actions "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(C). For the reasons stated above, summary judgment is appropriate. Defendants have a mandatory duty established by statute, and Defendants have acted in contravention of this statute.

**C.      BLM failed to comply with NEPA.**

Plaintiffs Fifth Cause of Action is brought pursuant to Section 706(2)(C), alleging that Defendants' failure to comply with NEPA is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A). NEPA requires preparation of an environmental impact statement (EIS) for "every ...major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An EA is done for the purpose of determining whether an EIS is required. *See* 40 C.F.R. § 1508.9. If any 'significant' environmental impacts might result from the proposed agency action then an EIS must be prepared before agency action is taken." *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983).

In the context of a NEPA challenge, the APA's arbitrary and capricious standards requires courts to determine whether an agency has taken a "hard look" at the actual environmental consequences of its action (or inaction). *See Marsh v. Oregon Natural Resources* Council, 490 U.S. 360, 373-74 (1990); *350 Montana v. Haaland*, 50 F.4th 1254, 1265 (9th Cir. 2022). Where the government makes a finding that no significant impact will occur as a result of proposed action, this decision must be based on a consideration of all relevant factors and supported by a convincing statement of reasons. *See id*. In this regard, the agency must both accurately identify relevant environmental concerns and analyze alternatives to the proposed action. *See* 42 U.S.C. §4332(E); 40 C.F.R. §1508.9; *Sierra Club v. United States DOT*, 753 F.2d 120, 127 (D.C. Cir. 1985). "The

purpose of NEPA's alternatives requirement is to ensure agencies do not undertake projects "without intense consideration of other more ecologically sound courses of action, including shelving the entire project, or of accomplishing the same result **by entirely different means**." *Envtl. Defense Fund, Inc. v. U.S. Army Corps of Engrs.*, 492 F.2d 1123, 1135 (5th Cir. 1974) (emphasis added). Federal courts have consistently held that an agency's failure to consider a reasonable alternative is fatal to an agency's NEPA analysis. *See Muckleshoot Indian Tribe v. U.S. ForestServ.*, 177 F.3d 800, 814 (9th Cir. 1999); *Idaho Conserv. League v. Mumma*, 956 F.2d 1508, 1519-20 (9th Cir. 1992).

Further, as it is a fundamental objective of NEPA is to ensure that an agency will not act on incomplete information, where critical information is missing, the government may not rely upon an EA to implement proposed action. *See Marsh*, 490 U.S at 371; *350 Montana*, 50 F.4th at 1263; *National Parks & Conservation Ass'n. v. Babbitt*, 241 F.3d 722, 732-33 (9th Cir. 2001). "The 'hard look' 'must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made.'" *W. Watersheds Project v. Kraayenbrink*, 620 F.3d 1187, 1205 (9th Cir. 2010), quoting *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000).

By proceeding to remove horses without first creating an HMAP, BLM undertook management action without considering all factors relevant to herd health. Moreover, Defendants' analysis does not constitute the "hard look" required under NEPA. *See* 42 U.S.C. §4332(E); 40 C.F.R. §1508.9; *Marsh*, 490 U.S. at 371 (1989). By proceeding to remove horses based upon a 20 year gather plan, Defendants also have failed to consider new evidence and circumstances in violation of NEPA's requirement for a new or supplemental EA. *See* 40 C.F.R. § 1502.9; 43 C.F.R. 46.120(c).

### 1. BLM did not take a "hard look" at the impact of gathers in the Blue Wing Complex.

BLM's Gather EA does not constitute the "hard look" required under NEPA because it relied on stale data, and its focus was improperly narrowed to exclude matters relevant to management of wild horses and burros. The 2017 Gather EA's analysis is based on AMLs established in 1999 or earlier and on horse and burro population numbers derived from December

2014 animal count estimates. *See* AR03279-80. When making a determination that excess horses should be removed from public lands, the WHBA requires that such determination rely on "a current inventory of wild free-roaming horses and burros on given areas of the public lands." 16 U.S.C § 1333(b)(1). Because BLM has relied on stale data, the adoption of the Gather EA was arbitrary and violated NEPA. *See N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1086-87 (9th Cir. 2011) (agency failed to take a "hard look" when relying on stale data); *Animal Prot. of N.M. v. United States,* No. 98-538 JP/LFG, 2000 U.S. Dist. LEXIS 24419, at *30 (D.N.M. Jan. 10, 2000) (reliance on stale scientific evidence violates NEPA); *Nat'l Wildlife Fedn v. Nat'l Marine Fisheries Serv.*, 184 F. Supp. 3d 861, 936 (D. Or. 2016) (reliance on stale data may be arbitrary and capricious).

