TODD KIM, Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division
MICHELLE M. SPATZ, Trial Attorney
FRANCES B. MORRIS, Trial Attorney
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044-7611
(202) 598-9741 (Spatz)
(202) 514-2855 (Morris)
michelle.spatz@usdoj.gov
frances.morris@usdoj.gov

*Attorneys for Federal Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| CANA FOUNDATION, a non-profit corporation, LAURA LEIGH, individually, and WILD HORSE EDUCATION, a nonprofit corporation,<br><br>    *Plaintiffs,*<br><br>       v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT, and JON RABY, Nevada State Director of the Bureau of Land Management,<br><br>    *Federal Defendants.* | Case No. 2:22-cv-01200-CDS-BNW<br><br>**FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

CANA FOUNDATION, a non-profit corporation, LAURA LEIGH, individually, and WILD HORSE EDUCATION, a nonprofit corporation,

     *Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT, and JON RABY, Nevada State Director of the Bureau of Land Management,

     *Federal Defendants.*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 2:22-cv-01200-CDS-BNW

---

**FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

Under Federal Rule of Civil Procedure 56 and Local Civil Rule 56-1, Federal Defendants cross-move for summary judgment in the above-captioned action. This cross-motion is based on the accompanying memorandum, the administrative record, and all argument or evidence that may be presented at any hearing on the cross-motion. For the reasons provided in the accompanying memorandum, Federal Defendants respectfully request that the Court grant their cross-motion for summary judgment and deny Plaintiffs' motion for summary judgment.

Dated: March 8, 2024

          Respectfully Submitted,

          TODD KIM, Assistant Attorney General

          */s/ Michelle M. Spatz*
          MICHELLE M. SPATZ, Trial Attorney
          D.C. Bar No. 1044400
          United States Department of Justice
          Environment & Natural Resources Division
          Wildlife & Marine Resources Section
          P.O. Box 7611

Washington, D.C. 20044-7611
(202) 598-9741
michelle.spatz@usdoj.gov

*/s/ Frances B. Morris*
FRANCES B. MORRIS, Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
(202) 514-2855
frances.morris@usdoj.gov

ii

# TABLE OF CONTENTS

PAGE

I.    INTRODUCTION.................................................................................................1

II.   BACKGROUND..................................................................................................2

   A.   Statutory Background.................................................................................2

      1.   The Wild Free-Roaming Horses and Burros Act.......................................2

      2.   The National Environmental Policy Act....................................................4

      3.   The First Amendment................................................................................5

   B.   Factual Background....................................................................................6

      1.   The Blue Wing Complex Gather Plan......................................................6

      2.   The 2022 Gather.......................................................................................9

      3.   Public Observation Sites for the 2022 Gather.........................................10

      4.   Temporary Holding Corrals and Off-Range Facilities for the 2022 Gather.............12

III.  STANDARD OF REVIEW.................................................................................13

IV.   ARGUMENT.....................................................................................................14

   A.   The Gather Plan complies with the Wild Horse Act and its regulations. (First, Second, Third, and Fourth Causes of Action)...............................................14

      1.   The Wild Horse Act and its regulations do not require BLM to prepare an HMAP prior to gathering excess horses and burros...........................................14

         a.   There is no requirement in the Wild Horse Act that an HMAP be prepared prior to the removal of excess wild horses and burros. ............................15

         b.   There is no requirement in the Wild Horse Act's implementing regulations that an HMAP be prepared prior to the removal of excess wild horses and burros..............17

2. BLM has not unlawfully withheld or unreasonably delayed the creation of an HMAP. ……………………………………………………………………………………21

3. BLM has not unreasonably delayed the removal of excess animals. ..........................24

B. BLM complied with NEPA. (Fifth Cause of Action)........................................29

1. BLM's Environmental Assessment complied with NEPA.........................30

2. No supplemental NEPA analysis is required. ............................................34

C. Plaintiffs' First Amendment claim fails. (Sixth Cause of Action)...................38

1. Plaintiffs' lack standing for their First Amendment Claim. .....................39

2. BLM did not violate Plaintiffs' First Amendment rights. .........................42

V. CONCLUSION ..............................................................................46

1
2                          **TABLE OF AUTHORITIES**
3      **CASES**                                                    **PAGE**
4
5      *Accardi v. Shaughnessy,*
          347 U.S. 260 (1954) ...................................................................20
6
7      *Am. Horse Prot. Ass'n, Inc. v. Frizzell,*
          403 F. Supp. 1206 (D. Nev. 1975) ..........................................21
8
       *Am. Horse Prot. Ass'n, Inc. v. Watt,*
9         694 F.2d 1310 (D.C. Cir. 1982) ......................................passim
10
       *Arcamone-Makinano v. Haaland,*
11        No. 2:22-cv-00621-JAD-NJK, 2022 WL 4585298 n.40 (D. Nev. Sept. 29, 2022) ...........39, 41
12     *Arcamone-Makinano v. Haaland,*
          No. 22-8006, 2022 WL 1042573 (10th Cir. Apr. 7, 2022)...........................41
13
14     *Arizonans for Off. Eng. v. Arizona,*
          520 U.S. 43 (1997) .....................................................................39
15
       *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,*
16        462 U.S. 87 (1983) .....................................................................13
17     *Biodiversity Legal Found. v. Badgley,*
          309 F.3d 1166 (9th Cir. 2002) ...................................................22
18
19     *Blake v. Babbitt,*
          837 F. Supp. 458 (D.D.C. 1993) ...............................................2
20
       *Citizens to Pres. Overton Park, Inc. v. Volpe,*
21        401 U.S. 402 (1971) ...................................................................13
22     *Cloud Found. v. BLM,*
          802 F. Supp. 2d 1192 (D. Nev. 2011) .......................................3
23
24     *Cloud Found. v. BLM,*
          No. 3:11-CV-00459-HDM-VPC, 2013 WL 1249814 (D. Nev. Mar. 26, 2013) ....................16
25
       *Ctr. for Biological Diversity v. Ilano,*
26        928 F.3d 774 (9th Cir. 2019) ...................................................34
27
28                                    i

*Ctr. for Cmty. Action & Env't Just. v. BNSF Ry. Co.*,
   764 F.3d 1019 (9th Cir. 2014) ..................................................................19

*Ctr. for Cmty. Action & Env't Just. v. Fed. Aviation Admin.*,
   18 F. 4th 592 (9th Cir. 2021) ...................................................................14

*Dep't of Transp. v. Pub. Citizen*,
   541 U.S. 752 (2004) ..................................................................................4

*Downer v. BLM*,
   No. 20-CV-191-SWS, 2021 WL 7210048 (D. Wyo. Mar. 12, 2021)....................41

*Earth Island Inst. v. Nash*,
   No. 19-cv-05792-RS, 2019 WL 11023709 (N.D. Cal. Oct. 7, 2019) ....................37

*Env't Def. Ctr., Inc. v. U.S. EPA*,
   344 F.3d 832 (9th Cir. 2003) ...................................................................34

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985) ................................................................................34

*Friends of Animals v. BLM,*,
   No. 16-cv-0199, 2017 WL 5247929 (D. Wyo. Mar. 20, 2017).............................32

*Friends of Animals v. BLM*,
   232 F. Supp. 3d 53 (D.D.C. 2017) ...........................................................27

*Friends of Animals v. BLM*,
   548 F. Supp. 3d 39, 67 (D.D.C. 2021) ......................................................19

*Friends of Animals v. Culver*,
   610 F. Supp. 3d 157 (D.D.C. 2022) ..........................................................28

*Friends of Animals v. Pendley*,
   523 F. Supp. 3d 39 (D.D.C. 2021) ......................................................26, 29

*Friends of Animals v. Silvey*,
   353 F. Supp. 3d 991 (D. Nev. 2018) ....................................................16, 27

*Friends of the Earth v. Hintz*,
   800 F.2d 822 (9th Cir. 1986) ...................................................................13

*Fund for Animals, Inc. v. BLM*,
   460 F.3d 13 (D.C. Cir. 2006) ...................................................................41

*Hells Canyon Pres. Council v. U.S. Forest Serv.*,
   593 F.3d 923 (9th Cir. 2010) ........................................................................ 22

*In Def. of Animals v. U.S. Dep't of Interior*,
   751 F.3d 1054 (9th Cir. 2014) .............................................. 3, 13, 17, 32

*In Def. Animals v. U.S. Dep't of Interior*,
   909 F. Supp. 2d 1178 (E.D. Cal. 2012) ................................................ 3, 17

*Indep. Mining Co. v. Babbitt*,
   885 F. Supp. 1356 (D. Nev. 1995) ................................................................ 22

*In re A Cmty. Voice*,
   878 F.3d 779 (9th Cir. 2017) ........................................................................ 23

*Kern v. BLM*,
   284 F.3d 1062 (9th Cir. 2002) ........................................................................ 4

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019) .................................................................................... 21

*Klamath-Siskiyou Wildlands Ctr. v. BLM*,
   387 F.3d 989 (9th Cir. 2004) ........................................................................ 37

*Kleppe v. Sierra Club*,
   427 U.S. 390 (1976) ........................................................................................ 13

*League Of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen*,
   615 F.3d 1122 (9th Cir. 2010) ...................................................................... 30

*Leigh v. Salazar*,
   677 F.3d 892 (9th Cir. 2012) ..................................................................... 5, 6

*Leigh v. Salazar*,
   954 F. Supp. 2d 1090 (D. Nev. 2013) ................................................... passim

*Leigh v. Salazar*,
   No. 3:13-cv-00006, 2014 WL 4700016 (D. Nev. Sept. 22, 2014) .................. 27

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ................................................................................... 39, 42

*Marsh v. Or. Nat. Res. Council*,
   490 U.S. 360 (1989) ................................................................................... 35, 37

iii

*Native Ecosystems Council & All. for the Wild Rockies v. U.S. Forest Serv.*,
    866 F. Supp. 2d 1209 (D. Idaho 2012) ..................................................................... 4

*Native Ecosystems Council v. U.S. Forest Serv.*,
    428 F.3d 1233 (9th Cir. 2005) ................................................................................. 5

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ................................................................................................ 22

*Pereira v. Sessions*,
    585 U.S. 198 (2018) .............................................................................................. 20

*Press-Enterprise Co. v. Superior Court of California*,
    478 U.S. 1 (1986) ............................................................................................... 5, 6

*R.T. Vanderbilt Co. v. Babbitt*,
    113 F.3d 1061 (9th Cir. 1997) ............................................................................... 15

*Ratzlaf v. United States*,
    510 U.S. 135 (1994) .............................................................................................. 20

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ..................................................................................... 4, 5, 30

*Sierra Club v. Fed. Energy Regul. Comm'n*,
    867 F.3d 1357 (D.C. Cir. 2017) ....................................................................... 30, 34

*Service v. Dulles*,
    354 U.S. 363 (1957) .............................................................................................. 20

*Telecommunications Research & Action Center v. Federal Communications Commission*,
    750 F.2d 70 (D.C. Cir. 1984) ............................................................... 22, 23, 24, 28

*Tillett v. BLM*,
    586 F. App'x 394 (9th Cir. 2014) .......................................................................... 41

*Tri-Valley CAREs v. U.S. Dep't of Energy*,
    671 F.3d 1113 (9th Cir. 2012) ............................................................................... 30

*Vaz v. Neal*,
    33 F.4th 1131 (9th Cir. 2022) ............................................................................... 15

*W. Rangeland Conservation Ass'n v. Zinke*,
    265 F. Supp. 3d 1267 (D. Utah 2017) ......................................................... 3, 27, 28

iv

**STATUTES**

5 U.S.C. §§ 701-06................................................................................13

5 U.S.C. § 706(1).....................................................................25, 28, 34

5 U.S.C. § 706(2).....................................................................29, 30, 34

5 U.S.C. § 706(2)(A)..............................................................................13

16 U.S.C. §§ 1331-1340............................................................................2

16 U.S.C. § 1331.......................................................................................2

16 U.S.C. § 1332(a)..................................................................................2

16 U.S.C. § 1333.....................................................................................15

16 U.S.C. § 1333(a)...........................................................................2, 14

16 U.S.C. § 1331(b)(1).............................................................................3

16 U.S.C. § 1333(b)(2).....................................................................passim

28 U.S.C. § 1361.....................................................................................15

42 U.S.C. § 4332(C).................................................................................4

**FEDERAL REGULATIONS**

40 C.F.R. § 1501.3....................................................................................4

40 C.F.R. § 1501.4.................................................................................4, 5

40 C.F.R. § 1501.5(c)(2)...........................................................................4

40 C.F.R. § 1508.1.....................................................................................5

40 C.F.R. § 1508.9(a)................................................................................4

40 C.F.R. § 1508.9(a)(1)............................................................................5

43 C.F.R. § 4100.....................................................................................33

43 C.F.R. § 4700.0-5(d).............................................................................6

43 C.F.R. § 4710.3-1........................................................................passim

43 C.F.R. § 4710.4 ................................................................................................................18

43 C.F.R. § 4720.1 ................................................................................................................17

## I.   INTRODUCTION

Plaintiffs challenge the Bureau of Land Management's ("BLM") decision to address the severe wild horse and burro overpopulation on the Blue Wing Complex in Nevada through gather and removal management actions. BLM determined that there were over five times as many wild horses and burros as the Blue Wing Complex can sustainably support, resulting in insufficient forage and water for wild horses and burros, among other ecological imbalances. In order to maintain a thriving natural ecological balance, the Wild Free-Roaming Horses and Burros Act of 1971 ("Wild Horse Act") requires BLM to remove wild horses and burros from public lands when the agency determines that there is an overpopulation and action is necessary to remove excess animals. Pursuant to this statutory mandate, after considering public comments and several alternative approaches, in 2017, BLM adopted a plan to gather and remove excess wild horses and burros from the Blue Wing Complex. BLM's gather plan complies with the Wild Horse Act and the National Environmental Policy Act ("NEPA"), and the Court should defer to the agency's expertise and seasoned judgment in exercising its authority to manage wild horses and burros on public lands.

