DANIELLE M. HOLT
(Nevada Bar No. 13152)
DE CASTROVERDE LAW GROUP
1149 S Maryland Pkwy
Las Vegas, NV 89104
Ph (702) 222-9999
Fax (702) 383-8741
danielle@decastroverdelaw.com

JESSICA L. BLOME
(Cal. Bar No. 314898, admitted pro hac vice)
J. RAE LOVKO
(Cal. Bar No. 208855, admitted pro hac vice)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com
rlovko@greenfirelaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| CANA FOUNDATION, a non-profit corporation, LAURA LEIGH, individually, and WILD HORSE EDUCATION, a nonprofit corporation, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT, and JON RABY, Nevada State Director of the Bureau of Land Management, <br><br> *Defendants*. | Case No. 2:22-cv-01200-CDS-BNW <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

1

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................................... 7

II.  ARGUMENT ............................................................................................................ 7

    A.   Issue preclusion is appropriate. .................................................................... 7

        1.   Plaintiffs are entitled to issue preclusion with respect to three identical issues. ............................................................................................ 8

        2.   These three issues were actually and necessarily decided. ........................... 9

        3.   The parties benefited from full and fair opportunity to litigate these issues. ................................................................................... 9

        4.   Plaintiffs seek preclusion against the same Defendants as in *Leigh v. Raby*. ............................................................................. 10

    B.   BLM has a mandatory, non-discretionary duty to prepare HMAPS. ..................... 10

        1.   HMAPs are distinct from Land Use Plans and Gather EAs. ........................ 11

        2.   BLM must prepare HMAPs before undertaking significant management actions or it cannot ensure it is meeting the objectives contained in the WHBA. ......................................................................... 12

        3.   Where no deadline exists for creation of an HMAP, BLM must still act reasonably. ........................................................................... 17

        4.   Under the applicable TRAC factors, there is no doubt that a thirty-eight-year delay is unreasonable. ........................................................ 19

    C.   BLM has a mandatory, non-discretionary duty to immediately remove excess wild horses; it cannot rely on a 20-year plan. ................................. 22

    D.   BLM has failed to comply with NEPA because BLM did not take a "hard look" at the impact of its Gather Plan. ......................................... 24

    E.   Supplemental NEPA analysis is required. .................................................. 25

    F.   BLM violated Plaintiffs' First Amendment rights. ..................................... 26

        1.   Plaintiffs have standing. ........................................................................... 26

        2.   BLM interfered with Plaintiffs' free speech right to access and observe gather operations. ..................................................................... 28

III. CONCLUSION ....................................................................................................... 31

1

2

**TABLE OF AUTHORITIES**

3

**Cases**

4

*Adnan Ahmed v. United States Dep't of State*, 2024 U.S. Dist. LEXIS 14461 ................... 19, 20

5

*Animal Prot. Inst. of Am.*, 109 IBLA 112 (1989) ............................................................. 13, 14

6

*Animal Prot. of N.M. v. United States*, No. 98-538 JP/LFG, 2000 U.S. Dist. LEXIS 24419

7

(D.N.M. Jan. 10, 2000) ........................................................................................... 24

8

*Arcamone-Makinano v. Haaland*, No. 2:22-cv-00621-JAD-NJK,

9

2022 WL 4585298 (D. Nev. Sep. 29, 2022) ............................................................. 27

10

*Baldwin v. Redwood City*, 540 F.2d 1360 (9th Cir. 1976)................................................ 27

11

*Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166 (9th Cir. 2002).............................. 17, 20

12

*Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946 (9th Cir. 2013) ..................... 13

13

*Conley v. Gibson*, 355 U.S. 41 (1957) .............................................................................. 18

14

*Dawod v. Garland*, 2023 U.S. Dist. LEXIS 212848 (C.D. Cal. Oct. 12, 2023) ....................... 20

15

*Doe v. Risch*, 398 F. Supp. 3d 647 (N.D. Cal. 2019) .......................................................... 19

16

*Downer v. BLM*, No. 20-CV-191-SWS, 2021 WL 7210048 (D. Wyo. Mar. 12, 2021) ........... 28

17

*Earth Island Inst. v. United States Forest Serv.*, 87 F.4th 1054 (9th Cir. 2023) ..................... 25

18

*Flores v. Bowen*, 790 F.2d 740 (9th Cir. 1986) ............................................................... 10

19

*Friends of Animals v. BLM*, 232 F. Supp. 3d 53 (D.D.C. 2017).......................................... 23

20

*Friends of Animals v. Culver*, 610 F. Supp. 3d 157 (D.D.C. 2022)...................................... 24

21

*Friends of Animals v. Pendley*, 523 F. Supp. 3d 39 (D.D.C. 2021)...................................... 23

22

*Friends of Animals v. Silvey*, 820 F. App'x 513 (9th Cir. 2020) ......................................... 23

23

*Friends of Animals v. United States Bureau of Land Mgmt.*,

24

548 F. Supp. 3d 39 (D.D.C. 2021) ........................................................................ 13, 15

25

*Fund for Animals, Inc. v. BLM*, 460 F.3d 13 (D.C. Cir. 2006)............................................ 28

26

*In re Yu*, 545 B.R. 633 (Bankr. C.D. Cal. 2016)................................................................. 9

27

*Independence Mining Co. v. Babbitt*, 885 F. Supp. 1356 (D. Nev. 1995).................... 19, 20, 21

28

*Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817 (9th Cir. 2020) .......... 28

*Janjua v. Neufeld*, 933 F.3d 1061, 1065 (9th Cir.2019) .................................................. 7, 8, 9

*Leigh et al. v. Jon Raby et al.,* No. 3:22-cv-00034-MMD-CLB,

   2022 U.S. Dist. LEXIS 15747 (D. Nev. Jan. 28, 2022) ................................................ passim

*Leigh v. Salazar*, 677 F.3d 892 (9th Cir. 2012) ........................................................ 29

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................................ 26

*Lyons v. United States Citizenship & Immigration Servs.*, 2023 U.S. Dist. LEXIS 4509

   (S.D.N.Y. Jan. 10, 2023)............................................................................................ 21

*Marbury v. Madison*, 5 U.S. 137 (1803)................................................................... 15

*Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, (1990)................................. 24, 25

*Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000) ..................................................... 24

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067 (9th Cir. 2011) ............... 24

*Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7 (2d Cir. 1997) ........................................ 25

*Nat'l Cable Television Ass'n, Inc. v. Am. Cinema Eds., Inc*.,

   937 F.2d 1572 (Fed. Cir. 1991)......................................................................... 14, 23

*Nat'l Wildlife Fedn v. Nat'l Marine Fisheries Serv.*, 184 F. Supp. 3d 861 (D. Or. 2016) ... 24, 25

*NRDC v. United States EPA (In Re NRDC)*, 956 F.3d 1134 (9th Cir. 2020) ............... 19, 20, 22

*Olivas-Motta v. Whitaker*, 910 F.3d 1271 (9th Cir. 2018) ............................................. 8

*Or. Nat. Desert Ass'n v. Bushue*, 644 F. Supp. 3d 813 (D. Or. 2022*)* ...................................... 21

*Press-Enterprise Co. v. Superior Court of Cal.*, 464 U.S. 501 (1984)...................................... 28

*R.J. Reynolds Tobacco Co. v. Cnty. of L.A.*, 29 F.4th 542 (9th Cir. 2022) ............................... 13

*Resolution Tr. Corp. v. Keating*, 186 F.3d 1110 (9th Cir. 1999)................................................. 8

*Singh v. Napolitano*, 909 F. Supp. 2d 1164 (E.D. Cal. 2012) ..................................... 20

*Spencer v. Kemna*, 523 U.S. 1 (1998) ..................................................................... 27

*Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002)........................................................ 19

*Trout Unlimited v. Pirzadeh*, 1 F.4th 738 (9th Cir. 2021*)* .......................................... 10

