DANIELLE M. HOLT
(Nevada Bar No. 13152)
DE CASTROVERDE LAW GROUP
1149 S Maryland Pkwy
Las Vegas, NV 89104
Ph (702) 222-9999
Fax (702) 383-8741
danielle@decastroverdelaw.com

JESSICA L. BLOME
(Cal. Bar No. 314898, admitted pro hac vice)
J. RAE LOVKO
(Cal. Bar No. 208855, admitted pro hac vice)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com
rlovko@greenfirelaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| CANA FOUNDATION, a non-profit corporation, LAURA LEIGH, individually, and WILD HORSE EDUCATION, a nonprofit corporation,<br><br>*Plaintiffs,*<br><br>v.<br><br>UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and JON RABY, Nevada State Director of the Bureau of Land Management,<br><br>*Defendants.* | CASE NO. 2:22-cv-01200-CDS-BNW<br><br>**DECLARATION OF JESSICA L. BLOME IN SUPPORT OF PLAINTIFFS' SECOND MOTION FOR JUDICIAL NOTICE** |

I, Jessica L. Blome, declare that if called as a witness in this action I would competently testify of my own personal knowledge, as follows:

1.      I am an attorney with Greenfire Law, PC, and lead counsel for Plaintiffs in the above-titled action. I am licensed to practice law in California and Missouri, and I am admitted to this Court *pro hac vice.*

2.      Plaintiffs move this Court to take judicial notice of the following documents filed in *Leigh, et al. v. Raby, et al.*, U.S. District Court for the District of Nevada, Case No. 3:22-cv-00034-MMD-CLB, March 29, 2024, Chief United States District Judge Miranda Du.

3.      Attached hereto as **Exhibit 1** is a true and correct copy of Plaintiffs' First Amended Complaint For Injunctive and Declaratory Relief.

4.      Attached hereto as **Exhibit 2** is a true and correct copy of Plaintiffs' Notice of Motion For Summary Judgment and Memorandum of Points and Authorities In Support Thereof.

5.      Attached hereto as **Exhibit 3** is a true and correct copy of Memorandum In Support of Federal Defendants' Cross-Motion For Summary Judgment and In Opposition to Plaintiffs' Motion For Summary Judgment.

6.      Attached hereto as **Exhibit 4** is a true and correct copy of Plaintiffs' Opposition to Defendants' Cross-Motion For Summary Judgment and Reply In Support of Plaintiffs' Motion For Summary Judgment.

7.      Attached hereto as **Exhibit 5** is a true and correct copy of Federal Defendants' Reply In Support of Their Cross-Motion For Summary Judgment.

8.      Attached hereto as **Exhibit 6** is a true and correct copy of February 22, 2024 Minute Order Requesting Supplemental Briefing.

9.      Attached hereto as **Exhibit 7** is a true and correct copy of Federal Defendants' Supplemental Response to Plaintiffs' Motion For Summary Judgment In Accordance With This Court's February 22, 2024 Order.

10.     Attached hereto as **Exhibit 8** is a true and correct copy of Plaintiffs' Supplemental Reply In Accordance With This Court's February 22, 2024 Order.

# EXHIBIT 1

1   DANIELLE M. HOLT
    (Nevada Bar No. 13152)
2   DE CASTROVERDE LAW GROUP
    1149 S Maryland Pkwy
3   Las Vegas, NV 89104
    Ph (702) 222-9999
4   Fax (702) 383-8741
    danielle@decastroverdelaw.com
5
6   JESSICA L. BLOME
    (Cal. Bar No. 314898, admitted pro hac vice)
7   ALEXANDRA J. MONSON
    (Cal. Bar No. 324794, admitted pro hac vice)
8   GREENFIRE LAW, PC
    P.O. Box 8055
9   Berkeley, CA 94707
    (510) 900-9502
10  jblome@greenfirelaw.com
    amonson@greenfirelaw.com
11
12  *Attorneys for Plaintiffs*

13              **UNITED STATES DISTRICT COURT**

                    **DISTRICT OF NEVADA**
14

15  ANIMAL WELLNESS ACTION, a non-
    profit corporation, THE CENTER FOR A
16  HUMANE ECONOMY, a non-profit
    corporation, CANA FOUNDATION, a non-
17  profit corporation, LAURA LEIGH,          CASE NO. 3:22-cv-00034-MMD-CLB
    individually, and WILD HORSE
18  EDUCATION, a non-profit corporation,      **PLAINTIFFS' FIRST AMENDED
                                              COMPLAINT FOR INJUNCTIVE AND
19                 Plaintiffs,                DECLARATORY RELIEF**

20                    v.

21  UNITED STATES DEPARTMENT OF
    INTERIOR, BUREAU OF LAND
22  MANAGEMENT, and JON RABY, Nevada
    State Director of the Bureau of Land
23  Management,

24                 Defendants.

25

26

                    Page 1 of 27

1.    Plaintiffs respectfully bring this case to challenge a decision by the United States Department of Interior, Bureau of Land Management (BLM) to remove wild, free-roaming horses from herd management areas in violation of the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. § 1331, et seq., which, as implemented through federal regulations, requires that such plans be carried out pursuant to a Herd Management Area Plan, or "HMAP." *See* 43 C.F.R. § 4710.4. The BLM has not yet adopted an HMAP for the area in question. Nonetheless, the BLM began rounding up thousands of horses in the Pancake Complex of Herd Management Areas, located in Eastern Central Nevada, by helicopter on January 11, 2022, with the stated goal of removing 73% of existing "excess horses," or 2,342 animals, from the land. When the removal effort concluded on February 14, BLM officials announced they had removed 2,054 wild horses and released 24 back to the wild. As a result of BLM's gather, 26 wild horses died. The rest of the gathered wild horses, 2,004 in total, were shipped out for adoption or sale, or to live on off-range pastures. The BLM developed its plan to remove these wild horses in violation of the Wild Free-Roaming Horses and Burros Act, which, through its regulations, requires that such plans be carried out pursuant to an HMAP. 43 C.F.R. § 4710.4. An HMAP does not yet exist for the Pancake Complex or any of its herd management areas. The BLM failed to follow proper procedure (including consideration of relevant public comment) in developing the gather plan under which it conducted this roundup, and the BLM will conduct future roundups under the same gather plan. Plaintiffs file this First Amended Complaint for Injunctive and Declaratory Relief (Complaint) to prevent the BLM from implementing further herd management activities until Defendants have complied with the Wild Free-Roaming Horses and Burros Act, National Environmental Policy Act (NEPA), Administrative Procedure Act (APA), and the First Amendment of the United States Constitution.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over the subject matter of this action pursuant to 5 U.S.C. § 706, 28 U.S.C § 1331, and 28 U.S.C. § 1361.

3.    Venue is proper in this district court pursuant to 28. U.S.C. § 1391. The BLM has sufficient contacts to subject it to personal jurisdiction in this district.

**THE PARTIES**

4.    Plaintiff ANIMAL WELLNESS ACTION is a national non-profit corporation that works to promote animal welfare by advocating for the passage and enforcement of laws that shield animals from various forms of intentional and institutional cruelty. Animal Wellness Action's principal place of business is at 611 Pennsylvania Avenue, SE, #136, Washington D.C., 20003. It maintains 135,000 supporters nationwide, with several thousand in Nevada. The further gathering and removal of wild horses in the Pancake Complex due to the challenged actions will adversely affect the substantial recreational, aesthetic, and conservational interests of Animal Wellness Action and its staff, volunteers, members, and supporters.

5.    Plaintiff THE CENTER FOR A HUMANE ECONOMY is the first organization of its kind in the animal protection movement, because its mission is to encourage corporations to honor their duties of social responsibility. The Center for a Humane Economy's principal place of business is at is at 611 Pennsylvania Avenue, SE, #136, Washington D.C., 20003. On behalf of its tens of thousands of supporters nationwide and in Nevada, the Center for a Humane Economy also supports laws and regulations that improve the welfare of animals in captivity and in the wild. The Center for a Humane Economy engages regularly on horse protection efforts, including promoting responsible policies towards wild horse management and fighting for federal safeguards under the Wild Free-Roaming Horses and Burros Act. The further removal of wild horses in the Pancake Complex due to the challenged actions will adversely affect the substantial recreational, aesthetic, and conservational interests of the Center for a Humane Economy and its staff, volunteers, members, and supporters.

6.    Plaintiff CANA FOUNDATION is a non-profit corporation that works with science-backed information to create rewilding initiatives for wild horses and environments. CANA Foundation's principal place of business is at 6150 Northern Boulevard, East Norwich, N.Y., 11732. CANA Foundation's rewilding initiatives foster community empowerment, land conservation, and the sustainable management and preservation of America's wild horse populations. CANA Foundation rescues, re-wilds, and re-homes wild horses in order to improve

their quality of life and ensure that they can live with dignity in protected habitats. CANA Foundation actively monitors for any Herd Management Area Plans that are available for public comment in the United States and routinely submits comments throughout the public commenting process. The Pancake Complex is one of the wild horse herds that CANA Foundation monitors and advocates for. The further gathering and removal of wild horses in the Pancake Complex due to the challenged actions will adversely affect the substantial recreational, aesthetic, scientific, and conservational interests of CANA Foundation and its staff, volunteers, members, and supporters.

7.      Defendants' failure to comply with the requirements of the Wild Free-Roaming Horses and Burros Act injured the CANA Foundation because Defendants' failure to prepare the required HMAP thwarted their organizational mission to advance rewilding as an alternative management strategy for wild horses and burros. Because the BLM failed to prepare an HMAP (and refused to entertain comments it considered outside the scope of its NEPA review that would have been appropriate in the context of an HMAP review), the CANA Foundation has been and continues to be injured by Defendants' violations of the law.

8.      Plaintiff WILD HORSE EDUCATION is a national non-profit corporation dedicated to research, journalism, and public education concerning the activities and operations of federal and state management of the free roaming horse and wild burro populations. Wild Horse Education's principal place of business is 216 Lemmon Drive, # 316, Reno, N.V., 89506. Wild Horse Education has more than 150,000 members and educates and informs the public about wild horses and burros through articles, photographs, videos, and sharing data and other information. Wild Horse Education also frequently submits comments on Herd Management Area Plans, Environmental Assessments, and other wild horse management documents and hearings made available for public comment. Wild Horse Education has previously held Board meetings and outreach sessions in the Pancake Complex. Advocating for the wild horses in the Pancake Complex is a past, present, and future important issue for Wild Horse Education. Wild Horse Education actively participated in the public commenting process of the Environmental Assessment for the Pancake Complex Gather Plan, which was finalized on May 4, 2021. Wild Horse Education has

actively participated in the review of wild horse and burro management and gather plans, and their members and supporters regularly attend and observe wild horse and burro roundups, removals, and holding pens. The further gathering and removal of wild horses in the Pancake Complex due to the challenged actions will adversely affect the substantial recreational, aesthetic, and conservational interests of Wild Horse Education and its staff, volunteers, members, and supporters.

9.      Plaintiff LAURA LEIGH is the founder and President of Plaintiff WILD HORSE EDUCATION. In addition, Ms. Leigh works with multiple non-profit organizations engaged in public land issues and provides in-field documentation and commentary on public land issues such as wild horse gathers and removals. Ms. Leigh is also a free-lance photojournalist, whose work has appeared internationally in media broadcast outlets, such as CNN, BBC/ITV, ABC, Common Dreams, and CounterPunch. Ms. Leigh has visited, observed, and photographed the wild horses at the Pancake Complex so many times, that she has formed unique and special relationships with individual horses that she has named and monitored throughout the years. Ms. Leigh experiences great enjoyment from watching young foals born in the Pancake Complex become curious and strong adult horses who then create their own families. Ms. Leigh has also attended several wild horse roundups throughout the United States, and frequently reviews photographs and videos from any roundups she is not able to attend in person. When Ms. Leigh recognizes individual horses that she has previously observed as wild, free-roaming horses, she experiences great sadness, but feels it is her responsibility to the horses to observe their treatment and capture and share it with others to educate them on the plight of wild horses. The further gathering and removal of wild horses in the Pancake Complex due to the challenged actions will adversely affect the substantial recreational, aesthetic, and conservational interests of Ms. Leigh.

10.     Animal Wellness Action, the Center for a Humane Economy, CANA Foundation, and Wild Horse Education (collectively, the Nonprofit Plaintiffs) and their members, supporters, and staff have a long-standing interest in wild, free-roaming horses and routinely advocate for wild horses in Nevada. If they had been given the opportunity, Nonprofit Plaintiffs would have

submitted comments to the Bureau of Land Management regarding a Herd Management Area Plan for the Pancake Complex.

11. Wild Horse Education's members, supporters, and staff visit the Pancake Complex for photography, observing wildlife, and other recreational and professional pursuits. Nonprofit Plaintiffs' members, supporters, and staff gain aesthetic enjoyment from observing, attempting to observe, hearing, seeing evidence of, and studying wild horses. The opportunity to possibly view wild horses, or signs of horses, in these areas is of significant interest and value to Nonprofit Plaintiffs' members, supporters, and staff, and increases their use and enjoyment of Nevada's public lands. Nonprofit Plaintiffs' members, supporters, and staff have engaged in these activities in the past and have specific plans to do so again in the future.

12. Nonprofit Plaintiffs' members and supporters are adversely impacted by the gathering and removal of wild horses from the Pancake Complex. Nonprofit Plaintiffs' members also have an interest in the health and humane treatment of animals, and work to rehabilitate sick and injured wildlife, including horses. Nonprofit Plaintiffs' members, staff, volunteers, and supporters have engaged in these activities in the past and intend to do so again soon.

13. Nonprofit Plaintiffs, as well as their members, supporters, and staff, are dedicated to ensuring the long-term survival of the wild, free-roaming horses throughout the contiguous United States, and specifically in Nevada, and to ensuring that Defendants comply with all applicable state and federal laws related to the survival and humane treatment of wild horses in Nevada. In furtherance of these interests, Nonprofit Plaintiffs' members, supporters, and staff have worked, and continue to work, to protect and advocate for wild horses in Nevada and throughout the contiguous United States.

14. The interests of Nonprofit Plaintiffs' members, supporters, and staff have been, and will continue to be, injured by Defendants' improper and inhumane gather and removal of wild horses in the Pancake Complex. The interests of Nonprofit Plaintiffs' members, supporters, and staff have been, and will continue to be, injured by Defendants' failure to comply with their obligations under the Wild Free-Roaming Horses and Burros Act (Wild Horse Act), National

Environmental Policy (NEPA), Administrative Procedure Act (APA), and the First Amendment in rounding up and removing wild, free-roaming horses in gruesome and inhumane ways in the Pancake Complex without a Herd Management Area Plan.

15.     The injunctive relief requested provides the only remedy that can redress the injuries of Nonprofit Plaintiffs, including of their members, supporters, volunteers, and staff. The relief requested by Plaintiffs, if granted, would require Defendants to comply with the requirements of the Wild Horse Act, NEPA, APA, and the First Amendment before further gathering and removing wild, free-roaming horses from the Pancake Complex. The relief requested by Plaintiffs, if granted, would reduce the number of wild, free-roaming horses needlessly injured, killed, or removed by Defendants.

16.     Defendant JON RABY is Nevada State Director of the BLM, and is charged by federal statute with managing, administering, and protecting the wild horses and burros in the State of Nevada, including the Pancake Complex of Herd Management Areas, pursuant to the Wild Horse Act.

17.     Defendant DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGE-MENT is charged by federal statute to manage administer and protect the wild horses and burros in the State of Nevada, including the Pancake Complex of Herd Management Areas, pursuant to the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. §§ 1331-1340.

## GENERAL ALLEGATIONS OF FACTS

### A.  Wild Free-Roaming Horses and Burros Act

18.     Finding that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West," and that "they contribute to the diversity of life forms within the Nation and enrich the lives of the American people," Congress enacted the Wild Free-Roaming Horses and Burros Act (Wild Horse Act) to ensure that "wild-free roaming horses and burros shall be protected from capture, branding, harassment, [and] death," and will "be considered in the area where presently found, as an integral part of the natural system of the public lands." 16 U.S.C. § 1331.

19.     "Wild free-roaming horses" are defined under the Wild Horse Act as "all unbranded and unclaimed horses ... on public lands of the United States," which include lands "administered by the Secretary of the Interior through the Bureau of Land Management or by the Secretary of Agriculture through the Forest Service." *Id.* §§ 1332(b), (d); *see also* 36 C.F.R. § 222.60(b)(13).

20.     The Wild Horse Act directs the Secretary of the Interior to "manage wild free-roaming horses and burros as components of the public lands ... in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1331. To further ensure this objective, the statute provides that "[a]ll management activities shall be at the minimal feasible level." 16 U.S.C. § 1333(a).

21.     The Wild Horse Act also gives the Secretary the ability to remove "excess" wild free-roaming horses and burros from the public range. "[E]xcess animals" are defined in the statute as wild free-roaming horses and burros "which must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." 16 U.S.C. § 1332(f).

22.     Excess horses must be "humanely captured and removed" per the Wild Horse Act's mandates. 16 U.S.C § 1333(b)(2)(B).

23.     "[H]umane treatment" is defined as "handling compatible with animal husbandry practices accepted in the veterinary community, without causing unnecessary stress or suffering to a wild horse or burro." 43 C.F.R. § 4700.0-5(e). "Inhumane treatment" is defined as "any intentional or negligent action or failure to act that causes stress, injury, or undue suffering to a wild horse or burro and is not compatible with animal husbandry practices accepted in the veterinary community." 43 C.F.R. § 4700.0-5(f).

24.     The Secretary delegated responsibility to administer the Wild Horse Act to the BLM. 43 C.F.R. § 4700.0-3.

25.     The BLM's regulations require that the Secretary establish Herd Management Areas for the maintenance of wild horse and burro herds. 43 C.F.R. § 4710.3-1. In delineating each herd management area, the BLM must consider the appropriate management level for the herd, the

habitat requirements of the animals, the relationships with other uses of the public and adjacent private lands, and the constraints contained in § 4710.4, which limits management of wild horses and burros to "the minimum level necessary to attain the objective identified in approved land use plans and herd management area plans." 43 C.F.R. § 4710.4.

26.     Once a Herd Management Area is established, the BLM "*shall* prepare a herd management area plan, which may cover one or more herd management areas." 43 C.F.R. § 4710.4 (emphasis added).

27.     The Herd Management Area Plans assist the BLM in meeting the regulatory policy requirements to manage wild horses and burros "in balance with other uses and the productive capacity of their habitat" and to ensure that wild horses and burros are "considered comparably with other resource values[.]" 43 C.F.R. §§ 4700.0-6(a)-(b)."

28.     A Herd Management Area Plan is the only wild horse and burro management document that is expressly identified and required by the Wild Horse Act regulations.

29.     The BLM implements its regulations through a policy document referred to as the "Wild Horses and Burros Management Handbook H-4700-1," (BLM Handbook).

30.     The BLM Handbook is not an agency rule; it was not subject to notice and comment rulemaking and does not have the force and effect of law, like the Wild Horse Act and BLM Regulations. The BLM Handbook is a policy document that presents guidance to BLM staff for implementing BLM's statutory and regulatory obligations in a uniform matter.

31.     Nevertheless, the BLM Handbook mirrors the BLM Regulations and requires that all wild horse herd management activities be carried out "at the minimum feasible level of management necessary to attain the objectives identified in approved land use plans (LUPs) *and* Herd Management Area Plans (HMAPs)." BLM Handbook, Chap. 1, p. 6 (emphasis added).

32.     Nothing in the BLM Handbook gives BLM authority to ignore its statutory and regulatory mandate to conduct herd management activities in a way that maintains the minimum feasible level required pursuant to a LUP *and* HMAP. *See* 43 C.F.R. § 4710.4 ("Management shall be at the minimum level necessary to attain the objectives identified in approved land use plans

and herd management area plans.")

33.     The BLM Handbook goes on to clarify that HMAPs, rather than LUPs, must be used to identify and document habitat and population management and monitoring objectives for specific complexes of HMAs. *Id.* at Chap. 2, p. 10. In fact, the BLM Handbook dictates that HMAPs must tier to and be in conformance with applicable LUPs. *Id.*

34.     To achieve statutory goals, HMAPs must also include a plan for monitoring and evaluating management actions and decisions and require the collection of data/information necessary to evaluate the effectiveness of those decisions. *Id.* at Chap. 6.2, p. 43. The BLM Handbook further emphasizes that "[a]s required in 43 C.F.R. § 4710.4, management shall be at the minimum level necessary to attain the objectives identified in approved LUPs and HMAPs." *Id.*

35.     Importantly, in evaluating and selecting the wild horse management plan authorized by an HMAP, the BLM must consider a range of alternatives, including taking no action. *Id.* at p. 38.  The BLM Handbook provides the example of "consider[ing] differing gather seasons or methods, various tools to slow population growth, or various habitat tools, projects, or techniques" as possible considerations for an alternatives analysis. *Id.* The alternative management strategies identified in an HMAP are intended to be broader and more long-term than just single and one-time management tools, projects, or methods.

36.     HMAPs may be prepared for a single HMA or a complex of adjacent HMAs where animal interchange occurs and must "identify and set objectives for [wild horse and burro] herds and their habitat." *Id.* at Chap. 6, p. 11, 36.

37.     Habitat management and monitoring consists of analyzing the forage, water, cover, and space available for wild horses. *Id.* at Chap. 3, p. 12-13.

38.     Examples of habitat management projects include seeding, emergency fire rehabilitation, constructing and maintaining fencing, rewilding, and water developments. *Id.* at p. 13-15. Examples of population control methods include gathers and removals, fertility control, and adjusting male/female sex ratios. *Id.* at p. 23-17.

39.   The BLM makes clear that the public participation process for an HMAP involves public review and comment to allow for public scoping of the key issues identified and the range of alternatives to be considered in the HMAP. *Id.* at p. 37.



40.   Figure 6.1 of the BLM Handbook demonstrates the separate and important decision-making process undertaken by agency officials when developing required HMAPs, including public participation. *See* BLM Handbook, Figure 6.1, p. 36.

41.   During HMAP development, herd-specific and habitat-specific information and concerns may be raised during public participation. For example, the public could submit information and data regarding the foaling season of the particular herd or local weather conditions that effect the range and horse movement during certain months. BLM would then be required to consider and address these site-specific concerns in the HMAP and any management actions that result from the HMAP would be in conformance with these considerations. This leads to more tailored and humane management actions.

42.   In the few HMAPs that BLM has developed, the HMAP affirms that BLM uses the HMAP to attain the mandate in the Wild Horse Act to establish a "thriving ecological balance" between and among wild horses, burros, and their habitat.

43. The BLM has identified no other mechanism to attain the goals specific to the Wild Horse Act, including ensuring the humane treatment and, if necessary, capture of wild horses.

**B. National Environmental Policy Act**

44. A second statute, NEPA, 42 U.S.C. § 4321 et seq., governs decisions by the BLM to gather horses. NEPA requires federal agencies to take a "hard look" at the environmental consequences before carrying out federal actions. *Marsh v. Or. Nat. Res. Council,* 490 U.S. 360, 373-74 (1989).

45. NEPA serves the dual purpose of, first, informing agency decisionmakers of the significant environmental effects of proposed major federal actions and, second, ensuring that relevant information is made available to the public so that it "may also play a role in both the decision-making process and the implementation of that decision." *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

46. To meet these goals, NEPA requires a comprehensive Environmental Impact Statement (EIS) for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.3.

47. To determine whether a proposed action will have significant effects, an agency may prepare an Environmental Assessment (EA). 40 C.F.R. § 1501.54. An EA is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS].'" *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004) (quoting 40 C.F.R. § 1508.9(a)).

48. Unlike the Wild Horse Act, NEPA does not impose any substantive obligations upon an agency but requires that an agency take a "hard look" at the environmental consequences of its decision-making. *Robertson*, 490 U.S. at 350.

49. If in its EA the agency finds that the proposed action will not significantly affect the human environment, it may issue a finding of no significant impact (FONSI) in lieu of an EIS. *Native Ecosystems Council v. U.S. Forest Serv*., 428 F.3d 1233, 1239 (9th Cir. 2005) (citing 40 C.F.R. § 1508.9(a)(1)); *see also* 40 C.F.R. § 1501.6(e).

50.     A FONSI "briefly present[s] the reasons why an action … will not have a significant effect on the human environment and for which an [EIS] therefore will not be prepared." 40 C.F.R. § 1508.1(1).

51.     When preparing an EA, agencies are only required to conduct brief discussions of reasonably feasible alternatives that are reasonably related to the purpose of the project. *See Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004). Agencies need not "consider alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area." *Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1180 (9th Cir. 1990) (citing *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982)).

52.     Critically, an agency's "obligation to consider alternatives under an EA is a lesser one than under an EIS," and so long as "'reasonable alternatives' have been considered," there is no "minimum number of alternatives that an agency must consider." *Native Ecosystems Council*, 428 F.3d at 1246 (finding sufficient the consideration of two alternatives including the no-action alternative).

53.     According to the BLM Handbook, if the BLM decides to implement the objectives of an HMAP by removing excess wild horses, it must prepare an environmental assessment to comply with NEPA for that specific gather plan. BLM Handbook, at p. 27-28; *see id.* at Chap. 7, p. 48 (the environmental analysis for gather plans should tier to HMAPs). (A gather plan that has gone through the NEPA process will be referred to as a "Gather-EA" throughout this Complaint.)

54.     BLM has determined that under NEPA, Gather-EAs are not required to solicit public scoping comments and are limited in scope to analyzing the proposed action's effect on the human environment.

55.     Because the broad management of wild horses under an HMAP is also a federal action that may significantly affect the human environment, the BLM may prepare an HMAP-EA that analyzes herd management and the environmental impacts associated with a range of alternative herd management strategies for the herd and its habitat. *Id.* at Chap. 6, p. 38. (A finalized HMAP that has gone through the NEPA process will be referred to as an "HMAP-EA"

throughout this Complaint.)

56. Though the NEPA process may be used to analyze the HMAP's potential impacts to the human environment, the NEPA process is one discreet part of the HMAP preparation process which, when completed, is intended to analyze the broad and long-term potential impacts to the wild horse herds and their habitats. *See id.* at Chap. 6, pp. 36-44 (Herd Management Area Planning).

57. To further illustrate the distinction between an HMAP/HMAP-EA and a Gather-EA, the BLM Handbook indicates that the separate decision to gather and remove horses has a different appeal process than the appeals process for the HMAP generally. *Id.* at Chap. 7, p. 45.

58. Therefore, a Gather-EA simply cannot substitute an HMAP or an HMAP-EA.

**C. The Pancake Complex Range Management Plans**

59. The Pancake Complex of Herd Management Areas (Pancake Complex) consists of 1,228,739 acres of land, 849,613 acres of which is public land managed by BLM. Located approximately 30 miles west of Ely, Nevada, the Pancake Complex is made up of the Sandy Springs West Herd Management Area (HMA), the Pancake HMA, the Jakes Wash Herd Area (HA), and the Monte Cristo Wild Horse Territory (WHT).

60. There is no single Range Management Plan (RMP) or Land Use Plan (LUP) that considers the Pancake Complex as one wild horse unit. Instead, there are three outdated RMPs that consider distinct parts of the Pancake Complex (the Sand Springs West HMA, the Pancake HMA, the Monte Cristo WHT, and the Jakes Wash HA). All three fail to adequately discuss wild horse habitat and population management and monitoring objectives for the Pancake Complex as required by the Wild Horse Act.

61. The 1997 Tonopah Resource Management Plan specifically contains the following section on Wild Horse and Burro Management:

> Management of the wild horses and/or burros will also be guided by Herd Management Area Plans (HMAPs) or their functional equivalent, when appropriate. The plans will be developed through consultation and coordination with interested parties and will be coordinated with livestock, wildlife, and other resource plans. The

management plans may include, but not be limited to, discussions
of seral stages, range trends, habitat requirements, dietary needs,
water requirements, and wild horse and/or burro reproductive
capabilities.

Department of the Interior Bureau of Land Management Battle Mountain District, *Tonopah Resource Management Plan and Record of Decision* (Oct. 6, 1997), at 30. The plan does not consider the Pancake HMA, the Jakes Wash HA, nor the Monte Cristo WHT.

62. The 1986 Humboldt National Forest Land & Resource Management Plan merely states that "horses will be managed under the Wild Horse and Burro Act," but does not provide any details on habitat and population management and monitoring. The plan does not consider the Pancake HMA, the Sand Springs West HMA, nor the Jakes Wash HA.

63. The 2008 Ely District Resource Management Plan only contains four pages on wild horse management, out of 121 pages total, and only discusses horse gathers as they affect desert tortoise habitat. The 2008 Ely District Resource Management Plan does not consider the Sand Springs West HMA nor the Monte Cristo WHT.

**D. The Pancake Complex Gather EA**

64. The BLM never prepared an HMAP for the Pancake Complex.

65. Instead, on May 5, 2021, the BLM published the Pancake Complex Gather Plan Environmental Assessment, DOI-BLM-NV-L060-2021-0005-EA. This assessment will be referred to as the Gather EA throughout this Complaint.

66. The Gather EA purports to establish a "cumulative [Appropriate Management Level] range" for the Pancake Complex by simply adding up the AMLs of the four separate herds that comprise the Pancake Complex. *See* Gather EA, Section 1.1, p. 2-3.

67. The Monte Cristo WHT AML was established in the 1986 Humboldt National Forest Land & Resource Management Plan. The Sand Springs West HMA AML was established in the 1997 Tonopah Resource Management Plan. The Pancake HMA AML and the Jakes Wash HA AML were established in the 2008 Ely District Resource Management Plan.

68. The BLM did not host a public scoping period for the Gather EA.

69. Far narrower in scope than an HMAP, the Gather EA analyzed the proposed gather as a population control tool and did not analyze this tool as an activity to be utilized in conjunction with various other habitat and herd management tools.

70. The Gather EA did not identify or analyze the herd-specific foaling season, nor the habitat-specific ground conditions during different seasons, both of which would have been a required component of an HMAP.

71. The Gather EA allowed for "an initial gather and follow-up gathers to be conducted over the next 10 years from the date of the initial gather operation." Gather Plan at p. 1. The Gather EA did not indicate an anticipated start date for the initial gather nor how many wild horses would be removed during the initial gather.

72. The Gather EA did not identify or analyze the significant impacts to the environment caused by removing nearly 63% of the horses and burros that make up the Pancake Complex during the initial gather, rather than over the phased ten-year period.

73. The Gather EA did not consider impacts to *horses* as opposed to *the human environment* because it was prepared under NEPA, which reflects government environmental policy, whereas the Wild Horse Act reflects government policy for the humane treatment and management of wild horses and burros.

74. Proving this point, every time Nonprofit Plaintiffs commented on the Gather EA regarding subject matter that would have been considered during the development of an HMAP, the BLM responded to Nonprofit Plaintiffs by advising them that their comment was outside the scope of the Gather EA, which addressed environmental impacts only.

75. For example, though BLM has authority under the Wild Horse Act to close public lands to livestock grazing if necessary to protect wild horses (43 C.F.R. § 4710.5), when Plaintiff Wild Horse Education and Marie Milliman, a representative of Wild Horse Education, commented on the Draft Gather EA regarding the impact of livestock grazing on wild horse habitat, the BLM responded that "[l]ivestock permits and their associated administrative management is [sic] outside the scope of this document." Gather EA at p. 183.

76.     Without a proper HMAP, BLM failed to consider recent data—*see* Public Employees for Environmental Responsibility (PEER), *BLM Rangeland Health Status (2020) – The Significance of Livestock Grazing on Public Lands* (available at https://mangomap.com/peer/maps/126421/blm-rangeland-health-status-2020-the-significance-of-livestock-grazing-on-public-lands)—indicating that livestock grazing, rather than wild horses, is a significant reason why a majority of BLM land does not meet its own land health standards.

77.     In response to public comments, BLM also deemed wild horse genetic resources and local mining activities to be outside the scope of the Gather EA, though both greatly impact the management of the Pancake Complex wild horses. Indeed, local mining activities affect the areas where horses can migrate as well as access for forage, water, cover, and space.

78.     Though BLM briefly discussed genetic diversity in the Gather EA, it refused to solicit and consider the public's local knowledge of rare genetic lineages present in the Pancake Complex such as Medicine Hat horses, Damale Curly horses, and Frame Overo Paint horses.

79.     The Gather EA also failed to appropriately consider that wild horses are a native species and the resulting harmful environmental impacts of removing native species.

80.     To comply with the Wild Horse Act's humane handling directive, BLM incorporated its own Comprehensive Animal Welfare Policy (CAWP) into the Gather EA to "ensure a safe and humane gather occurs" and to "minimize potential stress and injury to wild horses." Gather Plan at p. 33.

81.     However, the BLM refused to consider any gather-specific public comment on the CAWP or CAWP implementation, again explaining that humane handling was outside the scope of its NEPA review.

82.     The CAWP itself is a published instruction memorandum and was never subject to notice and opportunity for public comment. BLM, 2015, Instruction Memorandum 2015-151.

**E.  The Pancake Complex Gather**

83.     On May 5, 2021, the BLM finalized its plan to conduct a series of phased gathers to remove 2,342 "excess animals" over a ten-year period from the Pancake Complex, beginning

with an initial gather of more than 2,000 horses on an undetermined date.

84.     The BLM also announced its intention to apply fertility control methods, such as vaccines and/or IUDs to released mares in an attempt to maintain a sex ratio adjustment of 60% male and 40% female among the released animals. In addition, BLM planned to catch and release up to 138 geldings, or non-reproducing males.

85.     On January 6, 2022, and without any prior notice to Plaintiffs, BLM issued a press release announcing its plan to begin the initial gather on or around January 10, 2022. The press release further stated that "BLM plans to gather up 2,060 horses and remove up to 2,030 excess wild horses" and that BLM would be using helicopters during the gather.

86.     On January 11, 2022, the BLM began its gather of wild horses living in the Pancake Complex.

87.     Several of Plaintiffs' members, supporters, and staff attended the gather to observe, photograph, and film it.

88.     On January 11, 2022, Plaintiffs' observers filmed a group of three young wild horses falling behind a herd of horses that BLM was pursuing by a low-flying helicopter. One of the young horses, a colt, was observed limping and in obvious distress from several hundred feet away.

89.     The helicopter continued to drive the three young horses toward the holding area even though the colt's leg was clearly broken, and the colt was struggling to walk and run.

90.     The helicopter pursued the rest of the herd toward the holding area, while the colt was left behind.

91.     For 29 minutes, the colt was clearly suffering with a broken leg. The colt would stand without weight on his front left leg, try to take a few steps, and then stand still with the front leg held up and dangling at an unnatural angle. This continued until personnel reached the colt, loaded him into a trailer, drove him off the range, and euthanized him.

92.     On January 17, 2022, Plaintiffs' observers photographed and filmed BLM officials pursuing a single wild horse for over an hour. At the time of capture, the BLM Incident

Commander did not know and could not explain why his staff pursued this particular horse for so long, in violation of the CAWP.

93.    During the gather, Plaintiffs' observers documented that most days began at temperatures below freezing, warmed up slightly during the afternoon which melted away the ice and snow, and then returned to freezing by the end of the day.

94.    For example, on the first two days of gather operations, January 11 and 12, BLM reported a high temperature of 47°F and a low temperature of 19°F. On January 26, BLM reported a high temperature of 42°F and a low temperature of 15°F. On February 8, BLM reported a high temperature of 61°F and a low temperature of 31°F.[1]

95.    When the temperatures rose during the afternoon, Plaintiffs' observers saw the ground that the horses were being pursued on become muddy and slick, and the horses struggled to run without slipping and injuring themselves and others when the helicopters were pursuing them.

96.    The gather was not paused or stopped due to unsafe ground conditions at any time.

97.    The gather concluded on February 14, 2022. 2,054 wild horses were gathered, and 2,004 of those wild horses were "shipped" and will not return to the range. There were 26 wild horse deaths, and only 24 wild horses were released back onto the Pancake Complex.

98.    During this gather and previous BLM gathers of this herd, several genetic lines of rare horses were removed from the Complex and not returned. This includes Medicine Hat horses, Damale Curly horses, and Frame Overo Paint horses.

99.    The BLM also continued to geld, or castrate, stallions from rare genetic lines of wild horse breeds.

100.    Once gathered from the land, the wild horses were removed and held in a temporary holding facility by BLM personnel.

---

[1] *See* BLM, *2022 Pancake Complex Wild Horse Gather*, available at https://www.blm.gov/programs/wild-horse-and-burro/herd-management/gathers-and-removals/nevada/2022-pancake-complex-wild.

101.    BLM officials denied Plaintiffs' observers viewing access to temporary holding facilities where removed horses from the Pancake Complex were located. The public was denied meaningful access to document and observe the conditions and activities taking place in the temporary holding facilities.

102.    Throughout the gather, BLM officials obstructed or otherwise prohibited the public from viewing the capture and sorting pens at the Pancake Complex. Many horses were shipped to private facilities before the public was afforded an opportunity to inspect the wild horses.

103.    As of the filing of this First Amended Complaint, BLM officials are still denying Plaintiffs' observers access to view captured wild horses that were shipped to private facilities for short-term holding. Plaintiffs' observers, therefore, cannot perform welfare checks on horses or document the horses' tags for potential adoption. In addition, BLM officials are denying Plaintiffs' observers access to observe BLM's treatment of the horses during this critical period in short-term holding when horses are gelded, treated for injuries and illnesses sustained during the gather, and prepared for potential adoption. As a result of past gathers, many horses have succumbed to their injuries and died in these short-term holding facilities.

104.    Because the BLM continues to deny Plaintiffs' access to observe and document the conditions gathered horses in short-term holding facilities, they are unable to fulfill their organizational mission to assist and facilitate the adoption of these wild horses. Indeed, several potential adopters are waiting to determine whether Plaintiffs will be able to secure placement with them for the long-term care and humane treatment of these wild horses and burros.

**F.  Exhaustion of Administrative Remedies**

105.    On June 2, 2021, Plaintiffs Wild Horse Education and Ms. Leigh timely appealed Defendants' May 4, 2021 approval of the Gather EA to the United States Interior Board of Land Appeals and petitioned for an order staying the decision.

106.    On July 7, 2021, the petition for stay was denied by the United States Interior Board of Land Appeals (IBLA).

107.    On January 6, 2022, Plaintiffs Wild Horse Education and Ms. Leigh filed a Motion

to Reconsider the Stay of the Gather EA. Plaintiffs Wild Horse Education and Ms. Leigh saw the Pancake Complex Gather on the BLM's annual schedule that day and immediately filed the motion since the IBLA still had not rendered its decision over Plaintiffs' appeal.

108. Plaintiffs filed an Amended Motion to Reconsider the Stay Due to New Circumstances on January 10, 2022.

109. The IBLA denied Plaintiffs' Amended Motion to Reconsider the Stay on January 14, 2022, after the gather had already begun.

110. To date, the IBLA has not rendered a decision on Plaintiffs' appeal.

## FIRST CAUSE OF ACTION
### Writ of Mandamus, 28 U.S.C. § 1361

111. Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

112. Defendants have a mandatory duty to prepare a Herd Management Area Plan for each Herd Management Area prior to conducting any herd management activities, including the gather and removal of excess horses, under 43 C.F.R. § 4710.4, which provides, "Management shall be at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans." 43 C.F.R. § 4710.4, *see also* 16 U.S.C § 1333.

113. Defendants violated 16 U.S.C. § 1333 and 43 C.F.R. § 4710.4 when they authorized the gather and removal of wild horses and burros from the Pancake Complex of Herd Management Areas without first developing a Herd Management Area Plan.

114. To the extent Defendants have interpreted the BLM Handbook to conflict with Defendants' mandatory duty to comply with 43 C.F.R. § 4710.4 to carry out management of wild horse herds at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans, BLM has exceeded its authority and jurisdiction to comply with statutory and regulatory mandates.

115. Defendants' failure to adopt a Herd Management Area Plan for the Pancake Complex of Herd Management Areas has injured Plaintiffs in the manner described in this

Complaint.

116.     The Mandamus and Venue Act, 28 U.S.C. § 1361, vests district courts with original jurisdiction over any action in the nature of mandamus to compel a federal officer or agency to perform a duty owed to plaintiffs.

117.     Plaintiffs seek a writ of prohibition preventing Defendants from gathering wild horses under the Pancake Complex Gather Plan Environmental Assessment, DOI-BLM-NV-L060-2021-0005-EA, until Defendants have fully complied with the Wild Free-Roaming Horses and Burros Act and developed a Herd Management Area Plan for the Pancake Complex.

### SECOND CAUSE OF ACTION
### Administrative Procedure Act, 5 U.S.C. § 706(1)

118.     Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

119.     Defendants have a mandatory duty to prepare a Herd Management Area Plan for each Herd Management Area prior to conducting any herd management activities, including the gather and removal of excess horses, under 43 C.F.R. § 4710.4, which provides, "Management shall be at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans." *See* 43 C.F.R. § 4710.4 (implementing 16 U.S.C § 1333).

120.     Defendants violated 16 U.S.C. § 1333 and 40 CFR § 4710.4 when they authorized the gather and removal of wild horses and burros from the Pancake Complex of Herd Management Areas without first developing a Herd Management Area Plan.

121.     Defendants have unlawfully withheld or unreasonably delayed their mandatory duty to prepare and HMAP for the Pancake Complex of Herd Management Areas or for the individual herd management areas that make up the Complex.

122.     Defendants' failure to adopt a Herd Management Area Plan for the Pancake Complex of Herd Management Areas has injured Plaintiffs in the manner described in this Complaint.

123.     The Administrative Procedure Act gives this court authority to compel agency

action unlawfully withheld or unreasonably delayed. 5 U.S.C. § 706(1).

**THIRD CAUSE OF ACTION**

**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**

124.    Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

125.    Defendants have a mandatory duty to prepare a Herd Management Area Plan for each Herd Management Area prior to conducting any herd management activities, including the gather and removal of excess horses, under 43 C.F.R. § 4710.4, which provides, "Management shall be at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans." *See* 43 C.F.R. § 4710.4, 16 U.S.C § 1333.

126.    Defendants violated 16 U.S.C. § 1333 and 43 C.F.R. § 4710.4 when they authorized the gather and removal of wild horses and burros from the Pancake Complex of Herd Management Areas without first developing a Herd Management Area Plan.

127.    To the extent Defendants have interpreted the BLM Handbook to conflict with Defendants' mandatory duty to comply with 43 C.F.R. § 4710.4 to carry out management of wild horse herds at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans, Defendants have acted arbitrarily and capriciously and contrary to the law and abused their discretion.

128.    Defendants' decision to proceed with the gather and removal of more than 2,000 wild horses and burros from the Pancake Complex of Herd Management Areas was arbitrary and capricious, an abuse of discretion, and contrary to the law.

129.    Defendants' failure to adopt a Herd Management Area Plan for the Pancake Complex of Herd Management Areas has injured Plaintiffs in the manner described in this Complaint.

130.    The Administrative Procedure Act gives this court authority to hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

**FOURTH CAUSE OF ACTION**

**Administrative Procedure Act, 5 U.S.C. § 706(2)(C)**

131.    Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

132.    Defendants exceeded their statutory jurisdiction and authority as well as their own regulatory limitations when they removed more than 2,000 wild horses and burros from the Pancake Complex of Herd Management Areas without ensuring its management was at the minimum level necessary to attain the objectives identified in a herd management area plan. *See* 43 C.F.R. § 4710.4.

133.    To the extent Defendants have interpreted the BLM Handbook to conflict with Defendants' mandatory duty to comply with 43 C.F.R. § 4710.4 to carry out management of wild horse herds at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans, Defendants have acted in excess of statutory jurisdiction, authority, or limitations.

134.    Defendants' failure to adopt a Herd Management Area Plan for the Pancake Complex of Herd Management Areas has injured Plaintiffs in the manner described in this Complaint.

135.    The court may also set aside agency actions "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

**FIFTH CAUSE OF ACTION**

**National Environmental Policy Act and Administrative Procedure Act, 5 U.S.C. § 706(2)**

136.    Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

137.    The BLM violated NEPA when it failed to analyze the significant environmental impacts of removing wild horses from the Pancake Complex as alleged herein, including by failing to analyze (1) alternative methods of habitat management, such as rewilding, retiring livestock grazing allotments and licenses, and retiring or restricting mining activity; (2) population control, including managing to preserve rare genetic lines of wild horse breeds; and (3) significant

environmental impacts of removing the vast majority of the targeted 2,342 horses during a one-month timeframe, rather than the analyzed ten-year phased period.

138.    In addition, the BLM violated NEPA by abusing its discretion when it simply added up the Appropriate Management Levels from each herd management area within the Pancake Complex to set the excess number of wild horses targeted for removal. The BLM should have analyzed what the AML should or could be for the entire Pancake Complex, based on current data and information about habitat and horse populations located therein.

139.    Defendants' decision to proceed with the gather and removal of more than 2,000 wild horses and burros from the Pancake Complex of Herd Management Areas without analyzing significant environmental impacts was arbitrary and capricious, an abuse of discretion, and contrary to the law.

140.    Defendants' actions have injured plaintiffs in the manner described in this Complaint.

141.    The BLM's decision to adopt the Pancake Gather Environmental Assessment was arbitrary and capricious, and not in accordance with law in violation of the APA, 5 U.S.C. § 706(2).

## SIXTH CAUSE OF ACTION
### U.S. Constitution, First Amendment

142.    Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

143.    Plaintiffs have a right, under the First Amendment to the U.S. Constitution, to observe and document the BLM's gather of the wild horses and burros at the Pancake Complex, including in temporary holding facilities, capture pens, sorting pens, and short-term holding facilities where horses are held for veterinary treatment prepared for potential adoption.

144.    Defendants have interfered with Plaintiffs' protected right under the First Amendment by refusing them access to certain aspects of the gather and only providing them access from vantage points with known obstructed views.

145.    Defendants' actions have injured Plaintiffs in the manner described in this

Complaint.

146.     This Court is authorized to enjoin Defendants from further violations of Plaintiffs' First Amendment rights, including by compelling Defendants to provide Plaintiffs meaningful access to the gather and all locations where horses removed during the gather are currently housed to accurately and timely document the BLM's activities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court:

A. Issue a writ of prohibition preventing Defendants from gathering wild horses until Defendants have fully complied with the Wild Free-Roaming Horses and Burros Act, National Environmental Policy Act, and Administrative Procedure Act;

B. Issue an order and injunction compelling Defendants to immediately stop implementation of the Pancake Complex Herd Management Environmental Assessment until Defendants have fully complied with the Wild Free-Roaming Horses and Burros Act, National Environmental Policy Act, and Administrative Procedure Act;

C. Vacate and set aside the Pancake Complex of Herd Management Areas Gather Environmental Assessment;

D. Issue and order compelling Defendants to provide Plaintiffs with meaningful viewing access of each phase of future gather and removal efforts of horses living in the Pancake Complex of Herd Management Areas, including short-term holding facilities where gathered horses are held pending potential adoption at all times in the future;

E. Maintain jurisdiction over this action until Defendants are in compliance with the Wild Free-Roaming Horses and Burros Act, the Administrative Procedure Act, the National Environmental Policy Act, and every order of this Court;

F. Award Plaintiffs attorney fees and costs pursuant to and 28 U.S.C. § 2412; and

G. Grant such additional and further relief to which plaintiffs may be entitled.

1    DATED: April 1, 2022,                    Respectfully Submitted,

2                                             */s/ Jessica L. Blome*
                                             Jessica L. Blome
3                                             (Cal. Bar No. 314898, admitted pro hac vice)
                                             Alexandra Monson
4                                             (Cal. Bar No. 324794, admitted pro hac vice)
                                             GREENFIRE LAW, PC
5                                             P.O. Box 8055
                                             Berkeley, CA 94707
6                                             (510) 900-9502
                                             jblome@greenfirelaw.com
7                                             amonson@greenfirelaw.com

8
                                             Danielle M. Holt
9                                             (Nevada Bar No. 13152)
                                             DE CASTROVERDE LAW GROUP
10                                            1149 S Maryland Pkwy
                                             Las Vegas, NV 89104
11                                                  Ph (702) 222-9999
                                                    Fax (702) 383-8741
12                                            danielle@decastroverdelaw.com

13                                            *Attorneys for Plaintiffs*

14

15

16

17

18

19

20

21

22

23

24

25

26

# EXHIBIT 2

DANIELLE M. HOLT
(Nevada Bar No. 13152)
DE CASTROVERDE LAW GROUP
1149 S Maryland Pkwy
Las Vegas, NV 89104
Ph (702) 222-9999
Fax (702) 383-8741
danielle@decastroverdelaw.com

JESSICA L. BLOME
(Cal. Bar No. 314898, admitted pro hac vice)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| ANIMAL WELLNESS ACTION, a non-profit corporation, CANA FOUNDATION, a non-profit corporation, THE CENTER FOR A HUMANE ECONOMY, a non-profit corporation, LAURA LEIGH, individually, and WILD HORSE EDUCATION, a non-profit corporation,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and JON RABY, Nevada State Director of the Bureau of Land Management, and the<br><br>    Defendants. | Case No. 3:22-cv-00034<br><br>**PLAINTIFFS' NOTICE OF MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEROF**<br><br>Complaint Filed: January 21, 2021 |

To all parties and their attorneys of record:

PLEASE TAKE NOTICE that Plaintiffs Animal Wellness Action, Cana Foundation, the Center for a Humane Economy, Laura Leigh, and Wild Horse Education, by and through their counsel, Danielle M. Holt, Esq., and Jessica L. Blome, Esq. hereby move this court for summary judgment on their First, Second, Third, Fourth, and Fifth causes of action as raised in their First Amended Complaint against Defendants United States Department of Interior, Bureau of Land Management, and Jon Raby, Nevada State Director of the Bureau of Land Management.

Pursuant to the Court's July 5, 2023 scheduling order (Dkt. 60), Rule 56 of the Federal Rules of Civil Procedure, and local rule Rule 56-1, Plaintiffs' motion is supported by the accompanying Memorandum of Points and Authorities; the declarations of Laura Leigh, Scott Beckstead, Scott Edwards, and Manda Kalimian; Plaintiffs' Motion for Judicial Notice with corresponding Notice, Memorandum of Points and Authorities, Declaration of Jessica L. Blome with exhibits (filed concurrently); Plaintiff's First Amended Complaint (Dkt. 31); the certified Administrative Record (Dkt. Nos. 44–44-2, 55–55-6); and any written and oral argument and authorities that are presented at or before the hearing on this motion.

DATED: August 10, 2023          Respectfully Submitted,

*/s/ Danielle M. Holt*
Danielle M. Holt
(Nevada Bar No. 13152)
DE CASTROVERDE LAW GROUP
1149 S Maryland Pkwy
Las Vegas, NV 89104
(702) 222-9999
danielle@decastroverdelaw.com

*/s/ Jessica L. Blome*
Jessica L. Blome
(Cal. Bar No. 314898, admitted pro hac vice)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com

# MEMORANDUM OF POINTS AND AUTHORITIES

## Table of Contents

I. INTRODUCTION ........................................................................................ 1

II. STATEMENT OF FACTS ......................................................................... 1

    A. WHA and Implementing Regulations .............................................. 1

    B. National Environmental Policy Act (NEPA) .................................... 2

    C. Pancake Complex Gather-EA ........................................................... 3

    D. Differences Between HMAPs and Gather-EAs ................................ 4

III. LEGAL FRAMEWORK ............................................................................ 6

    A. Mandamus and Venue Act ............................................................... 6

    B. Administrative Procedure Act ........................................................... 7

IV. STANDING ................................................................................................ 7

    A. Zone of Interest ................................................................................ 7

    B. Article III ......................................................................................... 9

        1. Injury in Fact ........................................................................ 9

            a) Declaration of Laura Leigh, Individually, and on Behalf of Wild Horse Education (WHE) .................................... 11

            b) Declaration of Scott Edwards on Behalf of Animal Wellness Action (AWA) ............................................. 12

            c) Declaration of Manda Kalimian on Behalf of the CANA Foundation (CANA) ............................................ 13

            d) Declaration of Scott Beckstead on Behalf of the Center for a Humane Economy (CHE) ............................. 14

        2. Injury Fairly Traceable to Challenged Conduct and Likely to Be Redressed by Favorable Court Decision ................................. 15

    C. Exhaustion of Administrative Remedies ........................................ 15

    D. The WHA and Its Implementing Regulations Establish a Mandatory, Non-Discretionary Duty to Prepare an HMAP Prior to Engaging in Management Activities Such as Plans Providing for the Gather and Removal of Wild Horses ......................................................................................... 15

        1. Language of the WHA and Its Implementing Regulations ...................... 17

        2. Regulatory History .............................................................. 18

        3. BLM's Interpretation ........................................................... 19

    E. Summary Judgment is Appropriate on Plaintiffs' First Cause of Action Based Upon the Mandamus and Venue Act. ................................... 22

    F. Summary Judgment is Appropriate on Plaintiffs' Second Cause of Action Based Upon the APA. ............................................................ 23

    G. Summary Judgment is Appropriate on Plaintiffs' Third Cause of Action Based Upon the APA. ............................................................ 25

H.    Summary Judgment is Appropriate on Plaintiffs' Fourth Cause of Action Based Upon the APA. .......................................................... 28

I.    Summary Judgment is Appropriate on Plaintiffs' Fifth Causes of Action Based Upon the APA. .......................................................... 29

    1.    Defendants' Failed to Take a Hard Look at Alternative Methods of Habitat Management and Population Control. ........................................... 32

        a)    Impacts of a drastic reduction of population size on population growth rate .............................................. 33

        b)    Impacts of horse removal of horse removal on wildfire risks ...... 33

        c)    Addressing population management without removals by implementing reductions in livestock grazing on the land .......... 34

        d)    Addressing population management through rewilding .............. 35

    2.    Defendants' Failed to Take a Hard Look at Appropriate AMLs ............. 35

    3.    Defendants Failed to Take a Hard Look at the Impact of Returning Geldings to the Pancake Complex ........................................... 37

V.    CONCLUSION ......................................................................... 38

Plaintiffs' Notice of Motion for Summary Judgment and Memorandum of Points and Authorities in Support Thereof

1

<u>**Table of Authorities**</u>

2

**Cases**

3  *350 Montana v. Haaland*, 50 F.4th 1254 (9th Cir. 2022) ....................................................... passim

*Am. Horse Prot. Asso. v. Frizzell*, 403 F. Supp. 1206 (D. Nev. 1975) ................................... 10, 11

4  *Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127 (D.D.C. 2020) .......................... 11

*Andujar v. Weinberger*, 69 F.R.D. 690 (S.D.N.Y. 1976) ...................................................... 7, 16

5  *Animal Prot. Inst. of Am.*, 109 IBLA 112 (1989) ................................................................. 20, 21

6  *Auer v. Robbins*, 519 U.S. 452, 461 (1997) ............................................................................ 17

*Bd. of Cnty. Comm'rs of Rocky Mt. Wild v. United States BLM*, 584 F. Supp. 3d 949

7    (D. Colo. 2022) ........................................................................................................... 9

*Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166 (9th Cir. 2002)...................................... 24

8  *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) ................. 38

*Bruce v. First Fed. Sav. & Loan Asso.*, 837 F.2d 712 (5th Cir. 1988) ..................................... 18

9  *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ......................................... 26

10  *Castillo v. Ridge*, 445 F.3d 1057 (8th Cir. 2006) .............................................................. 6, 23

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d

11    104 (2d Cir. 2017).................................................................................................... 10, 11

*Cetacean Cmty. v. Bush*, 386 F.3d 1169 (9th Cir. 2004) ......................................................... 10

12  *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156 (2012) ............................... 17, 21, 29

13  *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946 (9th Cir. 2013) ....................... 20

*Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388 (1987) ................................................................... 8

14  *Coal. For a Sustainable 520 v. United States DOT*, 881 F.Supp.2d 1243 (W.D. Wash.

    2012) ............................................................................................................................ 4

15  *Davidson v. United States Dep't of State*, 113 F. Supp. 3d 183 (D.D.C. 2015)........................... 7

16  *Doe v. Risch*, 398 F. Supp. 3d 647 (N.D. Cal. 2019) ............................................................. 25

*E.W. Bliss Co. v. United States*, 77 F.3d 445 (Fed. Cir. 1996) ............................................... 26

17  *Ecosystem Inv., Partners v. Crosby Dredging, L.L.C.*, 729 F. App'x 287 (5th Cir. 2018) ............ 9

*Envtl. Defense Fund, Inc. v. U.S. Army Corps of Engrs.*, 492 F.2d 1123 (5th Cir. 1974)........... 30

18  *ErieNet, Inc. v. Velocity Net, Inc.*, 156 F.3d 513 (3d Cir. 1998) ............................................. 18

*Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118 (2d Cir. 2020)....................... 8

19  *Firebaugh Canal Co. v. United States*, 203 F.3d 568 (9th Cir. 2000)........................................ 18

20  *Friends of the Earth v. Sanderson Farms, Inc.*, 992 F.3d 939 (9th Cir. 2021)............................ 11

*Giddings v. Chandler*, 979 F.2d 1104 (5th Cir. 1992)............................................................... 8

21  *Gonzalez v. United States Dep't of Homeland Sec.*, 500 F. Supp. 3d 1115 (E.D. Cal.

    2020) ......................................................................................................................... 24

22  *Greene v. Costle*, 577 F. Supp. 1225 (W.D. Tenn. 1983) ...................................................... 16

*Hamazaspyan v. Holder*, 590 F.3d 744 (9th Cir. 2009)........................................................... 16

23  *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) .......................................................... 11

*Hernandez-Avalos v. INS*, 50 F.3d 842, (10th Cir. 1995) ........................................................ 8

24  *Idaho Conserv. League v. Mumma*, 956 F.2d 1508 (9th Cir. 1992) ................................ 30, 31, 36

25  *Independence Mining Co. v. Babbitt*, 105 F.3d 502 (9th Cir. 1997) ......................................... 24

*Kingman Reef Atoll Invs., L.L.C. v. DOI*, 195 F. Supp. 2d 1178 (D. Haw. 2002)...................... 10

26  *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) ........................................................................ 17, 20

*Knuckles v. Weinberger*, 511 F.2d 1221, 1222 (9th Cir. 1975) ............................................... 16

27  *Koopmann v. U.S. Dep't of Transp.*, 335 F. Supp. 3d 556 (S.D.N.Y. 2018)................................ 7

28

Plaintiffs' Notice of Motion for Summary Judgment and Memorandum of Points and Authorities in Support
   Thereof

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................................. 9, 11
*Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (1989) ................................................................. passim
*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209
    (2012) ................................................................................................................................... 8
*McGarry v. Sec'y of the Treasury*, 853 F.2d 981 (D.C. Cir. 1988) ........................................... 10
*McMahon v. Califano*, 476 F. Supp. 978 (D. Mass. 1979) ................................................... 7, 16
*Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000) ...................................................................... 31
*Michigan Head Start Directors Asso. v. Butz*, 397 F. Supp. 1124 (W.D. Mich. 1975) ............. 7
*Mitchael v. Colvin*, 809 F.3d 1050 (8th Cir. 2016) ................................................................... 18
*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .................... 26
*Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800 (9th Cir. 1999) ............... 30, 31, 36
*N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286 (2d Cir. 2011) ..................... 10
*Nat'l Cable Television Ass'n, Inc. v. Am. Cinema Eds., Inc.*, 937 F.2d 1572 (Fed. Cir.
    1991) .................................................................................................................................. 21
*National Parks & Conservation Ass'n. v. Babbitt*, 241 F.3d 722 (9th Cir. 2001) ...... 31, 33, 37, 38
*Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233 (9th Cir. 2005) ......................... 3
*New York v. U.S. Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475 (S.D.N.Y. 2019) ............ 7
*New York v. United States HHS*, 414 F. Supp. 3d 475 (S.D.N.Y. 2019) ................................... 16
*Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011) ........................................................................... 11
*R.J. Reynolds Tobacco Co. v. Cnty. of L.A.*, 29 F.4th 542 (9th Cir. 2022) ............................... 20
*Rice v. Vill. of Johnstown*, 30 F.4th 584 (6th Cir. 2022) .......................................................... 10
*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) ......................................... 2
*Schulke v. United States*, 544 F.2d 453 (10th Cir. 1976) ..................................................... 6, 23
*Sec'y of Labor v. Seward Ship's Drydock, Inc.*, 937 F.3d 1301 (9th Cir. 2019) ......................... 17
*Service v. Dulles*, 354 U.S. 363, 370 (1957) ............................................................................ 22
*Sierra Club v. Peterson*, 717 F.2d 1409 (D.C. Cir. 1983) ........................................................ 30
*Sierra Club v. United States DOT*, 753 F.2d 120 (D.C. Cir. 1985) ..................................... 30, 33
*Singh v. Still*, 470 F. Supp. 2d 1064 (N.D. Cal. 2007) ......................................................... 6, 23
*Telecommunications Research & Action v. FCC (TRAC)*, 242 U.S. App. D.C. 222,
    (D. C. Cir. 1984) ................................................................................................................. 24
*TRW Inc. v. Andrews*, 534 U.S. 19 (2001) ............................................................................... 20
*U.S. v. American Trucking*, 310 U.S. 534 (1940) .................................................................... 16
*United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) ................................... 22, 23
*United States v. Henry*, 1 F.4th 1315, 1333 (11th Cir. 2021) ................................................. 16
*United States v. Nixon*, 418 U.S. 683 (1974) ..................................................................... 22, 23
*Vaz v. Neal*, 33 F.4th 1131 (9th Cir. 2022) ............................................................................. 25
*W. Watersheds Project v. Kraayenbrink*, 620 F.3d 1187 (9th Cir. 2010) ............................ 31, 37
*Williams v. Hanover Hous. Auth.*, 871 F. Supp. 527 (D. Mass. 1994) ................................ 21, 29
*Workman v. Mitchell*, 502 F.2d 1201 (9th Cir. 1974) .......................................................... 7, 16

**Statutes**
5 U.S.C. § 551(13) ........................................................................................................................ 7
5 U.S.C. § 556 .............................................................................................................................. 7
5 U.S.C. § 557 .............................................................................................................................. 7
5 U.S.C. § 701(b)(2) ..................................................................................................................... 7
5 U.S.C. § 702 .............................................................................................................................. 7
5 U.S.C. § 706 .............................................................................................................................. 7

Plaintiffs' Notice of Motion for Summary Judgment and Memorandum of Points and Authorities in Support
Thereof

5 U.S.C. § 706(1) .................................................................................................. 24
5 U.S.C. § 706(2)(A) ............................................................................................ 26
5 U.S.C. § 706(2))(C) .......................................................................................... 29
6 U.S.C. § 706 ....................................................................................................... 1
16 U.S.C. § 1331 ............................................................................................. 1, 25
16 U.S.C. § 1331(a) .............................................................................................. 20
16 U.S.C. § 1333 ............................................................................................ 27, 29
16 U.S.C. § 1333(a) ...................................................................................... 1, 4, 17
16 U.S.C. § 1333(b). ................................................................................ 1, 17, 22, 23
16 U.S.C. § 1361 ..................................................................................................... 1
17 U.S.C. § 1331 ..................................................................................................... 9
17 U.S.C. § 1333(a). ............................................................................................... 9
28 U.S.C. § 1361 ............................................................................................... 6, 23
42 U.S.C. § 4321 ..................................................................................................... 1
42 U.S.C. § 4332(2)(C) ..................................................................................... 2, 30
42 U.S.C. § 4332(E) ........................................................................................ 30, 33

**Regulations**
40 C.F.R. § 1501.3 .................................................................................................. 2
40 C.F.R. § 1501.54 ................................................................................................ 3
40 C.F.R. § 1501.7 .................................................................................................. 4
40 C.F.R. § 1508.9(a)(1) ......................................................................................... 3
43 C.F.R. § 1501.0-5 .............................................................................................. 2
43 C.F.R. § 4700.0-1 ........................................................................................... 1, 9
43 C.F.R. § 4700.0-2 .............................................................................................. 2
43 C.F.R. § 4700.0-3 ........................................................................................... 1, 9
43 C.F.R. § 4710 ................................................................................................... 17
43 C.F.R. § 4710.1 ............................................................................................. 2, 4
43 C.F.R. § 4710.3-1 ...................................................................................... passim
43 C.F.R. § 4710.4 ......................................................................................... passim

Plaintiffs' Notice of Motion for Summary Judgment and Memorandum of Points and Authorities in Support Thereof

## I. Introduction

Plaintiffs' Amended Complaint seeks to hold Defendants accountable for their separate statutory obligations to provide for *both* the humane treatment and management of wild free-roaming horses *and* the protection of the environment. Plaintiffs' claims are brought under the Mandamus and Venue Act, 28 U.S.C. §1361 et seq., the Administrative Procedure Act (APA), 6 U.S.C. §706, alleging violations of the Wild Free-Roaming Horses and Burros Act (WHA), 16 U.S.C. §1331 *et seq*., and the National Environmental Policy Act (NEPA), 42 U.S.C. §4321 *et seq*. *See* Dkt. 31.

## II. Statement of Facts

### A. WHA and Implementing Regulations

Finding that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West," and that "they contribute to the diversity of life forms within the Nation and enrich the lives of the American people," Congress enacted the WHA to ensure that "wild-free roaming horses and burros shall be protected from capture, branding, harassment, [and] death," and will "be considered in the area where presently found, as an integral part of the natural system of the public lands." 16 U.S.C. §1331. The WHA provides the statutory authority by which the Secretary of the Interior "protect[s] and manage[s]" wild horses and burros on public lands, with the restriction that '[a]ll management activities shall be at the minimal feasible level. *Id.* at §1333(a). In managing wild horses and burros, the Act also provides the statutory authority by which the Secretary can remove "excess" wild horses from public lands. *Id.* at §1333(b).

The Secretary delegated responsibility for administering the WHA to the BLM. *See* 43 C.F.R. §4700.0-3. BLM has adopted regulations, the purpose of which "is to implement the laws relating to the protection, management, and control of wild horses and burros under the administration of the Bureau of Land Management." *Id.* at §4700.0-1. Their stated objective is the "management of wild horses and burros as an integral part of the natural system of the public lands under the principle of multiple use; protection of wild horses and burros from unauthorized capture, branding, harassment or death; and humane care and treatment of wild horses and burros[,]" which shall be done pursuant to the establishment of herd management areas (HMAs) and herd management area plans (HMAPs). *See id.* at §§4700.0-2, 4710.3-1, 4710.4. Management also must be undertaken in conformance with land use plans (LUPs), commonly

called resource management plans (RMPs). *See id.* at §§1501.0-5, 4710.1, 4710.4.

An LUP establishes general habitat and population management goals and objectives for a given area, which may contain multiple HMAs. *See* AR1359, 1407. An HMAP, which may cover more than one HMA, "establishes management actions and short- and long-term management and monitoring objectives for a specific [wild horse and burro] herd and its habitat. HMAPs also identify the actions to be taken to accomplish herd and habitat management objectives." AR1360; *see also* 43 C.F.R. §4710.3-1. Population management may be a component of both LUPs and HMAPs. *See* AR1360. Importantly, HMAPs are created with public involvement, including development through a public scoping process. *See* AR1386. They also require, as one component of their creation, NEPA review. *See* AR1386-87.

### B. National Environmental Policy Act (NEPA)

NEPA governs decisions by the BLM to gather horses. *See* 42 U.S.C. §4321 *et seq*. It requires federal agencies to take a "hard look" at the environmental consequences associated with proposed action. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (1989). NEPA serves the dual purpose of, first, informing agency decisionmakers of the significant environmental effects of proposed major federal actions and, second, ensuring that relevant information is made available to the public so that it "may also play a role in both the decision-making process and the implementation of that decision." *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); *350 Montana v. Haaland*, 50 F.4th 1254 (9th Cir. 2022).

To meet these goals, NEPA requires a comprehensive Environmental Impact Statement (EIS) for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. §4332(2)(C); 40 C.F.R. §1501.3. To determine whether a proposed action will have significant effects, an agency may prepare an Environmental Assessment (EA). *See* 40 C.F.R. §1501.54.

Where the government makes a finding that no significant impact will occur as a result of proposed action, this decision must be based on a consideration of all relevant factors and supported by a convincing statement of reasons. *See Marsh*, 490 U.S. at 373-74; *350 Montana*,

50 F.4th at 1265. After conducting a proper EA and upon finding that the proposed action will not significantly affect the human environment, the government may issue a finding of no significant impact (FONSI). *See Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005) (citing 40 C.F.R. §1508.9(a)(1)); *see also* 40 C.F.R. §1501.6(e).

### C.     Pancake Complex Gather-EA

The Pancake Complex is made up of the Pancake Herd Management Area (HMA), the Sand Springs West Wild Horse HMA, the Jakes Wash Herd Area (HA), and the Monte Cristo Wild Horse Territory (WHT). See AR03501. It consists of 1,228,739 acres of land, the majority of which is directly managed by the Bureau of Land Management (BLM).[1] See AR03501, 03503.

No Herd Management Area Plan (HMAP) exists to govern management activities for the Pancake Complex. Despite this, on May 5, 2021, the BLM adopted the Pancake Complex Gather Plan Environmental Assessment (Pancake Gather-EA or Pancake Gather Plan), which allows for a significant management action – the removal of "approximately 2,342 excess wild horses within the Complex . . . over a period of ten years from the initial gather." AR3507. The initial gather was conducted between January 10, 2022 and February 14, 2022, with 2030 horses removed from the Complex.[2] *See* AR3725, 3814-3819.

Gather-EAs, such as the Pancake Gather-EA, are – by their very nature – management activities and must conform with existing LUPs and HMAPs[3]. *See* 43 C.F.R. §§4700.0-2,

---

[1] The Monte Cristo WHT, which consists of 93,640 acres, is managed in accordance with an Interagency Agreement between the BLM and the US Forest Service. *See* AR3501, 3503.

[2] 1751 were removed from the Pancake HMA, 125 removed from the Sand Springs HMA, 120 removed from the Jakes Wash HA, and 34 removed from the Monte Cristo WHT. *See* AR3815.

[3] There is no HMAP for the Pancake Complex. The Complex falls within three separate resource management plans (RMPs): the 2008 Ely District RMP applies to over 11 million acres of land, which land contains six HMAs, including the Pancake HMA; the 1986 Humboldt National Forest Land & RMP applies to over 2 ½ million acres of land in the Humboldt National Forest, which land contains five WHTs, including the Monte Cristo WHT, and the 1997 Tonopah RMP applies to over 6 million acres of land, which land contains 16 HMAs, including the Sand Springs West Wild Horse HMA. *See* AR33-345, 532-724, 871-1349, 3501-3503. The 2008 Ely District RMP changed the Jakes Wash HMA to an HA, finding that it did not provide sufficient habitat resources to sustain healthy wild horse populations. *See* AR941-942, 3502.

4710.1, 4710.3-1, 4710.4; AR1397. They must ensure that all gathers are managed at the minimal feasible level. *See* 16 U.S.C. §1333(a); 43 C.F.R. §4710.4.

In adopting the Pancake Gather-EA, BLM acted without first creating an HMAP, without providing public scoping, and without considering whether the 10-year gather plan was ensuring management at the minimum feasible level possible. BLM also failed to take a "hard look" at the environmental consequences associated with proposed action.

### D. Differences Between HMAPs and Gather-EAs

The differences between an HMAP and a Gather Plan/Gather-EA are significant, and the BLM acknowledges that the Pancake Gather-EA is not an HMAP.[4] First, as addressed above, BLM requires public scoping for HMAPs, whereas this is not required for Gather-EAs. *See* AR1386. Scoping is the process by which a lead Federal agency solicits input from the public and other agencies regarding the breadth and depth of issues to be addressed. *See* 40 C.F.R. §1501.7. It "ensures that interested parties are aware of and able to participate meaningfully" in the at-issue review. *Coal. For a Sustainable 520 v. United States DOT*, 881 F.Supp.2d 1243, 1248 (W.D. Wash. 2012).

Second, an HMAP takes into consideration a broader array of issues related to herd health over the short and long-term than a Gather-EA. By way of example, Plaintiffs refer to BLM's creation of an HMAP for the Fifteenmile HMA[5] in comparison to the Pancake Gather-EA. *See* Exh. A (Fifteenmile Herd Management Area Plan, August 2019) to Plaintiffs' Request for Judicial Notice (RJN).

The Fifteenmile HMAP was created to "establish short and long-term management objectives for the wild horse herd and their habitat within lands administered by the Bureau of

---

[4] The preliminary EA for the Pancake Complex was entitled "Pancake Complex Preliminary Environmental Assessment." After public comment regarding the purpose and scope of the EA, BLM changed the title "Pancake Complex Wild Horse Gather Final Environmental Assessment." AR3382, 3658.

[5] While not every HMAP is the same, the Fifteenmile HMAP is an example of the type of short and long-term objectives that can be set for an HMA and its herds–objectives that are created only after allowing for public scoping.

Land Management (BLM) Worland Field Office (WFO). These objectives will guide management of the Fifteenmile Herd Management Area (HMA), and the wild horses within the HMA, over the life of the plan." *Id.* at p. 1. It provides guidance for future gathers under either a gather plan or in cases of emergency. *See id.* at pp.7-9. The Pancake Gather-EA's purpose, on the other hand, was to conduct an environmental assessment of a plan "to gather and remove excess wild horses from within and outside the Pancake Complex and to reduce the wild horse population growth rates to achieve and maintain established AML ranges." AR3504. It was not intended to address management of wild horses long-term, instead only focusing on the current status of the herd and the gather of excess horses over a 10 year period.

For population management, the Fifteenmile HMAP analyzed AML ranges and stated that wild horse populations should be established "within the established AML range to protect the range from deterioration associated with overpopulation." Exh. A to Plaintiff's RJN at p. 8. But, it further provides guidance regarding the need to assure that all age classes are represented in the HMA and identifies implementation objectives for maintaining adequate levels of genetic diversity. *See id.* at pp. 4, 7, 9. To sustain the health of the herd, the HMAP contains objectives regarding wild horse body conditions and the maintenance/development of water conditions to ensure good wild horse distribution throughout the HMA. *See id.* at pp. 3, 7, 9-10. One objective focuses on management of "livestock grazing within the HMA to avoid and minimize the conflict with wild horses and wildlife." *Id.* at p. 3. Rangeland health and vegetation objectives also are addressed. *See id.* at p. 9. Significantly, future gather plans, which are identified as "management actions," must conform with the Fifteenmile HMAP objectives, as well as various BLM instruction memoranda and directives. *Id.* at pp. 7-15.

The Pancake Gather Plan, on the other hand, does not have comparable objections to tier to since no HMAP exists for the Complex. Nor did the LUPs, which the BLM considered to some extent, have comparable objectives. *See* AR33-345, 532-724, 871-1349, 3501. BLM's use of Gather-EAs without an HMAP circumvents the need to consider gathers within the larger context of herd health over the long-term.

In so doing, BLM also refuses to consider public comment of important key issues[6]. For example, the public asked the BLM to address the management of livestock grazing and industry, which is affecting rangeland health and impacts horse AMLs. *See* AR2091, 2126-27, 3384. BLM responded that this issue was not within the scope of the Pancake Gather-EA as it involved land-use planning, and "[t]he purpose of the EA is not to adjust livestock use." AR3519-3520, 3657, 3661, 3678-80. (The narrow focus of the Pancake Gather-EA is addressed further, below, in Section V.F.)

BLM's actions have resulted in wild horses being removed through an environmental review process that does not robustly consider the health of the horses nor allow for meaningful public participation.

## III.    Legal Framework

### A.    Mandamus and Venue Act

Under the Mandamus and Venue Act, [d]istrict courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. §1361. Mandamus relief awarded through summary judgment is appropriate where a plaintiff establishes a defendant owes a clear, nondiscretionary duty to perform an act. *See Castillo v. Ridge*, 445 F.3d 1057, 1060 (8th Cir. 2006); *Schulke v. United States*, 544 F.2d 453, 455 (10th Cir. 1976); *Singh v. Still*, 470 F. Supp. 2d 1064, 1072 (N.D. Cal. 2007). In making such a determination, courts often engage in statutory and regulatory construction. *See Workman v. Mitchell*, 502 F.2d 1201, 1205 (9th Cir. 1974); *McMahon v. Califano*, 476 F. Supp. 978, 982 (D. Mass. 1979); *Andujar v. Weinberger*, 69 F.R.D. 690, 693-94 (S.D.N.Y. 1976); *Michigan Head Start Directors Asso. v. Butz*, 397 F. Supp. 1124, 1138 (W.D. Mich. 1975).

---

[6] Not only was there no HMAP to provide guidance, but because there was no public scoping for the Pancake Gather-EA, the public had no opportunity to provide input on the scope of the Pancake Gather Plan. *See* AR3522-3524; Declaration of Laura Leigh, individually and on behalf of Wild Horse Education at ¶¶19-25; Scott Beckstead on Behalf of the Center for a Humane Economy at ¶¶6-8; Scott Edwards on Behalf of Animal Wellness Action at ¶¶11, 13-15; and Manda Kalimian on Behalf of the CANA Foundation at ¶¶10-11, 15-18.

## B.    Administrative Procedure Act

The APA grants a right of judicial review to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. §702. The APA defines "agency action" to "include[] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* §§551(13) 701(b)(2).

Under the APA:

> The reviewing court shall—
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . .
>> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>> (D) without observance of procedure required by law;
>> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title [5 USCS §§ 556 and 557] or otherwise reviewed on the record of an agency hearing provided by statute . . .

*Id.* §706.

When addressing a summary judgment motion in an APA case, the court acts more like an appellate tribunal than a trial court because the scope of its review is limited to reviewing the administrative record, deciding relevant questions of law, interpreting statutory and regulatory provisions, and determining the meaning or applicability of agency action. *See* 5 U.S.C. §706; *Koopmann v. U.S. Dep't of Transp.*, 335 F. Supp. 3d 556 (S.D.N.Y. 2018); *New York v. U.S. Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475, 516 (S.D.N.Y. 2019); *Davidson v. United States Dep't of State*, 113 F. Supp. 3d 183 (D.D.C. 2015).

## IV.    Standing

Plaintiffs have filed, concurrent with this Motion, the declarations of Laura Leigh, individually and on behalf of Wild Horse Education (WHE Decl.); Scott Beckstead on Behalf of the Center for a Humane Economy (CHE Decl.); Scott Edwards on Behalf of Animal Wellness Action (AWA Decl.); and Manda Kalimian on Behalf of the CANA Foundation (CANA Decl.) to establish standing in this matter.

### A.    Zone of Interest

Under both the Mandamus and Venue Act and the APA, the first step in establishing standing requires a demonstration that plaintiff fall within the "zone of interest" protected by the at-issue law, which may include statutes or regulations. *See Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020); *Hernandez-Avalos v. INS*, 50 F.3d 842, 846-847 (10th Cir. 1995); *Giddings v. Chandler*, 979 F.2d 1104, 1108-1110 (5th Cir. 1992).

The "zone of interest" test "is not meant to be especially demanding." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399-400 (1987). The Supreme Court has emphasized that a plaintiff's claim need only "arguably" fall within the zone of interest, which "indicate[s] that the benefit of any doubt goes to the plaintiff." *Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d at 128 (2d Cir. 2020) (citing to *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224-225 (2012).) Further, "there need be no indication of congressional purpose to benefit the would-be plaintiff." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399-400 (1987. However, the interests of a plaintiff cannot be inconsistent with the purpose of the at-issue statute. *Id.* at 399.

Plaintiffs' First, Second, Third, and Fourth Causes of Action consist of Mandamus and Venue Act or APA claims based upon the WHA and its implementing regulations. The WHA provides the statutory authority by which the BLM manages wild horses and burros on public lands. 16 U.S.C. §1331 et seq. The congressional findings and declaration of policy for the WHA states:

> Congress finds and declares that wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene. It is the policy of Congress that wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death; and to accomplish this they are to be considered in the area where presently found, as an integral part of the natural system of the public lands.

17 U.S.C. §1331. This Congressional finding requires that management activities affecting wild horses be conducted at the minimal feasible level. *Id.* at §1333(a). BLM's regulations mandating LUPs and HMAPs were adopted to implement the WHA. 43 C.F.R. §§4700.0-1, 4700.0-3. Plaintiffs consist of American people with an interest in ensuring that wild free-roaming horses

are treated as an integral part of public lands and that management activities are conducted at the minimal level feasible. See e.g., WHE Decl. at ¶¶2-5, 7-10, 16-25; CHE Decl. at ¶¶3-10; AWA Decl. at ¶¶3-13 ; and CANA Decl. at ¶¶4-5. As such, they arguably are within the zone of interests to be protected and have a clear right to pursue the relief requested.

Plaintiffs' Fifth Cause of Action is an APA claim based upon NEPA.

Congress's purpose in enacting NEPA was to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; . . . promote efforts which will prevent or eliminate damage to the environment and biosphere . . . ; [and] enrich the understanding of the ecological systems and natural resources important to the Nation." Naturally, NEPA's zone of interests covers environmental injuries and not purely economic ones. . . . Environmental injuries include, but are not necessarily limited to, detrimental effects upon a plaintiff's "recreational use and aesthetic enjoyment."

*Ecosystem Inv., Partners v. Crosby Dredging, L.L.C.*, 729 F. App'x 287, 294-95 (5th Cir. 2018) (internal citations omitted). Conservational interests also are recognized under NEPA. *Bd. of Cnty. Comm'rs of Rocky Mt. Wild v. United States BLM*, 584 F. Supp. 3d 949, 963 (D. Colo. 2022).

Plaintiffs consist of an individual and organizations averring environmental, aesthetic, and conservational injuries that fall within NEPA's zone of interests. See e.g., WHE Decl. at ¶¶2-5, 7; CHE Decl. at ¶¶3-7; AWA Decl. at ¶¶ ; and CANA Decl. at ¶¶ . Thus, they have a clear right to pursue the relief requested.

**B.    Article III**

To demonstrate Article III standing to sue, plaintiffs must show (1) they suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) the injury is fairly traceable to defendants' challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

1.    Injury in Fact

Standing can apply to an individual, or where an organization is the plaintiff, there are two types of standing:  organizational and associational (or representative). *See N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2011); *Warth v. Seldin*, 422

U.S. 490, 511 (1975). Organizational standing exists where an organization sues in its own right to seek judicial relief from injury to itself. *See id.* Alternatively, an organization can assert associational standing to "sue on behalf of its members . . . ." *N.Y. Civil Liberties Union*, 684 F.3d at 294. Further, "[i]t is well settled that where multiple parties seek the same relief, 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'" *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (citations omitted).

The injury in fact requirement of standing can be established when a plaintiff is deprived of a procedural right that is connected to the protection of an established interest (such as those established to be within the "zone of interest" of applicable law). *See Rice v. Vill. of Johnstown*, 30 F.4th 584, 591 (6th Cir. 2022); *Kingman Reef Atoll Invs., L.L.C. v. DOI*, 195 F. Supp. 2d 1178, 1187 (D. Haw. 2002); *Am. Horse Prot. Asso. v. Frizzell*, 403 F. Supp. 1206, 1213 (D. Nev. 1975). For example, "[i]nterpreting NEPA broadly, [courts] have recognized standing for individuals and groups of individuals who sue to require preparation of an EIS, when they contend that a challenged federal action will adversely affect the environment." *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1179 (9th Cir. 2004). Additionally, standing exists where plaintiffs challenges an agency action that deprived them of their opportunity to comment. *See McGarry v. Sec'y of the Treasury*, 853 F.2d 981, 984 (D.C. Cir. 1988), holding that in such cases, plaintiffs need only state that "had the opportunity been made available, it would have commented upon" the agency action.

For cases involving the WHA and NEPA, "[i]t is clear that the person who observes . . . a particular animal threatened by a federal decision is facing perceptible harm, since the very subject of his interest will no longer exist." *Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127, 144 (D.D.C. 2020), quoting *Lujan*, 504 U.S. at 566. *See also Am. Horse Prot. Asso.*, 403 F. Supp. at 1214, finding an injury in fact where aesthetic or environmental interests has been impacted.

For organizations, standing exists where the challenged violation results in an impairment

10 Plaintiffs' Notice of Motion for Summary Judgment and Memorandum of Points and Authorities in Support Thereof

of the organization's ability to fulfill its mission or has resulted in a diversion of resources from other activities of the organizations. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Friends of the Earth v. Sanderson Farms, Inc*., 992 F.3d 939, 942 (9th Cir. 2021); *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104 (2d Cir. 2017)*; Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011).

      a)    *Declaration of Laura Leigh, Individually, and on Behalf of Wild Horse Education (WHE)*

Plaintiff Laura Leigh, individually, has suffered injury because of Defendants' failure to create an HMAP and failure to adequately conduct an environmental review under NEPA. Ms. Leigh has visited, observed, and photographed the wild horses at the Pancake Complex so many times that she has formed unique and special relationships with individual horses. *See* WHE Decl. at ¶¶12-14. Her presence in the Complex includes being present during the January 2023 gather and thereafter. *See id.* at ¶¶13, 66.

Ms. Leigh experiences great enjoyment from watching young foals born in the Pancake Complex become curious and strong adult horses who then create their own families. (*See id.* at ¶14.) But, BLM's action (or inaction) threatens Ms. Leigh's ability to recreate and enjoy these horses. *See id.* at ¶15, 33-50, 52-58, 63-65. In the first gather undertaken pursuant to the Pancake Complex-EA, she witnessed horses being inhumanely treated, severely injured and captured for euthanasia. *See id.*

Further, by failing to create an HMAP prior to gathering horses in the Complex, Ms. Leigh's right to comment has been impaired. *See id*. at ¶¶17-25. Had BLM done otherwise, Plaintiff would have been able to submit comments during the appropriate scoping period. *See id.* at ¶17. Without this, BLM prevented Ms. Leigh from submitting comments necessary to consideration of whether or not horses should be gathered, such as comments to close public lands to livestock grazing for protection of wild horses. *See id.* at ¶¶17-25.

By failing to adhere to the procedural requirements of the WHA and NEPA, Ms. Leigh suffered injury to her aesthetic and procedural interests—interests that are recognized under the

WHA and NEPA as challenged by the Mandamus and Venue Act and APA.

WHE is a national nonprofit corporation whose mission is to protect and preserve wild horses and burros on range, during and after capture. *See id* at ¶¶14-5. It aims to remove the curtain that veils governmental activities against wild horses from the public eye in order to advance wild horse advocacy and support. It also aims to facilitate public awareness and participation in wild horse issues. *See id.* at ¶5. "Advocating for the wild horses in the Pancake Complex is a past, present, and future important issue for [Laura Leigh], for WHE, and for [WHE's] members." *Id.* at ¶8.

Members of the WHE have suffered injury to their aesthetic and procedural interests, including their individual right to comment upon management practices associated with the Pancake Complex and protect their aesthetic interest in the herd. *See id.* at ¶¶11, 33-50, 52-58, 63-65. Because of this, WHE has established injury in fact for associational standing.

The WHE also has organizational standing because the Pancake Gather Plan and its implementation have caused the organization to divert an inordinate amount of resources in staff time and attention to the Pancake Complex. *See id.* at ¶51.

        b)    *Declaration of Scott Edwards on Behalf of Animal Wellness Action (AWA)*

AWA "is a national nonprofit organization with the mission of promoting animal welfare by advocating for the passage and enforcement of laws, regulations, and policies that protect animals. AWA maintains 135,000 supporters across America, with several thousand in Nevada." AWA Decl. at ¶3. In accomplishing this mission, AWE's focus includes ending horse slaughter, keeping wild horses in their natural habitats, and creating humane fertility control strategies to limit horse reproduction. *See id.* at ¶4. "AWA has been directly injured by the actions of the defendants because it has diverted significant organizational resources to identify, remedy and counteract unlawful and improper actions related to wild horse roundups, including the types of activities that are alleged in the current litigation." *Id.* at ¶5.

Further, the organization's right to publicly comment on management plans for the

Pancake Gather Complex has been impaired by Defendants' failure to create an HMAP. "If the BLM had prepared and published an HMAP for the Pancake Complex, AWA would have submitted comments during the appropriate public commenting period. Like previous AWA comments on HMAPs, our comments would have addressed concerns about the cruelty and inhumane nature of BLM round-ups, the need to reduce excessive livestock grazing rather than reducing the number of wild horses when land suffers degradation, and argued for the use of safe, reversible PZP for fertility control if and when population management becomes necessary." *Id.* at ¶13-14.

These injuries establish injury in fact for AWA's organizational standing.

c)    *Declaration of Manda Kalimian on Behalf of the CANA Foundation (CANA)*

"CANA is a non-profit corporation whose mission is conserve and restore the North American landscape by creating sustainable environmental ecosystems through restoring and preserving biodiversity and native species (also known as "rewilding"); in particular, CANA's focus is on the reintroduction and continuing survival of wild horses as a keystone species within their ecosystems. CANA believes that reintroducing and sustaining wild horses in their historic habitats can improve the overall health and vitality of North American grasslands. CANA's initiatives to achieve this mission foster community empowerment, land conservation, and the sustainable management and preservation of America's wild horse populations." CANA Decl. at ¶4. This mission includes monitoring and advocating for wild horses in the Pancake Complex. *See id.* at ¶5.

CANA suffered organizational injury to their right to publicly comment on management strategies for wild horses in the Pancake Complex by Defendant's failure to create an HMAP. *See id.* at ¶¶10-11. Had an HMAP had been created, CANA would have submitted comments during the scoping period, with comments addressing rewilding as an alternative management strategy for wild horses and burros. *See id.* at ¶10. These comments would have provided CANA the opportunity to address rewilding as an alternative management strategy. *See id.* at ¶¶10-11. Not

13    Plaintiffs' Notice of Motion for Summary Judgment and Memorandum of Points and Authorities in Support Thereof

only did this result in CANA's right to comment being injured, but as a result, CANA's primary organization mission was thwarted.

Accordingly, Plaintiffs have established injury in fact for CANA's organizational standing.

> d) *Declaration of Scott Beckstead on Behalf of the Center for a Humane Economy (CHE)*

CHE is a non-profit organization with the mission of forging a more humane economy for animals, including wild horses on public lands. *See* CHE Decl. at ¶¶3-4. It "believes that wild horse welfare and survival are inextricably linked with commercial livestock ranching, and for this reason, the plight of American wild horses does, indeed, implicate the American economy and the commercial livestock industry. The Center engages regularly on horse protection efforts, including promoting responsible policies in wild horse management and fighting for federal safeguards under the Wild Free-Roaming Horses and Burros Act." *Id.* at ¶4.

CHE suffered organizational injury to their right to publicly comment on management strategies for wild horses in the Pancake Complex by Defendant's failure to create an HMAP. *See id.* at ¶¶5-8. Had it been allowed, CHE "would have argued that excessive livestock grazing, rather than wild horses, is a significant reason why a majority of BLM land does not meet its own land health standards, and that any Pancake Complex HMAP should consider and invoke, if necessary, the BLM's authority under the Wild Horse Act to close public lands to livestock grazing when necessary to protect wild horses." *Id.* at ¶7. The inability to meaningfully address this served to frustrate CHE's mission. *See id.* at ¶8.

Further, the Pancake Gather Plan has injured the scientific interests of CANA and its ability to use scientific evidence to advance its mission. *See id.* at ¶14. "For example, CANA's ability to support the scientific study of the Pancake Complex herds' range, the heat dome over the range, and the drought experienced by the range was impacted." *Id.*

CHE's members also suffered injury to their individual interests, forming the basis of associational standing for CHE. *Id.* at ¶¶9-25. Specifically, Defendants' action (or inaction) has

affected their aesthetic interest, right to ensure treatment of wild horses is predicated upon all management activities being conducted at the minimal feasible level, and right to be free from observing particular horses suffering perceptible harm. *See id.*

2. <u>Injury Fairly Traceable to Challenged Conduct and Likely to Be Redressed by Favorable Court Decision</u>

Each and every injury addressed above is predicated upon Defendants' failure to follow the WHA and its implementing regulations as regards the creation of HMAPs and directive to conduct gathers at the minimum feasible level and/or upon Defendants' failure to conduct an appropriate environmental review. The relief being sought would result in the prohibition of any future gathers (and corresponding future injuries) until Defendants complied with the WHA, NEPA, and APA. By doing so, injury to Plaintiffs' individual, associational, and organizational interests would be rectified.

**C.    Exhaustion of Administrative Remedies**

On June 2, 2021, Plaintiffs Wild Horse Education and Ms. Leigh timely appealed Defendants' May 4, 2021 approval of the Gather EA to the United States Interior Board of Land Appeals and petitioned for an order staying the decision. On July 7, 2021, the petition for stay was denied by the United States Interior Board of Land Appeals (IBLA). On January 6, 2022, Plaintiffs Wild Horse Education and Ms. Leigh filed a Motion to Reconsider the Stay of the Gather EA. Plaintiffs Wild Horse Education and Ms. Leigh saw the Pancake Complex Gather on the BLM's annual schedule that day and immediately filed the motion since the IBLA still had not rendered its decision over Plaintiffs' appeal. Plaintiffs filed an Amended Motion to Reconsider the Stay Due to New Circumstances on January 10, 2022. The IBLA denied Plaintiffs' Amended Motion to Reconsider the Stay on January 14, 2022, after the gather had already begun.

Argument

**D.    The WHA and Its Implementing Regulations Establish a Mandatory, Non-Discretionary Duty to Prepare an HMAP Prior to Engaging in Management Activities Such as Plans Providing for the Gather and Removal of Wild Horses**

15  Plaintiffs' Notice of Motion for Summary Judgment and Memorandum of Points and Authorities in Support Thereof

Plaintiffs' First, Second, Third, and Fourth Causes of Action are based upon Defendant violating its mandatory duties as established by WHA and BLM's implementing regulations. In determining whether agency action is in violation of a mandatory duty, courts must often interpret the meaning of statutory or regulatory provisions to determine if an agency's actions contradict a legal mandate. *See Knuckles v. Weinberger*, 511 F.2d 1221 (9th Cir. 1975); *New York v. United States HHS*, 414 F. Supp. 3d 475, 517-18 (S.D.N.Y. 2019); *Greene v. Costle*, 577 F. Supp. 1225, 1228 (W.D. Tenn. 1983). "In statutory construction the function of the court is to give effect to legislative intent 'and there is no invariable rule for the discovery of that intent.'" *Greene*, 577 F. Supp. at 1228 (quoting *U.S. v. American Trucking*, 310 U.S. 534, 542 (1940)). Regulations have the same effect as statutes, since the agency has a duty to comply with regulations it has established. *See Workman v. Mitch*ell, 502 F.2d 1201, 1205 (9th Cir. 1974); *McMahon v. Califano*, 476 F. Supp. 978, 982 (D. Mass. 1979); *Andujar v. Weinberger*, 69 F.R.D. 690, 693-94 (S.D.N.Y. 1976).

Initially, courts should look to the wording of the law. *See id.* A well-settled principle of statutory construction is that each word of a statute must be accorded meaning. *See Hamazaspyan v. Holder*, 590 F.3d 744, 749 (9th Cir. 2009). Statutory titles and headings also can be viewed to establish meaning. *See United States v. Henry*, 1 F.4th 1315, 1333 (11th Cir. 2021). Where statutory language appears clear and ambiguous, courts normally look no further, but "[w]hen aid to construction of the meaning of the words . . . is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.'" *Train v. Colorado Pub. Int. Research Group*, 426 U.S. 1, 10 (1976) (quoting *United States v. American Trucking Assns*., 310 U.S. 534 (1940)).

Supreme Court doctrine, established in *Auer v. Robbins*, provides that courts also may examine an agency's interpretation of its own regulations where genuine ambiguity exists. *See Auer v. Robbins*, 519 U.S. 452 (1997); *see also Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019); *Christopher v. SmithKline Beecham Corp*., 132 S. Ct. 2156, 2166 (2012). In such circumstances, deference should be given to reasonable agency interpretation, although deference does not apply

where such interpretation is plainly erroneous or inconsistent with the regulation. *See Kisor*, 139 S. Ct. at 2415; *Christopher*, 132 S. Ct. at 2166; *Auer v. Robbins*, 519 U.S. 452, 461 (1997). Nor does such deference mean that the court shouldn't first rely on the ordinary tools of construction, such as looking at the "text, structure, purpose, and regulatory history" of a regulation. *Sec'y of Labor v. Seward Ship's Drydock, Inc.*, 937 F.3d 1301, 1310 (9th Cir. 2019); *see also Kisor*, 139 S.Ct. at 2415-2416.

1. Language of the WHA and Its Implementing Regulations

The WHA provides the statutory authority by which the Secretary of the Interior "is authorized and directed to protect and manage wild free-roaming horses and burros as components of the public lands." 16 U.S.C. §1333(a). "All management activities shall be at the minimal feasible level." *Id.* This includes management activities related to the removal of excess animals. *See id.* at §1333(b).

The Secretary has delegated its responsibilities to the BLM, which in response has adopted implementing regulations. *See* 43 C.F.R. §4700 et seq. Subpart 4710 of BLM's regulations, entitled "Management Considerations" addresses HMAs and HMAPs as follows:

§4710.3-1  Herd management areas.
Herd management areas shall be established for the maintenance of wild horse and burro herds. In delineating each herd management area, the authorized officer shall consider the appropriate management level for the herd, the habitat requirements of the animals, the relationships with other uses of the public and adjacent private lands, and the constraints contained in §4710.4. The authorized officer shall prepare a herd management area plan, which may cover one or more herd management areas.

§4710.4  Constraints on management.
Management of wild horses and burros shall be undertaken with the objective of limiting the animals' distribution to herd areas. Management shall be at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans.

Section 4710.3-1's use of the word "shall" creates a mandatory duty for the BLM to create HMAs "for the maintenance of wild horse and burro herds" and a mandatory duty to create HMAPs for these HMAs. *See Firebaugh Canal Co. v. United States*, 203 F.3d 568, 573-74 (9th Cir. 2000) ("[t]he term 'shall' is usually regarded as making a provision mandatory, and

17  Plaintiffs' Notice of Motion for Summary Judgment and Memorandum of Points and Authorities in Support Thereof

the rules of statutory construction presume that the term is used in its ordinary sense unless there is clear evidence to the contrary"); *cf. Mitchael v. Colvin*, 809 F.3d 1050, 1054 (8th Cir. 2016) (finding that the term "may" does not establish a "clear and non-discretionary duty.")

And, the wording of Section 4710.4 establishes, <u>as a constraint on management</u>, that both LUPs and HMAPs are a prerequisite for making management actions since management "shall" be undertaken based upon objectives in land use plans (LUPs) "and" HMAPs. *See Bruce v. First Fed. Sav. & Loan Asso.*, 837 F.2d 712, 714-15 (5th Cir. 1988) (finding that the use of the word "and" is "to be accepted for its conjunctive connotation rather than as a word interchangeable with 'or'"); *see also ErieNet, Inc. v. Velocity Net, Inc.*, 156 F.3d 513, 516 (3d Cir. 1998) (holding that effect must be given to all of a law's provisions, "so that no part will be inoperative or superfluous, void, or insignificant.")

### 2. Regulatory History

The clear and plain language of BLM's regulations creates a mandatory duty for BLM to create HMAPs before engaging in management activities; therefore, there is no need to look further for purposes of statutory construction. But, to the extent the court seeks to look deeper into the intent of the regulations, the regulatory history further establishes BLM's duty is ministerial.

The current BLM regulations were adopted in 1986, as amended in 1991. *See* Notes for 43 CFR Subtit. B, Ch. II, Subch. D, Group 4700; 51 Fed. Reg. 7410, Mar. 3. 1986; 56 Fed. Reg. 786, January 9, 1991; 43 C.F.R. §4700 *et seq.* (1985); and 49 Fed. Reg. 49252, Dec. 18, 1984, attached as Exh.s B-F to RJN. Prior to 1986, the regulations did not provide that HMAs "shall be established for the maintenance of wild horse and burro herds," did not contain any language regarding HMAPs, and did not connect any land use or management plans with HMAs[7]. *See* 43

---

[7] The pre-1986 regulations provided that the BLM "may designate and maintain specifically designated ranges principally for the protection and preservation of wild free-roaming horses and burros." Exhibit D at §4730.5. Herd management areas are mentioned once, without context. *Id.* The regulations stated that the BLM "shall, in connection with the designation of a specific range, develop a proposed wild free-roaming horse or burro management plan designed to protect, manage, and control wild free-roaming horses and burros on the area on a continuing basis." *Id.* at §4730.6. These plans are not tied to ensuring

1    CFR §4700 et seq. (1983), attached as Exh. E to RJN.

2           In 1984, BLM proposed changes to its regulations, introducing the requirements for

3    HMAs and HMAPs, which were published for comment. *See* 49 Fed. Reg. 49252 at proposed

4    §§4710.3-1, 4710.4, attached as Exh. F to RJN.

5           This proposed rulemaking revises the provisions on wild free-roaming horses and burros

6    in Part 4700 to reduce the regulatory burden on the public, to clarify the management procedures

7    of the Bureau of Land Management as they affect the public, to remove unnecessary self-

8    regulating provisions, and to arrange the regulations by subject. *Id.* at Summary on p. 49252.

9    Specific to management considerations:

10          The proposed rulemaking, amends existing Subpart 4730 as new Subpart 4710 to link the

11   management of wild free-roaming horses and burros with the Bureau's planning system; to

12   identify precisely the lands that will be considered for wild horse and burro management; <u>to</u>

13   <u>require that herd management area plans be prepared for all herd management areas</u> . . . " *Id.*,

14   emphasis added. In so doing, the requirement to consult both LUPs and HMAPs was created

15   under a section entitled "Constraints on management," – a title that was non-existent in the

16   earlier regulations. *See* 43 C.F.R. §4710.4; *cf.* Exh. E.  Thus, the regulatory history further

17   establishes that HMAPs were purposely included in the regulations as a mandatory duty for all

18   herd management areas and for the purpose of management activities affecting wild horses.

19          3.    <u>BLM's Interpretation</u>

20          The BLM's implementing regulations clearly establish that HMAPs must be created for

21   the management of HMAs, and thus, no *Auer* deference should be granted to any BLM

22   interpretation that is in contradiction. As the U.S. Supreme Court has elucidated:

23          First and foremost, a court should not afford *Auer* deference unless the regulation is
            genuinely ambiguous. If uncertainty does not exist, there is no plausible reason for
24          deference. The regulation then just means what it means—and the court must give it
            effect, as the court would any law. . . . Deference in that circumstance would "permit the
25          agency, under the guise of interpreting a regulation, to create *de facto* a new regulation."
            *Auer* does not, and indeed could not, go that far.

26   ───────────────

27   that maintenance activities are "undertaken with the objective of limiting the animals' distribution to herd
     areas" nor at ensuring that management "shall be at the minimum level necessary." *Id.* at §4700 et seq.

28

*See Kisor*, 139 S. Ct. at 2415, internal citations omitted.

In Defendants' opposition to Plaintiffs' Request for Temporary Restraining Order and Preliminary Injunction, Defendants argued that because there is no deadline provided for the creation of HMAPs, they are without effect in this case. Dkt. 18 at 11:21-22. Such interpretation is incorrect. While the Section 4710.3-1 mandate to create an HMAP has no identifiable deadline, Section 4710.4 establishes the deadline by tying management to "the objectives identified in approved land use plans and herd management area plans." 43 C.F.R. 4710.4. To find otherwise would make the regulatory mandate to create HMAPs for all HMAs a nullity. *See R.J. Reynolds Tobacco Co. v. Cnty. of L.A.*, 29 F.4th 542, 559 (9th Cir. 2022), declining statutory interpretation that renders sections superfluous; *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 965 (9th Cir. 2013), holding that "[i]n interpreting statutes, we observe the 'cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant'", quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). Further, to find that there is no deadline to create an HMAP undermines the regulations' stated purpose of having it considered for the purpose of managing wild horses "at the minimum level necessary." *Id. See also* 16 U.S.C. §1331(a), stating that the goal of the WHA is to ensure the protection and management of wild horses so as to ensure that "[a]ll management activities" are "at the minimal feasible level."

Defendants' reliance on the Interior Board of Land Appeals decision in *Animal Prot. Inst. of Am.*, 109 IBLA 112 (1989) does not alter the conclusion that an HMAP must be created before undertaking management actions (which include gather actions). Dkt. 18 at 11:22-12:8. IBLA decisions are not binding authority for the establishment of precedent, and furthermore, it is well established that "[w]hen an issue is not argued or is ignored in a decision, such decision is not precedent to be followed in a subsequent case in which the issue arises." *Nat'l Cable Television Ass'n, Inc. v. Am. Cinema Eds., Inc.*, 937 F.2d 1572, 1581 (Fed. Cir. 1991). In *Animal Prot. Inst.*

20 Plaintiffs' Notice of Motion for Summary Judgment and Memorandum of Points and Authorities in Support Thereof

*of Am.*, IBLA issued a 16-page order, one paragraph of which addressed HMAPs:

> Finally, API contends that BLM should not be permitted to proceed with removal of wild horses from the HMA/WHT's involved herein until it has prepared an HMAP in each case. We note that 43 CFR 4710.3-1 requires preparation of an HMAP. BLM and/or the Forest Service has prepared HMAP's only with respect to the Miller Flat and Nevada Wild Horse Range HMA's, Monte Cristo HMA/WHT, and Cherry Springs WHT. No HMAP's have been prepared in the case of the other HMA/WHT's involved herein. We conclude that it is not necessary that BLM prepare an HMAP as a basis for ordering the removal of wild horses, so long as the record otherwise substantiates compliance with the statute. Indeed, 43 CFR 4710.3-1 does not require preparation of an HMAP as a prerequisite for a removal action. Thus, we are not persuaded that preparation of an HMAP must in all cases precede the removal of wild horses from an HMA/WHT, and decline to order preparation of HMAP's.

*Animal Prot. Inst. of Am.*, 109 IBLA 112, 127 (1989). There is no discussion of Section §4710.4 or the regulatory history of the BLM's regulations. No mention is made of the tools of statutory construction that were argued (if they were). Accordingly, this paragraph in the decision provides no guidance[8].

In Defendants' opposition to Plaintiffs' Request for Temporary Restraining Order and Preliminary Injunction, Defendants also argued that management activities involving the gather and removal of wild horses could be undertaken by either "a land use plan, an EA, an established AML, and a gather plan, or some combination," with this interpretation based upon BLM's Wild Horse and Burro Management Handbook. Dkt. 18 at 12:12-16. But, again such argument is unavailing. The Handbook is not legally binding and cannot alter BLM's mandatory duties under WHA's implementing regulations. *See Christopher*, 567 U.S. at 155; *Williams v. Hanover Hous. Auth.*, 871 F. Supp. 527, 531 (D. Mass. 1994).

Finally, Plaintiffs anticipate Defendants arguing that Section 1333(b) of the WHA gives it discretionary authority regarding plans to remove excess wild horses in so far as it states the Secretary of the Interior may consider inventory, land use planning documents, and "such additional information as becomes available." 16 U.S.C. §1333(b). The problem with this

---

[8] For the same reasons, Defendants reliance on *Friends of Animals v. Bureau of Land Mgmt.*, No. CV 18-2029 (RDM), 2021 WL 2935900 (D.D.C. July 13, 2021) would be misplaced. It is not a published decision with precedential value, and it did not address the arguments that Plaintiffs now make.

interpretation and argument is that it ignores the effect of BLM's regulations.

In *United States ex rel. Accardi v. Shaughnessy*, the Attorney General adopted regulations that limited certain of his discretionary powers relating to immigration. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265-268 (1954). The Court held the Attorney General was unable to exercise the full discretion that was his prior to the regulation's enactment; should he wish to restore his full discretionary authority, he would need to amend the regulations. *See id; see also United States v. Nixon*, 418 U.S. 683, 695-96 (1974), finding that where the Attorney General delegated some of his powers to a Special Prosecutor via regulations, the Attorney General could not reassert these powers without amendment of the regulations. Similarly, in *Service v. Dulles*, Congress awarded the Department of State broad discretion in making determinations to terminate Department employees. *Service v. Dulles*, 354 U.S. 363 (1957). The Department thereafter adopted regulations that established standards and procedural requirements governing such termination, which regulations the Secretary of State did not follow. *See id.* at 387-388. The Court ruled that "[w]hile it is of course true that under the [statute] the Secretary was not obligated to impose upon himself these more rigorous substantive and procedural standards, neither was he prohibited from doing so . . . and having done so he could not, so long as the Regulations remained unchanged, proceed without regard to them." *Id.* at 388.

The BLM made the decision to implement its authority under the WHA by adopting regulations that mandate management based upon both land use plans and HMAPs. This decision purposely established "constraints on management." Now, if BLM regrets that decision, it must go through the process of changing Section 4710.4 to allow consideration of Gather-EAs in the absence of HMAPs.

### E. Summary Judgment is Appropriate on Plaintiffs' First Cause of Action Based Upon the Mandamus and Venue Act.

Under the Mandamus and Venue Act, [d]istrict courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. §1361. Mandamus relief

is appropriate where a plaintiff establishes a defendant owes a clear, nondiscretionary duty to perform an act. *See Castillo*, 445 F.3d at 1060; *Schulke*, 544 F.2d at 455; *Singh*, 470 F. Supp. 2d at 1072.

As established in Section V.A., above, WHA and its implementing regulations clearly establish a mandatory duty to create an HMAP before BLM can engage in management activities, which include plans to gather and remove horses. Without the relief requested, the BLM can continue to dodge the public scoping process and, further, will be allowed to remove and destroy wild horses without having to consider the full range of options available to control herd population and provide for herd health. It can ignore, for example, the impact of livestock grazing and industry upon wild horses, which also should be considered when determining AMLs. AR3384, 3657, 3661, 3678-80. It can make determinations regarding fertility control without public objection. AR3185, 3188, 3658.

HMAPs were incorporated into the WHA's implementing regulations for a reason: to ensure that gather plans and other management activities are done at the minimum feasible level possible. 43 C.F.R. §4710.4 This is consistent with Congress' direction to the Department of the Interior, as stated in the WHA itself. 16 U.S.C. §1333(b). Having adopted the regulations, BLM cannot now ignore them. *United States v. Nixon*, 418 U.S. at 695-96; *Service*, 354 U.S. at 387-388; *United States ex rel. Accardi*, 347 U.S. at 265-268.

For these reasons, Plaintiffs respectfully request that the court grant its request for summary judgment as to their First Cause of Action and order Defendants to halt any future gathers until such time as they develop an HMAP for the Pancake Complex.

**F.     Summary Judgment is Appropriate on Plaintiffs' Second Cause of Action Based Upon the APA.**

Plaintiffs' Second Cause of Action is based upon the APA's provisions regarding actions unlawfully withheld or unreasonably delayed. 5 U.S.C. §706(1).  The elements of this claim involve the establishment of a clear right to a mandatory duty, and as addressed in Section V.A., above, Plaintiffs have established that BLM has a duty to develop HMAPs prior to engaging in the gather and removal of wild horses. *See Gonzalez v. United States Dep't of Homeland Sec.,*

500 F. Supp. 3d 1115, 1131 (E.D. Cal. 2020), stating that "the APA commands courts to 'compel agency action unlawfully withheld or unreasonably delayed' when the agency is under a mandatory legal duty to act."

The 9th Circuit distinguishes between action that is "unreasonably delayed" and action that is "unlawfully withheld," with the former applying to agency inaction in the face of a discretionary deadline, and the latter applying to actions where a mandatory deadline exists. *See Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 n.11 (9th Cir. 2002). For cases involving action "unreasonably delayed," courts balance the following "TRAC" factors:

> (1) the time agencies take to make decisions must be governed by a "rule of reason"[;] (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason [; ](3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake [;] (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority[;] (5) the court should also take into account the nature and extent of the interests prejudiced by the delay[;] and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed."

*Independence Mining Co. v. Babbitt*, 105 F.3d 502, 507 n. 7 (9th Cir. 1997) (quoting *Telecommunications Research & Action v. FCC (TRAC)*, 242 U.S. App. D.C. 222, (D. C. Cir. 1984). But where a deadline exists, courts do not consider the TRAC factors. *See Biodiversity*, 309 F.3d at 1176 and n.11.

Here, Section 4710.4 provides the deadline for BLM's duty to create an HMAP – before management of wild horses is undertaken. 43 C.F.R. §4710.4.  This is a concrete timeframe; the BLM has no discretion to create the HMAP after management of wild horses is undertaken. Therefore, the court is mandated by the APA to compel BLM's action, and Plaintiffs respectfully request that the court grant its request for summary judgment as to their First Cause of Action and order Defendants to halt any future gathers until such time as they develop an HMAP for the Pancake Complex.

However, even if the court were to find that the application of TRAC factors is warranted, the requested relief should still be granted.  The first and second TRAC factors

considers whether the time for agency action has been reasonable. *See Vaz v. Neal*, 33 F.4th 1131, 1138 (9th Cir. 2022); *Doe v. Risch*, 398 F. Supp. 3d 647, 656-657 (N.D. Cal. 2019). In this case, BLM has refused to create an HMAP, and this refusal occurred despite the public asking it to honor its statutory duty to create one. *See* e.g., AR3184-86, 3382-86. Indeed, in responding to such request, BLM refused to explain why it has not created one. *See* AR3654-3692. Nor does BLM mention HMAPs anywhere within the Pancake Gather-EA. Moreover, as illustrated by the Fifteenmile HMAP, BLM has the ability to create an HMAP before instituting a Gather Plan. *See* Exhibit A to RJN.

The third and fifth TRAC factors focus on human health and welfare, as well as the nature and extent of the interests prejudiced by the delay. *See Doe*, 398 F. Supp. 3d at 657. Here, the WHA's main interest is to protect wild horses, with a recognition that such interest is "an integral part of the natural system of the public lands." 16 U.S.C. §1331. Further, Congress recognized that this interest is important to "enriching the lives of the American people." *Id.* By not creating an HMAP for the Pancake Complex, BLM's actions do not consider the full range of management options available to protect wild horses, and delay goes against the interests specifically elucidated by Congress.

The fourth TRAC factor examines the effect of compelling action on other agency activities or priorities. *See id.* at 658. Plaintiffs are unaware of any negative effect associated with compelling BLM to create an HMAP. The sixth, and final TRAC factor, merely holds that courts need not find agency impropriety prior to compelling action. *See id.*

Taken together, contemplation of the TRAC factors leads to the conclusion that no reasonable justification exists for BLM's delay in creating an HMAP, and this delay flies in the face of Congress' stated intent for legislating the WHA. Thus, even if the court considers BLM's inaction as being "unreasonably delayed" versus "unlawfully withheld," Plaintiffs' request should be granted.

### G. Summary Judgment is Appropriate on Plaintiffs' Third Cause of Action Based Upon the APA.

Plaintiffs' Third Cause of Action asserts that BLM acted in an arbitrary and capricious manner that was contrary to law and constitutes an abuse of their discretion when it interpreted its Handbook to conflict with its mandatory duty under 43 C.F.R. §4710.4 and by choosing to proceed with the gather and removal of more than 2,000 wild horses in the Pancake Complex prior to development of an HMAP[9]. The APA's arbitrary and capricious standard provides a court may set aside agency action where the there is no "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). Such examination takes into consideration whether the government's action is consistent with applicable statutes or regulations, as well as its own internal criteria. *See E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996); 5 U.S.C. §706(2)(A). Where an agency has "entirely failed to consider an important aspect of the problem" that is at issue, courts have held action to violate the APA. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

As addressed above in Section V.A., above, Defendants had a mandatory duty to compile an HMAP prior to any gather plan, with the objectives contained within the HMAP to be used to ensure "[m]anagement shall be at the minimum level necessary." 43 C.F.R. § 4710.4. As such, BLM has no discretion, and its choice to proceed with the removal and killing of wild horses in the Pancake Complex was plain error contrary to law.

BLM's Handbook, which is not binding law, examines the policies and procedures by which the agency adheres to WHA and the implementing regulations, and it acknowledges that management "[a]ctivities are carried out with the objective of maintaining free-roaming behavior and at the minimum feasible level of management necessary to attain the objectives identified in approved land use plans (LUPs) <u>and</u> Herd Management Area Plans (HMAPs)." AR1355, emphasis added. Despite this, BLM interprets its own regulations to allow for Gather

---

[9] The law underlying this APA claim is the WHA and its implementing regulations. Plaintiffs also allege an arbitrary and capricious claims based upon NEPA, which is addressed below in Section V.F.

Plans/Gather-EAs without first creating an HMAP. Indeed, the Handbook seems to indicate that while a Gather Plan should tier to an LUP or an HMAP, "where appropriate," it need not tier to either, but instead may comport with "other relevant decision documents." AR1396. There is no rational basis for such an interpretation.

To be clear, BLM interprets HMAPs as being important documents, but has repeatedly refused to create them. The BLM Handbook states that "HMAPs establish short- and long-term management and monitoring objectives for a specific WH&B herd and its habitat." AR1360. Normally, HMAPs also identify the actions to be taken to accomplish "herd or population management and monitoring objectives regarding the management of a specific HMA or complex of HMAs." AR1359. "An HMAP assists the authorized officer in tracking progress toward achieving LUP goals." AR1360. The "first step" in creating an HMAP involves the evaluation of existing management, which concludes with a report prepared and made available to the public as part of a public scoping period. AR1386. The "next step" is to conduct a NEPA analysis. AR1386-1387.

In adopting a gather plan based upon the Pancake Gather-EA, and without the benefit of an HMAP, BLM removal of horses was conducted without consideration of the full array of short- and long-term management and monitoring objectives governing the management and protection of wild horses in the Pancake Complex. Even if this court were to rule that a Gather Plan can be issued without the benefit of an HMAP, gather activities cannot be undertaken unless done so in a manner that accounts for managing at the minimum level feasible. See 16 U.S.C. § 1333; 43 C.F.R. § 4710.4. This was not done.

As illustrated by the Fifteenmile HMAP, an HMAP's focus on short and long-term management objectives, can address future gather operations for either a Gather Plan or in cases of emergency. Exhibit A to RJN at p.1, 7-15. In addressing the health of herds, it provides substantive guidance and implementation objectives. *Id.* at 3-4, 7-9. Because the Pancake Gather Plan does not have comparable objectives to tier to, BLM refused consideration of key issues. For example, BLM was asked to address the management of livestock grazing and industry,

which is affecting rangeland health and impacts horse AMLs. AR3384. BLM responded that this issue was not within the scope of the Pancake Gather-EA as it involved land-use planning, and "[t]he purpose of the EA is not to adjust livestock use." AR3657, 3661, 3678-80. Had BLM created an HMAP, Plaintiffs would have had the opportunity not only to address the impact of livestock grazing on herds in the Complex, but also they would have commented on the Pancake Complex's early foaling season, considerations of weather for gather operations, considerations for ensuring gathers are conducted in a humane manner, the use of reversible PZP for fertility control, rewilding as an alternative management strategy, considerations related to rare genetic lineages present in the Complex, and more. WHE Decl. at ¶¶19-25; CHE Decl. at ¶¶6-8; AWA Decl.¶¶11, 13-15; and CANA Decl. at ¶¶10-11, 15-18. Other examples are addressed in Section V.F., below. Taken together, the record unmistakably establishes that BLM's actions were arbitrary and capricious, in a manner that was contrary to law and constitutes an abuse of their discretion.

Gather-EAs focus only on environmental review pursuant to NEPA and entirely fail to consider important aspects of herd management that are interconnected with population objectives; such failure violates the APA. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43.

WHA's directive that BLM management activities be done at the minimum level feasible must be afforded meaning. BLM's regulations, mandating HMAP creation for this purpose, must be afforded meaning. Yet, BLM's interpretation (as stated in its Handbook) essentially abrogates such meaning. For gathers, BLM interprets the "minimum level feasible" directive to be optional.

BLM's interpretation contradicts binding law, and there is no reasonable basis for its conclusion that a Gather Plan can be issued with or without an LUP or HMAP. Accordingly, Plaintiffs respectfully request that the Court find Defendants' action to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

### H. Summary Judgment is Appropriate on Plaintiffs' Fourth Cause of Action Based Upon the APA.

Plaintiffs' Fourth Cause of Action is based upon the APA's provision for a court to set aside actions "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2))(C). Specifically, "[t]o the extent Defendants have interpreted the BLM Handbook to conflict with Defendants' mandatory duty to comply with 43 C.F.R. §4710.4 to carry out management of wild horse herds at the minimum level necessary to attain the objectives identified in approved land use plans and herd management plans, Defendants have acted in excess of statutory jurisdiction, authority, or limitations." Dkt. 31.

A cause of action based upon this APA provision examines whether Defendants' actions contravene the meaning of a statute or regulation. As established in Section V.A., above, the WHA provides the statutory authority by which the Secretary of the Interior, as delegated to BLM, protects and manages wild horses, including the removal of horses from public lands. 16 U.S.C. §1333. This authority is limited by the provision that "[a]ll management activities shall be at the minimal feasible level." *Id.* The BLM adopted regulations to implement the WHA, and for the purposes of ensuring that management activities adhered to Section's 1333 limit on it authority, these regulations provide that "[m]anagement shall be at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans." 43 C.F.R. 4710.4.

As addressed above in Section V.A., no deference should be given to any BLM interpretation that contradicts the WHA or its regulations. The content of BLM's Handbook is not legally binding and cannot alter BLM's mandatory duties. *See Christopher*, 567 U.S. at 155; *Williams v. Hanover Hous. Auth*., 871 F. Supp. 527, 531 (D. Mass. 1994).

For these reasons, Plaintiffs respectfully request the court grant summary judgement for Plaintiffs' Fourth Cause of Action.

I.     **Summary Judgment is Appropriate on Plaintiffs' Fifth Causes of Action Based Upon the APA.**

Plaintiffs' Fifth Cause of Action focuses on whether Defendants' NEPA review, which resulted in the adoption of the Pancake Gather EA, was arbitrary and capricious, an abuse of discretion, and not in accordance with law in violation of Section §706(2) of the APA. Dkt. 31.

NEPA requires preparation of an environmental impact statement (EIS) for "every … major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An EA is done for the purpose of determining whether an EIS is required. *See* 40 C.F.R. § 1508.9. "If any 'significant' environmental impacts might result from the proposed agency action then an EIS must be prepared before agency action is taken." *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983).

In the context of a NEPA challenge, the APA's arbitrary and capricious standards requires courts to determine whether an agency has taken a "hard look" at the actual environmental consequences of its action (or inaction). *See Marsh*, 490 U.S. at 373-74; *350 Montana v. Haaland*, 50 F.4th 1254, 1265 (9th Cir. 2022). Where the government makes a finding that no significant impact will occur as a result of proposed action, this decision must be based on a consideration of all relevant factors and supported by a convincing statement of reasons. *See id.* In this regard, the agency must both accurately identify relevant environmental concerns and analysis alternatives to the proposed action. 42 U.S.C. §4332(E); 40 C.F.R. §1508.9; *Sierra Club v. United States DOT,* 753 F.2d 120, 127 (D.C. Cir. 1985).

"The purpose of NEPA's alternatives requirement is to ensure agencies do not undertake projects "without intense consideration of other more ecologically sound courses of action, including shelving the entire project, or of accomplishing the same result by entirely different means." *Envtl. Defense Fund, Inc. v. U.S. Army Corps of Engrs.*, 492 F.2d 1123, 1135 (5th Cir. 1974). Federal courts have consistently held that an agency's failure to consider a reasonable alternative is fatal to an agency's NEPA analysis. *See Muckleshoot Indian Tribe v. U.S. Forest Serv.,* 177 F.3d 800, 814 (9th Cir. 1999); *Idaho Conserv. League v. Mumma*, 956 F.2d 1508, 1519-20 (9th Cir. 1992). If the agency rejects an alternative from consideration, it must explain why a particular option is not feasible and was therefore eliminated from further consideration. 40 C.F.R. § 1502.14(a). The courts will scrutinize this explanation to ensure that the reasons given are adequately supported by the record. *See Muckleshoot Indian Tribe*, 177 F.3d at 813-15; *Idaho Conserv. League*, 956 F.2d at 1522.

Further, as it is a fundamental objective of NEPA is to ensure that an agency will not act on incomplete information, where critical information is missing, the government may not rely upon an EA to implement proposed action. *See Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 (1990); *350 Montana*, 50 F.4th at 1263; *National Parks & Conservation Ass'n. v. Babbitt*, 241 F.3d 722, 732-33 (9th Cir. 2001). "The 'hard look ' 'must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made.'" *W. Watersheds Project v. Kraayenbrink*, 620 F.3d 1187, 1205 (9th Cir. 2010), quoting *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000).

The Pancake Complex is made up of the Pancake Herd Management Area (HMA), the Sand Springs West Wild Horse HMA, the Jakes Wash Herd Area (HA), and the Monte Cristo Wild Horse Territory (WHT). AR03501. It consists of 1,228,739 acres of land, the majority of which is directly managed by the Bureau of Land Management (BLM). AR03501, 03503.

The Pancake Gather-EA states the purpose of the 10-year Gather Plan "is to gather and remove excess wild horses from within and outside the Pancake Complex and to reduce the wild horse population growth rates to achieve and maintain established AML ranges." AR3504. The Gather Plan (identified as Alternative A) is described as: "Over a 10 year period, use phased gathers to removed excess animals in order to achieve and maintain the population within AML range, apply fertility control methods (vaccines and/or IUDs) to released mares, maintain a sex ratio adjustment of 60% male and 40% female, and release a small non-reproducing component of males (up to 138 geldings) that brings the population to mid-AML." AR3507. It is stated to be in conformance with the 2008 Ely District RMP, 1997 Tonopah RMP, and 1986 Humboldt National Forest Land & RMP. AR3504-05. The EA relied upon AMLs[10] developed in these RMPs[11], and it assumed that without any gathers, "[t]he current wild horse population would continue to increase at a rate of 20-25% per year." AR3502-3503, 3507.

---

[10] BLM defines AML "as the number of wild horses that can be sustained within a designated HMA which achieves and maintains a thriving natural ecological balance in keeping with the multiple-use management concept for the area." AR3502.

[11] BLM states that "[t]he Pancake Complex has a cumulative AML range of 361-638 wild horses." AR3502. This is consistent with the AMLs established through the three RMPs associated with the

31   Plaintiffs' Notice of Motion for Summary Judgment and Memorandum of Points and Authorities in Support
       Thereof

The Pancake Gather-EA considered the following alternatives to the proposed one: a no action alternative, Alternative B, which was the same as the proposed one sans the non-reproducing geldings component, Alternative C, which was the same as the proposed one but without fertility control methods, a sex ratio adjustment, or the non-reproducing geldings component, and Alternative D, which was limited to the capture of wild horses associated with the Jakes Wash HA. AR3502-3503, 3506-3507.

Public comments and BLM's responses are contained in Appendix XIII to the Pancake Gather-EA. AR3654-3692.

1.  Defendants' Failed to Take a Hard Look at Alternative Methods of Habitat Management and Population Control

Despite recognizing that the Pancake Gather-EA should analyze wild horses as a resource, BLM disproportionately focused on the impact of horses upon public lands, ignoring methods of habitat management and population control that could lower this impact without having to remove and destroy over 2,000 horses. AR2080-3392, 3524, 3654-3692. As one member of the public noted, the Plan's microscopic focus "favor[ed] livestock, mining, oil and gas leasing, and other exploitive interests on the public lands and within the wild horses' legal habitat." AR2089.

Defendants cannot demonstrate that they gave a "hard look" at potential impacts associated with the Gather Plan because they failed to consider all relevant factors and analyze appropriate alternatives. *See* 42 U.S.C. §4332(E); 40 C.F.R. §1508.9; *Marsh*, 490 U.S. at 371; *National Parks & Conservation Ass'n.*, 241 F.3d at 732-33; *350 Montana*, 50 F.4th at 1263; *Sierra Club*, 753 F.2d at 127. BLM failed to address the following factors and alternatives:

- Impacts of a drastic reduction of population size on population growth rate;
- Impacts of horse removal on wildfire risks;

---

Pancake Complex.The 2008 Ely District RMP identifies an AML range of 240-493 for the Pancake HMA, and it also changed the Jakes Wash HMA to an HA, finding that it did not provide sufficient habitat resources to sustain healthy wild horse populations. AR941. The 1997 Tonopah RMP identifies an AML of 49 for the Sand Springs West Wild Horse HMA, and the 1986 Humboldt National Forest Land & RMP identifies an AML range of 72-96 for the Monte Cristo WHT. AR55, 551.

- Addressing population management without removals by implementing reductions in livestock grazing on the land;
- Addressing population management through rewilding.

a) *Impacts of a drastic reduction of population size on population growth rate*

Several members of the public asked BLM to consider recommendations made by the NAS in its 2013 report, "Using Science to Improve the BLM Wild Horse and Burro Program: A Way Forward," which can be found at AR2134-2530. In this report, NAS found that BLM management practices are actually causing high horse population growth rates. AR2150-51. In fact, regularly removing horses can cause "population levels below food-limited carrying capacity. Thus, population growth rate could be increased by removals through compensatory population growth from decreased competition for forage. As a result, the number of animals processed through holding facilities is probably increased by management."

The Pancake Gather-EA states that the purpose of the Gather Plan is "to reduce the wild horse population growth rates to achieve and maintain established AML ranges." AR3504. Yet, when the NAS finding regarding the impact of removals upon growth rates was brought to BLM's attention, it provided no response. AR2118.

b) *Impacts of horse removal of horse removal on wildfire risks*

One member of the public noted that wild horses are important to lowering the risk of wildfires on public lands:

> Wild horses act as major reducers of dry flammable vegetation, or what becomes such later in the year. The major reduction of wild horses proposed by the EA would alarmingly increase the risk of catastrophic wildfires in many places. Often wild horses reach areas that are inaccessible to other herbivores including domestic livestock. After their removal, lightning-sparked fires could occur more frequently. These are likely to be quite extensive, e.g. the Rush Peak Fires started in the Twin Peaks W.H. HMA in NE California in September, 2012 occurred shortly after a major BLM wild horse and burro roundup the removed most of the equids from this ca. 800,000-acre area. It ended up burning 315,000 acres and was caused by lightning combusting vegetation on a remote peak. Another important factor is that by building more moisture-retaining soils wild horses bolster watersheds. Much of this involves their balancing all the ruminant herbivores that are overly promoted by people. Truly, wild horses create moisture conditions that prevent serious wildfires and benefit a myriad of species."

AR2089. *See also* AR3026. In response, BLM stated:

> The EA noted potential impacts of high populations of wild horses on rangelands, including the spread of invasive plant species, which could increase wildfire risk. The supposition that large numbers of wild horses may reduce fuel loads could probably be said for all large grazing animals on the range (including livestock). However, there are many different factors that affect wildfire risk and it is an oversimplification and inaccurate to state that grazing – in and of itself – will reduce wildfire risk, since this is just one component relevant to wildfire risk.

AR3671. This reply may indicate that BLM provided at least some minimal analysis on the potentially significant impact associated with wildfire risk as a result of the Gather Plan, but this is not the case. While the Gather-EA talks about invasive plant species, the connection between them and wildfires was not addressed. Wildfire risks, including those associated with removing wild horses, simply were never analyzed.

> c) *Addressing population management without removals by implementing reductions in livestock grazing on the land*

BLM was asked to consider addressing "the current wild horse population without removals by implementing reductions in livestock grazing pursuant to 43 C.F.R. § 4710.5(a). The BLM has a statutory mandate to protect wild horses, while livestock grazing is permitted only at the discretion of the Interior Department. Livestock grazing is not required to fulfill the agency's 'multiple use' mandate." AR2081. *See also* AR2091, 2126-27, 3384.

As evidence that such an alternative could significantly alleviate the need to remove over 2,000 horses, one commenter wrote:

> Federal regulation 43 C.F.R. §4710.5 "Closure to livestock grazing" authorizes the BLM to "close appropriate areas of the public lands to grazing use by all or a particular kind of livestock" "[i]f necessary to provide habitat for wild horses or burros, to implement herd management actions, or to protect wild horses or burros from disease, harassment or injury." . . . the BLM should pursue analysis of an alternative that considers how the agency could accommodate a larger wild horse population through adjustments to livestock stocking rates with options such as voluntary grazing retirement opportunities. . . .

> Although wild horses are allotted roughly 7,656 AUMs at the high AML of 638, ranchers are allotted roughly 59,427 AUMs in allotments that overlap or are completely within the Complex. Even at the BLM's 2020 estimated population of 2,262-3,864 adult wild

horses, that's 27,14446,368 AUMs – meaning the authorized use for livestock is still more than that allotted for horses even if the estimation is correct. . . .

Given that the BLM is claiming that range damage is caused by wild horses who are allotted for about 12 percent of the AUMs than livestock, it logically follows that the thousands of cow/calf pairs who graze in the Complex must be greatly reduced in number . . .

AR2126. A summary of rangeland health, contained in Appendix VII of the Pancake Gather-EA acknowledged that livestock were a contributing factor to not achieving a number of rangeland health standards. AR3606-3611.

BLM stated that this alternative was eliminated from further consideration because it would require revisions to applicable RMPs. AR3519-3520, 3657, 3661, 3678-80. As such, BLM stated this alternative was outside the scope of the EA. *Id.* (Such response is a perfect example of why an HMAP should be created, ensuring that population management is properly integrated with comprehensive herd and land use objectives.) If revision to RMPs can address population management without removing and killing thousands of horses, then BLM should so act. The requirement to consider appropriate alternatives does not cease simply because it involves action as a prerequisite to horse gathers.

### d) Addressing population management through rewilding

Another alternative, similar to the above one, would be to reduce livestock grazing and "other conflicting monopolizers." AR3028. This could include retiring or restricting mining activity, OHV use, and more. *Id.* Referred to as a rewilding strategy, this alternative would focus on returning the land to its natural state. *Id.* BLM simply ignored this alternative, without explanation.

### 2. Defendants' Failed to Take a Hard Look at Appropriate AMLs

The BLM refused to consider what the appropriate AML for the Pancake Complex should be, but instead just added up AMLs created in old LUPs. The AMLs are exceptionally low for the amount of land at issue (AML range of 361-638 for 1,228,739 acres of public land).

AR2089-91, 3501-03. And, numerous members of the public challenged the AML range that BLM relied upon. AR2081, 2089-91, 2109, 2126

To the extent that BLM justifies the 371-638 AML range, NEPA requires the agency to support its conclusion. But, the administrative record does not contain such support. Instead, the EA states that "[m]onitoring and other historical data collected within the Complex does not indicate that an increase in AML is warranted at this time." AR3519; see also AR3503. It is unclear what this refers to. The only data that is provided by BLM comes from a 2020 flight survey. AR3503. (BLM also identifies data from a 2021 flight survey; however, "[t]he data from the 2021 survey have not yet been analyzed." AR 3688.) As one commenter noted, the EA should have contained "all census data of the wild horse population for each of the past 10 years. Such a record would provide a clear picture of the population, how it has fluctuated over time, and would help the EA's analysis of population growth within the Complex." AR2130.

In discussing AMLs, BLM acknowledged that horse populations within the at-issue HMAs fluctuate "depending on the seasonal movement of these wild horses." AR3503. Horses also travel back and forth between HMAs. *Id.* BLM also recognized that rangeland health is an important consideration in determining AML levels, but even though "[a] Rangeland Health Evaluation is currently scheduled for the grazing allotments associated with the Sand Springs West HMA[,]" it did not consider adjusting the AML levels. *Id.*

The failure to identify the basis for its decision regarding AML and the decision to act even though relevant information is not yet available constitute a violation of NEPA; BLM must therefore conduct an EIS. *See Muckleshoot Indian Tribe*, 177 F.3d at 813-15; *Idaho Conserv. League*, 956 F.2d at 1522; *Marsh*, 490 U.S. at 371; *350 Montana*, 50 F.4th at 1263; *National Parks & Conservation Ass'n.*, 241 F.3d at 732-33. Where there is "lack of supporting data and cursory treatment of environmental effects[,]" an EIS is mandated. *National Parks & Conservation Ass'n.*, 241 F.3d at 732.

BLM's responses to the public and its cursory explanation regarding modification of AMLs does not demonstrate good faith. Rather, the EA appears to be "an exercise in form over

substance" that is disallowed under NEPA. *See W. Watersheds Project v. Kraayenbrink*, 620 F.3d at 1205.

3.   Defendants Failed to Take a Hard Look at the Impact of Returning Geldings to the Pancake Complex

The Pancake Gather Plan calls for the re-introduction of hundreds of geldings into the Pancake Complex to assist in a "reduction in per-capita population growth rates." AR3511. But, the EA does not analyze the associated negative impacts on horses or herds.

Several members of the public commented on BLM's inadequate analysis. *See e.g.,* AR2120-2121, 3005-3006, 3132, 3386. One commented that BLM "should review the scientific controversy surrounding the proposed gelding. The impacts of gelding on stallions can be severe, affecting their physiology, behavior, environment and impact on the herd." AR2120-2121, referencing past BLM attempts to rely upon gelding, the 2013 NAS report findings regarding potential impacts associated with gelding, and the case of *AWHPC v. Jewell*, wherein a court "struck down the approach of creating sterile herds of wild horses in part because the agency failed to consider relevant input from the [2013] NAS report"; see also

In response, BLM stated that "[t]he long historical use of gelding and IUDs in domestic mares[12] . . . is adequate to conclude that use of [this method] is not scientifically controversial in terms of expected effects." AR3663. "There is no indication in the available scientific literature that would suggest that the inclusion of some gelded wild horses in a wild horse herd would prevent the formation of social bands, by those geldings and/or by other horses. There is no statute or regulation that requires BLM to perform or wait for the results of any study before it utilizes a particular population control method." AR3664. In support of this, BLM references Appendix XII. Id. That appendix, however, barely discusses the impacts of re-introducing geldings into wild herds, stating that how geld males would interact with intact stallions and mares is "unknown." AR3626. And:

---

[12] There is no such long historical use of using gelding in wild herds. BLM states that it has only re-introduced geldings into HMA populations on 3 occasions – in 2011, 2012, and 2016. AR3511.

1
2

. . . it is not clear how the behaviors of geldings would change, how quickly any change would occur after surgery, or exactly what effect gelding an adult stallion and releasing him back in to a wild horse population would have on his behavior and that of the wider population. These can be <u>hypothesized</u> from the limited existing literature. . . .

3
4
5
6

Wild horses are rarely gelded and released back into the wild, resulting in few studies that have investigated their behavior in free-roaming populations. . . . These few studies may not reflect behavior of free-roaming wild horses in the western US . . . Additionally, no study exists on the behavior of wild stallions pre- and post-castration, and what effects this would have on their group membership, home range, and habitat use.

7

AR3628-3629.

8
9
10
11

This "review" of impacts associated with gelding clearly is inadequate. Preparation of an EIS is required where impacts are "highly uncertain or involve unique or unknown risks." *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 732, quoting *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998).

12

**V.    Conclusion**

13
14
15
16
17
18
19
20
21

Defendants have violated the mandates of the WHA and implementing regulations, as well as those in NEPA. The former establishes a robust system for considering population management choices, requiring gathers to consider objectives in both LUPs and HMAPs. By doing so, the public is allowed a meaningful opportunity to participate in the scope and substance of management activities. And, BLM is provided both short- and long-term objectives that take into account a broad range of issues relevant to herd and range health, supporting the recognition that wild horses must be protected as an integral part of the natural system of the public lands. Without HMAPs, gather decisions are made in a vacuum that allows BLM to pick and choose how objectives are created and what factors are relevant.

22
23
24
25
26
27

Even if HMAPs were not mandatory, the Pancake Gather-EA fails to comport with the WHA's requirement that all management activities occur at the minimum level feasible. For that requirement to mean anything, BLM must, at a minimum, taken into account all of the factors that affect the health of horses in their HMAs (such as the impact of livestock grazing). This conclusion is further supported by the requirements of NEPA, which BLM has not met insofar as

28

it ignored key issues, refused to consider important data, and failed to provide the basis for its conclusions.

Plaintiffs therefore request that their motion for summary judgment be granted.

DATED: August 10, 2023                    Respectfully Submitted,

*s/ Danielle M. Holt*
Danielle M. Holt
(Nevada Bar No. 13152)
DE CASTROVERDE LAW GROUP
1149 S Maryland Pkwy
Las Vegas, NV 89104
(702) 222-9999
danielle@decastroverdelaw.com

*s/ Jessica L. Blome*
Jessica L. Blome
(Cal. Bar No. 314898, pro hac vice)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94707
(510) 900-9502
jblome@greenfirelaw.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 10, 2023, I electronically filed the foregoing Notice of Motion for Summary Judgment and Memorandum of Points and Authorities in Support Thereof along with Standing Declarations in Support of Motion for Summary Judgment for Leigh, Beckstead, Edwards and Kalimian with the Clerk of the U.S. District Court in the District Court of Nevada using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.

*/s/ Jessica L. Blome*
Attorney for Plaintiffs

DANIELLE M. HOLT
(Nevada Bar No. 13152)
DE CASTROVERDE LAW GROUP
1149 S Maryland Pkwy
Las Vegas, NV 89104
Ph (702) 222-999
Fax (702) 383-8741
danielle@decastroverdelaw.com

JESSICA L. BLOME
(Cal. Bar No. 314898, admitted pro hac vice)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 947073
(510) 900-9502
jblome@greenfirelaw.com


*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| ANIMAL WELLNESS ACTION, a non-profit corporation, CANA FOUNDATION, a non-profit corporation, LAURA LEIGH, individually, and WILD HORSE EDUCATION, a non-profit corporation, | CASE NO. 3:22-cv-00034 |
| Plaintiffs, | **DECLARATION OF LAURA LEIGH INDIVIDUALLY AND ON BEHALF OF WILD HORSE EDUCATION** |
| v. | |
| UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and JON RABY, Nevada State Director of the Bureau of Land Management, | |
| Defendants. | |

I, Laura Leigh, declare as follows:

1.    The facts contained in this declaration are known personally to me and, if called as a witness, I could and would testify competently thereto under oath.

2.    I am a resident of the state of Nevada.

3.    I am the current President and founder of the non-profit organization Wild Horse Education (WHE), which has its principal place of business at 216 Lemmon Drive, # 316, Reno, N.V., 89506. In addition, I am also an active member and supporter of WHE.

4.    WHE is a national nonprofit corporation dedicated to research, journalism, and public education concerning the activities and operations of federal and state management of the free roaming horse and wild burro populations.

5.    The mission of WHE is to protect and preserve wild horses and burros on range, during and after capture. WHE works to do so in multiple ways. First, WHE provides information and education to the public about the current situation with American wild horses and burros and the issues surrounding public land management and wild horses. In this, WHE aims to remove the curtain that veils governmental activities against wild horses from the public eye in order to advance wild horse advocacy and support. Second, WHE also aims to facilitate public awareness and participation in wild horse issues, such as in comments on proposed agency actions. Third, WHE also advocates for the creation of a sane, scientifically-based management strategy for these animals in the wild. Fourth, WHE promotes public adoptions of formerly wild horses and supports those who adopt them for rescue and sanctuary.

6.    WHE frequently submits comments on Herd Management Area Plans, Environmental Assessments, and other wild horse management documents and hearings made available for public comment.

7.    WHE has more than 300,000 members and followers, with the majority of that number being individuals across the United States, and educates and informs these members and the American public about wild horses and burros through articles,

photographs, videos, and sharing data and other information. WHE's members and supporters regularly attend and observe wild horse and burro roundups, removals, and holding pens.

8.      WHE has previously held Board meetings and outreach sessions in the Pancake Complex. Advocating for the wild horses in the Pancake Complex is a past, present, and future important issue for myself, for WHE, and for our members.

9.      It is WHE's standard practice to send trained members of WHE to observe wild horse gathers conducted by the Bureau of Land Management (BLM) throughout the United States. When observing gather operations, our members document the events by filming the operations on video, capturing photographs, and writing written reports from the area designated by BLM for public observers.

10.     It is also WHE's standard practice to make documentation of the wild horse gathers and range data available to the public and to use this documentation to show and support any concerns we have directly to the BLM.

11.     From their years of visiting, viewing, observing, and documenting wild horses, many of WHE's members form strong bonds with the wild horses. Because of this, it is often very emotional for them to observe the wild horses being gathered and captured from their homes on the range at these gather operations. Both I and WHE's members experience great sadness when we observe horses we have visited, observed, enjoyed, and known in the past, be rounded up and lose their freedom. It is also very difficult for I and our members to witness gathers in which the horses appear to be injured or in distress, or in which horses are euthanized during the gather operation. This is especially true when our members know the individual horse or horses in question from time spent visiting, viewing, and enjoying them in their wild.

12.     I have devoted my energy to the pursuit of gaining protections for our wild horses and burros over all other interests.

13.     For example, I lived out of my vehicle for six years and literally called the open

range my home. I often slept on the range with the wild horses, including the wild horses of the Pancake Complex.

14.     I am a freelance photojournalist, whose work has appeared internationally in media broadcast outlets, such as CNN, BBC/ITV, ABC, Common Dreams, and CounterPunch. Over the past twelve years, I have visited, observed, enjoyed, and photographed the wild horses at the Pancake Complex so many times, that I have formed unique and special relationships with individual horses that I have named and monitored throughout the years. I experience great joy from watching young foals born in the Pancake Complex become curious and strong adult horses who then create their own families. I intend to continue to visit, observe, enjoy, and photograph the wild horses of the Pancake Complex in the future.

15.     I have grave concerns that the past, present, and future BLM actions with regards to the Pancake Complex horses will adversely affect my ability to recreate and enjoy, such as through visiting, observing, and photographing, the wild horses of these herds in the future.

**Comments Submitted by WHE and by Me Individually**

16.     I am aware that the BLM failed to create a Herd Management Area Plan (HMAP) for the Pancake Complex, as required by law.

17.     Had an HMAP been created for the Pancake Complex, I would have submitted comments during the appropriate scoping period.

18.     On November 23, 2021, on behalf of both myself and WHE, I submitted comments on the preliminary Pancake Complex Gather Plan Environmental Assessment (the Gather EA).

19.     These comments argued that the Gather EA failed to identify or create a management plan, which would have been done in an HMAP. In the Gather EA, the BLM cited numbers that were used in a land use plan decades ago. The BLM failed to identify or explain how the BLM arrived at these numbers and, in turn, how the BLM arrived at

its goals and objectives for the gather. I and WHE were injured by the lack and unavailability of information that would have been present in an HMAP.

20.     Proving this point, every time I and WHE commented on the Gather EA regarding subject matter that would have been considered during the development of an HMAP, the BLM responded by advising us that our comments were outside the scope of the Gather EA, which addressed environmental impacts only.

21.     For example, though BLM has authority under the Wild Horse Act to close public lands to livestock grazing if necessary to protect wild horses (43 C.F.R. § 4710.5), when WHE and Marie Milliman, a representative of Wild Horse Education, commented on the Draft Gather EA regarding the impact of livestock grazing on wild horse habitat, the BLM responded that "[l]ivestock permits and their associated administrative management is [sic] outside the scope of this document." Gather EA at p. 183.

22.     Had the BLM prepared an HMAP for the Pancake Complex, however, I and WHE would have been able to raise my raise my concerns about the Pancake Complex's early foaling season, the dangerous weather conditions, and other critical habitat and genetic composition concerns in the appropriate forum.

23.     Had the BLM prepared an HMAP for the Pancake Complex, my and WHE's concerns as described above would have been able to undergo consideration.

24.     Had the BLM prepared an HMAP for the Pancake Complex, I and WHE would have gained information available through said HMAP and been able to use said information to further our advocacy mission; namely, to spread information and awareness to the public regarding wild horse and public lands issues.

25.     The lack of information that an HMAP provides caused WHE to divert our resources and expend resources we otherwise would not have had to expend, in order to attempt to gather information ourselves.

26.     On May 5, 2021, the Bureau of Land Management released the Final Environmental Assessment, the Decision Record, and the Finding of No Significant

Impact (FONSI) for the Pancake Complex Wild Horse Gather (DOI-BLM-NV-L060-2021-0005-EA).

27.     On June 2, 2021, on behalf of both myself and WHE, I appealed the BLM's decision approving the Pancake Complex Gather Plan Environmental Assessment. I also included a petition for an order staying the decision. I filed these with the United States Interior Board of Land Appeals (IBLA).

28.     On July 7, 2021, the petition for stay was denied by IBLA.

29.     On January 6, 2022, on behalf of both myself and WHE, I filed a Motion to Reconsider the Stay Petition for the Pancake Complex Wild Horse Gather Plan Environmental Assessment.

30.     On January 6, 2022, and without any prior notice to the public, myself, or WHE, the BLM issued a press release announcing its plan to begin the FY2022 Pancake Complex Wild Horse Gather on or around January 10, 2022, pursuant to the Pancake Complex Gather Plan Environmental Assessment.

31.     On January 10, 2022, I filed an Amended Motion to Reconsider the Stay Due to New Circumstances. This motion was denied on January 14, 2022.

32.     The gather ultimately began on January 11, 2022.

**The 2022 Pancake Complex Wild Horse Gather**

33.     In keeping with WHE's standard practice, WHE sent members to observe and document the 2022 Pancake Complex gather ("the Gather"). Members filmed videos, captured photographs and footage, and wrote reports about their observations at the Gather.

34.     As is standard practice at WHE, I was given access to the videos, photographs, and written reports as soon as possible.

35.     I watched, viewed, and read every file that was uploaded by WHE's members, and I also discussed specific events or observations with members on the phone.

*The January 11, 2022 Incident Involving a Young Colt*

36.     On the very first day of the Gather operations, January 11, 2022, a member filmed a long video documenting a colt falling behind a herd of horses being pursued by helicopter, followed by his leg breaking and personnel roping him and loading him onto a trailer to be brought off the range for euthanasia.

37.     From this video, I have cropped together two separate and shorter videos.

38.     The first video shows the colt limping and his leg breaking while he is left alone on the range. The video is 1 minute and 4 seconds long. The video is available at https://videos.files.wordpress.com/PQ5gHNOw/pancake_011122_coltleg.mp4.

39.     The second video shows personnel roping the colt, holding him on the ground, and then being driven off the range for euthanasia. This video is 3 minutes and 30 seconds long. This video is available at https://videos.files.wordpress.com/wCFyaYv2/pancake_011122_coltedited_video2.mp4.

40.     In the first video, the colt appears to be limping behind the herd that is being rounded up. Based on my review of member documentation of the Gather and decades of observing other wild horse gathers, it is my opinion that this colt's leg was injured from being pursued by BLM on unsafe and dangerous range conditions caused by the recent weather. In the video, the ground is clearly uneven and there are pockets of snow and/or ice throughout the range. Based on my review of member documentation of the Gather, several horses suffered from injuries due to the ground conditions at the range.

41.     For example, on January 18, 2022, a member took a photograph of their footprints that had formed in the mud the day before on January 17, 2022 and then froze over when the temperatures at night and the early morning dipped. The photograph is an accurate depiction of much of the ground that BLM was pursuing wild horses on during the mornings of the gather. Once the temperature rises in the afternoon, the ground thaws and the mud is deep and slippery on the range. During the Gather, a member even saw a Jeep Wrangler having difficulty driving through the mud.  Based on my experience and knowledge of wild horses and observing BLM gathers, when the ground is like this,

horses have difficulty running from the helicopters without slipping and injuring themselves and other horses. Yet the Gather was never paused or stopped due to unsafe ground conditions.

42.     In the first video, the colt's leg appears to break completely, and he struggles to walk and stand alone on the range while a low-flying helicopter continues to hover over the colt.

43.     Based on the timing of the full video, it took personnel 29 minutes to arrive at the colt's location on the range and rope him.

44.     The second video above shows two personnel on horseback attempting to rope the colt while his broken front leg dangles as if there are no bones in the leg at all. Though the colt has a broken leg and is struggling to walk, he still desperately tries with all his strength to escape capture for several minutes.

45.     At one point during the event on film, one of the personnel on horseback dismounts the horse and strategically places the horse to directly block the public's view of the injured and struggling colt. After several more minutes, and as the colt continues to struggle to escape, the other personnel dismounts their horse and both personnel force the colt onto his side and hold him down.

46.     At this point in the video, a veterinarian walks over to where the two personnel are pinning the colt to the ground. A trailer is then brought to the colt and the colt is driven off the range while standing in the trailer. Based on the BLM's representations both at the Gather and on the public Gather website, it is my understanding that after the colt was driven off the range, the colt was euthanized by gunshot and out of the public's view. BLM has not released how long the colt was alive after breaking his leg and being captured before being euthanized.

47.     The area that this foal was captured is an area I consider to be a personal sanctuary. I used to go there and watch the Pancake Complex's babies being born there. I was even staying in that area in the previous year's (2021's) spring to summer, watching

the new babies being born.

48. It was emotionally and psychologically devastating to me to see horses that I feel I know – and have even witnessed them begin their lives shortly after their birth – die and disappear.

49. When I think of the incident with the young colt, I feel an oppressive despair over the needless catastrophic injury and death of this baby.

50. From the moment this colt's leg snapped onwards, a great deal of disruption occurred to WHE's normal operations. WHE has a small staff and tight resources; the sudden attention, including media attention, on the Pancake Complex caused WHE to divert many of our few resources. Instead of the usual operations of supporting our members in the field, WHE also had to address the media and respond to constant media attention. WHE also struggled to continue to observe in the field once the media arrived at the Pancake Complex.

51. Overall, the Pancake Complex Gather caused WHE to expend an inordinate amount of resources in staff time and attention, and did not gain us any revenue or otherwise valuable resources.

*Other Incidents*

52. On the second day of the Gather operations, January 12, 2022, a member filmed a video documenting BLM personnel repeatedly slamming trailer gates on horses in order to cram them into the trailer. Based on my review of the documentation of the Gather, there have been several other times when BLM had to slam the trailer gates on horses in order to cram them into a trailer. I created a clip of the video that is 2 minutes and 20 seconds long. This video is available at https://videos.files.wordpress.com/xO0uFHX7/ pancake011222_gate.mp4.

53. Also on the second day of the Gather, January 12, 2022, a member filmed a video documenting a herd of horses, made up of several different horse families, being pursued into a trap and then held in a small temporary holding corral. In the cramped corral, the

video shows the wild horses flailing around, pushing and biting each other, and rearing up. This video is available at https://videopress.com/v/zvrsgUdZ.

54.     Based on my review of member documentation of the Gather, decades of observing other wild horse gathers, and my extensive knowledge of these horse families, it is my opinion that because the BLM brought a big herd into the trap and corral, instead of one family at a time, the horses who were already agitated from the roundup and helicopter pursuit, began fighting among the families. Based on my review of member documentation of the Gather, there were several other times when BLM has corralled multiple horse families together and there have been fights and aggression that can lead to injuries and even deaths.

55.     On the sixth day of the Gather operations, January 17, 2022, a member filmed a video documenting a lone mare being pursued by BLM for over an hour. Based on my review of member documentation of the current gather and our decades of observing other wild horse gathers, it is my opinion that this mare was likely resisting capture so fiercely because she had a foal that was still nursing hidden out of site on the vast rangeland. Since the recording of this incident, the BLM did in fact confirmed that she was a "wet mare" which means she was still nursing a foal. Based on my research and knowledge of horses, a newborn foal would die overnight in the present conditions at the Pancake Complex without his or her mother.

56.     Based on member observations and my review of member documentation, we did not observe any young foals brought in during the same run as the mare. We also did not see any foals young enough to justify pursuing this mare for over an hour at dusk.

57.     From member video of the incident, I have cropped together a video that is 2 minutes and 49 seconds long. The video is available at https://videopress.com/v/4PsJFauK.

58.     Though the mare resisted moving with the herd toward BLM's trap, the helicopter found the lone mare and pursued it until personnel on horseback arrived and began

attempting to rope the horse. Throughout the whole video, the mare is seen fighting with all her strength to not be captured.

59.    I have documented and recorded the foaling season at the Pancake Complex for over a decade. Foaling season at the Pancake Complex is earlier than most other wild horse populations and begins in earnest at Pancake by the third week in January.

60.    In total, when the Gather finished on February 14, 2022, BLM officials announced they had removed 2,054 wild horses and released 24 back to the wild.

61.    As a result of the Gather, 26 wild horses died.

62.    The remaining unreleased wild horses – 2,004 in total – were shipped out for adoption or sale, and possibly across national borders, being destined for slaughter for human consumption.

63.    The impact of viewing the above-mentioned videos, photographs, and reading the written reports of these operations caused me great emotional harm and distress and continues to haunt me in the present day.

64.    I consider these wild horses to be my companions and, often, like family, due to the years I spent living on these ranges.

65.    I continue to mourn the loss of the thousands of wild horses. I will be unable to recreate among these horses or enjoy them through observation and photography. I worry that important genetic lineages have been damaged or lost, especially the Medicine Hats, and I will be unable to enjoy the beauty of the unique appearance of these rare wild horses in the future.

66.    I have returned to the Pancake Complex since the 2022 gather. The area used to have some of the most pristine valleys I have ever seen, but they are no longer pristine and beautiful. The wild horses have fragmented: while I used to see fifty or more horses there in a group, now I only see a few or several. I feel that the soul has been removed from the place, and what remains are only ghosts.

67.    Lastly, because the BLM denied WHE's access to observe and document the

conditions gathered horses in short-term holding facilities in Utah, WHE was unable to fulfill our organizational mission to assist and facilitate the adoption of these wild horses. Several potential adopters were awaiting to learn whether WHE was able to secure placement of horses to go to these adopters for the horses' long-term care and humane treatment. WHE was looking for dozens of horses; however, WHE was unable to many of the horses we aimed to rescue and adopt, because by the time WHE was permitted into this facility, the horses had already been shipped out and were gone.

68.     Ultimately, WHE was only able to rescue three Medicine Hat horses, who were adopted out for long-term care and humane treatment.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this  8th  day of August, 2023.

_____
Laura Leigh

DANIELLE M. HOLT
(Nevada Bar No. 13152)
DE CASTROVERDE LAW GROUP
1149 S Maryland Pkwy
Las Vegas, NV 89104
Ph (702) 222-999
Fax (702) 383-8741
danielle@decastroverdelaw.com

JESSICA L. BLOME
(Cal. Bar No. 314898, admitted pro hac vice)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| ANIMAL WELLNESS ACTION, a non-profit corporation, CANA FOUNDATION, a non-profit corporation, LAURA LEIGH, individually, and WILD HORSE EDUCATION, a non-profit corporation,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and JON RABY, Nevada State Director of the Bureau of Land Management,<br><br>Defendants. | CASE NO. 3:22-cv-00034<br><br>**DECLARATION OF SCOTT BECKSTEAD ON BEHALF OF THE CENTER FOR A HUMANE ECONOMY** |

I, Scott Beckstead, declare as follows:

1.      The facts contained in this declaration are known personally to me and, if called as a witness, I could and would testify competently thereto under oath.

2.      I am a resident of the state of Oregon.

3.      I am the current Director of Campaigns of the non-profit organization the Center for a Humane Economy (the Center), which has its principal place of business at 611 Pennsylvania Ave., S.E. #136, Washington, D.C.  20003. The first organization of its kind in the animal protection movement, the Center's mission is to forge a more humane economy for animals. The Center does so by influencing the conduct of corporations and industries through means including corporate engagement, advocacy campaigns, consumer education, litigation, and research and analysis of business practices and government policy.

4.      The Center supports policies, laws, and regulations that improve the welfare of animals in captivity and in the wild. The Center believes that wild horse welfare and survival are inextricably linked with commercial livestock ranching, and for this reason, the plight of American wild horses does, indeed, implicate the American economy and the commercial livestock industry. The Center engages regularly on horse protection efforts, including promoting responsible policies in wild horse management and fighting for federal safeguards under the Wild Free-Roaming Horses and Burros Act.

5.      In my position as Director of Campaigns of the Center – including our wild horse campaign – I regularly and frequently submit comments on behalf of the Center on Herd Management Area Plans, Environmental Assessments, and other wild horse management documents and hearings made available for public comment.

6.      If a Herd Management Area Plan (HMAP) for the Pancake Complex had been drafted and made available for comment, I would have submitted comments on behalf of the Center during the appropriate scoping period.

7.      My comments to such HMAP would have argued that excessive livestock grazing, rather than wild horses, is a significant reason why a majority of BLM land does not meet its own land health standards, and that any Pancake Complex HMAP should consider and

invoke, if necessary, the BLM's authority under the Wild Horse Act to close public lands to livestock grazing when necessary to protect wild horses (43 C.F.R. § 4710.5).

8.    The inability to argue and advocate that the BLM should, instead of reducing wild horse numbers, close land to commercial livestock grazing, served to frustrate CHE's mission to promote a more humane economy and more humane industries, including that of the American livestock industry.

9.    The Center has tens of thousands of supporters across the United States, including in Nevada. The Center educates and informs our supporters and followers across America about wild horses and burros through articles, photographs, videos, and sharing data and other information.

10.    I and many of our members are American people whose lives are enriched by having wild free-roaming horses treated as an integral part of the natural system of the public lands. This treatment is predicated upon all management activities being conducted at the minimal feasible level.

11.    As a staff member and supporter of the Center, I have also been injured myself by the BLM's actions as alleged in the complaint.

12.    I was born and raised with horses on a farm in Twin Falls, Idaho. As a child, horses were my favorite animal (and continue to be so today). My earliest memories are of being in the saddle with my father on one of our family's horses. I even started studying and reading about wild horses from a young age: I would look up entries on horses in encyclopedias and read children's literature about wild horses.

13.    I began to formally work on wild horse policy issues around 2008. For over a decade, I have engaged with the media regarding wild horse-related topics. I have given interviews and written opinion pieces on wild horse issues. I also work to bring attention to misinformation and disinformation, much of which I believe comes directly from the BLM, on wild horses in the media.

14.    In 2008, I also began studying photography of wild horses and following wild horse photographers. I enjoy photography of wild horses in their native habitats a great deal and

find the photographs not only beautiful but also emotionally moving and inspiring. I began to share selected works from wild horse photographers on a daily or semi-daily basis on social media.

15.     My love of and fascination with wild horses also inspired the creation of "Wild Horse Wednesday," which is my weekly series in which I provide up-to-date news about the most pressing or relevant wild horse issue of that week.

16.     Because of my sharing and promotion of wild horse photography and the Wild Horse Wednesday series, I have amassed a social media following of up to 12,000 followers, most of which are primarily interested in my coverage of wild horse issues. I am active on Facebook, Instagram, TikTok, and Twitter and use those platforms to share my appreciation of the beauty, power, and personality of wild horses, as well as advocate for their welfare and continuing survival.

17.     I have also been involved in the rescue of wild mustangs and burros from kill pens to safety in sanctuaries.

18.     I have also traveled extensively across the American West to visit, observe, enjoy, and photograph wild horses myself, particularly the wild horses of the Onaqui HMA in Utah.

19.     Because of my love of wild horse photography, my work on Wild Horse Wednesdays, and my own travels and in-person observation and photography of wild horses, I have become familiar with a great many individual wild horses across the West of the United States. This includes the horses of the Pancake Complex, though I have never visited the Pancake horses in person.

20.     Though I have not yet visited the Pancake horses in person, I hope and plan to do so in the future. I have grave concerns that the past, present, and future BLM actions with regards to the Pancake herds will impact my ability to recreate and enjoy, through observation and photography, the wild horses of these herds in the future.

21.     In fact, I will be driving through central Nevada in September 2023 and I plan to try to locate wild horses along the way in order to observe and enjoy them, including horses of the Pancake Complex.

22. One of the photographers whose work I follow is Laura Leigh. I have shared her photographs of the Pancake Complex horses with my many social media followers and viewers. Her photography of the Pancake Complex horses included very striking cremello ("cremello" refers to the striking, pale cream-colored coat and blue eyes of a small minority of horses) horses whom I particularly enjoyed viewing.

23. During the Pancake Complex gather in January to February of 2022 (the 2022 Gather), I recall seeing footage and images shared by Laura Leigh of Wild Horse Education. I particularly remember viewing footage of a foal that broke its leg. I have seen disturbing and sad imagery and video of injured and distressed wild horses before, but this instance was particularly egregious to me because, firstly, it involved a baby, and secondly, even though the baby was initially trying to flee on its three working legs, it finally stopped – in what seemed to me like hopeless and fearful despair – and helplessly awaited the BLM truck's arrival and what I felt was its untimely and unjust death.

24. These images of the baby foal caused me a great deal of psychological and emotional anguish. Indeed, this same baby foal was later specifically mentioned in the opening passages of H.R. 3656, the Wild Horse and Burro Protection Act of 2023 – a fact that speaks to the unusually cruel and disturbing nature of this particular incident and its imagery.

//
//
//
//
//
//
//
//
//
//
//
//

25.     The 2022 Gather also caused me anguish and sadness due to the apparent disappearance of a particular cremello stallion in one of the Pancake herds. Before the Gather, I had followed and enjoyed viewing the activities and beauty of this uniquely colored stallion through Laura Leigh's photography; after the Gather, I never saw him again. I felt this loss acutely and personally. I felt as if I had lost an individual I had known, in a way. I will never again enjoy the unique aesthetic impact of this particular cremello stallion, or, for that matter, many of the other individual horses within the Pancake Complex herds I had come to know, enjoy, and love.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 9th day of August, 2023.

/S/Scott Beckstead
Scott Beckstead

DANIELLE M. HOLT
(Nevada Bar No. 13152)
DE CASTROVERDE LAW GROUP
1149 S Maryland Pkwy
Las Vegas, NV 89104
Ph (702) 222-999
Fax (702) 383-8741
danielle@decastroverdelaw.com

JESSICA L. BLOME
(Cal. Bar No. 314898, pro hac vice)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

|  |  |
|---|---|
| ANIMAL WELLNESS ACTION, a non-profit corporation, CANA FOUNDATION, a non-profit corporation, LAURA LEIGH, individually, and WILD HORSE EDUCATION, a non-profit corporation, | CASE NO. 3:22-cv-00034 |
| Plaintiffs, | **DECLARATION OF SCOTT EDWARDS ON BEHALF OF ANIMAL WELLNESS ACTION** |
| v. | |
| UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and JON RABY, Nevada State Director of the Bureau of Land Management, | |
| Defendants. | |

I, Scott Edwards, declare as follows:

1. The facts contained in this declaration are known personally to me and, if called as a witness, I could and would testify competently thereto under oath.

2. I am a resident of the state of New York.

3. I am the General Counsel of the non-profit 501(c)(4) organization Animal Wellness Action (AWA), which has its principal place of business at 611 Pennsylvania Ave., S.E. #136, Washington, D.C. 20003. AWA is a 501(c)(4) national nonprofit organization with the mission of promoting animal welfare by advocating for the passage and enforcement of laws, regulations, and policies that protect animals. AWA maintains 135,000 supporters across America, with several thousand in Nevada. I and many of our members are American people whose lives are enriched by having wild free-roaming horses treated as an integral part of the natural system of the public lands. This treatment is predicated upon all management activities being conducted at the minimal feasible level.

4. AWA is actively engaged on multiple issues involving wild horses. These include ending horse slaughter (in which both tame and wild horses are shipped across international borders killed for human consumption), keeping wild horses and burros in their natural habitats, and creating a program by which retired American veterans are deployed to apply humane fertility control strategies to limit reproduction of wild horses.

5. AWA has been directly injured by the actions of the defendants because it has diverted significant organizational resources to identify, remedy and counteract unlawful and improper actions related to wild horse roundups, including the types of activities that are alleged in the current litigation.

6. To those ends, AWA has been instrumental in the introduction of the following pieces of legislation in Congress:

    a. The Save America's Forgotten Equines (SAFE) Act, to prevent the transport of horses across American borders for slaughter for human consumption;

    b. The Veterans for Mustangs Act (VMA), which would help better protect American wild horses and burros on federal lands by implementing appropriate

and safe fertility control methods while providing avenues for healing American veterans with post-traumatic stress and other disorders resulting from combat.

7.     AWA also conceived of the 2021 Investing in a New Vision for the Environment and Surface Transportation in America (INVEST) Act, to ban the transport of equines across state lines or to Canada or Mexico for slaughter for human consumption.

8.     AWA has also lobbied extensively for the passage of the above-mentioned federal bills, as well as the Wild Horse and Burro Protection Act of 2023 (H.R. 3656; to end the use of helicopters in round-ups).

9.     Members and staff of AWA have also submitted over 330 combined pages of testimony to the United States Congress in support of the SAFE Act and an anti-horse soring bill.

10.     In the past, AWA has also offered rewards for information leading to the identification, arrest and conviction of the person or persons responsible for illegally shooting and killing wild horses; for example, AWA offered a reward of up to $5,000.00 for information regarding the shooting of 15 wild horses and serious injuring at least four others in the Apache-Sitgreaves National Forest near Alpine, Arizona, on or about Monday, October 3, 2022. In July 2023, AWA also offered a reward of up to $38,500.00 for information regarding the shooting deaths of two beloved Onaqui stallions in the west desert of Utah.

11.     AWA has also submitted comments on various Herd Management Area Plans (HMAPs) in the past and plans to continue to do so in the future.

12.     Despite 43 C.F.R. § 4710.4 requiring that the BLM prepare HMAPs for HMAs, the BLM failed to prepare an HMAP for the Pancake Complex.

13.     If the BLM had prepared and published an HMAP for the Pancake Complex, AWA would have submitted comments during the appropriate public commenting period.

14.     Like previous AWA comments on HMAPs, our comments would have addressed concerns about the cruelty and inhumane nature of BLM round-ups, the need to reduce excessive livestock grazing rather than reducing the number of wild horses when land suffers degradation, and argued for the use of safe, reversible PZP for fertility control if and when population management becomes necessary.

Page 3 of 4

15. AWA has also been directly injured because of its inability to submit comments on a Pancake Complex HMAP and otherwise take steps to force an end to the illegal round up activities alleged herein; thereby frustrating, impairing and thwarting our organizational mission to protect animals and ensure animals' welfare. AWA was unable to tell its many members and supporters, many of whom are American people invested in the fight to protect American wild horses, that AWA submitted a comment and engaged in the regulatory process with regards to the Pancake Complex HMAP.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 9th day of August, 2023.

_____
Scott Edwards

Page 4 of 4

DANIELLE M. HOLT
(Nevada Bar No. 13152)
DE CASTROVERDE LAW GROUP
1149 S Maryland Pkwy
Las Vegas, NV 89104
Ph (702) 222-999
Fax (702) 383-8741
danielle@decastroverdelaw.com

JESSICA L. BLOME
(Cal. Bar No. 314898, admitted pro hac vice)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| ANIMAL WELLNESS ACTION, a non-profit corporation, CANA FOUNDATION, a non-profit corporation, LAURA LEIGH, individually, and WILD HORSE EDUCATION, a non-profit corporation,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and JON RABY, Nevada State Director of the Bureau of Land Management,<br><br>Defendants. | CASE NO. 3:22-cv-00034<br><br>**DECLARATION OF MANDA KALIMIAN ON BEHALF OF THE CANA FOUNDATION** |

1    I, Manda Kalimian, declare as follows:

2        1.    The facts contained in this declaration are known personally to me and, if called

3    as a witness, I could and would testify competently thereto under oath.

4        2.    I am a resident of New York.

5        3.    I am the CEO and founder of the non-profit organization the CANA Foundation

6    (CANA), which has its principal place of business at 6150 Northern Boulevard, East Norwich,

7    N.Y., 11732. I have been authorized to make this declaration on behalf of CANA.

8        4.    CANA is a non-profit corporation whose mission is conserve and restore the

9    North American landscape by creating sustainable environmental ecosystems through restoring

10    and preserving biodiversity and native species (also known as "rewilding"); in particular,

11    CANA's focus is on the reintroduction and continuing survival of wild horses as a keystone

12    species within their ecosystems. CANA believes that reintroducing and sustaining wild horses in

13    their historic habitats can improve the overall health and vitality of North American grasslands.

14    CANA's initiatives to achieve this mission foster community empowerment, land conservation,

15    and the sustainable management and preservation of America's wild horse populations.

16        5.    In particular, the Pancake Complex is one of the wild horse herds that CANA

17    Foundation monitors and advocates for.

18        6.    CANA Foundation also rescues and rehomes, including by reintroduction into

19    private wild spaces, wild horses in order to improve their quality of life and ensure that they can

20    live with dignity in protected habitats.

21        7.    CANA aided in the rescue of three "Medicine Hat" (horses with specific markings

22    on their heads, believed by Native tribes to have magical or mystical protective abilities) wild

23    horses from the 2022 Pancake Complex gather, who were reunited as family in North Dakota.

24        8.    CANA Foundation actively monitors for any Herd Management Area Plans

25    (HMAPs) that are available for public comment in the United States and routinely submits

26    comments throughout the public commenting process.

27        9.    I am aware that an HMAP was never prepared for the Pancake Complex, as

28    required by law.

10. Had an HMAP had been created for the Pancake Complex, CANA would have submitted comments during the appropriate scoping period. In the comments CANA would have submitted, CANA would have advocated for and advanced rewilding as an alternative management strategy for wild horses and burros.

11. As a result of the BLM's failure to prepare an HMAP and CANA's resulting inability to provide comments on said HMAP, as well as the BLM's refusal to entertain comments it considered outside the scope of its NEPA review that would have been appropriate in the context of an HMAP review, the CANA Foundation's primary organizational mission was thwarted.

12. Another major component of CANA's mission is the advancement of the scientific study of wild horses through genetics and environmental DNA.

13. CANA has funded two groundbreaking environmental DNA (eDNA) research papers from McMaster University. Specifically, eDNA extracted from soil samples has suggested that mammoths and Yukon wild horses survived thousands of years longer than science previously believed. CANA has also funded scientific research that suggests that the wild horses of the United States ought to be considered native species (rather than non-native species that were introduced by the Spanish conquistadors).

14. The gathering and removal of wild horses in the Pancake Complex due to the challenged actions have also adversely affected the scientific interests of CANA and its ability to use scientific evidence to advance its primary mission. For example, CANA's ability to support the scientific study of the Pancake Complex herds' range, the heat dome over the range, and the drought experienced by the range was impacted.

15. For the environmental assessment (EA) for the Pancake Complex gather, the BLM refused to solicit and consider the public's local knowledge of rare genetic lineages present in the Pancake Complex such as Medicine Hat horses, Damale Curly horses, and Frame Overo Paint horses. The BLM likewise refused to solicit and consider evidence of the native status of wild horses, and the well-known harmful impacts of removing native keystone species on habitats.

16. Had the BLM solicited and considered evidence of the above scientific evidence of rare genetics and wild horses' native status, CANA would have offered such evidence.

17. Subsequently, during this gather and previous BLM gathers of this herd, several genetic lines of rare horses were removed from the Complex and not returned. This includes Medicine Hat horses, Damale Curly horses, and Frame Overo Paint horses. The BLM also continued to geld, or castrate, stallions from rare genetic lines of wild horse breeds.

18. The BLM's failure to solicit and consider public comment on rare wild horse genetic lineages in the Pancake Complex, and the subsequent actions by the BLM that may have advanced the permanent extinction of rare genetic wild horse lineages, have thwarted and harmed the ability of CANA to advance scientific inquiry into wild horse genetics. CANA's scientific inquiry serves to advance CANA's primary mission to create and support sustainable ecosystems through robust biodiversity, which includes healthy wild horse genetic pools.

19. In addition, the removal of these wild horses drastically depleted CANA's ability to use these horses' genetics to trace the genetic lineages of American wild horses at large. CANA believes that the United States, as a nation, was built on the back of a horse; to that end, an important aspect of American history is within the genetics of these horses. Some of that American history has now been forever lost.

20. Lastly, CANA also supports the exploration and enjoyment of wild horses through the arts and the use of the arts to advocate for the reintroduction and sustainment of the American wild horse. For example, CANA and 11 [HH] Art Gallery collaborated to bring about the exhibition "Harmonic Rewild" at SCOPE Miami Beach for the 2022 Art Basel Week event. From November 29 through December 4, 2022, approximately 76,000 visitors attended this immersive art experience. The intention of the art piece was to impart to the observers the need for rewilding and the beauty of wild horses and wild spaces.

21. The gathering and removal of wild horses in the Pancake Complex due to the challenged actions have adversely affected the ability of CANA to use the arts to advance its mission. Through the disappearance of thousands of wild horses, and especially the rare wild

horse lineages and types mentioned above, CANA's ability to use the beauty, power, and emotional impact of wild horses in art to advance CANA's mission has been stunted.

22.     As a result of the BLM's contested actions pertaining to the 2022 Pancake Complex gather, CANA was forced to divert resources towards bringing public awareness to the BLM's mismanagement and missteps in the gather. Had CANA not been forced to divert its staff's attention and time to publicizing the Pancake Complex gather, CANA would have been able to use those resources in its educational, scientific, and environmental activities, such as genetic research, support of wild horse academia, and the purchase and creation of sustainable wild lands in which wild horses can safely thrive.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 9th day of August, 2023.

08/09/23

_____
Manda Kalimian

# EXHIBIT 3

TODD KIM, Assistant Attorney General
S. JAY GOVINDAN, Section Chief
BRIDGET K. MCNEIL, Assistant Section Chief
CHRISTIAN H. CARRARA (NJ Bar No. 317732020)
SAMANTHA G. PELTZ (IL Bar No. 6336536)
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section, Natural Resources Section
P.O. Box 7611
Washington, DC 20044
Phone: (202) 598-9736 (Carrara)
Fax: (202) 305-0275
Email: christian.carrara@usdoj.gov

*Attorneys for Federal Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| ANIMAL WELLNESS ACTION, a non-profit corporation, CANA FOUNDATION, a non-profit corporation, THE CENTER FOR A HUMANE ECONOMY, a non-profit corporation LAURA LEIGH, individually, and WILD HORSE EDUCATION, a non-profit corporation, | Case No: 3:22-cv-00034-MMD-CLB |
| *Plaintiffs*, | |
| *v.* | **MEMORANDUM IN SUPPORT OF FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and JON RABY, Nevada State Director of the Bureau of Land Management, | |
| *Defendants*. | |

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................... 1

BACKGROUND ............................................................................ 2

  I. STATUTORY BACKGROUND .................................................. 2

    A. The Wild Free-Roaming Horses and Burros Act ........................... 2

    B. The National Environmental Policy Act ................................... 3

  II. FACTUAL BACKGROUND ..................................................... 4

    A. The Pancake Complex Wild Horse Gather Plan ........................... 4

    B. The 2022 Gather ........................................................... 8

STANDARD OF REVIEW ................................................................ 8

ARGUMENT ............................................................................... 9

  I. Because the 2021 Gather Decision complies with the Wild Horse Act, the Court should grant summary judgment in favor of BLM. ........................... 9

    A. The 2021 Gather Decision and 2022 Gather are consistent with the Wild Horse Act and its regulations. .................................................. 9

    B. Plaintiffs fail to show the Wild Horse Act or its regulations require BLM to prepare an HMAP prior to gathering excess horses. .......................... 11

      a. There is no requirement in the Wild Horse Act that an HMAP be prepared prior to the removal of excess wild horses. .......................... 12

b. There is no requirement in the Wild Horse Act's implementing regulations that an HMAP be prepared prior to the removal of excess wild horses. ............................ 14

C. The Court should reject Plaintiffs' remaining Wild Horse Act arguments. ................ 17

a. Plaintiffs fail to show that BLM unlawfully withheld or unreasonably delayed the creation of an HMAP. ........................................................................................ 17

b. The BLM Wild Horse and Burro Handbook complies with the Wild Horse Act and Plaintiffs' challenges to it fail as a matter of law. ........................................... 20

c. Plaintiffs' argument that they lacked the opportunity to comment on the 2022 Gather Plan without an HMAP lacks merit. ........................................................... 22

II. Because the 2021 Gather Decision complies with NEPA, the Court should grant summary judgment in favor of BLM. ..................................................................... 24

A. BLM's EA complied with NEPA. ........................................................................ 25

B. BLM considered a reasonable range of alternatives. .................................... 25

C. BLM's reliance on well-established AMLs for the 2022 Gather complied with NEPA. ...................................................................................................................28

D. BLM considered the relevant factors when analyzing alternatives. ........................... 29

E. BLM's consideration of impacts of gelding satisfies NEPA. ................................... 30

CONCLUSION .......................................................................................................... 32

## TABLE OF AUTHORITIES

**Case**                                                                                                          **Page**

*Accardi v. Shaughnessy,*
   347 U.S. 260 (1954) .................................................................................. 16

*Am. Horse Prot. Ass'n v. Watt,*
   694 F.2d 1310 (D.C. Cir. 1982) ....................................................... 2, 11, 12, 13

*Am. Horse Prot. Ass'n, Inc. v. Frizzell,*
   403 F. Supp. 1206 (D. Nev. 1975) ............................................................. 11

*Am. Wild Horse Campaign v. Bernhardt,*
   963 F.3d 1001 (9th Cir. 2020) ......................................................... 22, 30, 31

*Am. Wild Horse Campaign v. Zinke,*
   353 F. Supp. 3d 971 (D. Nev. 2018) ........................................................... 31

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council,*
   462 U.S. 87 (1983) ..................................................................................... 8

*Bennett v. Spear,*
   520 U.S. 154 (1997) ............................................................................. 20, 21

*Blake v. Babbitt,*
   837 F. Supp. 458 (D.D.C. 1993) ................................................................. 2

*Cal. Sea Urchin Comm'n v. Bean,*
   828 F.3d 1046 (9th Cir. 2016) .................................................................... 21

*California v. Block,*
   690 F.2d 753 (9th Cir. 1982) ..................................................................... 25

*Citizens to Pres. Overton Park v. Volpe,*
   401 U.S. 402 (1971) ............................................................................. 8, 31

*Cloud Found. v. U.S. Bureau of Land Mgmt.,*
   802 F. Supp. 2d 1192 (D. Nev. 2011) .......................................................... 2

*Cloud Found. v. U.S. Bureau of Land Mgmt.,*
   No. 3:11-CV-00459-HDM, 2013 WL 1249814 (D. Nev. Mar. 26, 2013) ...................... 12, 27

*Colo. Wild Horse & Burro Coal. v. Jewell,*
   130 F. Supp. 3d 205 (D.D.C. 2015) ............................................................ 20

*Ctr. for Cmty. Action & Env't Just. v. BNSF R. Co.*,
  764 F.3d 1019 (9th Cir. 2014) ........................................................................... 14

*Dep't of Transp. v. Pub. Citizen*,
  541 U.S. 752 (2004) ............................................................................................. 3

*Forest Guardians v. Animal & Plant Health Inspection Serv.*,
  309 F.3d 1141 (9th Cir. 2002) ........................................................................... 20

*Friends of Animals v. Bureau of Land Management*,
  Case No: 16-CV-0199, 2017 WL 5247929, *8 (D. Wyo. Mar. 20, 2017) ........................... 28

*Friends of Animals v. Culver*,
  610 F. Supp. 3d 157 (D.D.C. 2022) ................................................................... 31

*Friends of Animals v. Pendley*,
  523 F. Supp. 3d 39 (D.D.C. 2021) ..................................................................... 9

*Friends of Animals v. Silvey*,
  353 F. Supp. 3d 991 (D. Nev. 2018) ..................................................... 12, 27, 31

*Friends of Animals v. United States Bureau of Land Mgmt.*,
  548 F. Supp. 3d 39 (D.D.C. 2021) ........................................................... 9, 10, 15

*Grunewald v. Jarvis*,
  776 F.3d 893 (D.C. Cir. 2015) ........................................................................... 28

*Headwaters, Inc. v. BLM*,
  914 F.2d 1174 (9th Cir. 1990) ........................................................................... 25

*In Defense of Animals v. U.S. Dep't of Interior*,
  751 F.3d 1054 (9th Cir. 2014) .................................................................... passim

*In Def. of Animals v. U.S. Dep't of Interior*,
  909 F. Supp. 2d 1178 (E.D. Cal. 2012) .......................................................... 2, 13

*In re A Cmty. Voice*,
  878 F.3d 779 (9th Cir. 2017) ...................................................................... 18, 19

*Kern v. U.S. Bureau of Land Mgmt.*,
  284 F.3d 1062 (9th Cir. 2002) ............................................................................. 3

*Kisor v. Wilkie*,
  139 S. Ct. 2400 (2019) ...................................................................................... 16

*Kleppe v. Sierra Club*,
   427 U.S. 390 (1976) ............................................................................. 8

*Laguna Greenbelt, Inc. v. U.S. Dep't. of Transp.*,
   42 F.3d 517 (9th Cir. 1994) ............................................................... 26

*Lands Council v. McNair*,
   537 F.3d 981 (9th Cir. 2008) ............................................................... 8

*Marsh v. Or. Nat. Res. Council*,
   490 U.S. 360 (1989) ................................................................. 8, 29, 30

*Mining Co. v. Babbitt*,
   105 F.3d 502 (9th Cir. 1997) ................................................. 17, 18, 19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................................................. 8

*Native Ecosystems Council v. U.S. Forest Serv.*,
   866 F. Supp. 2d 1209 (D. Idaho 2012) .............................................. 3

*Native Ecosystems Council v. U.S. Forest Serv.*,
   428 F.3d 1233 (9th Cir. 2005) ...................................................... 4, 25

*North Slope Borough v. Andrus*,
   642 F.2d 589 (D.C. Cir. 1980) ..................................................... 24, 28

*Norton v. Southern Utah Wilderness Alliance*,
   542 U.S. 55 (2004) ...................................................................... 17, 18

*R.T. Vanderbilt Co. v. Babbitt*,
   113 F.3d 1061 (9th Cir. 1997) ......................................................... 17

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) ................................................................. 3, 4, 24

*Rojas v. Sea World Parks & Ent., Inc.*,
   538 F. Supp. 3d 1008 (S.D. Cal. 2021) ............................................ 15

*Schweiker v. Hansen*,
   450 U.S. 785 (1981) ......................................................................... 21

*Service v. Dulles*,
   354 U.S. 363 (1957) ......................................................................... 16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Sierra Club v. FERC*,
   867 F.3d 1357 (D.C. Cir. 2017) .................................................. 24

*Telecommunications Research and Action Center v. F.C.C.*,
   750 F.2d 70 (D.C. Cir. 1984) ................................................ 18, 19

*Tri-Valley CAREs v. U.S. Dep't of Energy*,
   671 F.3d 1113 (9th Cir. 2012) ............................................. 24, 25

*U.S. Nat'l Bank of Or. v. Indep. Ins. Agents*,
   508 U.S. 439 (1993) ............................................................... 14

*Vaz v. Neal*,
   33 F.4th 1131 (9th Cir. 2022) ................................................... 17

*Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*,
   435 U.S. 519 (1978) ............................................................... 28

*W. Radio Servs. Co. v. Espy*,
   79 F.3d 896 (9th Cir. 1996) ................................................. 20, 21

*W. Rangeland Conservation Ass'n v. Zinke*,
   265 F. Supp. 3d 1267 (D. Utah 2017) ........................................... 3

*W. Watersheds Proj. v. Abbey*,
   719 F.3d 1035 (9th Cir. 2013) ................................................... 27

*Westlands Water Dist. v. U.S. Dep't of Interior*,
   376 F.3d 853 (9th Cir. 2004) ................................................... 25

*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*,
   5 F.4th 997 (9th Cir. 2021) ..................................................... 20

**Statutes**

5 U.S.C. § 706(1) ........................................................ 16, 17, 18, 21

5 U.S.C. § 706(2)(A) ............................................................... 8

5 U.S.C. § 706(2)(C) .............................................................. 21

16 U.S.C. § 1331 .................................................................. 1

16 U.S.C. § 1332(a) ............................................................... 1

16 U.S.C. § 1333 ................................................................. 11

16 U.S.C. § 1333(a) ............................................................................................ 2

16 U.S.C. § 1333(b)(1) ................................................................................. 3, 22

16 U.S.C. § 1333(b)(2) ...................................................................... 3, 9, 11, 12

28 U.S.C. § 2401(a) ......................................................................................... 21

42 U.S.C. § 4332(C) .......................................................................................... 3

**Regulations**

40 C.F.R. § 1501.3 .............................................................................................. 3

40 C.F.R. § 1501.4 .......................................................................................... 3, 4

40 C.F.R. § 1508.9(a) ........................................................................................ 3

40 C.F.R. § 1508.9(a)(1) .................................................................................... 3

40 C.F.R. § 1508.9(b) ........................................................................................ 3

40 C.F.R. § 1508.13 ........................................................................................... 4

43 C.F.R. § 4180 ................................................................................................ 6

43 C.F.R. § 4710.3-1 ................................................................................. passim

43 C.F.R. § 4710.4 ................................................................................. 10, 13, 14

43 C.F.R. § 4720.1 ............................................................................................. 9

**MOTION**

Federal Defendants move, under Federal Rule of Civil Procedure 56, for summary judgment, against Plaintiffs on each of their claims for relief under the Administrative Procedure Act, 5 U.S.C. §§ 701-706, the Mandamus and Venue Act, 28 U.S.C. § 1361, the Wild and Free Roaming Horses and Burros Act, 16 U.S.C. §§ 1331-1340, and the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370m-11. The grounds for this motion are set forth in detail in the memorandum submitted herewith. Accordingly, Federal Defendants request that the Court deny Plaintiffs' motion for summary judgment, ECF No. 64, grant Federal Defendants' motion for summary judgment, and enter judgment for Federal Defendants on all claims.

**MEMORANDUM IN SUPPORT OF FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiffs challenge the Bureau of Land Management's ("BLM") decision to address the severe wild horse overpopulation issue on the Pancake Complex in central eastern Nevada through gather and removal management actions. BLM determined there were over three times as many horses as the Pancake Complex can sustainably support, resulting in insufficient forage and water for wild horses, among other ecological imbalances. Consequently, annual emergency gathers have been required to prevent individual animals from suffering or dying. The Wild Free-Roaming Horses and Burros Act ("Wild Horse Act") requires BLM to remove wild horses and burros from a given area of the public lands when an overpopulation exists. And so, after considering public comments and alternatives, BLM reasonably chose to remove excess wild horses from the Pancake Complex to achieve the appropriate management level ("AML") and to maintain a thriving natural ecological balance. Plaintiffs may disagree with this decision, but that does not make BLM's decision arbitrary and capricious. BLM complied with the Wild Horse Act and National Environmental Policy Act ("NEPA") in applying the expertise of its specialists and appropriately exercised its discretion to manage the herd

management areas ("HMAs") within the Pancake Complex by removing excess horses. Federal Defendants therefore request that the Court deny Plaintiffs' Motion for Summary Judgment, grant this Cross-Motion for Summary Judgment, and uphold the challenged decision.

## BACKGROUND

### I. STATUTORY BACKGROUND

#### A. The Wild Free-Roaming Horses and Burros Act

In 1971, Congress passed the Wild Horse Act, 16 U.S.C. §§ 1331-1340, to preserve such animals as "living symbols of the historic and pioneer spirit of the West," and directed the Secretary[1] to provide for their protection and management. 16 U.S.C. § 1331. Within only a few years of the Wild Horse Act's passage, however, the wild horse population had grown dramatically, "and action [was] needed to prevent a successful program from exceeding its goals and causing animal habitat destruction." *Am. Horse Prot. Ass'n v. Watt*, 694 F.2d 1310, 1316 (D.C. Cir. 1982) (quoting H.R. Rep. No. 95-1122, 23 (1978)); *see also Blake v. Babbitt*, 837 F. Supp. 458, 459 (D.D.C. 1993) ("[e]xcess numbers of horses and burros pose a threat to wildlife, livestock, the improvement of range conditions, and ultimately [the horses themselves]") (citation omitted). Accordingly, in 1978, Congress passed amendments to the Wild Horse Act, which provided the Secretary with greater authority and discretion to manage and remove excess horses from rangeland. *Am. Horse Prot. Ass'n*, 694 F.2d at 1316-18.

The Wild Horse Act grants the Secretary jurisdiction over all wild free-roaming horses and burros on federal lands and directs the Secretary to "manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). Pursuant to this statutory mandate, BLM sets AMLs of wild horses within each HMA. *Id.* § 1333(b)(1); *Cloud Found. v. U.S. Bureau of Land Mgmt.*, 802 F. Supp. 2d 1192, 1199–200 (D. Nev. 2011). AML is defined by BLM as "the number of wild horses that can be sustained within a designated HMA which achieves and

---

[1] Relevant here, "Secretary" means "the Secretary of the Interior when used in connection with public lands administered by [her] through the Bureau of Land Management[.]" 16 U.S.C. § 1332(a).

maintains a thriving natural ecological balance in keeping with the multiple-use management concept for the area." AR_3502. "Range AMLs may be established in several ways, including through the preparation of 'resource management plans' ("RMPs")," prior agency decision, and environmental assessments. *See, e.g.*, *Cloud Found.*, 802 F. Supp. 2d at 1199 (RMP); *In Def. of Animals v. U.S. Dep't of Interior*, 909 F. Supp. 2d 1178, 1184 (E.D. Cal. 2012) (prior agency decision), *aff'd sub nom. In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054 (9th Cir. 2014); *In Def. of Animals*, 751 F.3d at 1063 (environmental assessment).

Once BLM sets an AML for a given HMA, the agency must "determin[e] where wild horse ... overpopulations exist." *Am. Horse Prot. Ass'n*, 694 F.2d at 1317 (citing 16 U.S.C. § 1333(b)(1)). Where BLM determines that "an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals, [BLM] shall immediately remove excess animals from the range so as to achieve appropriate management levels." 16 U.S.C. § 1333(b)(2). In doing so, BLM must determine the necessity of the removal based on current information, *id.*, but "the agency has wide discretion in how it addresses [an identified] overpopulation." *W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1282 (D. Utah 2017). To assist with planning and implementation, BLM developed an agency handbook and instruction memoranda—the Wild Horse and Burro Comprehensive Animal Welfare Program ("CAWP")—which provides guidance on how agency personnel should manage HMAs and carry out necessary animal removals. AR_3393-3437.

## B. The National Environmental Policy Act

NEPA serves the dual purpose of, first, informing agency decisionmakers of the significant environmental effects of proposed major federal actions and, second, insuring that relevant information is made available to the public that they "may also play a role in both the decisionmaking process and the implementation of that decision." *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). To meet these goals, NEPA requires a comprehensive Environmental Impact Statement ("EIS") only for "major Federal actions" expected to "significantly affect[] the quality of the human environment." 42 U.S.C. §

4332(C); 40 C.F.R. § 1501.3. To determine whether a proposed action will have significant effects, an agency may prepare an Environmental Assessment ("EA"). 40 C.F.R. § 1501.4. An EA is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS].'" *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004) (quoting 40 C.F.R. § 1508.9(a)). It includes "brief discussions of the need for the proposal, of alternatives as required by [statute], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b). "In reviewing a challenge to the adequacy of an EA, courts apply a 'rule of reason' to determine whether the agency took a 'hard look' at a proposed action." *Native Ecosystems Council & All. for the Wild Rockies v. U.S. Forest Serv.*, 866 F. Supp. 2d 1209, 1224 (D. Idaho 2012) (quoting *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1071 (9th Cir. 2002)).

NEPA does not impose any substantive obligations upon an agency but requires that an agency take a "hard look" at the environmental consequences of its decisionmaking. *Robertson*, 490 U.S. at 350. If, in its EA, the agency finds that the proposed action will not significantly affect the human environment, it may issue a finding of no significant impact ("FONSI") in lieu of an EIS. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005) (citing 40 C.F.R. § 1508.9(a)(1)); *see also* 40 C.F.R. § 1501.4. A FONSI "briefly present[s] the reasons why an action … will not have a significant effect on the human environment and for which an [EIS] therefore will not be prepared." 40 C.F.R. § 1508.13.

## II. FACTUAL BACKGROUND

### A. The Pancake Complex Wild Horse Gather Plan

The Pancake Complex consists of the Pancake and Sand Springs West Wild Horse HMAs, the Jakes Wash Herd Area ("HA"), and the Monte Cristo Wild Horse Territory. AR_3501. It is located approximately 30 miles west, southwest of Ely, Nevada in White Pine and Nye Counties. *Id*. The Pancake Complex is administered by the Ely and Battle Mountain

BLM Districts as well as the U.S. Forest Service Humboldt-Toiyabe National Forest[2] and consists of just over 1.2 million acres of private and public land. AR_3501-03.

In accordance with the Wild Horse Act, BLM set the AML for the entire Pancake Complex at 361 to 638 wild horses. AR_3502. This AML range was established through land use plans, Final Multiple Use Decisions, and a Wild Horse Territory Management Plan. *Id*. The AML range for the Pancake HMA was set as 240 to 493 wild horses to "maintain healthy wild horses and rangelands over the long-term based on monitoring data collected over time as well as an in-depth analysis of habitat suitability." *Id*. The range was established through prior decision-making processes and re-affirmed through the 2008 Record of Decision and 2008 Ely District RMP. *Id*. The 2008 Ely District RMP also determined that no wild horses should be managed in the Jakes Wash HA after analyzing habitat suitability and monitoring data which indicated insufficient forage, water, space, cover, and reproductive viability to maintain healthy wild horses and rangelands over the long-term. *Id*. The Sand Springs West HMA was determined to have an AML of 49 horses through a stipulated agreement between BLM and private landowners through the Department of Interior Office of Hearings and Appeals, Hearings Division and later confirmed in the 1997 Tonopah RMP. AR_3503. And the Monte Cristo Wild Horse Territory has an AML of 72 to 96 wild horses, which was established through the Humboldt National Forest Land & Resource Management Plan in 1986. *Id*. This range is based on proper use studies conducted on the natural horse concentration areas which were adjusted to help improve range conditions. *Id*.

In 2020 and 2021, BLM conducted several flights to confirm the number of wild horses within the Pancake Complex. *Id*. The 2020 flight resulted in a direct count of 2,262 wild horses, and the February 2021 flight was conducted to confirm those numbers. *Id*. As both flights used the "direct count method," however, they did not account for unseen horses, meaning the actual number of wild horses within the complex is likely higher. *Id*. Considering

---

[2] The gather and removal of excess wild horses from the U.S. Forest Service's Monte Cristo Wild Horse Territory is included in the Proposed Action and EA and is covered under a separate Forest Service decision not challenged by Plaintiffs. AR_3501.

all available information, BLM determined that at least 2,342 excess wild horses above the "low AML" exist in the complex. *Id*. These figures are reflected in Table 1 in the Final EA:

**Table 1.** Herd Management Area, Acres, AML, Estimated Population, and Estimated Numbers for Removal

| Herd | Total Acres Private/Public land | Appropriate Management Level | 2020 Flight Direct Count Population | 2021 Flight Direct Count Population | Removal to Achieve Low AML (based on2021 flight count) |
|---|---|---|---|---|---|
| Pancake | 824,000 | 240-493 | 1,829 | 2301 | 2061 |
| Sand Springs West | 157,436 | 49 | 155 | 145 | 96 |
| Jakes Wash | 153,663 | 0 | 46 | 169 | 169 |
| Monte Cristo WHT | 93,640 | 72-96 | 232 | 88 | 16 |
| Total | 1,228,739 | 361-638 | 2,262 | 2,703 | 2,342 |

*Id*. Additionally, BLM determined that excess horses need to be removed in order to achieve a thriving natural ecological balance based on factors including but not limited to: (1) excess horses establishing populations outside of HMA and HA boundaries; (2) evidence of moderate, heavy, and severe forage utilization in the Complex; (3) wild horses contributing—and in some cases serving as the sole contributor—to not meeting Rangeland Health Standards;[3] (4) water source damage at several springs; and (5) the need for emergency water trap gathers in 2017, 2018, and 2020, and the anticipated need for future emergency removals within the Pancake Complex if action is not taken. AR_3503-04.

BLM analyzed the likely effects of the proposed Pancake Complex Wild Horse Gather Plan ("2022 Gather Plan") in a preliminary EA that was made available for public comment on November 12, 2020. AR_1924-2079. During the 30-day comment period, BLM received comments from approximately 3,600 individuals or organizations (primarily as form letters) and eight agencies. AR_3654; *see also* AR_2080-3392 (public comments). BLM consolidated those comments into 92 distinct topics, considered all the comments received, provided responses, made minor, non-substantive changes, then released the Final EA on May 4, 2021.

---

[3] These are standards and guidelines for rangeland health required by 43 C.F.R. Subpart 4180 that BLM uses to evaluate and assess livestock grazing management practices. AR_3606-11.

FED. DEFS.' CROSS-MOT. FOR SUMM. J.
& OPP. TO PLS.' MOT. FOR SUMM. J.          6

*See* AR_3654-93 (responses to comments); AR_3097-3693 (Final EA). BLM signed the FONSI and issued its Decision Record ("Decision") on the same day. AR_3694-96 (FONSI); AR_3491-95 (Decision).

In the EA, BLM explained that the purpose of the 2022 Gather Plan is "to gather and remove excess wild horses from within and outside the Pancake Complex and to reduce the wild horse population growth rates to achieve and maintain established AML ranges." AR_3504. The 2022 Gather Plan is needed "to prevent undue or unnecessary degradation of the public lands associated with excess wild horses, and to restore a thriving natural ecological balance and multiple-use relationship on public lands," consistent with the Wild Horse Act. *Id.* The Proposed Action includes gather and removal of excess wild horses to achieve population within the AML range, application of fertility control methods consisting of vaccines and/or intrauterine devices ("IUDs") to released mares, maintenance of a sex adjustment ratio of 60% male to 40% female, and release of a small non-reproducing component of males of up to 138 geldings to bring the population up to mid-AML. AR_3507. Gathered horses would be transported to off-range corrals where they would be prepared for adoption, sale to qualified individuals, or transfer to off-range pastures. AR_3516. BLM also analyzed three other action alternatives: Alternative B that would not include the non-reproducing portion of the population; Alternative C that would gather and remove excess animals without fertility control, sex ratio adjustments, or geldings; and Alternative D that involved capture 100% of the current population of excess wild horses from within and outside the Jakes Wash HA. *Id.* And pursuant to NEPA, the EA considered a no action alternative. *Id.* Other alternatives were considered but not carried through for detailed analysis, including reduction of livestock within the Pancake Complex, gathering horses to the AML upper limit, fertility control only, and raising the AML. AR_3518-22. On May 4, 2021, BLM's Decision approved both the Proposed Action and Alternative D as part of the 2022 Gather Plan, which will occur over a 10-year time period following the initial gather operation and achieve management objectives identified in decision records and RMPs for the Pancake Complex. AR_3492.

### B. The 2022 Gather

On January 6, 2022, BLM announced that it would gather up to 2,060 horses and remove up to 2,030 excess wild horses. AR_3725. As explained by BLM, the gather is needed both to protect public lands from the effects of excess horses on the range, but also to reduce overpopulation of wild horses where there is not enough water or forage to support the number of horses currently present. *Id*. The action was analyzed and authorized as part of the Pancake Complex EA and Decision Record ("2021 Gather Decision"), *id*, and incorporated planning and guidance materials such as the CAWP. AR_3533. From January 10, 2022, through February 14, 2022, BLM conducted gather operations resulting in a total of 2,054 wild horses gathered ("2022 Gather"). AR_3814, 3819.

### STANDARD OF REVIEW

Wild Horse Act and NEPA claims are reviewed under the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06. *See In Def. of Animals*, 751 F.3d at 1061. Under the APA, a court may set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this narrow standard of review, "[t]he court is not empowered to substitute its judgment for that of the agency." *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). The burden of proof remains on the plaintiff. *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976).

The "arbitrary and capricious standard" is necessarily deferential. A decision is arbitrary and capricious only "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008). In other words, there must be a "clear error of judgment." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)

(citation omitted). "[A] reviewing court must generally be at its most deferential" when reviewing determinations involving agencies' technical expertise and scientific judgments. *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983).

## ARGUMENT

### I. Because the 2021 Gather Decision complies with the Wild Horse Act, the Court should grant summary judgment in favor of BLM.

In relying on the EA for the 2022 Gather, decision records, and RMPs, which showed overutilization of forage, deteriorating ecological conditions, and wild horse populations substantially over the AMLs for each HMA, BLM reasonably concluded that an excess of wild horses exists on the Pancake Complex and that their removal through gathers is necessary to achieve and maintain a thriving ecological balance. BLM thus proceeded to conduct a gather over January and February 2022 to remove excess wild horses and move toward an AML pursuant to objectives in the above-mentioned documents and management standards in the CAWP, ensuring they were completed at the minimal feasible level. These actions are consistent with the Wild Horse Act and its regulations which require BLM to immediately remove excess horses based on information currently available to the agency. They likewise comply with BLM's regulations concerning the management of HMAs. Accordingly, Plaintiffs' claim that BLM violated the Wild Horse Act by not creating a herd management area plan ("HMAP") for the Pancake Complex prior to the 2022 Gather must fail.

### A. The 2021 Gather Decision and 2022 Gather are consistent with the Wild Horse Act and its regulations.

The Wild Horse Act is clear: where BLM determines that an overpopulation exists and action is necessary to remove excess animals based on information currently available to it, BLM "shall immediately remove excess animals from the range so as to achieve appropriate management levels." 16 U.S.C. § 1333(b)(2). BLM's regulations confirm this mandate. 43 C.F.R. § 4720.1. And while 43 C.F.R. § 4710.3-1 generally requires that an HMAP be created,[4]

---

[4] As Federal Defendants have maintained, this general obligation is not in dispute in this matter. *See* March 30, 2023, Order at 5, ECF No. 54 (noting the same and clarifying the issue is whether "BLM had to prepare a HMAP before the gather").

relying on the plain text of the statute and regulation, courts have found that "it is not necessary that BLM prepare an HMAP as a basis for ordering the removal of wild horses, so long as the record otherwise substantiates compliance with the [Wild Horse Act]." *Animal Prot. Inst. of Am.,* 109 IBLA 112, 127 (1989); *accord Friends of Animals v. United States Bureau of Land Mgmt.*, 548 F. Supp. 3d 39, 67 (D.D.C. 2021) (finding a combination of materials may be used to manage an HMA); *Friends of Animals v. Pendley*, 523 F. Supp. 3d 39, 56 n.3 (D.D.C. 2021) (reasoning that a 2019 action could be in compliance with portions of a 1989 HMAP or a 2008 RMP). These findings reflect the discretion Congress has afforded, long recognized by courts, to BLM in removing excess animals from an HMA. *In Def. of Animals*, 751 F.3d at 1065; *see also id.* at 1065 n.16 (collecting cases). And so, where BLM considers "the [AML] for the herd, the habitat requirements of the animals, the relationships with other uses of the public and adjacent private lands, and the [minimal feasible level] [5]," 43 C.F.R. § 4710.3-1, the court should uphold BLM's management decisions to remove excess wild horses. *Friends of Animals*, 548 F. Supp. 3d at 67.

Here, the 2022 Gather Plan and 2022 Gather are consistent with the Wild Horse Act and its regulations. The AML range for the Pancake Complex was established through the Record of Decision and 2008 Ely District RMP, 1997 Tonopah RMP, and 1986 Humboldt National Forest Land & Resource Management Plan. AR_3502-03. In setting the AML for each HA, the RMPs and EA considered the range necessary to "maintain healthy wild horses and rangelands over the long-term based on monitoring data collected over time as well as an in-depth analysis of habitat suitability," AR_3502, prior agreements between BLM and private landowners, AR_3503, and proper use studies focused on improving range conditions. *Id.* Consistent with 43 C.F.R. § 4710.3-1, the 2021 EA considers habitat requirements of the animals, AR_3529-30 (discussing current habitat conditions leading to "increased stress and

---

[5] 43 C.F.R. § 4710.3-1 directs that "the constraints contained in § 4710.4" also be considered, which refers to the requirement that management be "at the minimum level necessary to attain the objectives identified in approved land use plans and [HMAPs]." 43 C.F.R. § 4710.4.

possible death as a result of increased competition for water and/or forage"), relationships with other uses of the public and adjacent private lands, AR_3538 (discussing concerns regarding public safety along highways and conflicts with public land as the wild horse populations increase), and the minimal feasible level for the gather, AR_3689 (responding to comments and assuring the proposed actions are at the minimum feasible level). Moreover, the CAWP provides standards for BLM to follow during gathers to limit any impacts on the health or welfare of wild horses. AR_3397-3436. This includes standards governing all facets of gathers such as, off-range holding facility design, capture technique, veterinary care, handling, and transportation—ensuring gathers are at the minimal feasible level. *Id*. These RMPs, decisions, and EA substantially comply with the Wild Horse Act and its regulations. *Animal Prot. Inst. of Am.,* 109 IBLA at 127. They consider the relevant information pursuant to 43 C.F.R. § 4710.3-1 and conclude that an overpopulation exists in the complex and action is necessary to achieve the AML consistent with the Wild Horse Act. 16 U.S.C. § 1333(b)(2). This determination complies with the law and the broad discretion Congress has long afforded BLM in making removal decisions. *Am. Horse Prot. Ass'n*, 694 F.2d at 1318; *see also Am. Horse Prot. Ass'n, Inc. v. Frizzell*, 403 F. Supp. 1206, 1217 (D. Nev. 1975) (noting the "high degree of discretionary authority" BLM has in carrying out its mandate to remove excess horses) (quoting 1971 U.S. Code Cong. & Admin. News, p. 2160).

**B. Plaintiffs fail to show the Wild Horse Act or its regulations require BLM to prepare an HMAP prior to gathering excess horses.**

Plaintiffs' First, Second, Third, and Fourth Causes of Action are all based upon the same flawed assertion: that the 2021 Gather Decision must be invalidated because BLM is required under the Wild Horse Act and its implementing regulations to prepare an HMAP prior to removing excess wild horses. Plaintiffs' Memorandum of Points and Authorities in Support of their Motion for Summary Judgment ("Pls.' Br.") at 23,[6] ECF No. 64. Plaintiffs attempt to

---

[6] This brief references the ECF-generated page numbers for court filings.

FED. DEFS.' CROSS-MOT. FOR SUMM. J.
& OPP. TO PLS.' MOT. FOR SUMM. J.          11

rewrite the regulations and improperly refer to extra-record materials[7] to misdirect the Court from this threshold inquiry, but these attempts fail to satisfy Plaintiffs' burden of proof.

### a. There is no requirement in the Wild Horse Act that an HMAP be prepared prior to the removal of excess wild horses.

First, Plaintiffs argue the language of the Wild Horse Act mandates that an HMAP be prepared prior to gathering and removing excess horses. Pls.' Br. 24, 30. This argument is unsupported by either the text of the Wild Horse Act or its legislative history. As a threshold matter, Plaintiffs do not identify any text in the Wild Horse Act that requires BLM to prepare an HMAP prior to a gather. That is because there is none. Plaintiffs merely cite to 16 U.S.C. § 1333 for the requirement that BLM conduct all management activities at the minimal feasible level. Pls.' Br. 24. But that is a far cry from mandating that the agency prepare an HMAP prior to removing excess horses. The Wild Horse Act's minimal feasible level requirement simply means that "BLM shall use '[t]he minimum number of habitat or population management tools or actions necessary to attain the objectives' for an HMA." *Friends of Animals v. Silvey*, 353 F. Supp. 3d 991, 1009 (D. Nev. 2018), *aff'd*, 820 F. App'x 513 (9th Cir. 2020). Minimal management tools can be deployed through EAs and CAWP standards, and objectives for an area can be identified from a combination of materials. *Animal Prot. Inst. of Am.,* 109 IBLA at 127. Thus, in order to abide by the "minimal feasible level" language, BLM is not required to prepare a separate HMAP prior to implementing a gather decision.

Plaintiffs' argument is also belied by the statute's legislative history. The 1978 amendments added language to specify "what information the Secretary must possess—or, more accurately, the information the Secretary need *not* possess—before removing wild horses deemed to be in excess." *Am. Horse Prot. Ass'n*, 694 F.2d at 1317–18 (citing 16 U.S.C. § 1333(b)(2)). Relevant here, Section 1333(b)(2) lists the information BLM may use to determine that a wild horse overpopulation exists in a specific area. BLM is encouraged to consider (i) the inventory of federal public land, (ii) land use plans, (iii) information from

---

[7] *See* Federal Defendants' Response to Plaintiffs' Motion for Judicial Notice (ECF No. 65), ECF No. 68.

environmental impact statements, and (iv) the inventory of wild horses. But, "in the absence of the information contained in (i–iv)[,]" BLM is expressly authorized to proceed with the removal of horses on the basis of whatever information BLM has at the time of the decision that an overpopulation exists. 16 U.S.C. § 1333(b)(2). The statute thus "clearly conveys Congress's view that BLM's findings of wild horse overpopulations should not be overturned quickly on the ground that they are predicated on insufficient information." *Cloud Found. v. U.S. Bureau of Land Mgmt.*, No. 3:11-CV-00459-HDM, 2013 WL 1249814, at *5 (D. Nev. Mar. 26, 2013) (quoting *Am. Horse Prot. Ass'n*, 694 F.2d at 1318). It is thus consistent with the statute and Congress's intent that BLM be given discretion to rely on a combination of materials to manage the horse population to maintain a thriving natural ecological balance.

This tracks the discretion that courts have long afforded BLM in removing excess horses under the Wild Horse Act. For example, *In Def. of Animals v. U.S. Dep't of Interior,* the Ninth Circuit explained that the Wild Horse Act "directs that horses 'shall' be removed 'immediately' once the Secretary determines, *on the basis of whatever information he has at the time of his decision*, that an overpopulation exists." 751 F.3d at 1064 (quoting *Am. Horse Prot. Ass'n*, 694 F.2d at 1318) (emphasis in original). In applying this reasoning, the Ninth Circuit upheld BLM's reliance on a 2008 RMP in setting the AML. 751 F.3d at 1064 n.13. In the underlying district court's decision, the court also acknowledged that the Wild Horse Act "unequivocally provide[s] that if the current population inventory for an HMA reveals that overpopulation exists, and if the BLM determines that "action is necessary to remove excess animals," it "shall immediately remove excess animals from the range so as to achieve appropriate management levels." *In Def. of Animals,* 909 F. Supp. 2d at 1189 (citation omitted). Like these decisions, the Court should afford BLM deference in managing and removing excess horses and reject Plaintiffs' argument that the Wild Horse Act requires the preparation of an HMAP prior to implementing gather decisions.

### b. There is no requirement in the Wild Horse Act's implementing regulations that an HMAP be prepared prior to the removal of excess wild horses.

Plaintiffs next turn to the Wild Horse Act's implementing regulations in support of their argument that BLM was required to create an HMAP for the complex prior to conducting the 2022 Gather. Primarily, Plaintiffs argue that, when read together, the wording of 43 C.F.R. §§ 4710.3-1 and 4710.4 establishes that HMAPs are a prerequisite for gathers since the regulations require both the creation of HMAPs and that management be based upon objectives in HMAPs. Pls.' Br. 25. Thus, Plaintiffs aver, an HMAP is necessary since gather operations are a form of management. *Id*. But this theory fares no better than Plaintiffs' statutory argument. Nowhere in the regulations is there an express requirement that an HMAP be prepared prior to removing excess horses nor do Plaintiffs point to one. Plaintiffs instead rewrite the regulations in an attempt to manufacture one. This argument is contradicted by the regulatory text and case law and should be rejected.

Beginning with the text, there is no express requirement that an HMAP be prepared prior to the removal of excess horses. Section 4710.4 states "[m]anagement shall be at the minimum level necessary to attain the objectives identified in *approved* land use plans and herd management area plans." 43 C.F.R. § 4710.4 (emphasis added). Thus, Section 4710.4 does not mandate the creation and approval of new plans; it only pertains to previously *approved* plans, if they exist for the relevant area. *Cf.* Pls.' Br. 25 (omitting "approved"). Section 4710.3-1 requires HMAs be established for the maintenance of wild horse herds and lists information BLM must consider in doing so. Both requirements exist separate from the general mandate that BLM create HMAPs. 43 C.F.R. § 4710.3-1; *see also U.S. Nat'l Bank of Or. v. Indep. Ins. Agents*, 508 U.S. 439, 454 (1993) ("A statute's plain meaning must be enforced . . ., and the meaning of a statute will typically heed the commands of its punctuation."). Indeed, based on a plain reading, the regulations do not specify what may constitute an HMAP; only what BLM must consider in establishing HMAs for maintenance of herds. *See* 43 C.F.R. § 4710.3-1 (requiring consideration of the AML, the habitat requirements

of the animals, the relationships with other uses of the public and adjacent private lands, and the constraints contained in § 4710.4). Nor do the regulations provide a time period in which BLM must create an HMAP.[8] Plaintiffs cannot simply rearrange the wording within the regulations to manufacture a mandate where none exists. *See Ctr. for Cmty. Action & Env't Just. v. BNSF R. Co.*, 764 F.3d 1019, 1024 (9th Cir. 2014) (declining to adopt plaintiffs' interpretation, which, "would effectively be to rearrange the wording of the statute—something that we, as a court, cannot do").

Courts have consistently agreed with this reading of the regulations. The Interior Board of Land Appeals ("IBLA") has acknowledged 43 C.F.R. § 4710.3-1 "does not require preparation of an HMAP as a prerequisite for a removal action," and concluded, "it is not necessary that BLM prepare an HMAP as a basis for ordering the removal of wild horses, so long as the record otherwise substantiates compliance with the statute." *Animal Prot. Inst. of Am.*, 109 IBLA 112. In response, Plaintiffs merely assert the decision is "not binding authority[,]" Pls.' Br. 27, and that there is no discussion of Section 4710.4, the regulatory history, or the tools of statutory construction. *Id*. 28. But these arguments are self-defeating. The IBLA's finding is persuasive because it is based on a plain reading of 43 C.F.R. § 4710.3-1, which shows that Plaintiffs' attempts to rewrite the regulation or rely on flawed statutory interpretation are unnecessary to resolve this legal question. *Animal Prot. Inst. Of Am.*, 109 IBLA at 127; *see also Rojas by & through Rojas v. Sea World Parks & Ent., Inc.*, 538 F. Supp. 3d 1008, 1017 (S.D. Cal. 2021) ("when the text of a statute is clear, as it is in this case, a court need look no further"). Thus, this is a straightforward question of law that can be settled by the plain text of the regulation.

Plaintiffs also attempt to bury the decision in *Friends of Animals v. United States Bureau of Land Mgmt.*, 548 F. Supp. 3d at 67, simply stating it is unpublished and does not address Plaintiffs' current arguments. Pls.' Br. 28 n.8. But these arguments fail, as the decision

---

[8] According to the regulatory text and Plaintiffs' own admission, there is "no identifiable deadline" for BLM to create an HMAP. Pls.' Br. 27; 43 C.F.R. § 4710.4.

FED. DEFS.' CROSS-MOT. FOR SUMM. J.
& OPP. TO PLS.' MOT. FOR SUMM. J.      15

is published and directly on point, addressing Plaintiffs' main dispute. In pertinent part, the *Friends of Animals* court explains:

> The [BLM Wild Horse and Burro Management] handbook, for example, contemplates that the Bureau could use an array of approaches to manage an HMA. It might, for example, use a land use plan, an EA, an established AML, and a gather plan. Or the Bureau might use an AML, an HMAP, and a gather plan. Or some other combination. Thus, although the categories may offer useful organizational tools, the handbook and manual leave the authorized officer with considerable discretion in framing her decision. [Plaintiff] points to nothing in either document that expressly forbids the authorized officer from issuing a long-term gather decision.

548 F. Supp. 3d at 67 (internal citations omitted). In short, BLM need not prepare an HMAP prior to implementing a gather decision. Rather, as it did for the 2022 Gather, the agency may rely upon a combination of land use plans, an EA, and an established AML in issuing a gather decision.

Plaintiffs nonetheless assert that Federal Defendants "ignore[d] the effect of BLM's regulations." Pls.' Br. 29. Relying on *Accardi v. Shaughnessy*, 347 U.S. 260 (1954), and *Service v. Dulles*, 354 U.S. 363 (1957), Plaintiffs assert BLM's duty to remove excess horses is constrained by Section 4710.4, but those cases are inapposite here. In *Shaughnessy*, "the Attorney General bound himself not to exercise his discretion until he had received an impartial recommendation from a subordinate board[,]" and in *Dulles*, "the Secretary bound himself not to act at all [in certain cases], except upon appeal by employee[.]" *Dulles*, 354 U.S. at 386–87. In contrast, here, the Secretary is not bound by regulation or statute to create an HMAP prior to conducting a gather. And Plaintiffs have failed to show otherwise. The Court, therefore, need not explore the agency's interpretation of law as Plaintiffs suggest—this is not a question of deference to agency interpretation of the regulations, because the agency's action is in accord with the plain language of the regulations. Pls.' Br. 27; *see Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019) ("the possibility of deference can arise only [when language is] genuinely ambiguous. And when we use that term, we mean it—genuinely ambiguous, even after a court has resorted to all the standard tools of interpretation"). Accordingly, the Court

should reject Plaintiffs' argument that the Wild Horse Act and its regulations require the creation of an HMAP prior to BLM conducting a gather.

**C. The Court should reject Plaintiffs' remaining Wild Horse Act arguments.**

In addition to Plaintiffs' main statutory and regulatory arguments addressed above, Plaintiffs advance a scattershot of arguments, hoping one will find the target. Pls.' Br. 29-36. Although these arguments generally fail for the same reasons as previously discussed, *supra* 13-18, they likewise lack legal and factual support. The Court should accordingly reject each argument.

**a. Plaintiffs fail to show that BLM unlawfully withheld or unreasonably delayed the creation of an HMAP.**

Plaintiffs next argue BLM unlawfully withheld or unreasonably delayed the creation of an HMAP, in violation of 5 U.S.C. § 706(1), by not doing so prior to the removal of horses from the Pancake Complex. Pls.' Br. 30-32. In the same vein, Plaintiffs contend that pursuant to the Mandamus and Venue Act, the Court should compel BLM to "halt any future gathers" until it develops an HMAP for the Pancake Complex. *Id.* 30.

With regard to Plaintiffs' request for relief under the Mandamus and Venue Act, Plaintiffs appear to rely upon the general test for mandamus relief. Pls.' Br. 13, 29-30. But because "mandamus relief and relief under [5 U.S.C. § 706(1)] are 'in essence' the same," when a complaint seeks relief under the Mandamus and Venue Act and the APA and there is an adequate remedy under the APA, courts may elect to analyze the APA claim only. *R.T. Vanderbilt Co. v. Babbitt*, 113 F.3d 1061, 1065 (9th Cir. 1997) (quoting *Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997)); *see also Vaz v. Neal*, 33 F.4th 1131, 1135 (9th Cir. 2022) (same). The extraordinary remedy of mandamus traditionally lies within the court's discretion. *Indep. Min. Co.*, 105 F.3d at 505. Here, Plaintiffs advance claims for relief under the Mandamus and Venue Act and the APA. *See* Pls.' Br. 29-32 (Plaintiffs' First and Second Causes of Action). Both claims, in essence, seek the same relief; that the court compel BLM to issue an HMAP. *Compare* Plaintiffs' First Amended Complaint ¶ 117, ECF No. 31 ("Plaintiffs seek a writ of prohibition" preventing gathers until BLM "develop[s] a [HMAP] for the

Pancake Complex") *with id.* ¶¶ 122-23 (requesting the same under the APA). And so, since there is an adequate remedy under the APA for the mandamus relief Plaintiffs request, review of both claims under Section 706(1) is appropriate.

A court's power to "compel agency action" under the APA is carefully limited to situations where an agency has ignored a specific legislative command. In *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004), the Supreme Court explained the two primary constraints on judicial review under Section 706(1). First, review of actions alleged to be unlawfully withheld or unreasonably delayed extends only to "discrete" actions, such as rules, orders, licenses, sanctions, and relief. *Id*. at 62–63. Second, the purportedly withheld action must not only be "discrete," but also "legally *required*"—"so that the agency's legal obligation is so clearly set forth that it could traditionally have been enforced through a writ of mandamus." *Id.* at 63.

As previously discussed, Plaintiffs have failed to show that BLM has a duty to prepare an HMAP *prior* to removing excess horses or that a deadline to create an HMAP prior to gathers exists. *See supra* 13-18. Plaintiffs merely assert that "BLM has a duty to develop HMAPs prior to engaging in the gather and removal of wild horses[,]" Pls.' Br. 30, but Plaintiffs "point[] to no specific statutory or regulatory deadline" requiring the agency to do so. *Indep. Min. Co. v. Babbitt*, 885 F. Supp. 1356, 1364 (D. Nev. 1995), *aff'd sub nom. Indep. Min. Co.*, 105 F.3d 502. Therefore, Plaintiffs' contention that a concrete deadline exists—and thus, the creation of an HMAP was unlawfully withheld—is without merit.

Plaintiffs argue in the alternative that, even if there is no concrete deadline, agency action has been unreasonably delayed. Pls.' Br. 30-32. But since there is no legal obligation to prepare an HMAP *prior to a gather*, the action is not subject to judicial review under Section 706(1). *See Norton*, 542 U.S. at 63 (constraining judicial review under 5 U.S.C. § 706(1) to "discrete" actions that are "legally *required*"); *see also In re A Cmty. Voice*, 878 F.3d 779, 784 (9th Cir. 2017) ("an agency cannot unreasonably delay that which it is not required to do").

Because Plaintiffs fail to make this initial showing, the Court need not consider Plaintiffs' *TRAC* factors arguments. *See In re A Cmty. Voice*, 878 F.3d at 784 ("the first step before applying the *TRAC* factors is necessarily to determine whether the agency is required to act"); *see also Indep. Mining Co.*, 105 F.3d at 507 (adopting the *TRAC* factors). But even if the Court were to do so, Pls.' Br. 31-32, those arguments would likewise fail. In assessing if an agency's actions have been unreasonably delayed, courts apply a six-factor standard, known as the *TRAC* factors, established in *Telecommunications Research and Action Center v. F.C.C. ("TRAC")*, 750 F.2d 70, 79-80 (D.C. Cir. 1984). The six TRAC factors are:

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*In re A Cmty. Voice*, 878 F.3d at 786 (citing *TRAC*, 750 F.2d at 80). Here, the first *TRAC* factor necessarily weighs in favor of BLM because there is no requirement for BLM to issue an HMAP prior to a gather.[9] The second *TRAC* factor—the lack of any Congress-provided timetable—also weighs toward BLM, and the sixth *TRAC* factor—the impropriety of agency lassitude—is irrelevant here, as there is no requirement that the agency has delayed fulfilling. The third and fifth factors largely overlap. *Indep. Mining Co., Inc.*, 105 F.3d at 509. Under the third factor, delays are less reasonable if "human health and welfare are at stake," than when agency actions are delayed "in the sphere of economic regulation." *TRAC*, 750 F.2d at 80. The fifth factor directs courts to "take into account the nature and extent of the interests prejudiced

---

[9] As previously mentioned, the question presented by Plaintiffs is not whether BLM has a general duty to create an HMAP, which was unreasonably delayed, but rather whether there is a duty to prepare such a plan prior to removing excess horses from the range. *See* Pls.' Br. 30 ("BLM has a duty to develop HMAPs prior to engaging in the gather and removal of wild horses"); *see also* Pls.' Am. Compl. ¶¶ 120-21.

FED. DEFS.' CROSS-MOT. FOR SUMM. J.
& OPP. TO PLS.' MOT. FOR SUMM. J.       19

by delay." Human lives are not at stake here. Nor do Plaintiffs convincingly point to any interests harmed by not creating an HMAP prior to gathers since management is ensured at the minimal feasible level by RMPs, the EA, and the CAWP. *Compare* Pls.' Br. 32 ("BLM's actions do not consider the full range of management options available"), *with supra* 12-13 (discussing management standards and tools). And the fourth factor—the effect of expediting delayed action on agency activities of a higher or competing priority—likewise weighs toward the agency. *See, e.g.*, AR_3502 (explaining that wild horses can increase their numbers by up to 25% annually which requires BLM to use discretion in managing herds). While Plaintiffs have not made the initial showing that BLM has a duty to prepare an HMAP prior to a gather, even if they had, the *TRAC* factors decisively favor rejecting Plaintiffs' argument that BLM should be compelled to prepare one prior to further implementation of the 2021 Gather Decision. Thus, Plaintiffs' arguments pursuant to Section 706(1) and the Mandamus and Venue Act should be rejected.

> **b. The BLM Wild Horse and Burro Handbook complies with the Wild Horse Act and Plaintiffs' challenges to it fail as a matter of law.**

Plaintiffs also challenge "BLM's interpretation" of the Wild Horse Act's regulations within the BLM Handbook as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and as exceeding "statutory jurisdiction, authority, or limitations." Pls.' Br. 33-36; *see also id.* (challenging the BLM Handbook as deviating from the Wild Horse Act's minimal feasible level and purported requirement to create an HMAP prior to a gather). These arguments, however, fail for the same reason as Plaintiffs' earlier arguments: there is no requirement that BLM create an HMAP prior to conducting a gather. *See supra* 13-18. Moreover, Plaintiffs' contentions are legally and factually inaccurate.

As a legal matter, Plaintiffs can only bring an APA claim against a final agency action. *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas,* 5 F.4th 997, 1007 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 713 (2021). For an agency action to be final, the action must "mark the consummation of the agency's decisionmaking process" and be one by which "legal consequences will flow." *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). Here,

BLM's Handbook does not meet that criteria and Plaintiffs' challenge to it must accordingly fail. The BLM Handbook does not constitute final agency action for two reasons. *See Forest Guardians v. Animal & Plant Health Inspection Serv.*, 309 F.3d 1141, 1143 (9th Cir. 2002) (per curiam) (holding that an agency manual "does not have the force of law and does not bind the agency"); *Colo. Wild Horse & Burro Coal. v. Jewell*, 130 F. Supp. 3d 205, 214 (D.D.C. 2015) (holding the provision of BLM's Wild Horse Handbook requiring population inventories every two years did not create "a legal duty" for BLM). First, it merely establishes guidelines for BLM's management of wild horses and burros and second, it was not published in the Federal Register and made subject to public notice and comment, nor was it promulgated under independent congressional authority. *See W. Radio Servs. Co. v. Espy*, 79 F.3d 896, 901-02 (9th Cir. 1996); *see also Schweiker v. Hansen*, 450 U.S. 785, 789 (1981) (per curiam). Thus, the BLM Handbook is not a final agency action reviewable under the APA. *Bennett v. Spear*, 520 U.S. at 178 (final agency action is an action "from which legal consequences will flow"). Confusingly, Plaintiffs appear to concede this, Pls.' Br. 33, but challenge it anyway. *See* Pls.' Br. 34 (arguing there is no rational basis for interpretations within the BLM Handbook). But because the BLM Handbook is not a final agency action, the Court does "not need to review" Plaintiffs' challenges to it under 5 U.S.C. § 706(1), (2)(C). *W. Radio Servs.*, 79 F.3d at 901. Moreover, even if Plaintiffs could challenge the BLM Handbook as a final agency action, which they cannot, Plaintiffs filed suit far outside of the six-year statute of limitations. *Compare* AR_1350-1429 (published in June 2010), *with* Plaintiffs' Complaint, ECF No. 1 (filed January 21, 2022); *see also* 28 U.S.C. § 2401(a). The Court can, therefore, refuse to hear Plaintiffs' claims challenging the BLM Handbook on timeliness grounds as well. *Cal. Sea Urchin Comm'n v. Bean*, 828 F.3d 1046, 1049 (9th Cir. 2016). And so, Plaintiffs' third and fourth causes of action which challenge the BLM Handbook fail as a matter of law.

Even so, as a factual matter, Plaintiffs' contention that BLM ignored guidance from the BLM Handbook concerning the consideration of monitoring objectives and the minimum

feasible level because it did not prepare an HMAP also fails.[10] Pls.' Br. 34. In responding to comments, the EA states the management actions proposed are tools to achieve management objectives contained in approved land use plans. AR_3659. And the approved management plans for HAs within the Pancake Complex contain numerous short and long-term objectives. *See, e.g.*, AR_17-22 (Monte Cristo HMA objectives); AR_84-101 (Humboldt National Forest LRMP objectives); AR_352-53 (South Pancake objectives); AR_541-61 (Tonopah RMP objectives). For example, within the Monte Cristo RMP, there are objectives for maintaining forage, cover, water, and the wild horse population. AR_17-24. Moreover, the Monte Cristo RMP contains direction for management and removal of excess horses at the minimal feasible level. *See, e.g.*, AR_22-23 (directing that "excess [horses] will be removed in the most humane manner possible" and providing instruction regarding holding facilities, the use of helicopters, and traps). And, as previously mentioned, the CAWP standards provide further direction on managing wild horses at the minimal feasible level. *See* AR_3393-3437 (discussing capture techniques and care, among other standards). The thorough analyses contained within these documents complies with the Wild Horse Act and its regulations. Thus, Plaintiffs' contention that herd objectives or the minimal feasible level of the 2022 Gather were not considered—or cannot be considered absent an HMAP— are simply inaccurate.[11]

### c. Plaintiffs' argument that they lacked the opportunity to comment on the 2022 Gather Plan without an HMAP lacks merit.

Plaintiffs also seemingly argue that if BLM is not required to prepare an HMAP prior to gathers, it "can continue to dodge the public scoping process[.]" Pls.' Br. 30; *see also id*. 13 n.6 ("the public had no opportunity to provide input on the scope of the Pancake Gather Plan").

---

[10] In addition to being factually inaccurate, Plaintiffs concede that an HMAP is not the only document BLM uses to establish objectives. *Compare* Pls.' Br. 9 (conceding that land use plans may establish habitat population goals and objectives for a given area, including HMAs), *with id*. 12 (arguing the Pancake Complex "does not have comparable objections … since no HMAP exists").

[11] For these reasons, as well as those outlined in Federal Defendants' Response to Plaintiffs' Motion for Judicial Notice (ECF No. 65), ECF No. 68, Plaintiffs' reliance upon the Fifteenmile HMAP is ineffective as well as inappropriate. Pls.' Br. 11-12, 34-35.

These arguments are contrary to the law and record. As a matter of law, the Wild Horse Act does not require BLM to discuss explicitly all opinions submitted during the public-comment period. *See* 16 U.S.C. § 1333(b)(1) (requiring that the agency consult individuals recommended by the National Academy of Sciences but leaving it to the Secretary's discretion whether to consult "other individuals" with "scientific expertise and special knowledge"); *see also Am. Wild Horse Campaign v. Bernhardt*, 963 F.3d 1001, 1013 (9th Cir. 2020) (acknowledging the same).

Second, as a factual matter, BLM held a 30-day comment period and considered comments from approximately 3,600 individuals or organizations (primarily as form letters) and eight agencies. AR_3654; *see also* AR_2080-3392 (public comments). BLM consolidated those comments into 92 distinct topics, considered all the comments received, provided responses, made minor, non-substantive changes, then released the Final EA. *See* AR_3654-93 (responses to comments). Notably, the Final EA captures various comments from Plaintiffs and provides BLM's response to those comments in an adjacent column. *See, e.g.*, AR_3658-61 (comments from Laura Leigh/Wild Horse Education and Marie Milliman). Still, Plaintiffs argue BLM did not adequately address comments concerning fertility control and livestock grazing. Pls.' Br. 13, 30. This is inaccurate. BLM thoroughly responded to comments concerning fertility controls, noting the EA is consistent with RMPs and the Wild Horse Act Handbook. AR_3656-60. BLM also responded to concerns about livestock grazing, stating that "resource damage is directly attributable to the wild horses" and that "changes to [forage allocations in] livestock grazing cannot be made through a wild horse gather decision" but through the revision of land use plans. AR_3678-80. Plaintiffs concede this.[12] Thus, Plaintiffs'

---

[12] *See, e.g.*, Declaration of Laura Leigh, ECF No. 64-1 ¶¶ 18- 21. In addition to undermining Plaintiffs' own argument that they were not afforded the opportunity "for meaningful public participation," Pls.' Br. 13, these declarations impermissibly stray from asserting standing and are used by Plaintiffs to support their Wild Horse Act argument. *See, e.g.*, *id.* 13 n.6 (citing several declarations to support the argument that an HMAP is necessary to ensure management is at the minimal feasible level); *see also* ECF No. 64-1 ¶ 16 (arguing "BLM failed to create an [HMAP] for the Pancake Complex, as required by law"); Declaration of Scott Edwards, ECF

disagreement is with the content of BLM's responses; not the ability to comment. But this fundamentally misunderstands that even if an HMAP had been in existence at the time of the 2022 Gather, Plaintiffs would meet the same response as the "purpose of the EA is not to adjust livestock use"—it is to restore the thriving natural ecological balance in the complex. AR_3680; AR_3504 (Purpose and Need). And, as stated, the RMPs consider numerous objectives, goals, and impacts, including livestock grazing. AR_3679. Thus, Plaintiffs' contention that "the public had no opportunity to provide input on the scope of the Pancake Gather Plan" without an HMAP is without merit.

In short, Plaintiffs attempt to rewrite the regulations and manipulate the meaning of the Wild Horse Act, but these sources only speak to the question of whether BLM is *generally* required to create an HMAP. There is no requirement to create an HMAP *prior* to removing excess horses and Plaintiffs have failed to show otherwise. As Plaintiffs' Wild Horse Act claims all rest upon this flawed foundation, the Court should reject Plaintiffs' arguments under Counts I-IV.

## II. Because the 2021 Gather Decision complies with NEPA, the Court should grant summary judgment in favor of BLM.

Plaintiffs next challenge the 2022 Gather Plan and 2022 Gather under NEPA. Plaintiffs advance three central claims: (1) that the EA should have analyzed additional alternatives, (2) that BLM should have reexamined the AML, and (3) that BLM did not adequately analyze the practice of "gelding" wild horses. Plaintiffs do not meet their burden to show that the agency's decisionmaking process failed to comply with NEPA. Rather than identifying an area where BLM's analysis has "undermine[d] informed public comment and informed decisionmaking," *Sierra Club v. FERC*, 867 F.3d 1357, 1368 (D.C. Cir. 2017), Plaintiffs discuss areas where they merely disagree with BLM's ultimate conclusion. However, it is inappropriate for Plaintiffs to substitute their judgment for that of the agency's. *See North Slope Borough v. Andrus*, 642 F.2d 589, 605 (D.C. Cir. 1980). The Court should, therefore, uphold BLM's

No. 64-3 ¶ 12. To the extent that paragraphs within these declarations stray from asserting standing, the Court should strike them. *See* March 30, 2023 Order, ECF No. 54 at 6 (limiting declarations "in scope to Plaintiffs' First Amendment claim").

1    thorough assessment of the environmental effects of the 2022 Gather Plan and its consideration

2    of reasonable alternatives.

### A. BLM's EA complied with NEPA.

NEPA's purpose is to ensure that federal agencies take a "hard look" at the environmental consequences of their proposed actions before deciding to proceed. *Robertson*, 490 U.S. at 350, 352. The purpose of an EA is "not to amass and disclose all possible details regarding a proposal, but to create a 'concise public document' that serves to '[b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI].'" *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1128 (9th Cir. 2012) (citations omitted).

The EA for the 2022 Gather more than satisfies NEPA's procedural requirements. Consistent with the Wild Horse Act, the EA explains the purpose of the proposed action is to gather and remove excess wild horses from the Pancake Complex and to reduce the horse population's growth rates in order to achieve and maintain established AML ranges. AR_3504. The EA discloses the action is needed to "prevent undue or unnecessary degradation of the public lands associated with excess wild horses, and to restore a thriving natural ecological balance and multiple-use relationship on public lands." *Id*. Consistent with this purpose and need, the EA proposes a no action alternative and four action alternatives. AR_3506-07. Supported by an extensive Administrative Record, the EA engages in a thorough analysis of the affected environment, environmental consequences, and the individuals, agencies, and groups consulted. AR_3522-58. This analysis allowed BLM to reasonably determine that the action will not significantly affect the quality of the human environment. AR_3694-96 (FONSI). Plaintiffs' challenges to the sufficiency of the EA's thorough analysis are without merit.

### B. BLM considered a reasonable range of alternatives.

Plaintiffs first argue that BLM should have considered additional alternatives than those analyzed in the EA. Pls.' Br. 39. As a general matter, when preparing an EA, agencies are only required to analyze reasonably feasible alternatives that are reasonably related to the purpose of the project. *See Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir.

2004). Agencies need not "consider alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area." *Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1180 (9th Cir. 1990) (citing *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982)). An agency's "obligation to consider alternatives under an EA is a lesser one than under an EIS," and so long as "'reasonable alternatives' have been considered," there is no "minimum number of alternatives that an agency must consider." *Native Ecosystems Council*, 428 F.3d at 1246 (finding sufficient the consideration of two alternatives including the no-action alternative). In the EA at issue here, the action alternatives were informed by the purpose and need for the 2022 Gather Plan: to remove excess wild horses and to restore a thriving natural ecological balance. AR_3504. BLM analyzed a no action alternative, as required by NEPA, and four other alternatives. *See* AR_3506-07; *see also* ECF No. 18 at 7. The EA explains that each of the action alternatives would remove excess horses to achieve the AML. AR_3513. In contrast, under the no action alternative—where no gather would occur— the current wild horse population would increase at a rate of 20 to 25% each year. AR_3507. This would result in further deterioration of rangeland in the Pancake Complex, public safety concerns with the increase of horses along heavily traveled roads, and property issues. *Id*. And emergency gathers would still be necessary to address limitations on water and forage resources. *Id*. This alternative, therefore, would not meet the purpose and need for the 2022 Gather Plan to achieve a thriving natural ecological balance in the Pancake Complex. Accordingly, BLM sufficiently examined a range of "reasonable alternatives" in this EA. *Laguna Greenbelt, Inc. v. U.S. Dep't. of Transp.*, 42 F.3d 517, 524 (9th Cir. 1994) (per curiam) (NEPA does not require agencies to consider alternatives that do not satisfy the purpose of the plan).

Further, Plaintiffs' suggested alternatives were either addressed and rejected by BLM or were simply not supported by any credible, peer-reviewed evidence that the alternative could be considered "reasonable." For example, Plaintiffs advance rewilding, which was raised by a single commenter without any support or peer-reviewed citations, as a "reasonable"

alternative that should have been considered. Pls.' Br. 35. But Plaintiffs' concept of rewilding—reducing livestock grazing, retiring mining, and other activities—would be inconsistent with the 2022 Gather Plan's purpose to create a thriving natural ecological balance and to allow for multiple use relationships within the Pancake Complex. AR_3504. It is also unclear how this alternative would resolve forage and water limitations as the wild horse population would continue to multiply if left unchecked. *See* AR_3507 (noting that within two years, the wild horse population could exceed 5,000 if no action is taken). Thus, because Plaintiffs cannot make even the threshold showing that the alternatives they posed were "reasonable," the agency is under no obligation to analyze them in the context of the EA.

Courts in the Ninth Circuit have consistently upheld agencies' refusal to consider alternatives in cases involving removal of animals and, specifically, as to proposed alterations to grazing practices because the alternatives were inconsistent with agency-defined objections. *W. Watersheds Proj. v. Abbey*, 719 F.3d 1035, 1046 (9th Cir. 2013) (determining that "BLM's interpretation of the Proclamation to allow the continued use of its grazing management was reasonable under [applicable law]" and thus "BLM did not violate NEPA by excluding changes to its grazing practices from the scope and purpose of the Breaks Resource Plan"); *see also Silvey*, 353 F. Supp. 3d at 1015-16 ("[D]efendants explained that this alternative would simply exchange a limited amount of current forage used by livestock for use by wild horses, which would not meet the purpose and need of the project to reduce wild horse growth rates; moreover, the proposed alternative would not conform to existing land use plans."); *Cloud Found.*, 2013 WL 1249814, at *18 ("BLM provided an appropriate explanation as to why it rejected the livestock reduction alternative: it simply could not reduce livestock grazing allotments through the gather process."). Plaintiffs have provided the Court with no reason to deviate from that clearly established law.

**C. BLM's reliance on well-established AMLs for the 2022 Gather complied with NEPA.**

Next, Plaintiffs argue that BLM did not consider reevaluating the AML as an alternative approach in the context of the 2022 Gather Plan and that the AML for the Pancake Complex is too low. Pls.' Br. 42-43. But this was not a reasonable alternative nor necessary for conducting the 2022 Gather. Range AMLs need not be adjusted each time a decision to gather excess horses is issued. *See In Def. of Animals*, 751 F.3d at 1064 (nothing in the Wild Horse Act requires BLM to determine new AMLs based on current conditions every time BLM decides to take action to restore the already-established AMLs). Instead, as discussed previously, the Wild Horse Act requires BLM to remove excess wild horses once it determines an overpopulation of wild horses exists. *See supra* 13-18. This is reinforced by the BLM Handbook. *See, e.g.*, AR_1416 (discussing the separate process for determining AML range). As noted, here, BLM reasonably determined that an overpopulation of wild horses existed in the Pancake Complex, which was leading to the deterioration of resources, threatening public safety, and resulting in emergency gathers to prevent needless suffering and death of the horses, so BLM was required to conduct a gather based on well-established AMLs from RMPs and decision documents within the Pancake Complex. *See supra* 6-8. Thus, reevaluation of the AML prior to the 2022 Gather was neither required nor a reasonable alternative. Instead, BLM was required to conduct a gather to remove excess horses under the Wild Horse Act and then the agency could reevaluate the AML, after doing so.

Moreover, Plaintiffs' arguments have been rejected by other courts. In *Friends of Animals v. Bureau of Land Management*, the plaintiff, as here, argued that the EA violated NEPA because it did not adjust the AML in the gather plan. Case No: 16-CV-0199, 2017 WL 5247929, *8 (D. Wyo. Mar. 20, 2017). The Court found that the plaintiff "ha[d] not carried its burden to show BLM's failure to re-evaluate and readjust the AML ranges as a component of the 2016 gather decisionmaking process was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" because the "gather document is not the appropriate

mechanism for adjusting the AML of an HMA." *Id*. Rather, the court noted, BLM's AML determination "is a separate process distinct from the gather decision processes." *Id*. Thus, BLM was not required to adjust the AML as part of the gather process nor would doing so be a "reasonable" alternative within the purpose and need of the 2022 Gather Plan.[13]

### D. BLM considered the relevant factors when analyzing alternatives.

Plaintiffs also argue that BLM should have considered additional factors when analyzing alternatives for the 2022 Gather Plan. Pls.' Br. 39. But this argument is belied by the record. The court need only determine whether the agency has taken a "hard look" at the consequences of its actions, based its decision on a consideration of the relevant factors, and provided an explanation why a project's impacts are significant. *In Def. of Animals*, 751 F.3d at 1068 (internal citations and quotations omitted).

Here, BLM adequately considered the relevant factors associated with the alternatives under NEPA. For example, Plaintiffs claim that BLM did not consider the factor "that wild horses are important to lower[] the risk of wildfires on public lands[.]" Pls.' Br. 40. In support of this assertion, they reference the general comment of a single individual who speculates that "the major reduction of wild horses proposed by the EA would alarmingly increase the risk of catastrophic wildfires in many places" without adequate support for this contention. AR_3026. Even if this commentor had presented specific information concerning the HMAs at issue in this case, BLM has discretion to rely on the reasonable opinions of its own qualified experts, including agency experts. *Marsh*, 490 U.S. at 378 ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."); *see*

---

[13] To the extent that Plaintiffs complain that the AML is too low, there is not an available remedy for Plaintiffs under NEPA. NEPA's mandate "is essentially procedural," *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978), and NEPA is "not intended to resolve fundamental policy disputes." *Grunewald v. Jarvis*, 776 F.3d 893, 903 (D.C. Cir. 2015) (internal citations omitted). The Court may not "substitute [its] judgment for that of the decisionmaker" and mandate an alternative policy outcome. *North Slope Borough*, 642 F.2d at 605 n.93.

1   *also In Def. of Animals*, 751 F.3d at 1071 (citation omitted). And importantly, the EA explains

2   that the belief that large numbers of wild horses may reduce fuel loads could be said about

3   other large grazing animals, like livestock. *Id*. Moreover, there is the potential from high

4   populations of wild horses to cause the spread of invasive plant species, which could *increase*

5   wildfire risk. AR_3671. Thus, keeping large numbers of wild horses on the Pancake Complex

6   would not necessarily decrease wildfire risk nor would it comply with the purpose and need of

7   the 2022 Gather Plan.

8          Plaintiffs also argue that the EA failed to consider factors that affect herd health such as

9   livestock grazing. Pls.' Br. 41. This assertion is likewise inaccurate. BLM considered livestock

10  grazing and explained that "even with significantly reduced levels of livestock grazing within

11  the gather area relative to the permitted levels authorized in the 2008 Ely RMP, there is

12  insufficient habitat for the current population of wild horses, as confirmed by monitoring data."

13  AR_3519. Thus, BLM considered livestock grazing, but reasoned that even if there were less

14  livestock present, an ecological imbalance would remain in the Pancake Complex.

15         Plaintiffs' suggestion that BLM refused consideration of "genetic lineages present in

16  the Complex," Pls.' Br. 34-35, is similarly contradicted by the record. The EA discusses the

17  "history, context, and periodic introductions" of wild horses in the Pancake Complex.

18  AR_3528. Relying on several studies, it explained that the horses should not be considered as

19  truly isolated populations, but rather, part of a "larger metapopulation (NRC 2013) that has

20  demographic and genetic connections with other BLM-managed herds in Nevada, Utah, and

21  beyond." *Id*. And the EA further discusses the genetic effects of fertility control measures.

22  AR_3638-40. Thus, Plaintiffs' assertion that BLM failed to consider genetics, or any relevant

23  factors, in its analysis of reasonable alternatives is without merit.

24      **E.  BLM's consideration of impacts of gelding satisfies NEPA.**

25         In addition, Plaintiffs argue that an EIS must be prepared because BLM failed to take a

26  "hard look" at the impacts of "gelding" or surgical sterilization of male horses. Pls.' Br. 44-45.

27  However, as Plaintiffs acknowledge, BLM responded to comments concerning gelding. *See id*.

28

44. In fact, the EA discusses gelding in depth: Appendix XII of the EA exclusively addresses the "Environmental Effects of Geldings and Contraception Use in Wild Horse Management", *see* AR_3623-3653, including a discussion of gelding behavior and effects of family structure among wild horses, AR_3629-3630.

Further, the Ninth Circuit has upheld BLM's NEPA analysis of gelding impacts. In *American Wild Horse Campaign v. Bernhardt*, the plaintiffs argued that BLM failed to meet the "hard look" standard in its NEPA analysis of a gelding plan. 963 F.3d at 1012. On the basis of a record similar to the one at issue here, the Ninth Circuit concluded that BLM had performed adequate analysis to justify the practice of gelding to control the wild horse population and did not need to perform an EIS. *Id.* at 1001.

Therefore, Plaintiffs fail to show that the EA's consideration of gelding was "arbitrary or capricious." *Marsh*, 490 U.S. at 378. In making this determination, "the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment.'" *Id.* (*quoting Citizens to Pres. Overton Park*, 401 U.S. at 416). As discussed above, the EA treats gelding in depth, relying on sound scientific information to inform the prospective plan. Plaintiffs' critiques of the EA's gelding analysis fail to identify "clear error" in decisionmaking. Instead, Plaintiffs discuss areas where they merely disagree with BLM's ultimate conclusion on the basis of the available data. But it is not the Court's role to substitute its judgment—much less Plaintiffs'—for that of the agency's expert resolution of an issue. And so, consistent with various other courts, this Court should reject Plaintiffs' baseless argument. *See, e.g., Friends of Animals v. Culver*, 610 F. Supp. 3d 157, 172 (D.D.C. 2022) (noting "the record is replete with scientific discussion on the consequences of the fertility controls …[and] that no EIS was required after detailed review in an Environmental Assessment"); *Am. Wild Horse Campaign v. Zinke*, 353 F. Supp. 3d 971, 988 (D. Nev. 2018) (finding BLM's discussion of the behavioral effects of gelding sufficient and did not "trigger the preparation of an EIS"), *aff'd sub nom., Am. Wild Horse Campaign*, 963 F.3d 1001; *Silvey*, 353 F. Supp. 3d at 1013 (explaining "[g]elding horses is hardly a new

process and is a common surgical procedure used by BLM" which does not require the preparation of an EIS).

In sum, the Court should deny Plaintiffs' NEPA claims. Plaintiffs fail to show that BLM failed to consider a reasonable range of alternatives or that it did not consider the relevant factors or environmental effects associated with the 2022 Gather Plan.

## **CONCLUSION**

For the foregoing reasons, Federal Defendants respectfully request that the Court grant their cross-motion for summary judgment and deny Plaintiffs' motion for summary judgment.

Respectfully submitted this 11th day of October, 2023.

TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division
S. JAY GOVINDAN, Section Chief
BRIDGET K. MCNEIL, Assist. Section Chief

*/s/ Christian Carrara*
CHRISTIAN CARRARA, Trial Attorney
(NJ Bar No. 317732020)
Wildlife & Marine Resources Section

*/s/ Samantha Peltz*
SAMANTHA PELTZ, Trial Attorney
(IL Bar No. 6336536)
Natural Resources Section
Ben Franklin Station
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 598-9736 (Carrara)
Fax: 202-305-0275
Christian.carrara@usdoj.gov

*Of Counsel:*
Janell M. Bogue
U.S. Dep't of the Interior
Office of the Solicitor
Pacific Southwest Region

*Attorneys for Federal Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 11, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court for the District of Nevada using the Court's CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system, which includes counsel of record for all parties in the case.

*/s/ Christian Carrara*
CHRISTIAN CARRARA
Attorney for Defendants

# EXHIBIT 4

DANIELLE M. HOLT
(Nevada Bar No. 13152)
DE CASTROVERDE LAW GROUP
1149 S Maryland Pkwy
Las Vegas, NV 89104
Ph (702) 222-9999
Fax (702) 383-8741
danielle@decastroverdelaw.com

JESSICA L. BLOME
(Cal. Bar No. 314898, admitted pro hac vice)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| ANIMAL WELLNESS ACTION, a non-profit corporation, CANA FOUNDATION, a non-profit corporation, THE CENTER FOR A HUMANE ECONOMY, a non-profit corporation, LAURA LEIGH, individually, and WILD HORSE EDUCATION, a non-profit corporation, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and JON RABY, Nevada State Director of the Bureau of Land Management, and the <br><br> Defendants. | Case No. 3:22-cv-00034 <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** <br><br> Complaint Filed: January 21, 2021 |

# Table of Contents

I.  INTRODUCTION ........................................................................................................ 5

II. ARGUMENT ............................................................................................................... 6

   A.  Management of Wild Horses Requires Consideration of HMAPs ...................... 6

      1.  Defendants' Opposition is Based on Inapposite Caselaw .............................. 7

      2.  Defendants' Opposition is Based on a Strained Interpretation of BLM Regulations ... 10

   B.  BLM Unlawfully Withheld and Unreasonably Delayed Creating an HMAP ................. 12

   C.  Plaintiffs Do Not Challenge the BLM Handbook as a Final Agency Action .................. 15

   D.  BLM's Gather-EA is Not the Same as an HMAP .......................................... 15

   E.  Defendants Did Not Take a "Hard Look" at the Consequences of Its Gather Plan .......... 17

III. CONCLUSION ........................................................................................................... 17

# Table of Authorities

## Cases

*Accardi v. Shaughnessy*, 347 U.S. 260 (1954)...................................................... 12
*Am. Horse Prot. Ass'n, Inc. v. Frizzell*, 403 F. Supp. 1206 (D. Nev. 1975) ................................. 10
*Am. Horse Prot. Ass'n v. Watt*, 694 F.2d 1310 (D.C. Cir. 1982).................................................. 10
*Animal Prot. Inst. of Am.*, 109 IBLA 112 (1989) ....................................................... 7, 8
*Associated Builders & Contractors of Tex. Gulf Coast, Inc. v. United States Dep't of Energy*,
    451 F. Supp. 281 (S.D. Tex. 1978) ................................................................ 12, 16
*Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166 (9th Cir. 2002)................................. 12, 14
*Brower v. Evans*, 257 F.3d 1058 (9th Cir. 2001) ......................................................... 14
*Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012) ................................................ 15
*Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946 (9th Cir. 2013) ........................ 11
*Cloud Found. v. U.S. Bureau of Land Mgmt.*,
    No. 3:11-CV-00459-HDM, 2013 WL 1249814 (D. Nev. Mar. 26, 2013) ............................... 10
*Friends of Animals v. Pendley*, 523 F. Supp. 3d 39 (D.D.C. 2021).................................... 7, 9
*Friends of Animals v. Silvey*, 353 F. Supp. 3d 991 (D. Nev. 2018) ....................................... 7
*Friends of Animals v. United States Bureau of Land Mgmt.*,
    548 F. Supp. 3d 39 (D.D.C. 2021)............................................................... 7, 9
*In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054 (9th Cir. 2014) ............................ 10
*In re A Cmty. Voice*, 878 F.3d 779 (9th Cir. 2017)...................................................... 13
*In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413 (D.C. Cir. 2004) ...................................... 13
*In re Bluewater Network*, 234 F.3d 1305 (D.C. Cir. 2000) .................................................. 14
*In re Int'l Chem. Workers Union*, 958 F.2d 1144 (D.C. Cir. 1992)........................................ 14
*In re Pesticide Action Network*, 798 F.3d 809 (9th Cir. 2015) ........................................... 13
*Indep. Min. Co. v. Babbitt*, 885 F. Supp. 1356 (D. Nev. 1995) ...................................... 13, 14
*Marbury v. Madison*, 5 U.S. 137 (1803)................................................................... 8
*Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (1989)...................................................... 17
*Nat'l Cable Television Ass'n, Inc. v. Am. Cinema Eds.*, Inc.,
    937 F.2d 1572 (Fed. Cir. 1991) ............................................................... 7
*Pac. Molasses Co. v. Fed. Trade Com.*, 356 F.2d 386 (5th Cir. 1966)............................ 5, 12, 16
*R.J. Reynolds Tobacco Co. v. Cnty. of L.A.*, 29 F.4th 542 (9th Cir. 2022) ................................ 11
*Service v. Dulles*, 354 U.S. 363 (1957)............................................................. 5, 12
*Telecommunications Research & Action v. FCC (TRAC)*,
    242 U.S. App. D.C. 222 (D. C. Cir. 1984)...................................................... 12
*United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) ..................................... 5
*United States v. Nixon*, 418 U.S. 683 (1974) .......................................................... 5
*W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267 (D. Utah 2017) .................... 10
*Webster v. Fall*, 266 U.S. 507 (1925) ................................................................. 7
*Williams v. Hanover Hous. Auth.*, 871 F. Supp. 527 (D. Mass. 1994). ..................................... 15

## Statutes

16 U.S.C. §1331............................................................................. 6
**16 U.S.C. §1333(b)**........................................................................ 16
16 U.S.C. 1333(a)........................................................................... 6
42 U.S.C. §4332(E).......................................................................... 17
5 U.S.C. §706(1) ........................................................................... 12

**Regulations**

40 C.F.R. §1508.9 ................................................................................................ 17
43 C.F.R. §4700.0-3 ............................................................................................... 6
43 C.F.R. §4710.3-1 ....................................................................................... passim
43 C.F.R. §4710.4 .......................................................................................... passim
43 C.F.R. §4710.4. ................................................................................................ 5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    **I.    Introduction**

2          Plaintiffs' Motion for Summary Judgment established that BLM has a mandatory, non-

3    discretionary duty to prepare a herd management area plan (HMAP) prior to engaging in

4    management activities, including the gather and removal of wild horses. This conclusion is

5    supported by the wording and legislative history of 43 C.F.R. §§4710.3-1 and 4710.4,

6    <u>regulations promulgated by BLM to act as constraints on their management authority</u>. *See* Pls.'

7    Motion at pp. 15:25-22:23. Defendants oppose Plaintiffs' motion by focusing on caselaw and

8    arguments that wholly fail to address this wording and legislative history.

9          BLM's regulations establish that HMAPs must be created before the agency engages in

10   any management activities to ensure that "[m]anagement shall be at the minimum level

11   necessary." 43 C.F.R. §4710.4. When an administrative agency promulgates regulations, these

12   regulations "must be scrupulously observed." *Pac. Molasses Co. v. Fed. Trade Com.*, 356 F.2d

13   386, 389 (5th Cir. 1966) (citing *Service v. Dulles*, 354 U.S. 363 (1957)). This is so even where

14   the regulations limit the agency's discretion beyond that required by statute. *See United States v.*

15   *Nixon*, 418 U.S. 683, 695-96 (1974);  *Service*, 354 U.S. at 387-388; *United States ex rel. Accardi*

16   *v. Shaughnessy*, 347 U.S. 260, 265-268 (1954). Where an agency violates such regulations, "any

17   action taken as a result . . . cannot stand." *Pac. Molasses Co.*, 356 F.2d at 390.

18         While BLM may wish it had not promulgated the at-issue regulations, it is nevertheless

19   bound by them, and absent court intervention, BLM plainly has no intention of complying with

20   them.

21         Plaintiffs' Motion for Summary Judgment also challenged BLM's Gather-EA because it

22   failed to comply with NEPA. In response, BLM erroneously argues that it took the required

23   "hard look" in its analysis and considered all reasonable alternatives. BLM ignores the specific

24   arguments raised by Plaintiffs, skirting issues determinative of Plaintiffs' Motion. The Court

25   should enter summary judgment in favor of Plaintiffs on all counts.

26

27

28

1    **II.    Argument**

2        **A.    Management of Wild Horses Requires Consideration of HMAPs**

3        The Wild Free-Roaming Horses and Burros Act (WHA) provides BLM with authority to

4    manage wild horses on public lands, which management includes removal operations. *See* 16

5    U.S.C. §1331 *et seq.*; 43 C.F.R. §4700.0-3. "All management activities shall be at the minimal

6    feasible level." 16 U.S.C. 1333(a).

7        To implement the WHA, including its provision for management at minimally feasible

8    levels, BLM adopted regulations that mandate the creation of both herd management areas and

9    HMAPs. *See* 43 C.F.R. §§4710.3-1 and 4710. Specifically, Section 4710.3-1 mandates BLM to

10   create herd management areas (HMAs) for the "maintenance of wild horse and burro herds." In

11   creating these HMAs, BLM "shall consider . . . the constraints contained in §4710.4." *See id.* at

12   §4710.3-1. Further, BLM "shall" prepare HMAPs for these HMAs. *Id.*

13       Section 4710.3-1 does not, in and of itself, expressly identify a timeframe by which

14   HMAPs must be created. For that, the section directs the reader to Section 4710.4. *See id.*

15   Section 4710.4 (entitled "Constraints on management") provides that management activities

16   "*shall* be at the minimum level necessary to attain the objectives identified in approved land use

17   plans *and* herd management area plans." *Id.* at §4710.4 (emphasis added).

18       Thus, reading both sections together, it is clear that BLM must consider both land use

19   plans and HMAPs prior to delineating any HMAs and prior to engaging in management activities

20   for these HMAs.

21       In their opposition to Plaintiffs' Motion for Summary Judgment, Defendants concede that

22   Section 4710.3-1 "generally requires that an HMAP be created" but deny that "the regulations

23   provide a time period in which BLM must create an HMAP." Defs.' Motion at pp. 9:25, 15:2-3.

24   As addressed below, their position relies upon unpersuasive, inapposite caselaw, as well as a

25   strained interpretation of the wording contained within Section 4710.4. Moreover, Defendants

26   completely ignore the legislative history of BLM's implementing regulations.

27

28

1          1.          Defendants' Opposition is Based on Inapposite Caselaw

2          Defendants assert that multiple courts have found it unnecessary for BLM to prepare an

3    HMAP prior to gather operations, citing *Friends of Animals v. Silvey*, 353 F. Supp. 3d 991, 1009

4    (D. Nev. 2018); *Animal Prot. Inst. of Am.*, 109 IBLA 112 (1989), *Friends of Animals v. Pendley*,

5    523 F. Supp. 3d 39 (D.D.C. 2021), and *Friends of Animals v. United States Bureau of Land*

6    *Mgmt.*, 548 F. Supp. 3d 39 (D.D.C. 2021). This is incorrect. None of these cases address Section

7    4710.4 or the regulatory history of BLM's regulations. No mention is made of the tools of

8    statutory construction that were argued (if they were). Only one of the three cases, *Animal Prot.*

9    *Inst. of Am.*, even considers the issue of temporality, and then without addressing Section 4710.4.

10   As such, they have no precedential value. *See Webster v. Fall*, 266 U.S. 507, 511 (1925)

11   ("[q]uestions which merely lurk in the record, neither brought to the attention of the court nor

12   ruled upon, are not to be considered as having been so decided as to constitute precedents");

13   *Nat'l Cable Television Ass'n, Inc. v. Am. Cinema Eds.*, Inc., 937 F.2d 1572, 1581 (Fed. Cir.

14   1991) ("[w]hen an issue is not argued or is ignored in a decision, such decision is not precedent

15   to be followed in a subsequent case in which the issue arises").

16          In *Friends of Animals*, the appellants argued that a gather plan violated the WHA's

17   requirement that management occur at the minimal feasible level. *See Friends of Animals*, 353 F.

18   Supp. 3d at 1008. Because this claim had not been raised in the complaint, the court dismissed it.

19   *See id.* In dicta, the court stated that 16 U.S.C. §1333(a) could be reasonably interpreted to mean

20   that "BLM shall use '[t]he minimum number of habitat or population management tools or

21   actions necessary to attain the objectives' for an HMA." The court was not asked to consider

22   whether BLM complied with its implementing regulations, which (as Plaintiffs have argued in

23   this case) establish that at a minimum, BLM shall consider land use plans and HMAPs. *See* 43

24   C.F.R. §4710.4.

25          *Animal Prot. Inst. of Am.* is an Interior Board of Land Appeals opinion that addressed a

26   challenge to four BLM decisions approving gather plans. *See Animal Prot. Inst. of Am.*, 109

27   IBLA at 112-113. Appellants put forth several arguments, and the vast majority of the opinion

28

focused on whether BLM's method for establishing AMLs was consistent with 16 U.S.C.

§1333(b)'s requirement that removal of horses be necessary to achieve and maintain a thriving

natural ecological balance on public lands. *See id.* at 114-126 (finding most AMLs had not been

properly established). One paragraph addresses HMAPs:

> Finally, API contends that BLM should not be permitted to proceed with removal of wild horses from the HMA/WHTs involved herein until it has prepared an HMAP in each case. We note that 43 CFR 4710.3-1 requires preparation of an HMAP. BLM and/or the Forest Service has prepared HMAPs only with respect to the Miller Flat and Nevada Wild Horse Range HMAs, Monte Cristo HMA/WHT, and Cherry Springs WHT. No HMAPs have been prepared in the case of the other HMA/WHTs involved herein. We conclude that it is not necessary that BLM prepare an HMAP as a basis for ordering the removal of wild horses, so long as the record otherwise substantiates compliance with the statute. Indeed, 43 CFR 4710.3-1 does not require preparation of an HMAP as a prerequisite for a removal action. Thus, we are not persuaded that preparation of an HMAP must in all cases precede the removal of wild horses from an HMA/WHT, and decline to order preparation of HMAPs.

*See id.* at 127.

Unlike the *Animal Protection Institute*, Plaintiffs aver that Defendants are in violation of

Section 4710.4 because BLM has not prepared a single HMAP for any of the HMAs or the

Complex of HMAs at issue in this litigation. Plaintiffs may agree that Section 4710.3-1—on its

own—does not expressly require preparation of an HMAP as a prerequisite for a removal action.

Instead, Section 4710.3-1 requires that in creating HMAs for the maintenance of wild horses,

BLM "shall consider . . . the constraints contained in § 4710.4." *See id.* at §4710.3-1. Section

4710.4 mandates that HMAPs be consulted before engaging in HMA management activities,

which include decisions to remove wild horses from public lands. Because the *Animal Prot. Inst.

of Am.* opinion does not address this section of BLM regulations, the paragraph's conclusion

regarding HMAPs is not controlling. Moreover, IBLA decisions are not controlling on this

Court, so a single IBLA decision from decades ago bears no weight in this case, which Plaintiffs

bring to a tribunal with oversight authority over the actions of administrative agencies per Article

III of the United States Constitution. *Marbury v. Madison,* 5 U.S. 137 (1803).

Defendants assert that *Friends of Animals v. Pendley* and *Friends of Animals v. United States Bureau of Land Mgmt.* accord with the *Animal Prot. Inst. of Am.* insofar as they note that BLM may consider a number of different materials in managing HMAs. *See* Defs. Motion at p. 10:4-14. Again, these cases do not address Section 4710.4, and so, their rulings are unpersuasive.

HMAPs are barely addressed in *Friends of Animals v. Pendley* – only in a footnote. *See Friends of Animals*, 523 F. Supp. at 56 n.3. In that case, the plaintiff made a "passing argument" that a BLM instruction memorandum, which amended the agency's Wild Horse and Burro Management Handbook, departed from an HMAP created for the Twin Peaks HMA. *Id.* The court noted the instruction memorandum was a non-binding document, and regardless, it was not persuaded that the memorandum diverged from the HMAP. *See id.* Also, the court stated "[m]oreover, the record indicates that the provisions of the 1989 HMAP upon which Plaintiff relies have been superseded by a 2008 resource management plan." *Id.* There was no discussion of BLM's regulations. Plaintiffs were not arguing that HMAPs must be created prior to removal actions. The court's opinion simply is not on point.

Plaintiffs in *Friends of Animals v. United States Bureau of Land Mgmt.* made a number of challenges to a removal plan that was issued in 2018. *See Friends of Animals*, 548 F. Supp. 3d at 46, 49-50. Among these challenges, plaintiffs made a series of arguments alleging that BLM's actions improperly departed from past agency policy and practice. *See id.* at 65-67. One such argument was that a proposed roundup in 2021 could not be "reconciled with the overall procedures for wild horse management as explained in BLM's handbook." *Id.* at 67. This argument was not properly before the court because plaintiffs had not brought suit to challenge the proposed roundup, but instead, the lawsuit was a facial challenge of the Friends of Animals v. United States Bureau of Land Mgmt., 548 F. Supp. 3d 39 (D.D.C. 2021)2018 actions. *See id.* at 56, 67. Nonetheless, in dicta, the court noted that the handbook's procedures provide BLM "considerable flexibility in choosing which types of plans to use" to manage HMAs. *Id.* at 67. Again, this case is inapposite, providing no analysis of BLM's regulations. Plaintiffs were not arguing that the 2018 plan was invalid because an HMAP had not first been created.

In addition to these cases, Defendants cite to cases for the general proposition that courts recognize BLM has discretion under the WHA regarding decisions involving the removal of excess horses from public lands, citing to *W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1282 (D. Utah 2017); *In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1064 (9th Cir. 2014); *Cloud Found. v. U.S. Bureau of Land Mgmt.*, No. 3:11-CV-00459-HDM, 2013 WL 1249814 at *5 (D. Nev. Mar. 26, 2013), *In Def. of Animals v. U.S. Dep't of Interior*, 909 F. Supp. 2d 1178, 1189 (E.D. Cal. 2012), *Am. Horse Prot. Ass'n, Inc. v. Frizzell*, 403 F. Supp. 1206, 1217 (D. Nev. 1975), *Am. Horse Prot. Ass'n v. Watt*, 694 F.2d 1310, 1317-1318 (D.C. Cir. 1982). These decisions, and the arguments made within, do not mention or address HMAPs or the issues raised by Plaintiffs in their Motion for Summary Judgment. Each merely notes that aspects of 16 U.S.C. §1333 afford BLM some discretionary authority. Plaintiffs do not disagree with this general proposition, but it is irrelevant. BLM chose to adopt regulations that limit its discretion – and these cases do not address this limitation.

Moreover, Defendants ignore Plaintiffs' reference to *Nat'l Cable Television Ass'n, Inc.* for the proposition that "[w]hen an issue is not argued or is ignored in a decision, such decision is not precedent to be followed in a subsequent case in which the issue arises." Instead, they appear to think that any case is "directly on point" so long as HMAPs or Section 1333 are in any way referenced. This is simply not so. Analysis of Section 4710.4 is critical to Plaintiff's motion and in establishing BLM's duty as to HMAPs.

To be clear, Plaintiffs' motion addresses an issue of first impression that has not previously been brought before this Court or, to Plaintiffs' knowledge, to any court. It is for this reason that Plaintiffs spent considerable time addressing the wording and legislative history of BLM's implementing regulations.

      2.      Defendants' Opposition is Based on a Strained Interpretation of BLM Regulations

Section 4710.3-1 provides, in full:

Herd management areas shall be established for the maintenance of wild horse and burro herds. In delineating each herd management area, the authorized officer shall consider the

appropriate management level for the herd, the habitat requirements of the animals, the
relationships with other uses of the public and adjacent private lands, and the constraints
contained in § 4710.4. The authorized officer shall prepare a herd management area plan,
which may cover one or more herd management areas.

43 C.F.R. §4710.3-1. Defendants state that the first two sentences "require[] HMAs be
established for the maintenance of wild horse herds and lists information BLM must consider in
doing so." Defs.' Motion at p. 14:19-25. However, these first two sentences "exist separate from
the general mandate [in the third sentence] that BLM create HMAPs." *Id.* At first glance, this
might appear to be the case, but only if you ignore that among the information BLM must
consider in "delineating each" HMA are "the constraints contained in §4710.4" (to wit,
consideration of the objectives contained in land use plans *and* HMAPs). 43 C.F.R. §4710.3-1;
*see also* 43 C.F.R. §4710.4. Defendants ignore this connection between Sections 4710.-1 and
4710.4.

As regards the wording of Section 4710.4, Defendants focus on the term "approved,"
arguing that this regulation "does not mandate the creation and approval of new plans; it only
pertains to previously approved plans, if they exist for the relevant area." Defs.' Motion at p.
14:14-18. In other words, if no land use plan or HMAP has been created, then Section 4710.4 is
utterly and completely without effect. This position not only ignores the legislative history of the
regulations, but it also requires the Court to engage in a strained interpretation of the regulations.
Statutory interpretation should not render regulatory provisions as superfluous. *See R.J. Reynolds
Tobacco Co. v. Cnty. of L.A.*, 29 F.4th 542, 559 (9th Cir. 2022); *Chubb Custom Ins. Co. v. Space
Sys./Loral, Inc.*, 710 F.3d 946, 965 (9th Cir. 2013).

Section 4710.4 is entitled "Constraints on management," but BLM ignores this. Section
4710.4 states that management activities "shall" be based on objectives in both land use plans
"and" HMAPs, but BLM finds this wording meaningless. As regards the term "approved," BLM
could read this as requiring the creation of approved plans and HMAPs, which would be
consistent with the regulations' purpose of clarifying BLM's management procedures and
constraining management. Instead, BLM posits that "approved" makes consideration of land use

plans and HMAPs optional. As addressed in Plaintiffs' initial brief, no *Auer* deference should be granted to this peculiar interpretation, which contradicts both the wording of the regulations and its legislative history. *See* Pls.' Motion at pp. 19:18-20:20.

Quite clearly, the regulations serve as a constraint on BLM's management of wild horses. Plaintiffs' opening briefing cited *Accardi v. Shaughnessy*, 347 U.S. 260 (1954) and *Service v. Dulles*, 354 U.S. 363 (1957) for the proposition that an agency's regulations can limit the discretion afforded it by Congress, imposing mandatory duties. *See* Pls.' Motion at pp. 21:21-22:23. BLM was not obligated to impose upon itself specific management procedures, but having done so through adoption of Sections 4710.3-1 and 4710.4, it cannot now proceed without regard to them. *See Service*, 354 U.S. at 388. This is so even if "the eventual outcome" after following the regulations is the same as that observed from failure to follow the regulations." *Associated Builders & Contractors of Tex. Gulf Coast, Inc. v. United States Dep't of Energy*, 451 F. Supp. 281, 287 (S.D. Tex. 1978); *see also Pac. Molasses Co.*, 356 F.2d at 389-90 (regulations "must be scrupulously observed[,] and where an agency violations its regulations, "any action taken as a result . . . cannot stand"). Defendants argue that *Accardi* and *Service* are inapplicable, but they do not analyze why this is so. Instead, they simply reiterate that the regulations do not bind them to create an HMAP before engaging in the removal of horses from public lands. *See* Defs.' Motion at pp. 16:13-21. This argument must necessarily fail.

**B.  BLM Unlawfully Withheld and Unreasonably Delayed Creating an HMAP**

Section 706(1) of the APA addresses agency action unlawfully withheld or unreasonably delayed. *See* 5 U.S.C. §706(1). Where a mandatory deadline exists, courts look at whether the action has been unlawfully withheld; where a discretionary deadline exists, courts look at whether the action has been unreasonably delayed. *See Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 n.11 (9th Cir. 2002). Analysis of whether an action is unreasonably delayed takes into consideration the TRAC factors elucidated in *Telecommunications Research & Action v. FCC (TRAC)*, 242 U.S. App. D.C. 222 (D. C. Cir. 1984).

As Plaintiffs have demonstrated, there is a mandatory duty to create an HMAP prior to engaging in management activities (including actions to remove horses from public lands), and as such, BLM's failure to create an HMAP constitutes an action unlawfully withheld. However, even if this Court were to instead consider the deadline discretionary, Section 706.1 has been violated because BLM's failure to create an HMAP has been unreasonably delayed. *See* Pls.' Motion at pp. 24:26-25:25.

Not only do Defendants erroneously argue that BLM's regulations fail to establish a mandatory deadline, but they also dispute that the regulations create a discretionary deadline. Defs.' Motion at p. 18:4-26. In examining whether an action was unreasonably delayed, Defendants note that judicial review is only appropriate where there is a "discrete" action that is "legally required." *Id.* at p. 18:21-26. But here, there is a discrete action, – the mandate to create an HMAP – which is legally required pursuant to BLM's implementing regulations.

Of note, Defendants cite to *Indep. Min. Co. v. Babbitt*, 885 F. Supp. 1356, 1364 (D. Nev. 1995), *aff'd sub nom. Indep. Min. Co.*, 105 F.3d 502. In that case, the District Court analyzed the TRAC factors for BLM action where no specific statutory or regulatory deadline was identified. *See Indep. Min. Co.*, 885 F. Supp. at 1364-65. Although its analysis ultimately ended in a finding that action had not been unreasonably delayed, the Court stated that where there is no specific deadline, under the first TRAC factor, an agency is "subject to a 'rule of reason' deadline," whereby "'reasonable' in this context, mean[s] 'expeditious.'" *Id.* at 1365. Section 4710.3-1 was adopted in 1986. *See* Pls. Motion at p. 18:18-21. Since then, BLM has refused to prepare an HMAP for any of the herd management areas within the Pankake Complex, despite being asked to do so. *See e.g.,* AR3184-86, 3382-86. Surely 37 years constitutes unreasonable delay per this "rule of reason." *See, e.g., In re A Cmty. Voice*, 878 F.3d 779, 783–84 (9th Cir. 2017) (eight-year delay unreasonable); *In re Pesticide Action Network*, 798 F.3d 809, 815 (9th Cir. 2015) (after eight years and without a "concrete timeline" for action, agency had "stretched the 'rule of reason' beyond its limits"); *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004) (agency's "six-year-plus delay is nothing less than egregious"); *In re Bluewater*

*Network*, 234 F.3d 1305, 1316 (D.C. Cir. 2000) (nine-year delay unreasonable); *In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1150 (D.C. Cir. 1992) (six-year delay unreasonable). Moreover, as illustrated by the Fifteenmile HMAP, it is clear that BLM can create HMAPs. *See* Exhibit A to RJN. Despite this, Defendants offer no explanation for their refusal to so act.

Defendants next argue that even if the Court were to find that BLM had a duty with a discretionary deadline, thereby warranting application of the TRAC factors, it should find that there has been no unreasonable delay. *See* Defs.' Motion at pp. 19:1-20:13. This argument mistakenly is based on the presumption that the TRAC factors are applied to analyze whether an HMAP must have been created *prior* to removing excess horses from the range. *See id.* at n. 9. While it is true that the unlawfully withheld prong of Section 706(1) focuses on this, analysis under the unreasonably delayed prong does not. This is necessarily so because the unreasonably delayed prong is only addressed where no specific deadline exists. *See Biodiversity Legal Found.*, 309 F.3d at 1177 n.11**.** This does not mean, however, that the TRAC factor analysis occurs in a vacuum without consideration of future BLM gather operations. *See Brower v. Evans*, 257 F.3d 1058, 1068-70 (9th Cir. 2001)**.**

BLM's regulations provide that BLM "shall prepare a herd management area plan, which may cover one or more herd management areas." 43 C.F.R. §4710.3-1**.** If Section 4710.4 did not exist, and this sentence were read in isolation, then it would provide for a discretionary deadline subject to review of the TRAC factors. And, the rule of reason deadline, requiring BLM to prepare HMAPs expeditiously, would be applied. *See Indep. Min. Co.*, 885 F. Supp. at 1365**.** Again, Plaintiffs have demonstrated that BLM's refusal to create an HMAP prior to initiating removal of horses constitutes action unlawfully withheld. And, even if the Court finds BLM regulations merely provide a discretionary deadline, BLM's refusal to create an HMAP is action unreasonably delayed. Accordingly, Plaintiffs request that BLM be ordered to create an HMAP immediately and before any future gather operations occur.

1       **C.**      **Plaintiffs Do Not Challenge the BLM Handbook as a Final Agency Action**

2       Defendants' oppose Plaintiffs' Motion for Summary Judgment as regards the third and

3 fourth causes of action by arguing that Plaintiffs cannot challenge the BLM Handbook as a final

4 agency action. *See* Defs.' Motion at pp. 20:14-22:17. This argument is irrelevant because

5 Plaintiffs are not seeking to have the Court hold unlawful or set aside the Handbook. The action

6 being challenged is not the Handbook, but rather, BLM's removal of horses, predicated upon a

7 Gather-EA, without first creating an HMAP. Plaintiffs' Motion for Summary Judgment

8 references the Handbook only to the extent that BLM has relied upon it to interpret their HMAP

9 duty as being discretionary. More specifically, Plaintiffs argue that the Handbook cannot alter

10 BLM's mandatory duties under WHA's implementing regulations, and no *Auer* deference should

11 be given to it. *See* Pls.' Motion at pp. 19:19-20:2, 21:13-29, 26:19-27:4, 29:18-21.The Handbook

12 is not legally binding and cannot alter BLM's mandatory duties under WHA's implementing

13 regulations. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 154-56 (2012);

14 *Williams v. Hanover Hous. Auth.*, 871 F. Supp. 527, 531 (D. Mass. 1994).

15       **D.**      **BLM's Gather-EA is Not the Same as an HMAP**

16       Defendants argue that the Gather-EA "states the management actions proposed are tools

17 to achieve management objectives contained in approved land use plans." Defs.' Motion at pp.

18 21:1-3. These plans "contain numerous short and long-term objectives." *Id.* at 21:4. As a result,

19 BLM did a "thorough analysis." *Id.* at p. 22:14. Further, they assert the public had ample

20 opportunity to provide input on the scope of the Pancake Gather Plan. *See id.* at pp. 22:18-24:8.

21 These arguments fail as they do not address Plaintiffs' arguments and evidence.

22       First, BLM's implementing regulations state that management actions should be achieved

23 through objectives contained in approved land use plans *and* HMAPs. *See* 43 C.F.R. §§4710.3-1,

24 4710.4. BLM may not just consult one. It cannot pick and choose what the regulations mandate

25 of it.

26       Second, to achieve management at the minimum feasible level, BLM has to *actually* tier

27 its removal actions to the short- and long-term goals in both land use plans *and* HMAPs. HMAPs

28

were incorporated into the WHA's implementing regulations for a reason: to ensure that gather plans and other management activities are done at the minimum feasible level possible. 43 C.F.R. §4710.4**.** This is consistent with Congress' direction to the Department of the Interior, as stated in the WHA itself. 16 U.S.C. §1333(b)**.** Removal actions are not to occur in a vacuum with Defendants' picking and choosing which HMA goals it should consider. Defendants appear to argue otherwise, noting that a Gather-EA need only focus on restoring a thriving natural ecological balance, regardless of whether long-term goals, such as those related to livestock management, might address that balance. *See* Defs.' Motion at p. 24:3-5. But, this is precisely the point that BLM seems to be missing! The Pancake Gather-EA is an action that does not achieve management at the minimum feasible level precisely because its scope is so narrow.

Third, Defendants argue that "even if an HMAP had been in existence at the time of the 2022 Gather," the concerns raised by the public would have been met with the same response. *See id.* Even if this were true, it does not allow BLM to ignore its mandatory duty to create an HMAP prior to approving removal actions. *See Associated Builders & Contractors of Tex. Gulf Coast, Inc.*, 451 F. Supp. at 287; *Pac. Molasses Co.*, 356 F.2d at 389-90**.** And, to be clear, it is not true. By refusing to create an HMAP, the public has not been afforded the opportunity, through a public scoping process, to participate in the development of HMA goals. *See* Pls.' Motion at p. 2:8-10. Had BLM created an HMAP, Plaintiffs would not only have addressed the impact of livestock grazing on herds in the Complex, but also they would have commented on the Pancake Complex's early foaling season, considerations of weather for gather operations, considerations for ensuring gathers are conducted in a humane manner, the use of reversible PZP for fertility control, rewilding as an alternative management strategy, considerations related to rare genetic lineages present in the Complex, and more. WHE Decl. at ¶¶19-25; CHE Decl. at ¶¶6-8; AWA Decl.¶¶11, 13-15; and CANA Decl. at ¶¶10-11, 15-18. By refusing to create an HMAP, BLM can ignore all of these considerations or make determinations about them without public input.

E.      Defendants Did Not Take a "Hard Look" at the Consequences of Its Gather
        Plan

By proceeding to remove horses without first creating an HMAP, BLM undertook management action without considering all factors relevant to herd health. Moreover, it undertook a NEPA review that was arbitrarily limited in scope. Defendants analysis does not constitute the "hard look" required under NEPA. *See* 42 U.S.C. §4332(E); 40 C.F.R. §1508.9; *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989). Defendants opposition to Plaintiffs' Motion for Summary Judgment does not establish otherwise. Instead, Defendants make sweeping generalizations that fail to address the specific issues raised by Plaintiffs.

For example, Plaintiffs note that members of the public asked BLM to consider recommendations made in the National Research Council's report, "Using Science to Improve the BLM Wild Horse and Burro Program: A Way Forward." *See* Pls.' Motion at p. 33:4-16. In that report, the authors noted BLM management practices, which include regularly removing horses from public lands, can actually cause high horse population growth rates. *See id.* Defendants never responded to public comment on this issue, and they ignore it in their opposition papers. Similarly, as regards impacts of horse removal on wildfire risks, Plaintiffs point out that BLM did respond to public comment; however, neither the response nor the Gather-EA actually contain any analysis of the matter. *See id.* at pp. 33:17-34:11. Defendants' opposition does not address this specific point.

III.    Conclusion

BLM adopted regulations to implement the WHA with the intent of clarifying the management procedures of the Bureau of Land Management as they affect the public. See 49 Fed. Reg. 49252 at Summary on p. 49252, attached as Exh. F to RJN. Toward this end, the regulations require BLM to create and consider both land use plans *and* HMAPs prior to engaging in population management choices. *See* 43 C.F.R. §§4710.3-1, 4710.4. By adopting these management procedures, the public is allowed a meaningful opportunity to participate in the scope and substance of HMA goals, thereby meeting the intent of the regulations.

BLM also failed to meet the requirement of NEPA insofar as it ignored key issues, refused to consider important data, and failed to provide the basis for its analysis.

Plaintiffs therefore request that their motion for summary judgment be granted.

DATED:          November 14, 2023          Respectfully Submitted,

                                          *s/ Danielle M. Holt*
                                          Danielle M. Holt
                                          (Nevada Bar No. 13152)
                                          DE CASTROVERDE LAW GROUP
                                          1149 S Maryland Pkwy
                                          Las Vegas, NV 89104
                                          (702) 222-9999
                                          danielle@decastroverdelaw.com

                                          */s/ Jessica L. Blome*
                                          Jessica L. Blome
                                          (Cal. Bar No. 314898, admitted pro hac vice)
                                          GREENFIRE LAW, PC
                                          2748 Adeline Street, Suite A
                                          Berkeley, CA 94703
                                          (510) 900-9502
                                          jblome@greenfirelaw.com

                                          *Attorneys for Plaintiffs*

# EXHIBIT 5

TODD KIM, Assistant Attorney General
S. JAY GOVINDAN, Section Chief
BRIDGET K. MCNEIL, Assistant Section Chief
CHRISTIAN H. CARRARA (NJ Bar No. 317732020)
Wildlife and Marine Resources Section
SAMANTHA G. PELTZ (IL Bar No. 6336536)
Natural Resources Section
U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, DC 20044
Phone: (202) 598-9736 (Carrara)
Fax: (202) 305-0275
Email: christian.carrara@usdoj.gov

*Attorneys for Federal Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| ANIMAL WELLNESS ACTION, a non-profit corporation, CANA FOUNDATION, a non-profit corporation, THE CENTER FOR A HUMANE ECONOMY, a non-profit corporation LAURA LEIGH, individually, and WILD HORSE EDUCATION, a non-profit corporation, <br><br> *Plaintiffs,* <br><br> *v.* <br><br> UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and JON RABY, Nevada State Director of the Bureau of Land Management, <br><br> *Defendants.* | Case No: 3:22-cv-00034-MMD-CLB <br><br><br> **FEDERAL DEFENDANTS' REPLY IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT (ECF No. 70)** |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 1

    I.     BLM is entitled to summary judgment on Plaintiffs' Wild Horse Act
          claims ................................................................................................... 2

        A.     The 2022 Gather complied with the Wild Horse Act and its
              implementing regulations........................................................ 2

        B.     The Wild Horse Act's implementing regulations do not require
              BLM to create an HMAP before conducting a gather of excess
              horses. ...................................................................................... 3

        C.     Plaintiffs' interpretation of BLM's regulations contradicts the
              Wild Horse Act and congressional intent ................................. 7

        D.     Plaintiffs' claim that BLM unlawfully withheld or unreasonably
              delayed the creation of an HMAP fails as a matter of law. .................. 12

        E.     The Court should reject Plaintiffs' remaining Wild Horse Act
              arguments................................................................................. 14

    II.     BLM is entitled to summary judgment on Plaintiffs' NEPA claims ................. 16

CONCLUSION............................................................................................................. 18

# TABLE OF AUTHORITIES

**Cases**

*Accardi v. Shaughnessy*,
   347 U.S. 260 (1954)................................................................. 6, 7

*Alaska v. Haaland*,
   No. 3:21-CV-0158-HRH, 2022 WL 772968 (D. Alaska Mar. 14, 2022) .............................. 14

*Am. Horse Prot. Ass'n v. Watt*,
   694 F.2d 1310 (D.C. Cir. 1982) ................................................ 10, 11

*Bartell Ranch LLC v. McCullough*,
   2023 U.S. Dist. LEXIS 19280 (D. Nev. Feb. 6, 2023) ...................... 16

*Blake v. Babbitt*,
   837 F. Supp. 458 (D.D.C. 1993) .............................................. 9

*Brown v. Haaland*,
   604 F. Supp. 3d 1059 (D. Nev. 2022) ....................................... 3, 12

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ............................................................ 16

*Cloud Found. v. BLM*,
   No. 3:11-CV-00459-HDM-VPC, 2013 WL 1249814 (D. Nev. Mar. 26, 2013) ................. 10

*Ctr. for Cmty. Action & Env't Just. v. BNSF Ry. Co.*,
   764 F.3d 1019 (9th Cir. 2014) ............................................... 2, 4

*Earth Island Inst. v. Carlton*,
   626 F.3d 462 (9th Cir. 2010) ................................................. 18

*Ecology Ctr. v. Castaneda*,
   574 F.3d 652 (9th Cir. 2009) ................................................. 18

*Exportal Ltda. v. United States*,
   902 F.2d 45 (D.C. Cir. 1990) ................................................. 4, 7

*Fed. Express Corp. v. Holowecki*,
   552 U.S. 389 (2008) ............................................................ 12

*Friends of Animals v. BLM*,
   232 F. Supp. 3d 53 (D.D.C. 2017) ............................................ 6

*Friends of Animals v. BLM*,
   548 F. Supp. 3d 39 (D.D.C. 2021) ............................................ 3, 9

*Friends of Animals v. Culver*,
   610 F. Supp. 3d 157 (D.D.C. 2022) .......................................... 8

*Friends of Animals v. Pendley*,
   523 F. Supp. 3d 39 (D.D.C. 2021)............................................. 3, 10

*Friends of Animals v. Silvey*,
353 F. Supp. 3d 991 (D. Nev. 2018) .................................................................. 11, 13

*Friends of Animals v. United States Bureau of Land Mgmt.*,
No. 16-CV0199, 2017 WL 5247929 (D. Wyo. Mar. 20, 2017) ........................... 10

*Friends of Southeast's Future v. Morrison*,
153 F.3d 1059 (9th Cir. 1998) .......................................................................... 17

*Gonzalez v. Cuccinelli*,
985 F.3d 357 (4th Cir. 2021) ............................................................................ 14

*In Def. of Animals v. U.S. Dep't of Interior*,
751 F.3d 1054 (9th Cir. 2014) ................................................................. 9, 17, 18

*In re A Cmty. Voice*,
878 F.3d 779 (9th Cir. 2017) ............................................................................ 13

*Inhabitants of Montclair Twp. v. Ramsdell*,
107 U.S. 147 (1883) .......................................................................................... 7

*Kleppe v. Sierra Club*,
427 U.S. 390 (1976) ......................................................................................... 16

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989) ......................................................................................... 16

*Native Ecosystems Council v. Marten*,
209 F. Supp. 3d 1168 (D. Mont. 2016) ............................................................... 2

*Native Ecosystems Council v. Marten*,
719 F. App'x 715 (9th Cir. 2018) ....................................................................... 2

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ............................................................................... 12, 13, 14

*Pac. Gas & Elec. Co. v. United States*,
664 F.2d 1133 (9th Cir. 1981) ............................................................................ 8

*Romo v. Barr*,
933 F.3d 1191 (9th Cir. 2019) ............................................................................ 5

*Sec'y of Labor v. Twentymile Coal Co.*,
411 F.3d 256 (D.C. Cir. 2005) ............................................................................ 5

*Service v. Dulles*,
354 U.S. 363 (1957) ....................................................................................... 6, 7

*Stevens v. Corelogic, Inc.*,
899 F.3d 666 (9th Cir. 2018) .............................................................................. 7

*Swanson v. U.S. Forest Serv.*,
87 F.3d 339 (9th Cir. 1996) .............................................................................. 17

*Telecomms. Rsch. & Action Ctr. v. FCC*,
  750 F.2d 70 (D.C. Cir. 1984) ................................................................. 13

*Tri-Valley CAREs v. U.S. Dep't of Energy*,
  671 F.3d 1113 (9th Cir. 2012) ............................................................... 17

*United States v. Larionoff*,
  431 U.S. 864 (1977) ............................................................................... 8

*Viet. Veterans of Am. v. CIA*,
  811 F.3d 1068 (9th Cir. 2016) ............................................................... 13

**Statutes**

16 U.S.C. § 1333 ....................................................................................... 8

16 U.S.C. § 1333(a) .................................................................................. 8

16 U.S.C. § 1333(b)(2) .............................................................. 2, 5, 8, 10

5 U.S.C. § 706(1) ............................................................................. 12, 14

5 U.S.C. § 706(2)(A) ............................................................................. 13

**Regulations**

43 C.F.R. § 4700.0- 6(c) ........................................................................ 11

43 C.F.R. § 4710 ...................................................................................... 5

43 C.F.R. § 4710.4 ............................................................................. 4, 10

43 C.F.R. § 4720 ...................................................................................... 5

43 C.F.R. § 4720.1 ............................................................................... 2, 6

43 C.F.R. §§ 4710.3-1 .......................................................... 2, 4, 6, 10, 11

## **INTRODUCTION**

The Bureau of Land Management's ("BLM") 2022 Gather that addressed the severe wild horse overpopulation on the Pancake Complex in central eastern Nevada through gather and removal actions complied with the Wild Free-Roaming Horses and Burros Act ("Wild Horse Act"), its implementing regulations, and the National Environmental Policy Act ("NEPA").

Congress granted BLM a high degree of discretion in carrying out its mandate to remove excess wild horses once an overpopulation determination is made. The Wild Horse Act's implementing regulations support this authority, and echo Congress' command that the agency immediately remove excess animals based on information currently available. Plaintiffs' response continues to argue that BLM failed to create a Herd Management Area Plan ("HMAP") prior to removing excess horses and failed to consider enough factors while doing so. But there is no such requirement to create an HMAP before a gather and Plaintiffs fail to show BLM did not take a hard look when analyzing the 2022 Gather. Instead, on top of attempting to rewrite the regulations to support their claims, Plaintiffs now try to rewrite their claims, contending for the first time that their unreasonable delay claim is tied to the general obligation that BLM prepare an HMAP. Pls.' Opp. to Defs.' Cross-Mot. for Summ. J. and Reply in Support of Pls.' Mot. for Summ. J. ("Pls.' Reply"), ECF No. 71 at 14.[1] But it is far too late for Plaintiffs to revise their claims. And, in any event, Plaintiffs' claims are unsupported by fact and law. Accordingly, the Court should reject Plaintiffs' arguments, deny their motion for summary judgment, and grant summary judgment for Federal Defendants.

## **ARGUMENT**

Plaintiffs' response brief merely rearranges the same arguments from the past two years. Here, again, Plaintiffs' argument boils down to three contentions: (1) the Wild Horse Act's implementing regulations require BLM to create an HMAP prior to removing excess horses, (2) BLM's failure to create an HMAP before the 2022 Gather constitutes action

---

[1]This brief references the ECF-generated page numbers for court filings.

1    unlawfully withheld or unreasonably delayed under the Administrative Procedure Act

2    ("APA"), and (3) BLM violated NEPA by failing to consider enough factors. Each proposition

3    fails as there is simply no requirement in the Wild Horse Act or its implementing regulations

4    that BLM first prepare an HMAP before the removal of excess horses. Thus, BLM could not

5    have unlawfully withheld or unreasonably delayed doing so. Additionally, Plaintiffs fail to

6    show BLM did not take a hard look under NEPA when analyzing the 2022 Gather Plan. The

7    Court should accordingly reject Plaintiffs' arguments to the contrary.

8    **I.      BLM is entitled to summary judgment on Plaintiffs' Wild Horse Act claims.**

9            Plaintiffs insist that the Wild Horse Act's implementing regulations require BLM to

10   create HMAPs before the removal of excess horses. Pls.' Reply at 6, 10-12. To reach this

11   conclusion, Plaintiffs twist the language contained in 43 C.F.R. §§ 4710.3-1 and 4710.4 and

12   brush aside the regulatory text and scheme, the Wild Horse Act itself, and congressional intent.

13   But Plaintiffs cannot simply rearrange the wording within the regulations to manufacture a

14   mandate where none exists. *See Ctr. for Cmty. Action & Env't Just. v. BNSF Ry. Co.*, 764 F.3d

15   1019, 1024 (9th Cir. 2014) (declining to adopt the plaintiffs' interpretation, which, "would

16   effectively be to rearrange the wording of the statute—something that we, as a court, cannot

17   do"). Nor can they ignore the regulatory and statutory scheme that contradicts their claims. *See*

18   *Native Ecosystems Council v. Marten*, 209 F. Supp. 3d 1168, 1177 (D. Mont. 2016) (plaintiffs

19   cannot isolate words from their context), *aff'd*, 719 F. App'x 715 (9th Cir. 2018). The Court

20   should therefore reject each of Plaintiffs' challenges to the 2022 Gather under the Wild Horse

21   Act as without merit.

22   **A. The 2022 Gather complied with the Wild Horse Act and its implementing**
     **regulations.**

23           As a threshold matter, the 2022 Gather complied with the Wild Horse Act, its

24   implementing regulations, and congressional intent by removing excess wild horses from the

25   Pancake Complex once BLM determined that an overpopulation existed based on the

26   information available to it. 16 U.S.C. § 1333(b)(2); 43 C.F.R. § 4720.1. Although Plaintiffs

27   continue to contend that the 2022 Gather violated the requirement that BLM create HMAPs,

28

Pls.' Reply at 5, "it is not necessary that BLM prepare an HMAP as a basis for ordering the removal of wild horses, so long as the record otherwise substantiates compliance with the [Wild Horse Act]." *Animal Prot. Inst. of Am.*, 109 IBLA 112, 127 (1989)[2]; *accord Friends of Animals v. BLM*, 548 F. Supp. 3d 39, 67 (D.D.C. 2021) (finding a combination of materials may be used to manage a herd management area ("HMA")); *Friends of Animals v. Pendley*, 523 F. Supp. 3d 39, 56 n.3 (D.D.C. 2021) (reasoning that an action could use an HMAP or a resource management plan ("RMP") to comply with the Wild Horse Act). As mentioned, here, BLM substantially complied with the Wild Horse Act by establishing the appropriate management level ("AML") range and various short and long-term objectives through the Record of Decision and 2008 Ely District RMP, 1997 Tonopah RMP, and 1986 Humboldt National Forest Land & Resource Management Plan. *See* Fed. Defs.' Br. at 18-19. BLM also followed gather standards and responded to comments to address and implement the minimal feasible level for the gather. *Id.* at 19. This thorough analysis and determination demonstrates that Plaintiffs do not dispute the reasonableness—and necessity—of BLM's decision; they merely disagree with the 2022 Gather.

**B. The Wild Horse Act's implementing regulations do not require BLM to create an HMAP before conducting a gather of excess horses.**

Plaintiffs attempt to rewrite the Wild Horse Act's implementing regulations to require BLM to create HMAPs before conducting gathers. Pls.' Reply at 10-12. But this attempt falls flat for at least two reasons. First, the plain text of the regulations upon which Plaintiffs rely creates no such duty. Second, if adopted, Plaintiffs' flawed reading of the regulations would create a conflict within the regulatory text and with Congress' intent behind enacting the Wild Horse Act.

---

[2] Plaintiffs assert that the Court should not consider this Interior Board of Land Appeals ("IBLA") Decision because it was not issued by an Article III court. Pls.' Reply at 7-8. However, the decision is persuasive authority since it is directly on point in rejecting Plaintiffs' regulatory interpretation argument. *See Brown v. Haaland*, 604 F. Supp. 3d 1059, 1082 n.34 (D. Nev. 2022) (recognizing that although Interior Board of Indian Appeals decisions are not binding or precedential, their reasoning can be considered as persuasive authority especially when there is a gap in federal caselaw).

First, the regulatory text does not require BLM to create an HMAP prior to removing excess wild horses. Plaintiffs argue that 43 C.F.R. §§ 4710.3-1 and 4710.4 create a "mandatory, non-discretionary duty" for BLM to do so, but fail to identify an express requirement. Pls.' Reply at 5, 10-11. In fact, Plaintiffs concede that an unambiguous requirement does not exist anywhere in the regulatory text. *See* Pls.' Reply at 6 ("Section 4710.3-1 does not, in and of itself, expressly identify a timeframe by which HMAPs must be created."); *see also id.* at 11 (appearing to concede the same). And as relevant to Plaintiffs' argument, Section 4710.4 merely states that "[m]anagement shall be at the minimum level necessary to attain the objectives identified in approved land use plans and [HMAPs]." Thus, a plain reading of each regulation reveals there is no mandate for the agency to create an HMAP before conducting a gather.

Seeming to acknowledge this shortcoming, Plaintiffs argue that only in "reading both [43 C.F.R. §§ 4710.3-1 and 4710.4] together, it is clear" that the requirement exists. *Id.* at 6, 11. But this is not so either. Reading the regulations together, as Plaintiffs suggest, merely shows that, "[i]n delineating each [HMA], [BLM] shall consider … the constraints contained in § 4710.4." 43 C.F.R. § 4710.3-1. And as stated above, the constraints that Plaintiffs refer to are that "[m]anagement shall be at the minimum level necessary to attain the objectives identified in approved land use plans and [HMAPs]." 43 C.F.R. § 4710.4. Simply put, the regulations only require BLM to consider that management be at the minimum feasible level to obtain its identified and approved goals when delineating HMAs. There is no duty for BLM to create an HMAP before conducting a gather that can be gleaned from the plain meaning of the regulations. The Court should accordingly decline to adopt Plaintiffs' interpretation, which, "would effectively be to rearrange the wording of the statute[.]" *Ctr. for Cmty. Action & Env't Just.*, 764 F.3d at 1024; *accord Exportal Ltda. v. United States*, 902 F.2d 45, 50 (D.C. Cir. 1990) (the APA mandates courts apply the plain meaning doctrine when interpreting regulations).

1    Second, Plaintiffs' reading of the regulations not only ignores—but conflicts with—the

2   other Wild Horse Act implementing regulations that address the removal of excess animals.

3   Under the Wild Horse Act's implementing regulations, there are separate sections for

4   management considerations and the removal of excess animals. *Compare* 43 C.F.R. § 4710 *et*

5   *seq.* ("Management Considerations"), *with* 43 C.F.R. § 4720 *et seq.* ("Removal"). As for

6   removal, Section 4720.1 reflects Congress' intent in enacting the Wild Horse Act and requires

7   that "[u]pon examination of current information and a determination by [BLM] that an excess

8   of wild horses … exists, [BLM] shall remove the excess animals immediately[.]" *See also* 16

9   U.S.C. § 1333(b)(2) (requiring the immediate removal of excess animals when the Secretary

10  determines that an overpopulation exists based on "all information currently available to him").

11  It is thus clear that Congress and BLM intended that the removal of excess horses not be

12  hindered by separate management considerations where the agency substantially complies with

13  the statute, much less prohibited until BLM has the resources to develop an HMAP for a given

14  area.

15    Reading the regulations as Plaintiffs suggest, however, would create an illogical result:

16  BLM would be tasked with immediately removing excess horses on the basis of the current

17  information available but would also have to first create an HMAP where none exists—even

18  where the action otherwise substantially complies with the Wild Horse Act. The Court should

19  reject these "absurd results" that follow Plaintiffs' misreading of the Wild Horse Act and

20  regulations. *Romo v. Barr*, 933 F.3d 1191, 1198 (9th Cir. 2019); *accord Sec'y of Labor v.*

21  *Twentymile Coal Co.*, 411 F.3d 256, 260-61 (D.C. Cir. 2005) ("To read the regulation's use of

22  the term... [in this way] would lead to absurd results .... This [c]ourt will not adopt an

23  interpretation of a statute or regulation when such an interpretation would render the particular

24  law meaningless.") (citations omitted).

25    This straightforward reading of the regulations also dovetails with BLM's Wild Horses

26  and Burros Management Handbook ("BLM Handbook"). *See* AR_1350-1429. In the BLM

27  Handbook, BLM separates management into three chapters: (1) habitat management, (2)

28

population management, and (3) herd management area planning. For herd management area planning, the BLM Handbook explains that "HMAPs establish short- and long-term management and monitoring objectives for a specific [wild horse and burro] herd and its habitat[,] … identify the actions to be taken to accomplish herd and habitat management objectives[,] … [and] assists the authorized officer in tracking progress toward achieving [land use plan] goals." AR_1360. But the BLM Handbook states, "[w]hen the authorized officer has determined that excess [horses] exist, gathers to capture and remove the animals immediately or as soon as possible are required." AR_1372. The BLM Handbook then directs the reader to BLM Manual Section 4720 and 43 C.F.R. §§ 4720.1, 4740.1 and 2. *Id*. The BLM Handbook notably does not direct BLM to 43 C.F.R. §§ 4710.3-1 and 4710.4—the regulations that Plaintiffs rely on—as a constraint on conducting gathers. Thus, Plaintiffs' contention that BLM "impose[d] upon itself specific management procedures" requiring the creation of an HMAP prior to removing excess horses is belied by both the regulatory text and the BLM Handbook.[3] Pls.' Reply at 12; *see Friends of Animals v. BLM*, 232 F. Supp. 3d 53, 63 (D.D.C. 2017) (rejecting plaintiff's argument that BLM must create an environmental assessment ("EA") for each gather and noting BLM's guidance encourages the use of existing analyses in order to "avoid redundancy").

Despite this evidence, Plaintiffs nonetheless return to *Accardi v. Shaughnessy*, 347 U.S. 260 (1954), and *Service v. Dulles*, 354 U.S. 363 (1957), to again argue BLM's duty to remove excess horses is constrained by Sections 4710.3-1 and 4710.4. Pls.' Reply at 12. But, as explained, those cases are inapplicable here as the Secretary is not bound by regulation or statute to create an HMAP before conducting a gather. Fed. Defs.' Br. at 24. Unlike this matter where Plaintiffs concede their theory cannot be gleaned from the face of the regulation, Pls.'

---

[3] Plaintiffs contend that the "BLM Handbook cannot alter BLM's [duty to create an HMAP prior to conducting a gather], and no *Auer* deference should be given to it." Pls.' Reply at 15. Federal Defendants make neither argument. Like the regulatory scheme, the BLM Handbook simply reinforces that the regulations should be understood in accordance with their plain meaning.

Reply at 6, 11, in *Shaughnessy* the court emphasized that the regulations at issue delegated authority in "unequivocal terms[.]" 347 U.S. at 266. The regulation in *Dulles* is also unequivocal as to the duty at issue. *See* 354 U.S. at 383-85 (quoting the regulatory text). Here, Plaintiffs combine two regulations, omit words, and ignore the regulations' scheme and plain meaning to construct their argument. Plaintiffs' interpretation could not be farther from "unequivocal." Thus, *Shaughnessy* and *Dulles* bear no weight here.

In sum, the Court should reject Plaintiffs' illogical reading of BLM's regulations, which cannot be garnered from the plain meaning of the regulations and would create conflict within the regulatory scheme.

**C. Plaintiffs' interpretation of BLM's regulations contradicts the Wild Horse Act and congressional intent.**

Plaintiffs also suggest that applying the plain meaning of the regulations "requires the Court to engage in a strained interpretation" and "ignores the legislative history" of the regulations. Pls.' Reply at 11. Both arguments fail. Giving each word effect within the regulations is not a strained interpretation—it is required. Moreover, Plaintiffs' interpretation of the regulatory text would cause an impermissible conflict with congressional intent. Thus, it is Plaintiffs who minimize the Wild Horse Act's legislative history, which underscores Congress' intent that BLM remove excess horses immediately based on the information it has available so long as it substantially complies with the statute.

First, Plaintiffs' claim that somehow giving the word "approved" effect in Section 4710.4 engages in a strained interpretation and ignores the legislative history of the regulations is unfounded. Pls.' Reply at 11. Contrary to Plaintiffs' contention, giving effect to the plain meaning of words in a statute is not a strained interpretation; it is the required interpretation. *Exportal Ltda.*, 902 F.2d at 50. Indeed, "[i]t is a fundamental principle of statutory interpretation that [courts] must 'give effect, if possible, to every clause and word of a statute[.]'" *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 673 (9th Cir. 2018) (quoting *Inhabitants of Montclair Twp. v. Ramsdell*, 107 U.S. 147, 152 (1883)). And so, reading the regulation to require BLM to consider objectives in *approved* land use plans and HMAPs—rather than

unapproved ones or ones not yet developed—does not render the Section "without effect" as Plaintiffs suggest. Pls.' Reply at 11. Doing so renders each word in the regulation with effect as required.[4]

Also, Plaintiffs' interpretation of the regulatory text impermissibly conflicts with the purpose of the Wild Horse Act. It is axiomatic that in order for regulations to be valid, they "must be consistent with the statute under which they are promulgated[.]" *Pac. Gas & Elec. Co. v. United States*, 664 F.2d 1133, 1136 (9th Cir. 1981) (quoting *United States v. Larionoff*, 431 U.S. 864, 873 (1977)). Plaintiffs, however, do not discuss the text of the authorizing statute for Sections 4710.3-1 and 4710.4—the Wild Horse Act—or its legislative history in their reply. Plaintiffs merely cite 16 U.S.C. § 1333 for the requirement that BLM conduct all management activities at the minimal feasible level. Pls.' Reply at 6; *cf*. Fed. Defs.' Br. at 20-21. But Plaintiffs' fleeting reference to the Wild Horse Act ignores the wide discretion Congress granted to BLM in managing excess horses that is embedded in the text of the statute. For example, the statute lists information BLM may use to determine that a wild horse overpopulation exists and then states "in the absence of [such] information" BLM must proceed with removal on the basis of whatever information BLM has at the time of the decision. 16 U.S.C. § 1333(b)(2). Thus, the text shows that the purpose of the Wild Horse Act removal provision is to respond to wild horse overpopulations and that a lack of information immediately available should not prevent that from occurring. Like the conflict Plaintiffs' misreading would cause within the Wild Horse Act's regulations, *see supra* 5-7, their regulatory interpretation would also frustrate the purpose of the Wild Horse Act which makes clear that the agency must immediately remove excess horses once a determination is made. *See, e.g.*, *Friends of Animals v. Culver*, 610 F. Supp. 3d 157, 169 (D.D.C. 2022) (finding

---

[4] Plaintiffs' argument that Federal Defendants ignore that Section 4710.4 is entitled "Constraints on management" likewise fails. Pls.' Reply at 11. By giving each word effect in Section 4710.4, it is evident that any constraint is focused on management being at the "minimum level." This reading is consistent with the Wild Horse Act as well. *See* 16 U.S.C. § 1333(a) (requiring all management activities be at the minimal feasible level).

nothing in the legislative history to "suggest 'immediately' means anything other than what it says"); *Blake v. Babbitt*, 837 F. Supp. 458, 459 (D.D.C. 1993) (finding the Wild Horse Act requires truly immediate action upon an excess finding because of Congress' determination in the Wild Horse Act that "the endangered and rapidly deteriorating range cannot wait"). The Court should reject this misreading.

To be clear, Federal Defendants do not contend that Sections 4710.3-1 and 4710.4 have no effect or that BLM can simply choose which regulations to follow if it determines that an excess of animals exists on the range and removal is necessary.[5] *Cf.* Pls.' Reply at 11, 15. Consistent with the IBLA's holding in *Animal Protection Institute of America,* and as Federal Defendants have maintained since this case first began, "it is not necessary that BLM prepare an HMAP as a basis for ordering the removal of wild horses, so long as the record otherwise substantiates compliance with the statute." 109 IBLA at 127; *see also* Defs.' Opp. to Request for Temp. Restraining Order and Prelim. Injunction, ECF No. 18 at 11-12. And as explained, to substantially comply, BLM could use a land use plan, an EA, an established AML, and a gather plan, or some combination, in issuing a gather decision. *Friends of Animals v. BLM*, No. CV 18-2029 (RDM), 2021 WL 2935900, at *20 (D.D.C. July 13, 2021). These options do not bypass constraints on management, as Plaintiffs argue. Pls.' Reply at 11-12. Rather, as outlined in the BLM Handbook and confirmed by statute, they give BLM "considerable flexibility" in choosing the types of plans relied on for gathers so that the agency can comply with its mandate to immediately remove excess animals. *Id.*; *see also In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1066 n.20 (9th Cir. 2014) (concluding the Wild Horse Act gives

---

[5] Likewise, it is not disputed that BLM is generally required to create an HMAP or that Sections 4710.3-1 and 4710.4 pertain to how the agency manages HMAs. *See, e.g.*, Mem. in Support of Fed. Defs.' Cross-Mot. for Summ. J. and Opp. to Pls.' Mot. for Summ. J. ("Fed. Defs.' Br."), ECF No. 70 at 17 n.4. These issues are not before the Court. The question that is before the Court is whether the Wild Horse Act or its regulations prohibit removal of excess horses prior to creation of an HMAP. *See* March 30, 2023, Order at 5, ECF No. 54 (clarifying the issue).

1    BLM discretion to take measures not delineated by statute because BLM must also comply

2    with the Wild Horse Act's command to remove excess horses immediately).

3         This reading of the regulations and understanding of Congress' intent to afford BLM

4    wide discretion in relying on information to support the gather and removal of excess horses

5    has been long recognized by courts. *See Cloud Found. v. BLM*, No. 3:11-CV-00459-HDM-

6    VPC, 2013 WL 1249814, at *5 (D. Nev. Mar. 26, 2013) (The statute "clearly conveys

7    Congress's view that BLM's findings of wild horse overpopulations should not be overturned

8    quickly on the ground that they are predicated on insufficient information." (quoting *Am.

9    Horse Prot. Ass'n v. Watt*, 694 F.2d 1310, 1318 (D.C. Cir. 1982)); *see also Am. Horse Prot.

10   Ass'n*, 694 F.2d at 1317–18 (The 1978 amendments added language to specify "what

11   information the Secretary must possess—or, more accurately, the information the Secretary

12   need *not* possess—before removing wild horses deemed to be in excess.") (citing 16 U.S.C. §

13   1333(b)(2)). Plaintiffs seek to rebut these cases but "do not disagree with th[e] general

14   proposition" that Congress afforded BLM with discretionary authority in addressing and

15   removing excess horses. Pls.' Reply at 10. Rather, Plaintiffs attempt to undermine these

16   decisions by simply arguing they hold no weight because they do not "address Section 4710.4

17   or the regulatory history of BLM's regulations." *Id.* at 7-10. But this is inaccurate. Throughout

18   their briefing, Plaintiffs insist that a reading of Section 4710.3-1 necessarily implicates Section

19   4710.4. *See, e.g.*, *id.* at 6 ("[Section 4710.3-1] directs the reader to Section 4710.4."); *id.* at 11

20   (asserting "Defendants ignore this connection between Sections 4710.[3]-1 and 4710.4"). Thus,

21   when the IBLA concluded that Section 4710.3-1 "does not require preparation of an HMAP as

22   a prerequisite for a removal action" the IBLA necessarily considered whether Section 4710.4,

23   which the reader is directed to, requires the same. *Animal Prot. Inst. of Am.*, 109 IBLA at 127.

24   And because this reading is clear from the text of the regulations, Plaintiffs' contention that the

25   decisions do not address the tools of statutory construction is irrelevant.  For these reasons,

26   Plaintiffs' arguments against the applicability of *Friends of Animals v. Pendley*, 523 F. Supp.

27   3d 39, and *Friends of Animals v. BLM*, Case No: 16-CV-0199, 2017 WL 5247929, at *8 (D.

28

1  Wyo. Mar. 20, 2017), similarly fail as both cases interpret 43 C.F.R. § 4710.3-1 with its
2  reference to Section 4710.4. *See* Pls.' Reply at 9.

3      As for *Friends of Animals v. Silvey*, 353 F. Supp. 3d 991 (D. Nev. 2018), *aff'd*, 820 F.
4  App'x 513 (9th Cir. 2020), Plaintiffs argue that, because "the court was not asked to consider
5  whether BLM complied with its implementing regulations," the decision does not have
6  precedential value. Pls.' Reply at 7. This misses the mark. Like here, the plaintiff in *Silvey*
7  argued that BLM's overpopulation determination and response violated the Wild Horse Act's
8  implementing regulations governing management activities.[6] *See* Pls.' Mot. for Summ. J. and
9  Mem. of P. & A., 3:18-cv-00043-LRH-CLB, ECF No. 21 at 20 (citing 43 C.F.R. § 4700.0-
10 6(c)). The *Silvey* court explained that plaintiff's argument "fails in light of the widely accepted
11 understanding that the [Wild Horse Act] 'conveys Congress's view that BLM's findings of
12 wild horse overpopulations should not be overturned quickly on the ground that they are
13 predicated on insufficient information.'" *Silvey*, 353 F. Supp. 3d at 1007 (quoting *Am. Horse*
14 *Prot. Ass'n, Inc.*, 694 F.2d at 1318). Similarly, Plaintiffs' HMAP argument is premised upon
15 the false assertion that, in absence of an HMAP, BLM's gather decision is based on insufficient
16 information. *See* Pls.' Reply at 6, 8, 11, (arguing the constraints contained in 4710.4 are among
17 the information BLM must consider); *id.* at 15-16 (arguing the minimum feasible level must be
18 considered). And so, the court's reasoning in *Silvey* equally applies here: BLM's 2022 Gather
19 should not be overturned quickly on the ground that it was predicated on insufficient
20 information in the name of an HMAP that does not exist. *See supra* 2-3 (discussing
21 information relied upon). The Court should thus reject Plaintiffs' "baseless" interpretation
22 which conflicts with the "plain meaning of the statutory terms of the [Wild Horse Act.]"[7]
23 *Silvey*, 353 F. Supp. 3d at 1009.

---

24 [6] The only difference is that, here, Plaintiffs challenge BLM's decision to gather horses before
25 creating an HMAP whereas, in *Silvey*, plaintiff challenged BLM's decision to geld a portion of
   the wild horse population. *Silvey*, 353 F. Supp. 3d at 1007; Pls.' Reply at 15.
26
27 [7] Plaintiffs also repeat their assertion that Federal Defendants do not adequately respond to
   their reference to *National Cable Television Associaion, Inc.* Pls.' Reply at 10. But this

28

In short, Plaintiffs quibble with mistaken and meaningless distinctions between the instant matter and case law but do not dispute the broad discretion afforded to BLM under the Wild Horse Act in making determinations to remove excess horses. Pls.' Reply at 10. Nor do Plaintiffs dispute—or even address—that their reading of the regulations thwarts the Congressionally-dictated goals of the Wild Horse Act. *Cf.* Fed. Defs.' Br. at 20-21 (discussing such). Accordingly, the Court should reject Plaintiffs' theory which would cause "tension with the structure and purposes" of the Wild Horse Act. *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 401-02 (2008).

## D. Plaintiffs' claim that BLM unlawfully withheld or unreasonably delayed the creation of an HMAP fails as a matter of law.

Plaintiffs also argue that BLM unlawfully withheld or unreasonably delayed the creation of an HMAP under 5 U.S.C. § 706(1). Pls.' Reply at 12-13. Both arguments fail as a matter of law. First, Plaintiffs' contention that BLM unlawfully withheld creating an HMAP before conducting a gather fails because Plaintiffs have not—and cannot—show there is a specific legislative command to do so. *See supra* 3-11. As explained, it is fundamental that a court's power to "compel agency action" under the APA is limited to situations when an agency has ignored a specific legislative command. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004) (constraining judicial review under 5 U.S.C. § 706(1) to "discrete" actions that are "legally *required*"); *see also Brown*, 604 F. Supp. 3d at 1079 (to compel agency action under the APA, the agency must have "a clear, certain, and mandatory duty") (internal quotation marks and citation omitted). Plaintiffs concede that there is no clear, certain, and mandatory duty to create an HMAP before conducting a gather. *See* Pls.' Reply at 6 ("Section 4710.3-1 does not, in and of itself, expressly identify a timeframe by which HMAPs must be created."); *see also id*. at 11 (appearing to concede the same). Plaintiffs attempt to invent a duty by putting together two regulations—and ignoring regulatory text, scheme, and congressional

---

argument needs to only be briefly addressed. As discussed, the cases Federal Defendants rely on address whether BLM can conduct a gather without an HMAP, which is precisely the issue in this case. *See supra* 9-11.

intent along the way—but that cannot establish a duty, the fulfillment of which was unlawfully withheld. *See In re A Cmty. Voice*, 878 F.3d 779, 784 (9th Cir. 2017) ("an agency cannot unreasonably delay that which it is not required to do").

Perhaps acknowledging this shortfall, Plaintiffs appear to abandon their Mandamus and Venue Act claim and instead focus on arguing that BLM unreasonably delayed the creation of an HMAP. Pls.' Reply at 13. But this argument fares no better than Plaintiffs' Mandamus and Venue Act and unlawfully withheld action claims for two reasons. Plaintiffs cannot now, after two years of litigation, rewrite their claim in their reply brief. In addition, Plaintiffs' claim fails as a matter of law.

First, Plaintiffs assert the discrete action that was unreasonably delayed is "the mandate [for BLM] to create an HMAP." Pls.' Reply at 13; *see also Telecomms. Rsch. & Action Ctr. v. FCC* ("*TRAC*"), 750 F.2d 70, 79-80 (D.C. Cir. 1984). But that is not so. Plaintiffs' unreasonable delay claim hinges upon whether BLM has a duty to create an HMAP *prior* to conducting a gather. *See* Pls.' Am. Compl. ¶¶ 120-21; Fed. Defs.' Br. at 27 n.9. That is the discrete action to be analyzed; not whether BLM was only required to create an HMAP.[8] Plaintiffs cannot now pursue a different claim in their reply brief because their initial unreasonable delay claim is unavailing. *Silvey*, 353 F. Supp. 3d at 1008 (rejecting a similar attempt by plaintiff to do so). Because Plaintiffs cannot change their unreasonable delay claim now—and Plaintiffs cannot show BLM is legally required to create an HMAP before conducting a gather—Plaintiffs' citations to cases discussing unreasonable delays are inapplicable here. Pls' Reply at 13-14. And as explained, Plaintiffs' reference to the

---

[8] Plaintiffs' requested relief demonstrates this to be so. If Plaintiffs' claim were truly focused on compelling BLM to develop an HMAP, that would be the only agency action that the Court could compel. *See Viet. Veterans of Am. v. CIA*, 811 F.3d 1068, 1075-76 (9th Cir. 2016) (citing *Norton*, 542 U.S. at 63-64). However, Plaintiffs here seek invalidation of the 2021 Gather Decision for an alleged noncompliance with the Wild Horse Act's implementing regulations. In other words, Plaintiffs truly bring an APA 706(2) challenge that the 2021 Gather Decision is "otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

Fifteenmile HMAP is not only irrelevant but inappropriate. *See* Fed. Defs.' Br. at 30 n.11; *see also* Fed. Defs.' Resp. to Pls.' Mot. for Judicial Notice (ECF No. 65), ECF No. 68.

Plaintiffs attempt to overcome this flaw in their unreasonable delay argument by suggesting that, while the unlawfully withheld prong requires the Court to analyze whether an HMAP must have been created prior to removing excess horses from the range, "analysis under the unreasonably delayed prong does not." Pls.' Reply at 14. According to Plaintiffs, this is because "the unreasonably delayed prong is only addressed where no specific deadline exists." *Id.* Plaintiffs' argument does not withstand scrutiny. Plaintiffs cannot now remove a necessary condition of their claim—that the creation of an HMAP is required *prior* to removing excess horses—in an attempt to save their argument. *See, e.g.*, *Gonzalez v. Cuccinelli*, 985 F.3d 357, 366 (4th Cir. 2021) (rejecting plaintiffs' unreasonable delay claim alleging the defendants had a duty to issue a determination *upon a party's request* and explaining "where an agency is *not required* to do something, we cannot compel the agency to act—let alone to act faster.") (citing *Norton*, 542 U.S. at 63 n.1).

In sum, Plaintiffs cannot now change their claims to keep their unreasonable delay argument alive. And because Plaintiffs have failed to show there is a duty to create an HMAP before conducting a gather, there can be no unreasonable delay as a matter of law.[9] *Alaska v. Haaland*, No. 3:21-CV-0158-HRH, 2022 WL 772968, at *9 (D. Alaska Mar. 14, 2022) (finding because BLM has no duty to publish public land orders under its regulations, there is no basis for allegation that there has been an unreasonable delay). The Court should thus reject Plaintiffs' 5 U.S.C. § 706(1) claims.

**E. The Court should reject Plaintiffs' remaining Wild Horse Act arguments.**

Finally, Plaintiffs pull together several last-ditch arguments related to the Wild Horse Act that are quickly dismantled. First, Plaintiffs argue, for a third time, that BLM cannot

---

[9] Moreover, even if the Court were to consider the *TRAC* factors, for the reasons previously explained, Plaintiffs' arguments would still fail. *See* Fed. Defs.' Br. at 26-28. Notably, Plaintiffs do not respond to the reasoning provided in Federal Defendants' opening brief and we do not further address these points.

achieve the minimal feasible level without an HMAP. Pls.' Reply at 15-16; Pls.' Notice of Mot. for Summ. J. and Mem. of P. & A. in Support Thereof, ECF No. 64 at 34; Pls.' Ex Parte Request for Temp. Restraining Order and Prelim. Inj., ECF No. 4 at 17. But this is simply inaccurate. As mentioned previously, the approved management plans for the herd areas in the Pancake Complex contain many short and long-term objectives for maintaining the wild horse population at the minimal feasible level. *See* Fed. Defs.' Br. at 30, 32. Additionally, the Wild Horse and Burro Comprehensive Animal Welfare Program, which BLM relied upon in conducting the 2022 Gather, contains guidance on how agency personnel should manage HMAs and employ minimal management tools. *Id*. at 20. Thus, Plaintiffs' myopic focus on just the gather-EA and not these other documents that provide a range of objectives for the Pancake Complex is insincere and incorrect.

Plaintiffs also argue that they were denied the opportunity to publicly participate because BLM did not create an HMAP before the 2022 Gather. Pls.' Reply at 16. But this argument is belied by the record.[10] As stated, BLM held a 30-day comment period and considered comments from about 3,600 individuals or organizations. AR_3654. Many of the comments submitted were from Plaintiffs. *See, e.g.*, AR_3658-61. Moreover, there was public involvement and the opportunity to comment on different objectives for the various other decisions governing management of the Pancake Complex. *See, e.g.*, AR_873 (Ely District RMP); AR_575 (Tonopah RMP); AR_417 (Newark Allotment Final Multiple Use Decision within the Ely District); AR_419 (the Six Mile Allotment within the Ely District). It is thus inaccurate for Plaintiffs to claim that they were denied an opportunity to publicly participate or to suggest that an HMAP is the only opportunity for them to do so. It is thus clear that Plaintiffs merely disagree with BLM's decision to conduct the 2022 Gather, a position that would not have been altered by an additional opportunity to comment.

---

[10] As mentioned, in addition to Plaintiffs' claim being factually inaccurate, neither the Wild Horse Act nor the APA require BLM to explicitly respond to all opinions submitted during the public-comment period. Fed. Defs.' Br. at 31.

At bottom, Plaintiffs reiterate the same arguments that they have pushed for the last two years to challenge BLM's 2022 Gather. Despite this, Plaintiffs fail to meet their burden of showing that BLM has a duty under the Wild Horse Act or its implementing regulations to create an HMAP before conducting the gather. Because of this, Plaintiffs fail to show that BLM unlawfully withheld or unreasonably delayed doing so. Plaintiffs' auxiliary arguments fare no better and are also quickly dismantled. Accordingly, the Court should deny Plaintiffs' Wild Horse Act claims.

**II.      BLM is entitled to summary judgment on Plaintiffs' NEPA claims.**

Plaintiffs continue to fail to establish that the challenged gather decisions were arbitrary and capricious. *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989). Plaintiffs' NEPA arguments center on alleged deficiencies in the scientific analysis of each of the challenged EAs. However, the record reflects that BLM took the required "'hard look' at the environmental consequences" of its proposed actions. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976) ("The only role for a court is to insure that the agency has taken a 'hard look' at environmental consequences[.]"). Plaintiffs merely disagree "as to the choice of the action to be taken." *Id.* (internal quotation marks and citation omitted); *see also Marsh*, 490 U.S. at 378 ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."); *Bartell Ranch LLC v. McCullough*, 2023 U.S. Dist. LEXIS 19280, at *52 (D. Nev. Feb. 6, 2023) (scientific or technical disagreement alone is not a basis to overturn agency action, particularly in light of deference). Plaintiffs' initial brief provided no basis to determine that BLM's analysis showed a "clear error of judgment." *Marsh*, 490 U.S. at 378 (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). Their reply does not provide any further basis for their claim. Accordingly, the Court should grant summary judgment for BLM on Plaintiffs' NEPA claims.

The purpose of an EA is "not to amass and disclose all possible details regarding a proposal, but to create a 'concise public document' that serves to '[b]riefly provide sufficient

evidence and analysis for determining whether to prepare an environmental impact statement [("EIS")] or a finding of no significant impact [("FONSI")].'" *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1128 (9th Cir. 2012) (citations omitted). Consistent with the purpose and need to gather and remove excess wild horses from the Pancake Complex and to reduce the horse population's growth rates to achieve and maintain established AML ranges, *see* AR_3504, the EA evaluated a no-action alternative and four action alternatives. AR_3506-07. Before issuing the EA and FONSI, BLM analyzed nearly 30 environmental, economic, and social factors for the proposed action and its alternatives. AR_3522-58. BLM received and responded to 3,600 comments across 92 issue areas. *See* AR_3654-93. As support for the EA and their responses to comments, BLM relied on hundreds of scientific articles. *See* AR_3559-74.

Against the background of this effort, Plaintiffs' citation to only two issues—without discussion of their import to the EA or the resulting FONSI—rings particularly hollow.[11] Rather than point to any failure "to address certain crucial factors, consideration of which [is] essential to a truly informed decision whether or not to prepare an EIS[,]" *In Def. of Animals*, 751 F.3d at 1072 (internal quotation marks and citation omitted), Plaintiffs' reply asks this Court to "fly-speck the document and hold it insufficient on the basis of inconsequential, technical deficiencies," *Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 343 (9th Cir. 1996) (internal quotation marks and citation omitted). *See Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1063 (9th Cir. 1998).

Further, the EA substantively responds to both issues areas raised by Plaintiffs in their reply. Plaintiffs argue that BLM disregarded whether "regularly removing horses from public lands [] can actually cause high horse population growth rates." *See* Pls.' Reply at 17. This is not so. BLM compared a no-action alternative—where no gather would occur—and the Proposed Action. The results found that, when compared with a no-action alternative, the Proposed Action and Alternative B would result in lower growth rates over a ten-year period,

---

[11] In replying to BLM's opposition, Plaintiffs appear to have conceded that their other arguments are futile, as the reply does not address BLM's response to issues other than the two discussed below.

*see* Appendix VI, AR_3592-605, establishing a rational basis for their conclusion. *See Ecology Ctr. v. Castaneda*, 574 F.3d 652, 668 (9th Cir. 2009). Further, the study mentioned by Plaintiffs was considered as part of the EA. *See* AR_3561, AR_3571. Even if BLM had not considered this study, Ninth Circuit precedent makes clear that "an agency need not respond to every single scientific study" particularly where the agency has otherwise established a basis for its decision. *See Ecology Ctr.*, 574 F.3d at 668; *see also In Def. of Animals*, 751 F.3d at 1072-73 (finding no requirement that the agency "address in detail the substance conveyed in every single comment made on an EA to prove that the agency 'considered' the relevant factors").

The same applies to Plaintiffs' contention regarding wildfires. As BLM's opposition discussed, *see* Fed Defs' Br. at 37-38, BLM both responded to the comment on wildfires, *see* AR_3671 ("[T]here are many different factors that affect wildfire risk and it is an oversimplification and inaccurate to state that grazing—in and of itself—will reduce wildfire risk, since this is just one component relevant to wildfire risk."), and considered the effect of high populations of wild horses on rangelands, including the spread of invasive plant species, which could increase wildfire risk, *see id.*; AR_3549 (explaining that the no-action alternative could lead to an expansion of noxious and invasive species). However, even if it had not addressed wildfire, for the reasons discussed above, this single comment—raised without citation to scientific information or adequate support for its contention—would not dispose of an otherwise robust EA. Rather than expose a flaw using scientific analysis, Plaintiffs' argument here shows that they disagree with BLM's conclusion. But "disagreement does not render…[the] review and comment process improper." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 473 (9th Cir. 2010).

For these reasons, the Court should grant summary judgment in favor of BLM on Plaintiffs' NEPA claims.

## **CONCLUSION**

Accordingly, Federal Defendants request that the Court grant their cross-motion for summary judgment and deny Plaintiffs' motion for summary judgment.

Respectfully submitted this 15th day of December, 2023.

TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division
S. JAY GOVINDAN, Section Chief
BRIDGET K. MCNEIL, Assistant Section Chief

*/s/  Christian Carrara*
CHRISTIAN CARRARA, Trial Attorney
(NJ Bar No. 317732020)
Wildlife & Marine Resources Section

*/s/  Samantha Peltz*
SAMANTHA PELTZ, Trial Attorney
(IL Bar No. 6336536)
Natural Resources Section
Ben Franklin Station
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 598-9736 (Carrara)
Fax: 202-305-0275
Christian.carrara@usdoj.gov

*Of Counsel:*
Janell M. Bogue
U.S. Dep't of the Interior
Office of the Solicitor
Pacific Southwest Region

*Attorneys for Federal Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 15, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court for the District of Nevada using the Court's CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system, which includes counsel of record for all parties in the case.

*/s/ Christian Carrara*
CHRISTIAN CARRARA
Attorney for Defendants

# EXHIBIT 6

Case 2:23-cv-01200-CDS-BNW - Document 65-1 - Filed 04/12/24 - Page 195 of 258

# Activity in Case 3:22-cv-00034-MMD-CLB Leigh et al v. Raby et al Minute Order

Inbox ×

**cmecf@nvd.uscourts.gov**      Feb 22, 2024, 2:59 PM (19 hours ago)
to cmecfhelpdesk

**This is an automatic e-mail message generated by the CM/ECF system. Please do NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

United States District Court

District of Nevada

## Notice of Electronic Filing

The following transaction was entered on 2/22/2024 at 2:58 PM PST and filed on 2/22/2024

**Case Name:**      Leigh et al v. Raby et al
**Case Number:**      [3:22-cv-00034-MMD-CLB](#)
**Filer:**
**Document Number:** 77(No document attached)

**Docket Text:**
MINUTE ORDER IN CHAMBERS of the Honorable Chief Judge Miranda M. Du on 2/22/2024. Plaintiffs' Motion for Summary Judgment (ECF No. [64]) raises significant issues which would benefit from additional briefing. Defendants are directed to file a supplemental response to Plaintiffs' Motion for Summary Judgment addressing the six-factor test under *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 79-80 (D.C. Cir. 1984) ("*TRAC*"), by March 7, 2024. *See Vaz v. Neal*, 33 F.4th 1131, 1137 (9th Cir. 2022) (applying the *TRAC* factors). Plaintiffs are permitted to submit a reply by March 14, 2024. The supplemental briefs are subject to a 10-page limit. (Copies have been distributed pursuant to the NEF - GIVM)

**3:22-cv-00034-MMD-CLB Notice has been electronically mailed to:**

Danielle M. Holt      [danielle@decastroverdelaw.com](#), [lexi@decastroverdelaw.com](#)

Jessica Blome      [jblome@greenfirelaw.com](#), ndelafuente@recap.email, [service@greenfirelaw.com](#)

# EXHIBIT 7

TODD KIM, Assistant Attorney General
S. JAY GOVINDAN, Section Chief
BRIDGET K. MCNEIL, Assistant Section Chief
CHRISTIAN H. CARRARA (NJ Bar No. 317732020)
SAMANTHA G. PELTZ (IL Bar No. 6336536)
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section, Natural Resources Section
P.O. Box 7611
Washington, DC 20044
Phone: (202) 598-9736 (Carrara)
Fax: (202) 305-0275
Email: christian.carrara@usdoj.gov

*Attorneys for Federal Defendants*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| ANIMAL WELLNESS ACTION, a non-profit corporation, CANA FOUNDATION, a non-profit corporation, THE CENTER FOR A HUMANE ECONOMY, a non-profit corporation, LAURA LEIGH, individually, and WILD HORSE EDUCATION, a non-profit corporation, <br><br> *Plaintiffs*, <br><br> *v.* <br><br> UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and JON RABY, Nevada State Director of the Bureau of Land Management, <br><br> *Defendants*. | Case No: 3:22-cv-00034-MMD-CLB <br><br> **FEDERAL DEFENDANTS' SUPPLEMENTAL RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT IN ACCORDANCE WITH THIS COURT'S FEBRUARY 22, 2024 ORDER (ECF No. 77)** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................... 1

DISCUSSION .......................................................................................................... 1

  A.  The First and Second *TRAC* Factors Do Not Support a Finding of Unreasonable Delay. ………………………………………………………………………………..2

    1.  The Statutory and Regulatory Schemes of the Wild Horse Act Do Not Require the Preparation of HMAPs Before Gathers. .................................................... 2

    2.  Plaintiffs' Arguments on the First and Second *TRAC* Factors Do Not Demonstrate Unreasonable Delay Warranting Judicial Intervention.............................................. 6

  B.  The Third And Fifth *TRAC* Factors Do Not Support A Finding Of Unreasonable Delay Justifying the Issuance of Equitable Relief................................................... 7

  C.  An Order Requiring BLM To Prepare an HMAP Before Gathers Will Unduly Disrupt BLM's Ability To Immediately Remove Excess Animals As Required Under the Wild Horse Act. ................................................................................................ 9

CONCLUSION....................................................................................................... 10

## TABLE OF AUTHORITIES

**Case**          **Page**

*Cloud Found. v. BLM*,
No. 3:11-CV-00459-HDM-VPC, 2013 WL 1249814 (D. Nev. Mar. 26, 2013) .................. 4

*Ctr. for Biological Diversity v. BLM*,
35 F. Supp. 3d 1137 (N.D. Cal. 2014) ............................................. 8

*Ctr. for Cmty. Action & Env't Just. v. BNSF Ry. Co.*,
764 F.3d 1019 (9th Cir. 2014) .................................................. 4

*Friends of Animals v. BLM*,
548 F. Supp. 3d 39 (D.D.C. 2021) ............................................... 5

*Friends of Animals v. Pendley*,
523 F. Supp. 3d 39 (D.D.C. 2021) ............................................... 5

*Indep. Mining Co., Inc. v. Babbitt*,
105 F.3d 502 (9th Cir. 1997) ............................................... 3, 7

*In re A Cmty. Voice*,
878 F.3d 779 (9th Cir. 2017) .................................................. 5

*In re Barr Lab'ys, Inc.*,
930 F.2d 72 (D.C. Cir. 1991) .................................................. 7

*In re Nat. Res. Def. Council, Inc.*,
956 F.3d 1134 (9th Cir. 2020) .............................................. 1, 2

*Jamul Action Comm. v. Chaudhuri*,
651 F. App'x 689 (9th Cir. 2016) .............................................. 1

*Nat'l Wildlife Fed'n v. Cosgriffe*,
21 F. Supp. 2d 1211 (D. Or. 1998) ............................................. 8

*Nio v. U.S. Dep't of Homeland Sec.*,
270 F. Supp. 3d 49 (D.D.C. 2017) ............................................. 4

*Norton v. S. Utah Wilderness*,
All., 542 U.S. 55 (2004).................................................... 1

*Romo v. Barr*,
933 F.3d 1191 (9th Cir. 2019) ................................................ 5

*Sierra Club v. Gorsuch*,
  715 F.2d 653 (D.C. Cir. 1983) ......................................................... 1

*Sierra Club v. Thomas*,
  828 F.2d 783 (D.C. Cir. 1987) ......................................................... 3

*Telecommunications Research & Action Center v. FCC*,
  750 F.2d 70 (D.C. Cir. 1984) .................................................... 1, 2, 3

*Vaz v. Neal*,
  33 F.4th 1131 (9th Cir. 2022) ..................................................... 4, 10

**Statutes**

5 U.S.C. § 706(1) ..................................................................... 1, 10

16 U.S.C. § 1331 ......................................................................... 8

16 U.S.C. § 1333(a) ...................................................................... 9

16 U.S.C. § 1333(b)(2) ............................................................... 3, 5

**Regulations**

43 C.F.R. § 4710.3-1 ..................................................................... 4

43 C.F.R. § 4710.4 ....................................................................... 4

51 Fed. Reg. 7,410 (Mar. 3, 1986) ...................................................... 4, 5

**INTRODUCTION**

On February 22, 2024, this Court ordered Federal Defendants to "file a supplemental response to Plaintiffs' Motion for Summary Judgment addressing the six-factor test under *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 79-80 (D.C. Cir. 1984) ("*TRAC*"), by March 7, 2024." In accordance with that order, Federal Defendants file this supplemental response. As explained below, Plaintiffs' argument that the Bureau of Land Management ("BLM") unreasonably delayed preparing a Herd Management Area Plan ("HMAP") in violation of 5 U.S.C. § 706(1) lacks merit.

**DISCUSSION**

Under the Administrative Procedure Act ("APA"), a court may "compel agency action ... unreasonably delayed[.]" 5 U.S.C. § 706(1). But a claim under § 706(1) can proceed "only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). And even then, the Ninth Circuit has made clear that the issuance of equitable relief under Section 706 of the APA is an "extraordinary remedy" that is "justified only in exceptional circumstances[.]" *In re Nat. Res. Def. Council, Inc.*, 956 F.3d 1134, 1138 (9th Cir. 2020) (cleaned up). Thus, a finding of unreasonable delay is appropriate only upon a showing that the delay is "egregious." *Id.* These principles are borne out of the recognition that, "[a]bsent a precise statutory timetable or other factors counseling expeditious action, an agency's control over the timetable of [its action] is entitled to considerable deference." *Jamul Action Comm. v. Chaudhuri*, 651 F. App'x 689, 689-90 (9th Cir. 2016) (quoting *Sierra Club v. Gorsuch*, 715 F.2d 653, 658 (D.C. Cir. 1983)); *accord Sierra Club*, 715 F.2d at 659 ("our review of delayed action …[is] limited to examining an agency's reasons for deferred action and determining whether that delay is inconsistent with the agency's discretion under the applicable statutory scheme").

Consistent with these principles, the Ninth Circuit has adopted the now familiar six-part *TRAC* factors for determining whether an agency's delay in completing a required action is so egregious or "unreasonable" as to warrant equitable relief:

(1) the time agencies take to make decisions must be governed by a "rule of reason";

(2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;

(3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;

(4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;

(5) the court should also take into account the nature and extent of the interests prejudiced by delay; and

(6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*In re Nat. Res. Def. Council, Inc.*, 956 F.3d at 1138-39 (quoting *TRAC*, 750 F.2d at 80) (cleaned up). Application of these factors here demonstrates that Plaintiffs have failed to show that BLM is required to prepare an HMAP before conducting a gather—and so, it could not have unreasonably delayed doing so.[1] Moreover, considering the statutory and regulatory contexts, BLM's 2022 gather of wild horses on the Pancake Complex ("2022 Gather") without an HMAP cannot be deemed an "unreasonable delay" of the general requirement to prepare an HMAP and certainly does not warrant judicial intervention by this Court.

## A. The First and Second *TRAC* Factors Do Not Support a Finding of Unreasonable Delay.

### 1. The Statutory and Regulatory Schemes of the Wild Horse Act Do Not Require the Preparation of HMAPs Before Gathers.

---

[1] Although the Court has ordered Federal Defendants to address the six-factor test under *TRAC* and Plaintiffs' relevant arguments, Federal Defendants maintain, as explained below, that Plaintiffs have failed to establish that a legal obligation exists for BLM to prepare an HMAP *prior to conducting a gather*. *See* Mem. in Supp. of Fed. Defs.' Cross-Mot. for Summ. J. and in Opp'n. to Pls.' Mot. for Summ. J. ("Fed. Defs.' Br."), 26-28, ECF No. 70. To the extent that Plaintiffs now argue they are challenging BLM's general duty to prepare an HMAP, Pls.' Opp. to Defs.' Cross-Mot. for Summ. J. and Reply in Supp. of Pls.' Mot. for Summ. J., 13, ECF No. 71, Federal Defendants maintain that Plaintiffs cannot change their unreasonable delay claim to keep their argument alive. *See* Fed. Defs.' Reply in Supp. of their Cross-Mot. for Summ. J. (ECF No. 70) ("Fed. Defs.' Reply"), 18-19, ECF No. 73.

The first and second *TRAC* factors are often considered together in that the statutory scheme often gives context to the "rule of reason." *TRAC*, 750 F.2d at 80; *Indep. Mining Co., Inc. v. Babbitt*, 105 F.3d 502, 507 n.7 (9th Cir. 1997). "It is well established that . . . the reasonableness of the delay must be judged in the context of the statute which authorizes the agency's action." *Sierra Club v. Thomas*, 828 F.2d 783, 797 (D.C. Cir. 1987) (cleaned up). Here, consideration of the first two *TRAC* factors demonstrates that BLM was not under a statutory or regulatory requirement to prepare an HMAP prior to conducting the 2022 Gather. Thus, BLM could not have unreasonably delayed doing so. Further, even considering BLM's general requirement under its regulations to prepare an HMAP, BLM's decision to conduct the 2022 Gather without an HMAP is not unlawful and does not constitute unreasonable delay.

There is no requirement in the Wild Free-Roaming Horses and Burros Act ("Wild Horse Act") for BLM to prepare an HMAP, much less a requirement to prepare an HMAP before conducting a gather. Plaintiffs do not identify any text in the Wild Horse Act to rebut this. Fed. Defs.' Br. at 20.[2] What is clear from the Wild Horse Act is the unequivocal mandate that, where BLM makes the two-part determination that an overpopulation exists and action is necessary to remove excess animals based on information currently available to it, BLM "shall immediately remove excess animals from the range so as to achieve appropriate management levels." 16 U.S.C. § 1333(b)(2). The Wild Horse Act expressly lists the information BLM may use to determine that a wild horse overpopulation exists in a specific area, which includes: (i) the inventory of federal public land, (ii) land use plans, (iii) information from environmental impact statements, and (iv) the inventory of wild horses. *Id*. But, "in the absence of the information contained in (i–iv)[,]" BLM is expressly authorized to proceed with the removal of horses on the basis of whatever information BLM has at the time of the decision that an overpopulation exists. *Id*. The legislative history affirms this understanding of the Wild Horse Act as Congress added this language to clarify that BLM's findings of excess wild horse overpopulations—and resultant gathers—"should not be overturned quickly on the ground that

---

[2] This brief references the ECF-generated page numbers for court filings.

they are predicated on insufficient information." *See Cloud Found. v. BLM*, No. 3:11-CV-00459-HDM-VPC, 2013 WL 1249814, at *5 (D. Nev. Mar. 26, 2013) (cleaned up); *see also* Fed. Defs.' Br. at 20-21 (discussing the 1978 amendments). Thus, the Wild Horse Act does not provide any such requirement, much less a timetable, for BLM to prepare an HMAP.

By comparison, BLM's regulations implementing the Wild Horse Act do contemplate the preparation of HMAPs, but the regulations provide no timeframe in which an HMAP must be prepared. But while the applicable regulatory provision, 43 C.F.R. § 4710.3-1, directs BLM to prepare an HMAP, it neither requires preparation of an HMAP before BLM authorizes a gather nor does it provide any timetable for BLM to do so. *See Vaz v. Neal*, 33 F.4th 1131, 1138 n.6 (9th Cir. 2022) ("The second *TRAC* factor is inapplicable because the regulations provide no timetable for the [action].")". The provision merely states that "[m]anagement shall be at the minimum level necessary to attain the objectives identified in approved land use plans and [HMAPs]." 43 C.F.R. § 4710.4. As explained in Federal Defendants' previous briefs, Section 4710.4 places a requirement on BLM to tier management to objectives in *approved* land use plans and HMAPs. Fed. Defs.' Br. at 22-23. The two regulations cannot be read together to create a duty to prepare an HMAP before a gather where none exists. *See Ctr. for Cmty. Action & Env't Just. v. BNSF Ry. Co.*, 764 F.3d 1019, 1024 (9th Cir. 2014) (declining to adopt the plaintiffs' interpretation, which, "would effectively be to rearrange the wording of the statute—something that we, as a court, cannot do").

Moreover, adopting Plaintiffs' interpretation would thwart the regulatory scheme. *See* Pls.' Notice of Mot. for Summ. J. ("Pls.' Br."), 30, ECF No. 64; *see also Vaz*, 33 F.4th at 1138 n.6 (looking to the regulations for context for the rule of reason); *accord Nio v. U.S. Dep't of Homeland Sec.*, 270 F. Supp. 3d 49, 66 (D.D.C. 2017) (the second *TRAC* factor is informed by the applicable regulatory schemes). The preamble to the final rule promulgating BLM's wild horse and burro regulations describes how Section 4710.4 was changed to "make clear" that management will be "undertaken with the objective of limiting animal distribution to herd areas by controlling herd size to prevent habitat from being overpopulated." 51 Fed. Reg. 7410,

7412 (Mar. 3, 1986). Thus, this update to the regulations identified a management tool to seek to prevent overpopulation; it did not create, or intend to create, a timetable for preparing HMAPs before gathers or supersede the controlling language from the statute requiring BLM to gather and remove excess wild horses. *See id*. at 7410 (explaining, "[t]he language of the statute will govern management"). This is further evinced by the summary of the final rule, which explains that the changes are "to reduce the regulatory burden on the public, to clarify the management procedures of [BLM] as they affect the public, to remove unnecessary provisions, and to improve the organization of the regulations." *Id*. Plaintiffs' interpretation of the regulations contradicts these purposes.[3] Requiring BLM to prepare an HMAP before a gather would increase the regulatory burden on BLM, create confusion where Congress and the agency have spoken clearly, and potentially lead to greater overpopulation problems where BLM cannot remove excess animals immediately.[4] *See, e.g.*, *infra* 8-9. The Court should reject such a reading of the regulations that would bely the rule of reason. *See Romo v. Barr*, 933 F.3d 1191, 1198 (9th Cir. 2019) (rejecting interpretation that would create absurd results).[5]

  Thus, as the evidence shows here, BLM was not required to prepare an HMAP before conducting the 2022 Gather and so it could not have "unreasonably delay[ed] that which it is not required to do[.]" *In re A Cmty. Voice*, 878 F.3d 779, 784 (9th Cir. 2017). Requiring BLM to

---

[3] Notably, Plaintiffs do not address this language in the final rule. *See* Pls.' Br. at 25-26.

[4] Plaintiffs' interpretation could put BLM in a position of unreasonably delaying action that Congress has spoken clearly to: the need to "immediately" remove animals after the agency determines an overpopulation exists and action necessary to do so. 16 U.S.C. § 1333(b)(2). If BLM instead took the position that it could only conduct a removal after preparing an HMAP, the agency would risk a more colorable 706(1) claim than the one brought in this case.

[5] Indeed, adjudicative bodies have rejected this reading of the statute and regulations and found that "it is not necessary that BLM prepare an HMAP as a basis for ordering the removal of wild horses, so long as the record otherwise substantiates compliance with the [Wild Horse Act]." *Animal Prot. Inst. of Am.*, 109 IBLA 112, 127 (1989); *accord Friends of Animals v. BLM*, 548 F. Supp. 3d 39, 67 (D.D.C. 2021); *Friends of Animals v. Pendley*, 523 F. Supp. 3d 39, 56 n.3 (D.D.C. 2021). Importantly, the Interior Board of Land Appeals rejected the very argument that Plaintiffs put forth here and found that the regulations "do[] not require preparation of an HMAP as a prerequisite for a removal action." *Compare Animal Prot. Inst. of Am.,* 109 IBLA at 127, *with* Pls.' Br. at 33; *see also* Fed. Defs.' Reply at 15.

do so would frustrate the statutory and regulatory schemes, contrary to the rule of reason. The first and second *TRAC* factors thus weigh heavily against an unreasonable delay finding.

### 2. Plaintiffs' Arguments on the First and Second *TRAC* Factors Do Not Demonstrate Unreasonable Delay Warranting Judicial Intervention.

Plaintiffs present primarily two arguments on the first and second *TRAC* factors; neither of which advance their cause. First, Plaintiffs contend that BLM refused to create an HMAP despite the public asking it to do so. Pls.' Br. at 32. Second, Plaintiffs suggest that because BLM created the Fifteenmile HMAP, the agency can create one before instituting a gather plan here. *Id.* In essence, Plaintiffs contend that BLM lacks an identifiable rationale for the purported delay. This argument lacks merit.

First, BLM has neither refused to create an HMAP nor has it "refused to explain why it has not created one[,]" as Plaintiffs claim. *Id.* In responding to comments submitted on the Pancake Complex decision arguing that BLM should not authorize a gather without the information included in an HMAP, *see, e.g.*, AR_03661, BLM explained "[t]he scope of the Pancake Complex [Environmental Assessment] is to restore a [thriving natural ecological balance] and multiple use relationship on the public lands consistent with the [Wild Horse Act's requirement] to remove excess wild horses from within and outside the Complex[.]" *Id.* BLM further explained the documents it relied on to inform the excess determination and gather. *Id.* The agency did not simply refuse to explain why an HMAP was not prepared— BLM responded to the thrust of the comments and provided the documents it relied on for short- and long-term management objectives, consistent with the Wild Horse Act. *See* Fed. Defs.' Br. at 29-30; *see also id.* at 13-16 (discussing the planning documents relied on). Thus, this argument fails to show BLM acted unreasonably.

Plaintiffs' second argument fares no better. Plaintiffs suggest that because BLM prepared the Fifteenmile HMAP—a plan for a different herd in a different state—the agency could have prepared one before the 2022 Gather here. Pls.' Br. at 32. Along with the Fifteenmile HMAP being inadmissible and irrelevant here, *see* Fed. Defs.' Resp. to Pls.' Mot.

for Jud. Not. (ECF No. 65), ECF No. 68, its existence does not undermine BLM's rationale for not preparing an HMAP before conducting the 2022 Gather. As explained previously, there are many differences between the Pancake Complex and Fifteenmile herd management area. *See id.* at 5-6. In addition, the 2019 Fifteenmile HMAP replaced the 1985 version, so it made sense for BLM to update the HMAP, as one already existed. *See* Fifteenmile Herd Management Area Plan Update and Wild Horse Gather Environmental Assessment (November 2018), at 9, https://eplanning.blm.gov/public_projects/nepa/103350/165483/201860/Fifteenmile_EA_FINAL_01282019.pdf (last visited Mar. 7, 2024). In contrast, the relevant information for the Pancake Complex is contained in existing land use plans, Final Multiple Use Decisions, and a Wild Horse Territory Management Plan. Fed. Defs.' Br. at 13. Thus, BLM's reliance on those documents for the 2022 Gather, which contain the same information that an HMAP would, was eminently reasonable given the circumstances. And so, Plaintiffs' contention that since BLM updated the Fifteenmile HMAP—which was already in existence and concerned a different area than the Pancake Complex—before a gather does not prove that either the first or second *TRAC* factor favor Plaintiffs' arguments challenging the Pancake Complex gather decision.

In sum, Plaintiffs fail to show that the Wild Horse Act or its implementing regulations require BLM to prepare an HMAP before conducting a gather. Even considering the regulatory requirement to prepare an HMAP, the rule of reason weighs heavily against finding that BLM unreasonably delayed action by not preparing one before conducting a gather, and Plaintiffs' arguments fail to rebut this. Considering the statutory and regulatory text, and context, the first and second *TRAC* factors decidedly favor BLM.

**B. The Third And Fifth *TRAC* Factors Do Not Support A Finding Of Unreasonable Delay Justifying the Issuance of Equitable Relief.**

The third and fifth *TRAC* factors regarding any impacts to human health and welfare, and the nature and extent of interests prejudiced by the delay, often overlap. *Indep. Mining Co., Inc.*, 105 F.3d at 509; *In re Barr Lab'ys, Inc.*, 930 F.2d 72, 75 (D.C. Cir. 1991). The third *TRAC* factor is not in play, as human lives are not at stake. And for the fifth *TRAC* factor,

1   Plaintiffs do not convincingly identify any interests that are harmed by not preparing an HMAP

2   before gathers since management is ensured at the minimal feasible level by other management

3   standards and tools. *See* Fed. Defs.' Br. at 18-19, 27 (explaining the documents and processes

4   governing the 2022 Gather); *see also Ctr. for Biological Diversity v. BLM*, 35 F. Supp. 3d

5   1137, 1154 (N.D. Cal. 2014), *aff'd*, 833 F.3d 1136 (9th Cir. 2016) (finding that failure to issue

6   a recovery plan for an endangered plant species "does not involve human health and welfare").

7   And so, the third and fifth factors do not support a finding of unreasonable delay.

8        Plaintiffs contend that the Wild Horse Act's "main interest is to protect wild horses" as

9   "an integral part of the natural system of the public lands" and that by not creating an HMAP

10  for the Pancake Complex, BLM did not consider the full range of management options

11  available to protect wild horses. *See* Pls.' Br. at 32 (quoting 16 U.S.C. § 1331). Plaintiffs

12  contend that the delay, therefore, goes against the interests specifically elucidated by Congress.

13  *Id*. While it is true that the public can have a significant interest in agency management that

14  promotes "such important values as wildlife, scenery, cultural resources, and recreational

15  opportunities[,]" *Nat'l Wildlife Fed'n v. Cosgriffe*, 21 F. Supp. 2d 1211, 1219 (D. Or. 1998),

16  considering these interests here does not tip the scale in favor of Plaintiffs.

17       To the contrary, Congress mandated BLM to immediately remove excess wild horses

18  once an excess determination has been made in recognition that excess numbers of wild horses

19  and burros "pose a threat to themselves and their habitat and to other rangeland values[.]" H.R.

20  Rep. No. 95-1122, 23 (1978). Congress thus acknowledged that while wild free-roaming

21  horses and burros should be protected, "at the same time" excess animals need to be removed

22  in order to maintain a thriving natural ecological balance for all species—including horses. *Id*.

23       As for the Pancake Complex, BLM determined that excess wild horses were causing

24  "[m]oderate, heavy and severe utilization . . . on key forage species within [the] Complex[,]"

25  that emergency removals were necessary in the recent past and would be necessary in the

26  future due to lack of water and/or forage if the wild horse population is not reduced, and that a

27  gather was needed to prevent undue or unnecessary degradation of the public lands and to

28

FED. DEFS.' SUPPLEMENTAL RESP.          8

restore a thriving natural ecological balance. AR_03504. Thus, immediate removal of excess animals was necessary to protect the important values of wildlife, scenery, cultural resources, and recreational opportunities. This includes the protection of wild horses, which Congress expressly identified as a threat to themselves when their numbers exceed the appropriate management level. H.R. Rep. No. 95-1122, 23 (1978). And so, Plaintiffs' suggestion that the removal of excess horses before the creation of an HMAP somehow prejudices wild horses or public lands more generally does not withstand scrutiny.

Plaintiffs' argument that conducting the 2022 Gather prior to creating an HMAP prejudiced wild horses in that BLM did not consider every management option available fares no better. Pls.' Br. at 32. The Wild Horse Act does not require the consideration of every management option nor do Plaintiffs explain how, exactly, the failure to do so would be prejudicial. The Wild Horse Act requires that all management activities be at the "minimal feasible level." 16 U.S.C. § 1333(a). BLM relied on resource management plans, the environmental assessment, and Wild Horse and Burro Comprehensive Animal Welfare Program standards to ensure that the 2022 Gather was at the minimal feasible level. Fed. Defs.' Br. at 29-30. Thus, the third and fifth factors weigh decidedly against an unreasonable delay finding.

## C. An Order Requiring BLM To Prepare an HMAP Before Gathers Will Unduly Disrupt BLM's Ability To Immediately Remove Excess Animals As Required Under the Wild Horse Act.

There can little doubt that the fourth *TRAC* factor—the effect of expediting delayed action on agency activities of a higher or competing priority— counsels against a finding of unreasonable delay warranting equitable relief. Plaintiffs state they are "unaware of any negative effect associated with compelling BLM to create an HMAP[,]" Pls.' Br. at 32, but this is unsupported by the record. As chronicled in detail, along with the Wild Horse Act mandating that BLM remove excess wild horses immediately, *supra* at 3, the delay in doing so could have drastic effects on public lands. *See also* AR_3502 (explaining that wild horses can increase their numbers by up to 25% annually, which requires BLM to use discretion in managing herds); AR_3521 (the failure to control overpopulation can lead to increased competition for

resources, which could lead to death of individual animals and the deterioration of habitat conditions). Indeed, BLM explained in the environmental assessment that, without the 2022 Gather, "[t]he presence of increasing numbers of excess wild horses will continue to deteriorate rangelands within the Complex, public safety concerns will increase along heavily traveled road as well as private property issues, and an increase in emergency actions will be necessary to address the overpopulations of wild horses and limited water/forage resources." AR_03507; *see also* Declaration of Benjamin F. Noyes, ECF No. 18-1 ¶¶ 9-10 (emergency gathers in 2016, 2018, and 2020 were required to address these issues within the Complex). Plaintiffs, however, do not address any of these effects on public lands, resources, or wild horses. The Court should summarily reject Plaintiffs' contention as without merit.

Finally, regarding the sixth *TRAC* factor, Plaintiffs neither allege any agency impropriety nor can there be a finding of impropriety as there is no requirement that the agency has delayed completing. *See Vaz*, 33 F.4th at 1138 n.6 (finding the sixth *TRAC* factor "irrelevant because there is no evidence that the [agency] has engaged in any improper conduct").

In sum, each *TRAC* factor weighs in favor of BLM and against finding that there has been an unreasonable delay. Plaintiffs point to no statutory requirement for the agency to prepare an HMAP before a gather and the Court should reject their attempt to rewrite the regulations in contravention of the statutory and regulatory context to create a requirement where none exists. Accordingly, the Court should reject Plaintiffs' argument that BLM unreasonably delayed agency action in violation of 5 U.S.C. § 706(1).

## **CONCLUSION**

For these reasons, Federal Defendants ask the Court to grant their cross-motion for summary judgment and deny Plaintiffs' motion for summary judgment.

Respectfully submitted this 7th day of March, 2024.

TODD KIM
Assistant Attorney General

U.S. Department of Justice
Environment & Natural Resources Division
S. JAY GOVINDAN, Section Chief
BRIDGET K. MCNEIL, Assistant Section Chief

*/s/ Christian Carrara*
CHRISTIAN CARRARA, Trial Attorney
(NJ Bar No. 317732020)
Wildlife & Marine Resources Section

*/s/ Samantha Peltz*
SAMANTHA PELTZ, Trial Attorney
(IL Bar No. 6336536)
Natural Resources Section
Ben Franklin Station
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 598-9736 (Carrara)
Fax: 202-305-0275
Christian.carrara@usdoj.gov

*Of Counsel:*
Janell M. Bogue
U.S. Dep't of the Interior
Office of the Solicitor
Pacific Southwest Region

*Attorneys for Federal Defendants*

# CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2024, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court for the District of Nevada using the Court's CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system, which includes counsel of record for all parties in the case.

*/s/ Christian Carrara*
CHRISTIAN CARRARA
Attorney for Defendants

# EXHIBIT 8

1    DANIELLE M. HOLT
     (Nevada Bar No. 13152)
2    DE CASTROVERDE LAW GROUP
3    1149 S Maryland Pkwy
     Las Vegas, NV 89104
4    Ph (702) 222-9999
     Fax (702) 383-8741
5    danielle@decastroverdelaw.com

6    JESSICA L. BLOME
     (Cal. Bar No. 314898, admitted pro hac vice)
7    J. RAE LOVKO
8    (Cal. Bar No. 208855, admitted pro hac vice)
     GREENFIRE LAW, PC
9    2748 Adeline Street, Suite A
     Berkeley, CA 94703
10   (510) 900-9502
11   jblome@greenfirelaw.com
     rlovko@greenfirelaw.com
12
     *Attorneys for Plaintiffs*
13

14                  **UNITED STATES DISTRICT COURT**
15                      **DISTRICT OF NEVADA**

16   ANIMAL WELLNESS ACTION, a non-profit
     corporation, CANA FOUNDATION, a non-
17   profit corporation, THE CENTER FOR A
     HUMANE ECONOMY, a non-profit
18   corporation, LAURA LEIGH, individually,          Case No. 3:22-cv-00034
     and WILD HORSE EDUCATION, a non-
19   profit corporation,                              **PLAINTIFFS' SUPPLEMENTAL REPLY
20                                                    IN ACCORDANCE WITH THIS
                            Plaintiffs,               COURT'S FEBRUARY 22, 2024 ORDER
21                                                    (ECF No. 77)**
                     v.
22
     UNITED STATES DEPARTMENT OF
23   INTERIOR, BUREAU OF LAND
24   MANAGEMENT, and JON RABY, Nevada
     State Director of the Bureau of Land
25   Management, and the

26                          Defendants.
27   _____

28

     Plaintiffs' Supplemental Reply in Accordance with Court's February 22, 2024 Order          1

**Table of Contents**

I.    Introduction ........................................................................................................... 5

II.   Argument ............................................................................................................... 6

    A.   Defendants improperly frame the analysis. ..................................................... 6

    B.   Application of the TRAC Factors supports a finding of unreasonable delay. .................... 7

        1.    Defendants have a duty to create HMAPs. ............................................... 8

        2.    The First and Second TRAC Factors support a finding of unreasonable delay...... 9

        3.    The Third and Fifth TRAC Factors support a finding of unreasonable delay. ..... 10

        4.    The Fourth TRAC Factor supports a finding of unreasonable delay. ................... 11

III.  Conclusion ........................................................................................................... 11

**Table of Authorities**

**Cases**

*Adnan Ahmed v. United States Dep't of State*,
  2024 U.S. Dist. LEXIS 14461 (N.D. Cal. Jan. 26, 2024) ........................ 8

*Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166 (9th Cir. 2002 ...................... 4, 5

*Cmty. Voice v. United States EPA*, 878 F.3d 779 (9th Cir. 2017) ................................ 7

*Dawod v. Garland*, 2023 U.S. Dist. LEXIS 212848 (C.D. Cal. Oct. 12, 2023) ........................... 8

*Doe v. Risch*, 398 F. Supp. 3d 647 (N.D. Cal. 2019) .................................................. 5, 8

*In re A Cmty. Voice*, 878 F.3d 779 (9th Cir. 2017) ......................................... 9

*In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413 (D.C. Cir. 2004) ................... 9

*In re Bluewater Network*, 234 F.3d 1305 (D.C. Cir. 2000) .............................. 9

*In re Int'l Chem. Workers Union*, 958 F.2d 1144 (D.C. Cir. 1992) ....................... 9

*In re Pesticide Action Network*, 798 F.3d 809 (9th Cir. 2015) ........................ 9

*Independence Mining Co. v. Babbitt*, 105 F.3d 502 (9th Cir. 1997) ....................... 6, 8

*Independence Mining Co. v. Babbitt*, 885 F. Supp. 1356 (D. Nev. 1995) .................... 8

*Lyons v. United States Citizenship & Immigration Servs.*,
  2023 U.S. Dist. LEXIS 4509 (S.D.N.Y. Jan. 10, 2023) ......................... 10

*NRDC v. United States EPA (In Re NRDC)*, 956 F.3d 1134 (9th Cir. 2020) .................... 8, 9

*Pac. Molasses Co. v. Fed. Trade Com.*, 356 F.2d 386 (5th Cir. 1966) ........................ 5

*Service v. Dulles*, 354 U.S. 363 (1957) ........................................................ 5

*Sierra Club v. Gorsuch*, 715 F.2d 653 (D.C. Cir. 1983) ....................................... 6

*Singh v. Napolitano*, 909 F. Supp. 2d 1164 (E.D. Cal. 2012) .............................. 8

*Telecommunications Research & Action v. FCC (TRAC)*,
  242 U.S. App. D.C. 222 (D. C. Cir. 1984) ............................................ 4, 6

*Vaz v. Neal*, 33 F.4th 1131 (9th Cir. 2022) ........................................... 5, 7, 8

**Statutes**

16 U.S.C. § 1331 .................................................................................................. 9, 10

5 U.S.C. § 706(1) .............................................................................................. 4, 5, 9


**Regulations**

43 C.F.R. § 4710.3-1 ............................................................................................ 7, 11

43 C.F.R. § 4710.4. ............................................................................................. 7, 11

**I.     Introduction**

Plaintiffs' Second Cause of Action is based upon Section 706(1) of the Administrative Procedure Act (APA) and avers that "Defendants have unlawfully withheld or unreasonably delayed their mandatory duty to prepare an HMAP for the Pancake Complex of Herd Management Areas or for the individual herd management areas that make up the Complex." *See* Dkt 31 at ¶ 121. Though Defendants apparently wish that Plaintiff had linked this unreasonable delay claim to their management decisions, the plain text of Plaintiffs' Second Cause of Action does no such thing. Rather, Plaintiffs allege that Defendants have unreasonably delayed a mandatory duty for thirty-eight years at the time of this writing. The regulations mandating that BLM create HMAPs were adopted in 1986. *See* Dkt 65 at p. 18. Since that time, BLM has refused to create any HMAP for the Pancake Complex or the individual herd management areas within the Complex. *See* Dkt 65 at p. 25; Dkt 71 at p. 13.

Where agency inaction has occurred in the face of a mandatory deadline, courts look at whether the action has been unlawfully withheld; where agency inaction has occurred in the face of a discretionary deadline, courts look at whether the action has been unreasonably delayed. *See Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 n.11 (9th Cir. 2002). Plaintiffs' Second Cause of action alleges both, so this Court must analyze Defendants' thirty-eight year delay under both tests.[1]

Analysis of whether an action is unreasonably delayed takes into consideration the TRAC factors elucidated in *Telecommunications Research & Action v. FCC (TRAC)*, 242 U.S. App. D.C. 222 (D. C. Cir. 1984). Plaintiffs and Defendants addressed the TRAC factors in their initial motions and responses. *See* Dkt 64 at pp. 23-25; Dkt 70 at pp. 17-20; Dkt 71 at pp. 12-14; Dkt 73 at pp. 12-14. On February 22, 2024, this Court issued an order to allow supplemental briefing on

---

[1] Plaintiffs argue that the implementing regulations of the Wild Free-Roaming Horses and Burros Act (WHA) establish a duty with a mandatory deadline. As such, the "unlawfully withheld" prong of Section 706(1) applies. However, should this Court believe the deadline is discretionary and the "unreasonably delayed" prong of Section 706(1) governs, Plaintiffs should prevail based upon application of the TRAC factors. *See* Dkt 64 at pp. 23-25; Dkt 71 at pp. 12-14.

application of the TRAC factors only. *See* Dkt 77. Despite being given this opportunity to provide additional facts and argument, Defendants supplemental response merely repeats the content of their earlier briefing. BLM offers no reason for its thirty-eight year delay in creating HMAPs for the Pancake Complex or herd management areas in the Complex. Caselaw supporting Plaintiffs' position, as cited in earlier briefing, is ignored by Defendants.

Because BLM's regulations "must be scrupulously observed." *Pac. Molasses Co. v. Fed. Trade Com.*, 356 F.2d 386, 389-90 (5th Cir. 1966) citing *Service v. Dulles*, 354 U.S. 363 (1957) the Court must find that that Defendants' inaction constitutes unreasonable delay and grant Plaintiffs' summary judgment on their Second Cause of Action.

## II.  Argument

### A.  Defendants improperly frame the analysis.

Defendants have repeatedly tried to frame Plaintiffs' unreasonable delay claim as focusing on whether BLM should have prepared an HMAP *prior to* conducting a gather. *See* Dkt 70 at pp. 18-19; Dkt 73 at p. 13; Dkt 78 at pp. 2-3. Plaintiffs' Second Cause of Action, as alleged in their First Amended Complaint, simply does not frame the Section 706(1) claim in the manner suggested by Defendants. *See* Dkt 31 at ¶ 121. Plaintiffs pointed this out in their Opening Brief:

> However, even if the court were to find that the application of TRAC factors is warranted, the requested relief should still be granted. The first and second TRAC factors considers whether the time for agency action has been reasonable. *See Vaz v. Neal*, 33 F.4th 1131, 1138 (9th Cir. 2022); *Doe v. Risch*, 398 F. Supp. 3d 647, 656-657 (N.D. Cal. 2019). In this case, BLM has refused to create an HMAP, and this refusal occurred despite the public asking it to honor its statutory duty to create one. *See* e.g., AR3184-86, 3382-86. Indeed, in responding to such request, BLM refused to explain why it has not created one. *See* AR3654-3692.

Dkt. 64, p. 31-32.

Plaintiffs also pointed this out in their Reply Brief:

> While it is true that the unlawfully withheld prong of Section 706(1) focuses on [Defendants' duty to prepare an HMAP *prior to* conducting a gather], analysis under the unreasonably delayed prong does not. This is necessarily so because the unreasonably delayed prong is only addressed where no specific deadline exists. *See Biodiversity Legal Found.*, 309 F.3d at 1177 n.11.

1    Dkt. 71 at p. 14.

2         The Court should not adopt Defendants' framing of Plaintiffs' Second Cause of Action.

3    **B.    Application of the TRAC Factors supports a finding of unreasonable delay.**

4         For cases involving action "unreasonably delayed," courts balance the following

5    "TRAC" factors:

6         (1) the time agencies take to make decisions must be governed by a "rule of reason;" (2)
7         where Congress has provided a timetable or other indication of the speed with which it
          expects the agency to proceed in the enabling statute, that statutory scheme may supply
8         content for this rule of reason; (3) delays that might be reasonable in the sphere of
          economic regulation are less tolerable when human health and welfare are at stake; (4)
9         the court should consider the effect of expediting delayed action on agency activities of a
          higher or competing priority; (5) the court should also take into account the nature and
10        extent of the interests prejudiced by the delay; and (6) the court need not "find any
          impropriety lurking behind agency lassitude in order to hold that agency action is
11        unreasonably delayed."

12   *Independence Mining Co. v. Babbitt*, 105 F.3d 502, 507 n. 7 (9th Cir. 1997) (quoting

13   *Telecommunications Research & Action v. FCC (TRAC)*, 242 U.S. App. D.C. 222, (D. C. Cir.

14   1984) (cleaned up)[2].

15

16   _____

     [2] Defendants argue that application of the TRAC factors should afford agencies considerable
17   deference when determining whether or not inaction is unreasonable. *See* Dkt 78 at p. 1 (citing
     *Sierra Club v. Gorsuch*, 715 F.2d 653, 659 (D.C. Cir. 1983)). The *Sierra Club* case involved
18   review of the EPA's rulemaking under the Clean Air Act, focusing on the validity of
     promulgated regulations that identified "categories of sources whose fugitive emissions would be
     taken into account in determining whether a source is a major emitting facility." *See Sierra Club*,
19   715 F.2d at 655. Strip mines were not included as a category, and Plaintiffs argued that the
     EPA's decision not to include strip mines was arbitrary and capricious. *See id.* at 661.

20   The *Sierra Club* case did not address the TRAC factors nor was the Court's review based on
21   Section 706(1) of the APA. The issue of delayed action did arise, however, because the EPA
     argued its rulemaking was not a final action; strip mines might subsequently be added to the
22   fugitive emissions category list. *See id.* at 656-658. In response to this argument, the Court
     stated:

23        Although EPA's position -- that final action has not been taken -- does not affect our
24        jurisdiction, it does affect our standard of review. Absent a precise statutory timetable or
          other factors counseling expeditious action, an agency's control over the timetable of a
25        rulemaking proceeding is entitled to considerable deference. Such deference derives from
          an agency's discretion to set its own priorities, which may reflect a variety of factors
26        outside the focus of a rulemaking. For this reason, our review of delayed action in
          rulemaking is of necessity limited to examining an agency's reasons for deferred action
27        and determining whether that delay is inconsistent with the agency's discretion under the
          applicable statutory scheme. That **review must be undertaken vigorously**, however, for
28        it must enable reviewing courts to evaluate claims -- like the one made by petitioner here

1.    <u>Defendants have a duty to create HMAPs.</u>

Under the guise of addressing the first and second TRAC factors, Defendants defend their inaction by arguing that they have no legal duty to create HMAPs. *See* Dkt 78 at pp. 3-6[3].  As such, they contend their inaction is reasonable, and to find otherwise would "thwart the regulatory scheme." *Id.* at p. 4.

Plaintiffs have extensively briefed this issue in their Motion for Summary Judgment and Reply thereto. *See* Dkt 64, Dkt 71. To summarize, BLM's regulations state that the agency "shall" prepare HMAPs. 43 C.F.R. §4710.3-1. Management of wild horses and burros "shall be at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans." 43 C.F.R. §4710.4. This mandatory language clearly establishes a duty to create HMAPs.

BLM concedes that the regulations "contemplate the preparation of HMAPs" as "a management tool to seek to prevent overpopulation." Dkt 78 at pp. 4-5. Yet, BLM nevertheless concludes that it has no duty to ever actually prepare any HMAPs, largely based on its position that the regulations do not provide a timetable by which HMAPs must be created.  *See id.* This is nonsensical. The fact that the implementing regulations do not provide a detailed timetable is irrelevant to analysis under Section 706(1)'s unreasonably delayed prong. *See Vaz v. Neal*, 33 F.4th 1131, 1136-37 (9th Cir. 2022) (where regulations do not identify a certain deadline for agency action, the APA requires that the action be done "within a reasonable time); *Dawod v.*

---

-- that an agency is preventing review of a decision not to regulate by indefinitely insisting that final action has been deferred. **Judicial review of decisions not to regulate must not be frustrated by blind acceptance of an agency's claim** that a decision is still under study.

*Id* at 658-69 (emphasis added). Thus, to the extent the case has any relevance, it does not stand for the proposition that the TRAC factors should afford agencies considerable deference when determining whether or not inaction is unreasonable. Instead, the review must be thorough and not blindly accepting of an agency's rationale.

[3] Defendants argument is not related to the TRAC factors, but instead it is based on whether they have a duty to create HMAPs. *See Cmty. Voice v. United States EPA*, 878 F.3d 779, 784 (9th Cir. 2017) (noting that before applying the TRAC factors, it is necessary to determine whether an agency has a duty to act).

*Garland*, 2023 U.S. Dist. LEXIS 212848, at *7 (C.D. Cal. Oct. 12, 2023) (where a duty exists, the APA "demands that action be done within a reasonable time"); *Singh v. Napolitano*, 909 F. Supp. 2d 1164, 1176 (E.D. Cal. 2012) (where Congress has not provided a timetable for action, agencies must act "within a reasonable time").

> 2.    The First and Second TRAC Factors support a finding of unreasonable delay.

The first and second TRAC factors focus on whether the time of agency action has been reasonable. *See Vaz v. Neal*, 33 F.4th 1131, 1138 (9th Cir. 2022); *Doe v. Risch*, 398 F. Supp. 3d 647, 656-657 (N.D. Cal. 2019). "Reasonable" means "expeditious." *Independence Mining Co. v. Babbitt*, 885 F. Supp. 1356, 1364 (D. Nev. 1995), *aff'd sub nom. Indep. Min. Co.*, 105 F.3d 502. The most important TRAC factor is the first one – the "rule of reason" factor. *See Vaz*, 33 F.4th at 1138; *NRDC v. United States EPA (In Re NRDC)*, 956 F.3d 1134, 1139 (9th Cir. 2020)[4].

Here, more than thirty-eight years have passed since BLM adopted the regulations mandating creation of HMAPs. Despite being asked repeatedly to create an HMAP for the Pancake Complex, Defendants have refused to address when (if ever) an HMAP will be created. *See* Dkt 64 at p. 25. Defendants allege this delay is reasonable because "[r]equiring BLM to prepare an HMAP before a gather would increase the regulatory burden on BLM." Dkt 78 at p. 5. As addressed above in Section II.A., the unreasonable delay analysis does not focus on whether or not an HMAP must be created *before* a gather. Instead, Plaintiffs argue that delaying action for more than thirty-eight years constitutes unreasonable delay. The record does not contain any evidence to support the conclusion that compelling agency action would unduly burden the BLM and its resources. Instead, the record shows that BLM has the ability to create HMAPs. *See* Dkt 64 at p. 25.

Defendants next argue that compelling BLM to prepare an HMAP could "create confusion where Congress and the agency have spoken clearly, and potentially lead to greater

---

[4] Where Congress does not provide a timeline, the second TRAC factor does not weigh in favor of plaintiffs or defendants; it is neutral. *See Adnan Ahmed v. United States Dep't of State*, 2024 U.S. Dist. LEXIS 14461, at *13 (N.D. Cal. Jan. 26, 2024).

overpopulation problems." Dkt 78 at p. 5. Again, Defendants framing of the issue is incorrect, as addressed above in Section II.A. Further, Defendants address the WHA as if its main goal is the removal of excess horses. But, the Act was primarily designed to protect wild free-roaming horses as an integral part of the natural system of public lands. *See* 16 U.S.C. § 1331. Gather operations are only one tool that can be used to meet the protection-based goals of the WHA. Also, Defendants admit that HMAPs are a tool designed to assist in management decisions addressing overpopulation. *See* Dkt 78 at p. 5.

Defendants note that relief under Section 706(1) of the APA is appropriate only in exceptional circumstances where the delay is egregious. In support of this statement, they cite to *In Re NRDC*, 956 F.3d at 1138. *See* Dkt 78 at p. 1. However, in that case, the Ninth Circuit also noted that "a reasonable time for agency action is typically counted in weeks or months, not years." *In Re NRDC*, 956 F.3d at 1139. Where delay has been for multiple years, courts routinely find unreasonable delay. *See, e.g., In re A Cmty. Voice*, 878 F.3d 779, 783–84 (9th Cir. 2017) (eight-year delay unreasonable); *In re Pesticide Action Network*, 798 F.3d 809, 815 (9th Cir. 2015) (after eight years and without a "concrete timeline" for action, agency had "stretched the 'rule of reason' beyond its limits"); *In re Core Communs., Inc.*, 531 F.3d 849, 857 (2008) (six-year delay unreasonable); *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004) (agency's "six-year-plus delay is nothing less than egregious"); *In re Bluewater Network*, 234 F.3d 1305, 1316 (D.C. Cir. 2000) (nine-year delay unreasonable); *In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1150 (D.C. Cir. 1992) (six-year delay unreasonable). The Defendants do not address any of these cases in their supplemental response.

Why has BLM repeatedly ignored its duty to create an HMAP for the Pancake Complex? What reasonable justification do Defendants offer for its thirty-eight year delay in producing an HMAP? Defendants have offered no reason for the delay. Instead, they remain entrenched in the position that BLM has no obligation to ever create an HMAP.

3.     The Third and Fifth TRAC Factors support a finding of unreasonable delay.

The third and fifth TRAC factors focus on human health and welfare, as well as the

nature and extent of the interests prejudiced by the delay. *See Doe*, 398 F. Supp. 3d at 657. Here, the WHA's main interest is to protect wild horses, with a recognition that such interest is "an integral part of the natural system of the public lands." 16 U.S.C. §1331. Further, Congress recognized that this interest is important to "enriching the lives of the American people." *Id*. By not creating an HMAP for the Pancake Complex, BLM's actions do not consider the full range of management options available to protect wild horses, and delay goes against the interests specifically elucidated by Congress. In addition, the public is harmed by Defendants' delay because they have not been given the opportunity to participate in the formulation of the full range of management options available to protect wild horses.

4.    The Fourth TRAC Factor supports a finding of unreasonable delay.

The fourth TRAC factor examines the effect of compelling action on other agency activities or priorities. See *Doe*, 398 F. Supp. 3d at 658. Defendants argue that requiring creation of an HMAP "could" impact public lands by delaying BLM's ability to remove excess wild horses immediately. *See* Dkt 78 at pp. 9-10. This hypothetical impact is connected to Defendants incorrect position that Plaintiffs' unreasonable delay claim is based on requiring the creation of HMAPs prior to gather operations. Again, Plaintiffs' claim is based on Defendants' thirty-eight year delay and focuses on now expediting HMAP creation.  Such expedition need not be connected to future gather operations.

Defendants offer no evidence that expediting HMAP creation would impact any other agency priorities, in error. *See Lyons v. United States Citizenship & Immigration Servs.*, 2023 U.S. Dist. LEXIS 4509, at *21 (S.D.N.Y. Jan. 10, 2023) (noting that Defendants must produce evidence and not just aver that a negative impact will occur). BLM has done HMAPs for other herd management areas without any drastic effect on the agency's priorities, and Defendants have not shown that they cannot do so here.

**III.    Conclusion**

BLM adopted regulations to implement the WHA with the intent of clarifying management procedures. Toward this end, the regulations require BLM to create and consider

HMAPs. *See* 43 C.F.R. §§4710.3-1-4710.4. By adopting these management procedures, the public is allowed a meaningful opportunity to participate in the scope and substance of HMA goals, thereby meeting the intent of the regulations. Plaintiffs therefore request that the Court order Defendants to immediately begin preparation of an HMAP for the Pancake Complex.

DATED: March 14, 2024                    Respectfully Submitted,

                                         *s/ Danielle M. Holt*
                                         Danielle M. Holt
                                         (Nevada Bar No. 13152)
                                         DE CASTROVERDE LAW GROUP
                                         1149 S Maryland Pkwy
                                         Las Vegas, NV 89104
                                         (702) 222-9999
                                         danielle@decastroverdelaw.com

                                         */s/ Jessica L. Blome*
                                         Jessica L. Blome
                                         (Cal. Bar No. 314898, admitted pro hac vice)
                                         J. RAE LOVKO
                                         (Cal. Bar No. 208855, admitted pro hac vice)
                                         GREENFIRE LAW, PC
                                         2748 Adeline Street, Suite A
                                         Berkeley, CA 94703
                                         (510) 900-9502
                                         jblome@greenfirelaw.com
                                         rlovko@greenfirelaw.com

                                         *Attorneys for Plaintiffs*

# EXHIBIT 9

1

2

3                    UNITED STATES DISTRICT COURT

4                          DISTRICT OF NEVADA

5                                 * * *

6    LAURA LEIGH, *et al.*,                    Case No. 3:22-cv-00034-MMD-CLB

7                          Plaintiffs,                    ORDER

8          v.

9    JON RABY, *et al.*,

10                         Defendants.

11

12

13   **I.      SUMMARY**

14          Animal rights plaintiffs[1] have filed suit against the U.S. Bureau of Land

15   Management ("BLM"), U.S. Department of the Interior, and Nevada BLM Director Jon

16   Raby on the grounds that a recent roundup of wild horses in eastern Nevada violated

17   the Wild Free-Roaming Horses and Burros Act ("WHA") and the National Environmental

18   Policy Act of 1969 ("NEPA"). Before the Court are the parties' cross-motions for

19   summary judgment (ECF Nos. 64, 70 ("Motions")) and Plaintiffs' request for judicial

20   notice of several documents (ECF No. 65 ("Request")).[2] As explained in further detail

21   below, the Court finds that BLM must be compelled to prepare a herd management area

22   plan ("HMAP") and must reanalyze the foreseeable effects of the Gather Plan

23   alternatives on wildfire risks in the Pancake Complex and reach a conclusion as to their

24   significance. Accordingly, the Court will grant in part and deny in part both Motions and

25

26          [1]Plaintiffs are Laura Leigh, Wild Horse Education, Animal Wellness Action, CANA
     Foundation, and the Center for a Humane Economy.

27
            [2]The Court has reviewed the parties' responses and replies. (ECF Nos. 68, 69,
28   71, 73, 78, 79.) The Court also considered the parties' arguments on the Motions after
     directing supplemental briefing. (ECF No. 80.)

1   Plaintiffs' Request.

2   **II.   BACKGROUND**

3        The following facts are undisputed and primarily derived from the administrative

4   record ("AR").

5        The Pancake Complex is a 1.2 million-acre area in eastern Nevada comprised of

6   two herd management areas ("HMAs"), one herd area, and one wild horse territory.

7   (ECF Nos. 64 at 10; 70 at 4-5.) The two HMAs in the Pancake Complex are the

8   Pancake HMA and the Sand Springs West Wild Horse HMA. (ECF No. 70 at 4.) BLM

9   created the Pancake HMA in 2008 by combining two pre-existing HMAs, the Monte

10  Christo HMA and the Sand Springs East HMA. (Pancake Complex Wild Horse Gather

11  Final Environmental Assessment ("Final EA") at AR 3501.) The Sand Springs West

12  HMA was established in the late 1980s. (*Id.* at AR 3554.)

13       BLM set the appropriate management level[3] ("AML") for the Pancake Complex at

14  a range of 361 to 638 wild horses. (*Id.* at AR 3502.) This AML is the sum of the AMLs

15  for its component management areas, which were most recently set in the Ely District

16  Record of Decision ("ROD") and Resource Management Plan ("RMP"), the Tonopah

17  RMP, and the Humboldt National Forest Land and Resource Management Plan

18  ("Humboldt RMP"). (*Id.* at AR 3502, 3553-54.)

19       In 2020, BLM conducted flight surveys and estimated that the population of wild

20  horses in the Pancake Complex was at least 2,300 above the low AML. (*Id.* at AR

21  3503.) The agency therefore determined that removing excess horses was necessary to

22

23       [3]BLM defines the AML as "the number of wild horses that can be sustained within
    a designated HMA which achieves and maintains a thriving natural ecological balance
24  in keeping with the multiple-use management concept for the area." (Pancake Complex
    Preliminary Environmental Assessment ("Preliminary EA") at AR 1928.) *See also Dahl*
25  *v. Clark*, 600 F. Supp. 585, 595 (D. Nev. 1984) ("[T]he test as to appropriate wild horse
    population levels is whether such levels will achieve and maintain a thriving, ecological
26  balance on the public lands."). Wild horse and burro management should seek to
    balance wild horse and burro populations, wildlife, livestock, and vegetation, and to
27  "protect the range from the deterioration associated with overpopulation of wild horses
    and burros." (Preliminary EA at AR 1928 (quoting *Animal Prot. Inst. of Am.*, 109 IBLA
28  112, 115 (1989).)

achieve a thriving natural ecological balance and protect rangeland resources. (*Id.*)

BLM then conducted a preliminary environmental assessment ("EA") of its gather plan. (Preliminary EA at AR 1924-2079.) Thousands of comments on the Preliminary EA were submitted during its 30-day public comment period. (ECF No. 70 at 6; Public Comments on Pancake Complex Wild Horse Gather EA ("Public Comments") at AR 2080-3392.) These public comments notified BLM of concerns about population growth rates, wildfire risks, gelding, livestock grazing levels, and AMLs. (*Id.*) BLM responded to the comments, edited the gather plan, then released the Final EA. (ECF No. 70 at 6.)

The Final EA considered five alternatives: (1) the no-action alternative; (2) the proposed action or Alternative A, which included phased gathers, fertility control, sex ratio adjustments, and releasing geldings; (3) Alternative B, which was the same as Alternative A but without geldings; (4) Alternative C, which would only use gathers; and (5) Alternative D, which would focus only on the Jakes Wash HA. (Final EA at AR 3506-07.) BLM signed its finding of no significant impact ("FONSI") and issued a Decision Record on May 4, 2021, adopting Alternatives A and D. (FONSI for Pancake Complex Wild Horse Gather at AR 3694-96; Decision Record at AR 3491-95.)

During the initial gather in early 2022, approximately 2,030 horses were removed from the Pancake Complex. (ECF No. 64 at 10.)

Plaintiffs brought this suit in January 2022 (ECF No. 1) and filed an amended complaint three months later (ECF No. 31 ("Complaint")). Now that discovery is complete, the parties have both moved for summary judgment. (ECF Nos. 64, 70 ("Motions").) Plaintiffs also seek to supplement the AR. (ECF No. 65.)

**III.    MOTIONS FOR SUMMARY JUDGMENT**

The Motions seek summary judgment on Plaintiffs' claims that BLM violated the WHA and NEPA.[4] (ECF Nos. 64, 70.) "Because neither NEPA nor the [WHA] contain[s]

---

[4]Plaintiffs make other arguments in their Motion that the Court does not address in detail here. First, Plaintiffs affirmatively argue they have standing to prosecute this case. (ECF No. 64 at 16-22.) Defendants do not dispute Plaintiffs' standing, and the

an internal standard of judicial review, the Administrative Procedure Act [("APA")] governs this court's review of the BLM's actions." *In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1061 (9th Cir. 2014); *see also* 5 U.S.C. § 702. The APA requires courts to compel "unlawfully withheld or unreasonably delayed" agency action and to set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. The Court will first determine whether BLM must be compelled to prepare HMAPs, then assess whether the gather plan or its EA were arbitrary, capricious, or otherwise not in accordance with the law.

### A. Compelling Action Under the WHA and Implementing Regulations

Plaintiffs allege that BLM has unlawfully withheld, or alternatively unreasonably delayed, preparing HMAPs for the Pancake Complex. *See* 5 U.S.C. § 706(1). Under the APA, courts may compel withheld or delayed agency action only if that action is both discrete and legally required. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62-64 (2004). Preparing an HMAP is indisputably a discrete action. *See Vietnam Veterans of Am. v. Cent. Intel. Agency*, 811 F.3d 1068, 1079 (9th Cir. 2016) (noting that an action can still be discrete when the agency retains discretion over the way its duty may be carried out); *cf. Norton*, 542 U.S. at 64 (describing the discreteness requirement as precluding a "broad programmatic attack"). At issue here are the circumstances under which developing an HMAP is also mandatory. The Court's analysis accordingly turns on whether the deadline for preparing an HMAP is firm or discretionary—that is,

---

Court finds that Plaintiffs have met the Article III threshold requirements. It is undisputed that BLM gathered horses from the Pancake Complex, which caused the injury and deaths of wild horses. Plaintiffs, who are wild horse enthusiasts and animal rights groups, were harmed or have members whose aesthetic interests and interests in the wellbeing of horses were harmed as a result. Plaintiffs' requested relief could remedy those harms moving forward.

Defendants also do not dispute Plaintiffs' assertion that they have exhausted their administrative remedies. (ECF No. 64 at 22.) Accordingly, the Court's analysis will focus on whether Defendants violated the WHA and NEPA.

4

1    whether the HMAP is being unlawfully withheld or unreasonably delayed, respectively.

2    *See Biodiversity Legal Found. v. Badgely*, 309 F.3d 1166, 1177 n.11 (9th Cir. 2002).

3    The Court will employ traditional tools of construction to determine whether the

4    WHA and its implementing regulations are "genuinely ambiguous" as to the deadline for

5    preparing an HMAP. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019). If there is genuine

6    ambiguity, then *Auer* deference might apply to BLM's interpretation; however, if

7    "uncertainty does not exist . . .  [t]he regulation then just means what it means." *Id.*

8    **1.    Unlawfully Withheld HMAP**

9    Plaintiffs argue that the interplay between two BLM regulations sets a firm

10   deadline for preparing HMAPs: BLM must have an approved HMAP *before* performing

11   management activities on an HMA. (ECF No. 64 at 31.) *See also* 43 C.F.R. §§ 4710.3-

12   1, 4710.4. Otherwise, they argue, the mandate to manage wild horses and burros "at

13   the minimum level necessary to attain the objectives identified in approved land use

14   plans and [HMAPs]" would be rendered superfluous. 43 C.F.R. § 4710.4.

15   Viewed in isolation, the regulation requiring BLM to prepare HMAPs is silent as to

16   the deadline for doing so. *See id.* at § 4710.3-1. Regulatory language, however, "cannot

17   be construed in a vacuum." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012)

18   (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)); *see also Kisor*,

19   139 S.Ct. at 2415 (holding that to "exhaust all the traditional tools of construction" courts

20   must "carefully consider the text, structure, history, and purpose of a regulation"

21   (cleaned up)). "It is a fundamental canon of [] construction" that regulations "must be

22   read in their context" and with a view to their place in the overall regulatory scheme.

23   *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)

24   (quotation marks and citation omitted); *accord King v. Burwell*, 576 U.S. 473, 492

25   (2015).[5] Courts must interpret a statute's implementing regulations "as a symmetrical

26

27   [5]Though these cases discuss statutory interpretation, the Supreme Court
     indicated in *Kisor v. Wilkie* that the same rules of interpretation apply to regulations. *See*

28   139 S.Ct. at 2414-15.

1    and coherent regulatory scheme and fit, if possible, all parts into a[] harmonious whole."

2    *Brown & Williamson*, 529 U.S. at 133 (quotation marks and citation omitted).

3         The requirement to prepare HMAPs should thus be read in the context of other

4    implementing regulations of the WHA, as well as the WHA's controlling statutory

5    language. The WHA requires that the Secretary of the Interior manage wild horses in a

6    manner that will "achieve and maintain a thriving natural ecological balance" on public

7    land. 16 U.S.C. § 1333(a). If the Secretary determines an area is overpopulated, she

8    must fulfill her duty to maintain ecological balance by "*immediately* remov[ing] excess

9    animals from the range." *Id.* at § 1333(b)(2) (emphasis added). Though Plaintiffs assert

10   that the directive to manage wild horses at "the minimal feasible level" is operative here,

11   *id.* at § 1333(a), "Congress could not have intended that the 'minimal' management

12   requirement would force the BLM to ignore these other statutory mandates," *In Def. of*

13   *Animals*, 751 F.3d at 1066. Reading the regulations as Plaintiffs request would force

14   BLM to put gathers on hold for months, years, or perhaps even decades until an HMAP

15   is approved, instead of conducting immediate removals. As the WHA implementing

16   regulations must comport with the WHA itself, they have "only one reasonable

17   construction." *Kisor*, 139 S. Ct. at 2415. BLM may conduct management activities on

18   HMAs which do not yet have an approved HMAP.

19        As Plaintiffs have not identified any firm deadlines for developing an HMAP, the

20   Pancake Complex HMAPs have not been unlawfully withheld.

21        **2.    Unreasonable Delay in Preparing an HMAP**

22        In the absence of a firm deadline for preparing HMAPs, the Court will assess

23   whether BLM has unreasonably delayed creating an HMAP for the Pancake Complex

24   HMAs. The Court finds that BLM has unreasonably delayed its performance of this

25   mandatory duty and must be compelled to prepare an HMAP.

26        **a.    Notice Pleading Standard**

27        As a threshold matter, Defendants object that Plaintiffs' unreasonable delay claim

28   was not adequately raised in the Complaint. (ECF Nos. 70 at 19; 73 at 13-14.) The

Federal Rules of Civil Procedure require only that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIVIL PROC. 8(a)(2). Though plaintiffs must state a demand for the relief they seek, that demand "may include relief in the alternative." *Id.* at (a)(3). "This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues," rather than requiring plaintiffs to define all their claims perfectly before further proceedings are conducted. *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002).

The Complaint satisfies these notice pleading requirements because Defendants have received fair notice of Plaintiffs' claims and the grounds upon which they rest. *See id.* at 514; *Updike v. Multnomah Cnty.*, 870 F.3d 939, 952 (9th Cir. 2017). The second cause of action begins with a focus on BLM's duty to prepare HMAPs before gathering horses. (ECF No. 31 at 22.) It then more broadly states,

> Defendants have unlawfully withheld *or unreasonably delayed* their mandatory duty to prepare an HMAP for the Pancake Complex of Herd Management Areas or for the individual herd management areas that make up the Complex . . . Defendants' failure to adopt a Herd Management Area Plan for the Pancake Complex of Herd Management Areas has injured Plaintiffs in the manner described in this Complaint.

(*Id.* (emphasis added).) Plaintiffs may set out multiple statements of a claim in a single count, and "the pleading is sufficient if any one of them is sufficient." FED. R. CIVIL PROC. 8(d). Thus, Plaintiffs' general request that the Court compel BLM to prepare an HMAP is not defeated by their more specific request that the Court compel BLM to prepare an HMAP before engaging in management actions. Nor is this claim defeated by Plaintiffs' failure to expressly request preparation of an HMAP as a form of relief, as Plaintiffs included a blanket request that the Court grant "additional and further relief to which plaintiffs may be entitled." (ECF No. 31 at 26.) The liberal notice pleading standard has been met. The Court will proceed with reviewing the claim on its merits.

### b.   Legally Required

Section 4710.3-1 of BLM's WHA implementing regulations provides that HMAs

"shall be established for the maintenance of wild horse and burro herds" and that BLM "shall prepare a [HMAP], which may cover one or more [HMAs]." 43 C.F.R. § 4710.3-1. These are mandatory duties with which BLM must comply. (ECF No. 70 at 14 (Defendants' admission that Section 4710.3-1 includes a "general mandate that BLM create HMAPs"); BLM Wild Free-Roaming Horses and Burros Management Policy Manual ("Manual") at AR 1433 (noting BLM district or field office managers must prepare "HMAPs for all HMAs in their offices").) *See also Animal Prot. Inst. of Am.*, 109 IBLA at 127 ("43 CFR 4710.3-1 requires preparation of an HMAP."); *Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020) ("The first sign that the statute imposed an obligation is its mandatory language: 'shall.'"). Therefore, regardless of the discretion the agency was originally granted under the WHA, BLM "has chosen to constrain its own discretion via regulations that carry the force of law." *Trout Unlimited v. Pirzadeh*, 1 F.4th 738, 751 (9th Cir. 2021); *accord Flores v. Bowen*, 790 F.2d 740, 742 (9th Cir. 1986). BLM must comply with Section 4710.3-1 and develop one or more HMAPs for the Pancake Complex HMAs. *See Flores*, 790 F.3d at 742; *Vietnam Veterans of Am.*, 811 F.3d at 1079; *Erie Boulevard Hydropower, LP v. Fed. Energy Regul. Comm'n*, 878 F.3d 258, 269 (D.C. Cir. 2017) ("It is axiomatic that an agency is bound by its own regulations.").

### c. Substantial Compliance with HMAP Mandate

Defendants concede that they have not prepared HMAPs for the Pancake or Sand Springs West HMAs (ECF Nos. 78 at 11; Final EA at AR 3553-54; ECF No. 80 (oral argument on the Motions)); however, they argue that BLM has substantially complied with its duty to develop an HMAP through its land use plans ("LUPs"), including the Humboldt, Tonopah, and Ely District RMPs.[6] This interpretation of Section 4710.3-1 is unreasonable, as LUPs and HMAPs are not equivalent documents. BLM must adhere to its own regulations and develop an HMAP for the Pancake Complex.

---

[6] RMPs are a type of LUP. (H-4700-1 Wild Horses and Burros Management Handbook ("Handbook") at AR 1356.)

Only two regulations discuss HMAPs: Section 4710.3-1 and Section 4710.4. *See* 43 C.F.R. §§ 4710.3-1, 4710.4. Neither lays out what comprises an HMAP, leaving that largely up to the agency to decide. *See Kisor*, 139 S. Ct. at 2415. The regulations, however, are clear on what HMAPs are *not*, as they explicitly distinguish HMAPs from LUPs. *See id.* at 2415-16; 43 C.F.R. § 4710.4. BLM recognizes this distinction throughout its guidance documents, and other courts have recognized that the documents are not equivalent as well. (Manual at AR 1431, 1435; BLM Wild Horses and Burros Management Handbook ("Handbook") at AR 1359-60, 1395.) *See, e.g.*, *Friends of Animals v. BLM*, 548 F. Supp. 3d 39, 47 (D.D.C. 2021).

BLM counters that issuing RMPs which included all the substantive requirements of HMAPs fulfilled its duty under Section 4710.3-1. Even if an RMP engaged in all the herd-focused management planning of an HMAP, the differences between HMAPs and RMPs go beyond their substance. Parties aggrieved by an HMAP have different procedural rights and administrative review processes than parties who wish to protest RMPs.[7] *Compare* 43 C.F.R. §§ 4.21, 4.410 (administrative review procedures for wild horse and burro implementation decisions, including HMAPs), *with* 43 C.F.R. §§ 1610.5-1, 1610.5-2 (protest procedures for RMPs); *High Desert Multiple-Use Coal., Inc., et al. Keith Collins*, 142 IBLA 285, 289 (1998). To the extent that BLM argues that any wild horse management decisions would be implementation decisions subject to the same administrative review procedures as an HMAP, the agency failed to recognize this in its RMPs. (Ely District RMP at AR 880-81 (recognizing other actions as implementation decisions).) Engaging in the decision-making of an HMAP without actually preparing an HMAP could therefore deprive interested parties of the administrative review processes to which they are entitled.

Moreover, BLM engages in environmental review under NEPA at each stage of

---

[7]The same is true for HMAPs and gather plans. (Handbook at AR 1394-95 (distinguishing the appeals timing and processes for HMAPs and gather decisions).) *Compare* 43 C.F.R. §§ 4.21, 4.410, *with id.* at § 4770.3(c) (gather and removal decision appeals procedures).

its wild horse management planning process, from establishing broad LUPs to narrower HMAPs and specific gather plans. (Handbook at AR 1385-90, 1397-99.) *See also* 43 C.F.R. § 1601.0-6 (requiring NEPA review for RMPs). Skipping the HMAP stage evades that middle level of environmental review. Such additional review might well be redundant if an RMP includes the same information that an HMAP would cover; however, it is not the Court's role to question that policy choice. BLM has committed itself to engaging in a tiered, iterative process for managing wild horses on public lands. The agency must uphold that commitment, even if it appears formalistic.

BLM's reading of Section 4710.3-1 is therefore outside "the bounds of reasonable interpretation." *Kisor*, 138 S. Ct. at 2416 (quoting *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013)). RMPs cannot fulfill the Section 4710.3-1 HMAP preparation mandate.

### d. *TRAC* Factors

The issue then is whether BLM's delay in preparing HMAPs has been unreasonable. To answer that question, the Ninth Circuit uses the six-factor balancing test announced by the D.C. Circuit in *Telecommunications Research & Action Center v. FCC* ("*TRAC*"). *See Vaz v. Neal*, 33 F.4th 1131, 1137 (9th Cir. 2022) (quoting *TRAC*, 750 F.2d 70, 80 (D.C. Cir. 1984)).

The first factor considers "whether the time for agency action has been reasonable." *Id.* at 1138 (quoting *In re Nat. Res. Def. Council, Inc.*, 956 F.3d 1134, 1139 (9th Cir. 2020) ("*In re NRDC*")). Though not determinative, it is "the most important factor." *Id.* (quotation marks omitted). "Repeatedly, courts in this and other circuits have concluded that a reasonable time for agency action is typically counted in weeks or months, not years." *Id.* (quoting *In re NRDC*, 956 F.3d at 1139) (quotation marks omitted).

By these standards, BLM has taken more than a reasonable amount of time to prepare HMAPs for the Pancake and Sand Springs West HMAs. The duty to prepare an HMAP arose as soon as BLM created the HMAs—or, if the HMAs predate Section

4710.3-1, that duty arose when BLM promulgated the regulation 38 years ago in 1986. (ECF No. 71 at 13.) *See also* Revision of Existing Regulations on Protection, Management, and Control of Wild Free-Roaming Horses and Burros, 51 Fed. Reg. 7410, 7416 (Mar. 3, 1986) (to be codified at 43 C.F.R. pt. 4710.3-1). BLM's decades-long delays in developing and approving HMAPs have therefore been "nothing short of egregious" and clearly violate the rule of reason. (Final EA at AR 3501, 3553-54 (noting that BLM created the Pancake HMA in 2008 and the Sand Springs West HMA in the late 1980s).) *In re NRDC*, 956 F.3d at 1142; *see also In re Pesticide Action Network N. Am.*, 798 F.3d 809, 814 (9th Cir. 2015) (eight-year delay with no concrete timeline to reach a final ruling was a "roadmap for further delay" that "stretched the 'rule of reason' beyond its limits"); *All. for Wild Rockies v. Cooley*, 661 F. Supp. 3d 1025, 1039 (D. Mont. 2023) (20-year delay in grizzly bear management was "clearly" unreasonable). The first *TRAC* factor strongly favors Plaintiffs.

The second factor is not applicable because Congress has not supplied a timeframe in which HMAPs should be prepared. *See In re NRDC*, 956 F.3d at 1140-41.

The third factor indicates that delay is less likely to be reasonable when the regulation at issue affects human health and welfare than when it is an economic regulation, and the fifth factor looks more broadly at the nature and extent of the interests that have been prejudiced by the agency's delay. *See Vaz*, 33 F.4th at 1137. The Court will analyze these factors together, as they often overlap. *See Indep. Mining Co., Inc. v. Babbitt*, 105 F.3d 502, 509 (9th Cir. 1997). The consequences of BLM's failure to prepare an HMAP "fall neither into the economic realm nor specifically into the realm of human health and welfare." *Or. Nat. Desert Ass'n v. Bushue*, 644 F. Supp. 3d 813, 842 (D. Or. 2022), *appeal dismissed sub nom. Or. Nat. Desert Ass'n v. BLM*, No. 23-35101, 2023 WL 5012123 (9th Cir. June 5, 2023). The third factor is thus neutral.

But "the public can still have a significant interest in agency management that promotes such important values as wildlife, scenery, cultural resources, and recreational opportunities." *Id.* (quotation marks omitted). Congress enacted the WHA to

1    protect wild horses and burros—which are "an integral part of the natural system of the

2    public lands" and symbols of American history and culture—and the ecology of the

3    public lands they inhabit. 16 U.S.C. §§ 1331, 1333(a). Defendants contend that,

4    because the RMPs are functionally HMAPs, none of these interests were prejudiced by

5    BLM's delay in developing an HMAP. (ECF No. 80.) The Court will assume, without

6    deciding, that this is true[8] and that the fifth factor weighs in Defendants' favor.

7         The fourth factor looks to "whether compelling the agency to act would detract

8    from its higher or competing priorities." *Vaz*, 33 F.4th at 1138. Preparing the Pancake

9    Complex HMAP may take personnel and funding away from other BLM activities, like

10   gathering excess horses. (ECF No. 78 at 13-14.) The Court is sympathetic to the fact

11   that BLM, like most public agencies, has multiple resource-intensive mandates and

12   limited resources with which to fulfill them. *See Vaz*, 33 F.4th at 1138. But it would be

13   overly generous to say that BLM gets a free pass on the fourth factor because all of its

14   activities to some extent touch on the important values of wildlife, recreation, and the

15   multiple use of public lands. *See In re NRDC*, 956 F.3d at 1141. Preparing an HMAP

16   should have only limited impact on BLM's other priorities. The agency can conduct

17   gathers in the meantime, and the HMAP should require minimal work since BLM claims

18   to have already substantially prepared one. (ECF No. 80.) This factor favors Plaintiffs.

19        Finally, the sixth factor is irrelevant because there is no evidence that BLM has

20   behaved improperly. (ECF Nos. 64 at 32; 78 at 14.) *See also Vaz*, 33 F.4th at 1138 n.6.

21        Only the fifth factor has weighed in Defendants' favor, leaving little question that

22   BLM's delay in preparing HMAPs for the Pancake and Sand Springs West HMAs has

23   been unreasonable. BLM must develop and approve one or more HMAPs for the

24

---

25   [8]Before the gather, a massive overpopulation of wild horses was harming the ecology of the Pancake Complex, its rangeland resources, and the horses themselves.
26   (Final EA at AR 3503-04.) These are the types of issues that HMAPs are meant to address, leaving the Court not entirely convinced that no interests have been prejudiced
27   by the decades-long delays in preparing HMAPs. (Handbook at AR 1386, 1401.) Regardless, this factor is not dispositive, and the Court still finds that BLM's delay is
28   unreasonable, as explained below.

1  Pancake Complex HMAs within the next year.[9] *See* 43 C.F.R. § 4710.3-1 (noting that

2  HMAPs may cover one or multiple HMAs). Plaintiffs' Motion is granted, and Defendants'

3  Motion is denied, as to Plaintiffs' second cause of action.

### B.  Timing of Gather Plan Arbitrary and Capricious

5  Plaintiffs further argue that BLM's decision to adopt the gather plan and proceed

6  with the gather was arbitrary and capricious, an abuse of discretion, and contrary to the

7  law in light of BLM's mandatory duty to prepare an HMAP prior to conducting herd

8  management activities. (ECF Nos. 31 at 23; 64 at 33-35.) *See also* 5 U.S.C. §

9  706(2)(A). The Court has already found that BLM may gather excess horses without

10  first preparing and approving an HMAP. BLM's interpretation of its duties therefore does

11  not conflict with binding law, nor does it lack a reasonable basis. Plaintiffs' Motion is

12  denied, and Defendants' Motion is granted, as to Plaintiffs' third cause of action.

### C.  Timing of Gather Plan in Excess of BLM's Authority

14  BLM likewise did not act in excess of statutory jurisdiction, authority, or limitations

15  by gathering horses before preparing an HMAP for the Pancake Complex. (ECF Nos.

16  31 at 24; 64 at 36.) *See also* 5 U.S.C. § 706(2)(C). Again, the gather was congruent

17  with the WHA and its implementing regulations, and thus conducting a gather for an

18  area which did not yet have an HMAP was within BLM's authority. Plaintiffs' Motion is

19  denied, and Defendants' Motion is granted, as to Plaintiffs' fourth cause of action.

### D.  Compliance with NEPA and its Implementing Regulations

21  The Court will now turn to whether the Gather Plan EA complies with NEPA.

22  Although NEPA lacks a substantive mandate, its "action-forcing" procedural

23  requirements help carry out a "national commitment to protecting and promoting

24  environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348

25  (1989); *accord* 42 U.S.C. § 4331. One such means by which NEPA forces action is its

26

27  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
[9]The parties agreed at the March 19, 2024, hearing that one year was a
reasonable period in which BLM could complete an HMAP for the Pancake Complex

28  HMAs. (ECF No. 80.)

requirement that agencies take a "hard look" at the environmental consequences of their proposed actions. *See Kern v. BLM*, 284 F.3d 1062, 1066 (9th Cir. 2002). This 'hard look' includes conducting an environmental assessment ("EA") in certain circumstances to inform whether the agency prepares an environmental impact statement ("EIS") or instead issues a finding of no significant impact ("FONSI"). *See* 40 C.F.R. §§ 1501.5(c)(1), 1501.6(a).

Courts examine an EA "with two purposes in mind: to determine whether it has adequately considered and elaborated the possible consequences of the proposed agency action when concluding that it will have no significant impact on the environment, and whether its determination that no EIS is required is a reasonable conclusion." *350 Montana v. Haaland*, 50 F.4th 1254, 1265 (9th Cir. 2022) (quoting *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1215 (9th Cir. 2008)). Here, Plaintiffs challenge both whether BLM took the requisite "hard look" at its Gather Plan and whether BLM's decision not to conduct an EIS was reasonable. They specifically allege that BLM did not adequately consider the environmental impacts of the Gather Plan, appropriate alternative courses of action, its AML calculation formula, or the effects of incomplete information.

### 1. Hard Look at Environmental Impacts

To satisfy NEPA's 'hard look' requirement, agencies preparing an EA must provide "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *350 Montana*, 50 F.4th at 1265 (quoting *Nat'l Highway Traffic Safety Admin.*, 538 F.3d at 1194). Compiling an "exhaustive examination of each and every tangential event that potentially could impact the local environment," however, would be an "impossible, and never-ending," task. *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1129 (9th Cir. 2012). As a result, EAs are designed "not to amass and disclose all possible details regarding a proposal but to . . . briefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]." *Id.* at 1128 (cleaned up); *accord* 40 C.F.R. § 1508.1(h) (defining EAs as

1    "concise" documents). The agency's analysis must include a "satisfactory explanation"

2    for its action so that the Court may assess "whether the process employed by the

3    agency to reach its decision took into consideration all the relevant factors." *Asarco, Inc.*

4    *v. U.S. Env't Prot. Agency*, 616 F.2d 1153, 1159 (1980).

5         Plaintiffs argue that the EA did not sufficiently assess the Gather Plan's impacts

6    on the population growth rate of wild horse populations, herd social dynamics, or wildfire

7    risks in the Pancake Complex. The Court will conduct "a searching and careful inquiry

8    into the facts" in reviewing these claims. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*,

9    18 F.3d 1468, 1471 (9th Cir. 1994).

10                    **a.    Impacts to Population Growth Rate**

11        Commenters raised concerns that removals may increase wild horse herd

12   population growth rates by lowering population levels below food-limited carrying

13   capacity and consequently decreasing competition for forage. (Public Comments on EA

14   at AR 2118, 2151-52.) Plaintiffs now allege that BLM did not respond to these

15   comments and thus failed to take a 'hard look' at how a gather may keep population

16   growth rates high, despite the Gather Plan's stated purpose to "reduce the wild horse

17   population growth rates to achieve and maintain established AML ranges."[10] (Final EA

18   at AR 3504.)

19        Both the Preliminary and Final EAs include significant discussion of the issue,

20   which the Court will summarize here. (Preliminary EA at AR 1962-65; Final EA at AR

21   3506-37.) Wild horses are a non-self-regulating species, meaning without human

22   intervention their population will steadily increase beyond the range's carrying capacity.

23   (Final EA at AR 3529.) Allowing the range to naturally limit populations would therefore

---

24        [10]As part of this claim, Plaintiffs allege that BLM did not examine

25   recommendations from a 2013 study published by the National Academy of Sciences
     ("NAS"). (ECF No. 64 at 40.) The Final EA cites the study several times, including when

26   examining the impacts of a no-action alternative on wild horse population growth. (Final
     EA at AR 3521, 3529 ("The NAS report (NRC 2013) concluded that the primary way that

27   equid populations self-limit is through increased competition for forage at higher
     densities.").) BLM also examined the substance of the NAS recommendation at issue.

28   The Court thus finds this argument unpersuasive.

not only be inhumane but would also violate the WHA's mandates to immediately remove excess horses, protect the range from the deterioration associated with overpopulation, and preserve and maintain a thriving natural ecological balance. (*Id.* at AR 3521, 3529.) *See also* 16 U.S.C. §§ 1333(a), 1333(b)(2). Moreover, BLM ran population models which estimated that the no-action alternative would actually lead to higher average annual growth rates over a ten-year period than Alternatives A, B, or C—all of which included a gather.[11] (Final EA at AR 3596-605.) BLM thus gave a hard look to impacts on population growth rates, concluded a gather would not raise growth rates, and properly eliminated the no-action alternative from further consideration. (*Id.* at AR 3520-21.) *See N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011) (holding that, to be afforded deference, an agency must support its conclusions with studies that the agency deems reliable).

Plaintiffs' argument also ignores the totality of BLM's purpose in reducing population growth rates, which was to achieve and maintain established AMLs. (Final EA at AR 3504.) As the herd population in the Pancake Complex was about seven times greater than its low AML, BLM concluded that removing a significant portion of the wild horses on the Pancake Complex was necessary to reach AMLs and restore a thriving natural ecological balance. (FONSI at AR 3694; Decision Record at 3493.) BLM recognized that removing horses from the range, without more, would cause "reduced competition for scarce resources within the HMA," and thus removals alone "would not address population control on the range by reducing population growth." (Final EA at AR 3537.) Alternatives which combined gathers with means of curbing the herd's fertility were therefore also assessed. These alternatives were the best at controlling population growth rates and maintaining AMLs, so BLM adopted an approach that used both gathers and fertility controls. (*Id.* at AR 3594-605; Decision Record at AR 3492.)

The EA adequately considered how gathers might keep herd population growth

---

[11]This conclusion refences the estimated median ten-year growth rates.

rates high and even implemented additional corrective measures to ensure that the Plan's population control purposes were met. (*Id.* at AR 3504.) BLM gave the Gather Plan's impact on population growth a sufficiently hard look and adopted an alternative in line with the evidence before the agency. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Plaintiffs' Motion is denied, and Defendants' Motion is granted, as to whether BLM adequately considered the impacts to population growth rates.

### b. Impacts to Horses and Herds from Returning Geldings

In support of their challenge to BLM's analysis of how re-introducing hundreds of geldings into the Pancake Complex might impact horses or herds, Plaintiffs reference the lack of complete information on these effects, as well as expert opinions that contradict the studies upon which BLM relied. (ECF No. 64 at 44-45.)

Incomplete information about the effects of gelding does not itself render the EA arbitrary and capricious, so long as BLM considered and addressed the relevant unknown factors, explained why additional information was not available, and did not otherwise engage in a clear error of judgment. *See Am. Wild Horse Campaign v. Bernhardt*, 963 F.3d 1001, 1012 (9th Cir. 2020); *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989). BLM did just that in the Gather Plan EA. (Final EA at AR 3531, 3626-31.) The agency looked at existing studies on geldings and their interactions with other horses, recognizing that it was unclear exactly how a wild horse's behavior would change post-gelding or how releasing geldings would affect the behavior of other wild horses. (*Id.* at AR 3627-29.) Based on this literature, BLM concluded that the proposed level of gelding in the Pancake Complex would not significantly change herd social structures or demographics. (*Id.* at AR 3630.) Such analysis is sufficient, even with gaps in scientific knowledge. *See Friends of Animals v. Silvey*, 353 F. Supp. 3d 991, 1016-17 (D. Nev. 2018), *aff'd*, 820 F. App'x 513 (9th Cir. 2020); *Bernhardt*, 963 F.3d at 1012-13.

BLM also adequately responded to comments which raised concerns about the studies BLM cited. (Final EA at AR 3663-65, 3670-73, 3675-76.) One commenter

referenced two experts who stated that gelding a wild stallion would materially change his behavior. (*Id.* at AR 3675-76.) BLM directly addressed these expert opinions, "ultimately determining them to be 'speculative' because neither of them had actually conducted a study on the issue." *Am. Wild Horse Campaign v. Zinke*, 353 F. Supp. 3d 971, 985 (D. Nev. 2018), *aff'd sub nom. Bernhardt*, 963 F.3d 1001. The agency likewise noted that other concerns were unfounded. (Final EA at AR 3664-65, 3671-72.) Determinations like these are the types of "scientific judgments and technical analyses within the agency's expertise" that require the Court to be "at its most deferential." *N. Plains Res. Council*, 668 F.3d at 1075; *accord Marsh*, 490 U.S. at 378; *Ctr. for Biological Diversity v. Ilano*, 928 F.3d 774, 782-3 (9th Cir. 2019).

BLM has fairly considered the available evidence and the issues before it with regard to gelding. *See Zinke*, 353 F. Supp. 3d at 985-86. Plaintiffs' Motion is denied, and Defendants' Motion is granted, as to whether BLM adequately considered the effects of gelding stallions.

### c.  Increased Wildfire Risks

Plaintiffs next maintain that BLM did not sufficiently respond to concerns about increased wildfire risk post-gather. (ECF No. 64 at 40-41.)

To start, the record indicates that the impacts from altered wildfire risk are not "tangential event[s]" which the agency can ignore. *Tri-Valley CAREs*, 671 F.3d at 1129; *accord Salmon River Concerned Citizens v. Robertson*, 798 F. Supp. 1434, 1442 (E.D. Cal. 1992), *aff'd*, 32 F.3d 1346 (9th Cir. 1994) (holding environmental reviews need not discuss all speculative impacts). Throughout the EA, BLM references how wildfires, and the lack thereof, have affected riparian areas, wetlands, surface water quality, soils, watersheds, and rangeland habitat health in the Pancake Complex. (Final EA at AR 3540, 3552, 3607, 3610-11.) Impacts to wildfire risk were also reasonably foreseeable and had a reasonably close causal connection to the gather, as BLM noted in the EA. (*Id.* at 3614 (discussing how considered alternatives would affect the spread of invasive plants, which could change the fire regime).) *See also* 40 C.F.R. §§ 1508.1(g), (aa).

BLM could have still properly determined that the Gather Plan's effects on wildfire risks were minimal, but the record does not allow the Court to find that the agency took a hard look at wildfire risks. If the effects of the proposed action on wildfire risks were insignificant, the EA needed to say that and explain why it reached that conclusion. *See* 40 C.F.R. § 1502.2 (noting that a FONSI should include enough discussion of insignificant issues to show why further study is not needed); *350 Montana*, 50 F.4th at 1266 (holding that an agency's failure to cite scientific evidence or identify science-based criteria used to support its decision was fatal to its determination a project's impacts would be minor); *Tri-Valley CAREs*, 671 F.3d at 1124 ("[A]n agency must support its conclusions with studies that the agency deems reliable."). Here, BLM responded to concerns about how reductions in wild horse grazing might alter fire risks by stating that grazing was just one of many factors that influence wildfire risk and thus "it is an oversimplification and inaccurate to state that grazing—*in and of itself*—will reduce wildfire risk." (*Id.* at AR 3671 (emphasis added).) The Court will defer to these expert opinions. *See N. Plains Res. Council*, 668 F.3d at 1075. But grazing was not the only wildfire risk factor that the gather would affect. BLM itself recognized in the Final EA that, under every considered alternative, wild horses would spread an invasive weed called cheatgrass, which could alter the fire regime by increasing wildfire risks.[12] (*Id.* at AR 3526-27, 3614, 3671.) No effort was made to evaluate how greatly the spread of invasive plants would alter risks or how the combined effects of changes in wild horse grazing and the spread of cheatgrass would shift risk levels. The reader is instead left to guess how these factors will interact. *See 350 Montana*, 50 F.4th at 1266.

Consideration of how all affected wildfire risk factors might alter the Pancake Complex fire regime was essential to ensuring that BLM made an informed decision on whether it should prepare an EIS. *See Found. for N. Am. Wild Sheep v. U.S. Dep't of*

---

[12]The no-action alternative would lead to the greatest spread in invasive plants and therefore, impliedly, the greatest increase in fire risk, though BLM did not explicitly reach this conclusion. (*Id.* at AR 3614.)

*Agric.*, 681 F.2d 1172, 1178 (9th Cir. 1982). BLM therefore did not provide "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *350 Montana*, 50 F.4th at 1265 (quoting *Nat'l Highway Traffic Safety Admin.*, 538 F.3d at 1194). As such, Defendants acted in an arbitrary and capricious manner and failed to take the required 'hard look' at the foreseeable direct and indirect effects on fire risk from the proposed gather alternatives. Therefore, vacatur of the EA, ROD, and FONSI is necessary. BLM must reanalyze the foreseeable effects of the Gather Plan alternatives on wildfire risks in the Pancake Complex and reach a conclusion as to their significance. Plaintiffs' Motion is granted, and Defendants' Motion is denied, as to BLM's consideration of effects on wildfire risk.

Once the agency has addressed the identified problems, BLM may decide to make different choices. *See Oregon Nat. Desert Ass'n v. BLM*, 625 F.3d 1092, 1124 (9th Cir. 2010). "NEPA is not a paper exercise, and new analyses may point in new directions." *Id.* But the Court is not necessarily directing BLM to reach a different outcome. *See Norton*, 542 U.S. at 65. The issue identified today is only with the processes by which BLM reached its final result, not the final result itself.

### 2. Consideration of Range of Alternatives

In addition to thoroughly assessing the Gather Plan's environmental impacts, BLM must have also considered a reasonable range of alternatives. Agencies developing an EA for a proposal involving unresolved conflicts over how to use available resources must consider "appropriate" alternatives to the proposed action, including a 'no action' alternative. 42 U.S.C. §§ 4332(2)(C)(iii), (H); *see also* 40 C.F.R. § 1501.5(c)(2).[13] Of course, not every possible alternative is appropriate or reasonable.

---

[13]Congress has amended NEPA since BLM prepared the EA in 2021. *See* Fiscal Responsibility Act of 2023, Pub. L. 118-5, 137 Stat. 38. These amendments did not meaningfully change the aforementioned substantive requirements of NEPA Section 102 but merely renumbered them. *See id.* at § 321 (redesignating Section 102 subparagraphs (D) through (I) as (G) through (L)). The Court cites Section 102 as it is currently codified and notes that, because updates to the NEPA regulations following

1    Agencies need not consider alternatives that do not advance the purpose of a project or

2    are otherwise infeasible or impractical. *See Native Ecosystems Council v. U.S. Forest*

3    *Serv.*, 428 F.3d 1233, 1247 (9th Cir. 2005); *Env't Def. Ctr. v. Bureau of Ocean Energy*

4    *Mgmt.*, 36 F.4th 850, 877 (9th Cir. 2022); 40 C.F.R. § 1508.1(z).[14] Nor must agencies

5    engage in duplicative work by considering alternatives that are "substantially similar" to

6    other alternatives. *Native Ecosystems Council*, 428 F.3d at 1249. However, the

7    "existence of a viable but unexamined alternative renders the environmental review

8    conducted under NEPA inadequate." *Env't Def. Ctr.*, 36 F.4th at 877 (quotation marks

9    omitted).

10    This examination need not be extensive. Agencies' "obligation to consider

11    alternatives under an EA is a lesser one than under an EIS," and they may reject an

12    alternative without detailed discussion if they considered the alternative and provided

13    "an appropriate explanation as to why [it] was eliminated." *Native Ecosystems*, 428 F.3d

14    at 1246. The Court will now determine whether BLM insufficiently considered three

15    alternatives that would have increased the number of wild horses remaining on the

16    Pancake Complex.

17                    **a.    Reductions in Livestock Grazing**

18    According to Plaintiffs, BLM improperly eliminated from further consideration a

19    suggestion to reduce livestock grazing so that Pancake Complex could support more

20    wild horses. (ECF No. 64 at 41-42.) But BLM provided an "appropriate explanation as to

21    why it rejected the livestock reduction alternative: it simply could not reduce livestock

22    grazing allotments through the gather process." *Cloud Found. v. BLM*, 802 F. Supp. 2d

23    _____

24    the 2023 NEPA amendments have not yet been finalized, 40 C.F.R. § 1501.5(c)(2)'s
      reference to Section 102(2)(E) now refers to Section 102(2)(H).

25          [14]Though this provision of the NEPA implementing regulations has recently been

26    amended, it still defined "reasonable alternatives" as a "range of alternatives that . . .
      meet the purpose and need for the proposed action" when the EAs were prepared. *See*

27    Update to the Regulations Implementing the Procedural Provisions of the National
      Environmental Policy Act, 85 Fed. Reg.  43304-01, 43376 (July 16, 2020) (to be codified

28    at 40 C.F.R. pt. 1508(z)).

1192, 1206 (D. Nev. 2011); *accord Silvey*, 353 F. Supp. 3d at 1016. As the agency noted in its response to this suggestion, livestock allotments may only be changed through the official amendment of an RMP, which requires public involvement, preparation of an EA or EIS, interagency coordination, and other analysis. (Final EA at AR 3520.) *See Cloud Found.*, 802 F. Supp. 2d at 1206-07 (citing 43 C.F.R. § 1610.5-5). Lowering livestock grazing allotments was therefore outside the scope of the Final EA. (Final EA at AR 3519.)

Moreover, reducing livestock grazing to increase wild horse AMLs was not a reasonable alternative because it would have undermined the Gather Plan's stated purpose to "prevent undue or unnecessary degradation of . . . and to restore a thriving natural ecological balance and multiple-use relationship on public lands." (*Id.* at AR 3504.) *See also Native Ecosystems Council*, 428 F.3d at 1247. Due to the unique negative impacts wild horses had upon native vegetation and riparian buffers in the Pancake Complex, BLM concluded that "simply re-allocating livestock Animal Unit Months (AUMs) to increase the wild horse AMLs would not achieve a thriving natural ecological balance." (Final EA at AR 3520.) "It is not our role to question that informed scientific judgment." *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 991 (9th Cir. 2022). BLM had no obligation to consider this alternative that conflicted with the purpose of the Final EA. *See Native Ecosystems Council*, 428 F.3d at 1247-48.

The livestock reduction alternative was properly considered and eliminated.

**b.    Rewilding**

Plaintiffs also claim that BLM ignored a commenter's suggestions to consider "rewilding," which they define as returning the land to its natural state by reducing livestock grazing and "other conflicting monopolizers" like mining or off-highway vehicle use. (ECF No. 64 at 42; Public Comments at AR 3028.) However, BLM need not undertake a separate analysis of why it eliminated this alternative because it would have "substantially similar consequences" to reducing livestock grazing. *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004); *accord Native*

22

*Ecosystems Council*, 428 F.3d at 1249. Reallocating other uses of the Pancake Complex to support more wild horses would still undermine the thriving ecological balance of the area, as the additional horses are an ecological concern regardless of what land use they replace. (Final EA at AR 3520.) There was no need for BLM to engage in a redundant analysis of why it would not further consider decreasing other uses of the Pancake Complex to increase the horse population. *See Native Ecosystems Council*, 428 F.3d at 1248-49. The rewilding alternative was properly ignored.

### c.    Raising AMLs

Plaintiffs finally assert that BLM did not adequately support its decision not to raise the AML range for the Pancake Complex. (ECF No. 64 at 42-43.) Their primary concerns are that BLM did not rely upon sufficient monitoring data and acted before an evaluation of the Sand Springs West HMA rangelands could be completed. (*Id.*)

To start, BLM had no statutory or self-imposed requirements to assess the AML. The WHA does not require BLM to determine new AMLs based on current conditions each time the agency decides to restore an already-established AML. *See In Def. of Animals*, 751 F.3d at 1064 n.13. Nor must BLM show that an AML range remains valid before relying upon it. *See Friends of Animals v. BLM*, 2018 WL 1612836, at *18 (D. Or. Apr. 2, 2018). Existing management plans likewise do not commit BLM to recalculating the AML in any particular timeframe. (Monte Cristo HMAP at AR 18-20; Humboldt National Forest RMP at AR 54-55; Tonopah RMP and ROD at AR 532-724; Ely RMP and ROD at AR 871-1349.) *See also Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114, 1125 (D. Mont. 2016).

BLM also properly considered and rejected suggestions to increase the AML for the Pancake Complex. (Final EA at AR 3519.) The agency found that monitoring and other historical data did not indicate that AMLs should be increased but instead "confirm[ed] the need to remove excess wild horses." (Final EA at AR 3519; Handbook at AR 1367 (recommending BLM evaluate AMLs when "resource monitoring and population inventory data indicates the AML may no longer be appropriate").) Plaintiffs

have presented no evidence to the contrary, beyond unsupported assertions that the AMLs seem too low. (Public Comments at AR 2089-91 (stating that the square miles of habitat per horse are low)[15]; *id.* at AR 2126 (noting that horses receive limited AUMs compared to livestock).) As Plaintiffs have "failed to provide any support to show how a reevaluation and adjustment in AMLs would reduce . . . or in any way promote the health of existing wild horse populations," BLM reasonably eliminated this alternative from analysis as contrary to the principles of the WHA. *Silvey*, 353 F. Supp. 3d at 1015.

The unfinished rangeland health evaluation does not alter that conclusion. In determining whether a gather is necessary, BLM "must act immediately, even if more relevant information could become available at a later date." *Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127, 155 (D.D.C. 2020), *aff'd sub nom. W. Watersheds Project v. Haaland*, 850 F. App'x 14 (D.C. Cir. 2021); *accord* 16 U.S.C. § 1333(b)(2). Therefore, BLM did not need to wait to conduct a gather until it had completed the rangeland evaluation.

BLM has fulfilled its duty to prepare appropriate alternatives for the EA and gave those alternatives due consideration, even though they were outside the purpose and need of the Gather Plan.

### 3. Arbitrary and Capricious Means of Calculating Total AMLs

Plaintiffs also suggest that it was arbitrary and capricious for BLM to calculate the AML for the entire Pancake Complex by adding up the AMLs of its component management areas, instead of calculating a cumulative AML. (ECF No. 64 at 42-43.)

---

[15]This commenter also noted that studies have shown many AMLs are well below ecological carrying capacity. (Public Comments at AR 2091.) But, as BLM explained, the ecological carrying capacity is not equivalent to a thriving natural ecological balance. (Final EA at 3520-21 (finding that controlling wild horse populations by natural means would result in the "catastrophic mortality of wild horses," "reduce herbaceous vegetative cover, damage springs[,] and increase erosion, and could result in irreversible damage to the range"); Handbook at AR 1395 ("AML decisions determine the maximum number of WH&B to be managed in the HMA that results in a TNEB and avoids a deterioration of the range.").) *See also Cent. Or. Wild Horse Coal. v. Vilsak*, No. 2:21-CV-01443-HL, 2023 WL 4456855, at *7 (D. Or. May 12, 2023), *report and recommendation adopted sub nom. Cent. Or. Wild Horse Coal. v. Vilsack*, No. 2:21-CV-1443-HL, 2023 WL 7545514 (D. Or. Nov. 14, 2023).

While several commenters requested that BLM raise AMLs, no commenters questioned the methodology of using an aggregate AML. (Public Comments at AR 2081, 2089-91, 2109, 2126.) Thus, BLM was not notified of this concern during the public comment process with sufficient particularity for the agency to give the issue "meaningful consideration." *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 489 (9th Cir. 2023) (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004)).

No exceptional circumstances exist here that might excuse the belated raising of this issue. *See Alliance for the Wild Rockies v. Savage*, 897 F.3d 1025, 1033 (9th Cir. 2018). Plaintiffs had the full information needed to make these concerns known during the public comment period. (Preliminary EA at AR 1927-29.) *Cf. id.* at 1034 (holding that an exceptional circumstance existed where an agency's failure to disclose information prevented the plaintiff from raising a concern during the comment period). There is also no evidence that BLM had independent knowledge of this issue. *Cf. 'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1092-93 (9th Cir. 2006).

As BLM did not receive a prior opportunity to consider whether aggregating AMLs was appropriate and no exceptional circumstances are present, this claim has been waived. *See Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1063-65 (9th Cir. 2023).

### 4. Decision Not to Prepare an EIS

Plaintiffs finally argue that the unknown effects of gelding and the unsupported Pancake Complex AML require an EIS. (ECF No. 64 at 43, 45.) The Court disagrees.

### a. Uncertainty Regarding Gelding

NEPA requires federal agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c). This mandate extends to situations where an EA left "substantial questions" as to whether the proposed action will have a significant effect. *See Bernhardt*, 963 F.3d at 1007. Although NEPA does not require an EIS "anytime there is some uncertainty," substantial questions exist if the effects of the project are "highly uncertain." *Ctr. for Cmty. Action &*

*Env't Just. v. Fed. Aviation Admin.*, 61 F.4th 633, 649 (9th Cir. 2023) (quoting *Bernhart*, 963 F.3d at 1008).

BLM's proposal to geld and release male horses to the range does not meet the 'highly uncertain effects' threshold. Gelding horses is an established practice with well understood consequences. (Final EA at AR 3531.) *See also Bernhardt*, 963 F.3d at 1008. The Final EA thoroughly reviewed the known impacts of gelding on domestic horses and other species, then used these studies to find that gelding would have minimal effects on the wild horses in the Pancake Complex. (Final EA at AR 3626-31.) This was a "reasonable prediction[] on the basis of prior data" which left "only that quotient of uncertainty which is always present when making predictions about the natural world." *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 712 (9th Cir. 2009); *accord Bernhart*, 963 F.3d at 1008-09.

The inclusion of gelding did not raise substantial questions regarding whether the Gather Plan would significantly affect the environment.

### b. Unsupported AMLs

The Court has already discussed each component of this claim but will briefly reiterate those findings here. The EA properly identified the basis for BLM's decision not to recalculate AMLs for the Pancake Complex. (Final EA at AR 3503, 3519.) Monitoring data did not show any need to do so. (*Id.*; Ely RMP at AR 1106.) Nor was the calculated total AML for the Complex arbitrary. BLM simply added up the controlling, previously evaluated AMLs of its component parts to obtain the total numbers—a methodology which Plaintiffs failed to challenge before filing their Motion. *See Earth Island Inst.*, 87 F.4th at 1063-65 (finding claim waived under similar circumstances). Incomplete rangeland studies also did not render the AMLs invalid, as the WHA mandates that BLM "immediately" remove excess horses even if all relevant information on a gather is not yet available. 16 U.S.C. § 1333(b)(2). Plaintiffs fail to identify a basis upon which the Final EA or FONSI were inadequate with regard to the Pancake Complex AML.

Apart from its inadequate assessment of impacts on wildfire risks, BLM took the

appropriate hard look at the environmental impacts of and considered reasonable alternatives to its plan to achieve established AMLs in the Pancake Complex. The Court denies Plaintiffs' Motion and grants Defendants' Motion as to all NEPA claims except the claim regarding wildfire risk assessment.

## IV.    REQUEST FOR JUDICIAL NOTICE

Plaintiffs have requested that the Court take judicial notice of six additional documents to supplement the AR: (1) the Fifteenmile HMAP from Wyoming; (2) notes for 43 C.F.R. Part 4700; (3) a 1986 Federal Register notice for the final rulemaking of 43 C.F.R. Part 4700; (4) a 1991 Federal Register notice of an interim final rulemaking for 43 C.F.R. Part 4700; (5) 43 C.F.R. Part 4700; and (6) a 1984 Federal Register notice of proposed rulemaking for 43 C.F.R. Part 4700. (ECF No. 65.) Defendants oppose only judicial notice of the Fifteenmile HMAP. (ECF No. 68 at 2 & n.1.)

### A.  Fifteenmile HMAP

"Judicial review of agency actions should generally be confined to the original record upon which the actions were based." *Rybachek v. U.S. Env't Prot. Agency*, 904 F.2d 1276, 1296 n.25 (9th Cir. 1990). "The reviewing court may consider information supplemental to the record only exceptionally: for instance, if the information is necessary as background to explain the basis of the agency's action and the factors the agency considered." *Id.* (quotation marks omitted).

Plaintiffs argue that the Fifteenmile HMAP provides necessary background information on the differences between HMAPs and other planning documents. (ECF No. 65 at 3-4.) The Court disagrees. BLM did not rely on any information in the Fifteenmile HMAP, the HMAP does not address any issues not already present in the record, and it would not provide any explanation as to the basis of BLM's failure to prepare an HMAP for the Pancake Complex. *See Rybachek*, 904 F.2d at 1296 n.25. Whether RMPs can act as substitute HMAPs for the purposes of Section 4710.3-1 is a legal question upon which other HMAPs have no bearing. There is accordingly no need for the Court to reference the Fifteenmile HMAP, and Plaintiffs' Request is denied as to

this document.

**B.  Other Documents**

Defendants submitted a notice of their non-opposition to judicial notice of the documents from the Code of Federal Regulations or Federal Register. (ECF No. 68 at 2 n.1.) Defendants have therefore consented to the Court granting Plaintiffs' Request as to these filings. *See R.S. Coppola Tr. - Oct. 19, 1995 v. Nat'l Default Servs.*, No. 3:21-CV-00281-MMD-CSD, 2022 WL 2753512, at *1 (D. Nev. July 13, 2022), *aff'd sub nom. Coppola v. Nat'l Default Servs.*, No. 22-16212, 2023 WL 6566493 (9th Cir. Oct. 10, 2023). Alternatively, the Court grants the Request as to these documents because they are properly subject to judicial review as part of "the original record upon which the actions were based." *Rybachek*, 904 F.2d at 1296 n.25.

**V.     CONCLUSION**

The Court notes that the parties made several arguments and cited several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion because they do not affect the outcome of the Motions.

It is therefore ordered that Plaintiffs' motion for summary judgment (ECF No. 64) and Defendants' motion for summary judgment (ECF No. 70) are granted in part and denied in part as discussed herein.

The Court grants Plaintiff's Motion and denies Defendants' Motion as to the claim under the Wild Free-Roaming Horses and Burros Act that BLM unreasonably delayed preparing an HMAP but otherwise denied. Under 5 U.S.C. § 706(1), the Court remands to compel Defendants to prepare and approve HMAP(s) covering the Pancake Complex HMAs within one year of the date of this order.

The Court grants Plaintiff's Motion and denies Defendants' Motion as to the National Environmental Policy Act claim involving BLM's consideration of wildfire risks in the Final EA. The Court vacates and remands the Environmental Assessment, Record of Decision, and Finding of No Significant Impact for the agency to reanalyze the

foreseeable effects of the Gather Plan alternatives on wildfire risks in the Pancake Complex and reach a conclusion as to their significance. The Court otherwise denies Plaintiff's Motion and grants Defendants' Motions as to the remaining claims.

It is further ordered that Plaintiffs' request for judicial notice (ECF No. 65) is denied as to the Fifteenmile HMAP (ECF No. 65-2) but granted as to the other exhibits (ECF Nos. 65-3–65-7).

It is further ordered that the Clerk of Court enter judgment in accordance with this order and close this case.

DATED THIS 28th Day of March 2024.

_____

MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE

# EXHIBIT 10

AO450 (NVD Rev. 2/18)  Judgment in a Civil Case

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

LAURA LEIGH, et al.,

                         JUDGMENT
                  Plaintiffs,

v.                                       Case Number:   3:22-cv-00034-MMD-CLB

JON RABY, et al.,

                  Defendants.

___  **Jury Verdict.**  This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

___  **Decision by Court.**  This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

_X_  **Decision by Court.**  This action came for consideration before the Court. The issues have been considered and a decision has been rendered.

   **IT IS ORDERED AND ADJUDGED** pursuant to this court's order filed March 28, 2024 (ECF No. 81) Plaintiffs' motion for summary judgment (ECF No. [64]) and Defendants' motion for summary judgment (ECF No. [70]) are **granted in part and denied in part** as discussed therein (ECF No. 81).

   The Court grants Plaintiff's Motion and denies Defendants' Motion as to the claim under the Wild Free-Roaming Horses and Burros Act that BLM unreasonably delayed preparing an HMAP but otherwise denied. Under 5 U.S.C. § 706(1), the Court remands to compel Defendants to prepare and approve HMAP(s) covering the Pancake Complex HMAs within one year of the date of the order (ECF No. 81).

   The Court grants Plaintiff's Motion and denies Defendants' Motion as to the National Environmental Policy Act claim involving BLM's consideration of wildfire risks in the Final EA. The Court vacates and remands the Environmental Assessment, Record of Decision, and Finding of No Significant Impact for the agency to reanalyze the  foreseeable effects of the Gather Plan alternatives on wildfire risks in the  Pancake Complex and reach a conclusion as to their significance. The Court otherwise denies Plaintiff's Motion and grants Defendants' Motions as to the remaining claims.

   **IT IS FURTHER ORDERED** that judgment is hereby entered accordingly and this case is closed.

CLERK OF COURT

Date:  _____  March 29, 2024

_____
Signature of Clerk or Deputy Clerk

11.     Attached hereto as **Exhibit 9** is a true and correct copy of March 28, 2024 Opinion and Order Granting, in Part, Plaintiffs' Motion for Summary Judgment.

12.     Attached hereto as **Exhibit 10** is a true and correct copy of the Judgment.

13.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


DATED this 12th day of April 2024.

*/s/ Jessica L. Blome*
Jessica Blome