1   TODD KIM, Assistant Attorney General
    United States Department of Justice
2   Environment and Natural Resources Division
    MICHELLE M. SPATZ, Trial Attorney
3   FRANCES B. MORRIS, Trial Attorney
    P.O. Box 7611, Ben Franklin Station
4   Washington, D.C. 20044-7611
    (202) 598-9741 (Spatz)
5   (202) 514-2855 (Morris)
    michelle.spatz@usdoj.gov
6   frances.morris@usdoj.gov
7
8   *Attorneys for Federal Defendants*

9               **UNITED STATES DISTRICT COURT**
                  **DISTRICT OF NEVADA**
10

11  CANA FOUNDATION, a non-profit          )
    corporation, LAURA LEIGH, individually, and )
    WILD HORSE EDUCATION, a non-profit     )  Case No. 2:22-cv-01200-CDS-BNW
12  corporation,                            )
                                            )
13          *Plaintiffs*,                   )
                                            )
14                  v.                       )  **FEDERAL DEFENDANTS' REPLY**
                                            )  **IN SUPPORT OF CROSS-MOTION**
15  UNITED STATES DEPARTMENT OF THE         )  **FOR SUMMARY JUDGMENT**
    INTERIOR, BUREAU OF LAND               )
16  MANAGEMENT, and JON RABY, Nevada       )
    State Director of the Bureau of Land    )
17  Management,                             )
                                            )
18          *Federal Defendants*.           )
                                            )
19  _____    )
20
21
22
23
24
25
26
27
28

1

2

### TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION..................................................................................................1

II.   ARGUMENT .......................................................................................................2

    A.   The Gather Plan complies with the Wild Horse Act and its regulations. (First, Second, Third, and Fourth Causes of Action)............................................................................2

        1.   As this Court has already held, BLM is not required to prepare an HMAP prior to conducting a gather............................................................................................2

        2.   BLM has taken steps toward issuing an HMAP for the Blue Wing Complex within one year, rendering Plaintiffs' unreasonable delay claim prudentially moot. ..............6

        3.   The Gather Plan fulfills BLM's duty to immediately remove excess wild horses and burros so as to achieve appropriate management levels. ................................................8

    B.   BLM is entitled to summary judgment on Plaintiffs' NEPA claim. (Fifth Cause of Action) ..............................................................................................................12

        1.   BLM's Environmental Assessment took the requisite hard look at the environmental consequences of the proposed action............................................................13

        2.   Supplemental NEPA analysis is not required. ........................................................15

    C.   Plaintiffs' First Amendment claim fails. (Sixth Cause of Action)...............................17

        1.   Plaintiffs lack standing for their First Amendment claim regarding the placement of public observation sites for the 2022 Gather. .........................................................17

        2.   BLM did not violate Plaintiffs' First Amendment rights. .........................................22

            a.   There is no qualified right of public access to privately owned temporary and off-range holding corrals..........................................................................................22

            b.   Any perceived insufficiency with the public's view of the 2022 Gather was due to narrowly tailored restrictions to serve overriding safety interests.........................25

III.  CONCLUSION ...................................................................................................26

i

# TABLE OF AUTHORITIES

**CASE**                                                                      **PAGE**

*Arizonans for Off. Eng. v. Arizona,*
   520 U.S. 43 (1997) ......................................................................................19

*Audubon Soc'y of Portland v. Haaland,*
   40 F.4th 967 (9th Cir. 2022) .....................................................................16

*Bartell Ranch LLC v. McCullough,*
   Case No. 3:21-cv-00080-MMD-CLB, 2023 WL 1782343 (D. Nev. Feb. 6, 2023).................13

*Biodiversity Legal Found. v. Badgley,*
   309 F.3d 1166 (9th Cir. 2002) ....................................................................5

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
   401 U.S. 402 (1971) ...................................................................................13

*Deutsche Bank Nat. Tr. Co. v. F.D.I.C.,*
   744 F.3d 1124 (9th Cir. 2014) ................................................................7, 8

*Earth Island Inst. v. U.S. Forest Serv.,*
   87 F.4th 1054 (9th Cir. 2023) ...................................................................16

*Friends of Animals v. BLM,*
   No. CV 18-2029 (RDM), 2024 WL 1344424 (D.D.C. Mar. 30, 2024) ...................... 11, 14, 15

*Friends of Animals v. Silvey,*
   353 F. Supp. 3d 991 (D. Nev. 2018) .........................................................15

*Friends of Animals v. Silvey,*
   820 F. App'x 513 (9th Cir. 2020) .............................................................10

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
   528 U.S. 167, (2000) .................................................................................19

*Garcia v. Serv. Emps. Int'l Union,*
   No. 217-cv-01340-APG-NJK, 2019 WL 4279024 (D. Nev. Sept. 10, 2019) ......................8

*Howard v. City of Coos Bay,*
   871 F.3d 1032 (9th Cir. 2017) ....................................................................3

*Kleppe v. Sierra Club,*
   427 U.S. 390 (1976) ............................................................................12, 13

ii

*Leigh v. Raby*,
   No. 3:22-cv-00034-MMD-CLB, 2024 WL 1345297 (D. Nev. Mar. 28, 2024) ............ 1, 3, 5, 7

*Leigh v. Salazar*,
   677 F.3d 892 (9th Cir. 2012) ................................................................... 17, 18, 24

*Leigh v. Salazar*,
   954 F. Supp. 2d 1090 (D. Nev. 2013) ........................................................... 22, 24

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ..................................................................................... 17

*Marsh v. Or. Nat. Res. Council*,
   490 U.S. 360 (1989) ..................................................................................... 13

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
   668 F.3d 1067 (9th Cir. 2011) ....................................................................... 14

*Nat. Res. Def. Council v. Norton*,
   No. 1:05-cv-01207-OWW-LJO, 2007 WL 14283 (E.D. Cal. Jan. 3, 2007) ............................. 8

*Renne v. Geary*,
   501 U.S. 312 (1991) ..................................................................................... 19

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) ..................................................................................... 16

*Robi v. Five Platters*,
   838 F.2d 318 (9th Cir. 1988) ........................................................................... 4

*Spencer v. Kemna*,
   523 U.S. 1 (1998) ........................................................................................ 20

*Taylor v. Sturgell*,
   553 U.S. 880 (2008) ...................................................................................... 3

*W. Rangeland Conservation Ass'n v. Zinke*,
   265 F. Supp. 3d 1267 (D. Utah 2017) ................................................................ 11

**Statutes**

5 U.S.C. § 706(1) .............................................................................................. 9

5 U.S.C. § 706(2) .............................................................................................. 9

5 U.S.C. § 706(2)(A) .......................................................................................... 9

iii

5 U.S.C. § 706(2)(C) ................................................................................................................10

16 U.S.C. § 1333(b)(1) .............................................................................................................14

16 U.S.C. § 1333(b)(2) .........................................................................................................8, 12

28 U.S.C. § 1361 ....................................................................................................................4, 9

**Regulations**

40 C.F.R. § 1502.9(d)(ii) ..........................................................................................................16

1

2

## I.    INTRODUCTION

Pursuant to its mandate under the Wild Free-Roaming Horses and Burros Act of 1971 ("Wild Horse Act"), in October 2017, the Bureau of Land Management ("BLM") issued the Blue Wing Complex Gather Plan ("Gather Plan"), which provides for multiple gathers and removals of excess wild horses and burros to achieve and maintain appropriate management levels ("AML") over a period of multiple years. BLM's Gather Plan should be upheld as it complies with the Wild Horse Act and the National Environmental Policy Act ("NEPA"), and the Court should afford deference to the agency's judgment and expertise in managing wild horses and burros on public lands.

