UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

LAURA LEIGH, *et al.*,

                      Plaintiffs,

     v.

UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,

                      Defendants.

Case No. 2:22-cv-01200-MMD-BNW

ORDER

## I.    SUMMARY

Animal rights plaintiffs[1] have filed suit against the U.S. Bureau of Land Management ("BLM"), U.S. Department of the Interior, and Nevada BLM Director Jon Raby on the grounds that a recent roundup of wild horses in northwestern Nevada violated the First Amendment, the Wild Free-Roaming Horses and Burros Act ("WHA"), and the National Environmental Policy Act of 1969 ("NEPA"). Before the Court are the parties' cross-motions for summary judgment (ECF Nos. 50, 60 ("Motions")) and Plaintiffs' requests for judicial notice of several documents (ECF Nos. 51, 65 ("Requests")).[2] As explained in further detail below, the Court finds that BLM must be compelled to prepare a herd management area plan ("HMAP") but that the agency did not violate NEPA and that summary judgment is inappropriate as to the First Amendment claims. The Court will accordingly grant in part and deny in part both Motions and Requests.

---

[1]Plaintiffs are Laura Leigh, Wild Horse Education ("WHE"), and the CANA Foundation.

[2]The Court has reviewed the parties' responses and replies. (ECF Nos. 61-64, 71, 73, 75.)

## II.     BACKGROUND

The following facts are undisputed and primarily derived from the administrative record ("AR").

The Blue Wing Complex is a 2.2-million-acre area northeast of Reno, Nevada, that contains five herd management areas ("HMAs"). (ECF No. 60 at 17.) The five HMAs in the Pancake Complex are the Kamma Mountains, Seven Troughs Range, Lava Beds, Blue Wing Mountains, and Shawave Mountains HMAs. (*Id.* at 17 n.2.)

BLM set the appropriate management level[3] ("AML") for the Blue Wing Complex at a range of 333 to 553 wild horses and 55 to 90 wild burros. (*Id.* at 17.) This AML was affirmed in the Winnemucca District Resource Management Plan ("RMP") that BLM issued in May 2015. (*Id.* at 17-18.)

BLM conducted a preliminary environmental assessment ("EA") of its gather plan ("the Gather Plan"). (Preliminary EA at AR 3054-3255.) Thousands of comments on the preliminary EA were submitted during its 30-day public comment period. (ECF No. 60 at 7.) These public comments notified BLM of concerns about livestock grazing levels and AMLs. (Final EA at 3513-36.) BLM responded to the comments, edited the Gather Plan, then released the Final EA. (*Id.* at AR 3404, 3513-36.)

The Final EA considered five alternatives: (1) the no-action alternative; (2) Alternative A, which implemented a fertility control vaccine with or without gathers; (3) preferred Alternative B, which combined multiple gathers and removals with a fertility control vaccine and/or spaying and gelding; (4) Alternative C, which combined one removal with multiple gathers and the fertility control vaccine; and (5) Alternative D,

---

[3]BLM defines the AML as the "'optimum number' of wild horses which results in a thriving natural eco-logical balance and avoids a deterioration of the range." (Blue Wing Complex Gather Environmental Assessment ("Final EA") at AR 3286.) *See also Dahl v. Clark*, 600 F. Supp. 585, 595 (D. Nev. 1984) ("[T]he test as to appropriate wild horse population levels is whether such levels will achieve and maintain a thriving, ecological balance on the public lands."). Wild horse and burro management should seek to balance wild horse and burro populations, wildlife, livestock, and vegetation, and to "protect the range from the deterioration associated with overpopulation of wild horses and burros." *Animal Prot. Inst. of Am.*, 109 IBLA 112, 115 (1989).

1   which implemented only one gather and removal to the low AML. (*Id.* at 3273-74.) BLM

2   signed its finding of no significant impact ("FONSI") and issued a Decision Record on

3   May 4, 2021, adopting Alternative B without spaying and gelding. (FONSI at AR 3543-

4   45; Decision Record at AR 3537-42.)

5          BLM has conducted multiple gathers under this Gather Plan. (ECF Nos. 50 at 10;

6   60 at 20.) One such gather of 218 wild horses and 804 wild burros ran from August 1 to

7   12, 2022 ("the 2022 Gather"). (Final Blue Wing Gather Report at AR 3880-81.) Laurie

8   Ford, a member of WHE, attended this gather and sought to document it by taking

9   photographs and videos. (ECF No. 50-2.) The BLM-established observation sites for the

10  gather ranged from 0.7 to 1.8 miles away from the relevant trap sites. (ECF No. 60-1.)

11  After trapping was completed, the gathered burros were taken to the Axtell Off-Range

12  Corrals in Utah. (ECF No. 50 at 23-24.)

13         Plaintiffs brought this suit in July 2022 (ECF No. 1) and filed an amended

14  complaint two months later (ECF No. 24 ("FAC")). Now that discovery is complete, the

15  parties have both moved for summary judgment. (ECF Nos. 50, 60.) Plaintiffs also seek

16  to supplement the AR. (ECF Nos. 51, 65.)

17  **III.    MOTIONS FOR SUMMARY JUDGMENT**

18         The parties seek summary judgment on Plaintiffs' claims that BLM violated the

19  First Amendment, WHA, and NEPA.[4] (ECF Nos. 50, 60.) The Court will address each of

20  these claims in turn.

21      **A.  Article III Standing**

22         Standing is a threshold issue, so the Court will address these arguments first.

23  *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024); *Lance*

24  *v. Coffman*, 549 U.S. 437, 439 (2007) ("Federal courts must determine that they have

25

26         [4]"Because neither NEPA nor the [WHA] contain[s] an internal standard of judicial
    review, the Administrative Procedure Act [("APA")] governs this court's review of the
27  BLM's actions" under those acts. *In Def. of Animals, Dreamcatcher Wild Horse & Burro*
    *Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1061 (9th Cir. 2014); *see also* 5
28  U.S.C. § 702.

jurisdiction before proceeding to the merits."). "[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Plaintiffs must show that (1) they have suffered an actual or imminent concrete and particularized injury-in-fact, (2) the injury is "fairly traceable to the challenged action of the defendant," and (3) it is likely, rather than speculative, that the injury will be redressed by a favorable decision. *Id.* at 560-61. Defendants contest only the first and third prongs as they pertain to Plaintiffs' First Amendment claim.[5] (ECF No. 60 at 50.)

### 1. Injury in Fact

Plaintiffs allege that BLM's designated observation sites for the 2022 gather operations were located such that they could not meaningfully observe the gather;[6] however, they have requested only prospective injunctive relief for this past harm. (ECF Nos. 24 at 31; 50 at 41-42; 50-2 at 2-3.). "Past exposure to harmful or illegal conduct does not necessarily confer standing to seek injunctive relief if the plaintiff does not continue to suffer adverse effects." *Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir. 2010). Thus, to obtain an injunction, Plaintiffs must demonstrate that they have suffered a concrete and particularized legal harm "coupled with 'a sufficient likelihood that [they] will again be wronged in a similar way.'" *Bates v. United Parcel Serv.*, 511 F.3d 974, 985 (9th Cir. 2007) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)); *accord DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223, 1240 (9th Cir. 2024). Plaintiffs have satisfied both prongs.

///

---

[5]Plaintiffs make arguments regarding their standing to bring WHA and NEPA claims that the Court does not address in detail here. (ECF No. 50 at 18-22.) Defendants do not dispute Plaintiffs' standing to bring these claims, and the Court finds that Plaintiffs have met the threshold requirements. It is undisputed that BLM gathered horses from the Pancake Complex, which caused the injury and deaths of wild horses. Plaintiffs, who are wild horse enthusiasts and animal rights groups, were harmed or have members whose aesthetic interests and interests in the wellbeing of horses were harmed as a result. Plaintiffs' requested relief could remedy those harms moving forward.

[6]Defendants submit as contradictory evidence a blog post from WHE containing various photographs and videos of the gather. (ECF No. 60 at 50 n.18.)

### a. Past Harm

At summary judgment, it is sufficient for Plaintiffs to establish their injury by setting forth in an affidavit or other evidence "specific facts, which for purposes of summary judgment motion will be taken to be true." *Lujan*, 504 U.S. at 561 (internal quotation marks and citation omitted); *see also* FED. R. CIV. PROC. 56(c)(1)(A). Plaintiffs have submitted the affidavit of WHE member and 2022 gather attendee Laurie Ford. (ECF No. 50-2.) Ford claims that, even with cameras, she "could hardly observe or document the gather operations" from the observation sites due to their distance from trapping operations and the presence of BLM trucks and stock trailers that obstructed her view. (*Id.* at 2-3.) Photographs and videos of the gather shared on WHE's website raise genuine questions as to the accuracy of Ford's statements, but many of those images are sufficiently blurry that a reasonable jury could find Ford was unable to see the gather operations clearly. (ECF No. 60 at 50 n.18.) *See Blue Wing Roundup, 2022*, WILD HORSE EDUC. (Aug. 5, 2022), https://perma.cc/3GSL-S3NX; *cf. Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that courts ruling on a motion for summary judgment should not adopt a version of the facts that is "blatantly contradicted by the record, so that no reasonable jury could believe it"). Plaintiffs have adequately shown that one of their members suffered a particularized injury when she was unable to observe the 2022 gather from the BLM-established viewing locations.

### b. Future Injury

Plaintiffs' likelihood of repeated future harm depends upon whether (1) BLM will gather horses in the Blue Wing Complex, (2) BLM will impair observers' ability to watch these gathers, and (3) Plaintiffs have concrete plans to observe these gathers. The record establishes that, when the FAC was filed, there was a "real possibility" of more gathers in the Blue Wing Complex. *Leigh v. Salazar*, 677 F.3d 892, 896 (9th Cir. 2012) [hereinafter *Salazar I*] (discussing mootness of a similar claim); *see also Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 838 (9th Cir. 2007) ("The existence of standing turns on the facts as they existed at the time the plaintiff filed the complaint.").