In its analysis, BLM refused to consider public comment on issues such as adjusting AMLs or limiting livestock use. *See* AR03529-03531, 03546-03547. BLM also deemed range improvements, such as moving fencing and developing water sources, to be outside the scope of the Gather EA, though both greatly impact the management of the Blue Wing Complex wild horses and burros. *See* AR03542. The impact of removing over 88% of the horses and burros in the Blue Wing Complex similarly was ignored. *See* AR03268-03557. This constitutes arbitrary action in violation of NEPA. *See Marsh*, 490 U.S. at 378 (agency decisions may be arbitrary and capricious where they fail to consider relevant factors); *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 17 (2d Cir. 1997) (failure to consider relevant factors is violation of NEPA).

### 2.    BLM failed to consider new evidence and circumstances.

BLM violated NEPA when it failed to issue a new Gather EA or supplement the existing Gather EA pursuant to 40 C.F.R. § 1502.9. Rule 1502.9 provides that where agency action "remains to occur" and "[t]here are significant new circumstances or information[,]" a supplement to an existing EA should be prepared. 40 C.F.R. § 1502.9(d). For purposes of NEPA compliance, "the Council of Environmental Quality, which promulgates the NEPA regulations, has emphasized that NEPA documents more than five years old should be 'carefully reexamined' for supplementation." *Nat'l Wildlife Fedn v. Nat'l Marine Fisheries Serv.*, 184 F. Supp. 3d 861, 936 (D. Or. 2016) (quoting Council on Environmental Quality, Executive Office of the President, Publication of Memorandum to Agencies Containing Answers to 40 Most Asked Questions on NEPA Regulations, 46 Fed. Reg.

18026-01 at *18036 (1981)). Where new information demonstrates that the physical environment has changed (or our understanding about the physical environment has changed), supplementation is warranted. *See id.* at 875, 936.

Here, new information shows that the impact of gather operations on burros is far greater than assessed in 2017. In addressing the impact of gather operations on wild horses and burros in the Blue Wing Complex, the Gather EA did not differentiate between the two species despite recognition that horses and burros are different physiologically, and scientific data for horses should not be extrapolated for burros. *See* AR03356-03359; Ford Decl. at ¶30.  While acknowledging that gather operations can be stressful to the animals, BLM notes that gather related mortality generally averages .5%, with another .6% attributable to animals being euthanized due to pre-existing conditions. *See* AR03356. Since 2017, when the Gather EA was adopted, mortality for burros associated with Blue Wing Complex gathers actually has been much higher. *See* Exhs. 3-5 to MJN. For example, the 2020 gather operations in the Selenite HA resulted in 17.5% confirmed burro deaths, with over 5% occurring within 1 month of their initial capture. *See* Exh. 3 to MJN; Ford Decl. at ¶21. In 2022, following the gather operations in the Sinbad HMA, 15.7% of the gathered burros died. *See* Exh. 5 to MJN; Ford Decl. at ¶23.[16] And, during the gather operations in August of 2022 in the Blue Wing Complex, 5.5% of the gathered burros died either at the trap/site or within two months of being sent to the off range holding corrals. *See* Exh. 3 to MJN; Ford Decl. at ¶21.

Since 2017, the data and scientific literature clearly establish that one of the main causes of death for burros after capture is from hyperlipidemia. *See* Exhs. 3-6 of MJN; Ford Decl. at ¶24. Hyperlipidemia involves the abnormal accumulation of lipids in blood. It is more likely to occur in burros than adult horses, and it is more life-threatening to burros than adult horses. It is more likely to occur in pregnant and stressed burros. *See* Ford Decl. at ¶25. Hyperlipemia is caused by a negative energy balance or primary disease state. The initial roundup and "handling" of burros causes stress and a negative energy balance. This stress, when combined with a pre-existing non-life-threatening illness, separation from a bonded pair, or exposure to a totally new environment and unnatural diet, often leads to inappetence in burros. *See id.* In response, a burro's body starts to

---

[16] The Sinbad HMA is not within the Blue Wing Complex; however, burros from this gather were shipped to the Axtell Off Range Holding Corrals, which are at issue in this case.