Plaintiffs also assert a First Amendment challenge, alleging that BLM provided inadequate public viewing opportunities for a gather conducted on the Blue Wing Complex in August 2022. Plaintiffs lack standing for this claim because the gather was completed over 19 months ago and Plaintiffs' alleged grievances cannot be redressed by judicial relief. And, regardless of standing, BLM did not violate Plaintiffs' First Amendment rights because, even in the instances where Plaintiffs had a qualified right to public access, BLM's reasonable restrictions were narrowly tailored to ensure the safety of the wild horses and burros being gathered, BLM's personnel and contractors handling the animals, and any public spectators.

Federal Defendants therefore request that the Court deny Plaintiffs' Motion for Summary Judgment ("Pls.' Br.", ECF No. 50) and grant Federal Defendants' Cross-Motion for Summary Judgment.

## II.   BACKGROUND

### A.   Statutory Background

#### 1.   The Wild Free-Roaming Horses and Burros Act

In 1971, Congress passed the Wild Horse Act, 16 U.S.C. §§ 1331-1340, to preserve wild horses and burros as "living symbols of the historic and pioneer spirit of the West," and directed the Secretary to provide for their protection and management.[1] 16 U.S.C. § 1331. Within only a few years of the Wild Horse Act's passage, however, wild horse and burro populations had grown dramatically, "and action [was] needed to prevent a successful program from exceeding its goals and causing animal habitat destruction." *Am. Horse Prot. Ass'n, Inc. v. Watt*, 694 F.2d 1310, 1316 (D.C. Cir. 1982) (quoting H.R. Rep. No. 95-1122, 23 (1978)); *see also Blake v. Babbitt*, 837 F. Supp. 458, 459 (D.D.C. 1993) ("[e]xcess numbers of horses and burros pose a threat to wildlife, livestock, the improvement of range conditions, and ultimately [the horses themselves]") (quotation marks and citation omitted). Accordingly, in 1978, Congress passed amendments to the Wild Horse Act, which provided BLM with greater authority and discretion to manage and remove excess horses and burros from rangeland. *Am. Horse Prot. Ass'n, Inc.*, 694 F.2d at 1316-18.

The Wild Horse Act grants BLM jurisdiction over all wild free-roaming horses and burros on BLM-managed public lands and directs BLM to "manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological

---

[1] The "Secretary" refers to "the Secretary of the Interior when used in connection with public lands administered by [her] through [BLM.]" 16 U.S.C. § 1332(a).

balance on the public lands." 16 U.S.C. § 1333(a). Pursuant to this statutory mandate, once BLM has determined "that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals, [BLM must] immediately remove excess animals from the range so as to achieve appropriate management levels" ("AML"). *Id.* § 1333(b)(2).

To do this, BLM first sets an AML of wild horses and burros within each herd management area ("HMA"). *Id.* § 1333(b)(1); *Cloud Found. v. BLM*, 802 F. Supp. 2d 1192, 1199-200 (D. Nev. 2011). AML is defined as "the number of wild horses that can be sustained within a designated HMA which achieves and maintains a 'thriving natural ecological balance' . . . in keeping with the multiple-use management concept for the area." BW_03279. AMLs "may be established in several ways, including through the preparation of 'resource management plans' ('RMPs')," environmental assessments, and prior agency decisions. *See, e.g.*, *Cloud Found.*, 802 F. Supp. 2d at 1199 (established through an RMP); *In Def. of Animals v. U.S. Dep't of Interior*, 909 F. Supp. 2d 1178, 1184 (E.D. Cal. 2012) (established through a prior agency decision); *In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1063 (9th Cir. 2014) (established through an environmental assessment).

Once BLM sets an AML for a given HMA, the agency must "determin[e] where wild horse and burro overpopulations exist." *Am. Horse Prot. Ass'n, Inc.*, 694 F.2d at 1317 (citing 16 U.S.C. § 1333(b)(1)). Where BLM determines that "an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals, [BLM] shall immediately remove excess animals from the range so as to achieve [AML]." 16 U.S.C. § 1333(b)(2). In doing so, BLM must determine the necessity of the removal based on current information, *id.*, but "the agency has wide discretion in how it addresses [an identified] overpopulation." *W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1282 (D. Utah 2017). To assist with planning

3

and implementation, BLM has developed an agency handbook and instruction memoranda—the Wild Horse and Burro Comprehensive Animal Welfare Program ("CAWP")—which provides guidance on how agency personnel should manage HMAs and carry out necessary animal removals. *See* BW_03759-803.

### 2. The National Environmental Policy Act

NEPA serves the dual purpose of, first, informing agency decisionmakers of the significant environmental effects of proposed major federal actions and, second, ensuring that relevant information is made available to the public that they "may also play a role in both the decisionmaking process and the implementation of that decision." *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). To meet these goals, NEPA requires a comprehensive Environmental Impact Statement ("EIS") only for "major Federal actions" expected to "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(C); 40 C.F.R. § 1501.3. To determine whether a proposed action will have significant effects, an agency may prepare an Environmental Assessment. 40 C.F.R. § 1501.4. An Environmental Assessment is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS].'" *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004) (quoting 40 C.F.R. § 1508.9(a) (2004)). "An [Environmental Assessment] shall briefly discuss the purpose and need for the proposed action, alternatives as required by [statute], and the environmental impacts of the proposed action and alternatives, and include a listing of agencies and persons consulted." 40 C.F.R. § 1501.5(c)(2). "In reviewing a challenge to the adequacy of an [Environmental Assessment], courts apply a 'rule of reason' to determine whether the agency took a 'hard look' at a proposed action[.]" *Native Ecosystems Council & All.*

4

*for the Wild Rockies v. U.S. Forest Serv.*, 866 F. Supp. 2d 1209, 1224 (D. Idaho 2012) (quoting *Kern v. BLM*, 284 F.3d 1062, 1071 (9th Cir. 2002)).

NEPA does not impose any substantive obligations upon an agency but requires that an agency take a "hard look" at the environmental consequences of its decisionmaking. *Robertson*, 490 U.S. at 350. If, in its Environmental Assessment, the agency finds that the proposed action will not significantly affect the human environment, it may issue a finding of no significant impact ("FONSI") in lieu of an EIS. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005) (citing 40 C.F.R. § 1508.9(a)(1) (2004)); *see also* 40 C.F.R. § 1501.4. A FONSI "briefly present[s] the reasons why an action … will not have a significant effect on the human environment and for which an [EIS] therefore will not be prepared." 40 C.F.R. § 1508.1.

### 3. The First Amendment

Under the First Amendment, there is a "qualified right of access for the press and public to observe government activities." *Leigh v. Salazar*, 677 F.3d 892, 898 (9th Cir. 2012) ("*Leigh I*"). The Ninth Circuit has held that whether this right of access applies to wild horse and burro gathers is governed by the two-step test articulated in *Press-Enterprise Co. v. Superior Court of California*, 478 U.S. 1, 8-9 (1986). *Id.* at 898-900. Under that standard, a district court must determine: (1) "whether the place and process have historically been open to the press and general public"; and (2) "whether public access plays a significant positive role in the functioning of the particular process in question." *Id.* at 898 (quoting *Press-Enterprise Co.*, 478 U.S. at 8-9).

While gathers conducted on public land have generally been recognized as having been historically open to the press and the public, this Court has held that holding corrals located on private land have, historically, "not been open to the press and general public, and, as such, no

qualified right of access arises." *Leigh v. Salazar*, 954 F. Supp. 2d 1090, 1104 (D. Nev. 2013) ("*Leigh III*") (citing *Press-Enterprise Co.*, 478 U.S. at 8-9). If the court answers both questions in the affirmative, a qualified right of access attaches to the government proceeding and the government may only overcome that right by demonstrating "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Leigh I,* 677 F.3d at 898 (quoting *Press-Enterprise Co.*, 478 U.S. at 9). This Court has recognized that "the effective and efficient gather of the horses" and "the safety of all individuals including those involved in gather activities, members of the viewing public, and the horses themselves" all constitute "important overriding interests[.]" *Leigh III,* 954 F. Supp. 2d at 1101.

## B. Factual Background

### 1. The Blue Wing Complex Gather Plan

The Blue Wing Complex is located in western Pershing County, Nevada, approximately 65 miles northeast of Reno, Nevada. It consists of approximately 2,283,000 acres and encompasses five HMAs, four Herd Areas ("HAs"), and non-HMA areas where wild horses and burros migrate back and forth. BW_03549.[2] In accordance with the Wild Horse Act, BLM set the AML for the Blue Wing Complex at 333 to 553 wild horses and 55 to 90 wild burros. BW_03279. BLM established the AML based on monitoring data, to "achieve[] and maintain[] a 'thriving natural ecological balance' . . . in keeping with the multiple-use management concept for the area." *Id.* In May 2015, BLM issued the Winnemucca District Resource Management

---

[2] An HA is an area where wild horse and burro herds existed at the time the Wild Horse Act was passed in 1971, 43 C.F.R. § 4700.0-5(d), whereas an HMA is an area that has since been "established for the maintenance of wild horse and burro herds." 43 C.F.R. § 4710.3-1. The HMAs within the Blue Wing Complex consist of: Kamma Mountains; Seven Troughs Range; Lava Beds; Blue Wing Mountains; and Shawave Mountains. BW_03549. The HAs are: Antelope Range; Selenite Range; Trinity Range; and Truckee Range. *Id.*

Plan ("Winnemucca RMP"), which, pursuant to BLM's mandate under the Wild Horse Act, affirmed the AML for the Blue Wing Complex. BW_01744-3036 (Winnemucca RMP).

In October 2017, BLM issued the Blue Wing Complex Gather Plan ("Gather Plan"), which provides for multiple gathers and removals of excess wild horses and burros with the use of fertility control, to achieve and maintain AML over a period of multiple years. BW_03549.[3] BLM had "documented severe utilization of riparian vegetation and extreme degradation of many springs" and found that there was "[in]adequate water on the public lands within the Complex to continue supporting the increasing number of [wild horses and burros]." BW_03277-78. Based on these findings, among others, BLM determined that excess wild horses and burros were present and that the Gather Plan was necessary to: (1) reduce the likelihood of collisions between vehicles and wild horses and burros; (2) promote vegetative health by preventing overutilization of perennial grasses; (3) decrease resource competition for space, forage, and water among wildlife and livestock; (4) improve vegetation density and increase plant vigor, seed production, seedling establishment, and forage production by reducing grazing pressures caused by excess wild horses and burros; (5) comply with the Wild Horse Act's mandate to remove excess wild horses and burros; and (6) preserve the health and well-being of the wild horses and burros competing for limited forage and water. BW_03550.