*United States v. Allen*, 34 F.4th 789 (9th Cir. 2022)......................................................... 29

*United States v. Johnson*, 256 F.3d 895 (9th Cir.2001) ............................................... 9

*Updike v. Multnomah Cnty.*, 870 F.3d 939 (9th Cir. 2017) ..................................... 19

*Van Damme v. Wells Fargo Bank, N.A.*, 651 B.R. 791 (Bankr. D. Nev. 2022) ........................ 8

*Vaz v. Neal*, 33 F. 4th 1131 (9th Cir. 2022) ...................................................... 19, 20, 22

*W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267 (D. Utah 2017) ................ 24

*W. Watersheds Project v. Kraayenbrink*, 620 F.3d 1187 (9th Cir. 2010)................................. 24

*Waller v. Georgia*, 467 U.S. 39 (1984)............................................................................ 28

*Webster v. Fall*, 266 U.S. 507 (1925) ............................................................... 13, 23

**Statutes**

16 U.S.C. § 1332(f)..................................................................................................... 14

16 U.S.C. § 1333........................................................................................................ 14

16 U.S.C. § 1333(b) ...................................................................................... 13, 15, 24

16 U.S.C. § 1333(b)(1) ............................................................................................... 23

16 U.S.C. § 1333(b)(2) ...................................................................................... 21, 22

16 U.S.C. §1331.......................................................................................................... 24

42 U.S.C. § 4332(E)................................................................................................... 23

5 U.S.C. § 706(1) ...................................................................................................... 16

**Regulations**

40 C.F.R. § 1502.9(d) ................................................................................................. 24

40 C.F.R. § 1508.9 ..................................................................................................... 23

43 C.F.R. § 1610.5-1 .................................................................................................. 11

43 C.F.R. § 1610.5-2 .................................................................................................. 11

43 C.F.R. § 4.21 ......................................................................................................... 11

43 C.F.R. § 4.410 ....................................................................................................... 11

43 C.F.R. § 4710.3-1 ........................................................................................... passim

43 C.F.R. § 4710.4 ................................................................................... 11, 12, 13, 14

43 C.F.R. §4710.4 ............................................................................................ 10, 11, 12

**Rules**

Fed. R. Civ. Proc. 56(a) ................................................................................. 6

Fed. R. Civ. Proc. 8(a)(2) ............................................................................. 17

Fed. R. Civ. Proc. 8(a)(3) ............................................................................. 17

Fed. R. Civ. Proc. 8(d) ................................................................................. 17

Fed. R. Civ. Proc. 8(d)(2) ............................................................................. 17

Fed. R. Civ. Proc. 8(d)(3) ............................................................................. 17

**Other Authorities**

46 Fed. Reg. 18026-01 (1981) ..................................................................... 24

## I.  INTRODUCTION

This case is about whether Congressional directives and management objectives for wild horses and burros contained in the Wild & Free Roaming Horses and Burros Act (WHBA) truly act as a restraint on BLM's management of one of the most enduring and beloved resources in the West. And this case has taken on a sense of urgency, as BLM has scheduled another roundup of horses and burros in the Blue Wing Complex of Herd Management Areas, or HMAs, to take place this July. *See* Supplemental Declaration of Laura Leigh (Suppl. Leigh Decl.), ¶ 9. Absent judicial intervention, BLM will continue its policy of conducting serial roundups over a two decades-long period of time without undertaking the careful planning required by the WHBA and its implementing regulations to protect the health of wild horses and burros, to ensure wild horse and burro populations are in balance with other uses of public lands, and to achieve a thriving ecological balance on the nation's rangelands.

Plaintiffs have averred causes of action based upon violations of the WHBA, National Environmental Policy Act (NEPA), and Administrative Procedure Act (APA), as well as violation of Plaintiffs' First Amendment right to observe and document BLM's actions during the roundup of wild horses and burros. *See* ECF 24 at 26-30. As to each cause of action, Plaintiffs have demonstrated that there is no genuine dispute as to any material fact, and thus, they are entitled to judgment as a matter of law. *See* Fed. R. Civ. Proc. 56(a). In addition, since Plaintiffs filed their Opening Brief, Chief U.S. District Judge Miranda M. Du in *Leigh et al. v. Jon Raby et al.* (U.S. District Court for the District of Nevada, Case No. 3:22-cv-00034-MMD-CLB) issued an order granting, in part, Plaintiffs' Motion for Summary Judgment, and in so doing, ruled on a number of issues now before this Court in the above-captioned matter. As such, issue preclusion applies to these issues and should be binding in this case.

## II.  ARGUMENT

### A.  Issue preclusion is appropriate.

Issue preclusion prohibits re-litigation of previously decided issues of fact or law. *See Janjua v. Neufeld*, 933 F.3d 1061, 1065 (9th Cir. 2019); *Olivas-Motta v. Whitaker*, 910 F.3d

1271, 1279 (9th Cir. 2018). For issue preclusion to apply: (1) the issue must be identical in

both proceedings, (2) the issue must have been actually litigated and necessarily decided in the

first suit, (3) there must have been a full and fair opportunity to litigate the issue in the first

suit, and (4) preclusion can only be asserted against one who was a party in the first suit or one

in privity with that party. *See Van Damme v. Wells Fargo Bank, N.A.*, 651 B.R. 791, 808

(Bankr. D. Nev. 2022); *Janjua*, 933 F.3d at 1065. Plaintiffs succeeded in litigation involving

several issues that qualify for issue preclusion in the matter *Leigh, et al. v. Raby, et al.*, U.S.

District Court for the District of Nevada, Case No. 3:22-cv-00034-MMD-CLB (hereinafter

*Leigh v. Raby*). Accordingly, Plaintiffs seek issue preclusion on these issues and apply the

factor analysis below.

### 1. Plaintiffs are entitled to issue preclusion with respect to three identical issues.

In looking at whether issues are identical, courts analyze whether there is substantial

overlap between the arguments in both cases, whether both cases involved application of the

same rule of law, and how closely related the claims are in both cases. *See Resolution Tr. Corp.

v. Keating*, 186 F.3d 1110, 1116 (9th Cir. 1999). The following issues are identical in both the

previous action of *Leigh v. Raby* and the current matter:

- whether the language of 43 C.F.R. § 4710.3-1 imposes a mandatory duty on
  BLM to create HMAPs;

- whether land use plans and gather plans can be used in lieu of HMAPs to fulfill
  Section 4710.3-1's HMAP preparation mandate, and

- whether a thirty-eight year delay to create an HMAP is unreasonable under
  APA, § 706.

*See generally* Declaration of Jessica L. Blome in Support of Plaintiffs' Second Motion for

Judicial Notice (Second Blome Decl.), Exhs. 2-8. In *Leigh v. Raby,* the Court granted final

judgment in favor of Plaintiffs on these three issues on March 29, 2024. *See id.* at Exhs. 9-10.

As regards these three issues, the parties' arguments, cited caselaw, and claims are virtually

8

identical to the arguments, cited caselaw, and claims at issue in this litigation. *See id.* at Exhs. 2-8.

### 2. These three issues were actually and necessarily decided.

"[A]n issue is actually litigated when an issue is raised, contested, and submitted for determination." *Janjua*, 933 F.3d at 1066. Necessarily decided "means only that the court undeniably decided the issue." *United States v. Johnson*, 256 F.3d 895, 915 (9th Cir. 2001). Where the first court "heard evidence and argument from both parties, and specifically ruled on the issue, a party may not escape the ruling's binding effect on the ground that it was not logically essential to the court's ultimate determination." *Id.* There is no doubt that each issue was raised and contested with considerable briefing in *Leigh v. Raby. See* Second Blome Decl., Exhs. 2-8. After submission to the Court, Chief Judge Du ruled upon each issue. *See id.* at Exhs. 9-10. As such, this element of issue preclusion has been met.