Consistent with the Gather Plan, in August 2022, BLM conducted a gather to address a severe overpopulation of wild horses and burros on the Blue Wing Complex ("2022 Gather"). Despite this Court's recent ruling in *Leigh v. Raby*, No. 3:22-cv-00034-MMD-CLB, 2024 WL 1345297 (D. Nev. Mar. 28, 2024) ("*Leigh I*"), Plaintiffs maintain the misguided position that BLM was required to complete a Herd Management Area Plan ("HMAP") prior to conducting the 2022 Gather.[1] But this does not constitute grounds to invalidate the Gather Plan because, as this Court has recognized, the Wild Horse Act allows BLM to "gather excess horses without first preparing and approving an HMAP." *See id.* Further, in light of the Court's other rulings in *Leigh I*, BLM has taken active steps to complete an HMAP for the Blue Wing Complex and intends to issue the HMAP within one year, thus rendering Plaintiffs' unreasonable delay claim at least

---

[1] Federal Defendants do not oppose Plaintiffs' Second Motion for Judicial Notice, ECF No. 65, which Plaintiffs filed simultaneously with their Opposition to Federal Defendants' Cross-Motion for Summary Judgment, and which requests judicial notice of the summary judgment filings and Opinion in *Leigh I*.

prudentially moot.[2] And Plaintiffs' argument that a multi-year gather plan runs afoul of the statute's "immediacy" language also fails, as it ignores the body of applicable caselaw on this issue.

Furthermore, Plaintiffs lack standing for their First Amendment claim regarding the 2022 Gather, as the gather was completed almost two years ago, and Plaintiffs' alleged grievances cannot be redressed by judicial relief. Plaintiffs' First Amendment claim also fails on the merits. Even where Plaintiffs enjoyed a qualified right to public access, BLM's reasonable restrictions on public observation opportunities for the 2022 Gather were narrowly tailored to ensure the safety of the public, the animals, and the personnel and contractors handling the animals.

For these reasons and those discussed herein, the Court should grant summary judgment in favor of Federal Defendants.

## II.   ARGUMENT

### A. The Gather Plan complies with the Wild Horse Act and its regulations. (First, Second, Third, and Fourth Causes of Action)

#### 1. As this Court has already held, BLM is not required to prepare an HMAP prior to conducting a gather.

Remarkably, while Plaintiffs argue that issue preclusion applies with respect to several rulings that they deem favorable to them from *Leigh I*, *see* ECF No. 63 ("Pls.' Br.") at 7-10, they maintain that preparation of an HMAP is a mandatory prerequisite to conducting gathers, despite this Court's clear ruling to the contrary, *see id.* at 12-17. Plaintiffs continue to argue that Section 4710.4 of the Wild Horse Act's implementing regulations "mandates that HMAPs be consulted before engaging in [herd management area ("HMA")] management activities, which include

---

[2] *See* https://www.blm.gov/announcement/humboldt-river-field-office-has-initiated-public-scoping-period-blue-wing-complex-herd (last visited on May 10, 2024).

2

decisions to remove wild horses from public lands." *Id.* at 14-15. But this argument was explicitly rejected by the Court in *Leigh I.* The Court found that "[r]eading the regulations as Plaintiffs request would force BLM to put gathers on hold for months, years, or perhaps even decades until an HMAP is approved, instead of conducting immediate removals" and thus would run counter to the intent of the Wild Horse Act. *Leigh I,* 2024 WL 1345297 at *3. Indeed, the Court held that, when read in line with the statute, there is "only one reasonable construction" of the regulations: that "BLM may conduct management activities on HMAs which do not yet have an approved HMAP." *Id.* (citation and quotations marks omitted).

Even if Plaintiffs disagree with the Court's holding in *Leigh I* addressing whether an HMAP must be issued prior to conducting a gather, the doctrine of issue preclusion bars Plaintiffs from relitigating the issue. *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (issue preclusion "bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment") (citation and quotation marks omitted). Issue preclusion, also known as collateral estoppel, applies when: "(1) the issue at stake was identical in both proceedings; (2) the issue was actually litigated and decided in the prior proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the merits." *Howard v. City of Coos Bay*, 871 F.3d 1032, 1040, 1041 (9th Cir. 2017) (citation and quotation marks omitted).

Here, there can be no dispute that all the parties to this case were parties to *Leigh I* and that the very same question—i.e., whether the Wild Horse Act and its implementing regulations require BLM to prepare an HMAP *prior* to conducting a gather—was fully and fairly litigated in the prior proceeding, resulting in a rejection of several of Plaintiffs' claims on the merits. *Compare* Pls.' Mot. for Summ. J. in *Leigh I* (attached to Pls.' Second Mot. for Judicial Notice),

3

ECF No. 65-1 at 15-22 (arguing that "The [Wild Horse Act] and Its Implementing Regulations Establish a Mandatory, Non-Discretionary Duty to Prepare an HMAP Prior to Engaging in Management Activities Such as Plans Providing for the Gather and Removal of Wild Horses"), *with* Pls.' Mot. for Summ. J. in this case, ECF No. 50 at 23-28 (arguing that "BLM must prepare . . . HMAPs prior to engaging in management activities, such as the removal of horses and burros"). Although the two cases involve different gathers, the legal question presented to the Court is identical.[3]

Plaintiffs' claims relying on the incorrect premise that an HMAP is a mandatory prerequisite to removing excess wild horses and burros must therefore be rejected, just as they were in *Leigh I*. This includes Plaintiffs' First, Third, and Fourth Causes of Action.[4] Here, Plaintiffs' First Cause of Action, asserted under the Mandamus and Venue Act, 28 U.S.C. § 1361, seeks "a writ of prohibition preventing Defendants from gathering and removing wild horses and burros under the Blue Wing Complex Gather Plan" until they have "developed [an HMAP.]" Pls.' First Am. Compl., ECF No. 24 ¶ 134. Similarly, Plaintiffs' Third Cause of Action, asserted under Administrative Procedure Act ("APA") Section 706(2)(A), alleges that BLM's decision to conduct the 2022 Gather without first preparing an HMAP was "was arbitrary and capricious, an abuse of discretion, and contrary to the law." *Id.* at ¶ 149. But as the Court held in *Leigh I*, "BLM may gather excess horses without first preparing and approving an

---

[3] The summary judgment decision issued in *Leigh I* is a final judgment for the purposes of issue preclusion, regardless of whether Federal Defendants were to appeal the decision. *See Robi v. Five Platters*, 838 F.2d 318, 327 (9th Cir. 1988) ("[I]n federal courts . . . the preclusive effects of a lower court judgment cannot be suspended simply by taking an appeal that remains undecided.") (citation omitted).