BLM estimated in July 2022 that there was an excess of 1,360 wild horses and 1,272 wild burros on the Complex and, by September 2022, had removed only 218 horses and 804 burros. (Gather Request at AR 3826; Final Gather Report at AR 3880-81.) These numbers, combined with the Gather Plan's authorization to conduct phased gathers through 2037 and BLM's mandate to remove excess horses, indicated that BLM would imminently gather more horses and burros in the Blue Wing Complex. *See also* 16 U.S.C. 1333(b)(2).

Plaintiffs have likewise alleged that there is a substantial risk BLM will impair their ability to observe these future Blue Wing Complex gathers. It is "standard practice" for WHE to send its members to observe and document gathers throughout the country, including in the Blue Wing Complex. (ECF Nos. 50-1 at 3; 50-2.) Though herd management decisions are highly fact-specific, access issues for gather observers have been "commonplace" in the Winnemucca District. (ECF No. 50-1 at 6.) *See also Fund for Animals, Inc. v. BLM*, 460 F.3d 13, 22-23 (D.C. Cir. 2006). Taking these allegations as true, Plaintiffs face a "realistic danger" that they will be directly harmed by BLM's selection of observation sites for future gathers in the Blue Wing Complex. *Pennell v. City of San Jose*, 485 U.S. 1, 8 (1988) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

### 2.    Causation

There is little question that these injuries are traceable to BLM's challenged actions. Ford stated in her affidavit that BLM escorted her to the public observation sites and would not grant her access to the temporary holding corrals. (ECF No. 50-2 at 2-3.) *See Lujan*, 504 U.S. at 560. The causation requirement has been met.

### 3.    Redressability and Mootness

As relief for their First Amendment claim, Plaintiffs request that the Court compel Defendants to provide them "meaningful viewing access" to the holding corrals containing the animals gathered in 2022 and to "each phase of future gather and removal efforts of horses and burros living in the Blue Wing Complex." (ECF No. 24 at

31.) The Court will assess Plaintiffs' standing for each type of relief sought. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

### a.   Access to Holding Corrals

To the extent any animals gathered from the Blue Wing Complex in 2022 are still held by BLM in the Midwest or elsewhere, the Court could grant effective relief by ensuring that Plaintiffs have access to those animals, wherever they may be. (ECF No. 60-1 at 7.)

For any animals that are no longer in BLM's possession, Plaintiffs' request is moot. The Court cannot effectively remedy a present controversy between the parties where a plaintiff seeks an injunction regarding an activity that has already concluded, as the Court "cannot undo that action's allegedly harmful effects." *Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 834 (9th Cir. 2014) (quotation marks omitted). Such claims would not fall within the mootness exception for cases that are 'capable of repetition yet evading review' either because it was not clear at the inception of BLM's plan that any controversies regarding the holding of gathered animals would be of "*inherently* limited duration." *Id.* at 836; *see also Dep't of Fish & Game v. Fed. Subsistence Bd.*, 62 F.4th 1177, 1181 (9th Cir. 2023) ("The plaintiff has the burden of showing that the exception applies."). In other words, this is not part of the "classes of cases that, absent an exception, would *always* evade judicial review." *Bowen*, 752 F.3d at 836; *cf. Roe v. Wade*, 410 U.S. 113, 125 (1973), *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) (exception applied to abortion access because pregnancy usually lasts only 266 days); *Enyart v. Nat'l Conf. of Bar Examiners, Inc.*, 630 F.3d 1153, 1160 (9th Cir. 2011) (exception applied to month-long injunctions); *Dep't of Fish & Game*, 62 F.4th at 1181-82 (exception applied to 60-day emergency hunt).

### b.   Meaningful Viewing Access to Future Gathers

Plaintiffs' concerns about access to future gathers are redressable and are not moot. Though the gather had ended by September 2022—meaning any injuries arising

1  from an inability to observe the gather operations ceased to exist by the time Plaintiffs

2  filed their FAC—Plaintiffs request *prospective* injunctive relief to prevent similar future

3  injuries. *See Arcamone-Makinano v. Haaland*, No. 2:22-CV-00621-JAD-NJK, 2022 WL

4  4585298, at *3 (D. Nev. Sept. 29, 2022). Plaintiffs have properly shown that there was a

5  substantial risk they would be similarly harmed again at the time they filed their FAC.

6  Thus, their injuries were redressable in September 2022.

7      Nor has this case become moot since its filing, as the Court can still provide

8  effective relief for Plaintiffs' alleged future injuries. *See Bowen*, 752 F.3d at 834 ("An

9  actual controversy must exist at all stages of federal court proceedings."). Since

10  Plaintiffs filed their initial complaint, the 2022 gather has fully concluded, and BLM

11  conducted another gather in the Complex. But even after this additional gather, the

12  AMLs have not been achieved for the Complex.[7] BLM is required to "immediately

13  remove" the remaining excess animals, meaning the probability of a future gather is

14  almost guaranteed. *See Salazar I*, 677 F.3d at 896 (quoting 16 U.S.C. § 1333(b)(2)).

15  Plaintiffs' request for prospective injunctive relief is not moot because it is highly likely,

16  given these circumstances, that the Court can redress Plaintiffs' injuries when BLM

17  gathers and removes the excess animals currently present in the Blue Wing Complex.

18  Plaintiffs' request for injunctive relief is not moot as applied to future gathers.

19      **B. First Amendment**

20      The First Amendment grants a "qualified right of access for the press and public

21  to observe government activities." *Salazar I*, 677 F.3d at 898. Whether this right of

22  access applies to wild horse and burro gathers is governed by a two-step test. *See id.*

23  (citing *Press-Enter. Co. v. Sup. Ct. of Cal. for Riverside Cnty.*, 478 U.S. 1 (1986)). The

24

25      [7]Under Federal Rule of Evidence 201, the Court takes judicial notice of a BLM
publication stating that the Blue Wing Complex contained approximately 1,912 wild
26  horses and 476 burros before it conducted a gather in 2024. *See 2024 Blue Wing
Complex Wild Horse and Burro Gather*, BLM, https://perma.cc/PCA3-NFH4. BLM
27  reported that it gathered only 1,305 horses and 360 burros in 2024, leaving an
approximate 607 horses and 116 burros in the Complex. *See id.* These reported
28  populations exceed the AMLs of 333 to 555 horses and 55 to 90 burros. *See id.*

1    court must first determine whether a right of access attaches to the government activity

2    by assessing "whether the place and process have historically been open to the press

3    and general public" and "whether public access plays a significant positive role in the

4    functioning of the particular process in question." *Id.* (quoting *Press-Enter.*, 478 U.S. at

5    8). If a qualified right exists, then the government may abridge that right only if it

6    demonstrates "an overriding interest based on findings that closure is essential to

7    preserve higher values and is narrowly tailored to serve that interest." *Id.* (quoting

8    *Press-Enter.*, 478 U.S. at 9). Plaintiffs challenge BLM's restrictions on their ability to

9    observe the gather and the post-gather holding facilities.

10                   **1.    Trapping Sites on Public Land**

11          The public has a qualified right of access to view wild horse gather operations,

12   like the 2022 gather. (ECF No. 60 at 56.) *See Leigh v. Salazar*, 954 F. Supp. 2d 1090,

13   1101 (D. Nev. 2013) [hereinafter *Salazar II*]; *Wild Horse Educ. v. U.S. Dep't of the*

14   *Interior*, No. 3:23-CV-00372-LRH-CLB, 2024 WL 2060272, at *2 (D. Nev. May 8, 2024).

15   Defendants have identified two important overriding interests served by the selected

16   observation sites: carrying out their statutory duty to gather excess horses and burros in

17   an effective and efficient manner and protecting the safety of the public, wranglers, and

18   animals themselves. (ECF No. 60 at 56-57.) *See Wild Horse Educ.*, 2024 WL 2060272,

19   at *2. Keeping proper space between public observers and gather operations is

20   essential to public safety and the efficiency of the gather—especially where, like here,

21   helicopters are being used to round up over 1,000 animals.[8] (Final EA at 3333, 3455

22   (discussing how having the public too close to helicopters during a gather can be

23   dangerous for observers, wranglers, and the animals); Final Blue Wing Gather Report at

24   AR 3880-81; ECF No. 71 at 30.)

25          The primary question, then, is whether BLM's restrictions on public observation

26   _____

27          [8]Plaintiffs do not contest that putting a sufficient distance between observers and gather operations was essential to these governmental interests. (ECF Nos. 50 at 41-43; 63 at 29-30.) But the Court "cannot rubber-stamp an access restriction simply

28   because the government says it is necessary." *Salazar I*, 677 F.3d at 900.

1   for the 2022 gather were narrowly tailored to its interests in efficiency and safety. In

2   determining whether a burden imposed on a constitutional right is narrowly tailored, the

3   Court may consider whether other jurisdictions have effectively addressed the problem

4   at hand with less intrusive tools and the existence of reasonable alternatives. *See*

5   *United States v. Allen*, 34 F.4th 789, 797-98 (9th Cir. 2022).

6           **a.   Other Gathers and Other Jurisdictions**

7        Plaintiffs first argue that another BLM gather in the Silver King HMA employed

8   much closer observation sites, which indicates that BLM could have done the same in

9   the Blue Wing Complex. The 2010 Silver King gather also used helicopters but had two

10  designated viewing areas that were one-quarter mile from one trap location and 35 feet

11  from the other. *See Salazar II*, 954 F. Supp. 2d at 1094. The location of each of those

12  observation sites, "the first on the ridge overlooking the jute wings and the second

13  overlooking the trap itself, naturally arose from the trap's placement." *Id.* at 1102. And

14  both were placed "above the gather path and away from the helicopter's flight path"

15  such that BLM could avoid "the danger of flying debris that can be picked up by the

16  helicopter's draft." *Id.*

17       Opportunities for such proximity were precluded by the terrain in the Blue Wing

18  Complex. Unlike the Silver King gather site which sat below a ridge, the trap site used

19  during the first three days of the 2022 Blue Wing Complex gather was in a "flat and

20  open" area with "limited geographical features to hide vehicles and members of the

21  public." (ECF No. 60-1 at 4.) BLM thus selected an observation site 1.8 miles away from

22  the trap site that had tree cover and fencing—and was not in the burros' path of travel.