mobilize fat reserves as an energy source, causing excess fat in the bloodstream to infiltrate the organs and lead to organ failure and death. The simple release of stress hormones alone can promote this mobilization of deadly excess fat. Pregnant jennies are especially prone to hyperlipidemia due to their extra energy needs. Hyperlipidema carries a high risk of death even when recognized and treated promptly. *See id.*

Recent literature has shown that the transportation of burros can cause stress on the animals, impacting their health. *See id.* at ¶¶26-29. These impacts include increased cortisol levels (which in turn increase a burro's risk of hyperlipidemia), transport stress syndrome, and impacts to the heart. *See id.* BLM has not conducted a new EA nor supplemented the 2017 Gather EA despite this new data regarding burro mortality and despite scientific evidence showing that gather operations are inherently stressful to burros and associated with life-threatening hyperlipidema. As such, Rule 1502.9 has been violated, and this Court should set aside the 2017 Gather EA.

**D.    BLM violated Plaintiffs' First Amendment rights.**

Finding that "many governmental processes operate best under public scrutiny," the Supreme Court has held that there is a First Amendment qualified right of access for the press and public to observe government activities. *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8–9 (1986).  Where a qualified right of access applies, restrictions on viewing may only be placed if the government demonstrates that such restrictions are "narrowly tailored to serve the government's overriding interests." *Leigh v. Salazar*, 954 F. Supp. 2d 1090, 1101 (D. Nev. 2013). The District Court of Nevada has ruled that a qualified right of access applies to the public's right to access and observe BLM's removal and gather activities of wild horses and burros. *See Leigh*, 954 F. Supp. 2d at 1101. In so finding, the District Court of Nevada noted that "public access to gather activities plays an important role in the function of the gather, namely protecting the interests of the overpopulated horses and news gathering for the benefit of the public." *Id.* at 1101.

Defendants have interfered with Plaintiffs' protected right under the First Amendment by refusing them meaningful access to gather, holding, and shipment operations, instead limiting them to observe from afar and with known obstructed views. *See* Exhs. 1-2 of MJN; Ford Decl. at ¶¶7-18; Leigh Decl. at ¶¶37-40. During Blue Wing Complex gather operations in August of 2022, Laurie Ford initially was allowed no closer than 1.3 miles of the trap site. *See* Ford Decl. at ¶7.

Subsequently, another observation post was established that was 0.7 miles from gather operations. *See* Ford Decl. at ¶17. From such distances, Ms. Ford could hardly observe nor document the gather operations at the trap site because of the distance and obstruction from BLM trucks and stock trailers. *See* Exhs. 1-2 of MJN; Ford Decl. at ¶¶7-11, 17. Even using a 500 mm camera lens and a 3000 mm video camera, Ms. Ford could not view BLM's actions nor assess the condition of the animals being gathered and loaded onto trucks. *See* Exhs. 1-2 of MJN; Ford Decl. at ¶¶10-11.

Defendants further interfered with Plaintiffs' protected right under the First Amendment by refusing to allow them any access to view burros taken to temporary holding corrals or the Axtell Off Range Holding Corrals. *See* Ford Decl. at ¶¶12-14, 18; Leigh Decl. at ¶¶38-41.

BLM's restrictions on access are not "narrowly tailored to serve the government's overriding interests." BLM's observation protocol for the Blue Wing Complex states that viewing locations are to be approximately 500 feet from any operating helicopters. *See* AR03467. In other locations, observation points often are far less than 500 feet. For example, in the Pancake Complex, the public was allowed to view holding corrals initially at the distance of a couple hundred yards, and thereafter, at a distance of 20 feet. *See Leigh v. Raby*, No. 3:22-cv-00034-MMD-CLB, 2022 U.S. Dist. LEXIS 15747, at *29 (D. Nev. Jan. 28, 2022). At the Silver King HMA, the public was allowed as close as 35 feet from the trap location. *See Leigh*, 677 F.3d at 895.

In addition, historically, the public has been allowed daily tours of and/or access to temporary holding corrals to assess the condition of the animals and to document any individual markings or tags on the animals. *See* Leigh Decl. at ¶¶23, 38. This is true even when the corrals are on private land. *See id.*

The Axtell Off Range Corrals are privately owned, and BLM has contracted with the owners since 2015. *See id.* at ¶38. In the past, WHE and the public have been given access to this facility on select visitation days. *See id.* However, for the 2022 gather operations, BLM limited access, providing access only to horses and not burros. *See id.* When asked why access was being denied to burros, BLM reported because its contract with the Axtell Off Range Corrals inexplicably only allows for select public viewing days of wild horses, and not of wild burros. *See id.* at ¶40. Plaintiffs contend that the real reason restrictions have been placed on viewing is to prevent the public from documenting improper and inhumane handling of burros. *See* Ford Decl. at ¶19.