BLM analyzed the likely effects of the proposed Gather Plan in a preliminary Environmental Assessment that was made available for a 30-day public comment, during which BLM received over 5,000 comment submissions. BW_03525; BW_03066-267 (Preliminary Environmental Assessment). After considering the public comments and providing responses to

---

[3] At that time, population survey data indicated that there was approximately 2,492 wild horses and 848 wild burros in the Blue Wing Complex. BW_03332. In other words, the population exceeded the AML by 1,939 to 2,159 wild horses and 758 to 793 wild burros.

1   each substantive issue raised in the comments, BLM made several changes to better explain and

2   clarify its analysis in the Environmental Assessment, BW_03525-48, then subsequently finalized

3   the Environmental Assessment on July 7, 2017. BW_03268-548 (Final Environmental

4   Assessment).

5       BLM's Environmental Assessment considered five action alternatives to reduce the wild

6   horse and burro population to achieve AML and restore a thriving natural ecological balance on

7   the Blue Wing Complex. BW_03281. "Alternative A" considered the use of fertility control,

8   with or without gathers; "Alternative B" considered multiple gathers and removals with the use

9   of fertility control; "Alternative C" considered a one-time removal with multiple gathers and the

10  use of fertility control; "Alternative D" considered a one-time gather and removal; and

11  "Alternative E" considered a no-action alternative. BW_03285-86.

12      On October 23, 2017, BLM issued a Decision Record selecting Alternative B as the Gather

13  Plan for the Blue Wing Complex based on its analysis of the environmental impacts of each

14  alternative, including a FONSI for Alternative B. BW_03549-54 (Decision Record);

15  BW_03555-57 (Finding of No Significant Impact). Alternative B was designed to "meet low

16  AML and maintain AML ranges within approximately 20 years," BW_03295. Under this plan,

17  BLM determined that it could decrease the population and, "with multiple gathers of varying

18  sizes, treat an increased number of mares with fertility control vaccine[,]" ultimately resulting in

19  the removal of fewer wild horses and burros. BW_03296. By gradually removing excess wild

20  horses and burros over a 20-year period, the plan would "help alleviate holding capacity

21  limitations within short and long-term holding facilities." *Id.* Any wild horses and burros

22  "removed from the range would be transported to . . . short-term holding facilit[ies]" to be cared

23  for in anticipation of adoption, sale, or long-term care in Midwestern pastures. *Id.*

8

All gathers conducted under the Gather Plan are required to comply with the CAWP. BW_03286. CAWP is a comprehensive set of standards developed to ensure the humane treatment of wild horses and burros during all on-range and off-range management activities. *See* BW_03759-803 (CAWP). CAWP sets forth standards for the capture and handling of wild horses and burros, traps (used to trap the animals during gathers), transportation, temporary holding facilities, veterinarian care, disease control, and euthanasia. *Id.* The CAWP standards are incorporated into all gather contracts, and all BLM staff, including contractor crews, are required to complete annual training on CAWP. *Id.*

Prior to the 2022 Gather at issue in this case, BLM conducted several other gathers under the Gather Plan, including one at the Seven Troughs HMA in June 2019, one at the Shawave Mountains HMA in August 2020, and one at the Selenite Range HA in November 2020. *See* BW_03585-92; BW_03648-69; BW_03744-58.

### 2. The 2022 Gather

In July 2022, as part of its overall plan to remove excess animals and achieve AML on the Blue Wing Complex, BLM announced a plan to conduct a gather to remove 200 excess horses and 800 excess burros ("2022 Gather"). BW_03888. BLM determined that the gather was necessary to reduce overpopulation—which surveys indicated was "over 3-times above the high end of the established AML for wild horses and 15 times above high end of established AML for wild burros"—as there was not enough water or forage to support the animals. *Id.* Additionally, BLM determined that the gather was necessary to prevent further degradation of the land and to protect habitat for wildlife species including sage grouse, pronghorn antelope and mule deer. *Id.*

The 2022 Gather was a particularly high priority for BLM due to the discovery that wild burros were dying from lack of water. BW_03835. In June 2022, BLM personnel and a contracted veterinarian documented approximately 20 dead burros on the Blue Wing Complex. *Id.* Based on tissue, blood, and stomach samples, the veterinarian concluded that the burros died of dehydration. BW_03837.

BLM conducted the 2022 Gather from August 1 to August 12, 2022, and successfully gathered a total of 218 wild horses and 804 wild burros. BW_03908-13.

### 3. Public Observation Sites for the 2022 Gather

During the 2022 Gather, BLM provided opportunity for public observation every day of the gather and made staff available to escort the public to the public observation site each day. Declaration of Garrett W. Swisher ("Swisher Dec.") ⊩ 17.[4] As set forth in BLM's Wild Horse and Burro Gather Observation Protocol, "[t]he number one priority of the BLM when selecting public observation sites is to ensure the safety of the operation and those viewing it; the site is also selected so as not to disrupt gather operations or place undue pressure/stress on the animals or the operational personnel." BW_03828. Wild horses and burros are flighty and reactive to things around them, so it is critical to their safety and the safety of the wranglers to minimize unnecessary movements within the animals' line of sight. Swisher Dec. ⊩ 11.

For the first three days of the gather (from August 1 to August 3), the public observation site was placed approximately 1.8 miles away from the trap in an area with tree cover and

---

[4] "Per the Court's September 22, 2023 Order, ECF No. 47, for the limited purpose [of] supporting/opposing Plaintiffs' Sixth Cause of Action (First Amendment), the parties may rely on [certain] extra-record materials in their summary judgment briefing" that were permitted by the Court. ECF No. 49. Federal Defendants submit the Swisher Dec. for the limited purpose of opposing Plaintiffs' First Amendment claim—as the declaration is "witness testimony regarding public access and historical access[,]" which the Court permitted in its Order. *Id.*; ECF No. 47.

fencing, in order to minimize the risk of injury to the animals and to the observers. *Id.* ¶ 12. BLM considered other locations that were closer to the trap site, but determined the alternative locations were unsuitable due to how the burros would travel while being herded. *Id.* The selected viewing site ensured that there was enough space for the helicopters herding the animals to maneuver, without placing spectators in harm's way and without limiting the ability of the helicopters to make course corrections for the herd's traveling path. *Id.*

On August 4, the trap site was moved to the east side of the Seven Troughs Mountain Range and kept there until August 7 due to its close proximity to the animals' location and the terrain's ability to hide the trap, vehicles, and equipment from view of the animals. *Id.* ¶ 13. BLM also moved the public observation site to remain within viewing distance of the new trap site. *Id.* For this portion of the gather, the public observation site was only 0.7 miles from the trap site. *Id.*[5]

BLM selected the public observation sites, from limited available options, due to their geographical features allowing members of the public and their vehicles to be concealed during the gather, and in accordance with Federal Aviation Administration ("FAA") guidelines requiring that public viewing locations be a minimum of 1,000 feet from areas in which a helicopter may be herding horses and burros or flying over. *Id.* ¶ 11.

---

[5] The remaining trap sites and public observation sites for the 2022 Gather are not at issue in Plaintiffs' claims or discussed in their summary judgment brief, but the sites were moved three more times after August 7. On August 9, the trap was moved to the Antelope HA, with the public observation site positioned approximately 0.9 miles from the trap. Swisher Dec. ¶ 14. On August 10, the trap was moved back to the first trap site (in Granite Springs Valley) and the same public observation site was used (approximately 1.8 miles away from the trap). *Id.* ¶ 15. Finally, on August 12, the trap was moved to the Shawave Mountains HMA and the public observation site was placed approximately 1.02 miles from the trap. *Id.* ¶ 16.

### 4.   Temporary Holding Corrals and Off-Range Facilities for the 2022 Gather

Once wild horses and burros are gathered and trapped, BLM's contractor will typically move them by trailer to temporary holding corrals that are located nearby, where the animals are kept for one to two days to be fed, watered, sorted by sex and condition, and checked for injuries or chronic conditions. *Id.* ⁋ 18. These temporary holding corrals may be located on public or private land; when they are located on private land, some landowners are comfortable with allowing public access, but others will not agree to public access. *Id.* ⁋ 19. After one to two days at the temporary holding corrals, the gathered animals are moved by semi-truck to off-range holding facilities that can also be either public or private, where they are cared for in anticipation of adoption, sale, or long-term care in Midwestern pastures. *Id.* ⁋ 18.

BLM's gather contractor for the 2022 Gather selected locations for temporary holding corrals that were nearby on private land. *Id.* ⁋ 20. The temporary holding corrals were selected after considering several other locations, on both public and private lands, based on factors including: their close proximity to the gather site; minimizing necessary transport time for the animals; the availability of sufficient access to water (as the site had access to a well producing 1,000 gallons of water per minute, enabling the contractor to keep the animals watered and dust under control); and their close proximity to access roads that were accessible by semi-trucks. *Id.* The private landowner granted access to the temporary holding corrals to BLM's gather contractor and to federal government staff, but they denied public access due to liability concerns. BW_03904.

After a few days in temporary holding corrals, the gathered horses were transported to Palomino Valley Off-Range Corrals, an off-range holding facility in Reno, Nevada, and the gathered burros were transported to Axtell Off-Range Corrals, an off-range holding facility in

Axtell, Utah. BW_03888. The off-range holding facilities were selected based on the facilities' respective capacities and space constraints, and the national gather priorities for the Wild Horse and Burro Program. Swisher Dec. ⁋ 23. Upon arrival at these facilities, the animals were checked by veterinarians and readied for BLM's wild horse and burro Adoption and Sale Program. *Id.*

The Palomino Valley Off-Range Corrals is a BLM-operated facility that is open to the public. *Id.* ⁋ 21. The Axtell Off-Range Corrals is a privately-owned facility that is not open to the public. *Id.* ⁋ 22.

## III.    STANDARD OF REVIEW

Claims asserted under the Wild Horse Act and NEPA are reviewed under the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. *In Def. of Animals*, 751 F.3d at 1061. Under the APA, a court may set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this narrow standard of review, "[t]he court is not empowered to substitute its judgment for that of the agency." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *Friends of the Earth v. Hintz*, 800 F.2d 822, 831 (9th Cir. 1986) ("The court may not set aside agency action as arbitrary or capricious unless there is no rational basis for the action.").

The "arbitrary and capricious standard" is necessarily deferential. A reviewing court's only role is to determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park, Inc.*, 401 U.S. at 416. Agencies are accorded particular deference with respect to the resolution of scientific questions within their expertise. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,

1   *Inc.*, 462 U.S. 87, 103 (1983) ("[A] reviewing court must generally be at its most deferential"

2   when reviewing determinations involving agencies' technical expertise and judgment).

3       The party challenging an agency's action bears the burden of proof. *Kleppe v. Sierra*

4   *Club*, 427 U.S. 390, 412 (1976); *Ctr. for Cmty. Action & Env't Just. v. Fed. Aviation Admin.*, 18

5   F. 4th 592, 599 (9th Cir. 2021) ("[E]ven assuming the [agency] made missteps[,] the burden is

6

7   on petitioners to demonstrate that the [agency's] ultimate conclusions are unreasonable.")

8   (quotation marks and citations omitted).

9   **IV.   ARGUMENT**

10      **A.  The Gather Plan complies with the Wild Horse Act and its regulations. (First,
            Second, Third, and Fourth Causes of Action)**

11      BLM reasonably determined that the Gather Plan was necessary to reduce the

12

13  overpopulation of wild horses and burros on the Blue Wing Complex, as the population plainly

14  exceeded AML and there was not enough water or forage to support them. BW_03549-54. The

15  record before the agency—including, among other things, the Winnemucca RMP, Blue Wing

16

17  Complex Environmental Assessment, and monitoring data—established that there were excess

18  wild horses and burros that were having severe negative impacts on the land, including

19  overutilization of riparian vegetation and degradation of springs, posing a danger to the wild

20  horses and burros as well as other species. BW_03277-81; BW_03549-51. Accordingly, BLM

21  determined that the Gather Plan was necessary to fulfill its mandate to "maintain a thriving

22  natural ecological balance." 16 U.S.C. § 1333(a).