### 3. The parties benefited from full and fair opportunity to litigate these issues.

A full and fair opportunity to litigate exists where the procedures in both cases are similar and where the defendant's motivation in both cases is similar. *See In re Yu*, 545 B.R. 633, 639 (Bankr. C.D. Cal. 2016). Like the instant case, *Leigh v. Raby* required that the District Court review an administrative record to determine whether the BLM had acted in accordance with the requirements of the National Environmental Policy Act, Wild & Free Roaming Horses and Burros Act, and Administrative Procedure Act. *See* Second Blome Decl., Exh. 1. Also like the instant case, the parties submitted cross motions for summary judgment to dispose of largely legal questions, and in both actions, Plaintiffs sought to compel BLM to create HMAPs for complexes of HMAs. *See id.* at Exhs. 2-8. The parties indisputably benefited from a full vetting of the issues and opportunity to litigate the issues in *Leigh v. Raby.*

4.   **Plaintiffs seek preclusion against the same Defendants as in *Leigh v. Raby*.**

Federal Defendants in both actions are identical. As such, this Court should find that Plaintiffs are entitled to summary judgment on the three issues already decided in *Leigh v. Raby* and enter judgment accordingly. Should the Court disagree with Plaintiffs and find that issue preclusion does not apply, Plaintiffs argue the merits of these claims below.

**B.   BLM has a mandatory, non-discretionary duty to prepare HMAPS.**

The language of 43 C.F.R. § 4710.3-1 is crystal clear:  BLM "**shall** prepare a herd management area plan, which may cover one or more herd management areas." 43 C.F.R. §4710.3-1 (emphasis added). In *Leigh v. Raby*, Chief Judge Du agreed that this language legally obligates BLM to create HMAPs for HMAs and HMA complexes, like those at issue in this litigation:

> Section 4710.3-1 of BLM's [WHBA] implementing regulations provides that HMAs "shall be established for the maintenance of wild horse and burro herds" and that BLM "shall prepare a [HMAP], which may cover one or more [HMAs]." 43 C.F.R. § 4710.3-1. These are mandatory duties with which BLM must comply. … Therefore, regardless of the discretion the agency was originally granted under the [WHBA], BLM "has chosen to constrain its own discretion via regulations that carry the force of law." *Trout Unlimited v. Pirzadeh*, 1 F.4th 738, 751 (9th Cir. 2021)*; accord Flores v. Bowen*, 790 F.2d 740, 742 (9th Cir. 1986). .. BLM must comply with Section 4710.3-1 and develop one or more HMAPs for the Pancake Complex HMAs.

*See* Second Blome Decl., Exh. 9 at pp. 7-8.

BLM does not actually deny that this obligation exists, but instead, the agency focuses its arguments on (a) whether BLM has substantially complied with its duty to develop a HMAP, and (b) whether there is a temporal mandate requiring that HMAPs be created prior to BLM undertaking gather operations. To the extent that HMAPs are mandated, but this Court finds they need not be created before gather plans, Defendants also argue that they have not unreasonably delayed in creating any HMAPs for the HMAs within the Bluewing Complex.

10

### 1.     HMAPs are distinct from Land Use Plans and Gather EAs.

Defendants argue that instead of creating an HMAP, management decisions can be based on a combination of materials. In this instance, Defendants argue that their reliance on the Winnemucca RMP and the Gather EA substantially complies with their mandate to create an HMAP. None of the cases cited by Defendants in support of this position examine whether substantial compliance with the HMAP mandate can abrogate the duty to create an HMAP. Rather, all of the cases examine whether or not an HMAP is required prior to gather operations. As such, those cases are addressed below in Section II.B.2.b.

While the WHBA's implementing regulations do not discuss what comprises an HMAP, they "are clear on what HMAPs are *not*, as they explicitly distinguish HMAPs from [land use plans]." *See* Second Blome Decl., Exh. 9 at pp. 8 – 10 (emphasis in the original); *see also* 43 C.F.R. §4710.4 ("Management shall be at the minimum level necessary to attain the objectives identified in approved land use plans *and* herd management area plans") (emphasis not in the original). The Winnemucca District RMP also recognizes the difference, stating that BLM must develop HMAPs for the HMAs in the district, and these HMAPs "will be the vehicle for determining the management and objectives for the herds and their habitat." AR02231. Defendants completely ignore this point, which Plaintiffs raised in their Opening Brief. *See* ECF 50 at p. 29.

Also, in its Wild Horses and Burros Management Handbook, BLM recognizes the distinction between land use plans, environmental assessments, and HMAPs. *See* AR00058-AR00062, AR0087-AR001020. In general, land use plans apply to public lands in a given district, focusing on "general habitat and population management goals and objectives." AR00061. HMAPs, on the other hand, apply to public lands in specific HMAs and herd areas, and they "establish short- and long-term management and monitoring objectives for a specific WH&B herd and its habitat." AR00062. Environmental assessments focus on impacts to the environment associated with BLM management projects, including projects to adopt land use plans and HMAPs.

Moreover, even where there is overlap amongst these tools, their differences go beyond substance. Parties aggrieved by an HMAP have different procedural rights and administrative review process than parties who wish to protest a land use plan or environmental assessment. For example, a public scoping period is required for an HMAP but not for an environmental assessment. *See* AR0087-00088. The review processes for HMAPs and land use plans also are different. *Compare* 43 C.F.R. §§ 4.21, 4.410 (administrative review procedures for wild horse and burro implementation decisions, including HMAPs) with 43 C.F.R. §§ 1610.5-1, 1610.5-2 (protest procedures for RMPs). And further, "BLM engages in environmental review under NEPA at each stage of its wild horse management planning process, from establishing broad LUPs to narrower HMAPs and specific gather plans. Skipping the HMAP stage evades that middle level of environmental review." *See* Second Blome Decl., Exh. 9 at pp. 9-10.

Because of these differences, Chief US District Judge Du concluded that '[e]ngaging in the decision-making of an HMAP without actually preparing an HMAP could therefore deprive interested parties of the administrative review processes to which they are entitled." *Id.* at p. 9.  Land use plans "cannot fulfill the Section 4710.3-1 HMAP preparation mandate." *Id.* at p. 10.

### 2. BLM must prepare HMAPs before undertaking significant management actions or it cannot ensure it is meeting the objectives contained in the WHBA.

Plaintiffs have shown that Section 4710.4 was adopted as a constraint on management, and that "[m]anagement shall be at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans." 43 C.F.R. § 4710.4. Defendants argue that (i) this provision only requires consideration of *approved* plans, (ii) caselaw demonstrates that HMAPs are not a requisite for gather operations, and (iii) requiring creation of HMAPs before gather operations goes against the WHBA's statutory language regarding removal of excess animals. Each of these arguments must necessarily fail.

1

### a)      "Approved" HMAPs

2       As regards the wording of Section 4710.4, Defendants focus on the term "approved,"

3  arguing that this regulation does not mandate the creation and approval of *new* plans; it only

4  pertains to previously *approved* plans, if they exist for the relevant area. In other words, if no

5  land use plan or HMAP has been created, then Section 4710.4 is utterly and completely

6  without effect. This position not only ignores the legislative history of the regulations, but it

7  also requires the Court to engage in a strained interpretation of the regulations. Statutory

8  interpretation should not render regulatory provisions as superfluous. *See R.J. Reynolds*

9  *Tobacco Co. v. Cnty. of L.A.*, 29 F.4th 542, 559 (9th Cir. 2022); *Chubb Custom Ins. Co. v.*

10  *Space Sys./Loral, Inc.*, 710 F.3d 946, 965 (9th Cir. 2013).