[4] To the extent these claims are premised on NEPA allegations (in addition to Plaintiffs' allegations under the Wild Horse Act and its implementing regulations), the claims must be rejected for the additional reasons discussed below in Section II.B.

HMAP[,]" meaning that "BLM's interpretation of its duties [] does not conflict with binding law, nor does it lack a reasonable basis." *Leigh I*, 2024 WL 1345297, at *7 (rejecting Plaintiffs' nearly identical claim under APA Section 706(2)(A) alleging that "BLM's decision to adopt the gather plan and proceed with the gather was arbitrary and capricious, an abuse of discretion, and contrary to the law in light of BLM's mandatory duty to prepare an HMAP prior to conducting herd management activities."). Plaintiffs' Fourth Cause of Action, asserted under APA Section 706(2)(C), fails for the same reasons. In *Leigh I,* the Court rejected Plaintiffs' claim under APA Section 706(2)(C) which alleged, as it does here, that BLM "act[ed] in excess of statutory jurisdiction, authority, or limitations by gathering horses before preparing an HMAP." *Leigh I*, 2024 WL 2024 WL 1345297, at *8; ECF No. 24 ¶¶ 152-156. Just as the Court held in *Leigh I* with respect to BLM's Pancake Complex gather, the 2022 Gather "was congruent with the [Wild Horse Act] and its implementing regulations, and thus conducting a gather for an area which did not yet have an HMAP was within BLM's authority." *Leigh I*, 2024 WL 2024 WL 1345297, at *8.

The portion of Plaintiffs' Second Cause of Action, asserted under APA Section 706(1), which alleges that BLM has unlawfully withheld an HMAP (as opposed to unreasonably delayed in preparing one) must also be rejected. As the Court correctly held in *Leigh I*, because "Plaintiffs have not identified any firm deadlines for developing an HMAP, the . . . HMAPs have not been unlawfully withheld." *Id.* at *4 (rejecting Plaintiffs' Section 706(1) claim on this basis); *see also Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1176 n.11 (9th Cir. 2002) (distinguishing between action that is "unreasonably delayed" and "unlawfully withheld," with the former

applying to agency inaction where there is a discretionary deadline, and the latter applying to inaction where a mandatory deadline exists).[5]

Despite the same Plaintiffs and counsel being involved in *Leigh I* (and despite arguing that issue preclusion should be applied to *other* issues in this case, Pls.' Br. 7-10), Plaintiffs fail to acknowledge these other holdings of *Leigh I*, let alone provide any reason why they should be permitted to relitigate the question of whether an HMAP is a mandatory prerequisite to removing excess wild horses and burros under the Wild Horse Act and its regulations. BLM acted pursuant to its statutory mandate to reduce the overpopulation of wild horses and burros on the Blue Wing Complex, and Plaintiffs are estopped from arguing that BLM's actions were unlawful simply because it did not complete an HMAP prior to taking action.

**2. BLM has taken steps toward issuing an HMAP for the Blue Wing Complex within one year, rendering Plaintiffs' unreasonable delay claim prudentially moot.**

In light of the Court's decision on Plaintiffs' APA unreasonable delay claim in *Leigh I* (which was issued in the midst of summary judgment briefing in this case), BLM has taken active steps to complete an HMAP for the Blue Wing Complex and intends to issue the HMAP within one year. On May 2, 2024, BLM issued a Management Evaluation Report and opened a 30-day public scoping period for the Blue Wing Complex HMAP, with the stated goal of "adopting an HMAP for the Blue Wing Complex within approximately one year." *See* https://www.blm.gov/announcement/humboldt-river-field-office-has-initiated-public-scoping-period-blue-wing-complex-herd (last visited on May 10, 2024). Thus, while Federal Defendants

---

[5] The remaining portion of Plaintiffs' Second Cause of Action, alleging that BLM has unreasonably delayed in preparing an HMAP and in removing excess wild horses and burros from the Blue Wing Complex, fail for the separate reasons discussed below in Sections II.A.2 and II.A.3.

do not dispute that issue preclusion applies with respect to the Court's finding of unreasonable delay in *Leigh I* (the same as it applies to the issues discussed above),[6] Plaintiffs' claim is now prudentially moot.

Plaintiffs' Second Cause of Action alleges that BLM has "unreasonably delayed [its] mandatory duty to prepare an HMAP for the Blue Wing Complex[.]" ECF No. 24 ¶¶ 140, 142. But the relief permitted by APA Section 706(1)—i.e., a court order compelling the agency to take the unreasonably delayed action—is no longer necessary and would not be meaningful in light of BLM's intervening actions. While Plaintiffs' claim may not be moot in the strict Article III sense since BLM has not yet issued its HMAP for the Blue Wing Complex HMAs, the agency has taken active steps toward completion and has announced its intent to do so within one year. The doctrine of prudential mootness "permits a court to 'dismiss [a claim] not technically moot if circumstances have changed since the beginning of litigation that forestall any occasion for meaningful relief[.]'" *Deutsche Bank Nat. Tr. Co. v. F.D.I.C.*, 744 F.3d 1124, 1135 (9th Cir. 2014) (citation omitted). Prudential mootness "has particular applicability in cases . . . where the relief sought is an injunction against the government. A court should decline to grant declaratory or injunctive relief where the government has already changed or is in the process of changing

---

[6] Similar to the Pancake Complex HMAs at issue in *Leigh I*, which BLM created beginning in the 1980s (*see Leigh I*, 2024 WL 1345297, at *6), the Blue Wing Complex HMAs and herd areas ("HAs") were established beginning in the 1970s (*see* BW_00004). Thus, this Court's finding that "BLM's delay in preparing HMAPs for the Pancake [Complex] HMAs has been unreasonable" is on point here. *Leigh I*, 2024 WL 1345297, at *7. Accordingly, in line with the Court's ruling that "BLM must develop and approve one or more HMAPs for the Pancake Complex HMAs within the next year[,]" *id.*, BLM has begun the process of completing an HMAP for the Blue Wing Complex HMAs and HAs and plans to complete it within one year. https://www.blm.gov/announcement/humboldt-river-field-office-has-initiated-public-scoping-period-blue-wing-complex-herd (last visited on May 10, 2024).