23  (*Id.* at 4-5.) Each successive observation site used during the 2022 Blue Wing gather

24  was similarly chosen for having terrain that would hide observers while remaining within

25  viewing distance of the trap site. (*Id.* at 5-6.)

26       "[A]ll wild horse gather locations are different and present unique challenges to []

27  BLM and its contractors based on the natural topography and terrain of the location."

28  *Salazar II*, 954 F. Supp. 2d at 1103. So, while the Silver King gather observation sites

1   are helpful in explaining that observers may not inherently have to be quite so far from a

2   helicopter-based gather, they ultimately do little to undermine BLM's reasoning in

3   choosing the Blue Wing gather sites. The fundamental differences in the topography of

4   the Silver King and Blue Wing trap sites fully explain the disparities in the placement of

5   their observation sites. (Final EA at AR 3277 ("[T]here may be circumstances (flat

6   terrain, limited vegetative cover, private lands, etc.) that require viewing locations to be

7   at greater distances from the gather site due to public visitor access or to ensure safe

8   gather operations.").)

9           **b.   Reasonable Alternatives**

10          Plaintiffs also present three potential alternative observation protocols that they

11  argue BLM should have adopted. They first argue that closer observation sites were

12  available. (ECF No. 63 at 29 (citing ECF No. 60-1 at 4-6).) But the alternative sites they

13  reference were specifically rejected by BLM because, if observers had been there, "they

14  would have been run over by the animals, and the helicopter would have had to avoid

15  the area and would not have been able to make any correction to the burros['] traveling

16  paths." (ECF No. 60-1 at 5.) Plaintiffs offer no evidence to the contrary. Any alternative

17  that put observers in danger of being trampled by burros was not a viable option.

18          Plaintiffs' next suggestion—that BLM could have placed observers in an

19  abandoned fenced cattle pen located approximately 200 feet from the first trap site—is

20  similarly unavailing. BLM used the pen as a helicopter refueling site. (ECF Nos. 71 at

21  30; 71-1 at 2.) Placing members of the public near working helicopters would have been

22  unsafe due to flying debris and the possibility of helicopter crashes or emergency

23  landings. (Final EA at 3333, 3455; ECF No. 71-1 at 3.) Depending on the size of the

24  pen, using it as an observation site may have also violated Federal Aviation

25  Administration aircraft safety regulations. *See* 14 C.F.R. § 91.119(c) (mandating that

26  "aircraft may not be operated closer than 500 feet to any person"). The cattle pen

27  therefore posed too many safety risks to be a reasonable alternative.

28          Nor is the Court fully convinced by Plaintiffs' contention that BLM could have

allowed the public to be closer to trap locations by requiring them to observe the gather from their vehicles. BLM did not close the road but did limit vehicular access to the gather areas because having vehicles on the roads would create safety risks for observers and wranglers alike and affect the efficiency of the gather. (ECF No. 71-1 at 2.) However, whether the limitations on vehicles were narrowly tailored is not entirely clear. Questions remain as to where observers could have parked their vehicles, how close these sites were to gather operations, and what levels of viewing access and safety concerns were present. Summary judgment is therefore denied as to whether allowing the public to access closer observation sites in their vehicles was a reasonable alternative.

Given the triable questions of fact regarding Plaintiffs' suggested vehicular alternative, the Court denies both Motions as to whether BLM's selected observation sites were narrowly tailored to serve its interests in public safety and an effective and efficient gather.

### 2.    Holding Corrals on Private Land

#### a.    Qualified Right of Access

BLM cites to *Salazar II* in arguing that "[t]he law in this District is clear" that "no qualified right of access arises" for post-gather holding corrals on privately owned land. (ECF No. 63 at 55.) *See Salazar II*, 954 F. Supp. 2d at 1103 (noting the "important distinction between gathers conducted upon public property where the public ordinarily enjoys full access and follow-up activities conducted by private contractors on private property"). But a decision by one district judge does not bind another, let alone constitute the law of the district. This Court disagrees with BLM's sweeping contention that "there is no qualified right of access" to holding corrals that would otherwise be available for public viewing simply because BLM contracted with a private company to run the facilities, rather than establishing and managing the corrals itself.

Public access to post-gather holding corrals plays a positive role in managing gathered animals, particularly with regard to adopting out the animals and protecting

their interests. *See Salazar II*, 954 F. Supp. 2d at 1101 (discussing benefits of public access to gathers). Without public access, it is difficult for the press and concerned observers to report on the government's activities and the health and wellbeing of gathered animals. *See id.*

Moreover, Plaintiffs have provided evidence that they have historically been given access to post-gather holding facilities, albeit subject to a variety of restrictions, to observe how the government is caring for gathered animals. (ECF Nos. 50-1 at 6; 63-1 at 2-3.) Drawing a hard line between privately and publicly owned facilities construes the meaning of 'place and process' too narrowly; instead, the Court looks at the process and place (*i.e.*, holding gathered animals in off-range corrals) more broadly and considers the difficulties of contracting with private vendors in determining whether restrictions were narrowly tailored. Here, the factual record shows that Plaintiffs have been able to visit post-gather off-range holding facilities, including the Axtell Corrals. (ECF Nos. 50-1 at 6; 63-1 at 2-3.) BLM even opened up its publicly operated facility, the Palomino Valley Off-Range Corrals, for the public to observe horses that were removed from the Blue Wing Complex during the 2022 gather. (ECF No. 60 at 24.)

The Court accordingly finds that corrals holding gathered animals have historically been open to the press and general public, with some limitations. The public has a qualified right of access to post-gather holding corrals.

### b.   Narrowly Tailored

BLM appears to cite its overriding interests in private property rights and public safety, given past fires at holding corrals. (ECF No. 60 at 54-55.)

Factual questions remain, however, as to whether the outright ban on viewing burros held at the Axtell Corrals was narrowly tailored to BLM's public safety and property rights concerns. The Court understands that the means of holding the burros may have made public access more difficult and that private landowners often have discretion as to who may enter their property. (ECF No. 71 at 29.) It is unclear, though, what alternative holding facilities were available, what level of access was available at

those alternatives, and whether BLM could have negotiated greater public access at the Axtell Corrals. Especially given BLM's ability to accommodate safety concerns at other facilities without fully prohibiting public visitation, the Court finds that summary judgment is inappropriate as to whether the access restrictions on the Axtell Corrals after the 2022 gather were narrowly tailored to BLM's overriding interests.

In sum, triable issues of fact exist as to whether BLM's restrictions on public access to post-gather holding facilities were narrowly tailored to serve its interests in public safety and an effective and efficient gather. The Court denies both Motions as to Plaintiffs' First Amendment claim for access to the Axtell Corrals.

### C. APA Section 706(1) and the Mandamus and Venue Act

"District courts have jurisdiction 'to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff,' pursuant to the Mandamus Act, 28 U.S.C. § 1361, and a similar provision of the APA, 5 U.S.C. § 706(1), which allows courts to compel 'agency action unlawfully withheld or unreasonably delayed.'" *Agua Caliente Tribe of Cupeño Indians of Pala Rsrv. v. Sweeney*, 932 F.3d 1207, 1216 (9th Cir. 2019). The Court will consider Plaintiffs' causes of action under both statutes together "because the relief sought is essentially the same." *Id.* (quoting *Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997)) (brackets omitted).

### 1. Preparing an HMAP

Plaintiffs first allege that BLM has unlawfully withheld, or alternatively unreasonably delayed, preparing HMAPs for the Blue Wing Complex. *See* 5 U.S.C. § 706(1). Under the APA, courts may compel withheld or delayed agency action only if that action is both discrete and legally required. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62-64 (2004) [hereinafter *SUWA*].

Preparing an HMAP is indisputably a discrete action. *See Vietnam Veterans of Am. v. Cent. Intel. Agency*, 811 F.3d 1068, 1079 (9th Cir. 2016) (noting that an action can still be discrete when the agency retains discretion over the way its duty may be

1   carried out); *cf. SUWA*, 542 U.S. at 64 (describing the discreteness requirement as

2   precluding a "broad programmatic attack"). At issue here are the circumstances under

3   which developing an HMAP is also mandatory. The Court's analysis accordingly turns

4   on whether the deadline for preparing an HMAP is firm or discretionary—that is,

5   whether the HMAP is being unlawfully withheld or unreasonably delayed, respectively.

6   *See Biodiversity Legal Found. v. Badgely*, 309 F.3d 1166, 1177 n.11 (9th Cir. 2002).

7         **a.   Unlawfully Withheld HMAP**

8         Defendants assert that issue preclusion, or collateral estoppel, applies to whether

9   a firm deadline exists by which BLM must complete an HMAP. The Court agrees.

10  Collateral estoppel applies when four conditions are met: "(1) the issue at stake was

11  identical in both proceedings; (2) the issue was actually litigated and decided in the prior

12  proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the

13  issue was necessary to decide the merits." *Oyeniran v. Holder*, 672 F.3d 800, 806 (9th

14  Cir. 2012), *as amended* (May 3, 2012). Each of these factors has been met here. The

15  Court recently addressed a similar challenge to a BLM roundup in eastern Nevada. *See*

16  *Leigh v. Raby*, __ F. Supp. 3d __, No. 3:22-CV-00034-MMD-CLB, 2024 WL 1345297

17  (D. Nev. Mar. 28, 2024) [hereinafter *Leigh I*]. While the facts of this case and *Leigh I* are

18  different, they raise identical questions about whether the WHA and its implementing

19  regulations require BLM to prepare an HMAP before conducting a gather. *See id.* at *3-

20  4. This issue was litigated and decided in *Leigh I*, and the parties in had a full and fair

21  opportunity to litigate this question; the Court even ordered supplemental briefing and

22  heard oral argument. *See id.* at *1 n.2, *5. Finally, resolution of the issue was necessary

23  to the merits. *See id.* at *3-*4. Collateral estoppel bars the re-litigation of this question.[9]

24

25          [9]When deciding this issue in *Leigh I*, the Court relied heavily on the Supreme

26  Court's opinion in *Kisor v. Wilkie*, 588 U.S. 558 (2019). *See* 2024 WL 1345297, at *3-4.
    Though the Supreme Court has since overruled *Chevron, U.S.A., Inc. v. Natural*

27  *Resources Defense Council, Inc.*, 467 U.S. 837 (1984), the Court "did not call *Kisor* into
    question . . . (and in fact cited it), and as the concurrence acknowledges did not overrule

28  it, so [the Ninth Circuit] continue[s] to apply it." *United States v. Trumbull*, ___ F.4th ___,

The Blue Wing Complex HMAPs have not been unlawfully withheld because there is no firm deadline for preparing an HMAP.