As was addressed above, the number of burros who died after initially being captured was far higher than BLM assumed in its 2017 Gather EA. In 2020, BLM gathered 218 horses from the Selenite Range HA, which is part of the Blue Wing Complex. *See* Exh. 4 to MJN; Ford Decl. at ¶22. On its website, BLM notes that 3 burros died during the gather, but this only accounts for deaths at the actual gather/trap. *See id.*  It fails to acknowledge that an additional 35 burros died once moved from the range to holding corrals. *See id.* Based on BLM's own data, 17.5% of the gathered burros ended up dead, with 5% dying within one month of the gather operations. *See id.* The causes of death included hyperlipidemia, respiratory: other, starvation, unknown, and more. *See id.*

In 2022, BLM gathered 153 burros from the Sinbad HMA. *See* Ford Decl. at ¶23. The burros from this gather were sent to the Axtell Off Range Holding Corrals – the site that BLM denied WHE access to in 2022. One burro died at the trap/gather site; another 24 burros died at the Axtell Off Range Holding Corrals. *See id.*; Exh. 5 to MJN. Thus 15.7% of the total gathered and shipped died, with all but four of the deaths occurring within 1 to 2 months of capture. *See id.*

Causes of death included hyperlipidemia, foaling complications, hemorrhaging associated with castration, and more. *See id.*

In August of 2022, 794 burros were gathered from the Blue Wing Complex and shipped to the Axtell Off Range Holding Corrals. *See* Ford Decl. at ¶21. Fourteen burros died at the trap/gather site; another 30 died at the Axtell Off Range Holding Corrals during August and September. *See id.*; Exh. 3 to MJN. The vast majority died from hyperlipidemia. *See id.* Thus, based on these numbers, 5.5% of the burros died either at the trap/gather site or within two months of capture. *See id.*

It is clear that access to burros at the Blue Wing Complex, as well as at holding corrals, is necessary. BLM's conduct goes against the important role recognized by the District of Nevada in allowing access to gather activities. *See Leigh,* 677 F.3d at 1101. Where the government restricts the public's access to its actions, "its real motive may be to prevent the gathering of information about government abuses or incompetence." *Woodstock v. City of Portland*, No. 3:20-cv-1035-SI, 2020 U.S. Dist. LEXIS 116612, at *8 (D. Or. July 2, 2020).

Accordingly, summary judgment is appropriate as to Plaintiffs' Sixth Cause of Action.

1

## VI.    CONCLUSION

2

For these reasons, Plaintiffs request that this Court grant summary judgment as to each of

3    Plaintiffs' causes of action.

4

5    DATED: December 15, 2023,                      Respectfully Submitted,

6                                                   /s/ Jessica L. Blome

7
                                                    Danielle M. Holt
8                                                   (Nevada Bar No. 13152)
                                                    DE CASTROVERDE LAW GROUP
9                                                   1149 S Maryland Pkwy
                                                    Las Vegas, NV 89104
10                                                  (702) 222-9999
                                                    danielle@decastroverdelaw.com
11

12                                                  Jessica L. Blome
                                                    (Cal. Bar No. 314898, admitted pro hac vice)
13                                                  GREENFIRE LAW, PC
                                                    2748 Adeline Street, Suite A
14                                                  Berkeley, CA 94703
                                                    (510) 900-9502
15                                                  jblome@greenfirelaw.com

16
                                                    Attorneys for Plaintiffs
17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs' Notice of Motion for Summary Judgment and Memorandum of Points and Authorities in Support Thereof

1

2

### CERTIFICATE OF SERVICE

3   I hereby certify that on December 15, 2023, I electronically filed the foregoing Notice of

4   Motion and Motion for Judicial Notice and Memorandum of Points and Authorities in Support

5   Thereof with the Clerk of the U.S. District Court in the District Court of Nevada using the CM/ECF

6   system, which will send notification of this filing to the attorneys of record and all registered

7   participants.

8                                        */s/ Jessica L. Blome*
                                         Attorney for Plaintiffs
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs' Notice of Motion for Summary Judgment and Memorandum of Points and Authorities in Support Thereof