23      **1.  The Wild Horse Act and its regulations do not require BLM to prepare an
              HMAP prior to gathering excess horses and burros.**

24

25      Plaintiffs' First, Second, Third, and Fourth Causes of Action are all based upon the same

26  flawed assertion: that the Gather Plan must be invalidated because the Wild Horse Act and its

27  implementing regulations require BLM to prepare a Herd Management Area Plan ("HMAP")

28
                                           14

prior to removing excess wild horses and burros. *See* ECF No. 24 (Amend. Compl.) ¶¶ 126-156.[6]

Plaintiffs' attempts to rewrite the statute and regulations fail.

### a. There is no requirement in the Wild Horse Act that an HMAP be prepared prior to the removal of excess wild horses and burros.

Turning to the statute first, Plaintiffs argue the language of the Wild Horse Act mandates that an HMAP be prepared prior to gathering and removing excess horses. Pls.' Br. 22-24. This argument finds no support in the text of the Wild Horse Act or its legislative history. The Wild Horse Act is clear: where BLM determines that an overpopulation exists and action is necessary to remove excess animals based on information currently available to it, BLM "shall immediately remove excess animals from the range so as to achieve [AML]." 16 U.S.C. § 1333(b)(2).

Plaintiffs do not identify any language in the statute that requires BLM to prepare an HMAP, much less prepare one prior to a gather. That is because no such language exists. Instead, Plaintiffs cite to 16 U.S.C. § 1333 for the requirement that BLM conduct all management activities at the minimal feasible level. Pls.' Br. 23-28. But this requirement does not somehow establish a mandate that the agency prepare an HMAP, nor does it establish that the agency must do so prior to removing excess horses. Rather, the Wild Horse Act's minimal feasible level requirement simply means that "BLM shall use '[t]he minimum number of habitat or population management tools or actions necessary to attain the objectives' for an HMA." *Friends of Animals*

---

[6] Plaintiffs' First Cause of Action is asserted under the Mandamus and Venue Act, 28 U.S.C. § 1361, and Plaintiffs' Second, Third, and Fourth Causes of Action are asserted under the APA (Sections 706(1), 706(2)(A), and 706(2)(C)). Amend. Compl. ¶¶ 126-156. Because "mandamus relief and relief under the APA are 'in essence' the same," when a complaint seeks relief under both statutes and there is an adequate remedy under the APA, courts may elect to analyze the APA claims only. *R.T. Vanderbilt Co. v. Babbitt*, 113 F.3d 1061, 1065 (9th Cir. 1997) (citation omitted); *Vaz v. Neal*, 33 F.4th 1131, 1135 (9th Cir. 2022) (same). Here, Plaintiffs mandamus and APA claims seek essentially the same relief: that the court compel BLM to stop conducting gathers until it issues an HMAP for the Blue Wing Complex. *See* Amend. Compl. at 31, Prayer for Relief ¶¶ A-B. Since there is an adequate remedy under the APA for the mandamus relief Plaintiffs request, review of all four claims under the APA is appropriate.

*v. Silvey*, 353 F. Supp. 3d 991, 1009 (D. Nev. 2018), *aff'd*, 820 F. App'x 513 (9th Cir. 2020) (quotation marks omitted). BLM can—as it did here—deploy minimal management tools, as analyzed in the Environmental Assessment and through its CAWP standards, to obtain objectives for the Blue Wing Complex. *Animal Prot. Inst. of Am.*, 109 IBLA 112, 127 (1989) (finding that "it is not necessary that BLM prepare an HMAP as a basis for ordering the removal of wild horses, so long as the record otherwise substantiates compliance with the statute"). Thus, BLM is not required to prepare a separate HMAP prior to implementing the Gather Plan to abide by the statute's "minimal feasible level" requirement.

Plaintiffs' argument is further belied by the statute's legislative history. In 1978, language was added to the statute to specify "what information the Secretary must possess—or, more accurately, the information the Secretary need *not* possess—before removing wild horses deemed to be in excess." *Am. Horse Prot. Ass'n, Inc.*, 694 F.2d at 1317-18 (citing 16 U.S.C. § 1333(b)(2)). Relevant here, Section 1333(b)(2) lists the information BLM may use to determine that a wild horse or burro overpopulation exists in a specific area. BLM may consider: (i) the inventory of federal public land; (ii) land use plans; (iii) information from EISs; and (iv) the inventory of wild horses and burros. 16 U.S.C. § 1333(b)(2). But, "in the absence of the information contained in (i–iv)[,]" BLM is expressly authorized to proceed with the removal of horses and burros on the basis of whatever information BLM has at the time of the decision that an overpopulation exists. *Id.* "The statute thus clearly conveys Congress's view that BLM's findings of wild horse overpopulations should not be overturned quickly on the ground that they are predicated on insufficient information." *Cloud Found. v. BLM*, No. 3:11-CV-00459-HDM-VPC, 2013 WL 1249814, at *5 (D. Nev. Mar. 26, 2013) (quoting *Am. Horse Prot. Ass'n, Inc.*, 694 F.2d at 1318). Consistent with the statute and Congress's intent, BLM therefore has

discretion to rely on a combination of available materials to manage wild horse and burro populations to maintain a thriving natural ecological balance.

Courts have long afforded BLM such discretion in removing excess wild horses and burros under the Wild Horse Act. For example, in *In Defense of Animals v. U.S. Department of Interior,* the Ninth Circuit explained that the Wild Horse Act "directs that horses 'shall' be removed 'immediately' once the Secretary determines, *on the basis of whatever information he has at the time of his decision*, that an overpopulation exists." 751 F.3d at 1064 (quoting *Am. Horse Prot. Ass'n, Inc.*, 694 F.2d at 1318). In applying this reasoning, the Ninth Circuit upheld BLM's reliance on a 2008 RMP in setting the AML. *Id*. at 1064 n.13; *see also id*. at 1065 n.16 (collecting cases).  The underlying district court also acknowledged that the Wild Horse Act "unequivocally provide[s] that if the current population inventory for an HMA reveals that overpopulation exists, and if [] BLM determines that 'action is necessary to remove excess animals,' it 'shall immediately remove excess animals from the range so as to achieve [AML].'" *In Def. of Animals,* 909 F. Supp. 2d at 1189 (citation omitted).

In line with the law of this Circuit, the Court should afford BLM deference in managing and removing excess wild horses and burros and should reject Plaintiffs' argument that the Wild Horse Act requires the preparation of an HMAP prior to implementing gather decisions.

### b.  There is no requirement in the Wild Horse Act's implementing regulations that an HMAP be prepared prior to the removal of excess wild horses and burros.

Nor can Plaintiffs find support for their argument in the Wild Horse Act's implementing regulations. BLM's regulations confirm its mandate to immediately remove excess animals from the range to achieve AML once it determines that an overpopulation exists. 43 C.F.R. § 4720.1. But nowhere in the regulations is there a requirement that BLM prepare an HMAP before it carries out its duty to remove excess horses and burros, nor do Plaintiffs point to one.

Instead, Plaintiffs argue that, when read together, the wording of 43 C.F.R. § 4710.3-1 (which generally requires that an HMAP be prepared) and 43 C.F.R. § 4710.4 (which requires that herd management be based upon objectives in land use plans and HMAPs) establishes that HMAPs are a prerequisite for gathers. Pls.' Br. 24. Plaintiffs argue that, since gather operations are a form of herd management, an HMAP must be completed before a gather is conducted. *Id.* But Plaintiffs' attempt to rewrite the regulations to manufacture such a requirement is contradicted by the regulatory text and case law.

Beginning with the text, there is no language mandating that an HMAP be prepared prior to the removal of excess horses and burros. Section 4710.4 states that "[m]anagement shall be at the minimum level necessary to attain the objectives identified in *approved* land use plans and [HMAPs]." 43 C.F.R. § 4710.4 (emphasis added). Thus, Section 4710.4 does not mandate the creation of *new* plans; but rather states that management activities must comply with any existing *approved* plans for the relevant area. *Cf.* Pls.' Br. 24 (omitting "approved" in its discussion of Section 4710.4). Here, BLM's management of the wild horses and burros in the Blue Wing Complex complies with Section 4710.4, as it is being conducted pursuant to an approved land use plan—specifically, the Winnemucca RMP, which is the governing land use plan for the area. BW_01744-3036.

The other regulation cited by Plaintiffs, Section 4710.3-1, contains three sentences that do three things: first, it establishes the requirement for BLM to develop herd management *areas* (HMAs); second, it lists factors that BLM must consider when designating those HMAs; and finally—the part that is relevant here—states that BLM "shall prepare [an HMAP], which may cover one or more [HMAs]." 43 C.F.R. § 4710.3-1. Notably, Section 4710.3-1 does not provide any temporal element addressing a time period in which BLM must take any of these actions,

18

including the creation of an HMAP. Indeed, Plaintiffs admit that there is "no identifiable deadline" for BLM to create an HMAP. Pls.' Br. 27. Thus, the Court should reject Plaintiffs' attempt to impute a temporal mandate into the regulation where none exists. *See Ctr. for Cmty. Action & Env't Just. v. BNSF Ry. Co.*, 764 F.3d 1019, 1024 (9th Cir. 2014) (declining to adopt plaintiffs' interpretation, which, "would effectively be to rearrange the wording of the statute—something that we, as a court, cannot do").

Courts have consistently agreed with Federal Defendants' reading of the regulations. In *Friends of Animals v. BLM*, the court specifically addressed the question of what, if any, prerequisites there are for BLM to issue a gather decision and found that a combination of materials—not necessarily including an HMAP—may be used to manage an HMA:

> The [BLM Wild Horse and Burro Management] handbook . . . contemplates that the Bureau could use an array of approaches to manage an HMA. It might, for example, use a land use plan, an [environmental assessment], an established AML, and a gather plan. Or the Bureau might use an AML, an HMAP, and a gather plan. Or some other combination. **Thus, although the categories may offer useful organizational tools, the handbook and manual leave the authorized officer with considerable discretion in framing her decision.** [Plaintiff] points to nothing in either document that expressly forbids the authorized officer from issuing a long-term gather decision.

548 F. Supp. 3d 39, 67 (D.D.C. 2021) (emphasis added and citations omitted). In short, the court recognized that there is no requirement for BLM to prepare an HMAP prior to implementing a gather decision. Rather—just like it did here for the 2022 Gather—BLM may rely upon a combination of land use plans, like the Winnemucca RMP, an Environmental Assessment, and/or an AML determination to issue a gather decision.[7]

---

[7] Indeed, through this combination of materials, BLM has completed all of the components of an HMAP as outlined in BLM's Wild Horses and Burros Management Handbook, including the establishment of HMA boundaries, setting AML, monitoring, and the consideration of a range of alternatives. *See* BW_00052-131. Thus, even if there were a requirement for BLM to prepare an HMAP prior to a gather (there is not), BLM would have fulfilled that obligation.

Further, the Interior Board of Land Appeals ("IBLA") has acknowledged that 43 C.F.R. § 4710.3-1 "does not require preparation of an HMAP as a prerequisite for a removal action." Based on a plain reading of the regulation language, the IBLA concluded that "it is not necessary that BLM prepare an HMAP as a basis for ordering the removal of wild horses, so long as the record otherwise substantiates compliance with the statute." *Animal Prot. Inst. of Am.,* 109 IBLA at 127. In other words, where—like here—the record before the agency supports the removal of excess animals to comply with its mandate under the Wild Horse Act,[8] there is no need to look beyond the express language of the regulation to fabricate a temporal requirement that does not exist. *Id.*; *see also Pereira v. Sessions*, 585 U.S. 198, 209 (2018) (The inquiry stops when the "text alone is enough to resolve [the] case."); *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994) (Courts will "not resort to legislative history to cloud a statutory text that is clear.").

Plaintiffs nonetheless assert that Federal Defendants "ignore[d] the effect of BLM's regulations." Pls.' Br. 26. Relying on *Accardi v. Shaughnessy*, 347 U.S. 260 (1954), and *Service v. Dulles*, 354 U.S. 363 (1957), Plaintiffs argue that BLM's duty to remove excess horses is constrained by Section 4710.4. But those cases are inapposite here. In *Shaughnessy*, "the Attorney General bound himself not to exercise his discretion until he had received an impartial recommendation from a subordinate board[,]" and in *Dulles*, "the Secretary bound himself not to act at all [in certain cases], except upon appeal by employees[.]" *Dulles*, 354 U.S. at 386-87. In contrast, here, BLM is not bound by statute, nor has it bound itself through its regulations, to create an HMAP prior to conducting a gather. And Plaintiffs have failed to show otherwise. This

---

[8] Under the Wild Horse Act, once BLM has determined "that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals, [BLM must] immediately remove excess animals from the range so as to achieve [AML]." 16 U.S.C. § 1333(b)(2).

is therefore not a question of which party's interpretation of the law should be applied or whether the agency's interpretation of its regulations should be afforded deference. Here, BLM's actions are in accord with the *plain language* of its regulations. Pls.' Br. 26-27; *see Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019) ("the possibility of deference can arise only [when language] is genuinely ambiguous. And when we use that term, we mean it—genuinely ambiguous, even after a court has resorted to all the standard tools of interpretation").