11       Section 4710.4 is entitled "Constraints on management," but BLM ignores this. Section

12  4710.4 states that management activities "shall" be based on objectives in both land use plans

13  "and" HMAPs, but BLM finds this wording meaningless. As regards the term "approved,"

14  BLM could read this as requiring the creation of approved plans and HMAPs, which would be

15  consistent with the regulations' purpose of clarifying BLM's management procedures and

16  constraining management. Instead, BLM posits that "approved" makes consideration of land

17  use plans and HMAPs optional. As addressed in Plaintiffs' initial brief, no Auer deference

18  should be granted to this peculiar interpretation, which contradicts both the wording of the

19  regulations and its legislative history. *See* ECF 50 at p. 24.

20

### b)      Defendants' caselaw is inapposite.

21       Defendants assert that multiple courts have found it unnecessary for BLM to prepare an

22  HMAP prior to gather operations, citing *Animal Prot. Inst. of Am*., 109 IBLA 112 (1989) and

23  *Friends of Animals v. United States Bureau of Land Mgmt*., 548 F. Supp. 3d 39 (D.D.C. 2021).

24  This is incorrect. Neither of these cases address Section 4710.4 or the regulatory history of

25  BLM's regulations. No mention is made of the tools of statutory construction that were argued

26  (if they were). As such, they have no precedential value. *See Webster v. Fall*, 266 U.S. 507,

27  511 (1925) ("[q]uestions which merely lurk in the record, neither brought to the attention of the

28

1    court nor ruled upon, are not to be considered as having been so decided as to constitute

2    precedents"); *Nat'l Cable Television Ass'n, Inc. v. Am. Cinema Eds., Inc.*, 937 F.2d 1572, 1581

3    (Fed. Cir. 1991) ("[w]hen an issue is not argued or is ignored in a decision, such decision is not

4    precedent to be followed in a subsequent case in which the issue arises").

5        *Animal Prot. Inst. of Am.* is an Interior Board of Land Appeals opinion that addressed a

6    challenge to four BLM decisions approving gather plans. *See Animal Prot. Inst. of Am.*, 109

7    IBLA at 112-113. Appellants put forth several arguments, and the vast majority of the opinion

8    focused on whether BLM's method for establishing AMLs was consistent with 16 U.S.C. §

9    1333(b)'s requirement that removal of horses be necessary to achieve and maintain a thriving

10   natural ecological balance on public lands. *See id.* at 114-126 (finding most AMLs had not

11   been properly established). One paragraph addresses HMAPs:

12           Finally, API contends that BLM should not be permitted to proceed with removal
             of wild horses from the HMA/WHTs involved herein until it has prepared an
13           HMAP in each case. We note that 43 CFR 4710.3-1 requires preparation of an
             HMAP. BLM and/or the Forest Service has prepared HMAPs only with respect to
14           the Miller Flat and Nevada Wild Horse Range HMAs, Monte Cristo HMA/WHT,
             and Cherry Springs WHT. No HMAPs have been prepared in the case of the other
15           HMA/WHTs involved herein. We conclude that it is not necessary that BLM
             prepare an HMAP as a basis for ordering the removal of wild horses, so long as
16           the record otherwise substantiates compliance with the statute. Indeed, 43 CFR
             4710.3-1 does not require preparation of an HMAP as a prerequisite for a removal
17           action. Thus, we are not persuaded that preparation of an HMAP must in all cases
             precede the removal of wild horses from an HMA/WHT, and decline to order
18           preparation of HMAPs.

19

20   *Id.* at 127.

21        Unlike *Animal Prot. Inst. of Am.*, Plaintiffs here aver that Defendants are in violation of

22   Section 4710.4 because BLM has not prepared a single HMAP for any of the HMAs or the

23   complex of HMAs at issue in this litigation. Plaintiffs may agree that Section 4710.3-1—on its

24   own—does not expressly require preparation of an HMAP as a prerequisite for a removal

25   action. Instead, Section 4710.3-1 requires that in creating HMAs for the maintenance of wild

26   horses, BLM "shall consider . . . the constraints contained in § 4710.4." *See* 43 C.F.R. §

27   4710.3-1. Section 4710.4 mandates that HMAPs be consulted before engaging in HMA

28

management activities, which include decisions to remove wild horses from public lands. Because the *Animal Prot. Inst. of Am.* opinion does not address this section of BLM regulations, the paragraph's conclusion regarding HMAPs is not controlling. Moreover, IBLA decisions are not controlling on this Court, so a single IBLA decision from decades ago bears no weight in this case, which Plaintiffs bring to a tribunal with oversight authority over the actions of administrative agencies per Article III of the United States Constitution. *See Marbury v. Madison*, 5 U.S. 137 (1803).

*Friends of Animals* involved a motion for a preliminary injunction to block a future gather operation in the Onaqui Mountain HMA. *See Friends of Animals*, 548 F.Supp. 3d at 45-46. In *dicta*, the Court noted that BLM's handbook contemplates use of an array of approaches to manage an HMA including but not limited to AMLs, HMAPs, and gather plans. *See id.* at 67. The case includes no discussion regarding statutory construction as to either Section 4710.3-1 or Section 4710.4.  As such, it has no relevance to the current matter.

c)      **The Wild & Free Roaming Horses and Burros Act is more than a removal statute; it is a management statute.**

Defendants note that the WHBA was amended in 1978 to address BLM's authority in removing excess animals from public lands, and this amendment does not require consideration of an HMAP. This ignores the fact that Section 4710.4 mandates consideration of HMAPs as a constraint on management. The WHBA's provisions regarding removal of excess horses and burros provide BLM with broad discretion in determining whether overpopulation exists. *See* 16 U.S.C. § 1333. But, this discretion is not limitless. The WHBA defines "excess animals" to mean those that "must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." 16 U.S.C. § 1332(f). Not only do the implementing regulations state that the objectives of HMAPs must be considered, but without the creation and consideration of HMAPs, such a determination is not possible. *See* 43 C.F.R. § 4710.4, AR00061, AR00068.

BLM acknowledges that to achieve a thriving natural ecological balance, wild horses and burros are to "be managed in a manner that assures significant progress is made toward achieving the Land Health Standards for upland vegetation and riparian plant communities, watershed function, and habitat quality for animal populations, as well as other site-specific or landscape-level objectives, including those necessary to protect and manage Threatened, Endangered, and Sensitive Species (TES)." AR00068. "Habitat or population management and monitoring objectives regarding the management of a specific HMA or complex of HMAs are normally identified in a HMAP rather than a LUP." AR00061. As regards habitat objectives:

> Habitat objectives may involve vegetation, trend or key area objectives for upland vegetation or riparian plant communities within the HMA or complex or objectives to maintain or improve the wild, free-roaming behavior of the population. Site-specific objectives to improve habitat conditions (e.g., forage or water) may also be established.

AR00090. As regards population objectives:

> These objectives would establish a framework for management of the WH&B herd over the longer term. Objectives could include when and how AML would be adjusted in the future, or when and how the population within the HMA would be gathered. Among other population management parameters, objectives may be identified for desired age structure and sex ratio, animal condition, phenotype, genetic diversity, population growth rate, or selective removal criteria. These objectives may be based on historical attributes or other management considerations.

*Id.*

Here, the Winnemucca RMP broadly refers to habitat and population objectives, but it provides no site-specific objectives nor identifies appropriate criteria for measuring objectives. Instead, it states that its broad objectives "will be implemented through a multi-step process involving …. HMAPs." AR02231. More specifically, HMAPs "will be the vehicle for determining the management and objectives for the herds and their habitat." *Id.*

The WHBA contemplates that BLM will make determinations regarding overpopulation based upon current data and act quickly once a determination of overpopulation exists. *See* 16 U.S.C. § 1333(b). Nowhere does the Act or its implementing regulations suggest

16

that BLM should ignore or put off management until such time as populations are 7 – 10 times the appropriate management level (AML).[1]  By ignoring its duties, BLM has created emergencies that could have been avoided, resulting in the recent wholesale removal of tens of thousands of wild horses and burros without consideration of HMAPs and their objectives.[2] All of this could have been avoided had BLM created an HMAP as mandated and used this tool as "the vehicle for determining the management and objectives for the herds and their habitat." AR02231.