7

[its] policies[.]" *Nat. Res. Def. Council v. Norton*, No. 1:05-cv-01207-OWW-LJO, 2007 WL 14283, at *7 (E.D. Cal. Jan. 3, 2007) (citations and quotation marks omitted).[7]

Here, BLM has already initiated the process of preparing an HMAP and has announced its intent to the complete the process within one year. There is thus no need for a Court order directing the agency to fulfill its regulatory requirement to prepare an HMAP, and the Court should decline to grant relief on Plaintiffs' unreasonable delay claim, as the claim is prudentially moot. *See, e.g., Garcia v. Serv. Emps. Int'l Union*, No. 217-cv-01340-APG-NJK, 2019 WL 4279024, at *3 (D. Nev. Sept. 10, 2019) (granting summary judgment to defendants where plaintiff's claim was rendered moot because plaintiff's requested relief was obtained through changed circumstances after the onset of litigation) (citing *Deutsche Bank*, 744 F.3d at 1135).

### 3. The Gather Plan fulfills BLM's duty to immediately remove excess wild horses and burros so as to achieve appropriate management levels.

On the one hand, Plaintiffs argue that the 2022 Gather was premature because BLM should have completed an HMAP before conducting gathers on the Blue Wing Complex (this argument fails for all the reasons discussed above). On the other hand, Plaintiffs simultaneously argue that BLM did not conduct gathers on the Blue Wing Complex *soon enough* and that the Gather Plan allegedly violates the Wild Horse Act's requirement to "immediately remove excess animals from the range so as to achieve [AML.]" 16 U.S.C. § 1333(b)(2); *see* Pls.' Br. 22-24. But Plaintiffs disregard the applicable law and the practical realities of fulfilling its obligations to manage hundreds to thousands of excess wild horses and burros.

---

[7] On the other hand, "courts have refused to dismiss on prudential mootness grounds where the action agency did *not* indicate an intent to change its operations." *Id.* (emphasis added and citation omitted). This is not the case here.

As a threshold matter, to the extent that Plaintiffs assert this argument as a basis for their First and Second Causes of Action, the claims must be rejected because the statutes under which the claims are asserted—i.e., the Mandamus and Venue Act, 28 U.S.C. § 1361 (First Cause of Action), and APA Section 706(1), 5 U.S.C. § 706(1) (Second Cause of Action)—do not permit Plaintiffs' requested relief. Nowhere in Plaintiffs' briefs do they seek to compel a speedier removal of the excess animals on the Blue Wing Complex. Instead, as Plaintiffs' Amended Complaint makes clear, they seek to "prevent[] Defendants from gathering wild horses and burros[,]" to "stop implementation of the Blue Wing [] Environmental Assessment[,]" and to "[v]acate and set aside the Blue Wing Complex [] Environmental Assessment[.]" ECF No. 24 at 31. But neither the Mandamus Act nor APA Section 706(1) allows Plaintiffs to obtain a prohibitory injunction or invalidate agency action once taken. The Mandamus Act allows district courts to "compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C.A. § 1361. And, similarly, APA Section 706(1) allows a court only to "compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1). Thus, even if the Gather Plan violated the Wild Horse Act's immediacy requirement as Plaintiffs contend (which it does not), Plaintiffs' First and Second Causes of Action fail on this basis.

To the extent that Plaintiffs assert their argument regarding the Wild Horse Act's immediacy requirement as a basis for their Third and Fourth Causes of Action (under APA Section 706(2)(A) and Section 706(2)(C)), their claims also fail. APA Section 706(2) allows a reviewing court to "hold unlawful and set aside agency action" that is found to be either "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]" *id.* § 706(2), (2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of

9

statutory right[,]" *id.* § 706(2)(C). BLM's 20-year Gather Plan for the Blue Wing Complex is neither arbitrary and capricious nor does it exceed BLM's statutory authority under the Wild Horse Act. Plaintiffs take issue with the fact that, after BLM determined in 2017 that an overpopulation existed on the Blue Wing Complex, "BLM did not begin any gather operations until 2019" and periodically completed several additional gathers.[8] Pls.' Br. 23 (citing BW_03838). Plaintiffs argue that the multi-year aspect of the Gather Plan is arbitrary and capricious and violates the Wild Horse Act because the statute "does not envision that 'immediately' means periodic removal over 20 or so years" and the plan thereby "sidestep[s] [BLM's] obligations to make determinations about excess horses and burros based upon current data and to immediately act to remove animals where overpopulation exists." *Id.* at 23.

But the Ninth Circuit has rejected such a notion. Indeed, the Ninth Circuit has held that "BLM's choice to conduct a continuous removal of [horses] through a [10-year] phased-gather approach [is] not arbitrary or capricious." *Friends of Animals v. Silvey*, 820 F. App'x 513, 516 (9th Cir. 2020). The Court specifically rejected the argument that such a plan sidesteps BLM's obligation to make determinations based on "current information" because, as the Court correctly noted, the "[Wild Horse] Act's current-information requirement does not apply to BLM's choice-of-removal method[,]" rather it "applies only to the determination that an excess exists and that action must be taken. *Id.* at 517 (citations omitted). The Court further noted that "BLM has broad discretion in deciding how to remove excess horses[,]" and upheld the agency's decision to address the excess population "gradually, over the course of ten years, through a series of gathers." *Id.* (citation omitted). The District Court for the District of Columbia also recently

---

[8] BLM has conducted four gathers implementing the Gather Plan. *See* BW_03585-92 (2019 gather); BW_03648-69 (August 2020 gather); BW_03744-58 (November 2020 gather); BW_03888-90 (2022 Gather).

confirmed that the Wild Horse Act permits multi-year gather plans to achieve AML. *Friends of Animals v. BLM*, No. CV 18-2029 (RDM), 2024 WL 1344424, at *20-23 (D.D.C. Mar. 30, 2024) (rejecting the notions that "the [Wild Horse Act] requires [BLM] to achieve AML 'immediately' after deciding that it is necessary to remove excess animals" and "that the agency's failure to plan to act with sufficient dispatch [would] require[] setting aside the gather plan—thereby *delaying* any such removal"). Here too, BLM's decision to gradually meet low AML within approximately 20 years, BW_03295, is reasonable and comports with BLM's authority under the Wild Horse Act.