### b. Unreasonably Delayed HMAP

In the absence of a firm deadline for preparing HMAPs, the Court will assess whether BLM has unreasonably delayed creating an HMAP for the Blue Wing Complex HMAs. BLM has bound itself to create HMAPs for each HMA, and, given the circumstances at hand, its 38-year delay in doing so for the Blue Wing Complex has been unreasonable. The Court will therefore compel BLM to prepare one or more HMAPs covering each HMA in the Blue Wing Complex.

### i. Legally Required

Section 4710.3-1 of BLM's WHA implementing regulations provides that HMAs "shall be established for the maintenance of wild horse and burro herds" and that BLM "shall prepare a [HMAP], which may cover one or more [HMAs]." 43 C.F.R. § 4710.3-1. These are mandatory duties with which BLM must comply. *See Leigh I*, 2024 WL 1345297, at *4; *Animal Prot. Inst. of Am.*, 109 IBLA at 127 ("43 CFR 4710.3-1 requires preparation of an HMAP."); *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 310 (2020) ("The first sign that the statute imposed an obligation is its mandatory language: 'shall.'"). Regardless of the discretion the agency was originally granted under the WHA, BLM "has chosen to constrain its own discretion via regulations that carry the force of law." *Trout Unlimited v. Pirzadeh*, 1 F.4th 738, 751 (9th Cir. 2021); *accord Flores v. Bowen*, 790 F.2d 740, 742 (9th Cir. 1986). BLM must comply with Section 4710.3-1 and develop one or more HMAPs for the Blue Wing HMAs. *See Flores*, 790 F.3d at 742; *Vietnam Veterans of Am.*, 811 F.3d at 1079.

///

///

---

No. 23-912, 2024 WL 3894526, at *3 n.2 (9th Cir. Aug. 22, 2024) (discussing *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024)) (citation omitted).

1

2          **ii.    *TRAC* Factors**

3          Defendants concede that they have not prepared HMAPs for the HMAs.[10] The

4   issue, then, is whether BLM's delay in preparing HMAPs has been unreasonable. To

5   answer that question, the Ninth Circuit uses the six-factor balancing test announced by

6   the D.C. Circuit in *Telecommunications Research & Action Center v. FCC* ("*TRAC*"),

7   750 F.2d 70, 80 (D.C. Cir. 1984). *See Vaz v. Neal*, 33 F.4th 1131, 1137 (9th Cir. 2022).

8          The first *TRAC* factor considers "whether the time for agency action has been

9   reasonable." *Id.* at 1138 (quoting *In re Nat. Res. Def. Council, Inc.*, 956 F.3d 1134, 1139

10  (9th Cir. 2020) [hereinafter *In re NRDC*]). Though not determinative, it is "the most

11  important factor." *Id.* (quotation marks omitted). "Repeatedly, courts in this and other

12  circuits have concluded that a reasonable time for agency action is typically counted in

13  weeks or months, not years." *Id.* (quoting *In re NRDC*, 956 F.3d at 1139) (quotation

14  marks omitted).

15         By these standards, BLM has taken more than a reasonable amount of time to

16  prepare HMAPs for the HMAs. Each of the five HMAs at issue predates the regulation

17  compelling BLM to prepare HMAPs, meaning BLM's duty to prepare HMAPs for these

18  HMAs arose when BLM promulgated the regulation 38 years ago in 1986. (Preliminary

19  EA at AR 3133 (noting that gathers were conducted in each HMA in 1985); Final EA at

20  AR 3316 (same).) *See also* Revision of Existing Regulations on Protection,

21  Management, and Control of Wild Free-Roaming Horses and Burros, 51 Fed. Reg.

22  7410, 7416 (Mar. 3, 1986) (to be codified at 43 C.F.R. pt. 4710.3-1). BLM's almost four-

23  decade-long delay in developing and approving HMAPs has been "nothing short of

24  egregious" and clearly violates the rule of reason. *In re NRDC*, 956 F.3d at 1142; *see*

25  *also In re Pesticide Action Network N. Am.*, 798 F.3d 809, 814 (9th Cir. 2015) (eight-

26  year delay with no concrete timeline to reach a final ruling was a "roadmap for further

27  ─────────────────
    [10]Although BLM has prepared gather plans and RMPs, these documents cannot
28  meet the Section 4710.3-1 mandate to prepare an HMAP. *See Leigh I*, 2024 WL
    1345297 at *5-6.

delay" that "stretched the 'rule of reason' beyond its limits"); *All. for Wild Rockies v. Cooley*, 661 F. Supp. 3d 1025, 1039 (D. Mont. 2023) (20-year delay in grizzly bear management was "clearly" unreasonable). The first *TRAC* factor strongly favors Plaintiffs.

The second factor is not applicable because Congress has not supplied a timeframe in which HMAPs should be prepared. *See In re NRDC*, 956 F.3d at 1140-41.

The third factor indicates that delay is less likely to be reasonable when the regulation at issue affects human health and welfare than when it is an economic regulation, and the fifth factor looks more broadly at the nature and extent of the interests that have been prejudiced by the agency's delay. *See Vaz*, 33 F.4th at 1137. The Court will analyze these factors together, as they often overlap. *See Indep. Mining*, 105 F.3d at 509. The consequences of BLM's failure to prepare an HMAP "fall neither into the economic realm nor specifically into the realm of human health and welfare." *Or. Nat. Desert Ass'n v. Bushue*, 644 F. Supp. 3d 813, 842 (D. Or. 2022), *appeal dismissed sub nom. Or. Nat. Desert Ass'n v. BLM*, No. 23-35101, 2023 WL 5012123 (9th Cir. June 5, 2023). The third factor is thus neutral.

But "the public can still have a significant interest in agency management that promotes such important values as wildlife, scenery, cultural resources, and recreational opportunities." *Id.* (quotation marks omitted). Congress enacted the WHA to protect wild horses and burros—which are "an integral part of the natural system of the public lands" and symbols of American history and culture—and the ecology of the public lands they inhabit. 16 U.S.C. §§ 1331, 1333(a). Defendants contend that the Winnemucca RMP, Blue Wing Complex EA, and Comprehensive Animal Welfare Program all ensure that management activities are conducted at the 'minimal feasible level,' and thus none of these interests were prejudiced by BLM's delay in developing an HMAP. (ECF No. 60 at 35.) The Court will assume, without deciding, that this is

18

true[11] and that the fifth factor weighs in Defendants' favor.

The fourth factor looks to "whether compelling the agency to act would detract from its higher or competing priorities." *Vaz*, 33 F.4th at 1138. Preparing an HMAP may take personnel and funding away from other BLM activities, like gathering excess wild horses and burros to protect their health and the health of range. (ECF No. 60 at 35.) The Court is sympathetic to the fact that BLM, like most public agencies, has multiple resource-intensive mandates and limited resources with which to fulfill them. *See Vaz*, 33 F.4th at 1138. But it would be overly generous to say that BLM gets a free pass on the fourth factor because all its activities to some extent touch on the important values of wildlife, recreation, and the multiple use of public lands. *See In re NRDC*, 956 F.3d at 1141. Preparing an HMAP should have a limited impact on BLM's other priorities. The agency can conduct gathers in the meantime to maintain the health of herds and rangelands. This factor therefore favors Plaintiffs.

Finally, the sixth factor is irrelevant because there is no evidence that BLM has acted improperly. (ECF Nos. 64 at 32; 78 at 14.) *See also Vaz*, 33 F.4th at 1138 n.6.

Only the fifth factor has weighed in Defendants' favor, leaving little question that BLM's delay in preparing HMAPs for the Kamma Mountains, Seven Troughs Range, Lava Beds, Blue Wing Mountains, and Shawave HMAs has been unreasonable. BLM must develop and approve one or more HMAPs for the Blue Wing Complex HMAs within the next year.[12] *See* 43 C.F.R. § 4710.3-1 (noting that HMAPs may cover one or

---

[11]Before the gather, an overpopulation of wild horses was severely harming riparian vegetation and springs in the Blue Wing Complex. (Final EA at AR 3265-66.) These are issues that HMAPs are meant to address, leaving the Court not entirely convinced that no interests have been prejudiced by the decades-long delays in preparing HMAPs. (Handbook at AR 90.) Regardless, this factor is not dispositive, and the Court still finds that BLM's delay is unreasonable, as explained below.

[12]Defendants have informed the Court that BLM recently began the process for developing a HMAP for the Blue Wing Complex and "intends on completing the process and adopting an HMAP for the Blue Wing Complex within approximately one year." Heather O'Hanlon, *Humboldt River Field Office Has Initiated a Public Scoping Period on the Blue Wing Complex Herd Management Area Plan*, BLM (May 2, 2024), https://perma.cc/GJ97-76X8. Because BLM's commitment to completing the HMAP

1    multiple HMAs). Because an adequate remedy is available under the APA, Plaintiffs'

2    Motion is denied and Defendants' Motion is granted as to Plaintiffs' motion to compel

3    BLM to prepare HMAPs under the Mandamus and Venue Act. *See Patel v. Reno*, 134

4    F.3d 929, 931 (9th Cir. 1997) ("Mandamus is an extraordinary remedy and is available

5    to compel a federal official to perform a duty only if . . . no other adequate remedy is

6    available.").