In sum, BLM's Gather Plan for the Blue Wing Complex complies with the Wild Horse Act and its regulations. The agency considered the relevant information pursuant to 43 C.F.R. § 4710.3-1 and reasonably concluded that an overpopulation existed and that action was necessary to achieve AML. 16 U.S.C. § 1333(b)(2); *Animal Prot. Inst. of Am.,* 109 IBLA at 127. BLM's determination, made pursuant to the law, is in line with the broad discretion that Congress has long afforded BLM in making and implementing its removal decisions. *Am. Horse Prot. Ass'n, Inc.*, 694 F.2d at 1318; *see also Am. Horse Prot. Ass'n, Inc. v. Frizzell*, 403 F. Supp. 1206, 1217 (D. Nev. 1975) (noting the "high degree of discretionary authority" BLM has in carrying out its mandate to remove excess horses) (quoting H.R. Conf. Rep. No. 92-681, reprinted in 1971 U.S.C.C.A.N. 2159, 2160).

### 2. BLM has not unlawfully withheld or unreasonably delayed the creation of an HMAP.

Plaintiffs' related argument that BLM has "unlawfully withheld or unreasonably delayed" a mandatory agency action by not issuing an HMAP prior to implementing the Gather Plan is similarly without merit. Pls.' Br. 29-32. A court's power to "compel agency action" under Section 706(1) of the APA is carefully limited to situations where an agency has unlawfully withheld or unreasonably delayed a "discrete" and "legally *required*" action—or, in other words, where "the agency's legal obligation is so clearly set forth that it could traditionally have been

enforced through a writ of mandamus." *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010) (citation omitted).[9] As discussed above, BLM has no mandatory duty to prepare an HMAP prior to conducting a gather. Indeed, Plaintiffs have not—and cannot—point to any "specific statutory or regulatory deadline" requiring the agency to prepare an HMAP. *Indep. Mining Co. v. Babbitt*, 885 F. Supp. 1356, 1364 (D. Nev. 1995), *aff'd sub nom.,* 105 F.3d 502 (9th Cir. 1997). Thus, Plaintiffs' contention that BLM has failed to issue an HMAP within a "concrete timeframe" and "the Court is [therefore] mandated by the APA to compel BLM's action" fails. Pls.' Br. 30-31.

As Plaintiffs acknowledge, the Ninth Circuit "distinguishes between action that is 'unreasonably delayed' and action that is 'unlawfully withheld,' with the former applying to agency inaction in the face of a discretionary deadline, and the latter applying to actions where a mandatory deadline exists." Pls.' Br. 29 (quoting *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 n.11 (9th Cir. 2002)). In evaluating allegations of "unreasonably delayed" agency action, courts consider the "TRAC" factors set forth in *Telecommunications Research & Action Center v. Federal Communications Commission ("TRAC")*, 750 F.2d 70, 80 (D.C. Cir. 1984).

---

[9] The Supreme Court has pointed to the Wild Horse Act as an example as to why courts cannot compel compliance with broad statutory mandates. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66-67 (2004) ("If courts were empowered to enter general orders compelling compliance with broad statutory mandates, . . . it would ultimately become the task of the supervising court, rather than the agency, to work out compliance . . . injecting the judge into day-to-day agency management. To take [an example] from federal resources management, a plaintiff might allege that [BLM] had failed to 'manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance[.]' . . . The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA.") (citation omitted).

Plaintiffs argue, in the alternative, that—even if there is no concrete deadline for BLM's preparation of an HMAP (which there is not)—BLM has unreasonably delayed in preparing one. Pls.' Br. 31-32. This argument fails, because "an agency cannot unreasonably delay that which it is not required to do[.]" *In re A Cmty. Voice*, 878 F.3d 779, 784 (9th Cir. 2017) ("[T]he first step before applying the *TRAC* factors is necessarily to determine whether the agency is required to act[.]"). As discussed above, BLM is not required to issue an HMAP prior to conducting a gather. Thus, the Court need not consider Plaintiffs' *TRAC* factor arguments. Pls.' Br. 31-32.

Even if the Court were to consider the *TRAC* factors, Plaintiffs' arguments still fail. In assessing whether an agency's actions have been unreasonably delayed, courts consider the following six factors:

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*In re A Cmty. Voice*, 878 F.3d at 786 (citing *TRAC*, 750 F.2d at 80). Here, the first *TRAC* factor necessarily weighs in favor of BLM because there is no requirement for BLM to issue an HMAP prior to a gather.[10] The second *TRAC* factor—the lack of any Congress-provided timetable— also decidedly weighs toward BLM. Under the third factor, delays are less reasonable if "human

---

[10] As discussed above, the question presented by Plaintiffs is not whether BLM has a general duty to create an HMAP, but rather whether there is a duty to prepare such a plan prior to removing excess horses and burros from the range. *See* Pls.' Br. 30 (BLM has a "duty to create an HMAP [] before management of wild horses is undertaken"); Pls.' Am. Compl. ¶ 136 (BLM has a "mandatory duty to prepare [an HMAP] … prior to conducting any herd management activities, including the gather and removal of excess horses").

health and welfare are at stake[,]" than when agency actions are delayed "in the sphere of economic regulation[.]" *TRAC*, 750 F.2d at 80. No human lives are at stake here. The fourth factor—the effect of expediting delayed action on agency activities of a higher or competing priority—likewise weighs in favor of BLM, which must address fluctuating overpopulation issues on a continuous basis. *See, e.g.*, BW_03285 (explaining that wild horses can increase their numbers by up to 25% annually, which requires BLM to use discretion in managing herds). Delaying the completion of necessary gathers prior to the completion of an HMAP could impair the range and jeopardize the health of wild horses and burros. The fifth factor directs courts to "take into account the nature and extent of the interests prejudiced by delay." But given that the Winnemucca RMP, the Blue Wing Complex Environmental Assessment, and CAWP all ensure that management activities are conducted at the "minimum feasible level", Plaintiffs fail to convincingly point to any interests that have been harmed by BLM's alleged delay in issuing an HMAP. And finally, the sixth *TRAC* factor—the impropriety of agency delay—is not applicable here because Plaintiffs have not alleged any dishonesty or bad faith on behalf of Federal Defendants (nor is there any evidence to support such an allegation).

In sum, even if Plaintiffs had established that BLM has a duty to prepare an HMAP prior to a gather (they have not), the Court should reject Plaintiffs' request under APA Section 706(1) to compel BLM to prepare an HMAP prior to further implementation of the Gather Plan.

### 3. BLM has not unreasonably delayed the removal of excess animals.

While most of Plaintiffs' arguments revolve around the flawed premise that BLM should not be permitted to conduct any gathers until after an HMAP is prepared, somewhat inconsistently, Plaintiffs simultaneously allege that BLM's removal of excess wild horses and burros constitutes "action unlawfully delayed." Pls.' Br. 33 (citation omitted). Specifically,

Plaintiffs take issue with the management approach that BLM selected in the Blue Wing Environmental Assessment, which allows the agency to conduct gathers to achieve and maintain AML over a 20-year period. *Id.* at 35.[11] Plaintiffs argue that the "delay" between BLM's determination that there was an overpopulation on the Blue Wing Complex and the agency's removal of the excess animals "clearly is not reasonable delay, and [] goes against Congress' intent in adopting Section 1333" of the Wild Horse Act. *Id.*; 16 U.S.C. § 1333(b)(2) (requiring BLM to "immediately remove excess animals from the range so as to achieve [AML]" once BLM determines that an overpopulation exists). But Plaintiffs' argument is at odds with the law and the practical realities of managing hundreds to thousands of excess wild horses and burros.

As an initial matter, Plaintiffs improperly seek to use their Second Cause of Action (asserted under 5 U.S.C. § 706(1)) to ask this Court to invalidate BLM's gather approach set forth in the Blue Wing Environmental Assessment. Pls.' Br. 33-35; Amend. Compl. 26. But Section 706(1) of the APA does not allow courts to invalidate agency action once taken. Rather, Section 706(1) allows a court to "compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1). Here, despite alleging that BLM's implementation of gather actions are "unreasonably delayed" under its 20-year approach, Plaintiffs do not seek to compel a speedier removal of the excess animals. Pls.' Br. 33-35; Amend. Compl. 31. Rather, they seek to "prevent[] Defendants from gathering wild horses and burros[,]" to "stop implementation of the Blue Wing [] Environmental Assessment[,]" and to "[v]acate and set aside the Blue Wing Complex [] Environmental Assessment[.]" Amend. Compl. 31, Prayer for Relief. Thus, even if

---

[11] BLM's Gather Plan was designed to: reduce the excess wild horse and burro population to achieve low AML and maintain the population within AML ranges over longer periods; protect public lands and rangeland resources from deterioration associated with an excess population of wild horses and burros within and outside of the Blue Wing Complex; and restore a thriving natural ecological balance and multiple use relationship on the public lands. BW_03281.

25

Plaintiffs' unreasonable delay argument had merit (it does not), Plaintiffs would not be entitled to the relief they seek.

Even if they could state a proper claim on this issue, courts have recognized that multiple gathers over a period of time "may be a practical necessity where a single gather decision implicates hundreds or even thousands of wild horses and burros, which cannot realistically be removed all at once." *Friends of Animals v. Pendley*, 523 F. Supp. 3d 39, 56-57 (D.D.C. 2021) (rejecting a challenge to a BLM policy document "recommend[ing] a multi-year phased gather plan[,]" and noting that a multi-year "phased gather approach to wild horse and burro removal is nothing new for BLM"). That practical necessity was plainly an issue here, where, based on population estimates in the Blue Wing Environmental Assessment, wild horses exceeded AML by 1,939 to 2,159 horses and wild burros exceeded AML by 758 to 793 burros. BW_03279. Further, population data indicates that the wild horses and burros "increas[e] their numbers by 18% to 25% annually … resulting in the doubling of wild horse[] populations about every four to five years." BW_03285 (citations omitted). Based on this, among other considerations, BLM reasonably determined that "[g]radually removing excess [horses and burros] would help alleviate holding capacity limitations within short and long-term holding facilities[,]" BW_03296, and selected a management approach calling for multiple gathers to remove excess animals and/or treat them with a fertility control vaccine and release them back into their HMA. BW_03295-97. The approach was "designed to be implemented immediately upon approval and meet low AML and maintain AML ranges within approximately 20 years." BW_03295.

This type of multi-year gather approach is often used by BLM to account for the realities of space limitations at holding facilities, safety concerns, and the rapid rate of reproduction of wild horses and burros. Indeed, the Ninth Circuit recently approved BLM's use of such a plan,

holding that "BLM's choice to conduct a continuous removal of [wild horses] through a phased-gather approach was not arbitrary or capricious." *Friends of Animals*, 820 F. App'x at 516. The court found that this approach was in line with the agency's past practices:

> BLM's use of a single gather plan and a single environmental assessment to cover a period of years and a series of individual gather operations is not a departure from the agency's past practice. *See, e.g., Leigh v. Salazar*, No. 3:13-cv-00006, 2014 WL 4700016 (D. Nev. Sept. 22, 2014) (approving a 10-year phased-gather plan for Owyhee Complex using a single environmental assessment).

*Id.; see also Friends of Animals*, 353 F. Supp. 3d at 1006-07 ("There is no requirement that a separate determination be made for each individual round up approved under a gather plan and the court shall not read such a requirement into the [Wild Horse Act].") (citing *Friends of Animals v. BLM*, 232 F. Supp. 3d 53, 63 (D.D.C. 2017) for its "holding that [the plaintiff]'s argument that BLM must issue an [Environmental Assessment] or other document 'for every individual gather ... reads too much into BLM's' statutory duties")).