### 3. Where no deadline exists for creation of an HMAP, BLM must still act reasonably.

Even if this Court finds that there is no temporal requirement for HMAP creation, Plaintiffs' Motion for Summary Judgment should still be granted based on their Second Cause of Action. *See* ECF 24 at ¶¶ 135-142. This cause of action is brought under Section 706(1) of the APA, alleging that Defendants have "unlawfully withheld or unreasonably delayed" their mandatory duty to prepare an HMAP for the Blue Wing Complex. *See* 5 U.S.C. § 706(1). Where agency inaction has occurred in the face of a mandatory deadline, courts look at whether the action has been unlawfully withheld; where agency inaction has occurred in the face of a discretionary deadline, courts look at whether the action has been unreasonably delayed. *See Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 n.11 (9th Cir. 2002).

### a) Defendants improperly frame the analysis.

Defendants repeatedly try to frame Plaintiffs' unreasonable delay claim as focusing on whether BLM should have prepared an HMAP *prior to* conducting a gather. *See* ECF 60 at pp.

---

[1] The low AML for the Blue Wing Complex is for 333 horses and 55 burros. At the time the final gather EA was completed, the Fall 2017 population estimate was for 2492 horses and 848 burros. *See* AR03267.

[2] In recent years, the number of wild horses and burros being removed has skyrocketed, with over 20,000 animals being removed in 2022 and a similar number planned for 2024. During the past five years of 2018 – 2022, the average number of horses and burros removed per year more than tripled the average number removed per year during the previous five years of 2013 – 2017. *See* BLM Program Data, https://www.blm.gov/programs/wild-horse-and-burro/about-the-program/program-data, last accessed on April 4, 2024; BLM FY2024 Tentative Wild Horse and Burro Gather and Fertility Control Schedule as of December 8, 2023, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.blm.gov/sites/default/files/docs/2023-12/Tentative%20National%202024%20%20Gather%20Sched.%20Revised%20Dec%208%202023.pdf, last accessed on April 4, 2024.

32-35. Plaintiffs' Second Cause of Action simply does not frame the Section 706(1) claim in the manner suggested by Defendants. Rather, Plaintiffs' First Amended Complaint states: "Defendants have unlawfully withheld **or** unreasonably delayed their mandatory duty to prepare an HMAP for the Blue Wing Complex or for the individual Herd Management Areas that make up the Complex." ECF24 at ¶ 140 (emphasis added). The unreasonably delayed claim is not connected to gather operations.

Plaintiffs also pointed this out in their Opening Brief, noting that should the Court believe the WHBA implementing regulations do not establish a mandatory deadline, the "unreasonably delayed" claim would require application of the "TRAC" factors. *See* ECF 50 at p. 30-32. The analysis that followed focused on BLM's failure to create an HMAP from the time of the regulations' adoption in 1986. *See id.* at p. 32. The analysis was not connected to gather operations.

Perhaps Defendants are meaning to raise a notice pleading argument, but such an argument fails. The Federal Rules of Civil Procedure only require that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. Proc. 8(a)(2). This "reject[s] the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept[s] the principle that the purpose of pleading is to facilitate a proper decision on the merits." *See Conley v. Gibson*, 355 U.S. 41, 47 (1957).

Additionally, Plaintiffs are permitted to seek relief in the alternative as here, where they allege both that the action was unlawfully withheld and, in the alternative, it was unreasonably delayed. *See* Fed. R. Civ. Proc. 8(a)(3) and (d). Plaintiffs may set out multiple statements of a claim in a single count, and "the pleading is sufficient if any one of them is sufficient." *See id.* at 8(d)(2). The alternative claims need not be consistent. *See id.* at 8(d)(3). "The simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues," rather than requiring plaintiffs to define all their claims

perfectly before further proceedings are conducted. *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002).

Plaintiffs' Amended Complaint satisfies these notice pleading requirements and Defendants have received fair notice of Plaintiffs' claims. *See id.* at 514; *Updike v. Multnomah Cnty.*, 870 F.3d 939, 952 (9th Cir. 2017). Accordingly, the Court should not adopt Defendants' framing of Plaintiffs' Second Cause of Action.

> **4.    Under the applicable TRAC factors, there is no doubt that a thirty-eight-year delay is unreasonable.**

The regulations mandating that BLM create HMAPs were adopted in 1986. At the time of this writing, 38 years have passed since their adoption, but Defendants still have not created any HMAPs for the Blue Wing Complex or any of its HMAs. The balance of the TRAC factors weigh in Plaintiffs favor.

The first TRAC factors focus on whether the time of agency action has been reasonable. *See Vaz v. Neal*, 33 F.4th 1131, 1138 (9th Cir. 2022); *Doe v. Risch*, 398 F. Supp. 3d 647, 656-657 (N.D. Cal. 2019). "Reasonable" means "expeditious." *Independence Mining Co. v. Babbitt*, 885 F. Supp. 1356, 1364 (D. Nev. 1995, *aff'd sub nom. Indep. Min. Co.*, 105 F.3d 502). Referred to as the "rule of reason" factor, the first TRAC factor is considered the most important factor. *See Vaz*, 33 F. .4th  at 1138; *NRDC v. United States EPA (In Re NRDC)*, 956 F.3d 1134, 1139 (9th Cir. 2020).[3]

Defendants make no attempt to justify their 38-year delay as being reasonable. BLM does not address the substantial caselaw supporting the conclusion that a 38-year delay is unreasonable, as cited to in Plaintiffs' Opening Brief. *See* ECF 50 at p. 32. Instead, BLM simply states that because there is no requirement for BLM to issue an HMAP *prior* to a gather, the first TRAC factor weighs in BLM's favor. Again, BLM misses the point. The TRAC factors are not applied where there is a mandatory deadline; they are applied where

---

[3] Where Congress does not provide a timeline, the second TRAC factor does not weigh in favor of plaintiffs or defendants; it is neutral. *See Adnan Ahmed v. United States Dep't of State*, 2024 U.S. Dist. LEXIS 14461, at *13.

there is a mandatory duty to act for which no mandatory deadline exists. *See Biodiversity Legal Found.*, 309 F.3d at 1177 n.11. That is why the first TRAC factor is known as a "rule of reason" factor. *See Vaz*, 33 F.4th at 1136-37 (where regulations do not identify a certain deadline for agency action, the APA requires that the action be done "within a reasonable time); *Dawod v. Garland*, 2023 U.S. Dist. LEXIS 212848, at *7 (C.D. Cal. Oct. 12, 2023) (where a duty exists, the APA "demands that action be done within a reasonable time"); *Singh v. Napolitano*, 909 F. Supp. 2d 1164, 1176 (E.D. Cal. 2012) (where Congress has not provided a timetable for action, agencies must act "within a reasonable time").

In *Leigh v. Raby*, Chief Judge Du ruled:

> The first factor considers "whether the time for agency action has been reasonable." [*Vaz v. Neal*, 33 F.4th 1131, 1138 (9th Cir. 2022)] (quoting *In re Nat. Res. Def. Council, Inc.*, 956 F.3d 1134, 1139 (9th Cir. 2020) ("In re NRDC")). Though not determinative, it is "the most important factor." *Id.* (quotation marks omitted). "Repeatedly, courts in this and other circuits have concluded that a reasonable time for agency action is typically counted in weeks or months, not years." *Id.* (quoting *In re NRDC*, 956 F.3d at 1139).

> By these standards, BLM has taken more than a reasonable amount of time to prepare HMAPs for the Pancake and Sand Springs West HMAs. The duty to prepare an HMAP arose as soon as BLM created the HMAs—or, if the HMAs predate Section 4710.3-1, that duty arose when BLM promulgated the regulation 38 years ago in 1986. … BLM's decades long delays in developing and approving HMAPs have therefore been "nothing short of egregious" and clearly violate the rule of reason. … [Thus, t]he first TRAC factor strongly favors Plaintiffs.