Plaintiffs' argument that the Gather Plan should be invalidated because of its multi-year approach also disregards the complex practical realties that BLM must account for when developing and implementing its gather plans. Once an excess population determination is made, BLM works to plan and implement removal actions under its gather plan as promptly as possible, while accounting for practicalities such as season, budget, competing priorities under BLM's national gather plan, rapid reproduction rates, and space constraints of available holding facilities. *See, e.g., W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1297 (D. Utah 2017) (recognizing the "profound administrative and practical obstacles facing BLM as it juggles practically unworkable statutory responsibilities on a shoestring budget" and finding that those "practical realities, coupled with the inadvisability of [the] court injecting itself into wild horse and burro management in any significant capacity, weigh decisively against . . . the issuance of injunctive relief").

Indeed, the Gather Plan's multi-year approach was based on, among other considerations, such practicalities. *See, e.g.,* BW_03296 (finding that "[g]radually removing excess [wild horses and burros] would help alleviate holding capacity limitations within short and long-term holding

facilities"); BW_03285 (recognizing that "wild horses are capable of increasing their numbers by 18% to 25% annually, resulting in the doubling of wild horses populations about every four to five years") (citations omitted). The Wild Horse Act requires BLM to take action to "immediately remove excess animals from the range so as to achieve [AML]" where it determines that "an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals[.]" 16 U.S.C. § 1333(b)(2). That is exactly what BLM has done here. If the statute were interpreted to prohibit multi-year gather plans, as Plaintiffs suggest it should be, this would create tremendous impracticalities that would significantly frustrate BLM's Wild Horse and Burro Program.

**B.   BLM is entitled to summary judgment on Plaintiffs' NEPA claim. (Fifth Cause of Action)**

Recognizing the need to reduce the wild horse and burro population to achieve AML and restore a thriving natural ecological balance on the Blue Wing Complex, BLM undertook an Environmental Assessment that considered five action alternatives, including the environmental impacts associated with each alternative. BW_03281. Based on this comprehensive analysis, in 2017, BLM issued a Decision Record selecting Alternative B as the Gather Plan for the Blue Wing Complex. BW_03549-54. BLM has since conducted multiple gathers in an effort to achieve low AML in the Blue Wing Complex. *See* Federal Defendants' Cross-Motion for Summary Judgment, ECF No. 60 ("Fed. Defs.' Cross Mot.") at 9-10.

Plaintiffs maintain that BLM's Environmental Assessment does not satisfy NEPA's "hard look" requirement, and that supplemental NEPA analysis is required to address impacts that BLM's Environmental Assessment already considered. But Plaintiffs merely repeat bare allegations made in their opening brief without any additional support. Plaintiffs' argument boils down to a disagreement "as to the choice of the action to be taken." *Kleppe v. Sierra Club*, 427

12

U.S. 390, 410 n.21 (1976); *see also Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."); *Bartell Ranch LLC v. McCullough*, Case No. 3:21-cv-00080-MMD-CLB, 2023 WL 1782343, at *18 (D. Nev. Feb. 6, 2023) (scientific or technical disagreement alone is not a basis to overturn agency action, particularly in light of deference). But neither Plaintiffs' opening brief, nor their reply, provide a basis for this Court to determine that BLM's analysis showed a "clear error of judgment." *Marsh*, 490 U.S. at 378 (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). Rather, the record demonstrates that BLM took the required "'hard look' at [the] environmental consequences" of its proposed actions. *Kleppe*, 427 U.S. at 410 n.21. Nothing more is required. Accordingly, the Court should grant summary judgment for BLM on Plaintiffs' NEPA claims.

1. **BLM's Environmental Assessment took the requisite hard look at the environmental consequences of the proposed action.**

Plaintiffs reiterate that it was improper for BLM to base its Environmental Assessment on the AML established in 1999,[9] as well as wild horse and burro population numbers derived (in part) from 2014 aerial census data. Pls.' Br. 24. Plaintiffs continue to provide no support for their assertion that such data is "stale" or otherwise outdated or inaccurate. And contrary to Plaintiffs' assertion, the Environmental Assessment did not rely solely on 2014 aerial census

---

[9] As explained in Federal Defendants' cross motion, Fed. Defs.' Cross Mot. 32-33, reconsidering or raising the AML was not only outside the scope of the Environmental Assessment, but it also was not supported by data, which showed insufficient water and forage within the Blue Wing Complex to support an increased AML. BW_03299.

data in estimating population—it also took annual population growth rates into account. BW_03332.[10]

Plaintiffs assert that Federal Defendants not only "ignore" the Wild Horse Act's requirement to maintain "a current inventory of wild free-roaming horses and burros . . . ." Pls.' Br. 24 (citing 16 U.S.C. § 1333(b)(1)), but also that Federal Defendants ignore case law on which Plaintiffs rely for their argument that analysis based on "stale" data violates NEPA. *Id.* The case law cited by Plaintiffs is unremarkable. Courts have held that "[r]eliance on data that is too stale to carry the weight assigned to it" may not comply with NEPA. *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1086 (9th Cir. 2011). But again, Plaintiffs provide no support for their assertion that BLM's population data or the data on which it established AML is stale.

What is remarkable is Plaintiffs' failure to address recent case law addressing a similar argument to that put forth by Plaintiffs in this case. In *Friends of Animals,* 2024 WL 1344424, the court determined that the Wild Horse Act did not support Plaintiffs' argument that phased gathers to achieve AML conflict with the requirement to maintain a "current inventory." *Id.* at *17 ("to the extent [plaintiff] contends that the [Wild Horse Act] bars [BLM] from authorizing future gathers, because, by the time the gather occurs, the inventory of wild horses will no longer be 'current,' it is mistaken.").[11] In fact, the court observed that it was not alone in this view— noting that both the "U.S. District Court for the District of Nevada and the Ninth Circuit share

---

[10] And BLM's population estimates are not static, but rather are updated annually based on routine population surveys and disclosed to the public on BLM's website. *See* https://www.blm.gov/programs/wild-horse-and-burro/about-the-program/program-data (last visited May 10, 2024).

[11] The court also noted that to the extent BLM failed to maintain a current inventory, "an interested party with standing might be able to bring suit to compel the agency to comply with that duty." Plaintiffs have not brought such a suit for inaction here.

14

this understanding of the [Wild Horse Act]." *Id.* (citing *Friends of Animals v. Silvey*, 353 F. Supp. 3d 991, 1006 (D. Nev. 2018), *aff'd* 820 F. App'x at 513, 517 (9th Cir. 2020)). Plaintiffs cannot transmogrify the Wild Horse Act's requirement to "maintain a current inventory" and to make excess determinations based on "current information" into a requirement to conduct new environmental analyses under NEPA for every round up under the Gather Plan. *Cf. id.* at **17-18 ("[T]he 'current information' requirement in the [Wild Horse Act] applies only to the determination that an excess exists and that action must be taken. The [Wild Horse Act]'s current-information requirement does not apply to BLM's choice-of-removal method.") (citation omitted).