7              **2.      Removing Excess Animals**

8              Plaintiffs further attest that BLM failed to "immediately" remove excess horses

9    and burros in violation of the WHA when it adopted a 20-year-long phased approach to

10   managing horse and burro populations in the Blue Wing Complex. (ECF No. 50 at 34

11   (quoting 16 U.S.C. § 1333(b)(2)).) However, the Court cannot reach the merits of this

12   claim because the Mandamus and Venue Act and APA Section 706(1) do not permit

13   Plaintiffs' requested relief. Each of Plaintiff's relevant requested remedies would prohibit

14   the gathering of wild horses and burros. (ECF No. 24 at 31 (requesting that the Court

15   issue "a writ of prohibition preventing Defendants from gathering wild horses and

16   burros" and "an order and injunction compelling Defendants to immediately stop

17   implementation of the Blue Wing Complex Environmental Assessment").) In contrast,

18   the Mandamus and Venue Act and APA Section 706(1) only allow the Court to compel

19   BLM to gather excess horses and burros more quickly. *See* 5 U.S.C. § 706(1); 28

20   U.S.C. § 1361. While this could fall within Plaintiffs' blanket request that the Court

21   "[g]rant such additional and further relief to which Plaintiffs may be entitled," compelling

22   the immediate removal of wild horses and burros would be obviously inconsistent with

23   Plaintiffs' objectives. (ECF No. 24 at 31.) The Court declines to exercise its discretion to

24

25   within one year is not binding, the Court declines to find that Plaintiffs' motion to compel
26   the production of an HMAP under the APA is prudentially moot. *See Deutsche Bank
     Nat'l Tr. Co. v. Fed. Deposit Ins. Corp.*, 744 F.3d 1124, 1135 (9th Cir. 2014) (noting that
27   a finding of prudential mootness is permissive). BLM's voluntary commitment to
     completing the HMAP by early May 2025 leads the Court to find that September 20,
28   2025, is a reasonable deadline.

grant such relief and thus denies Plaintiffs' Motion and grants Defendants' Motion as to the Mandamus and Venue Act and APA Section 706(1) claims regarding the delay in removing excess animals.

## D.  APA Section 706(2)(A)

The Court may also set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Plaintiff challenges the BLM gathers in the Blue Wing Complex under APA Section 706(2)(A) because they were conducted without an HMAP in place, are not immediate, and relied on stale population data.

### 1.    Failure to Prepare HMAP Before Gathering Animals

Plaintiffs do not argue that BLM's decision to gather excess horses and burros in the Blue Wing Complex without first approving and preparing an HMAP was arbitrary, capricious, or an abuse of discretion; rather, they challenge this decision solely on the basis that it was not in accordance with the WHA and its implementing regulations. As the Court has already found that BLM may gather excess horses and burros even if no HMAP is in place, Plaintiffs have not shown that BLM acted out of accordance with the WHA or its implementing regulations. *See Leigh I*, 2024 WL 1345297, at *7.

### 2.    Immediate Removal of Excess Animals

Plaintiffs next challenge BLM's phased approach to gathering excess horses and burros in the Blue Wing Complex as being inadequately justified and in violation of the WHA's immediacy requirement.

#### a.    Arbitrary and Capricious Phased Gather

"An agency action qualifies as arbitrary or capricious if it is not reasonable and reasonably explained." *Ohio v. Env't Prot. Agency*, 144 S. Ct. 2040, 2053 (2024) (internal quotation marks omitted). In reviewing agency action under this standard, the Court cannot "substitute its judgment for that of the agency," *id.*, but must still ensure that, among other things, BLM has "articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made," *Motor*

*Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *accord Ohio*, 144 S. Ct. at 2053. BLM's action may be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

Plaintiffs have not pointed to any specific reasons why BLM's explanation for its phased approach to gathers was inadequate. (ECF No. 50 at 37 (generally alleging, without more, that "[n]othing in the Gather EA shows a rational connection between the facts found and the plan that was adopted").) Nor does the Court see any glaring issues with the justification for the phased approach. "As Defendants explain, multiple round ups may be a practical necessity where a single gather decision implicates hundreds or even thousands of wild horses and burros, which cannot realistically be removed all at once." *Friends of Animals v. Pendley*, 523 F. Supp. 3d 39, 57 (D.D.C. 2021); *accord* (ECF No. 60 at 37). BLM even noted in its Final EA that the selection of an alternative would be influenced by "space and funding on a national level," as "holding space fluctuates depending on births/deaths and [BLM's] ability to secure contracts for holding space and/or establish new BLM facilities." (Final EA at AR 3269.) BLM also explained that it ultimately selected Alternative B because it would achieve the agency's objectives by reducing the likelihood of vehicular collisions with wild horses and burros, decreasing resource competition, improving vegetation, removing excess wild horses and burros, preserving the health and well-being of animals removed from the range, and achieving the established AML. (ROD at AR 3538-39; Final EA at 3269 (stating the purpose and need for the Gather Plan).) Finally, "BLM's use of a single gather plan and a single [EA] to cover a period of years and a series of individual gather operations is not a departure from the agency's past practice." *Friends of Animals v. Silvey*, 820 F. App'x 513, 516 (9th Cir. 2020) (citing *Leigh v. Salazar*, No. 3:13-cv-00006-MMD-VPC, 2014 WL

4700016 (D. Nev. Sept. 22, 2014)); *see also Pendley*, 523 F. Supp. 3d at 57-58.

Plaintiffs have not established that BLM acted arbitrarily and capriciously by selecting a phased gather alternative.

### b. Phased Gather in Violation of WHA's Immediacy Requirement

Plaintiff argues that BLM's phased approach to achieving the AML in the Blue Wing Complex is not in accordance with law because it violates the WHA's mandate to "immediately remove excess animals from the range so as to achieve [AMLs]" once it has been determined that "that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals." 16 U.S.C. § 1333(b)(2). The only agency action they have asked the Court to set aside, however, is the Final EA, rather than the actual decision to implement a phased gather.[13] (ECF Nos. 24 at 31; 50 at 37.) *Cf. Friends of Animals v. Culver*, 610 F. Supp. 3d 157, 162, 168-71 (D.D.C. 2022) (assessing BLM's decision to implement a ten-year phased gather under APA Section 706(2)(A)). Though Plaintiffs have included a blanket request for any other relief they may be entitled, the Court declines to exercise its discretion to cure this deficiency in Plaintiffs' claim. *See* 16 U.S.C. § 1333(b)(2). As the EA simply analyzes the potential environmental effects of different proposed alternatives, it does not violate the WHA's immediacy requirement. Plaintiffs' request to set aside the EA for alleged inconsistencies with the WHA is denied.

### 3. Using Stale Population Inventory Data in Violation of the WHA

Plaintiffs also argue that BLM violated WHA Section 1333(b)(1) by failing to use a "current inventory" of wild horses and burros in finding that excess animals were present on the Blue Wing Complex. (ECF No. 50 at 39.) The WHA is not so restrictive. The Secretary of the Interior may use "(i) the current inventory of lands within [her] jurisdiction; (ii) information contained in any land use planning completed pursuant to

---

[13]The Court later discusses Plaintiffs' requested relief and construes their complaint as requesting that the Court set aside both the EA and the FONSI. Including the FONSI here does not affect the success of Plaintiffs' claim and thus the Court will refer only to the EA for simplicity.

section 1712 of Title 43; (iii) information contained in court ordered environmental impact statements as defined in section 1902 of Title 43; and (iv) such additional information as becomes available to [her] from time to time" to determine that an overpopulation exists on public lands and that action is necessary to remove excess animals. 16 U.S.C. § 1333(b)(1). But "in the absence of the information contained in (i-iv) above," the Secretary can instead rely upon "all information currently available" to her in reaching these conclusions. *Id.* Plaintiffs do not argue that BLM relied upon only a subset of available information but rather that BLM did not acquire new information in reaching its removal decision. To the extent Plaintiffs challenge the recency of the data BLM used in determining that excess wild horses and burros were present on the Blue Wing Complex, their Motion is denied.

Plaintiffs' Motion is denied and Defendants' Motion is granted as to Plaintiffs' third cause of action.

### E. APA Section 706(2)(C)

BLM likewise did not act in excess of statutory jurisdiction, authority, or limitations by gathering horses before preparing an HMAP for the Pancake Complex. *See* 5 U.S.C. § 706(2)(C). Again, the gather was congruent with the WHA and its implementing regulations, and conducting a gather for an area which did not yet have an HMAP was within BLM's authority. Nor was the Final EA—the only agency action Plaintiffs have asked the Court to set aside—issued in excess of BLM's authority under the WHA.

Plaintiffs' Motion is denied and Defendants' Motion is granted as to Plaintiffs' fourth cause of action.

### F. NEPA Claims

The Court will now turn to whether the Final EA complies with NEPA. Although NEPA lacks a substantive mandate, its "action-forcing" procedural requirements help carry out a "national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989); *accord* 42 U.S.C. § 4331. One such means by which NEPA forces action is its requirement that

agencies take a "hard look" at the environmental consequences of their proposed actions. *See Kern v. BLM*, 284 F.3d 1062, 1066 (9th Cir. 2002). This 'hard look' includes conducting an environmental assessment ("EA") in certain circumstances to inform whether the agency prepares an environmental impact statement ("EIS") or instead issues a finding of no significant impact ("FONSI"). *See* 40 C.F.R. §§ 1501.5(c)(1), 1501.6(a).

Courts may examine an EA "to determine whether it has adequately considered and elaborated the possible consequences of the proposed agency action when concluding that it will have no significant impact on the environment." *350 Montana v. Haaland*, 50 F.4th 1254, 1265 (9th Cir. 2022) (quoting *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1215 (9th Cir. 2008)). Plaintiffs challenge both whether BLM took the requisite "hard look" at its Gather Plan in its assessment of potential impacts and alternatives, as well as whether BLM needed to prepare a supplemental EA ("SEA").