Even the District of Utah case relied on by Plaintiffs contradicts Plaintiffs' argument. Pls.' Br. 34-35. In *Western Rangeland Conservation Association v. Zinke*, an association of ranchers claimed that BLM unreasonably delayed in executing its duty to "immediately remove" excess wild horses under the Wild Horse Act because its gather plan consisted of a phased approach to reach AML over a period of six to 10 years. 265 F. Supp. 3d at 1285-87. While Plaintiffs highlight the court's finding that BLM's phased approach was difficult to square with the Wild Horse Act's "immediacy" requirement, Plaintiffs omit the court's ultimate holding— in which it rejected the plaintiffs' unreasonable delay claim. *Id.* at 1297 ("[T]he court holds that BLM has not 'unreasonably delayed' removal action . . . and declines to compel BLM to act[.]"). The court found that it could not "ignore the profound administrative and practical obstacles facing BLM as it juggles practically unworkable statutory responsibilities on a shoestring budget." *Id.* Those "practical realities, coupled with the inadvisability of [the] court injecting

itself into wild horse and burro management in any significant capacity, weigh decisively against a finding of unreasonable delay[.]" *Id.*[12]

Similarly, here, to the extent such an analysis of the *TRAC* factors is even appropriate, as discussed *supra*, the analysis would support the reasonableness of any "delay" resulting from BLM's decision to conduct gathers over multiple years due to the significant hurdles associated with a one-gather approach. *See TRAC*, 750 F.2d at 80. The first two *TRAC* factors weigh in favor of BLM because, while the requirement for BLM to "immediately remove excess animals from the range" is not without meaning, the statute does not delineate any specific deadline or period for BLM to achieve its goal of reducing the population to AML. 16 U.S.C. § 1333(b)(2). Moreover, BLM has already conducted four gathers implementing the Gather Plan. *See* BW_03585-92 (2019 gather); BW_03648-69 (August 2020 gather); BW_03744-58 (November 2020 gather); BW_03888-90 (2022 Gather). The third factor weighs in favor of BLM because, not only are no human lives at stake, but any harms resulting from BLM's delay (such as the wild horses' and burros' continued exposure to limited water sources) have been mitigated by BLM conducting gathers whenever resources allow or whenever herd conditions call for it. The fourth and fifth factors also weigh in favor of BLM, as an order compelling BLM to expedite the removal of wild horses and burros from the Blue Wing Complex—which, again, is not even relief that Plaintiffs have asked for—would force the agency to reallocate its resources and

---

[12] The only other case that Plaintiffs rely on for this argument is *Friends of Animals v. Culver*, 610 F. Supp. 3d 157 (D.D.C. 2022). Pls.' Br. 35. But as Plaintiffs acknowledge in a footnote, *id.* at n.15, the *Culver* case—in which the court remanded a 10-year gather plan to BLM for further consideration—is inapposite to Plaintiffs' Second Cause of Action because it did not involve an unreasonable delay claim. *Friends of Animals*, 610 F. Supp. 3d at 170 ("[W]hether to excuse compliance is beside the point in this case. Plaintiff has not asked the Court, pursuant to 5 U.S.C. § 706(1), to 'compel agency action … unreasonably delayed.' . . . [T]he sole question before the Court is whether BLM may lawfully direct its employees to wait ten years to 'immediately' remove excess horses that BLM has determined must be removed.").

prioritize the Blue Wing Complex gather over others for which there may be a more pressing need. Finally, the sixth *TRAC* factor further tips the scale in favor of BLM because there is no evidence of agency impropriety in the development of BLM's multi-year gather plan. To the contrary, BLM developed the Gather Plan to achieve its statutory mandate of removing thousands of excess wild horses and hundreds of excess wild burros from the Blue Wing Complex, BW_03279, "which cannot realistically be removed all at once." *Friends of Animals*, 523 F. Supp. 3d at 57; *see also* BW_03360 (noting that gather efficiency is not likely to "exceed 85% via helicopter, and may be less with bait and water trapping"). Accordingly, the Court should reject Plaintiffs' claim that BLM has unreasonably delayed its removal of excess animals from the Blue Wing Complex.

**B. BLM complied with NEPA. (Fifth Cause of Action)**

Plaintiffs challenge the Blue Wing Complex Environmental Assessment's compliance with NEPA under 5 U.S.C. § 706(2), arguing that: (1) the Environmental Assessment relied on "stale data" with respect to both AML and horse and burro population numbers; (2) the Environmental Assessment should have analyzed the additional alternatives of adjusting AML, limiting livestock use, and range improvements; and (3) the Environmental Assessment "ignored" the impact of removal of 88% of the horses and burros in the Blue Wing Complex. Pls.' Br. 37-38. Plaintiffs additionally argue that BLM violated NEPA by failing to undertake new or supplemental analysis based on alleged new information pertaining to the impact of gather operations on burros. *Id.* at 38-39. Plaintiffs do not meet their burden of demonstrating that the agency's decisionmaking process failed to comply with NEPA, or new or supplemental NEPA analysis is required.

Plaintiffs' arguments provide no basis for finding that BLM's analysis "undermine[d] informed public comment and informed decisionmaking." *Sierra Club v. Fed. Energy Regul. Comm'n*, 867 F.3d 1357, 1368 (D.C. Cir. 2017). Rather, the record reflects that the Environmental Assessment took the required "'hard look' at the potential environmental consequences" of its proposed actions. *League Of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1135 (9th Cir. 2010) (quotation marks and citation omitted). Neither do Plaintiffs identify significant new circumstances or information that would justify supplemental NEPA analysis. Moreover, the only information to which Plaintiffs cite is extra-record evidence that is not properly considered in a challenge to the adequacy of BLM's NEPA analysis under 5 U.S.C. § 706(2). *See* Order, ECF No. 47 at 2 (noting that "[c]ourts reviewing an agency decision are generally limited to the Administrative Record"). Accordingly, the Court should grant summary judgment in favor of BLM on Plaintiffs' NEPA claim.

### 1. BLM's Environmental Assessment complied with NEPA.

NEPA's purpose is to ensure that federal agencies take a "hard look" at the environmental consequences of their proposed actions before deciding to proceed. *Robertson*, 490 U.S. at 350, 352. The purpose of an Environmental Assessment is "not to amass and disclose all possible details regarding a proposal, but to create a 'concise public document' that serves to '[b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI].'" *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1128 (9th Cir. 2012) (citations omitted).

The Blue Wing Complex Environmental Assessment more than satisfies NEPA's procedural requirements. In accordance with the Wild Horse Act, the Environmental Assessment explains the purpose of the proposed action is to reduce the wild horse and burro population in

the Blue Wing Complex to achieve and maintain low AML, and to maintain the population within established AML ranges over longer periods. BW_03281. The Environmental Assessment discloses that the action is necessary "to prevent undue or unnecessary degradation of the public lands by protecting rangeland resources from deterioration associated with excess population," and "to restore a thriving natural ecological balance and multiple use relationship on the public lands." *Id.* Consistent with this purpose and need, the Environmental Assessment proposes a no action alternative and four action alternatives. BW_03285-86. With each of these alternatives in mind, the Environmental Assessment then engages in a thorough analysis of the affected environment, environmental consequences, the individuals, agencies, and groups consulted, and public involvement. BW_03307-416. This analysis allowed BLM to reasonably determine that the action will not significantly affect the quality of the human environment. BW_03555-57 (FONSI). Plaintiffs' challenges to the sufficiency of the Environmental Assessment's thorough analysis are without merit.

Plaintiffs first argue that the Environmental Assessment relied on "stale data." Pls.' Br. 37. At the outset, it is unclear whether Plaintiffs are asserting that the AML established in 1999,[13] or the wild horse and burro population numbers derived, in part, from 2014 aerial census data, are "stale." *Id.* 37-38. What is clear though is that Plaintiffs provide no support for their assertion that such data is "stale" or otherwise not current. In fact, the Environmental Assessment explained that the current estimated population of wild horses and burros within the Blue Wing Complex was based on a December 2014 aerial population census that "utilized best management practices recommended in Instruction Memorandum (IM) No. 2010-057."

---

[13] To the extent Plaintiffs are asserting that the Environmental Assessment should have reconsidered the 1999 AML, as explained below, reconsidering or raising the AML was outside the scope of the Environmental Assessment.

BW_03332. But the Environmental Assessment did not rely on the 2014 census alone in estimating population—it next considered annual population growth rates of approximately 15-25% for wild horses and 11% for burros. *Id.* The Environmental Assessment explained that the rates were "derived through analysis of the numbers of foals captured during previous gathers in relation to the number of adults, as well as the number of foals observed during aerial population counts." *Id.* The Environmental Assessment thus explained its reasonable basis for estimating horse and burro population numbers, and Plaintiffs provide no support for its assertion that BLM's population estimates are so outdated as to render the Environmental Assessment's analysis arbitrary and capricious.

Plaintiffs next argue that BLM "refused to consider public comment" regarding adjustment of AML or limiting livestock use. Pls.' Br. 38. But the Environmental Assessment did consider such comments, and explained in both the body of the Environmental Assessment and in response to comments why these alternatives did not warrant further analysis. Concerning AML, the Environmental Assessment provided that raising the AML was outside the scope of the analysis and would be inconsistent with the Wild Horse Act, which requires immediate removal of excess wild horses and burros. BW_03329-30; BW_03529-31.[14] This position is consistent with case law finding that AML need not be adjusted each time a decision to gather excess horses is issued. *See In Def. of Animals*, 751 F.3d at 1064 n.13 ("[N]othing in the [Wild Horse] Act requires the BLM to determine new AMLs based on current conditions every time the BLM decides to take action to restore the already-established AMLs."); *see also Friends of Animals v. BLM,* No. 16-cv-0199, 2017 WL 5247929, at *8 (D. Wyo. Mar. 20, 2017) (plaintiff

---

[14] Nevertheless, the Environmental Assessment explained that data showed that there is insufficient water and forage within the Blue Wing Complex to support an increased AML. BW_03299.

did not meet burden of showing failure to reevaluate AML ranges as component of gather decision was arbitrary and capricious because the "gather document is not the appropriate mechanism for adjusting the AML of an HMA").[15]

With respect to removing or reducing livestock, the Environmental Assessment explained that this alternative would be "inconsistent with the current land use plans and/or Final Multiple Use Decisions for the Blue Wing – Seven Toughs Allotment and with multiple use management." BW_03299. In addition, the Environmental Assessment explained that reducing livestock would not meet the purpose and need for the action—to remove excess wild horses and burros in accordance with the Wild Horse Act. *Id.* And the Environmental Assessment is not the appropriate mechanism for adjusting livestock grazing, which must follow regulations at 43 C.F.R. § 4100 and be consistent with multiple use allocations in the land use plan. The Environmental Assessment explained that any changes to livestock grazing would first require a land use plan revision and could not be made through a gather decision. BW_03300.

Plaintiffs lastly argue, in passing, that the Environmental Assessment "ignores" the impact of "removing over 88% of the horses and burros in the Blue Wing Complex." Pls.' Br. 38. But the Environmental Assessment extensively considered impacts of the proposed action and alternatives on wild horses and burros. *See* BW_03356-94. In fact, the Environmental Assessment noted that reducing excess wild horses and burros would improve herd health by decreasing competition for forage and water resources, reducing stress, and promoting healthier animals. BW_03359. Impacts to the population from the gather are expected to be "temporary

---

[15] Even if BLM had evaluated adjustment of AML, the Environmental Assessment explained that data would not have supported such adjustment. Monitoring around the time of an emergency gather in 2013 indicated "exceptional" and "severe" drought conditions, which impact forage and water availability. BW_03329-30.

1   in nature," based on observations from gathers over the last 30 years. BW_03375. The

2   Environmental Assessment also explained that animals "selected to remain in the population

3   would be selected to maintain a diverse age structure, herd characteristics and body type." *Id.*

4

5        Rather than identifying an area where BLM's analysis "undermine[d] informed public

6   comment and informed decisionmaking[,]" *Sierra Club*, 867 F.3d at 1368, Plaintiffs' critiques

7   are based on their mere disagreement with BLM's conclusion. However, it is inappropriate for

8   Plaintiffs to substitute their judgment for that of the agency's. *See Ctr. for Biological Diversity*

9   *v. Ilano*, 928 F.3d 774, 783 (9th Cir. 2019) (court must defer to agency's expert judgment); *see*

10  *also Env't Def. Ctr., Inc. v. U.S. EPA,* 344 F.3d 832, 858 n.36 (9th Cir. 2003) (reviewing court

11  may not substitute its judgment for that of the agency). Based on the Environmental

12  Assessment's thorough analysis of alternatives and the impacts thereof, the Court should grant

13  summary judgment in favor of BLM.