Second Blome Decl., Exh. 9 at p. 11.

The second TRAC factor examines whether Congress has provided any indication of the speed with which it expects an agency to act. *See Independence Mining Co. v. Babbitt*, 105 F.3d 502, 507 n. 7 (9th Cir. 1997). Here, Congress did not address the issue. Where this is the case, the second TRAC factor does not weigh in favor of plaintiffs or defendants; it is neutral. *See Adnan Ahmed v. United States Dep't of State*, 2024 U.S. Dist. LEXIS 14461, at *13 (N.D. Cal. Jan. 26, 2024). In *Leigh v. Raby*, Chief Judge Du ruled that this second factor is not applicable. *See* Second Blome Decl., Exh. 9 at p. 11.

The third TRAC factor applies where human health and welfare are at stake.  *See Independence Mining Co.,* 105 F.3d at 507 n. 7. Relatedly, the fifth TRAC factor looks at the interests prejudiced by the agency's delay. *See id.* These factors are often analyzed simultaneously. Here, the consequences of BLM's failure to prepare an HMAP "fall neither into the economic realm nor specifically into the realm of human health and welfare." *Or. Nat. Desert Ass'n v. Bushue*, 644 F. Supp. 3d 813, 842 (D. Or. 2022*), appeal dismissed sub nom. Or. Nat. Desert Ass'n v. BLM*, No. 23-35101, 2023 WL 5012123 (9th Cir. June 5, 2023). As a result, in *Leigh v. Raby*, Chief Judge Du ruled that the third factor is neutral. *See* Second Blome Decl., Exh. 9 at p. 11.

As regards the fifth factor, both in *Leigh v. Raby* and here, Plaintiffs argue that BLM's failure to create an HMAP goes against the interests elucidated by Congress in the WHBA. In *Leigh v. Raby*, Chief Judge Du noted that Defendants contended these interests were not prejudiced, and she assumed, without deciding, that this contention was true, thereby weighing the fifth factor in Defendants' favor. *See* Second Blome Decl., Exh. 9 at p. 12.

Finally, the fourth TRAC factor looks at "the effect of expediting delayed action on agency activities of a higher or competing priority." *Independence Mining Co.,* 105 F.3d at 507 n. 7. Defendants state this factor weighs in their favor because requiring creation of an HMAP "could" impact public lands and animals by delaying BLM's ability to remove excess wild horses. ECF 60 at p. 59. This hypothetical impact is connected to Defendants incorrect position that Plaintiffs' unreasonable delay claim is based on requiring the creation of HMAPs prior to gather operations. Again, Plaintiffs' claim is based on Defendants' thirty-eight year delay and focuses on expediting HMAP creation. Such expedition need not be connected to future gather operations. Defendants offer no evidence that expediting HMAP creation would impact any other agency priorities, in error. *See Lyons v. United States Citizenship & Immigration Servs.*, 2023 U.S. Dist. LEXIS 4509, at *21 (S.D.N.Y. Jan. 10, 2023) (noting that Defendants must produce evidence and not just aver that a negative impact will occur). BLM has done HMAPs

for other herd management areas without any drastic effect on the agency's priorities, and

Defendants have not shown that they cannot do so here.

In *Leigh v. Raby*, Chief Judge Du ruled:

> Preparing the [] HMAP may take personnel and funding away from other BLM
> activities, like gathering excess horses. The Court is sympathetic to the fact that
> BLM, like most public agencies, has multiple resource-intensive mandates and
> limited resources with which to fulfill them. *See Vaz*, 33 F.4th at 1138. But it
> would be overly generous to say that BLM gets a free pass on the fourth factor
> because all of its activities to some extent touch on the important values of
> wildlife, recreation, and the multiple use of public lands. *See In re NRDC*, 956
> F.3d at 1141. Preparing an HMAP should have only limited impact on BLM's
> other priorities. The agency can conduct gathers in the meantime, and the HMAP
> should require minimal work since BLM claims to have already substantially
> prepared one. [] This factor favors Plaintiffs.

Second Blome Decl., Exh. 9 at p. 12.

Defendants have completely failed to establish that their delay is reasonable. At best,

only the fifth factor weighs in Defendants' favor, clearly establishing that BLM's delay in

preparing HMAPs for the Blue Wing Complex or its HMAs is unreasonable. Based upon

consideration of the TRAC factors, Chief Judge Du order BLM to develop and approve

HMAPs within a year. Second Blome Decl., Exh. 9 at pp. 12-13.

**C.    BLM has a mandatory, non-discretionary duty to immediately remove
excess wild horses; it cannot rely on a 20-year plan.**

The WHBA provides that where BLM determines "that an overpopulation exists on a

given area of the public lands and that action is necessary to remove excess animals, [the

agency] shall immediately remove excess animals from the range so as to achieve appropriate

management levels." 16 U.S.C. § 1333(b)(2). On October 23, 2017, BLM published the Blue

Wing Complex Gather Plan Final Environmental Assessment and its associated Finding of No

Significant Impact (FONSI) and Decision Record (DOR). *See* AR03268-03557. At that time,

BLM determined that wild horses exceeded AML by 1,939 to 2,159 horses and wild burros

exceed AML by 758 to 793 burros. AR03279. The Gather EA allows for multiple gathers and

removals over "approximately 20 years." AR03295, AR03549 (emphasis added). Even after

1    AML is achieved, subsequent gather operations can occur to maintain AML – without any

2    further environmental assessment, declaration of NEPA adequacy or similar review. AR03295.

3          Despite determining that overpopulation existed in 2017, BLM did not begin any gather

4    operations until 2019. AR03838. Over 2019 and 2020, BLM removed 1,607 horses and 626

5    burros from the Blue Wing Complex. *Id.* BLM delayed any further gather operations until

6    almost two years later (in 2022), then removing 218 wild horses and 804 wild burros.

7    AR03908-03913. With another two years now approaching, BLM plans additional gather

8    operations to begin on July 8, 2024, with plans to remove 1,373 wild horses and 356 wild

9    burros. Suppl. Leigh Decl., ¶ 11.

10         Eight years have passed since the Gather EA was adopted. Another approximate 12

11   years remain under the plan. Surely the WHBA's mandate to BLM does not envision that

12   "immediately" means periodic removal over 20 or so years. ECF at pp. 34-37. The reality is

13   that BLM is improperly relying on the Gather EA (an environmental document; not a

14   management tool dictated by the WHBA or its implementing regulations) to sidestep its

15   obligations to make determinations about excess horses and burros based upon current data and

16   to immediately act to remove animals where overpopulation exists.

17         Summary judgment of Plaintiffs' First, Second, Third and Fourth Causes of Action is

18   proper because BLM violated 16 U.S.C. § 1333(b)(2) by failing to remove excess horses and

19   burros immediately. *See id.* In opposition, BLM only addresses Plaintiffs' Second Cause of

20   Action. BLM's opposition also relies upon a number of cases that do not address the WHBA's

21   immediacy requirement. None of the courts in *Friends of Animals v. Pendley*, 523 F. Supp. 3d

22   39 (D.D.C. 2021), *Friends of Animals v. Silvey*, 820 F. App'x 513 (9th Cir. 2020), or *Friends of*

23   *Animals v. BLM*, 232 F. Supp. 3d 53 (D.D.C. 2017) made any ruling as regards application of

24   the WHBA's immediacy requirement to phased gather plans. As such, they have no

25   precedential value. *See Webster*, 266 U.S. at 511; *Nat'l Cable Television Ass'n, Inc.*, 937 F.2d

26   at 1581.