With respect to the Environmental Assessment's consideration of alternatives, Plaintiffs repeat, in cursory fashion, their argument that BLM did not take a "hard look" at limiting livestock use or range improvements, or the impact of removing "over 88% of the horses and burros in the Blue Wing Complex." Pls.' Br. 25. But Federal Defendants explained that the Environmental Assessment considered these alternatives and the impacts of removal. Fed. Defs.' Cross Mot. 32-24. Plaintiffs offer no argument in response. Accordingly, the Court should grant summary judgment in favor of BLM.

### 2. Supplemental NEPA analysis is not required.

Plaintiffs should be precluded from asserting a new claim—failure to supplement the Environmental Assessment—that was not raised in their complaint. Thus, any extra-record information that was not before the agency at the time of its analysis is improper. *See Id.* at 34-35. But even if the Court considers the extra-record information, no supplemental NEPA analysis is required.

For supplemental analysis to be warranted, information must be both new, and significant. *See* 40 C.F.R. § 1502.9(d)(ii); *Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1069 (9th Cir. 2023) ("NEPA requires agencies to prepare a supplemental [environmental assessment] when there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.") (citation and quotation marks omitted). Plaintiffs myopically focus on only one of these requirements—that the information is "new." Pls.' Br. 26. It is unsurprising that the documents on which Plaintiffs rely are new because they were compiled *after* the Environmental Assessment. In any event, the information reflected in those documents is not "new" in that it represents impacts from transportation and handling that were already considered in the Environmental Assessment. *See* Fed. Defs.' Cross Mot. 46-49.

Newness alone is not enough—the information also "must show that the action will affect the quality of the human environment in a significant manner or to an extent not already considered." *Earth Island Inst.*, 87 F.4th at 1069. Plaintiffs have not demonstrated that the alleged new information will affect the quality of the human environment in a *significant* manner, or to an extent not already considered. Plaintiffs disagree with BLM's choice of actions. But Plaintiffs' disagreement amounts to "fly-specking" BLM's analysis in an attempt to substitute their policy preferences for the agency's expertise. *See Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 984 (9th Cir. 2022) (noting that in evaluating NEPA compliance, courts "refrain from acting as a type of omnipotent scientist," and "must defer to an agency's decision that is fully informed and well-considered") (citation and quotation marks omitted). NEPA prescribes the process; it does not mandate particular results. *Robertson v. Methow Valley*

*Citizens Council*, 490 U.S. 332, 333 (1989). Because BLM complied with the necessary process, it is entitled to summary judgment on Plaintiffs' NEPA claims.

## C. Plaintiffs' First Amendment claim fails. (Sixth Cause of Action)

Plaintiffs lack standing for their First Amendment claim regarding the placement of viewing stands during the 2022 Gather as the gather was completed almost two years ago, before Plaintiffs even filed their First Amended Complaint in which they asserted their First Amendment claim. Plaintiffs also fail on the merits of this claim because any perceived restrictions on public viewing imposed by BLM's placement of public viewing stands were narrowly tailored to serve the government's overriding interests of ensuring the safety of the public, the animals, and the wranglers conducting the gather, as well as conducting an efficient gather. Further, Plaintiffs fail to establish that temporary and off-range holding facilities located on private land, like those used to house the burros from the 2022 Gather, have "historically been open to the press and general public" such that a qualified right of public access would apply. *See Leigh v. Salazar*, 677 F.3d 892, 898-900 (9th Cir. 2012) ("*Leigh II*") (To determine whether a qualified right of public access applies to wild horse and burro gathers, a district court must determine: (1) "whether the place and process have historically been open to the press and general public"; and (2) "whether public access plays a significant positive role in the functioning of the particular process in question.") (citation omitted).

### 1. Plaintiffs lack standing for their First Amendment claim regarding the placement of public observation sites for the 2022 Gather.

Plaintiffs fail to meet their burden of establishing standing for their claim that BLM "interfered with Plaintiffs' protected right under the First Amendment to access and observe gather operations" during the 2022 Gather. Pls.' Br. 28; *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (Plaintiffs bear the burden of establishing standing, which requires them to

show that: (1) they have suffered a concrete injury in fact; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable decision.). As an initial matter, Plaintiffs fail to allege any actual injury that they have suffered due to BLM's placement of the "viewing locations . . . between .07 and 1.02 miles from the trap locations." Pls.' Br. 29 (citation omitted). Indeed, the evidence suggests that Plaintiffs' "qualified right of access . . . to observe government activities" was not meaningfully disturbed. *Leigh II*, 677 F.3d at 898. BLM staff were made available each day of the gather to escort members of the public to an observation site, *see* ECF No. 60-1 ⁋ 17, and Plaintiffs were able to successfully take pictures and videos and report their observations about the gather on the internet, *see* https://wildhorseeducation.org/2022/08/02/blue-wing-roundup-2022/ (Plaintiff Wild Horse Education's website with photographs and videos of the 2022 Gather) (last visited May 10, 2024).[12]

       Even if Plaintiffs had suffered some injury from the alleged insufficiencies of their view from the public observation sites, Plaintiffs still lack standing for this claim. Given that BLM concluded the 2022 Gather 22 months ago (on August 12, 2022), even a favorable judicial opinion would not redress Plaintiffs' alleged injuries caused by the specific placement of the four observation sites that were used during the 2022 Gather.

---

[12] Plaintiffs' contention that Federal Defendants cannot cite to the videos and photographs that Plaintiffs posted online because "they were required to request judicial notice" is misguided. Pls.' Br. 27 n5. Per the parties' agreement, which was entered by the Court, with respect to Plaintiffs' First Amendment claim, "the parties may rely on [the following] extra-record materials in their summary judgment briefing[:] . . . . photos, videos, and audio submitted regarding the 2022 Gather" (among other extra-record materials). ECF No. 49. Thus, there was no need to burden the Court with motion practice to cite Plaintiffs' publicly accessible videos and photos from the 2022 Gather.

Plaintiffs appear to concede that any alleged harm suffered during the 2022 Gather cannot be redressed, but argue that "the 'capable of repetition, yet evading review' exception to standing/mootness" applies. Pls.' Br. 27 (citations omitted). But "the capable of repetition, yet evading review" exception does not apply because it is an exception to the mootness doctrine, and Plaintiffs' claim is not moot – rather, Plaintiffs did not have standing to bring their claim to begin with. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 174, (2000) (distinguishing between "initial standing to bring suit" and "postcommencement mootness"); *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 67-68, n.22 (1997) ("The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).") The 2022 Gather ended on August 12, 2022, and Plaintiffs did not assert a First Amendment claim until three weeks later, on September 2, 2022, when they filed their First Amended Complaint. *See* ECF No. 24 ¶ 1. Thus, the alleged controversy did not cease to exist during the course of the lawsuit (which would have rendered the claim moot); rather, the event giving rise to the alleged controversy finished before Plaintiffs even asserted the claim. Thus, the "capable of repetition, yet evading review" exception is inapposite here. *See Renne v. Geary*, 501 U.S. 312, 320 (1991) ("[T]he mootness exception for disputes capable of repetition yet evading review . . . will not revive a dispute which became moot before the action commenced.") (citation omitted); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. at 170 (2000) ("[I]f a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum.").