### 1.    Hard Look at Environmental Impacts

To satisfy NEPA's 'hard look' requirement, agencies preparing an EA must provide "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *350 Montana*, 50 F.4th at 1265 (quoting *Nat'l Highway Traffic Safety Admin.*, 538 F.3d at 1194). Compiling an "exhaustive examination of each and every tangential event that potentially could impact the local environment," however, would be an "impossible, and never-ending," task. *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1129 (9th Cir. 2012). As a result, EAs are designed "not to amass and disclose all possible details regarding a proposal but to . . . briefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]." *Id.* at 1128 (cleaned up); *accord* 40 C.F.R. § 1508.1(j) (defining EAs as "concise" documents). The agency's analysis must include a "satisfactory explanation" for its action so that the Court may assess "whether the process employed by the agency to reach its decision took into consideration all the relevant factors." *Asarco, Inc.*

25

1    *v. U.S. Env't Prot. Agency*, 616 F.2d 1153, 1159 (1980).

2         Plaintiffs argue that BLM did not take a 'hard look' at the impacts of the Gather

3    Plan because the agency relied on stale data and did not adequately assess the

4    impacts of removing such a large portion of the horse and burro population. The Court

5    will conduct "a searching and careful inquiry into the facts" in reviewing these claims.

6    *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

7              **a.   Reliance on Stale Data**

8         The Final EA relies on animal population estimates from December 2014. (Final

9    EA at AR 3267.) Plaintiffs argue that BLM did not take a 'hard look' at the effects of the

10   Gather Plan on wild horses and burros in the Blue Wing Complex because the agency

11   used this 'stale' data.[14]

12        Relying on stale data can render an environmental review inadequate. *See N.*

13   *Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1086-87 (9th Cir. 2011)

14   (holding that an agency's reliance on stale data in preparing an EIS did "not constitute a

15   'hard look' under NEPA"); *Lands Council v. Powell*, 395 F.3d 1019, 1031 (9th Cir. 2005)

16   (same). NEPA's 'hard look' standard therefore requires agencies to "conduct new

17   scientific studies in order to fully and fairly analyze the impacts of a particular project" in

18   some circumstances. *League of Wilderness Defs./Blue Mountains Biodiversity Project v.*

19   *Connaughton*, 752 F.3d 755, 763 (9th Cir. 2014) (citing *N. Plains Res. Council*, 668

20   F.3d at 1085-87 and *Lands Council*, 395 F.3d at 1030-31) (brackets and quotation

21   marks omitted). But Plaintiff has identified no cases, and the Court is not aware of any,

22   in which an otherwise sufficient EA violated NEPA for failing to conduct new population

23   surveys. *See Idaho Conservation League v. Bonneville Power Admin.*, 667 F. App'x

24

25        [14]Plaintiffs also challenged the recency of the AMLs, which were established in or
     before 1999; however, as explained below, BLM provided appropriate reasons for
26   declining to increase the AML: available data showed that there was "insufficient water
     and forage within the Complex to support an increase in the [] AML." (Final EA at AR
27   3287.) Because this reasoning underscores the lack of evidence that the Blue Wing
     Complex AMLs were no longer accurate, it was not arbitrary or capricious for BLM to
28   continue relying upon the existing AMLs.

214, 215-16 (9th Cir. 2016); *cf. N. Plains Res. Council*, 668 F.3d at 1085-87 (assessing an EIS); *Lands Council*, 395 F.3d at 1030-31 (same).

Even if this standard does apply to the preparation of an EA, BLM did not violate it. Plaintiffs' argument "appears to misconstrue the contents of the administrative record." *Friends of Rapid River v. Probert*, 427 F. Supp. 3d 1239, 1258 (D. Idaho 2019), *aff'd in part, dismissed in part on other grounds*, 816 F. App'x 59 (9th Cir. 2020) (looking at compliance with National Forest Management Act ("NFMA")). BLM relied on a December 2014 aerial census in estimating the July 2017 wild horse and burro population in the Blue Wing Complex. (Final EA at AR 3276-77.) But the agency also updated the 2014 population estimate by incorporating estimations of the foal crops from 2015, 2016, and 2017. (*Id.*) One of these updates took place in the six-month period between the publication of the Preliminary EA in January 2017 and the Final EA in July 2017, when BLM added in the 2017 foal crop. (*Id.*; Preliminary EA at AR 3072.) Thus, even if the two-and-a-half-year-old aerial survey estimates were "stale" when BLM issued the Final EA, those population estimates were updated three times, with the most recent estimate occurring less than six months before the EA was published. Such data was by no means stale. *See N. Plains Res. Council Inc. v. BLM*, No. CV 14-60-BLG-SPW, 2016 WL 1270983, at *9-10 (D. Mont. Mar. 31, 2016), *aff'd sub nom.*, 725 F. App'x 527 (9th Cir. 2018) (BLM did not rely on stale data in preparing EA where it supplemented 20-year-old EISes with recent observations); *Hells Canyon Pres. Council v. Connaughton*, No. 3:11-CV-00023-PK, 2012 WL 13047991, at *5 (D. Or. Aug. 10, 2012), *report and recommendation adopted as modified*, No. 3:11-CV-00023-PK, 2013 WL 665134 (D. Or. Feb. 22, 2013) (holding, in the context of the NFMA, that "the Forest Service may not rely exclusively on 'stale' monitoring information dating from decades before the challenged decision" but "older data in conjunction with newer information can suffice"); *Friends of Rapid River*, 427 F. Supp. 3d at 1258-59 (same).

Moreover, just because data is 'old'—and again, this data is not—does not necessarily mean it is unreliable. *See Friends of Rapid River*, 427 F. Supp. 3d at 1258-

59. The traditional deference to agencies under the arbitrary and capricious standard is "at its highest" where, like here, "a court is reviewing an agency action that required a high level of technical expertise." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014) (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989)). BLM theoretically could have conducted a new aerial survey but instead chose to account for population growth by incorporating foal crop estimates. "Because there is no evidence that the choice to use [the 2014] data rendered its findings unreasonable or inaccurate," the Court will defer to BLM's technical expertise in calculating population estimates for the Blue Wing Complex as of July 2017. *Save the Colorado v. U.S. Dep't of the Interior*, No. 23-15247, 2024 WL 1756103, at *3 (9th Cir. Apr. 24, 2024).

BLM did not violate NEPA by using the 2014 aerial survey data.

**b.   Impacts of Removing Animals**

Plaintiffs also generally argue that BLM failed to consider the impact of removing such a large portion of the wild horse and burro population from the Blue Wing Complex without specifying what specific impacts of that removal BLM ignored. (ECF Nos. 50 at 39 (citing almost 300 pages of the administrative record); 63 at 25.) BLM extensively discussed numerous impacts of the chosen alternative in the Final EA, including its effects on cultural resources, invasive and nonnative species, migratory birds, Native American religious concerns, water quality, wetlands and riparian zones, wilderness, recreation, soils, vegetation, and even wild horses and burros themselves—as well as the cumulative impacts to all considered factors. (Final EA at AR 3328-3402.) On their face, these analyses appear to be sufficient, and the Court will not engage in a fishing expedition to identify deficiencies in the EA just because Plaintiffs have made vague claims that they exist. It Plaintiffs' burden, not the Court's, to show that BLM violated the law. *See Protect Our Communities Found. v. Black*, 240 F. Supp. 3d 1055, 1062 (S.D. Cal. 2017), *aff'd sub nom.*, *Protect Our Communities Found. v. LaCounte*, 939 F.3d 1029 (9th Cir. 2019) ("Plaintiffs bear the burden of showing that agency action violated the APA.").

Plaintiffs' Motion is denied and Defendants' Motion is granted as to whether BLM failed to take a 'hard look' at the consequences of the Gather Plan.

**2.     Consideration of Range of Alternatives**

In addition to thoroughly assessing the Gather Plan's environmental impacts, BLM must have also considered a reasonable range of alternatives. Agencies developing an EA for a proposal involving unresolved conflicts over how to use available resources must consider "appropriate" alternatives to the proposed action, including a 'no action' alternative. 42 U.S.C. §§ 4332(2)(C)(iii), (H); *see also* 40 C.F.R. § 1501.5(c)(2)(ii). Of course, not every possible alternative is appropriate or reasonable. Agencies need not consider alternatives that do not advance the purpose of a project or are otherwise infeasible or impractical. *See Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1247 (9th Cir. 2005); *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 877 (9th Cir. 2022), *cert. denied sub nom. Am. Petroleum Inst. v. Env't Def. Ctr.*, 143 S. Ct. 2582 (2023); 40 C.F.R. § 1508.1(hh).[15] Nor must agencies engage in duplicative work by considering alternatives that are "substantially similar" to other alternatives. *Native Ecosystems Council*, 428 F.3d at 1249. However, the "existence of a viable but unexamined alternative renders an EA inadequate." *Env't Def. Ctr.*, 36 F.4th at 876 (brackets omitted).

This examination need not be extensive. Agencies' "obligation to consider alternatives under an EA is a lesser one than under an EIS," and they may reject an alternative without detailed discussion if they considered the alternative and provided "an appropriate explanation . . . as to why [it] was eliminated." *Native Ecosystems*

---

[15]Though the NEPA implementing regulations have since been amended, the purpose and need of the Gather Plan still determined the scope of reasonable alternatives in 2017. *See 'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1097 (9th Cir. 2006) ("The scope of reasonable alternatives that an agency must consider is shaped by the purpose and need statement articulated by that agency."); *Nw. Coal. for Alternatives to Pesticides v. Lyng*, 844 F.2d 588, 592 (9th Cir. 1988) ("[I]t is the scope of the program that influences any determination of what alternatives are viable and reasonable."); *Env't Def. Ctr.*, 36 F.4th at 879 ("The NEPA regulations in effect at the time the agencies issued the EA set forth criteria for the agencies to consider when determining whether an action . . . requires a full EIS.").