14

15       **2.  No supplemental NEPA analysis is required.**

16       Plaintiffs assert—in their brief—that new information relating to the impact of gather

17  operations on burros requires BLM to conduct supplemental NEPA analysis. Pls.' Br. 39.

18  Notably, this allegation is not raised in the complaint. Moreover, Plaintiffs' NEPA claim arises

19  under 5 U.S.C. § 706(2)—not 5 U.S.C. § 706(1) (failure to act claims). *See* Amend. Compl. ¶¶

20  157-162 ("Fifth Cause of Action"). Thus, in accordance with this Court's September 22, 2023

21  Order on Plaintiffs' Motion to Complete and Supplement the Administrative Record, this Court's

22  review of BLM's decision is limited to the administrative record before the agency. ECF No. 47

23  at 2 (citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985)); *see also* ECF No.

24  62 (Federal Defendants' Response to Plaintiffs' Motion for Judicial Notice). Plaintiffs' attempt

25  to assert a new claim in their summary judgment brief should be rejected. However, even if this

26

27

28                                                34

Court were to consider the alleged new, extra-record information, no supplemental NEPA analysis is required.

Under NEPA, an agency must supplement an Environmental Assessment or EIS if new information shows "that the remaining action will 'affec[t] the quality of the human environment' in a *significant* manner or to a *significant* extent not already considered[.]" *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989) (alteration in original, emphasis added). An agency need not supplement an Environmental Assessment or EIS "every time new information comes to light[.]" *Id.* at 373. "To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Id.* The "new" information on which Plaintiffs rely stems from several spreadsheets and a veterinary report Plaintiffs obtained in response to Freedom of Information Act ("FOIA") requests relating to the 2022 Gather. Pls.' Br. 39 (citing Exhibits 3-6 to Plaintiffs' Motion for Judicial Notice, ECF No. 51). It is important to note that neither the comments in Ms. Ford's declaration (ECF No. 50-2), nor the cited literature on which Ms. Ford relies, were presented to BLM during its environmental analysis.[16] In any event, the information cited by Ms. Ford does not require supplemental NEPA analysis because impacts from transportation and handling are considered in the Environmental Assessment, and the information cited by Plaintiffs does not show that the remaining action will affect the quality of the human environment to a significant extent not already considered.[17]

---

[16] Moreover, Ms. Ford has not been established as an expert in the area of wild horse or burro veterinary care.

[17] In addition, the mortality numbers cited by Ms. Ford do not pertain to *gather-related* deaths, but represent primarily post-gather deaths, and often do not include a specific gather-related cause of death. For example, Plaintiffs allege that one spreadsheet obtained through FOIA demonstrates that "gather operations in the Selenite HA resulted in 17.5% confirmed burro deaths." Pls.' Br. 39 (citing Ex. 3 to Motion for Judicial Notice ("MJN")). Additionally, Plaintiffs

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs assert that supplemental NEPA analysis is required because new information shows that "the impact of gather operations on burros is far greater than assessed in 2017." Pls.' Br. 39. The Environmental Assessment explained that based on gathers of over 40,000 excess animals since 2004, gather related mortality has averaged 0.5%." BW_03356. Plaintiffs cite to percentages calculated based on both gather and post-gather deaths to support their assertion that burro mortality associated with Blue Wing Complex gathers has been "much higher" than 0.5%. Pls.' Br. 39 (citing Ford. Decl. ¶¶ 21, 23; Exs. 3-5). Plaintiffs conflate data associated with deaths during gathers or gather transportation with deaths occurring post-gather—often several months after gathers. Setting this aside, the Environmental Assessment acknowledges that wild horses and burros may be expected to experience health effects associated with handling. The Environmental Assessment provides that "[i]mpacts to individual animals may occur as a result of handling stress associated with the gathering, processing, and transportation of animals." BW_03358. The Environmental Assessment explains that the "intensity of these impacts varies by individual animal and is indicated by behaviors ranging from nervous agitation to physical distress." *Id.* Further, "[m]ortality to individuals from handling is infrequent but does occur in 0.5% of [wild horses and burros] gathered in a given gather." *Id.* Although the Environmental Assessment does not mention hyperlipidemia specifically, it does address stress-related impacts. In particular, "[i]ndirect individual impacts are those impacts which occur to individual [wild

---

allege that a second spreadsheet shows that 15.7% of gathered burros died after a 2022 gather in the Sinbad HMA, which Plaintiffs acknowledge is not within the Blue Wing Complex. *Id.* (citing Ex. 5 to MJN). What Plaintiffs fail to acknowledge is that these calculated percentages are largely based on deaths that occurred post-gather, and not during the gather or transport process. *See* Ex. 3 to MJN (compare capture date to date of death). Further, the veterinary report attached as Exhibit 6 is an autopsy report on a single burro that was gathered during a 2022 gather at Sinbad HMA—in a separate state and under a separate gather plan not at issue in this case.

horses and burros] after the initial stress event, and may include spontaneous abortions in mares/jennies, and increased social displacement and conflict in stallions." *Id.* And the Environmental Assessment also notes that gathered animals would be assessed by veterinarians at temporary holding facilities, which includes "recommendations to the BLM regarding care, treatment, and if necessary, euthanasia of the recently captured wild horses." *Id.* The data cited by Plaintiffs is within the realm of post-gather, handling related stress considered in the Environmental Assessment, and thus requiring additional NEPA analysis on this basis would "unfairly hamper agency action and violate the 'rule of reason' which governs an agency's duty to supplement under NEPA." *Earth Island Inst. v. Nash*, No. 19-cv-05792-RS, 2019 WL 11023709, at *8 (N.D. Cal. Oct. 7, 2019) (citing *Marsh*, 490 U.S. at 373-74).

Plaintiffs additionally allege that supplemental NEPA analysis is required to review "recent literature" addressing the relationship between burro transportation and stress. Pls.' Br. 40; Ford. Decl. ¶ 30. The recent literature referred to by Plaintiffs is three articles not presented to the agency at the time of its environmental review. Ford Decl. ¶ 30 n.5 (citing articles by Y. Wang et al. (August 2021) and F. Dai (December 2020); *id.* ¶ 33 n.6 (citing article by F. Mendoza (June 2018)). And even if these articles were available to the agency, the agency is not required to credit the opinions of these authors over its own experts. *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 993 (9th Cir. 2004) ("[C]ourts must also be mindful to defer to agency expertise, particularly with respect to scientific matters within the purview of the agency."). Nevertheless, Plaintiffs misstate or overstate the conclusions reached by the authors.

For example, Plaintiffs allege that Dai "reported that stress from transport was more profound in donkeys that had never previously been transported," and that "[t]his stress was associated with increased cortisol concentrations." Ford Decl. ¶ 32. But Dai found no difference

in the cortisol concentration between the two groups of donkeys observed (those with previous transportation versus those without). *See* Habituation to Transport Helps Reducing Stress-Related Behavior in Donkeys During Loading at 1, 4-5 ("No differences were found in delta cortisol concentration between groups."). Additionally, Plaintiffs assert that Wang reported that "stress from transporting burros can cause transport stress syndrome whereby the immunity of the animals is reduced," and that "[s]tress from transportation increases cortisol concentrations and burros' heart rates." Ford Decl. ¶ 31 (citing Survival Rate of Donkey Foals at pg. 344-45). But the Wang article explained that one study of mares and foals in a trailer during a 20 kilometer transport indicated that cortisol increased after transport—more so in foals. Wang at 344. The article then discussed transport stress syndrome, including a variety of factors relating to the actual transportation (violent driving, time, provision of food and water, etc.) that affect transport stress. *Id.* at 345. Lastly, Plaintiffs cite to an article by F. Mendoza for the assertion that "[i]ncreased cortisol levels are associated with hyperlipidemia in burros." Ford Decl. ¶ 33 (citing Donkey Internal Medicine—Part I: Metabolic, Endocrine, and Alimentary Tract Disturbances, F. Mendoza et al.). But this article states that cortisol "*may* contribute to the development of hyperlipemia [sic]." Mendoza at 67. These articles, taken together, analyze some effects of transportation-related stress on burros, which the Environmental Assessment acknowledged and considered. Thus, in addition to not supporting Plaintiffs' broad assertions, the articles do not rise to the level of "new" data requiring supplemental NEPA analysis.

**C. Plaintiffs' First Amendment claim fails. (Sixth Cause of Action)**

The Court should reject Plaintiffs' First Amendment claim for two reasons. First, Plaintiffs lack standing for their claim because the 2022 Gather was completed over 19 months ago and Plaintiffs' alleged grievances can no longer be redressed by judicial relief, as they no

longer exist. Second, even if Plaintiffs did have standing (they do not), the past events at issue in Plaintiffs' claim did not violate Plaintiffs' First Amendment rights.

### 1. Plaintiffs' lack standing for their First Amendment Claim.

Plaintiffs bear the burden of establishing standing for their claims, which requires them to show that (1) they have suffered a concrete injury in fact, (2) the injury is fairly traceable to the challenged conduct, and (3) the injury is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Plaintiffs fail to meet the first two prongs of this test because there has been no injury in fact.[18] But even more glaringly problematic here, is that, even if there had been an injury, it cannot be redressed by this Court because the gather is over and the alleged facts at issue in Plaintiffs' claim no longer exist.[19]

Plaintiffs allege that their First Amendment rights have been violated in two ways—neither of which is judicially redressable. First, Plaintiffs claim that the public viewing locations for the 2022 Gather were placed too far away and that, as a result, one of their members, Ms. Laurie Ford, "could hardly observe nor document the gather operations at the trap site because

---

[18] Despite Plaintiffs' allegations that the public viewing access provided for the 2022 Gather was so poor that they "could hardly observe nor document the gather operations at the trap site because of the distance and obstruction[,]" Pls.' Br. 41, Plaintiffs' website shows that they were able to successfully photograph and take videos of the gather and post them online. *See* https://wildhorseeducation.org/2022/08/02/blue-wing-roundup-2022/ (Plaintiff Wild Horse Education's website with photographs and videos of the 2022 Gather) (last visited Mar. 8, 2024).

[19] It is standing—not mootness—at issue here because Plaintiffs did not assert a First Amendment claim until September 2, 2022 when they filed their First Amended Complaint, ECF No. 24 at 30, three weeks after BLM had completed the 2022 Gather. A claim is moot if the challenged action ceases to be a controversy during the course of the lawsuit; whereas, a plaintiff lacks standing if there is no controversy at the outset of the litigation. *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 68 n.22 (1997) ("Mootness has been described as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'") (citation omitted). "[P]laintiffs have the burden to prove standing, while defendants have the burden to show that a claim is moot." *Arcamone-Makinano v. Haaland*, No. 2:22-cv-00621-JAD-NJK, 2022 WL 4585298, at *3 n.40 (D. Nev. Sept. 29, 2022) (citation omitted).

of the distance and obstruction from BLM trucks and stock trailers." Pls.' Br. 41. But as Plaintiffs acknowledge, the 2022 Gather began on August 1, 2022 and concluded on August 12, 2022. Pls.' Br. 9. So as of August 12, 2022—over 18 months ago—any perceived issues with BLM's placement of these public observation sites ceased to exist, because the 2022 Gather was complete and there was nothing left to view at the time Plaintiffs asserted their First Amendment claim in September 2022. Plaintiffs have failed to demonstrate how these alleged First Amendment violations could be rectified by this Court.