27

28
                                           23

The timing of removals is not entirely within BLM's discretion. "[I]mmediately' must mean something." *W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1284-85 (D. Utah 2017); *see also Friends of Animals v. Culver*, 610 F. Supp. 3d 157, 171 (D.D.C. 2022). Section 1333 clearly demands an urgency of action. *See id.*

    **D.**    **BLM has failed to comply with NEPA because BLM did not take a "hard look" at the impact of its Gather Plan.**

Plaintiffs Opening Brief argued that BLM's environmental assessment violates NEPA because BLM relied on stale data and failed to consider relevant factors. *See* ECF 50 at pp. 38-39. As regards stale data, Plaintiffs contend that that it was improper to base the 2017 Gather EA analysis on AMLs that were established in 1999 or earlier, and it was improper to rely on population numbers derived from December 2014 animal count estimates. *See id.*

When making a determination that excess horses should be removed from public lands, the WHBA requires that such determination rely on "a current inventory of wild free-roaming horses and burros on given areas of the public lands." 16 U.S.C. § 1333(b)(1). Plaintiffs argument was supported by three cases that found agency actions are arbitrary and violate NEPA when relying on stale data: *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067 (9th Cir. 2011); *Animal Prot. of N.M. v. United States*, No. 98-538 JP/LFG, 2000 U.S. Dist. LEXIS 24419 (D.N.M. Jan. 10, 2000); *Nat'l Wildlife Fedn v. Nat'l Marine Fisheries Serv.*, 184 F. Supp. 3d 861 (D. Or. 2016). *See* ECF 50 at p. 39. Defendants ignore Section 1333's requirement for current data, and they also ignore the three cases relied upon by Plaintiffs. Defendants' cursory comments on the issue of stale AML numbers and population estimates do not satisfy NEPA's "hard look" requirement, but instead, BLM's response is nothing more than "an exercise in form over substance." *W. Watersheds Project v. Kraayenbrink*, 620 F.3d 1187, 1205 (9th Cir. 2010), quoting *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000); *see also* 42 U.S.C. § 4332(E); 40 C.F.R. § 1508.9; *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 373-74 (1990).

As regards BLM's failure to consider relevant factors, Plaintiffs argue that BLM did not take a "hard look" at limiting livestock use; examining range improvements such as moving fencing and developing water sources; and considering the impact of removing over 88% of the horses and burros in the Blue Wing Complex. Defendants do not demonstrate otherwise. By failing to consider these relevant factors, BLM acted in an arbitrary and capricious manner in violation of NEPA. *Marsh*, 490 U.S. at 378; *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 17 (2d Cir. 1997).

**E.      Supplemental NEPA analysis is required.**

Plaintiffs have generally averred that Defendants should create a new or supplemental gather EA. ECF 24 at pp. 24-25, 26, 28. They have requested the Court issue a writ and/or an order an injunction until Defendants have fully complied with NEPA. *Id.* at 31. NEPA requires agencies prepare a new or supplemental EA when there are significant new circumstances or information bearing on the proposed action or its impacts. 40 C.F.R. § 1502.9(d). New information consists of "intervening information not already considered." *Earth Island Inst. v. United States Forest Serv.*, 87 F.4th 1054, 1069 (9th Cir. 2023). Further, for purposes of NEPA compliance, "the Council of Environmental Quality, which promulgates the NEPA regulations, has emphasized that NEPA documents more than five years old should be 'carefully reexamined' for supplementation." *Nat'l Wildlife Fedn v. Nat'l Marine Fisheries Serv.*, 184 F. Supp. 3d 861, 936 (D. Or. 2016) (quoting Council on Environmental Quality, Executive Office of the President, Publication of Memorandum to Agencies Containing Answers to 40 Most Asked Questions on NEPA Regulations, 46 Fed. Reg. 18026-01 at *18036 (1981)).

The WHBA provides that BLM must humanely capture and remove excess wild horses and burros. 16 U.S.C. §1333(b); *see also* 16 U.S.C. §1331. The 2017 Blue Wing Complex Gather EA recognizes this directive, noting that environmental issues include herd health impacts. AR03305.  To ensure that captures do not significantly impact herd health, gather operations are to be conducted in a humane manner, with data on herd health and characteristics data to be collected. AR03289, AR03357-03359. Here, the limited data obtained

by Plaintiffs through a FOIA request demonstrates the impact of gather operations on burros is far greater than assessed in 2017. ECF 50 at pp.40-41.

Defendants argue that the new information regarding burro health does not require supplementation "because impacts from transportation and handling are considered in the Environmental Assessment." ECF 60 at p. 46[4]. This is beside the point. It does not matter that BLM previously looked at the impacts. The issue is that new, intervening information shows the impacts associated with the gather and removal of burros is significantly higher than BLM originally assumed. *See* ECF 50 at p. 40; ECF 51-2 at Exhibits 3-6. In light of this, BLM needs to evaluate the significance of this new information in a supplemental EA.

**F.      BLM violated Plaintiffs' First Amendment rights.**

Defendants argue that Plaintiffs lack standing for their claim, and even if they do have standing, Plaintiffs' First Amendment rights were not violated.  Both arguments are incorrect.

**1.      Plaintiffs have standing.**

Plaintiffs' Complaint seeks, as a remedy for Defendants' violation of Plaintiffs' First Amendment rights, "an order compelling Defendants to provide Plaintiffs with meaningful viewing access of the off-range holding corrals where gathered horses and burros from the 2022 Blue Wing Complex operations are currently held, and to each phase of future gather and removal efforts of horses and burros living in the Blue Wing Complex, including trap sites, temporary holding corrals, and off-range holding corrals." ECF 24 at p. 31.

To demonstrate Article III standing to sue, Plaintiffs must show (1) they suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) the injury is fairly traceable to defendants' challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

---

[4] Defendants also note that the new information does not pertain to "*gather-related* deaths, but represent primarily post-gather deaths, and often do not include a specific gather-related cause of death." ECF 60 at p. 35 n. 17. Defendants offer no rationale to support the conclusion that post-gather deaths are not impacts associated with the approved gather plan. The cause of death is data that the Gather EA envisions BLM collecting; BLM is not limited to the data obtained by Plaintiffs when evaluating the significant of this new information.

Defendants' argument focuses on the third element,[5] as Defendants contend that any injury suffered by Plaintiffs cannot be redressed because at the time that Plaintiffs' First Amended Complaint was filed in September 2022, the August 2022 gather operations had concluded. This position ignores the "capable of repetition, yet evading review" exception to standing/mootness, which applies where "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Spencer v. Kemna*, 523 U.S. 1, 17 (1998); *see also Baldwin v. Redwood City*, 540 F.2d 1360, 1365 (9th Cir. 1976) (holding that an issue is "capable of repetition, yet evading review" where the record established that plaintiff had continuing interest in and past practices of participating in local political campaigns by creating signs).

Here, the Gather EA allows continuing gather operations in the Blue Wing Complex until "approximately" the year 2037. BLM also has plans to begin another gather operation in July of 2024. Suppl. Leigh Decl., ¶ 11. Accordingly, there is a reasonable expectation that Plaintiffs' First Amendment Rights will continue to be violated without redress by this Court.

Defendants state that "[i]n other cases challenging aspects of wild horse and burro gathers, courts have routinely held that once the gather is completed, the court can no longer redress the claim." These cases are all distinguishable in that none involved phased gathers, and none were capable of repetition yet evading review. *See e.g., Arcamone-Makinano v. Haaland*, No. 2:22-cv-00621-JAD-NJK, 2022 WL 4585298 (D. Nev. Sep. 29, 2022) (where

---

[5] Defendants says that Plaintiffs fail to meet the first two prongs because there has been no injury in fact. In support of this blanket assertion, Defendants state that photographs and videos posted on Plaintiffs' website show that public viewing access was not poor. ECF 60 at p. 39 n. 18. It is unclear what photographs and videos Defendants are referring to as no specific images are referred to. If Defendants wanted to rely upon these photographs and videos as evidence, they were required to request judicial notice. This would have provided both the Court and Plaintiffs with information necessary to respond to Defendants' argument. This being so, Defendants throw-away reference to Plaintiffs' website has no bearing on evidence before this court and in the record.