In any event, even if the mootness exception were relevant, it does not apply here. "The capable-of-repetition doctrine applies only in exceptional situations, where the following two

circumstances are simultaneously present: (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again[.]" *Spencer v. Kemna*, 523 U.S. 1, 17 (1998) (cleaned up and citations omitted). Plaintiffs' alleged grievances regarding the public observation sites at the 2022 Gather meet neither of those conditions. First, Plaintiffs can (and often do) file motions for injunctive relief to stop gathers of wild horses and burros in which they could have litigated their First Amendment allegations.[13]

Second, there is nothing to support any "reasonable expectation" that Plaintiffs would be subject to "the same action again." Plaintiffs argue that because the Gather Plan "allows continuing gather operations in the Blue Wing Complex" for a multiyear period and because BLM "has plans to begin another gather operation" in July, there is therefore "a reasonable expectation that Plaintiffs' First Amendment [r]ights will continue to be violated[.]" Pls.' Br. 27. But Plaintiffs' cursory conclusion that their First Amendment rights would be violated again simply because additional gathers will be conducted is fundamentally flawed. Plaintiffs provide no explanation as to why their alleged dissatisfaction with the placement of public viewing areas during the 2022 Gather would be likely to repeat itself. Nor could they, as no reasonable explanation exists.

Indeed, given that the Blue Wing Complex is made up of 2,283,000 acres of land, encompassing five HMAs, four HAs, and non-HMA areas, where wild horses and burros migrate back and forth, BW_03549, it would be unreasonable to make any assumption about where a

---

[13] Indeed, Plaintiffs did file a motion for temporary restraining order ("TRO") in this case. ECF No. 10. However, despite having seven months' notice that the gather would be conducted, they did not file their TRO until two days *after* the 2022 Gather began and chose not to include a First Amendment claim at that time, then withdrew their motion two days before the scheduled oral argument. ECF No. 21.

gather trap may be placed for future gathers. It would be even more unreasonable to then make further assumptions about what locations may be available around those hypothetical trap locations that could be designated as public viewing areas (and, in turn, to then make assumptions about whether those hypothetical viewing areas may violate Plaintiffs' First Amendment rights). BLM's contractor makes decisions regarding where to place gather traps based on factors including proximity to where the animals are located and topography that will allow the gather contractor to hide their vehicles and equipment. *See* ECF No. 60-1 ⁋ 10. With respect to the placement of public observation areas, BLM makes decisions based on factors including: safety of the horses and burros, contractors, federal employees, and the public; proximity to the trap and path of the animals (to allow for an effective gather with the best viewing opportunity possible while still ensuring safety); proximity to any helicopter operations (to ensure safety and meet applicable guidelines); and terrain and topography considerations that may influence animal movement or help conceal the public from the herd's line of sight during their run into the trap (as the animals can be very reactive to movement in their surroundings). *See, e.g.,* ECF No. 60-1 ⁋ 11. In other words, each gather site and its public viewing area is unique because it is customized to account for complex variables. Indeed, even throughout the course of a single gather, the trap site and public viewing area are likely to be moved multiple times (as they were during the 2022 Gather). *See id.* ⁋ 10 ("Trap locations are changed frequently, sometimes as often as daily, during the gather to reduce the distance that the animals must travel.").

Thus, Plaintiffs' cursory assumption that their First Amendment rights will be violated at future gathers lacks merit. And it certainly does not constitute a "reasonable expectation" that

would support application of the "capable of repetition, yet evading review" exception to the

mootness doctrine, even if that doctrine applied here.[14]

### 2. BLM did not violate Plaintiffs' First Amendment rights.

Even if the Court were to reach the merits of Plaintiffs' First Amendment claim, the claim

should be rejected. First, with respect to the temporary holding corrals used immediately after

the 2022 Gather and the Axtell Off-Range Holding Corrals where the gathered burros were

transferred, both of these facilities are privately owned. The law is clear that the public does not

have a qualified right of access to these facilities and Plaintiffs have failed to establish otherwise.

Second, with respect to Plaintiffs' allegations about the insufficiency of their view from the 2022

Gather public observation sites, any limitations were the result of narrowly tailored restrictions

designed to serve compelling governmental interests in ensuring the safety and efficiency of the

gather.

### a. There is no qualified right of public access to privately owned temporary and off-range holding corrals.

Plaintiffs do not even attempt to respond to the case law discussed in Federal Defendants'

cross-motion for summary judgment which clearly sets forth that "privately owned and operated

facilit[ies] which operate[] under contract with the Government" have not historically "been

open to the press and general public, and, as such, no qualified right of access arises." *Leigh v.*

*Salazar*, 954 F. Supp. 2d 1090, 1104 (D. Nev. 2013) ("*Leigh III*") (rejecting First Amendment

---

[14] In their cross-motion for summary judgment, Federal Defendants cited a body of case law in which courts have held that, once a gather is complete, the court can no longer redress the claim. *See* Fed. Defs.' Cross Mot. 41. Plaintiffs argue that those cases are distinguishable because "none involved phased gathers," and so "none were capable of repetition yet evading review." Pls.' Br. 27. But for the same reasons discussed above: it does not matter whether future gathers are conducted under the same gather plan (somewhere on the Blue Wing Complex's 2,283,000 acres of land) or under separate gather plans – each gather is necessarily unique with respect to trap placement and the placement of public viewing areas.

claim challenging restricted public access to a private holding facility because, even though the holding facility had periodically allowed BLM to offer public tours, the private owner has the right to deny public access and "the owners and operators of the [private] facility are not before the court and the court is without jurisdiction over them"). Instead, Plaintiffs argue for the first time that, with respect to the temporary holding corrals, during previous "2020 gathers in the Blue Wing Complex, the public had been allowed access to this very same facility." Pls.' Br. 30 (citing Suppl. Leigh Decl. ¶ 9). But Plaintiffs misstate the facts. While it was the same *landowner*, the temporary holding corrals for the 2020 and 2022 gathers were located on different land. Supp. Decl. of Garrett W. Swisher ("Supp. Swisher Decl.") ⫞⫞ 2, 3.[15] For the 2020 Gather, the temporary holding corrals were located on unfenced land, which the private landowner permitted public access to. *Id.* ⫞ 2. However, for the 2022 Gather, the temporary holding corrals were located on fenced land close to a well on the landowner's property, to which he denied public access. *Id.* ⫞ 3; *see also* ECF No. 60-1 ⫞ 20. With this misstatement corrected, Plaintiffs fail to establish that there is a qualified right to access this landowner's private property used for the 2022 Gather temporary holding corrals.