1    *Council*, 428 F.3d at 1246. The Court will now determine whether BLM insufficiently

2    considered three alternatives that would have increased the number of wild horses

3    remaining on the Blue Wing Complex: raising AMLs, limiting livestock use, and

4    implementing range improvements.

5            **a.   Raising AMLs**

6            BLM had no statutory or self-imposed requirements to assess the AML. The

7    WHA does not require BLM to determine new AMLs based on current conditions each

8    time the agency decides to restore an already-established AML. *See In Def. of Animals*,

9    751 F.3d at 1064 n.13. Nor must BLM show that an AML range remains valid before

10   relying upon it. *See Friends of Animals v. BLM*, 2018 WL 1612836, at *18 (D. Or. Apr. 2,

11   2018). Existing management plans likewise do not commit BLM to recalculating the

12   AML in any particular timeframe. (Winnemucca District RMP at AR 1828-29.[16]) *See also*

13   *Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114, 1125 (D. Mont. 2016). So long as

14   the RMPs setting AMLs were in place, BLM was bound to manage the HMAs in

15   conformance with them. *See* 43 C.F.R. § 4710.1.

16          BLM also properly considered and rejected suggestions to increase the AML for

17   the Blue Wing Complex. (Final EA at AR 3287, 3517-19.) The agency found available

18   data did not indicate AMLs should be increased but instead showed that excess animals

19   were present and there was "insufficient water and forage within the Complex to support

20   an increase in the [] AML." (*Id.* at 3287.) Plaintiffs have presented no evidence to the

21   contrary. Though commenters were concerned that AMLs were low for the size of the

22   Complex given BLM guidelines, BLM noted that the "AML is not a calculation of how

23   many acres per animal" but, again, "is based on many factors such as forage and water

24   availability, animal movement patterns, productivity and limitations of the range, trend,

25   _____

26   [16]The RMP does state that when "monitoring data indicate that adverse impacts
     on resources are occurring as a result of livestock, wild horses, or burros, appropriate
     management actions (e.g., adjust AUMs or AMLs, fence, season of use) will be made to
27   the specific class of use (i.e., livestock, wild horses, burros) causing the impacts."
     (Winnemucca District RMP at AR 1829.) But, as discussed below, monitoring data did
28   not support increasing the AML.

1    climate and actual use." (*Id.* at 3518.) The Court will defer to BLM's expert opinion that

2    the resource monitoring and population inventory data did not indicate that the AML

3    needed to be re-evaluated. (Handbook at AR 69 (recommending that BLM evaluate

4    AMLs when "resource monitoring and population inventory data indicates the AML may

5    no longer be appropriate").) *See N. Plains Res. Council*, 668 F.3d at 1075.

6         As Plaintiffs have "failed to provide any support to show how adjusting AMLs

7    would reduce . . . or in any way promote the health of existing wild horse populations,"

8    BLM reasonably eliminated this alternative from analysis as contrary to the principles of

9    the WHA. *Friends of Animals v. Silvey*, 353 F. Supp. 3d 991, 1015 (D. Nev. 2018).

10              **b.    Reductions in Livestock Grazing**

11        According to Plaintiffs, BLM improperly eliminated from further consideration a

12   suggestion to reduce livestock grazing so that Blue Wing Complex could support more

13   wild horses. (ECF No. 50 at 39.) But BLM provided an "appropriate explanation as to

14   why it rejected the livestock reduction alternative: it simply could not reduce livestock

15   grazing allotments through the gather process." *Cloud Found. v. BLM*, 802 F. Supp. 2d

16   1192, 1206 (D. Nev. 2011); *accord Silvey*, 353 F. Supp. 3d at 1016. As BLM noted in its

17   response to this suggestion, gather plans are "not the appropriate mechanism for

18   adjusting the authorized livestock use"; livestock allotments may only be changed

19   through the official amendment of an RMP, which requires public involvement,

20   preparation of an EA or EIS, interagency coordination, and other analysis. (Final EA at

21   AR 3287-88.) *See Cloud Found.*, 802 F. Supp. 2d at 1206-07 (citing 43 C.F.R. §

22   1610.5-5). Lowering livestock grazing allotments was therefore outside the scope of the

23   Final EA.

24        Reducing livestock grazing to increase wild horse AMLs also was not a

25   reasonable alternative because it would have undermined the Gather Plan's stated

26   purpose to "prevent undue or unnecessary degradation of . . . and to restore a thriving

27   natural ecological balance and multiple use relationship on the public lands." (Final EA

28   at AR 3269, 3288.) *See also Native Ecosystems Council*, 428 F.3d at 1247. Due to the

differences in how livestock and wild horses and burros graze, BLM concluded that "re-allocation of livestock AUMs to increase . . . AMLs would not achieve a thriving natural ecological balance," and that impacts from wild horses and burros could "only be addressed by limiting their numbers to a level that does not adversely impact rangeland resources and other multiple uses." (Final EA at AR 3288.) "It is not [the Court's] role to question that informed scientific judgment." *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 991 (9th Cir. 2022). BLM had no obligation to consider this alternative that conflicted with the purpose of the Gather Plan. *See Native Ecosystems Council*, 428 F.3d at 1247-48. The livestock reduction alternative was properly considered and eliminated.

### c.   Range Improvements

BLM likewise did not abuse its discretion in deeming Plaintiffs' suggested range improvements to be outside the scope of the EA. Commenters recommended that BLM develop more stable water sources to limit the migration of wild horses and burros. (Final EA at AR 3530.) BLM responded that wild horses and burros often travel between water sources that are as far as 20 miles apart, so additional stable sources of drinking water would have little impact on their roaming. (*Id.*) Moreover, the Winnemucca District was already developing a programmatic EA for the management and restoration of riparian areas, which included developing off-site water sources. (*Id.*) Creating additional water sources was therefore properly rejected as being both duplicative of another BLM initiative and not advancing the purpose of the Gather Plan. *See Native Ecosystems Council*, 428 F.3d at 1247.

Removing fencing was likewise properly rejected as not advancing the purpose of the Gather Plan. *See id.* The contested fences only separated HMAs from HAs, which have AMLs of zero. (Final EA at AR 3530.) *See also* 43 C.F.R. § 4710.4 ("Management of wild horses and burros shall be undertaken with the objective of limiting the animals' distribution to herd areas."). Wild horses could roam freely between all the HMAs in the Complex and were not fenced off from areas they needed to access.

1    Taking out the fences, then, would do nothing to advance the Gather Plan's purpose
2    and need.

3        BLM has fulfilled its duty to prepare appropriate alternatives for the EA and gave
4    those alternatives due consideration.

5        **3.    Failure to Prepare a Supplemental EA**

6        Plaintiffs finally argue that BLM violated NEPA regulations when it did not issue a
7    new or supplemental Gather Plan EA. (ECF No. 64 at 43, 45.) The Court disagrees.

8            **a.  Adequately Pled**

9        As a threshold matter, Defendants object that Plaintiffs' supplemental EA ("SEA")
10   claim was not adequately raised in the FAC. The Federal Rules of Civil Procedure
11   require only that a complaint include "a short and plain statement of the claim showing
12   that the pleader is entitled to relief." FED. R. CIVIL PROC. 8(a)(2). Though plaintiffs must
13   state a demand for the relief they seek, that demand "may include relief in the
14   alternative." *Id.* at (a)(3). "This simplified notice pleading standard relies on liberal
15   discovery rules and summary judgment motions to define disputed facts and issues,"
16   rather than requiring plaintiffs to define all their claims perfectly before further
17   proceedings are conducted. *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002).

18       The FAC meets these notice pleading requirements because Defendants have
19   received fair notice of Plaintiffs' claims and the grounds upon which they rest. *See id.* at
20   514; *Updike v. Multnomah Cnty.*, 870 F.3d 939, 952 (9th Cir. 2017). Plaintiffs did not
21   mention their request for a SEA in alleging their fifth cause of action, which seeks to
22   enforce NEPA through APA Section 706(2)(C). (ECF No. 24 at 29.) They instead
23   challenged BLM's failure to prepare a SEA in their first through fourth causes of action
24   under the Mandamus and Venue Act and APA. (*Id.* at 25-29.) Although these causes of
25   action specifically mentioned the WHA and its implementing regulations, they were not
26   explicitly limited to the WHA. Plaintiffs even "incorporate[d] all previous allegations" and
27   alleged that Defendants' actions injured them "in the manner described in this
28   Complaint" in their NEPA cause of action. (*Id.* at 29.) Construing the complaint liberally,

1   Defendants had fair notice that Plaintiffs' SEA claims may arise under NEPA.

2   The liberal notice pleading standard has been met. The Court will proceed with

3   reviewing the claim on its merits.

4   **b.  Standard of Review**

5   The Council on Environmental Quality recently updated its NEPA implementing

6   regulations as they pertain to SEAs. *See* National Environmental Policy Act

7   Implementing Regulations Revisions Phase 2, 89 Fed. Reg. 35442, 35477 (May 1,

8   2024). Previously, NEPA regulations only required supplemental environmental review

9   for EISes, and the Ninth Circuit extended this requirement to EAs as well. *See* COUNCIL

10  ON ENV'T QUAL., NATIONAL ENVIRONMENTAL POLICY ACT IMPLEMENTING REGULATIONS

11  (2020), https://perma.cc/6YH2-F3QP; *Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th

12  1054, 1069 (9th Cir. 2023) [hereinafter *Earth Island v. USFS*] (discussing the 2020

13  NEPA regulations). The currently operative regulations, however, now include specific

14  instructions for preparing SEAs. *See* 89 Fed. Reg. at 35477. Unlike the supplemental

15  EIS ("SEIS") provisions which dictate when an agency 'shall' prepare a supplemental

16  review, *see* 40 C.F.R. § 1502.9(d)(1), the SEA regulation provides only the

17  circumstances under which agencies 'should' prepare a SEA, *see* 40 C.F.R. §

18  1501.5(h)(1). The use of 'should'—especially when contrasted with the use of 'shall' for

19  SEISes—indicates that agencies are not obligated to prepare SEAs. *See Est. of Gould

20  v. United States*, No. CV 20-177-M-DWM, 2022 WL 2451377, at *5 (D. Mont. July 6,

21  2022), *aff'd*, No. 22-35563, 2023 WL 5453122 (9th Cir. Aug. 24, 2023) (finding that

22  'should' is "discretionary terminology"). The SEA regulation simply recommends that

23  agencies prepare SEAs in certain circumstances while leaving the ultimate choice of

24  whether to do so up to the agency.