Second, Plaintiffs claim that BLM violated "Plaintiffs' protected right under the First Amendment by refusing to allow them any access to view burros taken to temporary holding corrals or the Axtell Off Range Holding Corrals." Pls.' Br. 41. But Plaintiffs similarly fail to establish how this alleged grievance could be redressed. Temporary holding corrals—like those used immediately after the 2022 Gather—are used to hold the wild horses and burros for only a few days after the gather, before they are moved to off-range facilities to be cared for in anticipation of adoption, sale, or long-term care in Midwestern pastures. Swisher Dec. ¶ 18. At the time that Plaintiffs asserted their First Amendment claim in September 2022, none of the wild horses or burros from the 2022 Gather remained in their temporary holding corrals. The corrals were constructed specifically for the gather and, after being used to hold the animals for a few days immediately thereafter, the corrals were deconstructed. So in other words, the temporary holding corrals at issue in Plaintiffs' First Amendment claim did not even exist anymore at the time that Plaintiffs asserted the claim. *Id.* ¶ 18. Thus, Plaintiffs lack standing because they fail to make the requisite showing that the public access restrictions on the

temporary holding corrals are First Amendment violations that could be redressed by this Court.[20]

In other cases challenging aspects of wild horse and burro gathers, courts have routinely held that once the gather is completed, the court can no longer redress the claim. *See, e.g., Arcamone-Makinano*, 2022 WL 4585298, at *3 (holding that the plaintiffs "failed to demonstrate how their challenge to the [] gather can be rectified by this court" because "[t]hat event is complete") (footnote omitted); *Downer v. BLM*, No. 20-CV-191-SWS, 2021 WL 7210048, at *5 (D. Wyo. Mar. 12, 2021) (dismissing case for lack of subject-matter jurisdiction after BLM completed the gather because "a decision in this matter will not presently affect the parties' rights nor have a non-speculative chance of affecting them in the future"); *Fund for Animals, Inc. v. BLM*, 460 F.3d 13, 22 (D.C. Cir. 2006) (finding that plaintiffs lacked standing to challenge completed gathers because it "is impossible for the court to grant any effectual relief[,]" as those gathers "cannot be undone") (quotation marks and citation omitted); *Arcamone-Makinano v. Haaland*, No. 22-8006, 2022 WL 1042573, at *3 (10th Cir. Apr. 7, 2022) (finding that plaintiff lacked standing to challenge a completed gather because that "specific gather has been completed and is not capable of repetition").[21]

---

[20] When Plaintiffs filed their First Amendment claim in September 2022, the wild burros gathered at the 2022 Gather were at the Axtell Off Range Holding Corrals, where they were transferred after being held for a few days in temporary holding corrals. Swisher Dec. ¶ 22. Thus, Plaintiffs do not lack *standing* for this portion of their claim. However, the portion of Plaintiffs' claim regarding lack of public access to the Axtell holding facility is largely moot because only 356 of the 804 gathered burros remain at the Axtell Off Range Holding Corrals, as most have been distributed to other facilities, adopted, or sold into private care and placement. *Id.* Thus, any potential for the Court to redress this part of Plaintiffs' claim is limited. *See Tillett v. BLM*, 586 F. App'x 394 (9th Cir. 2014) (affirming the district court's dismissal of case as moot because "BLM moved the horses during the pendency of this action, and, thus, the district court could no longer provide any meaningful relief").

[21] Even if BLM's placement of public viewing areas for the 2022 Gather had violated Plaintiffs' First Amendment rights (it did not), this could not be redressed through an order setting

1   Plaintiffs' failure to establish that their alleged injury is likely to be redressed by a

2   favorable decision is fatal to their First Amendment claim. *Lujan*, 504 U.S. at 568-71.

3       **2.   BLM did not violate Plaintiffs' First Amendment rights.**

4       Even if Plaintiffs had standing for their First Amendment claim, the Court should still

5   grant summary judgment in favor of Federal Defendants because BLM has not violated

6   Plaintiffs' First Amendment rights. First, Plaintiffs' allegations that BLM violated the First

7   Amendment by "refusing to allow … access to view burros taken to temporary holding corrals

8   or the Axtell Off Range Holding Corrals" lack merit because both holding facilities are private,

9   and the law is clear that there is no qualified right of public access for such facilities. Pls.' Br.

10  41. Further, Plaintiffs' argument that BLM's allegedly inadequate placement of public viewing

11  stands at the 2022 Gather violated the First Amendment also fails. *Id.* 40-41. While there is a

12  qualified right of public access for gathers on public land, any perceived insufficiency with

13  Plaintiffs' view of the gather was the result of narrowly tailored restrictions that were designed

14  to serve a compelling governmental interest in ensuring the safety and efficiency of the gather.

15      Addressing the holding facilities first, both (1) the temporary holding corrals used to hold

16  the gathered horses and burros immediately after the gather, and (2) the Axtell Off Range Corrals

17  where the gathered burros were later held, are private facilities. Swisher Dec. ¶¶ 20, 22. BLM's

18  gather contractor selected the location for the temporary holding corrals, after considering

19  several other locations on both public and private lands, due to its: "close proximity to access

---

parameters for *future* gathers. Each gather is unique and the trap site is often moved throughout
the gather to account for the location of the animals and the features of the terrain. When the trap
is moved, the public viewing area is typically moved too, so that the public can still see the gather
and to ensure the safety of the animals and wranglers. Swisher Dec. ¶ 11. For example, the trap
for the 2022 Gather was moved multiple times throughout the gather and the public observation
area was moved each time. *Id.* ¶¶ 12-16.

roads that were accessible to semi-trucks, water availability, and the ability to keep animals safe"; close proximity to the gather site, minimizing necessary transport time for the horses; and "access [to] a well that produces approximately 1,000 gallons of water per minute to keep the dust to a minimum within the corrals and keep the animals watered with no logistical challenges to haul the water." *Id.* ⁋ 20. BLM selected the Axtell Off-Range Corrals in Utah as the subsequent holding facility for the gathered burros based on the capacity and space constraints of the available facilities and the national gather priorities for the Wild Horse and Burro Program. *Id.* ⁋ 23.[22]

The law of this District is clear: "privately owned and operated facilit[ies] which operate[] under contract with the Government" have not historically "been open to the press and general public, and, as such, no qualified right of access arises." *Leigh III*, 954 F. Supp. 2d at 1103-04. In *Leigh III,* the Court rejected Plaintiff Laura Leigh's First Amendment claim, which challenged public observation restrictions at a private holding facility, including a prohibition on the public walking around the facility and limited observation days. *Id.* at 1103. The Court found that, even though the holding facility had periodically allowed BLM to offer public tours, the private owner had the right to deny public access. *Id.* at 1103-04 (noting that "the owners and operators of the [private] facility are not before the court and the court is without jurisdiction over them"). The Court noted that there are many reasons why the owner of a private facility may want to limit or prohibit public access, including security concerns regarding people that "may be intent on either destroying or disrupting [the facilities]." *Id.* at 1103. The Court cited several examples, including: an Ohio facility that was "destroyed by what was believed to have

---

[22] The gathered wild horses from the 2022 Gather were sent to short-term holding at the Palomino Valley Off Range Wild Horse Corrals in Reno, Nevada. Plaintiffs' First Amendment claim does not include any allegations regarding the Palomino Valley facility.

been a bomb"; the explosion of a "fire bomb" in the hay storage of a California facility and another undetonated bomb "discovered under the office trailer on the property"; and cut fences in a Nevada facility, allowing horses to escape. *Id.* at 1103-04.

Here, like in *Leigh II*, the owner of the land where BLM's contractor constructed temporary holding corrals and the owner of Axtell Off-Range Corrals had the right to deny public access to their land and facilities. BW_03904; Swisher Dec. ¶¶ 20, 22. BLM cannot prohibit private entities from exercising this right. For these reasons, this Court has held that the public does not have a qualified right of access to such properties. *Leigh III*, 954 F. Supp. 2d at 1104.[23] Accordingly, Plaintiffs' First Amendment challenge regarding public access rights to these private holding facilities should be rejected.

Next, Plaintiffs argue that the public viewing access BLM provided for the 2022 Gather "from afar and with known obstructed views[,]" violated Plaintiffs' First Amendment rights. Pls.' Br. 40. Specifically, Plaintiffs complain that one of the observation sites was 1.3 miles from the trap site and another was 0.7 miles from the trap site. Pls.' Br. 40-41 (citing Ford Decl. ¶¶ 7, 17). This argument lacks merit.

---

[23] Plaintiffs proclaim that "the real reason restrictions have been placed on viewing is to prevent the public from documenting improper and inhumane handling of burros." Pls.' Br. 41 (citing Ford Decl. ¶ 19). But the only "evidence" Plaintiffs cite for this accusation is a paragraph in Ms. Ford's Declaration, which states: "I fear that the public was not provided access to the burros at Axtell because the conditions of the burros would reveal that they are not being treated humanely." Ford Decl. ¶ 19. Plaintiffs' unsubstantiated "fear" fails to support such an accusation. Further, Plaintiffs' citation to extra-record materials regarding death toll statistics for gathers not at issue here and for which there is no context in the record (specifically, the "Sinbad HMA" gather conducted in Utah in 2022, and the "Selenite Range HA" gather conducted in 2020) are irrelevant. Pls.' Br. 42. Moreover, BLM's contractors, including private holding facilities, are required to comply with the standards set forth in the CAWP, setting forth comprehensive standards for, *inter alia*, veterinarian care, disease control, general handling, transportation, and euthanasia. BW_03759-803.

44

1     While the public does have a qualified right of access to view the government's wild

2  horse and burro gathers on public land, this Court has recognized that BLM has the following

3  "important overriding interests": (1) "the effective and efficient gather of the horses"; and (2)

4  "the safety of all individuals including those involved in gather activities, members of the

5  viewing public, and the horses themselves." *Leigh III*, 954 F. Supp. 2d at 1101. Indeed, in *Leigh*

6  *III*, the Court held that "the placement of [] designated viewing areas above and away from the

7  [trap site,]" was an appropriate measure to protect those important and overriding interests. *Id.*

8  at 1102. The Court found that, although—like here—Plaintiff Laura Leigh "was not provided an

9  unobstructed view of the horses close enough to identify them by their markings[,]" the viewing

10  restrictions imposed by BLM did not infringe upon her First Amendment rights in light of the

11  agency's overriding interests of efficiency and safety. *Id.* at 1103.

12     BLM provided public observation opportunities every day of the 2022 Gather. Swisher

13  Dec. ⁋ 17. The observation sites at issue in Plaintiffs' First Amendment claim were placed 0.7

14  to 1.8 miles away from the trap sites, in areas with geographical features that BLM determined

15  would minimize the risk of injury to the animals and the public. *Id.* ⁋⁋ 12-13. For example, the

16  first trap site (the farthest from the public) was located in an area that was "flat and open with

17  limited geographical features to hide vehicles and members of the public." *Id.* ⁋ 12. To protect

18  the public and ensure the safety of the animals and their wranglers, BLM placed the observation

19  site at a nearby "spring source with tree cover and fencing." *Id.* Because wild horses and burros

20  are naturally flighty and reactive to movement in their surroundings, BLM aims to place public

21  viewing platforms in areas that will be outside of the animals' line of sight or are in some way

22  concealed from their view. *Id.* ⁋ 11. While BLM considered other locations that were closer to

23  the trap site, it determined that the other options were "unsuitable due to how the burros would

45

travel while being herded to the trap." *Id.* ¶ 12. Specifically, because the 2022 Gather involved helicopters, BLM needed to ensure that the public viewing sites complied with FAA guidelines requiring a buffer zone of 1,000 feet and did not encroach on the space needed for the helicopters to herd the animals and maintain the ability to course correct for their traveling paths. *Id.* ¶ 11. In other words, BLM's selection of observation sites for the 2022 Gather "sufficiently accounted for [] safety concerns and did so in a reasonable and narrowly tailored way to still allow the public to observe the gather activities[.]" *Leigh III*, 954 F. Supp. 2d at 1102-03.

In sum, the record supports the conclusion that the viewing restrictions for the 2022 Gather were narrowly tailored to achieve BLM's important and overriding interest of conducting a safe and efficient gather, and the Court should reject Plaintiffs' First Amendment claim.

## V.    CONCLUSION

For the foregoing reasons, Federal Defendants respectfully request that the Court grant their cross-motion for summary judgment and deny Plaintiffs' motion for summary judgment.


Dated: March 8, 2024

Respectfully Submitted,

TODD KIM, Assistant Attorney General

*/s/ Michelle M. Spatz*
MICHELLE M. SPATZ, Trial Attorney
D.C. Bar No. 1044400
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 598-9741
michelle.spatz@usdoj.gov

*/s/ Frances B. Morris*
FRANCES B. MORRIS, Trial Attorney

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
(202) 514-2855
frances.morris@usdoj.gov

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on March 8, 2024, I filed the foregoing Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment electronically through the CM/ECF system, which caused all parties or counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.


/s/ *Michelle M. Spatz*
Michelle M. Spatz
U.S. Department of Justice