Further, Plaintiffs note that Defendants completely ignored Plaintiffs' full discussion on the first two prongs, contained in Section IV of Plaintiffs' Opening Brief and supported by multiple declarations.

plaintiff was not challenging an environmental assessment but only an emergency gather that had transpired the year before the complaint was filed, plaintiff lacked standing because the event was complete and the decision record undergirding the gather was no longer operative); *Downer v. BLM*, No. 20-CV-191-SWS, 2021 WL 7210048 (D. Wyo. Mar. 12, 2021) (where a challenged roundup had concluded, and BLM stated there were no plans to conduct any further gather activities under the decision authorizing the challenged roundup, the case becomes moot); *Fund for Animals, Inc. v. BLM*, 460 F.3d 13 (D.C. Cir. 2006) (where complaint objected to seven specific gathers that had been completed, court could not provide injunctive relief against carrying out these gathers; the gathers could not be undone). Defendants' reliance on these cases is unavailing.

### 2.     BLM interfered with Plaintiffs' free speech right to access and observe gather operations.

In Plaintiffs' Opening Brief, Plaintiffs demonstrated that Defendants interfered with Plaintiffs' protected right under the First Amendment to access and observe gather operations, which includes the right to access and observe holding and shipment operations. *See* ECF 50 at pp. 41-43. Defendants argue that any restrictions on viewing that occurred were narrowly tailored to serve the government's overriding interests in the safety and efficiency of the gather.  ECF 60 at p. 53. In support of this argument, Defendants rely primarily upon the Declaration of Garrett W. Swisher.

In limiting Plaintiff's First Amendment right to access and observe gather operations, Defendants must articulate the overriding interest to be protected "along with findings specific enough that a reviewing court can determine whether" the government's actions were narrowly tailored. *Press-Enterprise Co. v. Superior Court of Cal.*, 464 U.S. 501, 510 (1984); *see also Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 829 (9th Cir. 2020). Government action is narrowly tailored where it is "essential" to preserve the government's overriding interests. *Id.* Any limitation must be "no broader than necessary." *Waller v. Georgia*, 467 U.S. 39, 48 (1984). Where reasonable alternatives exist to the limitations

28

imposed by the government, this is evidence indicating the limitations are not narrowly tailored. *See United States v. Allen*, 34 F.4th 789, 799-800 (9th Cir. 2022).

**a)**      **Viewing area locations**

Garrett Swisher states that "[g]enerally, public viewing locations at trap sites must be a minimum of 1,000 feet from an area that the helicopter may be herding horses or flying over to comply with FAA and contract requirements." ECF 60-1 at ¶11. However, BLM's observation protocol for the Blue Wing Complex states that viewing locations are to be approximately 500 feet from any operating helicopters. AR03467. In other locations, observation points often are far less than 500 feet. For example, in the Pancake Complex, the public was allowed to view holding corrals initially at the distance of a couple hundred yards, and thereafter, at a distance of 20 feet. *Leigh v. Raby*, No. 3:22-cv-00034-MMD-CLB, 2022 U.S. Dist. LEXIS 15747, at *29 (D. Nev. Jan. 28, 2022). At the Silver King HMA, the public was allowed as close as 35 feet from the trap location. *Leigh v. Salazar*, 677 F.3d 892, 895 (9th Cir. 2012). BLM does not address these facts.

The viewing locations during the 2022 gathers were located between .07 and 1.02 miles from the trap locations. ECF 60-1 at ¶12-17. During these gathers, two members of the public attended to view the gather operations. Suppl. Leigh Decl., ¶ 2. Reasonable alternatives existed to these viewing locations, including those which BLM has routinely used for observation locations for years. *Id.* at ¶ 3. For example, BLM could allow the public to move closer to the trap locations with the proviso that they not leave their vehicles. At all trap sites in the Blue Wing Complex, there are public roadways that would have allowed vehicles access to closer viewing. BLM has offered this alternative in the past. *Id.* at ¶ 4.

BLM also could have set up an observation area closer to the traps, utilizing jute blinds to separate the public from animals being gathered. This would have allowed access to closer viewing. BLM has offered this alternative in the past. *Id.* at ¶ 5. Also, on August 1-3 and August 12, 2002, the two members of the public attending the gathers could have been positioned in an abandoned, fenced cattle pen that was located approximately 200 feet from the

trap site. This location was not in the path of any helicopters or animals, and the location would have allowed the public an opportunity to (at least) view the loading at trap and condition of burros as they passed by on a trailer. *Id.* at ¶ 6.

As these alternatives demonstrate, the locations selected by BLM were not narrowly tailored.

### b) Access to temporary and off-range holding corrals

 In Plaintiffs' Opening Brief, Plaintiffs note that the public historically has been allowed access to both temporary and off-range holding corrals. This time, however, no such access was provided.

During the 2022 gather operations, horses were shipped to the Palomino Valley Off-Range Corrals directly from trap sites. Public viewing at Palomino Valley was available. Captured burros were sent to a temporary holding facility on privately-owned land, where they stayed for up to three days before being sent to the Axtell Off-Range Corrals. Public viewing was prohibited at Axtell. Suppl. Leigh Decl. ¶ 7.

Garrett Swisher states that access was denied at the temporary holding facility because of "liability concerns." ECF 60-1, ¶21. Yet, during the 2020 gathers in the Blue Wing Complex, the public had been allowed access to this very same facility. Suppl. Leigh Decl., ¶ 9. As regards the Axtell Off-Range Corrals, neither Garrett Swisher nor Defendants explain why the public has been allowed to view the wild *horses* being held at Axtell on select visitation days, but BLM informed Laurie Ford that no such access to view the wild *burros* being held there will ever be granted. ECF 50 at p. 12; ECF 50-1 at ¶ 38.

BLM's decisions regarding access to temporary and off-range corrals does not appear to be based on any impartial objective. Sometimes the public is allowed access to corrals on private lands and sometimes not, even where the land is owned by the same person. Suppl. Leigh Decl, ¶ 10. Government action that is arbitrarily applied is not narrowly tailored.

**III.     CONCLUSION**

　　　　For these reasons, Plaintiffs request that this Court grant summary judgment as to each of Plaintiffs' causes of action.

DATED: April 12, 2024,　　　　　　　　　Respectfully Submitted,


　　　　　　　　　　　　　　　　*s/ Danielle M. Holt*
　　　　　　　　　　　　　　　　Danielle M. Holt
　　　　　　　　　　　　　　　　(Nevada Bar No. 13152)
　　　　　　　　　　　　　　　　DE CASTROVERDE LAW GROUP
　　　　　　　　　　　　　　　　1149 S Maryland Pkwy
　　　　　　　　　　　　　　　　Las Vegas, NV 89104
　　　　　　　　　　　　　　　　(702) 222-9999
　　　　　　　　　　　　　　　　danielle@decastroverdelaw.com

　　　　　　　　　　　　　　　　*/s/ Jennifer Rae Lovko*
　　　　　　　　　　　　　　　　Jessica L. Blome
　　　　　　　　　　　　　　　　(Cal. Bar No. 314898, admitted pro hac vice)
　　　　　　　　　　　　　　　　Jennifer Rae Lovko
　　　　　　　　　　　　　　　　(Cal. Bar No. 208855, admitted pro hac vice)
　　　　　　　　　　　　　　　　GREENFIRE LAW, PC
　　　　　　　　　　　　　　　　2748 Adeline Street, Suite A
　　　　　　　　　　　　　　　　Berkeley, CA 94703
　　　　　　　　　　　　　　　　(510) 900-9502
　　　　　　　　　　　　　　　　jblome@greenfirelaw.com
　　　　　　　　　　　　　　　　rlovko@greenfirelaw.com

　　　　　　　　　　　　　　　　*Attorneys for Plaintiffs*