Plaintiffs also take issue with the lack of public access to the privately owned Axtell Off-Range Corrals, where the gathered burros were transferred after the 2022 Gather. Pls.' Br. 30. While the wild horses from the 2022 Gather were transferred to Palomino Valley Off-Range Corrals (a BLM-operated facility open to the public), based on available capacities, the wild

---

[15] The Supplemental Declaration of Garrett Swisher is attached to this brief in response to Plaintiffs' new arguments and new declaration submitted in support of their First Amendment claim. *See* Pls.' Br. 26-30; ECF 63-1 (Supplemental Declaration of Laura Leigh). Per the Court's ruling on admissible materials with respect to Plaintiffs' First Amendment claim, ECF No. 47, and the parties' subsequent agreement regarding how to implement that ruling which was entered by the Court, ECF No. 49, witness testimony (in the declarations) is admissible "for the limited purpose [of] supporting/opposing Plaintiffs' Sixth Cause of Action (First Amendment)," *id.*

23

burros were transferred to the Axtell Off-Range Corrals. ECF No. 60-1 ¶¶ 21-23. While Plaintiffs appear to accept the realities imposed on BLM by the holding facilities' space restrictions, they argue that they have a right to access the burros on Axtell's private property because "the public has been allowed to view [other] wild horses being held at Axtell on select visitation days[.]" Pls.' Br. 30. But simply because a private landowner permits limited public access to a certain part of their property, does not create a historical expectation of public access—especially not with respect to the *entire* property, as different areas may be subject to different sensitivities and issues implicated by public access. *See, e.g., Leigh III*, 954 F. Supp. 2d at 1103-04 (finding that, even though the holding facility periodically allowed BLM to offer public tours, the private owner had the right to deny public access). Here, it is BLM's understanding that Axtell's contract does not permit public access to the portion of its facilities holding the wild burros because, unlike its facilities for the wild horses, the wild burro facilities are largely made up of pastures allowing the burros to graze, which are not conducive to public viewing. Supp. Swisher Decl. ¶ 4.

In sum, Plaintiffs' argument that "BLM's decisions regarding access to temporary and off-range corrals [are not] based on any impartial objective[,]" Pls.' Br. 30, is based on the flawed premise that BLM can make decisions about public access to a private landowner's property. But the law is clear that a private landowner retains the right to make that decision, and a qualified right of public access does not arise unless: (1) "the place and process have historically been open to the press and general public"; and (2) "public access plays a significant positive role in the functioning of the particular process in question." *Leigh II*, 677 F.3d at 989 (citation omitted). Here, Plaintiffs have failed to establish either of those conditions for the private land at issue.

**b. Any perceived insufficiency with the public's view of the 2022 Gather was due to narrowly tailored restrictions to serve overriding safety interests.**

Plaintiffs argue that BLM's placement of public observation areas during the 2022 Gather was not narrowly tailored to overring interests because "[r]easonable alternatives existed to [the] viewing locations[.]" Pls.' Br. 29. But each of the alleged alternatives that Plaintiffs suggest fail to make this point. Plaintiffs argue that, for certain days of the gather, the public could have been "positioned in an abandoned, fenced cattle pen that was located approximately 200 feet from the trap site[,]" and allege that this location "was not in the path of any helicopters or animals[.]" *Id.* at Br. 29-30. But Plaintiffs either fail to appreciate or fail to mention that this cattle pen area was being used as the helicopter fueling location during the 2022 Gather, and thus would not have been safe for members of the public. Supp. Swisher Decl. ¶ 5.

Another "alternative" that Plaintiffs propose is that BLM could have "allow[ed] the public to move closer to the trap locations with the proviso that they not leave their vehicles." Pls.' Br. 29. But any limitations that BLM placed on road access during the 2022 Gather were imposed for a reason: because, due to the roads' proximity to the animals and helicopter operations, "having vehicles or people on the roads would pose a risk to safety to the personnel working on the gather and/or the public, and could affect the efficiency of the gather operations, causing undue stress on the animals being actively gathered." Supp. Swisher Decl. ¶ 6.

Further, Plaintiffs' broad assertions about public observation areas from unidentified past gathers that were allegedly positioned closer to the trap site, Pls.' Br. 29, fail to establish that such an option existed *here* that would have been safe and viable. Similarly, Plaintiffs' allegations regarding how close the public could get to the holding corrals at the Pancake

25

Complex or the trap location at the Silver King HMA are also irrelevant.[16] *Id.* The evidence at issue *here* establishes that BLM evaluated the topography and the other numerous factors at play to select a safe and viable observation site each time the trap was moved during the 2022 Gather. *See* ECF No. 60-1 ¶ 12-16.[17]

In sum, any perceived restrictions on Plaintiffs' view from public observation sites at the 2022 Gather were narrowly tailored to achieve BLM's important and overriding interest of conducting a safe and efficient gather, and the Court should reject Plaintiffs' First Amendment claim.

## III.   CONCLUSION

For the foregoing reasons, Federal Defendants respectfully request that the Court grant their cross-motion for summary judgment and deny Plaintiffs' motion for summary judgment.

Dated: May 10, 2024

Respectfully Submitted,

TODD KIM, Assistant Attorney General

*/s/ Michelle M. Spatz*
MICHELLE M. SPATZ, Trial Attorney
D.C. Bar No. 1044400
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section

---

[16] In addition to every gather site being different, Plaintiffs' Pancake Complex example is also irrelevant because, here, the temporary holding corrals were located on private property where the landowner had denied public access.

[17] Plaintiffs' note regarding the Blue Wing Complex Observation Protocol's requirement that public viewing sites be placed 500 feet away from helicopter operations misses the point that the protocol is intended to ensure compliance with regulations that "determine[] the *minimum* safe altitudes and distance people must be from the aircraft." BW_03467 (emphasis added). So while 500 feet is the *minimum* distance that must be between public viewing areas and helicopter operations, BLM may decide to place the viewing areas further away in order to ensure the safety of the public, the animals, and those conducting the gather. *See* Supp. Swisher Decl. ¶ 7.

26

P.O. Box 7611
Washington, D.C. 20044-7611
(202) 598-9741
michelle.spatz@usdoj.gov

*/s/ Frances B. Morris*
FRANCES B. MORRIS, Trial Attorney
D.C. Bar No. 1016833
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
(202) 514-2855
frances.morris@usdoj.gov

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 10, 2024, I filed the foregoing Reply in Support of Federal Defendants' Cross-Motion for Summary Judgment electronically through the CM/ECF system, which caused all parties or counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

/s/ *Michelle M. Spatz*
Michelle M. Spatz
U.S. Department of Justice