25  SEAs are never legally required, so the Court cannot compel the agency to

26  prepare a SEA as an unreasonably delayed agency action or duty owed to Plaintiffs.

27  *See SUWA*, 542 U.S. at 63-64 (discussing APA Section 706(1)); *Agua Caliente*, 932

28  F.3d at 1216 (discussing the Mandamus and Venue Act). Nor have Plaintiffs made any

1   showing that not preparing a SEA for the Blue Wing Complex Gather Plan overstepped

2   BLM's statutory jurisdiction, authority, or limitations. *See* 5 U.S.C. § 706(2)(C). The most

3   appropriate standard of review for not engaging in this discretionary environmental

4   review—and the standard of review under which Plaintiffs sought summary judgment on

5   their NEPA claims—is APA Section 706(2)(A)'s arbitrary and capricious standard. *See*

6   *id.* at § 706(2)(A).

7              **c. Arbitrary and Capricious**

8          The Court may hold unlawful and set aside agency action, findings, and

9   conclusions found to be arbitrary or capricious. *See* 5 U.S.C. § 706(2)(A). Plaintiffs'

10  concern here is that new information about impacts on burros renders the Final EA

11  outdated and necessitates a SEA addressing burro-specific issues. Their brief thus

12  expounds upon why BLM abused its discretion in failing to prepare a burro-focused

13  SEA. But the agency action they wish to set aside is BLM's issuance of the Final EA

14  and FONSI,[17] not a decision to gather burros without conducting a SEA or a decision

15  that a SEA is unwarranted. *Cf. Earth Island v. USFS*, 87 F.4th at 1069 (reviewing an

16  agency's affirmative decision not to supplement an EA under the arbitrary and

17  capricious standard). Their claim therefore turns on whether the Final EA and FONSI

18  were arbitrary and capricious when BLM took those final agency actions in 2017.

19         The crux of Plaintiffs' argument challenging the Final EA—or, more specifically,

20  its lack of a SEA—is that new studies and data undermining conclusions in the EA have

21  become available since 2017. This new data might show that BLM made flawed

22  assumptions about burros, but it does not establish that BLM "relied on factors

23  Congress did not intend it to consider, entirely failed to consider an important aspect of

24  the problem, or offered an explanation that runs counter to the evidence before the

25  _____

26         [17]"Final NEPA documents constitute 'final agency action' under the APA, whether they take the form of an EIS and Record of Decision or an EA and FONSI, because they culminate the agencies' environmental review process." *Env't Def. Ctr.*, 36 F.4th at

27  868. Though Plaintiffs only ask the Court to set aside the EA, the NEPA review process did not conclude until BLM issued its FONSI and thus the Court reads Plaintiffs request

28  as including the FONSI. *See id.*

agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Env't Def. Ctr.*, 36 F.4th at 871. A decision cannot retroactively become arbitrary and capricious simply because new scientific discoveries are made. In the absence of any evidence that BLM should have been aware of the discrepancies in impacts on burros and horses *before* issuing the EA and FONSI, the Court will not set those actions aside.

Greater focus on the lack of an SEA still leaves Plaintiffs' arguments unavailing. Unlike an affirmative agency decision to say no to a request, an omission of an action cannot be set aside. *See SUWA*, 542 U.S. at 63 (distinguishing 'denials' from 'failures to act'). The Court cannot afford Plaintiffs any relief under Section 706(2)(A) with regard to BLM's failure to prepare a SEA.

The Court denies Plaintiffs' Motion and grants Defendants' Motion as to all NEPA claims.

## IV.   REQUESTS FOR JUDICIAL NOTICE

Plaintiffs first requested that the Court take judicial notice of additional documents to supplement the AR: (1) photographs and videos taken of Blue Wing Complex gather operations; (2) burro autopsy data, consisting of spreadsheets and a veterinary report that BLM provided to Laurie Ford in response to her FOIA request; (3) notes for 43 C.F.R. Part 4700; (4) 43 C.F.R. Part 4700 itself; and (5) 1984, 1986, and 1991 Federal Register notices of rulemakings for 43 C.F.R. Part 4700. (ECF No. 51 ("First Request").) They then also requested that the Court take judicial notice of several filings from *Leigh I*. (ECF No. 65 ("Second Request").) While Defendants believe judicial notice is not warranted for most of these documents, they oppose only Plaintiffs' ability to reference the burro autopsy data.

### A.  Photographs and Videos of the Gather

The Court has already given Plaintiffs the ability to supplement the record with photographs, videos, and audio submitted regarding the Gather, so long as those materials are offered for the limited purpose of resolving Plaintiffs' First Amendment

1    claim. (ECF Nos. 47 at 6; 48 at 2-3; 49.) Plaintiffs' First Request is therefore granted as
2    to any photographs and videos of the 2022 gather.

3    **B.  Burro Autopsy Data**

4         "Judicial review of agency actions should generally be confined to the original
5    record upon which the actions were based." *Rybachek v. U.S. Env't Prot. Agency*, 904
6    F.2d 1276, 1296 n.25 (9th Cir. 1990). "The reviewing court may consider information
7    supplemental to the record only exceptionally," *id.* (quotation marks omitted), and
8    "limited exceptions operate to identify and plug holes in the administrative record,"
9    *Lands Council*, 395 F.3d at 1030. In these limited circumstances, which are "narrowly
10   construed and applied," "district courts are permitted to admit extra-record evidence: (1)
11   if admission is necessary to determine whether the agency has considered all relevant
12   factors and has explained its decision, (2) if the agency has relied on documents not in
13   the record, (3) when supplementing the record is necessary to explain technical terms
14   or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith."
15   *Id.* (internal quotation marks omitted).

16        As explained above, admission of the spreadsheets and veterinary reports is not
17   necessary to determine whether the Final EA and FONSI should be set aside as
18   arbitrary and capricious. The EA and FONSI predate all the data Plaintiffs seek to
19   introduce, making the content of the data irrelevant to the specific NEPA claims that
20   Plaintiffs have brought before the Court. The spreadsheets and veterinary reports are
21   likewise not needed to resolve Plaintiff's First Amendment claim. There is accordingly
22   no need for the Court to reference the burro autopsy data, and Plaintiffs' First Request
23   is denied as to these documents.

24   **C.  Federal Register and Code of Federal Regulations**

25        Defendants informed the Court that they agree that "Plaintiffs are free to cite the
26   law and relevant rulemaking documents, including Federal Register rules and regulatory
27   history, in their merits brief." (ECF No. 62 at 9.) Although it may be superfluous, the
28   Court grants the First Request as to these documents because they are properly

1   subject to judicial review as part of "the original record upon which the actions were

2   based." *Rybachek*, 904 F.2d at 1296 n.25.

3           **D.  *Leigh I* Filings and Orders**

4           Defendants submitted a notice of their non-opposition to judicial notice of the

5   documents from *Leigh I*. (ECF No. 73 at 6 n.1.) Defendants have therefore consented to

6   the Court granting Plaintiffs' Second Request. *See R.S. Coppola Tr. - Oct. 19, 1995 v.*

7   *Nat'l Default Servs.*, No. 3:21-CV-00281-MMD-CSD, 2022 WL 2753512, at *1 (D. Nev.

8   July 13, 2022), *aff'd sub nom.*, *Coppola v. Nat'l Default Servs.*, No. 22-16212, 2023 WL

9   6566493 (9th Cir. Oct. 10, 2023). The Second Request is granted.

10  **V.      CONCLUSION**

11          The Court notes that the parties made several arguments and cited several

12  cases not discussed above. The Court has reviewed these arguments and cases and

13  determines that they do not warrant discussion because they do not affect the outcome

14  of the issues before the Court.

15          It is therefore ordered that Plaintiffs' motion for summary judgment (ECF No. 50)

16  and Defendants' motion for summary judgment (ECF No. 60) are granted in part and

17  denied in part as discussed herein.

18          The Court denies both Motions as to whether BLM's selection of observations

19  site and restriction of access to the Axtell Corrals violated the First Amendment. Thus,

20  this is the only claim remaining for trial.

21          The Court grants Defendants' Motion and denies Plaintiffs' Motion as to whether

22  BLM restrictions on accessing private holding corrals violated the First Amendment.

23          The Court grants Plaintiff's Motion and denies Defendants' Motion as to the claim

24  under the Wild Free-Roaming Horses and Burros Act that BLM unreasonably delayed

25  preparing an HMAP but otherwise denied. Under 5 U.S.C. § 706(1), the Court compels

26  Defendants to prepare and approve HMAP(s) covering the Pancake Complex HMAs

27  within one year of the date of this order.

28          The Court grants Defendants' Motion and denies Plaintiffs Motion as to all claims

arising under the National Environmental Policy Act.

It is further ordered that Plaintiffs' first request for judicial notice (ECF No. 51) is denied as to the spreadsheets and veterinary reports (ECF No. 51-2 at 9-36) but granted as to the other documents (*id.* at 5-8).

It is further ordered that Plaintiffs' second request for judicial notice (ECF No. 65) is granted.

It is further ordered that the Court finds it appropriate to refer this case to United States Magistrate Judge Brenda Weksler to conduct a settlement conference under LR 16-5. The case is so referred. If the parties do not settle at the settlement conference, a joint proposed pretrial order on the First Amendment claims (sixth cause of action) is due within 30 days of the date the settlement conference is held.

DATED THIS 23rd Day of September 2024.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE